# 21-1778(L)

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
**Docket No. 21-1778(L), 22-351(CON)**

UNITED STATES,

Appellee,

-against-

MICHAEL AVENATTI,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT MICHAEL AVENATTI**
**VOLUME I OF VII**

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**MICHAEL AVENATTI**

**DANIEL HABIB,**
*Of Counsel*

# TABLE OF CONTENTS TO THE APPENDIX

## VOLUME I

Docket, *United States v. Avenatti*, 19 Cr. 373 (PGG) (S.D.N.Y.) .... A 0004

Superseding Indictment (Nov. 13, 2019) .... A 0058

Trial Transcript (Jan. 29, 2020) .... A 0077

Trial Transcript (Jan. 30, 2020) .... A 0102

Trial Transcript (Jan. 31, 2020) .... A 0156

Trial Transcript (Feb. 3, 2020) .... A 0204

## VOLUME II

Trial Transcript (Feb. 4, 2020) .... A 0263

Trial Transcript (Feb. 5, 2020) .... A 0322

Trial Transcript (Feb. 6, 2020) .... A 0394

Trial Transcript (Feb. 7, 2020) .... A 0452

Draft Jury Instructions (Feb. 9, 2020) .... A 0502

## VOLUME III

Trial Transcript (Feb. 10, 2020) .... A 0549

Trial Transcript (Feb. 11, 2020) .... A 0621

Trial Transcript (Feb. 12, 2020) .... A 0670

Trial Transcript (Feb. 13, 2020) .... A 0692

Trial Transcript (Feb. 14, 2020) .... A 0700

Verdict (Feb. 14, 2020) .... A 0703

Mem. Op. & Order Denying Post-Trial Motions (July 6, 2021) .... A 0704

Sentencing Transcript (July 8, 2021) .... A 0800

Judgment (July 15, 2021) .............................................................. A 0813

Notice of Appeal (July 22, 2021)...................................................... A 0821

Mem. Op. & Order Awarding Restitution (Feb. 14, 2022) ........... A 0822

**VOLUME IV - VII**

Order of Restitution (Feb. 17, 2022)................................................ A 0843

Amended Judgment (Feb. 18, 2022) ............................................... A 0847

Notice of Appeal (Feb. 23, 2022) ..................................................... A 0855

Government Trial Exhibits ............................................................. A 0856

Defense Trial Exhibits...................................................................... A 1725

Audio and Video Government Trial Exhibits (on DVD) ............. A 1868

Query Reports Utilities Help Log Out

CLOSED,APPEAL,ECF,PRIOR

# U.S. District Court
# Southern District of New York (Foley Square)
# CRIMINAL DOCKET FOR CASE #: 1:19-cr-00373-PGG All Defendants

Case title: USA v. Avenatti

Date Filed: 05/22/2019

Magistrate judge case number: 1:19-mj-02927-UA

Date Terminated: 07/15/2021

---

Assigned to: Judge Paul G. Gardephe

Appeals court case number: 21-1778 U.S. Court of Appeals, 2nd Circ.

**Defendant (1)**

**Michael Avenatti**
*TERMINATED: 07/15/2021*

represented by

**Jose Manuel Quinon**
Jose M. Quinon, P.A
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
(786)-348-3778
Fax: (786)-348-3778
Email: jquinon@quinonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Alan Srebnick**
Scott A. Srebnick
2214 NW 1st Place
Ste Second Floor
Miami, FL 33127
305-285-9019
Fax: 305-377-9937
Email: scott@srebnicklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sylvie Jill Levine**
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8700
Fax: (212) 571-0392
Email: sylvie_levine@fd.org
*TERMINATED: 03/25/2018*
*LEAD ATTORNEY*

*Designation: Public Defender or Community Defender Appointment*

**Benjamin Adam Silverman**
Law Office of Benjamin Silverman
224 W. 30th St., Suite 302
New York, NY 10001
212-203-8074
Email: Benjamin@bsilvermanlaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**E. Danya Perry**
Perry Guha LLP
1740 Broadway, 15th Floor
New York, NY 10019
212-399-8340
Fax: 212-399-8331
Email: dperry@perryguha.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Howard M. Srebnick**
Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
(305)371-6421
Fax: (305)358-2006
Email: HSrebnick@royblack.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:875D.F INTERSTATE COMMUNICATIONS - THREATS TO EXTORT (1s) | Imprisonment for a total term of 24 Months imprisonment on Count One, and 30 months imprisonment on each of Counts Two and Three, with all terms to be served concurrently. Supervised release for a term of 1 year supervised release on Count One, and 3 years supervised release on each of Counts Two and Three, with all terms to run concurrently. AMENDED ON 2/18/2022: IMPRISONMENT: 24 months' imprisonment on Count One, and 30 months' imprisonment on each of Counts Two and Three, with all terms to be served concurrently. SUPERVISED RELEASE: 1 year supervised release on Count One, and |

3 years' supervised release on each of Counts Two and Three, with all terms to run concurrently.

18:1951.F INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (EXTORTION)
(2s)

Imprisonment for a total term of 24 Months imprisonment on Count One, and 30 months imprisonment on each of Counts Two and Three, with all terms to be served concurrently. Supervised release for a term of 1 year supervised release on Count One, and 3 years supervised release on each of Counts Two and Three, with all terms to run concurrently. AMENDED ON 2/18/2022: IMPRISONMENT: 24 months' imprisonment on Count One, and 30 months' imprisonment on each of Counts Two and Three, with all terms to be served concurrently. SUPERVISED RELEASE: 1 year supervised release on Count One, and 3 years' supervised release on each of Counts Two and Three, with all terms to run concurrently.

18:1951.F INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (EXTORTION)
(3s)

Imprisonment for a total term of 24 Months imprisonment on Count One, and 30 months imprisonment on each of Counts Two and Three, with all terms to be served concurrently. Supervised release for a term of 1 year supervised release on Count One, and 3 years supervised release on each of Counts Two and Three, with all terms to run concurrently. AMENDED ON 2/18/2022: IMPRISONMENT: 24 months' imprisonment on Count One, and 30 months' imprisonment on each of Counts Two and Three, with all terms to be served concurrently. SUPERVISED RELEASE: 1 year supervised release on Count One, and 3 years' supervised release on each of Counts Two and Three, with all terms to run concurrently.

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:371.F CONSPIRACY TO TRANSMIT INTERSTATE COMMUNICATIONS WITH INTENT TO EXTORT (1) | All open counts are dismissed on the motion of the US |

| | |
|---|---|
| 18:1951.F CONSPIRACY TO COMMIT EXTORTION (2) | All open counts are dismissed on the motion of the US |
| 18:875D.F TRANSMISSION OF INTERSTATE COMMUNICATIONS WITH INTENT TO EXTORT (3) | All open counts are dismissed on the motion of the US |
| 18:1951.F EXTORTION (4) | All open counts are dismissed on the motion of the US |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:875D.F TRANSMISSION OF INTERSTATE COMMUNICATIONS WITH INTENT TO EXTORT, 18:371.F CONSPIRACY TO TRANSMIT INTERSTATE COMMUNICATIONS WITH INTENT TO EXTORT, 18:1951.F CONSPIRACY TO COMMIT EXTORTION , 18:1951.F EXTORTION | |

---

**Interested Party**

**Nike Inc.** represented by

**Andrew Zenner Michaelson**
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
212-790-5358
Fax: 212-556-2222
Email: amichaelson@kslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David Simons**
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY 10001
212-446-2300
Email: dsimons@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Peter M. Skinner**

Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY 10001
(212) 303-3654
Email: pskinner@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Glen Alexander Kopp**
Mayer Brown LLP (NY)
1221 Avenue of the Americas, 14th Floor
New York, NY 10020-1001
(212)-506-2648
Fax: 212-849-5675
Email: gkopp@mayerbrown.com
*ATTORNEY TO BE NOTICED*

**Milton L. Williams , Jr**
Walden Macht & Haran LLP
250 Vesey St
27th Floor
New York, NY 10281
212-335-2030
Fax: 212-335-2040
Email: mwilliams@wmhlaw.com
*ATTORNEY TO BE NOTICED*

---

**Interested Party**

**Gary Franklin** represented by **Whitney Rose O'Byrne**
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, CA 94111
415-362-6666
Email: wobyrne@durietangri.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Michael J. Proctor**
Durie Tangri LLP
953 East 3rd Street
Los Angeles, CA 90013
415-362-6666
Fax: 415-236-3600
Email: mproctor@durietangri.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Designation: Retained*

---

**Interested Party**

**Mark Geragos**      represented by   **Anjan Sahni**
Wilmer Cutler Pickering Hale & Dorr LLP
(NYC)
7 World Trade Center
New York, NY 10007
(212) 937-7418
Email: anjan.sahni@wilmerhale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Brendan Robert McGuire**
Wilmer Cutler Pickering Hale & Dorr LLP
(NYC)
7 World Trade Center
New York, NY 10007
(212) 295-6278
Fax: 212-230-8888
Email:
Brendan.McGuire@wilmerhale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Interested Party**

**Peter M. Skinner**      represented by   **Andrew Zenner Michaelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David Simons**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Interested Party**

**John Stovall**      represented by   **Andrew Zenner Michaelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Designation: Retained*

**David Simons**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Peter M. Skinner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Interested Party**

**Ben Meiselas** represented by **Maurice H. Sercarz**
Sercarz & Riopelle, LLP
950 Third Avenue
32nd Floor
New York, NY 10022
212-586-4900
Email: msercarz@sercarzandriopelle.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Interested Party**

**Tina Glandian** represented by **Maurice H. Sercarz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Roland Gustaf Riopelle**
Sercarz & Riopelle, LLP
950 Third Avenue
32nd Floor
New York, NY 10022
212-586-4900
Fax: 212-586-1234
Email: rriopelle@juno.com
*ATTORNEY TO BE NOTICED*

---

**Interested Party**

**John Slusher** represented by **Jonathan R. Streeter**
Dechert LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797
212-314-3826
Fax: 212-314-0046
Email: Jonathan.Streeter@dechert.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Plaintiff**

**USA** represented by **Matthew D Podolsky**
United States Attorney's Office-SDNY
One St. Andrew's Plaza
New York, NY 10007
212-637-1947
Email: matthew.podolsky@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Benjamin Sobelman**
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
(212)-637-2616
Email: robert.sobelman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Daniel Charles Richenthal**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-2109
Fax: (212) 637-2615
Email: daniel.richenthal@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/24/2019 | 1 | COMPLAINT as to Michael Avenatti (1). In Violation of 18 U.S.C. 371, 875 (d), 1951 and 2 (Signed by Magistrate Judge Stewart D. Aaron) (dif) [1:19-mj-02927-UA] (Entered: 03/26/2019) |
| 03/25/2019 | | Arrest of Michael Avenatti. (dif) [1:19-mj-02927-UA] (Entered: 03/26/2019) |

| | | |
|---|---|---|
| 03/25/2019 | 3 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Michael Avenatti. Sylvie Jill Levine for Michael Avenatti appointed. (BAIL ONLY). (Signed by Magistrate Judge Katharine H. Parker on 3/25/2019)(dif) [1:19-mj-02927-UA] (Entered: 03/26/2019) |
| 03/25/2019 | 4 | Minute Entry for proceedings held before Magistrate Judge Katharine H. Parker: Initial Appearance as to Michael Avenatti held on 3/25/2019., Deft Appears with Federal Defender Sylvie Levine (BAIL ONLY) and AUSA Matthew Podolsky and Robert Boone for the government. AGREED CONDITIONS OF RELEASE: $300,000 PRB; 2 FRP'S; Travel Limited to SDNY/EDNY and Central District of California (& Points in Between for Travel to Court/Personal Lawyer; Temporary Additional Domestic Travel Upon Consent of AUSA & Approval of PTS; Surrender Travel Documents (& No New Applications) Within 48 Hours; Pretrial Supervision As Directed by PTS; Deft to Be Released on Own Signature; Remaining Conditions to Be Met by 4/5/19; No Contact with Co-Conspirator Named in Complaint Outside Presence of Counsel; ( Preliminary Hearing set for 4/25/2019 at 10:00 AM before Judge Unassigned.) (dif) Modified on 3/26/2019 (dif). [1:19-mj-02927-UA] (Entered: 03/26/2019) |
| 03/25/2019 | 5 | AGREEMENT TO FORFEIT PROPERTY (OTHER THAN REAL PROPERTY) by Michael Avenatti. Personal Recognizance Bond in the amount of $ 300,000 PRB, 2 FRP'S; Travel Limited to SDNY/EDNY and Central District of California (& Points in Between for Travel to Court/Personal Lawyer; Temporary Additional Domestic Travel Upon Consent of AUSA and Approval of PTS; Surrender Travel Documents (& No New Applications) Within 48 Hours; Pretrial Supervision As Directed by PTS; Deft to Be Released on Own Signature; Remaining Conditions to Be Met by 4/5/19; No Contact with Co-Conspirator Named in Complaint Outside Presence of Counsel (dif) Modified on 3/26/2019 (dif). [1:19-mj-02927-UA] (Entered: 03/26/2019) |
| 04/25/2019 | 6 | AFFIRMATION of AUSA Matthew Podolsky in Support by USA as to Michael Avenatti, the government is requesting a 30-day continuance until 5/28/19. (jbo) [1:19-mj-02927-UA] (Entered: 04/26/2019) |
| 04/25/2019 | 7 | ORDER TO CONTINUE IN THE INTEREST OF JUSTICE as to Michael Avenatti. Time excluded from 4/25/19 until 5/28/19. (Signed by Magistrate Judge Henry B. Pitman on 4/25/19)(jbo) [1:19-mj-02927-UA] (Entered: 04/26/2019) |
| 05/22/2019 | 8 | INDICTMENT FILED as to Michael Avenatti (1) count(s) 1, 2, 3, 4. (bw) (Entered: 05/22/2019) |
| 05/22/2019 | | Case Designated ECF as to Michael Avenatti. (bw) (Entered: 05/22/2019) |
| 05/22/2019 | 9 | NOTICE OF ATTORNEY APPEARANCE Matthew D Podolsky appearing for USA. (Podolsky, Matthew) (Entered: 05/22/2019) |
| 05/24/2019 | 10 | ORDER as to Michael Avenatti. It is hereby ORDERED that the Defendant will be arraigned on the Indictment (Dkt. No. 8) in this action on Tuesday, May 28, 2019 at 3:30 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. (Signed by Judge Paul G. Gardephe on 5/23/2019)(bw) (Entered: 05/24/2019) |
| 05/24/2019 | 11 | NOTICE OF ATTORNEY APPEARANCE: Scott Alan Srebnick appearing for Michael Avenatti. Appearance Type: Retained. (Srebnick, Scott) (Entered: 05/24/2019) |

| | | |
|---|---|---|
| 05/28/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Arraignment as to Michael Avenatti (1) Count 1,2,3,4 held on 5/28/2019. Plea entered by Michael Avenatti Not Guilty. Defendant Michael Avenatti present with attorney Scott Alan Srebnick and Jose Quinon. AUSAs Matthew Podolsky and Robert Benjamin Sobelman present. Court reporter Tom Murray present. The defendant enters a plea of not guilty to the indictment. Status conference set for 6/18/19 at 12:00 pm. Speedy trial time is excluded from 5/28/19 until 6/18/19. Bail continued. (jbo) (Entered: 05/28/2019) |
| 05/28/2019 | 12 | ORDER FOR ADMISSION PRO HAC VICE ON ORAL MOTION as to Michael Avenatti. Upon the oral 1notion of, foracln1ission to practice Pro 1-fac Vice in the above captioned action is granted. Applicant has declared that he/she is a member in good standing of the bar(s) of the state(s) of FLORIDA: and that his/her contact information is as follows Jose M. Quinon, Jose M. Quinon, P.A., 2333 Brickell Avenue, Suite A-01, Miami, Florida 33129, Telephone (305) 858-5700; Fax (305) 358-7848. Applicant having requested admission Pro Hac Vice to appear for all purposes as counsel for Michael Avenatti in the above entitled action; IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned case in the United States District (Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. Counsel shall immediately forward the Pro Hac Vice fee to the Clerk of Court. (Signed by Judge Paul G. Gardephe on 5/28/2019)(ap) (Entered: 05/28/2019) |
| 05/29/2019 | 16 | PROTECTIVE ORDER as to Michael Avenatti...regarding procedures to be followed that shall govern the handling of confidential material. (Signed by Judge Paul G. Gardephe on 5/29/19)(jbo) (Entered: 05/31/2019) |
| 05/30/2019 | 13 | LETTER MOTION addressed to Judge Paul G. Gardephe from the Government dated May 30, 2019 re: Proposed Protective Order . Document filed by USA as to Michael Avenatti. (Attachments: # 1 Text of Proposed Order Proposed Protective Order) (Podolsky, Matthew) (Entered: 05/30/2019) |
| 05/30/2019 | 14 | NOTICE OF ATTORNEY APPEARANCE Daniel Charles Richenthal appearing for USA. (Richenthal, Daniel) (Entered: 05/30/2019) |
| 05/31/2019 | 15 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Jose M Quinon to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16995870. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Michael Avenatti. (Quinon, Jose) Modified on 5/31/2019 (wb). (Entered: 05/31/2019) |
| 05/31/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice as to Michael Avenatti to RE-FILE Document No. 15 MOTION for Jose M Quinon to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16995870. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): the PDF attached to the docket entry for the motion is not correct Please label your motion, Motion for Pro Hac Vice missing Proposed Order;. Re-file the motion as a Corrected Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (wb)** (Entered: 05/31/2019) |

| | | |
|---|---|---|
| 06/14/2019 | 17 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated June 14, 2019 re: Permission for Defendant and Co-counsel to Appear at Status Conference by Telephone . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 06/14/2019) |
| 06/17/2019 | 18 | MEMO ENDORSEMENT as to Michael Avenatti (1)granting 17 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated June 14, 2019 re: Permission for Defendant and Co-counsel to Appear at Status Conference by Telephone. ENDORSEMENT: The Application is granted. (Signed by Judge Paul G. Gardephe on 6/14/2019) (ap) (Entered: 06/17/2019) |
| 06/17/2019 | 19 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** AMENDED MOTION for Jose M Quinon to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Michael Avenatti. (Attachments: # 1 Affidavit, # 2 Exhibit Certificate of Good Standing)(Quinon, Jose) Modified on 6/18/2019 (bcu). (Entered: 06/17/2019) |
| 06/18/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice as to Michael Avenatti to RE-FILE Document No. 19 AMENDED MOTION for Jose M Quinon to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Proposed Order;. Re-file the motion as a Corrected Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (bcu)** (Entered: 06/18/2019) |
| 06/18/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference as to Michael Avenatti held on 6/18/2019. Defendant M. Avenatti appearing telephonically along with attorney Jose Quinon. Attorney Scott Srebnick present in court. AUSAs Matthew Podolsky and Daniel Richaenthal present. Court reporter Karen Gorlaski present. Status conference set for 8/23/19 at 12:30 pm. Jury trial set for 11/12/19 at 9:30 am. Speedy trial time is excluded from 6/18/19 until 11/12/19. Bail continued. (Status Conference set for 8/23/2019 at 12:30 PM before Judge Paul G. Gardephe. Jury Trial set for 11/12/2019 at 09:30 AM before Judge Paul G. Gardephe.) (lnl) (Entered: 06/18/2019) |
| 06/19/2019 | 20 | ORDER as to Michael Avenatti. It is hereby ORDERED that the following schedule will apply to Defendant's pretrial motions: 1. Any pretrial motions are due by August 19, 2019; 2. The Government's opposition papers are due by September 19, 2019; 3. Defendant's reply papers, if any, are due by October 3, 2019. It is further ORDERED that trial in this action will commence on Tuesday, November 12, 2019 at 9:30 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. Pretrial submissions - motions in limine, proposed voir dire, and requests to charge - are due on Friday, October 11, 2019. The next conference in this action will be held on Friday, August 23, 2019 at 12:30 p.m.; this conference will also take place in Courtroom 705. SO ORDERED. (Signed by Judge Paul G. Gardephe on 6/18/2019)(bw) (Entered: 06/19/2019) |
| 06/20/2019 | 21 | AMENDED MOTION for Jose M Quinon to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Michael Avenatti. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Text of Proposed Order, # 4 Text of Proposed Order)(Quinon, Jose) (Entered: 06/20/2019) |

| | | |
|---|---|---|
| 06/20/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 21 AMENDED MOTION for Jose M Quinon to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma)** (Entered: 06/20/2019) |
| 06/24/2019 | 22 | ORDER FOR ADMISSION PRO HAC VICE 21 Motion for Jose M. Quinon to Appear Pro Hac Vice as to Michael Avenatti. The motion of Jose M. Quinon, for admission to practice Pro Hac Vice in the above captioned action is granted. It is hereby ORDERED that Application is admitted to practice Pro Hac Vice in the above captioned case in the US District Court for the Southern District of NY. (Signed by Judge Paul G. Gardephe on 6/21/2019) (jw) (Entered: 06/24/2019) |
| 06/25/2019 | 23 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Arraignment held on 5/28/19 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Thomas Murray, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/16/2019. Redacted Transcript Deadline set for 7/26/2019. Release of Transcript Restriction set for 9/23/2019. (McGuirk, Kelly) (Entered: 06/25/2019) |
| 06/25/2019 | 24 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Arraignment proceeding held on 5/28/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/25/2019) |
| 07/16/2019 | 25 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Conference held on 6/18/19 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Karen Gorlaski, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/6/2019. Redacted Transcript Deadline set for 8/16/2019. Release of Transcript Restriction set for 10/15/2019. (McGuirk, Kelly) (Entered: 07/16/2019) |
| 07/16/2019 | 26 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Conference proceeding held on 6/18/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 07/16/2019) |
| 08/09/2019 | 27 | ORDER as to Michael Avenatti: It is hereby ORDERED that the next conference in this action, previously scheduled to take place on August 23, 2019, will now take place on Thursday, August 22, 2019 at 3:15 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. (Status Conference set for 8/22/2019 at 03:15 PM before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 8/9/2019) (ap) (Entered: 08/09/2019) |

| | | |
|---|---|---|
| 08/14/2019 | 28 | MOTION to Dismiss *for Vindictive and Selective Prosecution, and for Discovery*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/14/2019) |
| 08/14/2019 | 29 | MEMORANDUM in Support by Michael Avenatti re 28 MOTION to Dismiss *for Vindictive and Selective Prosecution, and for Discovery*.. (Srebnick, Scott) (Entered: 08/14/2019) |
| 08/16/2019 | 30 | DECLARATION of Scott A. Srebnick, Esq. in Support as to Michael Avenatti re: 28 MOTION to Dismiss *for Vindictive and Selective Prosecution, and for Discovery*.. (Attachments: # 1 Exhibit A: USAO Press Release, # 2 Exhibit B: Travel Team Contract (2010), # 3 Exhibit C: Travel Team Contract (2016), # 4 Exhibit D: Memo of Actions -- Auerbach to Avenatti, # 5 Exhibit E: Nike Text Messages, # 6 Exhibit F: Auerbach/Franklin Texts, Mar. 2018, # 7 Exhibit G: Auerbach/Franklin Texts, Oct. 2018, # 8 Exhibit H: Franklin Email, Jan. 2019, # 9 Exhibit I: Auerbach/Franklin Texts, Feb. 2019, # 10 Exhibit J: Memo, Correspondence with Slusher, Mar. 18, 2019, # 11 Exhibit K: Auerbach/Franklin texts, Feb. 2019, # 12 Exhibit L: Email, Auerbach to Avenatti, Mar. 2019, # 13 Exhibit M: Email, Bowen RICO suit, # 14 Exhibit N: PowerPoint Presentation, Mar. 2019, # 15 Exhibit O: Homes Notes of 3-19-19, # 16 Exhibit P: Nike emails, # 17 Exhibit Q: Draft of Settlement Agreement, # 18 Exhibit R: Search Warrant Affidavit in US v. Cohen, # 19 Exhibit S: Emails, Avenatti/USAO-SDNY, # 20 Exhibit T: NYT -- Mounting Costs of Internal Investigations)(Srebnick, Scott) (Entered: 08/16/2019) |
| 08/16/2019 | 31 | MOTION for Bill of Particulars . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/16/2019) |
| 08/16/2019 | 32 | DECLARATION of Scott A. Srebnick, Esq. in Support as to Michael Avenatti re: 31 MOTION for Bill of Particulars .. (Srebnick, Scott) (Entered: 08/16/2019) |
| 08/16/2019 | 33 | MEMORANDUM in Support by Michael Avenatti re 31 MOTION for Bill of Particulars .. (Srebnick, Scott) (Entered: 08/16/2019) |
| 08/19/2019 | 34 | MOTION to Dismiss *for Failure to State an Offense and Because the Extortion Statutes are Vague-as-Applied*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/19/2019) |
| 08/19/2019 | 35 | MEMORANDUM in Support by Michael Avenatti re 34 MOTION to Dismiss *for Failure to State an Offense and Because the Extortion Statutes are Vague-as-Applied*.. (Srebnick, Scott) (Entered: 08/19/2019) |
| 08/19/2019 | 36 | AFFIDAVIT of Scott A. Srebnick, Esq. in Support as to Michael Avenatti re 28 MOTION to Dismiss *for Vindictive and Selective Prosecution, and for Discovery*.. (Srebnick, Scott) (Entered: 08/19/2019) |
| 08/20/2019 | 37 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated August 20, 2019 re: 27 Order,, Set Hearings, re: Permission for co-counsel Jose M. Quinon to participate by telephone *(Srebnick and Avenatti will appear in person)*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/20/2019) |
| 08/20/2019 | 38 | MEMO ENDORSEMENT as to Michael Avenatti (1) granting 37 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated August 20, 2019 re: 27 Order,, Set Hearings, re: Permission for co-counsel Jose M. Quinon to participate by telephone (Srebnick and Avenatti will appear in person). ENDORSEMENT: The application is granted. (Signed by Judge Paul G. Gardephe on 8/20/2019) (ap) (Entered: 08/20/2019) |

| | | |
|---|---|---|
| 08/21/2019 | 39 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated August 21, 2019 re: 27 Order,, Set Hearings, re: Permission to Bring I-Phone and I-Pad into Courthouse on 8-22-19 . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/21/2019) |
| 08/22/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference as to Michael Avenatti held on 8/22/2019. Defendant M. Avenatti present with attorneys Scott Srebnick and Jose Quinon (appearing telephonically). AUSAs Matthew Podolsky, Robert Sobelman and Daniel Richenthal present. Court reporter Pamela Utter present. (jbo) (Entered: 08/22/2019) |
| 08/27/2019 | 40 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Assistant United States Attorney Daniel C. Richenthal dated August 27, 2019 re: Entry of Amended Protective Order . Document filed by USA as to Michael Avenatti. (Attachments: # 1 Text of Proposed Order)(Richenthal, Daniel) (Entered: 08/27/2019) |
| 08/28/2019 | 41 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated August 28, 2019 re: Permission to File Requests for Rule 17(c) Subpoenas on or before September 3, 2019 . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/28/2019) |
| 08/29/2019 | 42 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick and Jose Quinon dated August 29, 2019 re: Request for Two Month Adjournment of Trial Date . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/29/2019) |
| 08/30/2019 | 43 | MEMO ENDORSEMENT as to Michael Avenatti (1) granting 41 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated August 28, 2019 re: Permission to File Requests for Rule 17(c) Subpoenas on or before September 3, 2019. ENDORSEMENT: The Application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 8/30/2019) (lnl) (Entered: 08/30/2019) |
| 08/30/2019 | 44 | AMENDED PROTECTIVE ORDER as to Michael Avenatti...regarding procedures to be followed that shall govern the handling of confidential material.... (Signed by Judge Paul G. Gardephe on 8/30/2019) (lnl) (Entered: 08/30/2019) |
| 08/30/2019 | | *****DELETED DOCUMENT. Deleted document number 45 ORDER TO ANSWER, 28 U.S.C. § 2255, as to Michael Avenatti. The document was incorrectly filed in this case. (lnl)** (Entered: 08/30/2019) |
| 08/30/2019 | 45 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated August 30, 2019 re: 43 Order on Letter Motion, re: Permission to File Requests for Rule 17(c) on or before September 6, 2019 . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/30/2019) |
| 09/03/2019 | 46 | MEMO ENDORSEMENT as to Michael Avenatti (1) granting 45 CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated August 30, 2019 re: 43 Order on Letter Motion, re: Permission to File Requests for Rule 17(c) on or before September 6, 2019. ENDORSEMENT: The Application is granted. (Signed by Judge Paul G. Gardephe on 8/30/2019) (ap) (Entered: 09/03/2019) |
| 09/05/2019 | 47 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Conference held on 8/22/19 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript |

| | | |
|---|---|---|
| | | Restriction. After that date it may be obtained through PACER. Redaction Request due 9/26/2019. Redacted Transcript Deadline set for 10/7/2019. Release of Transcript Restriction set for 12/4/2019. (McGuirk, Kelly) (Entered: 09/05/2019) |
| 09/05/2019 | 48 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Conference proceeding held on 8/22/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/05/2019) |
| 09/05/2019 | 49 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated September 5, 2019 re: 42 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick and Jose Quinon dated August 29, 2019 re: Request for Two Month Adjournment of Trial Date .. (Podolsky, Matthew) (Entered: 09/05/2019) |
| 09/06/2019 | 50 | MOTION For Issuance of Rule 17(c) Subpoena Duces Tecum to Nike, Inc. . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 09/06/2019) |
| 09/06/2019 | 51 | DECLARATION of Scott A. Srebnick, Esq. in Support as to Michael Avenatti re: 50 MOTION For Issuance of Rule 17(c) Subpoena Duces Tecum to Nike, Inc. .. (Attachments: # 1 Exhibit 1: Proposed Subpoena Duces Tecum to Nike, Inc., # 2 Exhibit 2: Various Text Messages)(Srebnick, Scott) (Entered: 09/06/2019) |
| 09/06/2019 | 52 | MEMORANDUM in Support by Michael Avenatti re 50 MOTION For Issuance of Rule 17(c) Subpoena Duces Tecum to Nike, Inc. .. (Srebnick, Scott) (Entered: 09/06/2019) |
| 09/06/2019 | 53 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** NOTICE of Intent to File a Reply to Govt. Response (Dkt. #49) as to Michael Avenatti re: 42 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick and Jose Quinon dated August 29, 2019 re: Request for Two Month Adjournment of Trial Date ., 49 Response in Opposition to Motion,. (Srebnick, Scott) Modified on 9/9/2019 (ka). (Entered: 09/06/2019) |
| 09/09/2019 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Michael Avenatti: Notice to Attorney Srebnick, Scott to RE-FILE Document 53 Notice (Other). Use the event type Letter found under the event list Other Documents. (ka)** (Entered: 09/09/2019) |
| 09/09/2019 | 54 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Alan Srebnick and Jose Quinon dated September 6, 2019 re: Intent to File a Reply to Government's Response (Dkt. #49) to Defendant's Request for Adjournment (Srebnick, Scott) (Entered: 09/09/2019) |
| 09/10/2019 | 55 | LETTER REPLY TO RESPONSE to Motion by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Alan Srebnick and Jose Quinon dated September 10, 2019 re 42 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick and Jose Quinon dated August 29, 2019 re: Request for Two Month Adjournment of Trial Date .. (Srebnick, Scott) (Entered: 09/10/2019) |
| 09/12/2019 | 56 | ORDER as to Michael Avenatti. It is hereby ORDERED that any response from the Government to Defendant's motions for the issuance of subpoenas pursuant to Fed. R. |

| | | |
|---|---|---|
| | | Crim. P. 17(c) is due by September 23, 2019. SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/12/19)(jbo) (Entered: 09/12/2019) |
| 09/12/2019 | | Set/Reset Deadlines as to Michael Avenatti: Responses due by 9/23/2019. (jbo) (Entered: 09/12/2019) |
| 09/19/2019 | 57 | MEMORANDUM in Opposition by USA as to Michael Avenatti re 28 MOTION to Dismiss *for Vindictive and Selective Prosecution, and for Discovery*., 31 MOTION for Bill of Particulars ., 34 MOTION to Dismiss *for Failure to State an Offense and Because the Extortion Statutes are Vague-as-Applied*.. (Podolsky, Matthew) (Entered: 09/19/2019) |
| 09/20/2019 | 58 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Peter M. Skinner dated 9/19/19 re: We represent non-party NIKE, Inc. ("Nike"), the target of the extortion scheme perpetrated by Defendant Michael Avenatti in the above-referenced matter. Nike writes with respect to Defendant's September 6, 2019 Motion for Issuance of Subpoena Duces Tecum, Pursuant to Rule 17(c), to Custodian of Records of NIKE, Inc. (Dkt. 52) (the "Motion"), which attaches a proposed subpoena duces tecum to Nike (Dkt. 51-1) (the "Subpoena") requesting the production of certain documents in advance of trial. (jw) (Entered: 09/20/2019) |
| 09/20/2019 | 59 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick and Jose Quinon dated September 20, 2019 re: Response to Nike's Letter of Sept. 19, 2019 Regarding Rule 17(c) Subpoena (Srebnick, Scott) (Entered: 09/20/2019) |
| 09/22/2019 | 60 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Robert B. Sobelman, and Daniel C. Richenthal dated September 22, 2019 re: Joint Schedule for Certain Pretrial and Trial Disclosures Document filed by USA. (Richenthal, Daniel) (Entered: 09/22/2019) |
| 09/23/2019 | 61 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** RESPONSE in Opposition by USA as to Michael Avenatti re: 50 MOTION For Issuance of Rule 17(c) Subpoena Duces Tecum to Nike, Inc. .. (Podolsky, Matthew) Modified on 9/24/2019 (ka). (Entered: 09/23/2019) |
| 09/24/2019 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Michael Avenatti: Notice to Attorney Podolsky, Matthew to RE-FILE Document 61 Response in Opposition to Motion. Use the event type Letter found under the event list Other Documents. (ka)** (Entered: 09/24/2019) |
| 09/24/2019 | 62 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated September 23, 2019 re: Opposition to Motion for Subpoena to Nike, Inc. Document filed by USA. (Podolsky, Matthew) (Entered: 09/24/2019) |
| 09/24/2019 | 63 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Alan Srebnick and Jose Quinon dated September 24, 2019 re: Reply to Government's Response re Rule 17(c) Subpoena to Nike -- WITHDRAWAL OF REQUEST (Attachments: # 1 Exhibit 1: Letter of July 1, 2019, # 2 Exhibit 2: Email exchange of Aug. 29, 2019, # 3 Exhibit 3: Email exchange of Sept. 6, 2019)(Srebnick, Scott) (Entered: 09/24/2019) |
| 10/03/2019 | 64 | REPLY MEMORANDUM OF LAW in Support as to Michael Avenatti re: 28 MOTION to Dismiss *for Vindictive and Selective Prosecution, and for Discovery*., 34 |

| | | |
|---|---|---|
| | | MOTION to Dismiss *for Failure to State an Offense and Because the Extortion Statutes are Vague-as-Applied*. . (Srebnick, Scott) (Entered: 10/03/2019) |
| 10/03/2019 | 65 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** WAIVER of Speedy Trial by Michael Avenatti. (Srebnick, Scott) Modified on 10/4/2019 (ka). (Entered: 10/03/2019) |
| 10/04/2019 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Michael Avenatti: Notice to Attorney Srebnick, Scott to RE-FILE Document 65 Waiver of Speedy Trial. Use the event type Letter found under the event list Other Documents. (ka)** (Entered: 10/04/2019) |
| 10/04/2019 | 66 | CONSENT LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick and Jose Quinon dated October 3, 2019 re: Agreement to Exclude Time under the Speedy Trial Act (Srebnick, Scott) (Entered: 10/04/2019) |
| 10/10/2019 | 67 | ORDER as to Michael Avenatti: It is hereby ORDERED that trial in this action, previously scheduled to begin on November 12, 2019, is adjourned to January 21, 2020 at 9:30 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. Pretrial submissions- motions in limine, proposed voir dire, and requests to charge - are now due on December 6, 2019. Any responsive papers are due on December 20, 2019. It is further ORDERED that, upon application of the defendant, by and through his counsel, and with the consent of the Government, the time between November 12, 2019 and January 21, 2020 is excluded under the Speedy Trial Act, Title 18, United States Code, Section 3161(h)(7)(A). The Cami finds that the granting of such a continuance serves the ends of justice and outweighs the best interests of the public and the defendant in a speedy trial, because it will allow the defendant time to prepare and file additional motions, and will afford both parties additional time to prepare for trial. (Motions due by 12/6/2019. Responses due by 12/20/2019. Jury Trial set for 1/21/2020 at 09:30 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 10/9/2019)(ap) (Entered: 10/10/2019) |
| 10/17/2019 | 68 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated October 17, 2019 re: Revised Joint Schedule for Certain Pretrial and Trial Disclosures Document filed by USA. (Sobelman, Robert) (Entered: 10/17/2019) |
| 10/29/2019 | 69 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 10/29/2019) |
| 11/13/2019 | 70 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated November 13, 2019 re: S1 Indictment Document filed by USA. (Attachments: # 1 S1 Indictment)(Podolsky, Matthew) (Entered: 11/13/2019) |
| 11/13/2019 | 71 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott A. Srebnick and Jose M. Quinon dated November 13, 2019 re: Renewal of Pretrial Motions to Dismiss as to Superseding Indictment (Srebnick, Scott) (Entered: 11/13/2019) |
| 11/13/2019 | 72 | (S1) SUPERSEDING INDICTMENT FILED as to Michael Avenatti (1) count(s) 1s, 2s, 3s. (jm) (Entered: 11/14/2019) |
| 11/14/2019 | 73 | ORDER as to Michael Avenatti: Upon the application of the United States of America, by and through Assistant United States Attorney Matthew Podolsky, and with the |



| | | |
|---|---|---|
| | | consent of Michael Avenatti, by and through his counsel, it is hereby ORDERED that the time between November 14, 2019 and January 21, 2020 is excluded under the Speedy Trial Act, Title 18, United States Code, Section 3161(h)(7)(A). The Court finds that the granting of such a continuance serves the ends of justice and outweighs the best interests of the public and the defendant in a speedy trial, because it will allow the defendant time to prepare and file additional motions, and will afford the Defendant additional time to prepare for trial. Time excluded from 11/14/2019 until 1/21/2020. (Signed by Judge Paul G. Gardephe on 11/14/2019) (ap) (Entered: 11/14/2019) |
| 11/15/2019 | 74 | MOTION to Dismiss *Count Three of the Superseding Indictment for Failure to State an Offense, and Because 18 U.S.C. 1346 is Vague-as-Applied*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 11/15/2019) |
| 11/15/2019 | 75 | MEMORANDUM in Support by Michael Avenatti re 74 MOTION to Dismiss *Count Three of the Superseding Indictment for Failure to State an Offense, and Because 18 U.S.C. 1346 is Vague-as-Applied*.. (Srebnick, Scott) (Entered: 11/15/2019) |
| 11/15/2019 | 76 | MOTION for a Written Juror Questionnaire . Document filed by Michael Avenatti. (Attachments: # 1 Exhibit 1: Defendant Avenatti's Proposed Juror Questionnaire) (Srebnick, Scott) (Entered: 11/15/2019) |
| 11/15/2019 | 77 | DECLARATION of Scott A. Srebnick, Esq. in Support as to Michael Avenatti re: 76 MOTION for a Written Juror Questionnaire .. (Attachments: # 1 Exhibit 1: Spreadsheet of NYC media references to Avenatti, # 2 Exhibit 2: Spreadsheet of NYC media references to Avenatti and Nike, # 3 Exhibit 3: Spreadsheet of national media references to Avenatti and Nike)(Srebnick, Scott) (Entered: 11/15/2019) |
| 11/15/2019 | 78 | MEMORANDUM in Support by Michael Avenatti re 76 MOTION for a Written Juror Questionnaire .. (Srebnick, Scott) (Entered: 11/15/2019) |
| 11/22/2019 | 79 | MEMORANDUM in Opposition by USA as to Michael Avenatti re 74 MOTION to Dismiss *Count Three of the Superseding Indictment for Failure to State an Offense, and Because 18 U.S.C. 1346 is Vague-as-Applied*.. (Podolsky, Matthew) (Entered: 11/22/2019) |
| 11/24/2019 | 80 | REPLY MEMORANDUM OF LAW in Support as to Michael Avenatti re: 74 MOTION to Dismiss *Count Three of the Superseding Indictment for Failure to State an Offense, and Because 18 U.S.C. 1346 is Vague-as-Applied*. . (Srebnick, Scott) (Entered: 11/24/2019) |
| 11/27/2019 | 81 | FIRST MOTION in Limine *to Exclude Government's Proposed Expert Testimony and for a Daubert Hearing*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 11/27/2019) |
| 11/27/2019 | 82 | MEMORANDUM in Support by Michael Avenatti re 81 FIRST MOTION in Limine *to Exclude Government's Proposed Expert Testimony and for a Daubert Hearing*.. (Srebnick, Scott) (Entered: 11/27/2019) |
| 11/27/2019 | 83 | DECLARATION of Scott A. Srebnick, Esq. in Support as to Michael Avenatti re: 81 FIRST MOTION in Limine *to Exclude Government's Proposed Expert Testimony and for a Daubert Hearing*.. (Attachments: # 1 Exhibit 1: Government's Expert Witness Notice of Nov. 22, 2019 (with attachments), # 2 Exhibit 2: Letter of Nov. 24, 2019, from Scott A. Srebnick to Government Counsel, # 3 Exhibit 3: Government Supplemental Expert Witness Notice, Nov. 27, 2019)(Srebnick, Scott) (Entered: |

| | | |
|---|---|---|
| | | 11/27/2019) |
| 12/04/2019 | 84 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott A. Srebnick and Jose M. Quinon dated December 4, 2019 re: 67 Order,,,,,, Set Deadlines/Hearings,,,,,, re: Two (2) business day adjournment of Pretrial Submissions and Responses . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 12/04/2019) |
| 12/05/2019 | 85 | MEMO ENDORSED granting 84 LETTER MOTION Two (2) business day adjournment of Pretrial Submissions and Responses as to Michael Avenatti (1)...ENDORSEMENT: The application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/5/19) (jbo) (Entered: 12/05/2019) |
| 12/09/2019 | 86 | ORDER as to Michael Avenatti (Government Responses due by 12/13/2019, Status Conference set for 12/17/2019 at 12:30 PM before Judge Paul G. Gardephe.) The Government is directed to file its response to Defendants November 27, 2019 motion in limine (Dkt. No. 81) by December 13, 2019. It is further ORDERED that a conference will take place on December 17, 2019 at 12:30 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York to discuss Defendants motion in limine concerning expert testimony. The Defendant will be arraigned on the (S1) Indictment (Dkt. No. 72) at that time (Signed by Judge Paul G. Gardephe on 12/9/2019)(jw) (Entered: 12/09/2019) |
| 12/09/2019 | 87 | Proposed Voir Dire Questions by Michael Avenatti. (Srebnick, Scott) (Entered: 12/09/2019) |
| 12/09/2019 | 88 | SECOND MOTION in Limine *to Exclude Evidence of Financial Condition*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 12/09/2019) |
| 12/09/2019 | 89 | MEMORANDUM in Support by Michael Avenatti re 88 SECOND MOTION in Limine *to Exclude Evidence of Financial Condition*.. (Srebnick, Scott) (Entered: 12/09/2019) |
| 12/10/2019 | 90 | PROPOSED EXAMINATION OF JURORS by USA as to Michael Avenatti. (Sobelman, Robert) (Entered: 12/10/2019) |
| 12/10/2019 | 91 | THIRD MOTION in Limine *to Exclude all Evidence of Settlement Communications and Negotiations*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 12/10/2019) |
| 12/10/2019 | 92 | MEMORANDUM in Support by Michael Avenatti re 91 THIRD MOTION in Limine *to Exclude all Evidence of Settlement Communications and Negotiations*.. (Srebnick, Scott) (Entered: 12/10/2019) |
| 12/10/2019 | 93 | DECLARATION of Scott A. Srebnick, Esq. in Support as to Michael Avenatti re: 91 THIRD MOTION in Limine *to Exclude all Evidence of Settlement Communications and Negotiations*.. (Srebnick, Scott) (Entered: 12/10/2019) |
| 12/10/2019 | 94 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** Proposed Jury Instructions by Michael Avenatti. (Srebnick, Scott) Modified on 12/11/2019 (ka). (Entered: 12/10/2019) |
| 12/11/2019 | 95 | Request To Charge by USA as to Michael Avenatti. (Podolsky, Matthew) (Entered: 12/11/2019) |

| | | |
|---|---|---|
| 12/11/2019 | 96 | MOTION in Limine . Document filed by USA as to Michael Avenatti. (Attachments: # 1 Exhibit A (Defendant's Expert Notice))(Richenthal, Daniel) (Entered: 12/11/2019) |
| 12/11/2019 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Michael Avenatti: Notice to Attorney Srebnick, Scott to RE-FILE Document 94 Proposed Jury Instructions. Use the event type Request to Charge found under the event list Trial Documents. (ka)** (Entered: 12/11/2019) |
| 12/11/2019 | 97 | Request To Charge by Michael Avenatti. (Srebnick, Scott) (Entered: 12/11/2019) |
| 12/13/2019 | 98 | MEMORANDUM in Opposition by USA as to Michael Avenatti re 81 FIRST MOTION in Limine *to Exclude Government's Proposed Expert Testimony and for a Daubert Hearing*.. (Attachments: # 1 Exhibit A (Defendant's Expert Notice))(Richenthal, Daniel) (Entered: 12/13/2019) |
| 12/15/2019 | 99 | REPLY MEMORANDUM OF LAW in Support as to Michael Avenatti re: 81 FIRST MOTION in Limine *to Exclude Government's Proposed Expert Testimony and for a Daubert Hearing*. . (Attachments: # 1 Exhibit 1: Testimony of Lisa Reid in US v. Skelos, No. 15 Cr 317 (ECF No. 140:84-107))(Srebnick, Scott) (Entered: 12/15/2019) |
| 12/16/2019 | 100 | NOTICE OF ATTORNEY APPEARANCE: E. Danya Perry appearing for Michael Avenatti. Appearance Type: Retained. (Perry, E. Danya) (Entered: 12/16/2019) |
| 12/17/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Arraignment as to Michael Avenatti (1) Count 1s,2s,3s held on 12/17/2019. Defendant M. Avenatti present with attorneys Scott Srebnick, Jose Quinon (via telephone) and E. Danya Perry. AUSA Matthew D. Podolsky, Robert B. Sobelman and Daniel C. Richanthal. Court reporter Steven Griffing present. Defendant enters a plea of not guilty to the superseding indictment. Final pretrial conference set for 1/17/20 at 2:00 pm. (jbo) (Entered: 12/17/2019) |
| 12/17/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Plea entered by Michael Avenatti (1) Count 1s,2s,3s Not Guilty. (jbo) (Entered: 12/17/2019) |
| 12/17/2019 | | Set/Reset Hearings as to Michael Avenatti: Pretrial Conference set for 1/17/2020 at 02:00 PM before Judge Paul G. Gardephe. (jbo) (Entered: 12/17/2019) |
| 12/18/2019 | 101 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott A. Srebnick dated Dec. 18, 2019 re: Estimated Length of Trial (Srebnick, Scott) (Entered: 12/18/2019) |
| 12/20/2019 | 102 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Conference held on 12/17/19 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Steven Griffing, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/10/2020. Redacted Transcript Deadline set for 1/21/2020. Release of Transcript Restriction set for 3/19/2020. (McGuirk, Kelly) (Entered: 12/20/2019) |
| 12/20/2019 | 103 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Conference proceeding held on 12/17/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar |

| | | |
|---|---|---|
| | | days.... (McGuirk, Kelly) (Entered: 12/20/2019) |
| 12/20/2019 | 104 | SUPPLEMENTAL MOTION in Limine . Document filed by USA as to Michael Avenatti. (Richenthal, Daniel) (Entered: 12/20/2019) |
| 12/20/2019 | 105 | ORDER as to Michael Avenatti: The parties are hereby ORDERED to file the submissions discussed at the December 17, 2019 conference by the following dates: 1. the parties will confer as to the contents of a juror questionnaire and will submit a suggested questionnaire by December 23, 2019; 2. the Government will file a summary of the expert opinions it expects to offer at trial by December 27, 2019; defense counsel will make its submission concerning expert testimony by January 3, 2020; 3. the Government's response to the Defendants motions in limine is due on December 24, 2019; 4. Defendant's submission concerning the relevance of evidence concerning the motivations of Nike's attorneys is due by December 24, 2019; and 5. any additional defense submission concerning the Government's motions in limine is due by December 24, 2019. A final pre-trial conference will take place on January 17, 2020 at 2:00 p.m. (Responses due by 12/24/2019. Pretrial Conference set for 1/17/2020 at 02:00 PM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 12/20/2019) (lnl) (Entered: 12/23/2019) |
| 12/23/2019 | 106 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated December 23, 2019 re: Joint Proposed Jury Questionnaire Document filed by USA. (Attachments: # 1 Exhibit (Joint Proposed Jury Questionnaire))(Sobelman, Robert) (Entered: 12/23/2019) |
| 12/24/2019 | 107 | MEMORANDUM in Opposition by Michael Avenatti re 104 SUPPLEMENTAL MOTION in Limine .. (Srebnick, Scott) (Entered: 12/24/2019) |
| 12/24/2019 | 108 | MEMORANDUM in Opposition by USA as to Michael Avenatti re 88 SECOND MOTION in Limine *to Exclude Evidence of Financial Condition*., 91 THIRD MOTION in Limine *to Exclude all Evidence of Settlement Communications and Negotiations*.. (Richenthal, Daniel) (Entered: 12/24/2019) |
| 12/24/2019 | 109 | MEMORANDUM in Opposition by Michael Avenatti re 96 MOTION in Limine .. (Srebnick, Scott) (Entered: 12/24/2019) |
| 12/27/2019 | 110 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated December 27, 2019 re: Supplemental Summary of Expected Expert Testimony Document filed by USA. (Richenthal, Daniel) (Entered: 12/27/2019) |
| 12/30/2019 | 111 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated December 30, 2019 re: Defendant's Requests to Charge Document filed by USA. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Podolsky, Matthew) (Entered: 12/30/2019) |
| 12/31/2019 | 112 | ORDER as to Michael Avenatti: The Defendant is hereby ORDERED to respond to Nike's December 31, 2019 motion to quash the Defendant's subpoenas for five Nike employees to testify at his upcoming trial by January 6, 2020. (Responses due by 1/6/2020) (Signed by Judge Paul G. Gardephe on 12/31/2019) (ap) (Entered: 01/02/2020) |
| 01/02/2020 | 113 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 2, 2020 re: Government's |

| | | |
|---|---|---|
| | | Supplemental Expert Summary (Dkt. No. 110) and Court Order of Dec. 20, 2019 (Dkt. No. 105) (Srebnick, Scott) (Entered: 01/02/2020) |
| 01/02/2020 | 114 | MOTION to Quash *Subpoenas to Testify*. Document filed by Nike Inc. as to Michael Avenatti. (Skinner, Peter) (Entered: 01/02/2020) |
| 01/02/2020 | 115 | MEMORANDUM in Support by Nike Inc. as to Michael Avenatti re 114 MOTION to Quash *Subpoenas to Testify*.. (Skinner, Peter) (Entered: 01/02/2020) |
| 01/03/2020 | 116 | REPLY MEMORANDUM OF LAW in Support as to Michael Avenatti re: 88 SECOND MOTION in Limine *to Exclude Evidence of Financial Condition*. . (Attachments: # 1 Exhibit Letter of Sept. 24, 2019 from Govt Counsel)(Srebnick, Scott) (Entered: 01/03/2020) |
| 01/04/2020 | 117 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 4, 2020 re: 112 Order, Set Deadlines,, re: Request for 3-day Adjournment, until January 9, 2020, to Respond to Nike's Motion to Quash Subpoenas to Testify . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 01/04/2020) |
| 01/05/2020 | 118 | REPLY MEMORANDUM OF LAW in Support by USA as to Michael Avenatti re: 96 MOTION in Limine ., 104 SUPPLEMENTAL MOTION in Limine . . (Richenthal, Daniel) (Entered: 01/05/2020) |
| 01/06/2020 | 119 | MEMO ENDORSEMENT as to Michael Avenatti (1) granting 117 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 4, 2020 re: 112 Order, Set Deadlines,, re: Request for 3-day Adjournment, until January 9, 2020, to Respond to Nike's Motion to Quash Subpoenas to Testify. ENDORSEMENT: The Application is granted. (Signed by Judge Paul G. Gardephe on 1/6/2020) (ap) (Entered: 01/06/2020) |
| 01/06/2020 | | Set/Reset Deadlines as to Michael Avenatti: Responses due by 1/9/2020. (ap) (Entered: 01/06/2020) |
| 01/06/2020 | 120 | MEMORANDUM OPINION & ORDER as to Michael Avenatti. For the reasons stated above, Avenatti's motion to dismiss Count One and Count Two on grounds of insufficiency and vagueness (Def. Mot. (Dkt. No. 34)) is denied. (Signed by Judge Paul G. Gardephe on 1/6/2020) (ap) Modified on 1/6/2020 (ap). (Entered: 01/06/2020) |
| 01/06/2020 | 121 | ORDER as to Michael Avenatti: For the reasons stated above, the applications of Franklin, Defendant, and the Government to seal Defendant's motion for issuance of a Rule 17(c) subpoena, Franklin's objection, the Government's opposition, and associated filings is denied. The parties and Franklin are to file these submissions on the public docket along with the submissions filed in support of sealing by January 8, 2020. The discovery materials submitted to the Court including Exhibits 2 and 3 to the Srebnick declaration, and the materials provided to the Court in response to its October 25, 2019 sealed order will remain under seal. See Smith, 985 F. Supp. 2d at 520. (Signed by Judge Paul G. Gardephe on 1/6/2020) (ap) (Entered: 01/06/2020) |
| 01/06/2020 | 122 | ORDER as to Michael Avenatti: For the reasons stated above, Defendant's motion for issuance of a Rule 17(c) subpoena is denied. (Signed by Judge Paul G. Gardephe on 1/6/2020) (ap) (Entered: 01/06/2020) |
| 01/06/2020 | 123 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated January 6, 2020 re: Court Order of January 6, 2020 (Dkt. No. 121) (Attachments: # 1 Exhibit 1: Avenatti's Motion for Issuance of Rule 17(c) Subpoena |

| | | |
|---|---|---|
| | | Duces Tecum to Gary Franklin, Sr., Sept. 6, 2019, # 2 Exhibit 2: Avenatti's Memorandum of Law in Support of Issuance of Rule 17(c) Subpoena Duces Tecum to Gary Franklin, Sr., Sept. 6, 2019, # 3 Exhibit 3: Declaration of Scott A. Srebnick in Support of Motion for Issuance of Rule 17(c) Subpoena Duces Tecum (with Exhibit 1 only), Sept. 6, 2019, # 4 Exhibit 4: Letter to Judge Gardephe re Rule 17(c) Subpoena Duces Tecum (Request to Seal), Sept. 6, 2019, # 5 Exhibit 5: Avenatti's Reply Letter in Support of Rule 17(c) Subpoena Duces Tecum, Sept. 25, 2019)(Srebnick, Scott) (Entered: 01/06/2020) |
| 01/06/2020 | 124 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 6, 2020 re: Public Filing of Documents Relating to Rule 17(c) Litigation Document filed by USA. (Attachments: # 1 Government Opposition, # 2 Government Letter)(Podolsky, Matthew) (Entered: 01/06/2020) |
| 01/06/2020 | 125 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** RESPONSE by USA as to Michael Avenatti re: 113 Letter, filed by Michael Avenatti . (Richenthal, Daniel) Modified on 1/7/2020 (ka). (Entered: 01/06/2020) |
| 01/07/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Michael Avenatti: Notice to Attorney Richenthal, Daniel to RE-FILE Document 125 Response. Use the event type Letter found under the event list Other Documents. (ka)** (Entered: 01/07/2020) |
| 01/07/2020 | 126 | MOTION for Howard Milton Srebnick to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-18440738. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Michael Avenatti. (Attachments: # 1 Affidavit Affidavit of Howard M. Srebnick, # 2 Exhibit Certificate of Good Standing (Florida), # 3 Exhibit Certificate of Good Standing (California), # 4 Text of Proposed Order)(Srebnick, Howard) (Entered: 01/07/2020) |
| 01/07/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 126 MOTION for Howard Milton Srebnick to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-18440738. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 01/07/2020) |
| 01/07/2020 | 127 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 6, 2020 re: Response to Defendant's Letter of January 2, 2020 (Dkt. No. 113) Concerning Expert Testimony Document filed by USA. (Richenthal, Daniel) (Entered: 01/07/2020) |
| 01/07/2020 | 128 | ORDER FOR ADMISSION PRO HAC VICE as to Michael Avenatti (1) on 126 Motion for Howard M. Srebnick to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 1/7/2020) (ap) (Entered: 01/07/2020) |
| 01/09/2020 | 129 | MEMORANDUM OPINION & ORDER as to Michael Avenatti re: 74 MOTION to Dismiss Count Three of the Superseding Indictment for Failure to State an Offense, and Because 18 U.S.C. 1346 is Vague-as-Applied. For the reasons stated above, Defendant Avenatti's motion to dismiss Count Three on grounds of insufficiency and vagueness (Def. Mot. (Dkt. No. 74)) is denied. (Signed by Judge Paul G. Gardephe on 1/8/2020)(ap) (Entered: 01/09/2020) |

| | | |
|---|---|---|
| 01/09/2020 | 130 | LETTER by Gary Franklin as to Michael Avenatti addressed to Judge Paul G. Gardephe from Whitney O'Byrne dated January 9, 2020 re: Compliance with Order of Jan. 6, 2020 (Dkt. No. 121) Document filed by Gary Franklin. (Attachments: # 1 Exhibit 1 - Non-Party Gary Franklins Objection to Defendant Avenattis Motion for Issuance of Subpoena Duces Tecum, Pursuant to Rule 17(c), dated Sept. 23, 2019, # 2 Exhibit 2 - Transmittal Letter Requesting Sealing, dated Sept. 23, 2019, # 3 Exhibit 3 - Declaration of Michael J. Proctor in Support of Non-Party Gary Franklins Request to File Under Seal Objection to Defendant Avenattis Motion for Issuance of Rule 17(c) Subpoena Duces Tecum)(O'Byrne, Whitney) (Entered: 01/09/2020) |
| 01/09/2020 | 131 | MEMORANDUM in Opposition by Michael Avenatti re 114 MOTION to Quash *Subpoenas to Testify*.. (Srebnick, Scott) (Entered: 01/09/2020) |
| 01/09/2020 | 132 | ORDER as to Michael Avenatti: The parties are hereby ORDERED to provide a copy of the video recording of U.S. Attorney Geoffrey Berman's press conference, referenced in Defendant's Brief (Dkt. No. 29) at page 8, by 12:00 p.m. on January 10, 2020. (Signed by Judge Paul G. Gardephe on 1/9/2020) (ap) (Entered: 01/10/2020) |
| 01/10/2020 | 133 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 10, 2020 re: Video of Press Conference Document filed by USA. (Richenthal, Daniel) (Entered: 01/10/2020) |
| 01/12/2020 | 134 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 12, 2020 re: Request to Exclude Late-Produced Discovery *or, in the alternative, for an adjournment*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 01/12/2020) |
| 01/13/2020 | 135 | MEMO ENDORSEMENT as to Michael Avenatti on re: 134 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 12, 2020 re: Request to Exclude Late-Produced Discovery or, in the alternative, for an adjournment. ENDORSEMENT: The Government is directed to respond to this letter by 3:00 p.m. today. (Responses due by 1/13/2020) (Signed by Judge Paul G. Gardephe on 1/13/2020) (ap) (Entered: 01/13/2020) |
| 01/13/2020 | 136 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 13, 2020 re: 134 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 12, 2020 re: Request to Exclude Late-Produced Discovery *or, in the alternative, for an adjournment*.. (Podolsky, Matthew) (Entered: 01/13/2020) |
| 01/13/2020 | 137 | REPLY MEMORANDUM OF LAW in Support by Nike Inc. as to Michael Avenatti re: 114 MOTION to Quash *Subpoenas to Testify*. . (Skinner, Peter) (Entered: 01/13/2020) |
| 01/13/2020 | 138 | MOTION to Quash *Subpoenas Duces Tecum*. Document filed by Nike Inc. as to Michael Avenatti. (Skinner, Peter) (Entered: 01/13/2020) |
| 01/13/2020 | 139 | MEMORANDUM in Support by Nike Inc. as to Michael Avenatti re 138 MOTION to Quash *Subpoenas Duces Tecum*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Skinner, Peter) (Entered: 01/13/2020) |
| 01/13/2020 | 140 | LETTER REPLY TO RESPONSE to Motion by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 13, 2020 re 134 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott |

| | | |
|---|---|---|
| | | Srebnick, Jose Quinon, Danya Perry dated January 12, 2020 re: Request to Exclude Late-Produced Discovery *or, in the alternative, for an adjournment*.. (Srebnick, Scott) (Entered: 01/13/2020) |
| 01/13/2020 | 141 | LETTER MOTION addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 13, 2020 re: Authorization for Courtroom Connect (Internet Service) . Document filed by USA as to Michael Avenatti. (Richenthal, Daniel) (Entered: 01/13/2020) |
| 01/14/2020 | 142 | ORDER as to Michael Avenatti: It is hereby ORDERED that a telephone conference will take place on January 14, 2020 at 5:00 p.m., to discuss Defendant's request to adjourn the trial and complaints regarding the production of discovery. Once both sides are on the line, counsel should contact Chambers at 212-805-0224. SO ORDERED. (Telephone Conference set for 1/14/2020 at 05:00 PM before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 1/14/2019) (lnl) (Entered: 01/14/2020) |
| 01/14/2020 | 143 | ORDER as to Michael Avenatti: With respect to the telephone conference scheduled for January 14, 2020 at 5:00 p.m., the parties will dial (888) 363-4749 and use access code 6212642. The press and public may obtain access to the telephone conference by dialing the same number and using the same access code. (Signed by Judge Paul G. Gardephe on 1/14/2020) (ap) (Entered: 01/14/2020) |
| 01/14/2020 | 144 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 14, 2020 re: Response to NIKE, Inc.'s Motion to Quash Subpoenas to Seven Employees (Dkt. No. 114) Document filed by USA. (Richenthal, Daniel) (Entered: 01/14/2020) |
| 01/14/2020 | 145 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 14, 2020 re: Arrest of Defendant in Central District of California Document filed by USA. (Richenthal, Daniel) (Entered: 01/14/2020) |
| 01/14/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Telephone Conference as to Michael Avenatti held on 1/14/2020. Telephone conference held. (bw) (Entered: 01/15/2020) |
| 01/15/2020 | 146 | MEMORANDUM OPINION & ORDER as to Michael Avenatti: For the reasons stated above, Avenattis motion to dismiss the (S1) Indictment or, in the alternative, for discovery on his claims of vindictive or selective prosecution (Def. Mot. (Dkt. No. 28)) is denied. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/14/2020) (lnl) (Entered: 01/15/2020) |
| 01/15/2020 | 147 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 15, 2020 re: Telephonic Status Conference (this morning, if possible), and to delay the 10am Submission . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 01/15/2020) |

| | | |
|---|---|---|
| 01/15/2020 | 148 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated January 15, 2020 re: Office Manager's Testimony and Money Judgments Pending as of March 2019 Document filed by USA. (Attachments: # 1 Exhibit 1-5)(Sobelman, Robert) (Entered: 01/15/2020) |
| 01/15/2020 | 149 | ORDER as to Michael Avenatti: The Government is directed to submit a letter forthwith explaining why it was necessary to arrest Michael Avenatti on a bail violation a week before his trial is scheduled to begin. The Government will likewise set forth, from its perspective, what effect the arrest and proceedings in California will have on the trial date. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/15/2020) (lnl) (Entered: 01/15/2020) |
| 01/15/2020 | 150 | ORDER as to Michael Avenatti (1): It is hereby ORDERED that a telephone conference will take place on January 15, 2020 at 11:00 a.m. The parties will dial (888) 363-4749 and use access code 6212642. The press and public may obtain access to the telephone conference by dialing the same number and using the same access code. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/15/2020) (lnl) (Entered: 01/15/2020) |
| 01/15/2020 | 151 | MEMO ENDORSEMENT as to Michael Avenatti on 147 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 15, 2020 re: Telephonic Status Conference (this morning, if possible), and to delay the 10am Submission. ENDORSEMENT: The Court will conduct a telephone conference at 11:00 a.m. to discuss recent developments. The application to delay the 10:00 a.m. filing is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/15/2020) (lnl) (Entered: 01/15/2020) |
| 01/15/2020 | | Set/Reset Hearings as to Michael Avenatti: Telephone Conference set for 1/15/2020 at 11:00 AM before Judge Paul G. Gardephe. (lnl) (Entered: 01/15/2020) |
| 01/15/2020 | 152 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated January 15, 2020 re: Update Regarding Defendant's Arrest Document filed by USA. (Attachments: # 1 Exhibit)(Sobelman, Robert) (Entered: 01/15/2020) |
| 01/15/2020 | 153 | ORDER as to Michael Avenatti ( Telephone Conference set for 1/15/2020 at 04:00 PM before Judge Paul G. Gardephe) It is hereby ORDERED that a telephone conference will take place on January 15, 2020 at 4:00 p.m. The parties will dial (888) 363-4749 and use access code 6212642. The press and public may obtain access to the telephone conference by dialing the same number and using the same access code. (Signed by Judge Paul G. Gardephe on 1/15/20)(jw) (Entered: 01/15/2020) |
| 01/15/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Telephone Conference as to Michael Avenatti held on 1/15/2020. Telephone conference held. Another telephone conference set for 1/15/2020 at 4:00 pm. (bw) (Entered: 01/15/2020) |
| 01/15/2020 | | ORAL ORDER as to Michael Avenatti. Telephone Conference set for 1/15/2020 at 04:00 PM before Judge Paul G. Gardephe. (bw) (Entered: 01/15/2020) |
| 01/15/2020 | 154 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated January 15, 2020 re: Defendant's Custody Status Document filed by USA. (Sobelman, Robert) (Entered: |

| | | |
|---|---|---|
| | | 01/15/2020) |
| 01/15/2020 | 155 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 15, 2020 re: Declaration and Exhibits in Support of Motion for Arrest Warrant or Order to Show Cause in the Central District of California Document filed by USA. (Attachments: # 1 Exhibit (Declaration and Exhibits 1-34), # 2 Exhibit (Exhibits 35-45))(Richenthal, Daniel) (Entered: 01/15/2020) |
| 01/15/2020 | 156 | ORDER as to Michael Avenatti: The Court hereby orders the United States Marshal for the Southern District of New York to transport Michael Avenatti from the Central District of California to the Southern District of New York forthwith, for purposes of trial. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/15/2020) (lnl) (Entered: 01/16/2020) |
| 01/15/2020 | 157 | ORDER as to Michael Avenatti: It is hereby ORDERED that the conference previously scheduled for January 17, 2020 at 2:00 p.m. is adjourned until January 21, 2020 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The trial date of January 21, 2020 is adjourned sine die. SO ORDERED. (Pretrial Conference set for 1/21/2020 at 10:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 1/15/2020) (lnl) (Entered: 01/16/2020) |
| 01/16/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe:Telephone Conference as to Michael Avenatti held on 1/16/2020 (jw) (Entered: 01/16/2020) |
| 01/16/2020 | 158 | LETTER MOTION addressed to Judge Paul G. Gardephe from Michael J. Proctor/Whitney R. O'Byrne/Marc S. Harris/Scott A. Srebnick dated January 16, 2020 re: Dispute as to Subpoena Duces Tecum . Document filed by Gary Franklin as to Michael Avenatti. (O'Byrne, Whitney) (Entered: 01/16/2020) |
| 01/16/2020 | 159 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** SUPPLEMENTAL REPLY MEMORANDUM OF LAW in Support as to Michael Avenatti re: 81 FIRST MOTION in Limine *to Exclude Government's Proposed Expert Testimony and for a Daubert Hearing*. . (Srebnick, Scott) Modified on 1/17/2020 (ka). (Entered: 01/16/2020) |
| 01/17/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Michael Avenatti: Notice to Attorney Srebnick, Scott to RE-FILE Document 159 Reply Memorandum of Law in Support of Motion. Use the event type Letter found under the event list Other Documents. (ka)** (Entered: 01/17/2020) |
| 01/17/2020 | 160 | As per Judge Gardephe's chambers, a CD of a video was placed in the court file. (mhe) (Entered: 01/17/2020) |
| 01/17/2020 | 161 | SUPPLEMENTAL LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 16, 2020 re: Supplemental Letter Reply to Exclude Expert Testimony (Srebnick, Scott) (Entered: 01/17/2020) |
| 01/17/2020 | 162 | ORDER as to Michael Avenatti: It is hereby ORDERED that the conference previously scheduled for January 21, 2020 at 2:00 p.m. is adjourned until January 22, 2020 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. (Pretrial |

| | | |
|---|---|---|
| | | Conference set for 1/22/2020 at 10:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 1/17/2020) (lnl) (Entered: 01/17/2020) |
| 01/17/2020 | 163 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated January 17, 2020 re: to Quash Subpoena Duces Tecum to George Washington University . Document filed by Michael Avenatti. (Attachments: # 1 Exhibit 1: Subpoena to GW Law School)(Srebnick, Scott) (Entered: 01/17/2020) |
| 01/17/2020 | 164 | MEMO ENDORSEMENT as to Michael Avenatti (1) denying 163 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Alan Srebnick dated January 17, 2020 re: to Quash Subpoena Duces Tecum to George Washington University. ENDORSEMENT: The motion to quash is denied. George Washington University presumably issues transcripts every day, so there is nothing "oppressive" about the subpoena. Ethical rules for lawyers are at issue. Denying the motion to quash does not mean that responsive material will necessarily be admitted at trial. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/17/2020) (lnl) Modified on 1/21/2020 (lnl). (Entered: 01/17/2020) |
| 01/17/2020 | 165 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 17, 2020 re: Court's Draft Jury Questionnairre Document filed by USA. (Richenthal, Daniel) (Entered: 01/17/2020) |
| 01/17/2020 | 166 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 17, 2020 re: Response to Defendant's Letter of January 16, 2020 (Dkt. No. 159, re-filed at Dkt. No. 161) Concerning Expert Testimony Document filed by USA. (Attachments: # 1 Exhibit A (Transcript of Dec. 17, 2019 Conference), # 2 Exhibit B (Transcript of Jan. 15, 2020 Telephonic Conference))(Richenthal, Daniel) (Entered: 01/17/2020) |
| 01/17/2020 | 167 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 17, 2020 re: Clarification Of Information Concerning Certain Debt Evidence Document filed by USA. (Richenthal, Daniel) (Entered: 01/17/2020) |
| 01/17/2020 | 168 | MOTION to Compel *Testimony of Mark Geragos*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 01/17/2020) |
| 01/17/2020 | 169 | MEMORANDUM in Support by Michael Avenatti re 168 MOTION to Compel *Testimony of Mark Geragos*.. (Srebnick, Scott) (Entered: 01/17/2020) |
| 01/17/2020 | 177 | MEMO ENDORSEMENT as to Michael Avenatti on re: 161 SUPPLEMENTAL LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 16, 2020 re: Supplemental Letter Reply to Exclude Expert Testimony. ENDORSEMENT: The government is directed to respond to this letter by 5:00 p.m. on Jan. 20, 2020. (Signed by Judge Paul G. Gardephe on 1/17/2020) (ap) (Entered: 01/21/2020) |
| 01/18/2020 | 170 | LETTER RESPONSE in Support of Motion by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 18, 2020 re: 158 LETTER MOTION addressed to Judge Paul G. Gardephe from Michael J. Proctor/Whitney R. O'Byrne/Marc S. Harris/Scott A. Srebnick dated January 16, 2020 re: Dispute as to Subpoena Duces Tecum .. (Sobelman, Robert) (Entered: 01/18/2020) |
| 01/20/2020 | 171 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, E. Danya Perry dated January 20, 2020 re: Outstanding |

| | | |
|---|---|---|
| | | Judgments (Attachments: # 1 Exhibit 1: Jason Frank Law Settlement Agreement) (Srebnick, Scott) (Entered: 01/20/2020) |
| 01/20/2020 | 172 | MEMORANDUM in Opposition by USA as to Michael Avenatti re 168 MOTION to Compel *Testimony of Mark Geragos*.. (Richenthal, Daniel) (Entered: 01/20/2020) |
| 01/20/2020 | 173 | LETTER MOTION addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman re: Seeking Order Precluding Defendant From (1) Using or Describing Certain Materials or Using Certain Names or Phrases Absent a Sufficient Proffer as to Relevance and Admissibility and (2) Crossing Witnesses' on Prior Political Work, Alleged Political Views, or Campaign Donations, If Any . Document filed by USA as to Michael Avenatti. (Attachments: # 1 Exhibit A (DXs K, X, and Y), # 2 Exhibit B (DX DD Part I), # 3 Exhibit C (DX DD Part II), # 4 Exhibit D (DX L), # 5 Exhibit E (DXs N and O), # 6 Exhibit F (DX II), # 7 Exhibit G (DX P Part I), # 8 Exhibit H (DX P Part II), # 9 Exhibit I (DX R))(Richenthal, Daniel) (Entered: 01/20/2020) |
| 01/20/2020 | 174 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, E. Danya Perry dated January 20, 2020 re: Office Manager's Testimony (Srebnick, Scott) (Entered: 01/20/2020) |
| 01/20/2020 | 175 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 20, 2020 re: Innocence Proffer Agreement Document filed by USA. (Attachments: # 1 Exhibit (Form Innocence Proffer Agreement))(Richenthal, Daniel) (Entered: 01/20/2020) |
| 01/20/2020 | 176 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 20, 2020 re: Mr. Avenatti's Prison Conditions as a Pretrial Detainee (Srebnick, Scott) (Entered: 01/20/2020) |
| 01/20/2020 | 178 | ORDER as to Michael Avenatti re: 168 SUPPLEMENTAL LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 16, 2020 re: Supplemental Letter Reply to Exclude Expert Testimony. The Government is hereby ORDERED to respond to Defendant's January 17, 2020 motion to compel testimony of Mark Geragos (Dkt. No. 168) by 5:00 p.m. on January 20, 2020. (Responses due by 1/20/2020) (Signed by Judge Paul G. Gardephe on 1/18/2020) (ap) (Entered: 01/21/2020) |
| 01/20/2020 | 179 | ORDER as to Michael Avenatti: The parties are hereby directed to submit the following items to the Court: 1. Defendant will file the retainer agreement, if any, between Defendant and Gary Franklin, Sr., by 7:00 p.m. on January 20, 2020. 2. The Government will file copies of Mark Geragos's proffer agreements by 7:00 p.m. on January 20, 2020. 3. Defendant will file a reply to Nike's motion to quash (Dkt. No. 138) by 5:00 p.m. on January 21, 2020; any filing by the Government as to Nike's motion to quash (Dkt. No. 138) is also due by 5:00 p.m. on January 21, 2020. 4. Mark Geragos will submit a reply to Defendant's motion to compel (Dkt. No. 168) by 5:00 p.m. on January 21, 2020. The Government is directed to serve this Order on counsel for Geragos forthwith. (Replies due by 1/21/2020) (Signed by Judge Paul G. Gardephe on 1/20/2020) (ap) (Entered: 01/21/2020) |
| 01/20/2020 | 180 | ORDER as to Michael Avenatti: Defendant is hereby ORDERED to respond to the Government's January 20, 2020 letter motion (Dkt. No. 173) by January 21, 2020 at 5:00 p.m. (Responses due by 1/21/2020) (Signed by Judge Paul G. Gardephe on 1/20/2020) (ap) (Entered: 01/21/2020) |

| | | |
|---|---|---|
| 01/21/2020 | 181 | MEMO ENDORSEMENT as to Michael Avenatti on re: 176 LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 20, 2020 re: Mr. Avenatti's Prison Conditions as a Pretrial Detainee. ENDORSEMENT: The Government will submit a letter by 2:00 p.m. today explaining why the current conditions of confinement are in place. (Signed by Judge Paul G. Gardephe on 1/21/2020) (ap) (Entered: 01/21/2020) |
| 01/21/2020 | 182 | ORDER as to Michael Avenatti: Defendant has submitted a letter stating that there is no judgment or court order requiring him "to pay $2,049,000 in spousal and child support as of March 2019." (See Jan. 20, 2020 Def. Ltr. (Dkt. No. 171) at 2) The Government will submit any evidence to the contrary by January 21, 2020 at 12:00 p.m. (Signed by Judge Paul G. Gardephe on 1/20/2020) (ap) (Entered: 01/21/2020) |
| 01/21/2020 | 183 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 21, 2020 re: Support Obligations Document filed by USA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Podolsky, Matthew) (Entered: 01/21/2020) |
| 01/21/2020 | 184 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 21, 2020 re: Defendant's Conditions of Confinement Document filed by USA. (Attachments: # 1 Exhibit Letter dated January 21, 2020 from Warden Licon-Vitale) (Sobelman, Robert) (Entered: 01/21/2020) |
| 01/21/2020 | 185 | LETTER RESPONSE in Support of Motion by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 21, 2020 re: 138 MOTION to Quash *Subpoenas Duces Tecum*.. (Sobelman, Robert) (Entered: 01/21/2020) |
| 01/21/2020 | 186 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 21, 2020 re: Office Manager's Testimony Document filed by USA. (Sobelman, Robert) (Entered: 01/21/2020) |
| 01/21/2020 | 187 | MEMORANDUM in Opposition by Michael Avenatti re 138 MOTION to Quash *Subpoenas Duces Tecum*.. (Srebnick, Scott) (Entered: 01/21/2020) |
| 01/21/2020 | 188 | LETTER by Mark Geragos as to Michael Avenatti addressed to Judge Paul G. Gardephe from Brendan McGuire and Anjan Sahni dated January 21, 2020 re: defendant's motion to compel Document filed by Mark Geragos. (McGuire, Brendan) (Entered: 01/21/2020) |
| 01/21/2020 | 189 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, E. Danya Perry dated January 21, 2020 re: Government's Letter Motoin to Exclude (Dkt. No. 173) (Srebnick, Scott) (Entered: 01/21/2020) |
| 01/21/2020 | 190 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, E. Danya Perry dated January 21, 2020 re: Reply to Dkt. No. 183 regarding Outstanding Family Support and Jason Frank Law PLC Judgment (Attachments: # 1 Exhibit Stipulation and Order in Avenatti Divorce Case)(Srebnick, Scott) (Entered: 01/21/2020) |
| 01/21/2020 | 191 | REPLY MEMORANDUM OF LAW in Support by Nike Inc. as to Michael Avenatti re: 138 MOTION to Quash *Subpoenas Duces Tecum*. . (Skinner, Peter) (Entered: 01/21/2020) |
| 01/22/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference as to Michael Avenatti held on 1/22/2020. Defendant M. Avenatti present with attorneys Scott Srebnick, Danya Perry, Jose Quinon and Howard Srebnick. AUSAs |

| | | |
|---|---|---|
| | | Matthew Podolsky, Robert B. Sobelman and Daniel Richenthall present. Special Agent Deleana Penland present. Court reporter Rose Prater present. Jury trial set for 1/27/2020 at 10:00 am. Speedy trial time is excluded from 1/22/2020 until 1/27/2020. Detention continued. (Jury Trial set for 1/27/2020 at 10:00 AM before Judge Paul G. Gardephe) (lnl) (Entered: 01/22/2020) |
| 01/22/2020 | 192 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Conference held on 1/14/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Jennifer Thun, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/12/2020. Redacted Transcript Deadline set for 2/24/2020. Release of Transcript Restriction set for 4/21/2020. (McGuirk, Kelly) (Entered: 01/22/2020) |
| 01/22/2020 | 193 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Conference proceeding held on 1/14/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/22/2020) |
| 01/22/2020 | 194 | ORDER as to Michael Avenatti (Defendant Replies due by 1/23/2020., Government Responses due by 1/23/2020, Jury Selection set for 1/27/2020 at 10:00AM before Judge Paul G. Gardephe) the parties will submit amendments to their requests to charge by January 27, 2020 at 5:00 p.m. the Government will submit any additional letter concerning expert opinion testimony by January 27, 2020 at 9:30 a.m. the Government will submit any additional letter concerning the anticipated trial testimony of the office manager and the FBI analyst by January 27, 2020 at 9:30 a.m. Defendant will submit any letter regarding the relevance of post-arrest conduct by January 23, 2020 at 10:00 a.m., and the Government will file any response by January 23, 2020 at 5:00 p.m. Jury selection will begin on January 27, 2020 at 10:00 a.m. in Courtroom 110 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York (Signed by Judge Paul G. Gardephe on 1/22/20)(jw) (Entered: 01/22/2020) |
| 01/22/2020 | 195 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 22, 2020 re: Defendant's Housing Assignment Document filed by USA. (Attachments: # 1 Exhibit Letter dated January 22, 2020 from Warden Licon-Vitale) (Sobelman, Robert) (Entered: 01/22/2020) |
| 01/23/2020 | 196 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 23, 2020 re: to Exclude Post Arrest Text Messages and Tweets . Document filed by Michael Avenatti. (Attachments: # 1 Exhibit 1: Text Messages, # 2 Exhibit 2: Arrest Log)(Srebnick, Scott) (Entered: 01/23/2020) |
| 01/23/2020 | 197 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 23, 2020 re: to Exclude Post Arrest Text Messages and Tweets . Document filed by Michael Avenatti. (Attachments: # 1 Exhibit 1: Text Messages (redacted), # 2 Exhibit 2: Arrest Log)(Srebnick, Scott) (Entered: 01/23/2020) |

| | | |
|---|---|---|
| 01/23/2020 | 198 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Conference held on 1/15/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Sonya Ketter Moore, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/13/2020. Redacted Transcript Deadline set for 2/24/2020. Release of Transcript Restriction set for 4/22/2020. (McGuirk, Kelly) (Entered: 01/23/2020) |
| 01/23/2020 | 199 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Conference proceeding held on 1/15/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/23/2020) |
| 01/23/2020 | 200 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 23, 2020 re: Permission to Bring Electronic Equipment into the Courtroom *for Trial*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 01/23/2020) |
| 01/23/2020 | 201 | ORDER as to Michael Avenatti. Nike, Inc. has moved to quash Rule 17(c) subpoenas served on certain Nike employees. See Nike Mot. (Dkt. No. 114); Nike Br. (Dkt. No. 115) at 3; Nike Br. (Dkt. No. 137) at 3 n.1) Defendant Avenatti is hereby directed to file the seven subpoenas at issue on the docket forthwith. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/23/20)(jbo) (Entered: 01/23/2020) |
| 01/23/2020 | 202 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 23, 2020 re: Compliance with Court Order (Dkt. No. 201) (Attachments: # 1 Exhibit 1: Nike Subpoenas)(Srebnick, Scott) (Entered: 01/23/2020) |
| 01/23/2020 | 203 | MEMO ENDORSED granting 200 LETTER MOTION Permission to Bring Electronic Equipment into the Courtroom for Trial as to Michael Avenatti (1)...ENDORSEMENT: The application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/23/20) (jbo) (Entered: 01/23/2020) |
| 01/23/2020 | 204 | ORDER as to Michael Avenatti. In the event that one or more of the Nike employees moves to quash, that employee will state whether he or she intends to assert his or her Fifth Amendment right against self-incrimination. Such an intent may render a motion to quash effectively moot. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/23/20)(jbo) (Entered: 01/23/2020) |
| 01/23/2020 | 205 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 23, 2020 re: 197 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 23, 2020 re: to Exclude Post Arrest Text Messages and Tweets ., 196 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 23, 2020 re: to Exclude Post Arrest Text Messages and Tweets .. (Attachments: # 1 Exhibit A (GX 107), # 2 Exhibit B (Transcript of Jan. 22, 2020 Conference), # 3 Exhibit C (GX 108A), # 4 Exhibit D (GX 108B), # 5 Exhibit E (GX 108C), # 6 Exhibit F (GX 308), # 7 Exhibit G (GX 304), # 8 Exhibit H (GX 108D), # 9 Exhibit I (GX 313), # 10 Exhibit J (GX |

| | | |
|---|---|---|
| | | 106))(Richenthal, Daniel) (Entered: 01/23/2020) |
| 01/24/2020 | 206 | NOTICE OF ATTORNEY APPEARANCE as to Interested Party, NIKE, Inc. PLEASE TAKE NOTICE that the undersigned attorney, David L. Simons, who is a member in good standing of the bar of this Court, hereby appears as counsel for Interested Party NIKE, Inc. in the above-captioned proceeding. (bw) (Entered: 01/24/2020) |
| 01/24/2020 | 207 | NOTICE OF ATTORNEY APPEARANCE as to Interested Party, NIKE, Inc. PLEASE TAKE NOTICE that the undersigned attorney, Andrew Z. Michaelson, who is a member in good standing of the bar of this Court, hereby appears as counsel for Interested Party NIKE, Inc. in the above-captioned proceeding.(bw) (Entered: 01/24/2020) |
| 01/24/2020 | 208 | ENDORSED LETTER as to Michael Avenatti addressed to Judge Paul G. Gardephe from Scott A. Srebnick dated 1/24/20 re: To request an Order directing the Bureau of Prisons, the Metropolitan Correctional Center-New York, and the US Marshal Service to accept the following clothing for Mr. Michael Avenati, to wear for appearances at his trial commencing on Monday, January 27, 2020 and continuing thereafter...ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/24/20)(jw) (Entered: 01/24/2020) |
| 01/24/2020 | 209 | MOTION for Michael J. Proctor to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-18595537. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Gary Franklin as to Michael Avenatti. (Attachments: # 1 Affidavit of Michael J. Proctor, # 2 Text of Proposed Order Order for Admission Pro Hac Vice)(Proctor, Michael) (Entered: 01/24/2020) |
| 01/24/2020 | 210 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 24, 2020 re: to Exclude Evidence/Argument regarding: 1) GX 119, GX 126, GX 127; 2) Post-arrest Outreach by Coach Franklin's new counsel; 3) Mr. Avenatti's purported promise of "silence;" 4) Post-arrest Texts and Tweets (reply); and 5) the Amount Demanded for the Internal Investigation; and to Admit References to Colin Kaepernick . Document filed by Michael Avenatti. (Attachments: # 1 Exhibit A: Notes of March 15, 2019 Telephone call between BSF and Geragos)(Srebnick, Scott) (Entered: 01/24/2020) |
| 01/25/2020 | 213 | MEMO ENDORSEMENT as to Michael Avenatti on 210 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 24, 2020 re: to Exclude Evidence/Argument regarding: 1) GX 119, GX 126, GX 127; 2) Post-arrest Outreach by Coach Franklin's new counsel; 3) Mr. Avenatti's purported promise of "silence;" 4) Post-arrest Texts and Tweets (reply); and 5) the Amount Demanded for the Internal Investigation; and to Admit References to Colin Kaepernick. ENDORSEMENT: The Government is directed to respond to this letter by 5:00 p.m. on January 26, 2020. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/25/2020) (lnl) (Entered: 01/27/2020) |
| 01/26/2020 | 211 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 26, 2020 re: 210 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated January 24, 2020 re: to Exclude Evidence/Argument regarding: 1) GX 119, GX 126, GX 127; 2) Post-arrest Outreach by Coach Franklin's new cou. (Richenthal, Daniel) (Entered: 01/26/2020) |

| | | |
|---|---|---|
| 01/26/2020 | 215 | MEMORANDUM OPINION & ORDER as to Michael Avenatti: Aveantti's motion to compel Geragos to testify at trial (Dkt. No. 168) is denied. Avenatti's motion, in the alternative, for an order compelling the Government to seek an immunity order for Geragos (see id.) is likewise denied. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/26/2020) (lnl) (Entered: 01/27/2020) |
| 01/27/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 209 MOTION for Michael J. Proctor to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-18595537. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 01/27/2020) |
| 01/27/2020 | 212 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 27, 2020 re: Office Manager's Expected Testimony and Forensic Accountant's Expected Testimony Document filed by USA. (Attachments: # 1 Exhibit 1 (GX 129), # 2 Exhibit 2 (GX 111), # 3 Exhibit 3 (GX 102))(Sobelman, Robert) (Entered: 01/27/2020) |
| 01/27/2020 | 214 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 27, 2020 re: Professor Nora Engstrom's Expected Testimony Document filed by USA. (Sobelman, Robert) (Entered: 01/27/2020) |
| 01/27/2020 | 216 | ORDER FOR ADMISSION PRO HAC VICE Michael Avenatti (1) granting 209 Motion for Michael J. Proctor to Appear Pro Hac Vice to appear for all purposes as counsel for Non-Party and Subpoenaed Person GARY S. FRANKLIN. (Signed by Judge Paul G. Gardephe on 1/26/2020) (lnl) (Entered: 01/27/2020) |
| 01/27/2020 | 217 | LETTER MOTION addressed to Judge Paul G. Gardephe from Peter M. Skinner dated January 27, 2020 re: Rule 502(d) Order . Document filed by Nike Inc. as to Michael Avenatti. (Attachments: # 1 Proposed Order)(Skinner, Peter) (Entered: 01/27/2020) |
| 01/27/2020 | 218 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated January 27, 2020 re: Amended Requests to Charge With Respect to Honest Services Wire Fraud Document filed by USA. (Attachments: # 1 Exhibit (Amended Requests to Charge With Respect to Honest Services Wire Fraud))(Richenthal, Daniel) (Entered: 01/27/2020) |
| 01/27/2020 | 219 | Request To Charge by Michael Avenatti. (Srebnick, Scott) (Entered: 01/27/2020) |
| 01/27/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Voir Dire held on 1/27/2020 as to Michael Avenatti. Jury Trial began. Jury trial continued to 1/28/202 at 9:30 am. (lnl) (Entered: 01/31/2020) |
| 01/28/2020 | 220 | LETTER MOTION addressed to Judge Paul G. Gardephe from Michael J. Proctor dated January 28, 2020 re: Permission to bring electronic devices to court during trial . Document filed by Gary Franklin as to Michael Avenatti. (Attachments: # 1 [Proposed] Order)(Proctor, Michael) (Entered: 01/28/2020) |
| 01/28/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 1/28/2020. Jury trial continued to 1/29/2020 at 9:30 am. (lnl) (Entered: 01/31/2020) |
| 01/29/2020 | 221 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 1/27/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through |

| | | |
|---|---|---|
| | | the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/19/2020. Redacted Transcript Deadline set for 3/2/2020. Release of Transcript Restriction set for 4/28/2020. (McGuirk, Kelly) (Entered: 01/29/2020) |
| 01/29/2020 | 222 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Trial proceeding held on 1/27/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/29/2020) |
| 01/29/2020 | 223 | LETTER MOTION addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 29, 2020 re: Two Requests in Light of Defendant's Opening Statement . Document filed by USA as to Michael Avenatti. (Attachments: # 1 Exhibit A (Jan. 27, 2020 Transcript), # 2 Exhibit B (Jan. 29, 2020 Transcript))(Richenthal, Daniel) (Entered: 01/29/2020) |
| 01/29/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 1/29/2020. Jury trial continued to 1/30/2020 at 9:30 am. (lnl) (Entered: 01/31/2020) |
| 01/30/2020 | 224 | ORDER as to Michael Avenatti: On January 27, 2020, Nike, Inc. moved for an order pursuant to Federal Rule of Evidence 502(d), stating that testimony by Nike counsel at trial would not constitute a waiver of any privilege or protection that Nike currently enjoys. See Jan. 27, 2020 Nike Ltr. (Dkt. No. 217); Proposed Order (Dkt. No. 217-1)) Scott Wilson, outside counsel for Nike, is currently testifying at trial, and other Nike lawyers may be called to testify. Fed. R. Evid. 502(d) provides that "[a] federal court may order that [a] privilege or protection is not waived by disclosure connected with... litigation pending before the court - in which event the disclosure is also not a waiver in any other federal or state proceeding." Fed.R.Evid. 502(d). Testimony by Nike counsel at trial will not constitute a waiver of any privilege or protection that Nike currently enjoys. Given that Wilson will soon be cross-examined, and that it is possible that other Nike counsel may be subject to cross-examination, there is no practical way for Nike to attempt to police its privileges and protections and insure that they are not waived, either intentionally or inadvertently by lawyers who are not authorized to waive Nike's privileges and protections. Accordingly, Fed. R. Evid. 502(d) is applicable, and the relief Nike seeks is appropriate. As stated today in open court, this Order speaks only to testimony by Nike counsel at trial, and does not address any disclosures made by Nike counsel prior to today's date, or the effect of such disclosures. See Fed. R. Evid. 502 advisory committee note (a court "may not enter an order determining the waiver effects of a separate disclosure of the same information in other proceedings, state or federal"), SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/30/2020) (lnl) (Entered: 01/30/2020) |
| 01/30/2020 | 225 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION to Quash *Subpoena of Carlton DeBose*. Document filed by Nike Inc. as to Michael Avenatti. (Williams, Milton) Modified on 1/31/2020 (ka). (Entered: 01/30/2020) |
| 01/30/2020 | 226 | MEMORANDUM in Support by Nike Inc. as to Michael Avenatti re 225 MOTION to Quash *Subpoena of Carlton DeBose*.. (Williams, Milton) (Entered: 01/30/2020) |

| | | |
|---|---|---|
| 01/30/2020 | 227 | MOTION to Quash *Subpoena of John Stovall*. Document filed by Nike Inc. as to Michael Avenatti. (Skinner, Peter) (Entered: 01/30/2020) |
| 01/30/2020 | 228 | MEMORANDUM in Support by Nike Inc. as to Michael Avenatti re 227 MOTION to Quash *Subpoena of John Stovall*.. (Skinner, Peter) (Entered: 01/30/2020) |
| 01/30/2020 | 229 | MOTION to Quash Subpoena of Carlton Debose. Document filed by Nike Inc. as to Michael Avenatti. (Williams, Milton) Modified on 1/31/2020 (ka). Modified on 1/31/2020 (ka). (Entered: 01/30/2020) |
| 01/30/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 1/30/2020. Jury trial continued to 1/31/2020 at 9:30 am. (lnl) (Entered: 01/31/2020) |
| 01/31/2020 | 230 | ORDER granting 158 LETTER MOTION submitted as to Michael Avenatti (1). CONCLUSION: For the reasons stated above, Franklin and Auerbach's motion to quash Defendant's Rule 17(c) subpoena (Dkt. No. 158) is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/30/2020) (bw) (Entered: 01/31/2020) |
| 01/31/2020 | 231 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION to Quash *of Non-Party Jamal James*. Document filed by Nike Inc. as to Michael Avenatti. (Kopp, Glen) Modified on 2/3/2020 (ka). (Entered: 01/31/2020) |
| 01/31/2020 | 232 | MOTION to Quash *of Non-Party Jamal James*. Document filed by Nike Inc. as to Michael Avenatti. (Kopp, Glen) (Entered: 01/31/2020) |
| 01/31/2020 | 233 | MEMORANDUM in Support by Nike Inc. as to Michael Avenatti re 232 MOTION to Quash *of Non-Party Jamal James*.. (Kopp, Glen) (Entered: 01/31/2020) |
| 01/31/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 1/31/2020. Jury Trial began. Jury trial continued to 2/3/2020 at 9:30 am. (bw) (Entered: 02/04/2020) |
| 02/02/2020 | 234 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 2, 2020 re: to Exclude Testimony and Documents about 20 year old Bar Exams and CLE compliance (GX 112, 113, 114) . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 02/02/2020) |
| 02/03/2020 | 235 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Conference held on 1/22/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Rose Prater, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/24/2020. Redacted Transcript Deadline set for 3/5/2020. Release of Transcript Restriction set for 5/4/2020. (McGuirk, Kelly) (Entered: 02/03/2020) |
| 02/03/2020 | 236 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Conference proceeding held on 1/22/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/03/2020) |

| | | |
|---|---|---|
| 02/03/2020 | 237 | LETTER MOTION addressed to Judge Paul G. Gardephe from Peter M. Skinner dated February 3, 2020 re: Electronics Order . Document filed by Nike Inc. as to Michael Avenatti. (Attachments: # 1 Text of Proposed Order Electronics Order)(Skinner, Peter) (Entered: 02/03/2020) |
| 02/03/2020 | 238 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated February 3, 2020 re: 234 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 2, 2020 re: to Exclude Testimony and Documents about 20 year old Bar Exams and CLE compliance (GX 112, 113, 114) .. (Richenthal, Daniel) (Entered: 02/03/2020) |
| 02/03/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 2/3/2020. Jury Trial held. Jury trial continued to 2/4/2020 at 9:30 am. (bw) (Entered: 02/04/2020) |
| 02/04/2020 | 239 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated February 4, 2020 re: Federal Rule of Evidence 803(3) Document filed by USA. (Richenthal, Daniel) (Entered: 02/04/2020) |
| 02/04/2020 | 240 | SUPPLEMENTAL LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 4, 2020 re: Supplemental Letter re Office Manager Testimony (Srebnick, Scott) (Entered: 02/04/2020) |
| 02/05/2020 | 241 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 5, 2020 re: Order Appointing Receiver for Eagan Avenatti in Central District of California (relating to GX 109, 110, 111) (Attachments: # 1 Exhibit Order Appointing Receiver for Eagan Avenatti, Feb. 13, 2019)(Srebnick, Scott) (Entered: 02/05/2020) |
| 02/05/2020 | 242 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick dated February 5, 2020 re: 803(3) email from February 4, 2020 (Srebnick, Scott) (Entered: 02/05/2020) |
| 02/05/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial held on 2/5/2020 as to Michael Avenatti. Jury trial continued to 2/6/2020 at 9:30 am. (lnl) Modified on 2/12/2020 (lnl). (Entered: 02/07/2020) |
| 02/06/2020 | 243 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 6, 2020 re: Use of Text Messages Because the Government Opened the Door . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 02/06/2020) |
| 02/06/2020 | 244 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe re: Proposed Summary Chart Document filed by USA. (Attachments: # 1 GX 701)(Podolsky, Matthew) (Entered: 02/06/2020) |
| 02/06/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 2/6/2020. Jury trial continued to 2/7/2020 at 9:30 am. (lnl) (Entered: 02/07/2020) |
| 02/07/2020 | 245 | LETTER RESPONSE in Support of Motion by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated February 7, 2020 re: 232 MOTION to Quash *of Non-* |

| | | |
|---|---|---|
| | | *Party Jamal James*., 229 MOTION to Quash *Subpoena of Carlton DeBose*.. (Sobelman, Robert) (Entered: 02/07/2020) |
| 02/07/2020 | 246 | LETTER MOTION addressed to Judge Paul G. Gardephe from Jonathan R. Streeter dated February 7, 2020 re: Quash Subpoena issued to John Slusher . Document filed by John Slusher as to Michael Avenatti. (Attachments: # 1 Exhibit A)(Streeter, Jonathan) (Entered: 02/07/2020) |
| 02/07/2020 | 247 | LETTER MOTION addressed to Judge Paul G. Gardephe from Peter M. Skinner dated February 7, 2020 re: Motion to Quash Subpoena Ad Testificandum . Document filed by Nike Inc. as to Michael Avenatti. (Attachments: # 1 Exhibit A)(Skinner, Peter) (Entered: 02/07/2020) |
| 02/07/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 2/7/2020. Jury Trial held. Jury trial continued to 2/10/2020 at 9:30 am. (jbo) (Entered: 02/12/2020) |
| 02/08/2020 | 248 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 8, 2020 re: Defense Proffers (Srebnick, Scott) (Entered: 02/08/2020) |
| 02/08/2020 | 249 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 8, 2020 re: Preclude Cross-Examination of Defendant about Unrelated Conduct or Admission of Extrinsic Evidence . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 02/08/2020) |
| 02/08/2020 | 250 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION to Quash *Subpoena*. Document filed by Tina Glandian as to Michael Avenatti. (Riopelle, Roland) Modified on 2/10/2020 (ka). (Entered: 02/08/2020) |
| 02/08/2020 | 251 | LETTER RESPONSE in Support of Motion by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated February 8, 2020 re: 250 MOTION to Quash *Subpoena*., 229 MOTION to Quash *Subpoena of Carlton DeBose*., 247 LETTER MOTION addressed to Judge Paul G. Gardephe from Peter M. Skinner dated February 7, 2020 re: Motion to Quash Subpoena Ad Testificandum ., 246 LETTER MOTION addressed to Judge Paul G. Gardephe from Jonathan R. Streeter dated February 7, 2020 re: Quash Subpoena issued to John Slusher .. (Sobelman, Robert) (Entered: 02/08/2020) |
| 02/08/2020 | 252 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated February 8, 2019 re: 249 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 8, 2020 re: Preclude Cross-Examination of Defendant about Unrelated Conduct or Admission of Extrinsic Evidence .. (Richenthal, Daniel) (Entered: 02/08/2020) |

| | | |
|---|---|---|
| 02/08/2020 | 254 | ORDER - Defendant has served Rule l 7(c) subpoenas on Carlton DeBose, John Slusher, and Casey Kaplan. (See Jan. 23, 2020 Def. Ltr., Ex. 1 (Dkt. No. 202-1) at 1-2, 4; Feb. 7, 2020 Kaplan Ltr., Ex. A (Dkt. No. 247-1)) The witnesses have all moved to quash. (See DeBose Mot. (Dkt. No. 229); DeBose Br. (Dkt. No. 226); Feb. 7, 2020 Slusher Ltr. (Dkt. No. 246); Feb. 7, 2020 Kaplan Ltr. (Dkt. No. 247) The motions to quash are granted. The Court will issue a bench ruling on the morning of Monday, February 10, 2020, explaining its reasoning. (Signed by Judge Paul G. Gardephe on 2/8/20) (jw) (Entered: 02/10/2020) |
| 02/10/2020 | 253 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 10, 2020 re: Admissibility of Defense Exhibits (Texts and Emails) Under Fed.R.Evid. 1002 (Srebnick, Scott) (Entered: 02/10/2020) |
| 02/10/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Michael Avenatti: Notice to Attorney Riopelle, Roland to RE-FILE Document 250 MOTION to Quash Subpoena. Use the event type Letter Motion found under the event list Motions. (ka)** (Entered: 02/10/2020) |
| 02/10/2020 | 255 | LETTER MOTION addressed to Judge Paul G. Gardephe from Maurice H. Sercarz dated February 8, 2020 re: Motion to Quash Subpoena . Document filed by Tina Glandian as to Michael Avenatti. (Sercarz, Maurice) (Entered: 02/10/2020) |
| 02/10/2020 | 256 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Jose Quinon, Danya Perry dated February 10, 2020 re: Defense Exhibits FFF, GGG (Proffer for the record) (Attachments: # 1 Exhibit 1: DX FFF, # 2 Exhibit 2: DX GGG)(Srebnick, Scott) (Entered: 02/10/2020) |
| 02/10/2020 | 257 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated February 10, 2020 re: Proposed Jury Charge Document filed by USA. (Sobelman, Robert) (Entered: 02/10/2020) |
| 02/10/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 2/10/2020. Jury Trial held. Jury trial continued to 2/11/2020 at 9:30 am. (jbo) (Entered: 02/12/2020) |
| 02/11/2020 | 258 | JURY INSTRUCTIONS as to Michael Avenatti. (jbo) (Entered: 02/11/2020) |
| 02/11/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 2/11/2020. Jury Trial held. Jury trial continued to 2/12/2020 at 9:30 am. (jbo) (Entered: 02/12/2020) |
| 02/12/2020 | 259 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick dated February 12, 2020 re: Court's Jury Instructions (Dkt. No. 258) (Srebnick, Scott) (Entered: 02/12/2020) |
| 02/12/2020 | 260 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 02/12/2020) |
| 02/12/2020 | 261 | FINAL JURY INSTRUCTIONS as to Michael Avenatti. (jw) (Entered: 02/12/2020) |
| 02/12/2020 | 262 | Verdict Form as to Michael Avenatti. (jw) (Entered: 02/12/2020) |
| 02/12/2020 | 263 | JOINT LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated February 12, 2020 re: Jury Note Marked As Court Exhibit 2 Document filed by USA. (Sobelman, Robert) (Entered: 02/12/2020) |

| | | |
|---|---|---|
| 02/12/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 2/12/2020. Jury Trial held. Jury trial continued to 2/13/2020 at 9:30 am. (jbo) (Entered: 02/14/2020) |
| 02/13/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 2/13/2020. Jury Trial held. Jury trial continued to 2/14/2020 at 9:30 am. (jbo) (Entered: 02/14/2020) |
| 02/14/2020 | 264 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick dated February 14, 2020 re: Jury Note 1.B of February 13, 2020 (Srebnick, Scott) (Entered: 02/14/2020) |
| 02/14/2020 | 265 | VERDICT as to Michael Avenatti. (jbo) (Entered: 02/14/2020) |
| 02/14/2020 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Michael Avenatti held on 2/14/2020. Jury Trial held and concluded. The Jury returned a verdict of guilty as to all counts. Sentence set for 6/17/2020 at 4:00 pm. (jbo) (Entered: 02/14/2020) |
| 02/14/2020 | | JURY VERDICT as to Michael Avenatti (1) Guilty on Count 1s,2s,3s. (jbo) (Entered: 02/14/2020) |
| 02/14/2020 | | Set/Reset Hearings as to Michael Avenatti: Sentencing set for 6/17/2020 at 04:00 PM before Judge Paul G. Gardephe. (jbo) (Entered: 02/14/2020) |
| 02/14/2020 | 266 | ORDER as to Michael Avenatti. It is hereby ORDERED that any post-trial motions filed by Defendant are due by March 16, 2020. The Government's opposition is due by April 6, 2020. Any reply from Defendant is due by April 13, 2020. It is further ORDERED that the sentencing of the Defendant will take place on June 17, 2020 at 4:00 p.m. Any submissions on behalf of the Defendant are due on May 28, 2020, and any submission by the Government is due on June 4, 2020. The Probation Department is directed to prepare a presentence investigation report for the Defendant. SO ORDERED. (Signed by Judge Paul G. Gardephe on 2/14/2020)(bw) (Entered: 02/18/2020) |
| 02/19/2020 | 267 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated February 19, 2020 re: Summation PowerPoint Presentation Document filed by USA. (Attachments: # 1 PowerPoint Presentation)(Podolsky, Matthew) (Entered: 02/19/2020) |
| 02/20/2020 | 268 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick dated February 20, 2020 re: Defense Summation PowerPoint Presentations (Attachments: # 1 Exhibit 1: Summation PowerPoint Presentation (Scott Srebnick), # 2 Exhibit 2: Summation PowerPoint Presentation (Howard Srebnick))(Srebnick, Scott) (Entered: 02/20/2020) |
| 02/20/2020 | 269 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick dated February 20, 2020 re: Def. Exh. AA-3 (not admitted) (filed for appellate record) (Attachments: # 1 Exhibit 1: DX AA-3 (not admitted), # 2 Exhibit 2: DX AA-3 (annotated and highlighted) (not admitted))(Srebnick, Scott) (Entered: 02/20/2020) |
| 03/05/2020 | 270 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 1/27/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through |

| | | |
|---|---|---|
| | | the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 271 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 1/29/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 272 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 1/30/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 273 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 1/31/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Steven Griffing, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 274 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/3/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 275 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/4/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 276 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/5/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Karen Gorlaski, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |

| | | |
|---|---|---|
| 03/05/2020 | 277 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/6/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 278 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/7/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 279 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/10/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 280 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/11/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Karen Gorlaski, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 281 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/12/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 282 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/13/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 283 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/14/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due |

| | | |
|---|---|---|
| | | 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/05/2020 | 284 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 2/14/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/26/2020. Redacted Transcript Deadline set for 4/6/2020. Release of Transcript Restriction set for 6/3/2020. (McGuirk, Kelly) (Entered: 03/05/2020) |
| 03/11/2020 | 285 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick dated March 11, 2020 re: Adjournment of PSR Background Interview . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 03/11/2020) |
| 03/11/2020 | 286 | MEMO ENDORSEMENT as to Michael Avenatti (1) denying 285 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick dated March 11, 2020 re: Adjournment of PSR Background Interview. ENDORSEMENT: The application is denied. SO ORDERED. (Signed by Judge Paul G. Gardephe on 3/11/2020) (lnl) (Entered: 03/12/2020) |
| 03/13/2020 | 287 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick dated March 13, 2020 re: Four (4) Day Enlargement of Time, Until March 20, 2020, to File Post-Trial Motions . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 03/13/2020) |
| 03/13/2020 | 288 | MEMO ENDORSEMENT as to Michael Avenatti (1) granting 287 CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick dated March 13, 2020 re: Four (4) Day Enlargement of Time, Until March 20, 2020, to File Post-Trial Motions. ENDORSEMENT: The Application is granted. (Signed by Judge Paul G. Gardephe on 3/13/2020) (ap) (Entered: 03/13/2020) |
| 03/13/2020 | | Set/Reset Deadlines as to Michael Avenatti: Motions due by 3/20/2020. Responses due by 4/10/2020. Replies due by 4/17/2020. (ap) (Entered: 03/13/2020) |
| 03/18/2020 | 289 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick dated March 18, 2020 re: One (1) Additional Business Day to File Post-trial Motions *(until March 23, 2020)*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 03/18/2020) |
| 03/19/2020 | 290 | MEMO ENDORSEMENT as to Michael Avenatti (1) granting 289 CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick dated March 18, 2020 re: One (1) Additional Business Day to File Post-trial Motions (until March 23, 2020). ENDORSEMENT: The Application is granted. (Signed by Judge Paul G. Gardephe on 3/19/2020) (ap) (Entered: 03/19/2020) |
| 03/19/2020 | | Set/Reset Deadlines as to Michael Avenatti: Motions due by 3/23/2020. Responses due by 4/13/2020. Replies due by 4/20/2020. (ap) (Entered: 03/19/2020) |
| 03/23/2020 | 291 | MOTION for Acquittal *pursuant to Rule 29(c)*., MOTION for New Trial *pursuant to Rule 33*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 03/23/2020) |
| 04/13/2020 | 292 | MEMORANDUM in Opposition by USA as to Michael Avenatti re 291 MOTION for Acquittal *pursuant to Rule 29(c)*. MOTION for New Trial *pursuant to Rule 33*.. (Podolsky, Matthew) (Entered: 04/13/2020) |

| | | |
|---|---|---|
| 04/20/2020 | 293 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** REPLY TO RESPONSE to Motion by Michael Avenatti re 291 MOTION for Acquittal *pursuant to Rule 29(c)*. MOTION for New Trial *pursuant to Rule 33*.. (Srebnick, Scott) Modified on 4/21/2020 (ka). (Entered: 04/20/2020) |
| 04/21/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Michael Avenatti: Notice to Attorney Srebnick, Scott to RE-FILE Document 293 Reply to Response to Motion. Use the event type Reply Memorandum in support of Motion found under the event list Replies, Opposition and Supporting Documents. (ka)** (Entered: 04/21/2020) |
| 04/21/2020 | 294 | REPLY MEMORANDUM OF LAW in Support as to Michael Avenatti re: 291 MOTION for Acquittal *pursuant to Rule 29(c)*. MOTION for New Trial *pursuant to Rule 33*. . (Srebnick, Scott) (Entered: 04/21/2020) |
| 05/18/2020 | 296 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated May 18, 2020 re: Adjournment of Sentencing Date *(seeking adjournment until early-mid August 2020)*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 05/18/2020) |
| 05/19/2020 | 297 | MEMO ENDORSED re: 296 LETTER MOTION Adjournment of Sentencing Date (seeking adjournment until early-mid August 2020) as to Michael Avenatti (1)...ENDORSEMENT: Defendant's sentencing is adjourned to August 19, 2020 at 4pm. Defendant's sentencing submission is due by July 29, 2020. The Government's sentencing submission is due by August 5, 2020. SO ORDERED. (Signed by Judge Paul G. Gardephe on 5/19/2020) (jbo) (Entered: 05/20/2020) |
| 05/19/2020 | | Set/Reset Hearings as to Michael Avenatti: Sentencing set for 8/19/2020 at 04:00 PM before Judge Paul G. Gardephe. (jbo) (Entered: 05/20/2020) |
| 07/15/2020 | 298 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott A. Srebnick and E. Danya Perry dated July 15, 2020 re: Adjournment of Sentencing Date . Document filed by Michael Avenatti. (Attachments: # 1 Exhibit Governor Cuomo's Executive Order 205 (June 24, 2020), # 2 Exhibit NY Dept. of Health Travel Advisory (July 13, 2020))(Srebnick, Scott) (Entered: 07/15/2020) |
| 07/18/2020 | 299 | SUPPLEMENTAL LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott A. Srebnick and E. Danya Perry dated July 18, 2020 re: Adjournment of Sentencing Date (Srebnick, Scott) (Entered: 07/18/2020) |
| 07/21/2020 | 300 | ORDER as to Michael Avenatti: It is hereby ORDERED that the sentencing of Defendant, currently scheduled for August 19, 2020, will now take place on October 7, 2020 at 2:30 p.m. Any submissions on behalf of Defendant are due on September 16, 2020, and any submission by the Government is due on September 23, 2020. (Sentencing set for 10/7/2020 at 02:30 PM before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 7/21/2020) (ap) (Entered: 07/22/2020) |
| 08/13/2020 | 301 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Trial held on 1/28/2020 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/3/2020. Redacted Transcript Deadline set for 9/14/2020. Release of Transcript Restriction set for 11/12/2020. (McGuirk, Kelly) (Entered: 08/13/2020) |

| | | |
|---|---|---|
| 08/13/2020 | 302 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Trial proceeding held on 1/28/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 08/13/2020) |
| 09/07/2020 | 303 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated September 7, 2020 re: Adjournment of Sentencing Date *(seeking adjournment until early December 2020)*. Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 09/07/2020) |
| 09/08/2020 | 304 | MEMO ENDORSED re: 303 LETTER MOTION Adjournment of Sentencing Date (seeking adjournment until early December 2020) as to Michael Avenatti (1)...ENDORSEMENT: Defendant's sentencing is adjourned from October 7, 2020 to December 9, 2020 at 12:00p.m. Defendant's sentencing submission is now due November 18, 2020. The Government's sentencing submission is now due November 25, 2020. SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/8/2020) (jbo) (Entered: 09/09/2020) |
| 09/08/2020 | | Set/Reset Hearings as to Michael Avenatti: Sentencing set for 12/9/2020 at 12:00 PM before Judge Paul G. Gardephe. (jbo) (Entered: 09/09/2020) |
| 10/30/2020 | 305 | ORDER as to Michael Avenatti. This Order is entered, pursuant to Federal Rule of Criminal Procedure 5(f), to remind the Government of its disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the potential consequences of violating those obligations. For purposes of this Order, the "Government" includes all current or former federal, state, and local prosecutors, and other law enforcement officers, who have participated in the instant prosecution of, or in the investigation that led to the instant prosecution of, the defendant. The Government has an affirmative obligation to seek from such sources all information subject to disclosure under this Order. If the Government fails to comply with this Order in addition to orderingproduction of the information the Court may: (1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; (4) impose sanctions on any responsible lawyer for the Government; (5) dismiss charges before trial or vacate a conviction after trial or a guilty plea; or (6) enter any other order that is just under the circumstances (Signed by Judge Paul G. Gardephe on 10/30/2020)(jw) (Entered: 10/30/2020) |
| 11/13/2020 | 306 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated November 13, 2020 re: Adjournment of Sentencing Date for 60 Days . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 11/13/2020) |
| 11/13/2020 | 307 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated November 13, 2020 re: 306 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated November 13, 2020 re: Adjournment of Sentencing Date for 60 Days .. (Podolsky, Matthew) (Entered: 11/13/2020) |
| 11/16/2020 | 308 | ORDER as to Michael Avenatti: It is hereby ORDERED that the sentencing of Defendant Michael Avenatti, currently scheduled for December 9, 2020, will now take place on February 17, 2021 at 12:00 p.m. Any submissions on behalf of Defendant are due on January 27, 2021, and any submission by the Government is due on February |

| | | |
|---|---|---|
| | | 3, 2021. SO ORDERED. (Sentencing set for 2/17/2021 at 12:00 PM before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 11/16/2020) (lnl) (Entered: 11/16/2020) |
| 01/07/2021 | 309 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated January 7, 2021 re: Request for Adjournment of Sentencing for 90 Days . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 01/07/2021) |
| 01/08/2021 | 310 | ORDER as to Michael Avenatti: It is hereby ORDERED that the sentencing of Defendant Michael Avenatti, currently scheduled for February 17, 2021, will now take place on May 7, 2021 at 12:00 p.m. Any submissions on behalf of Defendant are due on April 16, 2021, and any submission by the Government is due on April 23, 2021. SO ORDERED. (Sentencing set for 5/7/2021 at 12:00 PM before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 1/8/2021) (lnl) (Entered: 01/11/2021) |
| 03/30/2021 | 311 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated March 30, 2021 re: Adjournment of Sentencing Date until June 23-30, 2021 . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 03/30/2021) |
| 03/31/2021 | 312 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated March 31, 2021 re: Correction of Letter Motion for Adjournment of Sentencing Date (Srebnick, Scott) (Entered: 03/31/2021) |
| 04/01/2021 | 313 | ORDER as to Michael Avenatti. The sentencing of Defendant Michael Avenatti, currently scheduled for May 7, 2021, will now take place on June 30, 2021 at 12:00 p.m. Any submissions on behalf of Defendant are due on June 9, 2021, and any submission by the Government is due on June 16, 2021. (Signed by Judge Paul G. Gardephe on 4/1/21)(jw) (Entered: 04/02/2021) |
| 06/04/2021 | 314 | NOTICE OF ATTORNEY APPEARANCE: Benjamin Adam Silverman appearing for Michael Avenatti. Appearance Type: Retained. (Silverman, Benjamin) (Entered: 06/04/2021) |
| 06/04/2021 | 315 | LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated June 4, 2021 ., MOTION to Compel . Document filed by Michael Avenatti. (Silverman, Benjamin) (Entered: 06/04/2021) |
| 06/04/2021 | 316 | MEMO ENDORSEMENT as to Michael Avenatti on re: 315 LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated June 4, 2021. MOTION to Compel. ENDORSEMENT: The Government will respond to this letter by June 11, 2021. (Responses due by 6/11/2021) (Signed by Judge Paul G. Gardephe on 6/4/2021) (ap) Modified on 6/7/2021 (ap). (Entered: 06/04/2021) |
| 06/09/2021 | 317 | SENTENCING SUBMISSION by Michael Avenatti. (Attachments: # 1 Exhibit Sentencing Chart, # 2 Exhibit Transcript of Sentencing in US v Days, # 3 Exhibit Transcript of Sentencing in US v Aracena De Jesus)(Srebnick, Scott) (Entered: 06/09/2021) |
| 06/11/2021 | 318 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated June 11, 2021 re: 315 LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated June 4, 2021 . MOTION to Compel .. (Attachments: # 1 Exhibit A (Twitter Screenshot)) |

| | | |
|---|---|---|
| | | (Richenthal, Daniel) (Entered: 06/11/2021) |
| 06/12/2021 | 319 | LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated June 12, 2021 re: respectfully requesting leave to respond to the government's June 11 letter . Document filed by Michael Avenatti. (Silverman, Benjamin) (Entered: 06/12/2021) |
| 06/14/2021 | 320 | MEMO ENDORSEMENT as to Michael Avenatti (1) granting 319 LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated June 12, 2021 re: respectfully requesting leave to respond to the government's June 11 letter. ENDORSEMENT: The Application is granted. (Signed by Judge Paul G. Gardephe on 6/14/2021) (ap) (Entered: 06/14/2021) |
| 06/14/2021 | | Set/Reset Deadlines as to Michael Avenatti: Replies due by 6/17/2021. (ap) (Entered: 06/14/2021) |
| 06/16/2021 | 321 | SENTENCING SUBMISSION by USA as to Michael Avenatti. (Attachments: # 1 Exhibit A (Nike Victim Impact Statement), # 2 Exhibit B (Franklin Victim Impact Statement))(Podolsky, Matthew) (Entered: 06/16/2021) |
| 06/16/2021 | 322 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated June 16, 2021 re: Correction to June 11, 2021 Letter Opposition Document filed by USA. (Podolsky, Matthew) (Entered: 06/16/2021) |
| 06/17/2021 | 323 | LETTER RESPONSE in Support of Motion by Michael Avenatti addressed to Judge Paul G. Gardephe from Benjamin Silverman dated June 17, 2021 re: 315 LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated June 4, 2021 . MOTION to Compel .. (Silverman, Benjamin) (Entered: 06/17/2021) |
| 06/21/2021 | 324 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated June 21, 2021 re: Adjournment of Sentencing Date for 60 Days . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 06/21/2021) |
| 06/22/2021 | 325 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated June 22, 2021 re: 324 LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated June 21, 2021 re: Adjournment of Sentencing Date for 60 Days .. (Richenthal, Daniel) (Entered: 06/22/2021) |
| 06/23/2021 | 326 | ORDER as to Michael Avenatti: Defendant's sentencing, currently scheduled for June 30, 2021, is adjourned to July 9, 2021 at 1:30 p.m. No further adjournments will be granted. SO ORDERED. (Sentencing set for 7/9/2021 at 01:30 PM before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 6/23/2021) (SEE ORDER AS FURTHER SET FORTH) (lnl) (Entered: 06/24/2021) |
| 06/24/2021 | 327 | LETTER MOTION addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated June 24, 2021 re: Movement of Sentencing from July 9, 2021 to July 8, 2021 . Document filed by USA as to Michael Avenatti. (Richenthal, Daniel) (Entered: 06/24/2021) |
| 06/25/2021 | 328 | MEMO ENDORSEMENT as to Michael Avenatti on 327 LETTER MOTION addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated June 24, 2021 re: Movement of Sentencing from July 9, 2021 to July 8, 2021. ENDORSEMENT: The |

| | | |
|---|---|---|
| | | sentencing for Defendant Michael Avenatti, currently scheduled for July 9, 2021, will now take place on July 8, 2021 at 1:00 p.m. SO ORDERED. (Sentencing set for 7/8/2021 at 01:00 PM before Judge Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 6/25/2021) (lnl) (Entered: 06/25/2021) |
| 06/25/2021 | 329 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated June 25, 2021 re: NIKE, Inc.'s Restitution Request Document filed by USA. (Attachments: # 1 Exhibit 1 (Letter from NIKE, Inc.), # 2 Exhibit A to Letter from NIKE, Inc., # 3 Exhibit B to Letter from NIKE, Inc., # 4 Exhibit C to Letter from NIKE, Inc.)(Sobelman, Robert) (Entered: 06/25/2021) |
| 06/28/2021 | 330 | ORDER as to Michael Avenatti. Judy Regnier was a Government witness at trial. Defendant asserts that the Government failed to produce to the defense - prior to trial - certain statements of Regnier. Defendant states that the U.S. Attorney's Office for the Central District of California recently "produced multiple additional witness statements by Ms. Regnier, including a voice message and at least one email" that she sent to Special Agent Ramoun Karlous on January 14, 2020. (June 17, 2021 Def. Reply Ltr. (Dkt. No. 323) at 5). By July 1, 2021, the parties will submit to this Court the Regnier materials that the U.S. Attorney's Office for the Central District of California recently produced to Defendant (Signed by Judge Paul G. Gardephe on 6/28/21)(jw) (Entered: 06/28/2021) |
| 06/29/2021 | 331 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Benjamin Silverman dated June 29, 2021 re: respectfully responding to the Court's June 28 Order (Silverman, Benjamin) (Entered: 06/29/2021) |
| 07/01/2021 | 332 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick dated July 1, 2021 re: Response to Government's Restitution Letter (ECF No. 329) (Attachments: # 1 Exhibit 1: Chart of Objections to Individual Time Entries) (Srebnick, Scott) (Entered: 07/01/2021) |
| 07/05/2021 | 333 | LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated July 5, 2021 re: Regnier witness statements . Document filed by Michael Avenatti. (Silverman, Benjamin) (Entered: 07/05/2021) |
| 07/05/2021 | 334 | NOTICE of Filing Sentencing Letters as to Michael Avenatti (Srebnick, Scott) (Entered: 07/05/2021) |
| 07/05/2021 | 335 | REPLY MEMORANDUM OF LAW in Support by Michael Avenatti re: 321 Sentencing Submission filed by USA, 317 Sentencing Submission filed by Michael Avenatti . (Attachments: # 1 Exhibit 1: Factual Bases in US v. Litzenburg and US v. Kincheloe)(Srebnick, Scott) (Entered: 07/05/2021) |
| 07/06/2021 | 336 | MEMORANDUM OPINION & ORDER as to Michael Avenatti. Defendant's post-trial motions are denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 291, 333). (Signed by Judge Paul G. Gardephe on 7/6/2021) (See ORDER set forth) (ap) (Entered: 07/06/2021) |
| 07/06/2021 | 337 | ORDER as to Michael Avenatti: The sentencing of the Defendant will take place on Thursday, July 8, 2021 at 1:00 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square,New York, New York. The press and public may obtain access to the sentencing by telephone by dialing 888-363-4749 to participate, and entering the access code 6212642. (Sentencing set for 7/8/2021 at 01:00 PM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge |

| | | |
|---|---|---|
| | | Paul G. Gardephe) (Signed by Judge Paul G. Gardephe on 7/6/2021) (ap) (Entered: 07/06/2021) |
| 07/08/2021 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Sentencing held on 7/8/2021 for Michael Avenatti (1) Count 1s,2s,3s. Sentence held. Defendant M. Avenatti present with attorneys Scott Srebnick and E. Danya Perry. AUSAs Matthew Podolsky, Robert Sobelman and Daniel Richenthal present. See Judgment for terms of sentence. (Court Reporter Michael McDaniel) (ap) (Entered: 07/08/2021) |
| 07/15/2021 | 338 | LETTER MOTION addressed to Judge Paul G. Gardephe from the Government dated July 14, 2021 re: Request for Restitution . Document filed by USA as to Michael Avenatti. (Attachments: # 1 Letter from Nike, Inc., # 2 Exhibit A to Letter from Nike, Inc.)(Podolsky, Matthew) (Entered: 07/15/2021) |
| 07/15/2021 | | DISMISSAL OF COUNTS on Government Motion as to Michael Avenatti (1) Count 1,2,3,4. (jw) (Entered: 07/15/2021) |
| 07/15/2021 | 339 | FILED JUDGMENT IN A CRIMINAL CASE as to Michael Avenatti (1), Count(s) 1, 2, 3, 4 are dismissed on the motion of the US. Found guilty to Count(s) 1s, Count(s) 2s and Count(s) 3s, Imprisonment for a total term of 24 Months imprisonment on Count One, and 30 months imprisonment on each of Counts Two and Three, with all terms to be served concurrently. The Court makes the following recommendations to the Bureau of Prisons; The Court recommends that defendant be assigned to the Camp at FCI Sheridan in Sheridan,Oregon. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons before 2pm on 9/15/2021. Special Assessment of $300 which is due immediately (Signed by Judge Paul G. Gardephe on 7/15/21)(jw) (Entered: 07/15/2021) |
| 07/21/2021 | 340 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick dated July 21, 2021 re: Response to Government/Nike's Post-Sentencing Restitution Submission (ECF No. 338) (Srebnick, Scott) (Entered: 07/21/2021) |
| 07/21/2021 | 341 | TRANSCRIPT of Proceedings as to Michael Avenatti re: Conference held on 7/8/21 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Michael McDaniel, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/11/2021. Redacted Transcript Deadline set for 8/23/2021. Release of Transcript Restriction set for 10/19/2021. (McGuirk, Kelly) (Entered: 07/21/2021) |
| 07/21/2021 | 342 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Michael Avenatti. Notice is hereby given that an official transcript of a Conference proceeding held on 7/8/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 07/21/2021) |
| 07/22/2021 | 343 | NOTICE OF APPEAL by Michael Avenatti from 339 Judgment. (tp) (Entered: 07/22/2021) |
| 07/22/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Michael Avenatti to US Court of Appeals re: 343 Notice of Appeal - Final Judgment. (tp) (Entered: 07/22/2021) |

| | | |
|---|---|---|
| 07/22/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Michael Avenatti re: 343 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (tp) (Entered: 07/22/2021) |
| 07/27/2021 | | USCA Case Number 21-1778 from the U.S. Court of Appeals, 2nd Circ. as to Michael Avenatti, assigned to 343 Notice of Appeal filed by Michael Avenatti. (nd) (Entered: 07/27/2021) |
| 07/27/2021 | 344 | USCA Appeal Fees received $ 505.00, receipt number 465401283462 as to Michael Avenatti on 07/27/2021 re: 343 Notice of Appeal filed by Michael Avenatti. USCA Case No. 21-1778.(nd) (Entered: 07/27/2021) |
| 07/28/2021 | 345 | LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick dated July 28, 2021 re: Declaration of In Forma Pauperis status for Mr. Avenatti for direct appeal . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 07/28/2021) |
| 07/30/2021 | 346 | MEMO ENDORSEMENT as to Michael Avenatti on re: 345 LETTER MOTION filed by Michael Avenatti addressed to Judge Paul G. Gardephe from Attorney Scott Srebnick dated July 28, 2021 re: Declaration of In Forma Pauperis status for Mr. Avenatti for direct appeal. ENDORSEMENT: Defendant Michael Avenatti must submit an affidavit pursuant to 28 U.S.C. 1915(a)(1) before the Court may rule on his in forma pauperis status. SO ORDERED. (Signed by Judge Paul G. Gardephe on 7/30/2021)(bw) (Entered: 07/30/2021) |
| 08/10/2021 | 347 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick dated August 10, 2021 re: In Forma Pauperis Status for Defendant Avenatti (Srebnick, Scott) (Entered: 08/10/2021) |
| 08/10/2021 | 348 | CJA 23 Financial Affidavit by Michael Avenatti. (Signed by Judge Paul G. Gardephe) (Srebnick, Scott) (Entered: 08/10/2021) |
| 08/11/2021 | 349 | ORDER as to Michael Avenatti: Leave to proceed in forma pauperis is authorized. See 28 U.S.C. § 1915. (Signed by Judge Paul G. Gardephe on 8/11/2021) (ap) (Entered: 08/11/2021) |
| 08/26/2021 | 350 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated August 26, 2021 re: 339 Judgment,,, re: Extend Surrender Date to December 15, 2021 . Document filed by Michael Avenatti. (Srebnick, Scott) (Entered: 08/26/2021) |
| 08/27/2021 | 351 | MEMO ENDORSEMENT 350 CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Scott Srebnick and Danya Perry dated August 26, 2021 re: 339 Judgment re: Extend Surrender Date to December 15, 2021...ENDORSEMENT...The application is granted. (Signed by Judge Paul G. Gardephe on 8/27/21) (jw) (Entered: 08/27/2021) |
| 10/29/2021 | 352 | LETTER MOTION addressed to Judge Paul G. Gardephe dated October 29, 2021 re: Modification of Surrender Date . Document filed by USA as to Michael Avenatti. (Sobelman, Robert) (Entered: 10/29/2021) |
| 10/29/2021 | 353 | LETTER RESPONSE in Opposition by Michael Avenatti addressed to Judge Paul G. Gardephe from Scott Srebnick, Andrew Dalack, Robert Baum dated October 29, 2021 re: 352 LETTER MOTION addressed to Judge Paul G. Gardephe dated October 29, 2021 re: Modification of Surrender Date .. (Srebnick, Scott) (Entered: 10/29/2021) |

| | | |
|---|---|---|
| 11/03/2021 | 354 | MEMO ENDORSEMENT as to Michael Avenatti re: 353 Modification of Surrender Date... ENDORSEMENT: The application is granted. Defendant Michael Avenatti's surrender date is adjourned from December 15, 2021 to February 28, 2022. SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/3/21)(jbo) (Entered: 11/03/2021) |
| 11/05/2021 | 355 | INTERNET CITATION NOTE as to Michael Avenatti: Material from decision with Internet citation re: 121 Order. (sjo) (Entered: 11/05/2021) |
| 11/05/2021 | 356 | INTERNET CITATION NOTE as to Michael Avenatti: Material from decision with Internet citation re: 121 Order. (sjo) (Entered: 11/05/2021) |
| 11/05/2021 | 357 | INTERNET CITATION NOTE as to Michael Avenatti: Material from decision with Internet citation re: 121 Order. (sjo) (Entered: 11/05/2021) |
| 12/02/2021 | 358 | LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated December 2, 2021 re: respectfully requesting an indicative ruling concerning a Brady violation . Document filed by Michael Avenatti. (Silverman, Benjamin) (Entered: 12/02/2021) |
| 12/03/2021 | 359 | MEMO ENDORSEMENT as to Michael Avenatti on re: 358 LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated December 2, 2021 re: respectfully requesting an indicative ruling concerning a Brady violation. ENDORSEMENT: The Government will respond to this letter by December 10, 2021. (Responses due by 12/10/2021) (Signed by Judge Paul G. Gardephe on 12/3/2021) (ap) (Entered: 12/03/2021) |
| 12/10/2021 | 360 | LETTER RESPONSE in Opposition by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe dated December 10, 2021 re: 358 LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated December 2, 2021 re: respectfully requesting an indicative ruling concerning a Brady violation .. (Podolsky, Matthew) (Entered: 12/10/2021) |
| 12/10/2021 | 361 | LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated December 10, 2021 re: respectfully requesting leave to file a reply . Document filed by Michael Avenatti. (Silverman, Benjamin) (Entered: 12/10/2021) |
| 12/13/2021 | 362 | MEMO ENDORSED granting 361 LETTER MOTION respectfully requesting leave to file a reply as to Michael Avenatti (1)... ENDORSEMENT: The Application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/13/21) (jbo) (Entered: 12/13/2021) |
| 12/13/2021 | | Set/Reset Deadlines as to Michael Avenatti: Replies due by 12/16/2021. (jbo) (Entered: 12/13/2021) |
| 12/15/2021 | 363 | LETTER REPLY TO RESPONSE to Motion by Michael Avenatti addressed to Judge Paul G. Gardephe from Benjamin Silverman dated December 15, 2021 re 358 LETTER MOTION addressed to Judge Paul G. Gardephe from Benjamin Silverman dated December 2, 2021 re: respectfully requesting an indicative ruling concerning a Brady violation .. (Silverman, Benjamin) (Entered: 12/15/2021) |
| 12/21/2021 | 364 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Benjamin Silverman dated December 21, 2021 re: Gary Franklin's request to access documents covered by the protective order (Silverman, Benjamin) (Entered: 12/21/2021) |

| | | |
|---|---|---|
| 12/28/2021 | 365 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated December 28, 2021 re: Letter Motion dated December 20, 2021 from counsel for Gary Franklin, Sr. Document filed by USA. (Sobelman, Robert) (Entered: 12/28/2021) |
| 12/29/2021 | 366 | CONSENT LETTER MOTION addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated December 29, 2021 re: Supplemental Protective Order . Document filed by USA as to Michael Avenatti. (Attachments: # 1 Text of Proposed Order)(Sobelman, Robert) (Entered: 12/29/2021) |
| 12/29/2021 | 367 | SUPPLEMENTAL PROTECTIVE ORDER as to Michael Avenatti...regarding procedures to be followed that shall govern the handling of confidential material..... (Signed by Judge Paul G. Gardephe on 12/29/21)(jbo) (Entered: 01/03/2022) |
| 12/30/2021 | 368 | MEMO ENDORSED granting 358 LETTER MOTION respectfully requesting an indicative ruling concerning a Brady violation as to Michael Avenatti (1)... ENDORSEMENT: The Defendant is directed to file the full transcripts of Exhibits B, C, and E (Dkt. 358). SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/30/21) (jbo) (Entered: 01/03/2022) |
| 01/03/2022 | 369 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Benjamin Silverman dated January 3, 2022 re: responding to December 30, 2021 Order (Dkt. 368) (Silverman, Benjamin) (Entered: 01/03/2022) |
| 01/05/2022 | 370 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Benjamin Silverman dated January 5, 2022 re: respectfully providing transcripts requested by the Court (Silverman, Benjamin) (Entered: 01/05/2022) |
| 01/25/2022 | 371 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorneys Matthew D. Podolsky, Daniel C. Richenthal, and Robert B. Sobelman dated January 25, 2022 re: Recent Ruling in United States v. Avenatti, No. 19 Cr. 374 (JMF) Document filed by USA. (Attachments: # 1 Exhibit 1)(Sobelman, Robert) (Entered: 01/25/2022) |
| 01/25/2022 | 372 | LETTER by Michael Avenatti addressed to Judge Paul G. Gardephe from Benjamin Silverman dated January 25, 2022 re: Recent Ruling in United States v. Avenatti, 19 Cr. 374 (JMF) (Silverman, Benjamin) (Entered: 01/25/2022) |
| 02/09/2022 | 373 | MEMORANDUM OPINION & ORDER as to Michael Avenatti. For the reasons stated above, and pursuant to Fed. R. Crim. P. 37, this Court issues an indicative ruling denying Avenatti's motion for a new trial. (Signed by Judge Paul G. Gardephe on 2/9/22)(jw) (Entered: 02/09/2022) |
| 02/14/2022 | 374 | MEMORANDUM OPINION & ORDER as to (S1 19-Cr-373) Michael Avenatti. A jury convicted Michael Avenatti of transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three). (Verdict (Dkt. No. 265)) On July 8, 2021, this Court imposed an aggregate sentence of 30 months' imprisonment and three years' supervised release. (Judgment (Dkt. No. 339)) Because of inadequate briefing, this Court deferred decision on the Government's application for an order of restitution. (Sentencing Tr. (Dkt. No. 341) at 47-48; Judgment (Dkt. No. 339) at 7) The parties have made supplemental submissions addressing restitution (July 14, 2021 Govt. Supp. Ltr. (Dkt. No. 338); July 21, 2021 Def. Supp. Ltr. (Dkt. No. 340)), and |

| | | |
|---|---|---|
| | | this Court now has an adequate record on which to base a decision regarding restitution....[*** See this Memorandum Opinion & Order ***]... CONCLUSION: For the reasons stated above, the total amount of expenses that Nike can recover is $259,800.50. By February 16, 2022, the Government will submit a proposed order of restitution, including the address to which the Clerk of Court should forward any restitution payments. SO ORDERED. (Signed by Judge Paul G. Gardephe on 2/14/2022)(bw) (Entered: 02/14/2022) |
| 02/16/2022 | 375 | LETTER by USA as to Michael Avenatti addressed to Judge Paul G. Gardephe from Assistant United States Attorney Robert B. Sobelman dated February 16, 2022 re: Proposed Restitution Order Document filed by USA. (Attachments: # 1 Text of Proposed Order)(Sobelman, Robert) (Entered: 02/16/2022) |
| 02/17/2022 | 376 | ORDER OF RESTITUTION as to Michael Avenatti. (Signed by Judge Paul G. Gardephe on 2/17/2022) (ap) (Entered: 02/17/2022) |
| 02/18/2022 | 377 | AMENDED JUDGMENT In A Criminal Case. Date of Imposition of Judgment: 7/8/2021. Date of Original Judgment: 7/15/2021. Defendant Michael Avenatti (1) was found guilty on count(s) 1s, 2s, 3s, after a plea of not guilty. Count(s) All open counts are dismissed on the motion of the United States. IMPRISONMENT: 24 months' imprisonment on Count One, and 30 months' imprisonment on each of Counts Two and Three, with all terms to be served concurrently. - The court makes the following recommendations to the Bureau of Prisons: The Court recommends that Defendant be assigned to the Camp at FCI Sheridan in Sheridan, Oregon. SUPERVISED RELEASE: 1 year supervised release on Count One, and 3 years' supervised release on each of Counts Two and Three, with all terms to run concurrently. Standard Conditions of Supervision (See page 5 of Judgment). Special Conditions of Supervision (See page 6 of Judgment). ASSESSMENT: $300.00, due immediately. RESTITUTION: $259,800.50. Special instructions regarding the payment of criminal monetary penalties: See Order of Restitution (Dkt. No. 376). (Signed by Judge Paul G. Gardephe on 2/18/2022)(bw) (Entered: 02/18/2022) |
| 02/23/2022 | 378 | NOTICE OF APPEAL by Michael Avenatti from 377 Amended Judgment. (wb) (Entered: 02/23/2022) |
| 02/23/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Michael Avenatti to US Court of Appeals re: 378 Notice of Appeal - Final Judgment. (wb) (Entered: 02/23/2022) |
| 02/23/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Michael Avenatti re: 378 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (wb) (Entered: 02/23/2022) |
| 02/23/2022 | | Appeal Remark as to Michael Avenatti $505.00 Appeal Fee Waived. Federal Defenders of New York, Inc. re: 378 Notice of Appeal - Final Judgment (wb) (Entered: 02/23/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/14/2022 12:22:55 | | | |
| **PACER Login:** | FDle0026 | **Client Code:** | |

| **Description:** | Docket Report | **Search Criteria:** | 1:19-cr-00373-PGG |
|---|---|---|---|
| **Billable Pages:** | 30 | **Cost:** | 3.00 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

MICHAEL AVENATTI,

Defendant.

- - - - - - - - - - - - - - - - x

SUPERSEDING INDICTMENT

S1 19 Cr. 373 (PGG)

OVERVIEW

1. The charges in this Indictment stem from an extortion and fraud scheme in which MICHAEL AVENATTI, the defendant, used confidential information provided by a client ("Client-1") to demand tens of millions of dollars in payments for AVENATTI himself from NIKE, Inc. ("Nike"), a multinational public corporation engaged in, among other things, the marketing and sale of athletic apparel, footwear, and equipment, by threatening to cause substantial economic and reputational harm to Nike if it did not give in to AVENATTI's demands. Specifically, AVENATTI threatened to hold a press conference on the eve of Nike's quarterly earnings call and the start of the annual National Collegiate Athletic Association ("NCAA") men's college basketball tournament, at which AVENATTI would publicly make allegations of misconduct by Nike employees, unless Nike agreed, in addition to making a payment of $1.5 million to Client-1, to "retain" AVENATTI and another attorney working with

AVENATTI ("Attorney-1") to conduct an "internal investigation" that Nike had not requested and for which AVENATTI demanded that he and Attorney-1 be paid, at a minimum, between $15 million and $25 million. Alternatively, and in lieu of such a retainer, AVENATTI demanded a total payment of $22.5 million from Nike to resolve any claims that Client-1 might have and to buy AVENATTI's silence. AVENATTI made these threats—including the demand for payments to himself and the threat to publicize confidential information provided to AVENATTI by Client-1—without Client-1's knowledge or consent.

RELEVANT INDIVIDUALS AND ENTITIES

2. At all relevant times, MICHAEL AVENATTI, the defendant, was an attorney licensed to practice in the state of California with a large public following as a result of, among other things, his representation of celebrity and public figure clients, as well as frequent media appearances and use of social media. As an attorney, AVENATTI was required to comply with all ethical and statutory obligations imposed on licensed attorneys, including ethical and legal obligations that impose duties of confidentiality, loyalty, honesty, and fair dealing with respect to all clients. In connection with his representation of Client-1, AVENATTI owed Client-1 duties of, among other things, confidentiality, loyalty, honesty, and fair dealing.

3. At all relevant times, Attorney-1 was an attorney licensed to practice in the state of California, and similarly was known for representation of celebrity and public figure clients, and frequent media appearances.

4. Nike is a multinational, publicly held corporation headquartered in Beaverton, Oregon. Nike produces and markets athletic apparel, footwear, and equipment, and sponsors athletic teams in many sports, including basketball, at the high school, amateur, collegiate, and professional levels.

5. Client-1 was the director and head coach of an amateur youth basketball program (the "Basketball Program") based in California. For a number of years, the Basketball Program coached by Client-1 had a sponsorship agreement with Nike pursuant to which Nike paid Client-1's program approximately $72,000 annually.

6. At all relevant times, "Outside Counsel-1" and "Outside Counsel-2" worked at a law firm based in New York and represented Nike.

7. At all relevant times, the "In-House Counsel" was an attorney who worked for Nike.

THE EXTORTION AND FRAUD SCHEME

8. In or about March 2019, MICHAEL AVENATTI, the defendant, was contacted by Client-1, who sought AVENATTI's legal assistance after the Basketball Program was informed by Nike that its annual contractual sponsorship would not be renewed.

9. On or about March 5, 2019, MICHAEL AVENATTI, the defendant, met with Client-1. During that meeting and in subsequent meetings and communications, Client-1 informed AVENATTI, in substance and in part, that Client-1 wanted Nike to reinstate its $72,000 annual contractual sponsorship of the Basketball Program, which, as noted above, Nike had recently declined to renew. During the meeting, Client-1 provided AVENATTI with information regarding what Client-1 believed to be misconduct by certain employees of Nike involving the alleged funneling of illicit payments from Nike to the families of certain highly ranked high school basketball prospects.

10. Although MICHAEL AVENATTI, the defendant, told Client-1 that AVENATTI believed that he would be able to obtain a $1 million settlement for Client-1 from Nike, at no time during the March 5, 2019 meeting or otherwise did AVENATTI inform Client-1 that AVENATTI also would and did seek or demand payments from Nike for himself in exchange for resolving any potential claims made by Client-1 and not causing financial and

reputational harm to Nike, or that AVENATTI would and did seek to make any agreement with Nike contingent upon Nike making payments to AVENATTI himself. Furthermore, at no time did AVENATTI inform Client-1 that AVENATTI intended to threaten to publicize the confidential information that Client-1 had provided to AVENATTI, nor did AVENATTI obtain Client-1's permission to publicize any such information.

*The March 19 Meeting*

11. On or about March 19, 2019, at approximately 12:00 p.m., Outside Counsel-1, Outside Counsel-2, and the In-House Counsel met with MICHAEL AVENATTI, the defendant, in New York, New York, during which the following occurred, among other things:

a. AVENATTI stated, in substance and in part, that he represented Client-1, a youth basketball coach, whose team had previously had a contractual relationship with Nike, but whose contract Nike had recently decided not to renew. According to AVENATTI, Client-1 had evidence that one or more Nike employees had authorized and funded payments to the families of top high school basketball players and attempted to conceal those payments, similar to conduct involving a competitor of Nike that had recently been the subject of a criminal investigation by the United States Attorney's Office for the Southern District of New York.

b. AVENATTI further stated, in substance and in part, that he intended to hold a press conference the following day to publicize the asserted misconduct at Nike, which would negatively affect Nike's public market value. In particular, AVENATTI stated, in substance and in part, that he had approached Nike now because he knew that the annual NCAA men's college basketball tournament—an event of significance to Nike and its brand—was about to begin, and further because he was aware that Nike's quarterly earnings call was scheduled for March 21, 2019, thus maximizing the potential financial and reputational damage his press conference could cause to Nike.

c. AVENATTI further stated, in substance and in part, that he would refrain from holding that press conference and damaging Nike if Nike agreed to two demands: (1) Nike must pay $1.5 million to Client-1 as a settlement for any claims Client-1 might have regarding Nike's decision not to renew its contract with the Basketball Program; and (2) Nike must hire AVENATTI and Attorney-1 to conduct an internal investigation of Nike, with a provision that if Nike hired another firm to conduct such an internal investigation, Nike would still be required to pay AVENATTI and Attorney-1 at least twice the fees of any other firm hired.

d. AVENATTI also stated, in substance and in part, that if Nike agreed to retain AVENATTI to conduct an

internal investigation, then Nike would be able to decide whether any misconduct uncovered by the investigation should be disclosed to law enforcement authorities.

e. At the end of the meeting, AVENATTI made clear, in substance, that Outside Counsel-1 and Nike would have to agree to accept those demands immediately or AVENATTI would hold his threatened press conference.

f. As noted above, at no time, including after the March 19 Meeting, did AVENATTI inform Client-1 that AVENATTI had (1) threatened to publicize confidential information provided to AVENATTI by Client-1, or (2) used that information to demand a multimillion dollar payment for himself.

12. After the meeting, representatives of Nike contacted representatives of the United States Attorney's Office for the Southern District of New York regarding the threats and extortionate demands made by MICHAEL AVENATTI, the defendant.

*The March 20 Call*

13. On or about March 20, 2019, Outside Counsel-1 and Outside Counsel-2 engaged in a conference call with MICHAEL AVENATTI, the defendant, and Attorney-1, which was consensually recorded by law enforcement. During that call, the following, among other things, occurred:

a. AVENATTI reiterated that he expected to "get a million five for our guy" (i.e., Client-1) and be "hired to

handle the internal investigation," adding, "if you don't wanna do that, we're done."

b. AVENATTI also reiterated threats made during the previous in-person meeting, along with his demand for a multimillion dollar retainer to do an internal investigation. With respect to such investigation, AVENATTI made clear, in substance, that his demand was not simply that he be retained by Nike, but also that he be paid millions of dollars by Nike in return for not holding a press conference.

c. In particular, AVENATTI stated, in part: "I'm not fucking around with this, and I'm not continuing to play games. . . . You guys know enough now to know you've got a serious problem. And it's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me. I'm just being really frank with you. So if that's what, if that's what is being contemplated, then let's just say it was good to meet you, and we're done. And I'll proceed with my press conference tomorrow . . . . I'm not fucking around with this thing anymore. So if you guys think that you know, we're gonna negotiate a million five, and you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done. . . . And I'll go and I'll go take ten billion dollars off your client's market cap. But I'm not fucking around."

d. AVENATTI also stated that an internal investigation of conduct at a company like Nike could be valued at "tens of millions of dollars, if not hundreds," saying, in part, "let's not bullshit each other. . . . We all know what the reality of this is," adding later in the conversation that while he did not expect to be paid $100 million, he did expect to be paid more than $9 million.

e. Finally, AVENATTI stated, in substance and in part, that he would agree to meet with Outside Counsel-1 in person the following day, Thursday, March 21, the date of Nike's scheduled quarterly earnings call and the beginning of the NCAA tournament, to present the exact amount AVENATTI demanded from Nike and under what terms it would have to be paid. AVENATTI further stated, in substance and in part, that Nike would be required to provide an answer the following Monday or he would hold his press conference.

*The March 21 Meeting*

14. On or about March 21, 2019, MICHAEL AVENATTI, the defendant, Attorney-1, Outside Counsel-1, and Outside Counsel-2 met in New York, New York. That meeting was consensually video- and audio-recorded by law enforcement. During that meeting, the following, among other things, occurred:

a. At the beginning of the meeting, at the direction of law enforcement, Outside Counsel-1 stated that he

did not believe that a payment to AVENATTI's client would be the "sticking point," but that Outside Counsel-1 needed to know more about the proposed "internal investigation." AVENATTI stated, in substance and in part, that he would require a $12 million retainer to be paid immediately and to be "deemed earned when paid," with a minimum guarantee of $15 million in billings and a maximum of $25 million, "unless the scope changes." Later during the meeting, AVENATTI also stated, in substance and in part, that an "internal investigation" could benefit Nike, by, among other things, allowing Nike to "self-report" any alleged misconduct, and that it would be Nike's choice whether to disclose such alleged misconduct.

b. Outside Counsel-1 reiterated, at the direction of law enforcement, that Outside Counsel-1 did not think paying AVENATTI's client $1.5 million would be a "stumbling block," but asked whether there would be any way to avoid AVENATTI carrying out his threatened press conference without Nike retaining AVENATTI. In particular, Outside Counsel-1 asked, in substance and in part, whether Nike could resolve AVENATTI's demands just by paying Client-1, rather than retaining AVENATTI. AVENATTI responded that he did not think it made sense for Nike to pay Client-1 an "exorbitant sum of money . . . in light of his role in this."

c. Outside Counsel-1 noted that Outside Counsel-1 had never received a $12 million retainer from Nike and had never done an investigation for Nike "that breaks $10 million." AVENATTI responded, in part, by asking whether Outside Counsel-1 had ever "held the balls of the client in your hand where you could take five, six billion dollars in market cap off of 'em?"

d. AVENATTI subsequently told Outside Counsel-1 and Outside Counsel-2, in part, "If [Nike] wants to have one confidential settlement and we're done, they can buy that for twenty-two and half million dollars and we're done. . . . Full confidentiality, we ride off into the sunset. . . ."

e. AVENATTI added, "I just wanna share with you what's gonna happen, if we don't reach a resolution." AVENATTI then laid out again his threat of harm to Nike, adding that, "as soon as this becomes public, I'm gonna receive calls from all over the country from parents and coaches and friends and all kinds of people, because this is always what happens—and they are all going to say I've got an email or a text message or—now, 90% of that is going to be bullshit because it's always bullshit 90% of the time. Always. Whether it's R. Kelly or Trump, the list goes on and on—but 10% of it is actually going to be true. And then what's going to happen is, this will snowball . . . and every time we get more information, that's

gonna be the Washington Post, the New York Times, ESPN, a press conference, and the company will die—not die, but they are going to incur cut after cut after cut after cut, and that's what's going to happen as soon as this thing becomes public."

f. Finally, AVENATTI agreed to meet at Outside Counsel-1's office on Monday, March 25, 2019, to hear whether Nike was willing to make the demanded payments. AVENATTI stated that Nike would have to agree to his demands at that meeting or he would hold his threatened press conference, stating in part, "If this is not papered on Monday, we're done. . . . I don't want to hear about somebody on a bike trip. I don't want to hear that somebody has, that somebody's grandmother passed away or . . . the dog ate my homework, I don't want to hear—none of it is going to go anywhere unless somebody was killed in a plane crash. It's going to go zero, no place with me."

g. At no point following the March 21 Meeting did AVENATTI inform Client-1 that Nike had offered to resolve Client-1's claims without paying AVENATTI. Nor did AVENATTI inform Client-1 that AVENATTI had continued to threaten to publicize confidential information provided to AVENATTI by Client-1, or that AVENATTI had continued to use that information to demand a multimillion dollar payment for himself.

*The March 21 Tweet*

15. Within approximately two hours after the conclusion of the audio- and video-recorded meeting described above, MICHAEL AVENATTI, the defendant, without consulting with Client-1, posted the following message on Twitter (the "March 21 Tweet"):

Michael Avenatti @MichaelA... · 36m
Something tells me that we have not reached the end of this scandal. It is likely far far broader than imagined...
adidas
College basketball corruption trial: Ex-Adidas exec sentenced to nine months in ...
cbssports.com
18
38
129

16. The article linked in the March 21 Tweet refers to a prior prosecution by the United States Attorney's Office for the Southern District of New York involving employees of a competitor of Nike referred to by MICHAEL AVENATTI, the defendant, in the initial March 19 meeting with attorneys for Nike.

*The Planned March 25 Meeting*

17. On or about March 25, 2019, MICHAEL AVENATTI, the defendant, arrived at the office complex of Outside Counsel-1 and Outside Counsel-2 in Manhattan, and he was arrested by law enforcement in the vicinity of that complex before the meeting could take place.

18. Shortly before his arrest, MICHAEL AVENATTI, the defendant, learned that law enforcement had approached Client-1. Without Client-1's permission, AVENATTI posted the following message on Twitter:

Michael Avenatti
@MichaelAvenatti

> Tmrw at 11 am ET, we will be holding a press conference to disclose a major high school/college basketball scandal perpetrated by @Nike that we have uncovered. This criminal conduct reaches the highest levels of Nike and involves some of the biggest names in college basketball.
>
> 12:16 PM · Mar 25, 2019 · Twitter for iPhone

COUNT ONE

(Transmission of Interstate Communications with Intent to Extort)

The Grand Jury charges:

19. The allegations contained in paragraphs 1 through 18 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

20. On or about March 20, 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, with intent to extort from a corporation money and a thing of value, transmitted in interstate commerce a communication containing a threat to injure the property and reputation of the corporation, to wit, AVENATTI, during an interstate telephone call, threatened to cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar payments to AVENATTI.

(Title 18, United States Code, Sections 875(d) and 2.)

COUNT TWO

(Extortion)

The Grand Jury further charges:

21. The allegations contained in paragraphs 1 through 18 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

22. In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, attempted to commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, AVENATTI used threats of economic and reputational harm in an attempt to obtain multimillion dollar payments from Nike, a multinational public corporation.

(Title 18, United States Code, Sections 1951 and 2.)

COUNT THREE

(Wire Fraud)

The Grand Jury further charges:

23. The allegations contained in paragraphs 1 through 18 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

24. In or about March 2019, in the Southern District of New York and elsewhere, MICHAEL AVENATTI, the defendant, having devised and intending to devise a scheme and artifice to defraud, and to deprive Client-1 of Client-1's intangible right to the honest services of AVENATTI, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice, to wit, AVENATTI, owing a duty of honest services to Client-1, engaged in a scheme to obtain payments for himself from Nike based on confidential information provided to AVENATTI by Client-1 for the purpose of furthering AVENATTI's representation of Client-1, without Client-1's knowledge or approval, and used and caused the use of interstate communications to effect the scheme.

(Title 18, United States Code, Sections 1343 and 1346.)

FORFEITURE ALLEGATION

25. As the result of committing one or more of the offenses charged in Counts One through Three of this Indictment, MICHAEL AVENATTI, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

Substitute Asset Provision

26. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461.)

[redacted]
FOREPERSON

[redacted]
GEOFFREY S. BERMAN
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**- v. -**

**MICHAEL AVENATTI,**

**Defendant.**

---

**SUPERSEDING INDICTMENT**

S1 19 Cr. 373 (PGG)

(18 U.S.C. §§ 371, 875, 1343, 1346, 1951, and 2.)

GEOFFREY S. BERMAN
United States Attorney.

[redacted]
Foreperson

---

11/13/19
CA

Superseding Indictment Filed
KH Parker
USMJ

Case 21-1778, Document 61, 04/04/2022, 3290318, Page77 of 263

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 19 CR 373 (PGG)

MICHAEL AVENATTI,

Defendant. Trial
------------------------------x
New York, N.Y.
January 29, 2020
9:35 a.m.

Before:

HON. PAUL G. GARDEPHE,

District Judge
-and a Jury-

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: MATTHEW D. PODOLSKY
DANIEL RICHENTHAL
ROBERT B. SOBELMAN
Assistant United States Attorneys

BLACK SREBNICK KORNSPAN & STUMPF, P.A.
Attorneys for Defendant
BY: HOWARD M. SREBNICK
-and-
SCOTT A. SREBNICK
JOSE M. QUINON
MICHAEL D. DUNLAVY
-and-
PERRY GUHA, LLP
BY: E. DANYA PERRY
GEORGE BARCHINI

Also Present:
DeLeassa Penland, Special Agent (USAO)
Andrew Hamilton, Paralegal
Juliana Manrique, Paralegal
Michael Lyon, Trial Technician

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(A jury of 12 and three alternates were selected and sworn)

THE COURT: Ladies and gentlemen, you are now a jury. There is no higher function in our legal system. From now on, whenever you enter or leave the courtroom as a jury, Mr. Ruocco will instruct the parties and the audience to rise, the same as he does for me, because you are every bit as powerful and important as any judge.

Let me reintroduce you to some of the people we have here in the courtroom. As I told you, my name is Paul Gardephe, and I will be the judge presiding over the trial. We are in Courtroom 110. If you forget what courtroom we are in, or how to get here, just ask one of the marshals at the entrance of the building and they will be happy to direct you.

I've already introduced you to Mr. Avenatti and his lawyers, Scott and Howard Srebnick, Mr. Quinon, Ms. Perry, Mr. Stabile, Mr. Dunlavy, Mr. Barchini. You've also met Mr. Podolsky, Mr. Richenthal and Mr. Sobelman, the Assistant United States Attorneys who are prosecuting the case.

In front of me sits Mr. Michael Ruocco, who is my courtroom deputy. He is the person to speak with if you have any questions or have any difficulties during the trial.

At our next break, Mr. Ruocco will show you back to the jury room. It is right behind this door. That's where you will report each morning. He will give you his telephone

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

number, where you can reach him if there is an emergency. I ask you to give him a telephone number where you can be reached in the evening.

Our trial days, generally speaking, will begin at 9:30. I told you before that we would end at 4:30. I am contemplating a schedule that would have us on some days at least end at 2:30 but have no lunch break. So, in other words, we would start at 9:30, take a brief recess at, say, 11/11:15 of no more than 15 minute, and then go for another couple of hours, take another 15-minute break, and then adjourn for the day at 2:30. I'm thinking about that schedule and will tell you more about that at the end of today's proceedings.

We will take a recess, as I said, in the morning and then in the afternoon. But I want to emphasize that if any of you need a recess at any other time, you just raise your hand and we'll take a recess.

I would ask you to be on time in the morning and after breaks, because if one of you is late, you'll keep everyone else waiting.

I have some preliminary instructions that I am going to give you now. They will take no more than ten minutes or so. After that, we will hear opening statements on behalf of the government and the defense, and then we will begin hearing testimony.

So let me turn to my preliminary instructions.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ladies and gentlemen of the jury, in the American system of justice, as I've told you, the judge and the jury have separate roles. My job is to instruct you as to the law that governs or controls the case. I'm going to give you some instructions now. I may give you other instructions during the trial. At the end of the trial, I will give you detailed instructions about the law you will need to apply when you deliberate.

Your job, as jurors, is to determine the facts based on the evidence that will be presented at this trial. You are the only triers of fact, and your decisions on the factual issues will determine the outcome of the case.

You must not take anything I may say or do during the trial as indicating what your verdict should be. Don't be influenced by my taking notes. What I write down may have nothing to do with this trial or with those matters that you have to be concerned about.

You must pay close attention to the evidence. Evidence consists only of the testimony of witnesses, documents, and other things that are received in evidence. And you will hear me say "received," and at that point that item becomes evidence; it becomes something that you can consider in your deliberations.

Sometimes the lawyers reach agreements as to certain facts, and those agreements are referred to as "stipulations,"

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000077

and they are also evidence.

There are certain things that are not evidence, and you must not consider them as evidence. For example, statements and arguments by lawyers are not evidence. They are simply arguments in which the lawyers will tell you what they think the evidence proves or how they think you should go about analyzing the evidence. You should give the lawyers' arguments only as much weight as is consistent with your own common sense, and you should under no circumstances consider lawyers' arguments as evidence.

Any statement I may make to you is not evidence.

Questions by lawyers are not evidence. Only the answers given by the witness are evidence. The question that the attorney asks is only important insofar as it places the witness' answer in context. For example, if a witness is asked "It was raining on June 2nd, wasn't it?" and the witness answers, "No," then based on that exchange, there is no evidence in the case that it was raining on June 2nd.

Objections to questions are also not evidence. Lawyers have an obligation to make an objection when they believe that evidence being offered is improper under the Rules of Evidence. You should not be influenced by the mere making of an objection. If I sustain the objection, you'll hear me a "Sustained," and you should ignore the question and any answer that may have been given. If I overrule the objection, you'll

hear me say "Overruled," and you should treat the answer just like any other.

From time to time, I may exclude or strike testimony or tell you to disregard it. If I do so, any answer that may have been given is not evidence and you may not consider it. If I instruct you that some evidence is only to be considered for a certain purpose, you must follow that instruction.

Anything you may have seen or heard or will see or hear about this case outside the courtroom is not evidence and must be disregarded. You are to decide the case based solely on the evidence presented here in this courtroom.

In deciding the facts of the case, you will have to make decisions concerning the credibility of the witnesses, that is, how truthful and believable they are. How do you decide what to believe and what not to believe? You listen carefully to the witnesses. You will watch them and observe them, and then decide as you would decide such questions in your ordinary lives: Did the witness know what he or she was talking about? Was the witness candid, honest, open, and truthful? Or did the witness appear to be falsifying, exaggerating, or distorting what happened? Is there any reason to think that the witness might be lying or just plain mistaken about what they're telling you?

Sometimes it's not so much what a witness says but how he or she says it that may give you a clue as to whether or not

you can accept that witness' version of an incident or an event as credible or believable. In short, the way a witness testifies may play an important part in your reaching a judgment as to whether or not you can accept the witness' testimony as reliable. You need to use your common sense and your life experience in evaluating each witness' testimony.

As the trial proceeds, you may develop impressions of a witness or of a particular issue. You must not allow these impressions to become fixed or hardened. In other words, you can't make up your mind right away. If you do, you will prevent yourself from considering the testimony of other witnesses or other evidence that may be presented after the witness or witnesses you have heard. This would be unfair to one side or the other. A case can only be presented step-by-step, witness-by-witness.

We know from experience that frequently one person's initial description of an event might sound impressive and even compelling, but when we hear another person's version of the same event, or even the same witness cross-examined about that event, what seemed to be very compelling and impressive may fall apart or become less convincing. Please remember that there may be another side to any witness' story.

You will use your common sense and your good judgment to evaluate each witness' testimony based on all the circumstances. You must keep an open mind. Until the trial is

over, you should not reach any conclusions until you have heard all the evidence.

Some of you may wish to take notes during the trial, and you are welcome to do so. If you do take notes, be sure that your note taking does not interfere with your listening to and considering all the evidence. Also, if you do take notes, don't discuss your notes with anyone before or during your deliberations. Your notes are to be used solely to assist you, and they are not to substitute for your recollection of the evidence in the case.

The fact that a particular juror has taken notes does not entitle that juror's views to any greater weight than the views of any other juror, and your notes are not to be shown to any other juror during your deliberations.

If during your deliberations you have any doubt as to any of the testimony, you will be permitted to request that the relevant portion of the trial transcript be sent back to you in the jury room.

There are three basic rules about a criminal case that you must keep in mind:

First, a defendant is presumed innocent until proven guilty. The indictment brought by the government against the defendant is only an accusation. It's proof of nothing. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the government until the very end of the case. A defendant has no burden to prove his innocence, or to present any evidence, or to testify. Since the defendant has the right to remain silent, the law prohibits you from arriving at your verdict by considering that the defendant may not have testified.

Third, the government must prove a defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later, but, as I have said, please bear in mind that in a criminal case the standard is much higher, a much higher standard of proof than that which applies in a civil case.

In order to ensure that you decide the case based solely on the evidence and that you not be influenced in any way by anything that might occur outside the courtroom, I must give you the following instructions.

First, don't discuss this case among yourselves or with anyone else, including any members of your family or your friends. You may tell your family that you are a juror in the case, but don't tell them anything else until after you have been discharged by me at the end of the trial. Also, you may discuss the case amongst yourselves only after all the evidence is in and the case has been given to you to discuss and to decide in the jury room.

This rule is important because experience has shown

that when someone expresses an opinion about a witness or about the larger case, that person begins to identify more strongly with that opinion. And since it's critically important that you keep an open mind until you have heard all the evidence, you should not discuss the case with anyone, including your fellow jurors, or communicate about the case in any fashion with anyone until the case is given to you at the end of the trial for you to reach your verdict.

As I told you earlier, it is vitally important that you not read anything in the newspapers, over the Internet, or anyplace else about the case, including any posts, blogs, any type of social media, whether it be Twitter, Facebook, LinkedIn, Instagram, or something else. Don't listen to or watch any reporting about the case if it should be broadcast on TV or the radio or on video on a site like YouTube or anyplace else.

Don't let anyone speak to you about the case. If you are approached by someone to speak about it, tell them that the Judge has directed you not to do so. If anyone seeks to contact you or contacts you about the case, you must immediately report that to me.

Next, and this is also critically important, don't do any research about the case. Don't try to investigate it on your own. Again, what is evidence is what comes in from the witness stand and nothing else.

Be sure that I'm told if someone you know comes into the courtroom. This is a public trial so that could happen. But it's important you do not hear from them what may have happened in the courtroom when the jury was not present. So if you should see a friend or relative come into the courtroom, please send a note to me through Mr. Ruocco at your first convenience.

The attorneys, the parties, and the witnesses are not supposed to talk to the jury outside the courtroom, even to offer a friendly greeting. So if you happen to see any of them outside the courtroom, they will not, and should not, speak to you. Please don't take any offense. They will only be acting properly by not speaking to you.

The parties are entitled to have you render a verdict in this case on the basis of your independent evaluation of the evidence presented here in this courtroom. Obviously, speaking to others about the case or exposing yourself to information about the case outside the courtroom would compromise your jury service and the duty of fairness that you owe to both sides.

Finally, let me say a few words about trial procedure. The trial essentially has three parts: First, the lawyers have the opportunity to make opening statements to you. These statements are not evidence. The purpose of opening statements is for the lawyers to give you a preview or a roadmap of what they think the evidence will be. Actual evidence, however,

comes from the witnesses and the exhibits that are received in evidence.

After the opening statements, you will hear testimony from witnesses. Because the government has the burden of proof, the government will call its witnesses first. Each witness will first give direct testimony, and then he or she may be cross-examined by the defendant's lawyers. Sometimes there is redirect testimony and recross-examination.

Exhibits and stipulations or agreements as to facts may be received in evidence.

After the government's case, the defendant may, but is not required to, present witnesses and other evidence. If the defense calls witnesses, those witnesses will be examined and cross-examined, just as the government's witnesses were. If the defendant presents evidence, it is possible that the government may then present some rebuttal to that evidence. Of course, the defendant never has to testify or to present any evidence at all, because the burden of proof at all times remains on the government.

After all the evidence has been received, the government and the defendant will have an opportunity to make closing arguments to you. The lawyers will review the evidence with you and make arguments as to what conclusions they think you should or should not draw from the evidence. These arguments also are not themselves evidence, but they may be

helpful to you in reviewing the evidence during your deliberations.

After these closing arguments, or summations, as they are called, I will give you detailed instructions as to the law that you must apply in deliberating and reaching your verdict.

Then you will go into the jury room to deliberate and discuss the evidence in order to decide the facts and render your verdict.

From time to time during the trial, it may be necessary for me to talk with the lawyers outside the hearing of the jury either by having a conference up here at the bench, if the jury is present in the courtroom, or by calling a recess. The lawyers and I will do this as little as possible. Please understand that while you are waiting, we are working. The purpose of any conference outside your hearing is not to keep relevant information from you but, rather, for me to decide procedural issues or how proposed evidence should be treated under the Rules of Evidence.

Ladies and gentlemen, that complete my preliminary instructions to you, and we will now hear the government's opening statement.

Mr. Sobelman.

MR. SOBELMAN: This is a case about a shakedown. This case is about how this man, Michael Avenatti, the defendant, betrayed his client. Like all lawyers, he was supposed to look

out for his client. Instead, he sold out his client and threatened to harm a major company. All to line his own pockets.

How did he do that? Extortion and fraud.

You see, the defendant had a weapon, a very modern weapon. He had a big following on social media and a big presence on TV and in the news, and he found a way to use that weapon. You will learn that that an amateur basketball coach came to the defendant looking for help. The coach had lost his sponsorship from Nike, the shoe company, and wanted it back. But the coach also told the defendant that Nike employees had given him money to pay to the families' amateur players. The coach told the defendant that he was afraid that what he and those Nike employees had done was illegal.

But when the defendant looked at the coach, he did not see a client to help. He saw dollar signs for himself.

The defendant knew that he could go on the news, get on the Internet, and tell people that Nike had done something wrong or broke the law. If he did that, it would really hurt Nike's image and value as a company. And he figured that Nike might pay up to keep him from hurting the company -- and pay up big. So the defendant made a threat. He told Nike that it better pay him or he was going to hold a press conference and accuse Nike of breaking the law.

The scheme is simple: Pay me and I'll keep quiet.

Don't pay me, and I'll hurt you.

The defendant may have been wearing a suit and a tie and using some legal terms, but make no mistake, it was extortion. There was a threat to harm Nike unless they pay up.

And it was also fraud. Who didn't the defendant tell about his plan? The coach. His own client. The one who wanted help from the defendant. The one who told him the information in the first place.

Why didn't he tell the coach? Well, first of all, the coach was not going to go along with this plan. The coach wanted to work with Nike again. But he also couldn't tell the coach because that was part of his scheme. He told Nike that he would get the coach to enter into a settlement only if Nike paid him, the defendant. He demanded a payoff to get his client to settle, and that's a crime. That's honest services fraud.

But the defendant didn't bet on Nike going straight to the authorities, and he didn't know that his threats would be recorded -- recordings that you will hear during this trial.

That's why we're here, because the defendant was caught on tape committing extortion and fraud.

Members of the jury, this is the government's opportunity to provide you a preview of what we expect the evidence will show. I'm going to do that in three parts:

First, I'm going to talk about the evidence that we

expect you are going to see and hear.

Second, I'll give you a brief description of the charges in this case.

Third, I'll describe how we're going to prove beyond a reasonable doubt that the defendant is guilty as charged.

I'm now going to tell you a little bit about the defendant's client and his relationship with Nike, because it will help you understand how the defendant committed fraud and extortion.

But before I do, I want to remind you of something. You will not be asked to decide whether the coach or anyone at Nike did something wrong or broke the law. There is only one person on trial here -- the defendant -- and two wrongs would not make a right.

So let's start with the coach who went to the defendant for help. His name is Gary Franklin. He runs a basketball program for kids in middle school and high school. The program is called California Supreme, or Cal Supreme for short.

Franklin built Cal Supreme from nothing into a nationally-recognized program with some of the best middle and high school players in the country. For more than ten years, Nike was Cal Supreme's sponsor. Nike gave basketball shoes and athletic clothing for Cal Supreme's players and coaches. Nike also gave Cal Supreme about $72,000 a year to help pay for

their program.

Franklin's relationship with Nike was going well until a few years ago, when two Nike employees had him give money to family members and other people connected to some of his players. They also had him create invoices, or bills, so that Nike would pay him back for those payments. But the Nike employees told Franklin to put things in the invoices that were not true, so that's what he did. Those two Nike employees also pressured Franklin to let a parent of one of his players coach Cal Supreme's top team instead of Franklin.

Then at the end of 2018, Nike did not renew its sponsorship of Cal Supreme. Nike stopped providing shoes, clothes, and funding.

Franklin was upset. He was loyal to Nike but felt mistreated over the last couple years.

He was also uncomfortable with the payments to families and the false invoices, and he was angry that control of his most important team had been taken away from him. He wanted to get back that team and the sponsorship.

So Franklin reached out to a friend, who knew the team, that had a contact at Nike. Franklin told his friend about the payments he made and the false invoices he submitted to Nike. He realized that this sounded like something that employees of another shoe company, Adidas, had recently gotten in trouble for. Those Adidas employees were convicted for

committing fraud by secretly paying amateur players to go to colleges that were sponsored by Adidas. Franklin became worried that he, too, could be in trouble.

For almost a year, Franklin and his friend talked and emailed and texted about their frustrations and tried to figure out what to do. In March 2019, Franklin's friend thought they should get a lawyer to help protect Franklin and to talk to Nike on his behalf. That's where the defendant came into the picture.

Franklin's friend had read about the defendant in the news. He saw the defendant on TV talking about a woman named Stormy Daniels, who brought a lawsuit against President Trump. He felt the defendant seemed willing to stand up to the powerful. So they reached out to the defendant. He agreed to meet with Franklin and his friend.

When they met, Franklin and his friend told the defendant that Franklin wanted justice. What did Franklin mean by "justice"? Franklin told the defendant that he wanted Nike to renew Cal Supreme's sponsorship and pay some compensation, money, for losses that Cal Supreme had suffered. Franklin also told the defendant that he wanted Nike to fire the two employees who had mistreated him and maybe committed crimes.

Franklin and his friend told the defendant about the two Nike employees who had directed Franklin to make payments to the families of a few of Cal Supreme's players and to make

false invoices, and they shared some bank records and text messages that helped explain what had happened. But they didn't want those materials made public, because they thought it might embarrass Franklin, the players' families, and Nike, or worse, so they marked the materials confidential.

The defendant told Franklin he would try to get him a million dollars from Nike. The defendant had other plans, too.

(Continued on next page)

MR. SOBELMAN: Franklin was his client, but he didn't tell Franklin about those other plans. Why? Because those plans were for himself, not Franklin. You see, the defendant realized that publicly broadcasting the payments that Franklin had made would make Nike look bad, maybe really bad. He thought Nike might be willing to pay and pay a lot to keep it all under raps, and he wanted that pay day for himself.

Without telling Franklin, his client, the defendant went to Mark Geragos, another TV lawyer who had been involved in high-profile cases, Geragos had a direct connection to someone high up inside Nike and set up a meeting for the defendant with Nike's lawyers. The defendant and Geragos met with Nike's lawyers here in Manhattan. The defendant told them they had a big problem. He said that he had evidence of widespread and serious criminal misconduct by Nike of payments made to youth basketball players, and he said he would hold a press conference to damage Nike's brand and stock price unless his demands were met immediately.

What were the defendant's demands? First, he told Nike's lawyers that they had to pay Franklin one and a half million dollars. Second, the defendant demanded a far larger payment for himself and Geragos, the lawyer who helped him get the meeting with Nike. He demanded that Nike hire him and Geragos to conduct a so-called internal investigation of Nike for millions of dollars. You will learn that an internal

investigation involves conducting interviews, reviewing documents, and writing reports on behalf of a company.

The defendant also told Nike's lawyers that if they didn't hire him, if they hired other lawyers to do an investigation, Nike would have to pay the defendant and Geragos twice the money that Nike paid to anyone else for doing no work at all.

Why should Nike do this? The defendant made clear that if he was not paid, he would hold a press conference to embarrass and harm Nike, and he would do so quickly. He would not let Nike just settle with Franklin, the defendant's client. Nike had to pay the defendant, too, and a lot more, more than $10 million more than the defendant was trying to get for Franklin.

As part of his threat the defendant warned them that this was a sensitive time for Nike because it was the same week as two important events.

First, Nike had an announcement of its corporate earnings coming up, which would be important to its shareholders, the people who owned Nike's stock. Second, March Madness, the NCAA men's college basketball tournament was beginning and Nike was a sponsor of many of the teams competing in that event. The defendant had them write where he wanted them. It was a shakedown. It was extortion. And Franklin, the defendant's own client, had no idea what he was up to.





Nike's lawyers could tell the defendant's threats were dead serious, and they were afraid he was going to damage the company. Within hours Nike reported the defendant's threats to the authorities.

After that, the defendant's conversations with Nike's lawyers were recorded by federal agents. In those conversations the defendant repeated his threats to Nike. He told Nike's lawyers that if they didn't pay up fast, he would damage Nike's values by billions of dollars. That's billions with a B. Nike had to hire him and Geragos and pay them $12 million right away. He also demanded up to 25 million if he actually did some work for Nike, whether Nike wanted it or not. If Nike refused, the defendant would hold his press conference.

You will hear how the defendant talked, how he spoke to Nike's lawyers behind closed doors, when he thought no one was listening. For example, this is how he told them they had to pay him millions to keep from holding his press conference, to keep him quiet.

You guys know enough now to know you've got a serious problem and it's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me. I'm just being really frank with you. If that's what -- if that's what is being contemplated, then let's just say it was good to meet you and we are done. And I will proceed with my press conference tomorrow, and I will hang up





with you now and I will call the New York Times, who are awaiting my call. I'm not fucking around with this thing anymore.

That is what you will hear the defendant say. He was shaking them down. He was saying, give me money or I will harm your company, money that he had no right to demand. It had nothing to do with his client. It was all about the defendant. It was extortion.

What if Nike didn't want to hire him and Geragos and pay for an investigation that Nike was not asking for? Well, the defendant had an answer for that, too. He said that if Nike just wanted him to just keep quiet and go away, Nike could pay one lump sum right away of more than $20 million. The defendant called it a settlement and typed up a document with some blanks to fill in. He showed it to Nike's lawyers, but he never told Franklin about it.

Ultimately, the defendant agreed to hold off on his press conference for just a few more days, but he wanted his money at that next meeting or else. You will hear exactly how the defendant ended that meeting. This is what he said. I don't want to hear about somebody on a bike trip. I don't want to hear that somebody has -- somebody's grandmother passed away or something. I don't -- look. The dog ate my homework. I don't want to hear -- none of it is going to go anywhere unless somebody is killed in a plane crash.





Members of the jury, this was nothing like the tough negotiating lawyers sometimes do. The defendant had not just crossed the line, he had leaped over it with a running start. He was not acting like a lawyer. He was not trying to help his client. He was trying to take advantage of his client. What he did was criminal. Fortunately, federal agents were recording those conversations, so they moved in and arrested him.

Why did the defendant do what he did? Simple. Money, lots of money, millions of dollars.

Also, you will learn that the defendant was deeply in debt and his law firm had trouble paying its employees. He owed a ton of money. And the scheme stood to make him the very millions he needed.

That is a summary of what the evidence will show. The defendant threatened Nike to pay him money or else he would inflict serious damage on its reputation and value, money for silence, and he did it without considering what Franklin wanted or what was best for Franklin, all to line his own pockets.

For what he did the defendant is charged with three crimes: First, he is charged with transmitting in interstate communication with the intent to extort; second, he is charged with attempting to extort Nike; third, he is charged with defrauding Gary Franklin by using his client's information to seek a payoff for himself.

Now, let's talk about how we are going to prove that the defendant is guilty of those crimes. The evidence will come in different forms, including recordings, witness testimony, and documents.

First, you are going to hear the defendant's own words. You will see and hear video and audio recordings of the defendant making threats to Nike and demanding money to keep quiet. You will hear for yourselves what the defendant said what happened to Nike if it didn't pay up and he held his press conference. He said, the company will die. Not die. But they are going to incur cut after cut after cut. And that's what's going to happen as soon as this thing becomes public. That is how he said pay me or else.

Second, you are going to hear from witnesses, including some of the Nike lawyers who met with the defendant. You will hear how they felt threatened by the defendant. You will learn about how they recorded the defendant's threats to the authorities.

What happened next? You are also going to hear from the defendant's client, Gary Franklin, and Franklin's friend. You will hear how they told the defendant about misconduct by two employees at Nike and what they wanted from Nike, including having those two employees fired.

Let me pause here for a moment. You will hear how Franklin felt wronged by those two Nike employees. He thought

some of what they had him do was improper and potentially even criminal, but that's not what this trial is about. This trial is not about whether Franklin was mistreated by Nike. This trial is not about whether anyone at Nike did anything wrong. Nike is not on trial.

What is this trial about? This trial is about how Franklin was mistreated by the defendant, his own lawyer. This trial is about how Nike was victimized by the defendant. Even if Nike did wrong, that did not give the defendant the right to do what you will learn he did. This trial is about how the defendant misused Franklin's information and threatened Nike for his own benefit. Franklin was the person who felt wronged by Nike, not the defendant, but the defendant used Franklin in an attempt to make millions for himself.

Both Franklin and his friend will tell you that the defendant never mentioned his scheme to them, never mentioned demanding to be paid millions. He never mentioned an internal investigation. He never mentioned a press conference. And Franklin did not want one. Just the opposite. The materials he gave the defendant were marked confidential for a reason.

Who else will you hear from? You will also hear from the defendant's former assistant. You will learn how desperate the defendant was for money at the time he committed these crimes. You will hear about the debts the defendant owed, many millions of dollars in debts. And you will also see documents.

One of those documents is a post the defendant put on Twitter. It was a veiled threat to Nike that the defendant called a warning shot in a text message to Geragos. You will see that text message, too. That is some of the evidence you will see and hear.

After you see and hear the evidence, we will have a chance to speak with you again and to talk with you about how the evidence shows the defendant is guilty because he abused his client's trust and tried to extort Nike, all to make millions of dollars for himself.

Before then, I ask you to do three things: First, pay close attention to the evidence; second, follow Judge Gardephe's instructions on the law; and, third, use your common sense as you consider the evidence, the same common sense you use every day. If you do those three things, the defendant will get a fair trial and the government will get a fair trial, and you will return the only verdict supported by the law and the evidence. The defendant is guilty.

THE COURT: Ladies and gentlemen, we will now hear the defense opening. Mr. Srebnick.

MR. H. SREBNICK: When Michael Avenatti met with the lawyers from Nike and the law firm of Boies Schiller here in New York City, he was there to settle the claims of his client. When Michael Avenatti made demands of Nike, he did so to achieve the goals of his client, the goals as his client had

stated to him, a client who had claimed that he had been bullied by Nike, that he had been asked to do improper things by Nike, a client who Coach Franklin explained to Mr. Avenatti that Nike had sidelined him, had taken away his team, and left him disreputed in the basketball community, a client who wanted justice, a client who was going to be a whistleblower and let the corruption be exposed, a client who wanted Nike executives who had participated in this corruption terminated, a client who, to use the words of Coach Franklin and his advisor, Mr. Jeff Auerbach, they wanted to light the fuse. They wanted answers.

In preparation for meeting with Mr. Avenatti, Coach Franklin and his advisor, Mr. Auerbach, presented Mr. Avenatti questions they wanted answers for.

Question No. 1: Is this a case of rogue executives from Nike committing egregious criminal acts on their own or was Nike, a Fortune 100 company, complicit in the corruption?

Question 2: Is Nike a company which tolerates workplace bullying and abuse by its senior executives?

Question 3. Is Nike's enterprise, the Nike Elite Youth Basketball, the racket, guilty of racketeering, having committed acts of fraud, bribery, coercion, conspiracy, illegal cash payments, wire fraud, mail fraud, bank fraud, money laundering, etc.?

Coach Franklin and his advisor, Mr. Auerbach, they

wanted answers. They did not want to whitewash. They had spent over a year trying to get answers, over a year where Nike blew them off. They wanted Michael Avenatti, their lawyer, to demand that an investigation occur so that they could bring justice to the situation.

And so when Michael Avenatti met with the lawyers of Nike, when Michael Avenatti met with the lawyers from Boies Schiller, former prosecutor no less that he met with, he made it very clear what his client wanted, no. 1, compensation, restitution, money and, No. 2, justice, an investigation, an internal investigation, a private internal investigation to root out the corruption at Nike.

This was a prelawsuit settlement conference. It occurred in a law office. And Michael Avenatti was asking for what his client wanted at that time, as evidenced by those three questions and the other items that were given to Mr. Avenatti by his client.

If Nike was willing to settle, they would reach a settlement agreement. It would all be put in writing. The lawyers from Boies Schiller, a 300 plus law firm here in New York City, a law firm that bills hundreds of millions of dollars a year to its clients, they would have to approve the settlement agreement. Nike, a Fortune 100 company, sales in the 30-billion-dollar-a-year range, their lawyers in-house would approve the settlement agreement.

But Mr. Avenatti made it clear, he was fighting for a client who wanted these remedies. And if Nike was unwilling to provide the remedies that Coach Franklin wanted, well, then Mr. Franklin's claims, the truth, would become public because, as we know, lawsuits are public filings. A complaint could be filed exposing in court, as we are here today in front of the world, in front of the media, Mr. Franklin's claims. That's not extortion. That's not fraud. That was litigation. That's exactly what it was.

Mr. Avenatti wasn't alone. He was accompanied by a colleague, a senior lawyer, Mark Geragos. I'll talk more about him in a moment, a very high-profile lawyer with a lot of experience. So when they made their request, their ask of Nike, it was done in the spirit of getting the client what the client wanted.

Who was the client you heard a bit from the prosecutor, Coach Gary Franklin, built up a youth team, basketball in California? Part of a Nike sponsored league of 40 teams. Coach Franklin had worked hard. He built loyalty. He built up a brand. He obtained a sponsorship from Nike of $72,000 a year. Developed a good reputation.

Why does Nike sponsor these teams? Nike is hoping that maybe one of the kids will become the next Lebron, the next Michael Jordan. So too does under Armour, so too does Adidas, sponsor youth leagues.

But out came the sneakers war, as it was called by Coach Franklin and his advisor, Mr. Auerbach. Nike executives suspected that Adidas was paying players, paying handlers to bring young kids to these basketball teams, paying the family members of basketball players, kids.

Two Nike executives, a Mr. DeBose and Mr. James, began directing Coach Franklin to do the same thing that was happening over at Adidas, paying handlers, paying family members, creating false invoices to conceal the cash payments. When I say cash, I include cash cash, structuring withdrawals to give green dollar bills to family members.

At one time the two Nike executives directed Mr. Franklin to get on an airplane from California, fly to Arizona to give cash to the family member of a kid who is playing basketball who, as it turns out, turned out to be the No. 1 draft pick in the NBA a few years later. Not a coincidence. These payments were concealed. The books and records of Nike did not reveal that cash payments, wire transfers to handlers, false invoices were being created to accomplish Nike's illicit objective.

At one point Nike was so eager, so eager to get the right players on a Nike team, they had a handler pay the handler to bring a seven-foot basketball player, a high school kid from Kansas. The handler would become the guardian of the kid. He would move to California and play basketball on the

California Supreme team, and by then Coach Franklin was no longer going to be in command of that team. The handler and this other person, two people, took over the team, and you can imagine how Coach Franklin felt about it back then.

Indeed, Franklin lost his sponsorship from Nike and felt he had been wronged. He wasn't going to participate any longer in those activities and now he was left out. He felt bullied, he felt strong-armed, in his own words.

He had begun tape-recording the Nike executives because he knew something wrong was going on. This is two years before they ever met Michael Avenatti. For a year, together with his advisor, Mr. Auerbach, they were trying to get Nike to do right by Coach Franklin, reaching out to Nike. They were ignored. And they expressed their sentiments to each other. As the prosecutor said, they spoke, they texted, and their sentiments were very clear.

By then Adidas was already under investigation and indeed Adidas executives had been indicted. This was huge news. Nike supposedly was cooperating with the Federal Government because Nike had received a grand jury subpoena. Now, Nike was under investigation. And still a year after the grand jury subpoena, a year after Nike supposedly cooperating with the government, the two Nike executives, DeBose and James, are still working at Nike.

So the advisor, Mr. Auerbach, and Mr. Franklin decide

they are going to go on a quest to expose what has happened. To use their words, they wanted justice. Nike executives had lied. Nike had irreparably harmed -- these are their words -- irreparably harmed Coach Franklin. Nike had bullied him, abused him, cheated, lied, colluded, committed fraud, corruption, strong arm. Those were the words, the sentiments of Coach Franklin and his advisor, Mr. Auerbach.

They wanted justice above all else. More important than the money, according to them, was achieving justice. And to them justice meant exposing the corruption in the youth basketball league. Quote, they wanted Nike to do the right thing. They wanted Nike to take swift action and to, quote, investigate, investigate their words, and fire the rogue executives. They wanted to stop further corruption.

Auerbach, the advisor, and you will hear more about Mr. Auerbach, a sophisticated guy, he had taken credit for putting together the NFL with the Jerry Maguire movie back when I was a younger man. You might remember the movie about an NFL agent. Auerbach on his profile takes credit for that. He had a relationship, so he said, with the founder of Nike, and Auerbach the advisor tells Coach Franklin, we are going to do this together, we are going to draft justice. We are going to write up what justice means. And they wrote it down to try to find a lawyer who would take the case.

No. 1, they wanted justice to be defined as preventing

Nike from taking any future illegal acts of corruption beginning with -- not ending with -- beginning with terminating the two rogue Nike executives, DeBose and James, to use their words for starters.

No. 2, they wanted fair and reasonable reparations, money for Coach Franklin.

In October of 2018, about five months before they meet Mr. Avenatti for the first time, they start the preparation of this effort to expose Nike. They contact a lawyer in early January of 2019, two months before they contact Mr. Avenatti, January 2019, about a year ago. His name was Trent Copeland. They reach out to attorney Copeland and they tell him, Franklin's words, what I'm looking for is justice. Clean up and reorganize Nike Elite Youth Basketball. Install new management. Install new procedures to prevent this type of abuse and criminal activity in the future.

It wasn't just about money. It wasn't just about his team. They wanted an investigation. They wanted new procedures. They wanted to uproot the corruption in youth basketball. And they wanted Nike to pay for all my legal and other related expenses in this matter. Three things: Compensation, justice through exposing and investigating the corruption, Nike pays all of the legal expenses associated with this.

Attorney Copeland doesn't take the case. And so

Auerbach says: I am going to call a high-level Nike executive named Slusher. Auerbach reaches out to Slusher at Nike and tells Slusher: We want justice. The word of the case, justice. Slusher asks: What does justice mean to you? Does that mean just firing the two executives from Nike? Answer: Yes, for starters. All of this is documented in memoranda by Auerbach.

What does Slusher say? Call the lawyers over at Boies Schiller. Go talk to them. You imagine Mr. Auerbach, Mr. Franklin, now they are going to call the 300-lawyer law firm and try to negotiate with them. Really? Auerbach decides the plan is, we are going to find a lawyer who can take on Nike, take on Boies Schiller and get justice, a lawyer with a high profile, a lawyer with a public platform, a lawyer who people listen to.

And so in 2019, in March, they contact Michael Avenatti who by then was the lawyer in America with the highest profile of any other lawyer, a lawyer who became nationally recognized because with 800,000 Twitter followers, having represented Stormy Daniels against the president of the United States, having appeared on national television more often than any lawyer perhaps in the history of the United States, the lawyer with the largest platform in the media, that's who they wanted. That's who they chose. That's who Coach Franklin wanted. That's who Auerbach wanted to take on Nike. Not

because he spends his days in the library researching case law. He does that, too. He brings lawsuits. He represents people in court. But they wanted this man right here because he had the platform to expose what had happened at Nike. That's why they chose him. And we can prove it. We can prove it because we have the exchange of communications between those two men.

Auerbach sent 119 videos of Mr. Avenatti on television, in social media, and said: Hey, Coach Franklin, this is Auerbach telling Coach Franklin, watch these. 800,000 Twitter followers, Coach Franklin. He has got the platform, Mr. Avenatti does. He had the skill set they wanted, the ability to expose the corruption, the ability to expose Franklin's claims. Franklin found it impressive.

Franklin was concerned that Mr. Avenatti wouldn't take the case. Copeland wouldn't take the case. Auerbach said: No. I think Avenatti will take the case because, quote, what will attract Avenatti is the opportunity to expose the injustice, to go after Nike, to really light the next fuse in the sneaker company scandal. A lot at play here for a guy like Avenatti. Those were the words of Auerbach and Franklin. Quote: A high profile case which can lead to good press for Mr. Avenatti and help Avenatti net other defendants. It was clear. What attracted Franklin and Auerbach to Mr. Avenatti was Avenatti's ability to get the attention of Nike because he had the platform in the media to do that. The claim would be

exposed if it would not settle, as lawyers do by way of a lawsuit.

They like Mr. Avenatti's bravado. They termed him the heavy artillery. Now, it is true, Mr. Avenatti is brash. He is aggressive, tenacious, bullish, hard charging, sometimes he's outrageous, and sometimes he might even be offensive.

But that's not what we put people in prison for. It's not a crime to be offensive. It's not a crime to use foul language from time to time, to use the F word. Mr. Avenatti has done it. It is what it is. But it's not extortion because you use harsh language in the course of negotiating for your client.

Franklin and Auerbach meet face to face with Mr. Avenatti in California. They express what they want. They share with him a Power Point presentation that's called Franklin v. Nike. It's what a lawsuit looks like. Gary Franklin v. Nike. They present Mr. Avenatti with a copy of a complaint, a lawsuit that had been filed against Adidas by a player, civil case, claiming racketeering by Adidas in which that plaintiff, the person asking for the money, was asking for all sorts of relief, including injunctions and attorney's fees.

They meet with Avenatti in person and they say to him, Michael, let me tell you what we want. To use their words, we want justice. We want to prevent this from happening again. That's what we want. And never once do they say to him, never

once do they say to him, you are not to expose this to the world. To the contrary. That's why they hired him.

They posed the three questions that I shared with you on the board. They give Mr. Avenatti the evidence that proves what had happened in California Supreme. The evidence of the fake invoices, the evidence of the cash withdrawals, the wire transfers to handlers, the text messages from Nike executives directing the coach to make fake invoices. Avenatti gets all of that. And he knows the claim is real. He knows it is the truth based on the evidence he has seen.

Now, Mr. Avenatti never takes one dollar from Gary Franklin or Mr. Auerbach, doesn't ask for any money up front, none. The truth is, Mr. Franklin didn't have the money to hire a lawyer. But as Auerbach said what was going to attract Mr. Avenatti financially to a case like this, getting justice through an investigation of Nike and, No. 2, the publicity that a case like this brings if it goes public. They understood that.

Mr. Avenatti agrees to take the case. No money down. Not even the expense money to get on an airplane to fly to New York to meet with the lawyers for Nike here in New York City.

Avenatti contacts attorney Mark Geragos, a high-profile lawyer who, as it turns out, had had a case with Nike. Geragos, the lawyer, had represented a very high-profile NFL football player who had a major controversy with Nike,

potentially an explosive situation, and Geragos representing that NFL football player, reached a very favorable settlement on behalf of that NFL football player. And to Michael Avenatti it seemed to him Geragos, the lawyer, was the right person to bring in to work this case with him, to conduct this investigation that Michael Avenatti understood the clients wanted.

Geragos, who knew people at Nike, contacts his counterpart at Nike, a guy named Kaplan, and says, hey, I just spoke to Mr. Avenatti. He has got a client. His client has claims against Nike. It could be explosive. I think you are going to want to meet us about it. And Nike agrees to set up a meeting with Avenatti and Geragos in New York City.

You will recall perhaps there was a lawyer named Michaelson on behalf of Boies. He was the first lawyer referred to Mr. Auerbach. Now, another lawyer, Mr. Wilson was introduced into the conversation. A Mr. Homes was another lawyer who ends up attending the meeting on behalf of Nike. We don't have a picture of Mr. Homes. We apologize.

And Nike sends its No. 2 lawyer in-house, a guy name Leinwand. When you meet Mr. Leinwand, you will realize we have an older picture of him. He is a little older than he appears there. And on behalf of Mr. Franklin, Michael Avenatti and Mark Geragos. And this meeting occurs at Mr. Geragos' office here in New York. By then Avenatti and Geragos had discussed

an internal investigation, how much it would cost to do that which they believed certainly Michael Avenatti believed the clients wanted. These are internal investigations. I don't think there will be any dispute. When you have to hire private investigators, accountants, forensics, paralegals, lawyers. Boies Schiller itself admitted that these investigations cost upwards of tens and tens of millions of dollars.

The money doesn't go to Mr. Avenatti's pocket. It goes into an account to pay for the investigation. It would include Mr. Avenatti getting paid for sure. That's how he will make money. It will include Mr. Geragos getting paid for sure. That's how they will make money.

So Geragos sets up the meeting. It occurs at the offices of Mr. Geragos in New York. Nike, the 3500-billion-dollar-a-year company represented by Boies Schiller on the one side. Avenatti and Geragos at the other side. Mr. Wilson, the lawyer for Boies, you see him in the picture, a former prosecutor. Mr. Michaelson, who is not at the meeting, but is connected with this negotiation, also a former prosecutor. Avenatti knows he is going into the room with a former prosecutor.

What Michael Avenatti did not know was that the Boies lawyers had already conferred among themselves. To use their words, they were, quote, on red alert that Michael Avenatti was coming to make an ask on behalf of a client. They knew who

Case 21-1778, Document 61, 04/04/2022, 3290318, Page87 of 263

Michael Avenatti was. They also knew what Coach Franklin had been complaining about, because by then Coach Franklin had been blown off so many times by Nike, they knew who he was. They were on red alert.

Their mission on that first meeting wasn't to settle a claim, which is what Michael Avenatti thought he was going to. Their mission was to contain Michael Avenatti. Their mission was to make sure that they got out in front of Michael Avenatti and Coach Franklin and Geragos because what Nike was worried about was the truth coming out. That's what Nike was worried about.

You will recall, as I mentioned earlier, that grand jury subpoena. That federal investigation still hadn't closed. Nike was still in the process of cooperating, whatever that means, with the Federal Government producing records. You will hear they hadn't produced all the records relating to this matter by March of 2019.

To them Nike had been successful in containing the truth. There had been no exposure of all the payments to the handlers Nike was up to. In fact, Nike was saying they had done nothing wrong. Nike was telling the feds they had done nothing wrong. We know that's not true. We know that now.

Now, Avenatti goes to that meeting with the authority of his client to try to see what he can get on behalf of his client. All it was was a negotiation asking Nike on behalf of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

his client for remedies, for relief, what lawyers do every day.

And I believe the instructions of law will tell you there is absolutely nothing wrong for Gary Franklin, on his own behalf, to demand from Nike that they pay him for any plausible claims he has. He can ask them to investigate. He can ask them whatever he wants as an ask if he has a claim of right. or he can hire a lawyer to do that for him.

That's what he did. He hired Michael Avenatti. So Michael Avenatti goes to a meeting in New York on March 19 and let's Nike know exactly what Gary Franklin wants. Mr. Geragos starts the meeting, the lawyer who is working with Avenatti. And Geragos said: Hey, I spoke to Michael. Michael has got claims on behalf of a client that would go public if there is a lawsuit. I, Geragos, suggested to Avenatti, let's meet with the Nike lawyers. They can maybe reach a settlement, just like Geragos had done on behalf of the NFL football player not long before.

Avenatti starts the meeting by saying: We all understand this is a settlement conference. He invokes a rule of evidence regarding settlement conferences. He makes two demands. No. 1, the client agrees to cooperate. Nothing that is settled here will prevent the client from talking to the government if the government wants to hear about these things. He makes that very clear up front. We are not buying anybody's silence here. Client gets compensated and Nike agrees to an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

internal investigation conducted by Avenatti and Geragos.

See, Avenatti and Geragos by then realize that there must have been some sort of whitewash, whitewash meaning the so-called investigation Nike was doing wasn't producing any kind of investigation. The two Nike executives were still employed at Nike, the ones who had done wrong to Coach Franklin.

The ask for Mr. Franklin, $1.5 million of compensation to Mr. Franklin. The investigation, direct quote from Mr. Avenatti. Quote: Whatever it costs, it costs. He insists that the investigation, however, be run by Franklin's team, Avenatti and Geragos. Don't go hiring some other law firm that's going to do a whitewash. If you do that, it's going to be more expensive, and he disincentivizes Nike from trying to do a whitewash. He doesn't think Boies Schiller can do it because Boies Schiller is Nike's lawyer. They are not incentivized to find anything wrong at Nike. They have been running this investigation for two years. Produced nothing for about a year and a half.

Wilson for Boies responds. Quote: We have an interest in conducting an internal investigation surrounding these allegations. So Boies Schiller tells Michael, that sounds like a fair request. We know now that they were trying to set up Michael Avenatti. But what does Michael Avenatti hear? Hey, Boies Schiller appreciates that Mr. Franklin's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

claims are real.

The inhouse attorney for Nike, Mr. Leinwand, who I think is on the screen in a younger form. He says: I want to see the evidence. What have you got? Mr. Avenatti produces the evidence in the form of the documents that coach and advisor Auerbach had provided Avenatti.

At no time in the meeting on March 19, the meeting attended by the lawyers for Nike and Mr. Avenatti, do the Nike people deny the accusation. They don't say: Hey, Avenatti, what are you talking about? This is a bunch of BS. Get out of the office. You got no claim. Your client has got no claim here. Skedaddle. They don't do that. They don't deny it.

In fact, after seeing the evidence, Leinwand says to Avenatti: I get the claims. We just need more time to try to settle it. Avenatti is a tough negotiator. He understands the power of urgency. You don't let the other side: Hey, take all the time you need. Talk to me in a few weeks. No. Avenatti says: We are going to do business. We are going to do it soon.

And, as the prosecutor read, in a less animated tone, I admit, Avenatti uses this harsh language. I ain't F'g around. If you guys aren't ready, I will just call the press and tell them we are going to move forward. Again, the press reports lawsuits every day of the week. If the lawsuit is public, you can talk about it. It's in the media. The Adidas

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000087

Case 21-1778, Document 61, 04/04/2022, 3290318, Page88 of 263

lawsuit was in the public. For God's sake, Michael Avenatti's indictment is in the media. We have heard all about that here. Lawsuits are public and there is absolutely nothing wrong with Michael Avenatti telling the truth, which is if we don't sell the case, this is going to be all over the media. If it's all over the media, the stock market might react. That's the truth. That's reality.

Now, he gave a prediction. He doesn't really know what the stock market will do. Nobody does. But he said, it could knock off billions of dollars of market cap, creating urgency. You all want to settle this case.

In a recorded meeting the next day the Boies lawyers want to get Michael Avenatti to put a number on that internal investigation. How much? I think we will show the FBI and Boies were going to say: How do we get Avenatti to give a number so we can get it on tape? Avenatti says: I'll take whatever Boies Schiller would charge. He lets them set the price. You will hear five times Avenatti says to Boies Schiller lawyers: Hey, stop. How much would Boies Schiller charge? That's good enough for me. Boies Schiller won't give a number. He asks again. He asks a third, a fourth, a fifth time. How much would Boies Schiller charge?

Now, in truth, Boies Schiller has done investigations in the tens of millions of dollars. They did an internal investigation on this matter. We will find out during the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

course of the trial how much Boies Schiller charged Nike for the internal investigation that produced not a single person being fired, not a single finding of wrongdoing, what we call a whitewash.

Finally, finally, Boies Schiller lawyer Scott Wilson says: It can cost 10 to $20 million. Well, if you're the lawyer for the other side, Mr. Avenatti here is 10 to $20 million. That's what my opposing counsel was saying it would cost. So Avenatti comes back and says: OK, here is the deal. A million five for my client, internal investigation is going to cost a minimum of 15 million right in the middle of that sweet spot that Boies Schiller had said was what they could charge for something like this. It will be a maximum of 25 million. 12 million down. Take that back to your client.

Remember, these are negotiations. I think a dozen times the lawyers for Boies Schiller said: Hey, we don't have authority here. We are just chitchatting. This is just talk. We have got to talk to corporate. We have got to talk to the board. We have got to talk to the whole world before we can get approval. But just tell us, Mr. Avenatti, what is your ask. We don't have any authority to give you what you want and what your client wants. Avenatti gives the ask. And still no one from Boies Schiller is denying the truth of the allegations that Michael Avenatti advances on behalf of his client.

So a third time, a third time they meet, March 21, in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

person. And that's when Avenatti puts the number on it based on what Boies Schiller said they would charge.

But that's not good enough for Boies Schiller and the FBI. They want to get more. They want to get him on tape again. So now Boies Schiller says: Hey, Avenatti, listen. What if you and Geragos don't do the internal investigation? Why don't we just do one big number, no internal investigation? Avenatti and Geragos say stand by and step outside of the negotiating room. They spend five minutes caucusing, the two lawyers.

They come back and they say: Look, if you want a settlement where you all handle the investigation, Boies Schiller deals with it, Boies Schiller has to self-report to the feds, you want Franklin's claims to be settled, he throws a number out, 22 and a half million dollars. That would be a great payday for Mr. Franklin, wouldn't it. And it would be paper. Avenatti brings a settlement document, a draft, a settlement agreement that leaves the number blank. Insert here number. Again, no one on the other side has the authority to settle.

So Avenatti and Geragos propose 22 and a half million dollars. The confidentiality clause would still allow Franklin to speak to the feds. Nothing would be concealed from the Federal Government. The only thing that would be confidential are the terms of the settlement, how much. But even that would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

be available to the feds by way of a subpoena. This was not buying silence. This was simply settling Gary Franklin's claims.

This would have to be signed off by everyone at Nike, signed off by everyone at Boies Schiller, signed off by Mr. Franklin, signed off by Avenatti. It would all be paper. It would be real. It wouldn't be like those fake invoices that Nike had been doing and no heads had rolled over up until then.

That was March 21 and the arrangement was that Avenatti would come back on a Monday -- I think the 21st was a Thursday -- Avenatti was scheduled to come back on Monday to hear the reaction of Boies Schiller to the two proposals, 22 and a half million, you guys do the internal investigation, Boies, or one and a half million plus 15 million, whatever the terms were if we have to do the internal investigation. Get back to us.

But they didn't get back to Michael Avenatti because Avenatti gets arrested. The FBI arrests him as he is going to the offices of Boies Schiller to hear what Boies Schiller has to say. The FBI and Boies Schiller had worked together, got Avenatti arrested so they could get out in front of Gary Franklin's claims. They could get out in front of the truth.

And yet no one from the FBI had ever spoken to Gary Franklin at that point about what his wishes were. They have spoken to Gary Franklin since then. They have spoken to Jeff

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000088

Auerbach since then. You can imagine how those two men reacted when they found out that Avenatti was arrested. They, of course, became worried because they saw the media.

And you will likely find out that their testimony may change since they met with Mr. Avenatti. And this courtroom will be a fight for credibility. It will be a search for the truth by you. Your job will be to watch them as they testify and compare what they say now to what they said back then, when they were meeting with Mr. Avenatti, because we have it in hard paper, what they were telling each other, what they shared with lawyers, what they shared with Avenatti.

And I believe the truth is, they wanted Avenatti. They wanted Avenatti to be Avenatti. They were hiring Michael Avenatti to be Michael Avenatti. And everybody knew who Michael Avenatti was. Boies Schiller knew who Michael Avenatti was. That is why they were on red alert.

You will also find out that the SEC, the Securities and Exchange Commission, since Avenatti was arrested and all this became public, have opened an SEC investigation of Nike. SEC, the Securities and Exchange Commission, they regulate public companies making sure that they are honest in their filings. That investigation has begun. And the SEC, which is not the Department of Justice, the SEC is looking into the same evidence. Whatever the Department of Justice got from Nike has been turned over to the SEC.

And who is coming to testify? Lawyers who still work for Nike. To whom do you think they owe their allegiance to when they take the witness stand? They are here supposedly to tell the truth. But you know to whom they owe their allegiance. The people who butter their bread.

The government will try to paint a picture of Michael Avenatti. That because he had debts you should conclude that he wasn't Avenatti, that he didn't perform the way that he should have, his judgment was clouded by the debts that he needed to make money. Avenatti in that room was Avenatti, whether he had debts or didn't have debts. He was doing what Avenatti does. That's what Franklin, that's what Auerbach wanted.

Avenatti's debts are not the issue in this case. This is not a civil case. This is not debt court. We are in a courtroom in a criminal case where someone's freedom is on the line. Michael Avenatti was hired by Franklin and Auerbach because they wanted him to be himself. They knew what they were buying for free, by the way, since they didn't give him any money. They knew what they were getting and they knew that he was going to get paid by Nike, not by them.

Now, let me just say Mr. Avenatti is a courtroom lawyer. He is sitting here at my side. You will see him from time to time passing me notes. My brother Scott, part of the defense team; Danya Perry; Mr. Lyon, who is handling the

technology; Jose Quinon; Mike Dunlavy; George Barchini, you will see us all confer, and he is going to be Avenatti because he is a lawyer, so he will participate with us, and you should expect to see him passing notes. Nothing wrong with that.

At the end of the trial it is for you to decide whether Michael Avenatti's aggressive, tenacious, demanding behavior that you will listen to, you will hear about, constitutes a crime. Michael Avenatti was being a lawyer fighting for what he believed his client wanted. And if it meant he had to go up and grab the tiger by the tail and if it meant he could make a living doing it, so be it. That's OK.

Ladies and gentlemen, that's all I have. Thank you.

THE COURT: Is the government prepared to proceed?

MR. PODOLSKY: Your Honor, at this time the government calls Scott Wilson.

SCOTT RONALD WILSON,

called as a witness by the government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. PODOLSKY:

Q. Good afternoon, Mr. Wilson.

A. Good afternoon.

Q. What do you do for a living?

A. I'm an attorney.

Q. Where do you work?

A. I work at the law firm of DLA Piper here in Manhattan.

Q. Where did you work previously to working at DLA Piper?

A. Immediately prior to joining DLA Piper I worked at the law firm of Boies Schiller Flexner, also here in Manhattan.

Q. Are you familiar with the company Nike?

A. Yes, I am.

Q. How are you familiar with Nike?

A. Nike has been a client of mine for several years.

Q. Have you met an individual named Michael Avenatti?

A. Yes, I have.

Q. About when did you meet him?

A. I met Mr. Avenatti in March of 2019.

Q. And where were you?

A. I was in the offices of another attorney on Fifth Avenue in Manhattan.

Q. Why were you there?

A. I was there because I had been asked to meet with Mr. Avenatti and the other attorney at the request of my client, Nike.

Q. We will get into detail, but at a high level, what happened when you met Mr. Avenatti?

A. When I met Mr. Avenatti, he threatened to hold a press conference and go public with allegations that Nike had been involved in corruption in amateur basketball unless we paid him off to the tune of millions of dollars.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page90 of 263

Q. Did you speak with him more than once?
A. I spoke with Mr. Avenatti on three occasions.
Q. Were any of those conversations recorded?
A. The second and third were.
Q. Do you see Michael Avenatti in the courtroom today?
A. I do.
Q. Can you identify him by describing where he is sitting and an article of clothing he is wearing.
A. He is standing and he is wearing a blue tie.

MR. PODOLSKY: Your Honor, may the record reflect that the witness has identified the defendant.

THE COURT: The record will so reflect.

Q. Before we talk about those meetings or discussions in March 2019, I want to get into a little bit of background.
A. Sure.
Q. When did you graduate from law school?
A. In 2007.
Q. Where did you work after you graduated?
A. Immediately after graduating I joined the law firm of Boies Schiller.
Q. What was your position at that time?
A. An associate attorney.
Q. What does it mean to be an associate at a law firm?
A. Associate is a junior attorney who works on cases, usually under the supervision of the partners.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q. How long were you an associate at Boies Schiller?
A. From 2007 until the beginning of 2011.
Q. What did you do at that point?
A. I joined the New York Attorney General's office.
Q. What was your position at the New York Attorney General's office?
A. I was, from 2011 to 2013, senior advisor and special counsel to the Attorney General.
Q. What were your duties and responsibilities in that position?
A. I was involved in overseeing criminal and civil investigations by the office, conducting investigations, and trying cases in court.
Q. What types of criminal investigations were you involved in?
A. A variety of things. Money laundering, public corruption, charities fraud.
Q. You mentioned civil investigations as well. What did you mean by that?
A. Everything from investigations into securities fraud, to environmental protection matters, to consumer protection cases.
Q. Just so we understand, what is the difference between a criminal investigation and a civil investigation?
A. Sure. In both cases the office was investigating violations of laws. The criminal cases involved violations of laws that were punishable with criminal penalties, like fines

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

or imprisonment.
Q. And in the case of civil investigations, what are the consequences?
A. Those are cases, again, where we would be investigating potential violation of laws. The remedies that the office could obtain on behalf of the public would include restitution, changes in behavior by defendants, but not criminal fines or imprisonment.
Q. I believe you said that that office that you've been referencing is the New York Attorney General's office. Is that separate from the United States Attorney's Office?
A. It is. The New York Attorney General's office is a state agency, not a federal agency.
Q. And approximately how long did you spend at the New York State Attorney General's office?
A. Approximately three years.
Q. What did you do at that point?
A. I rejoined the law firm of Boies Schiller.
Q. What was your position when you rejoined the firm?
A. When I went back to the firm I was a partner.
Q. What does it mean to be a partner of a law firm?
A. It can mean different things at different firms. It generally means you are in charge of overseeing cases on behalf of the clients of the law firm.
Q. Just a couple of background questions. Where is Boies

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Schiller located?
A. It's located at 55 Hudson Yards in Manhattan, which is on 34th Street between Tenth and Eleventh Avenues.
Q. What type of work did you do as a partner at Boies Schiller?
A. I primarily represented companies in connection with government investigations. I conducted internal investigations for companies. And I also represented companies in civil litigation.
Q. Let me follow up first on the internal investigations. Can you explain what an internal investigation is.
A. Sure. A company that has a sense that it may have been involved in wrongdoing one way or another may hire lawyers to gather facts through taking various steps within the company to gather those facts and then provide advice to the company about the company's legal risk and whether the law has been violated.
Q. So we understand, when you're conducting an internal investigation, who is the client? Who are you working for?
A. The client is generally the company itself.
Q. What's the ultimate point or goal of an investigation, generally speaking?
A. There may be different perspectives. From my perspective, the ultimate point is for the senior leadership of the company to obtain an understanding of what's happened at the company and legal advice regarding whether what's happened would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000090

violate laws or otherwise expose the company to risk.
Q. Before we go on, let me ask one other question about internal investigation. What types of techniques or steps would you take, generally speaking, in an internal investigation of the type you conducted?
A. Sure. First of all, it's generally internal, meaning you're looking at documents within the company, various categories of documents. Everything from payment records to e-mails, potentially to text messages on employees' phones. You're conducting interviews of employees who are asked to meet with counsel for the company by the company. Those would be the principal steps that are generally taken as part of an internal investigation.
Q. You referenced that you also, while at Boies Schiller, did some work in civil litigation?
A. I did, yes.
Q. Just generally, so we can understand, what do you mean by civil litigation?
A. Sure. Referring to when two parties in a dispute go to court to seek judicial resolution of that dispute and are represented by attorneys before the Court in that dispute.
Q. Do all disputes end up in court?
A. No.
Q. Are you occasionally brought in to help a client with a dispute that's not in court?

A. Yes. Frequently.
Q. And, generally, what steps might one take in that instance?
A. Sure. Generally, I work with the client to understand their perspective on the dispute, potentially communicate with the other side regarding the opponent's view of the dispute, and it's certainly possible that the party could work out their differences before either side has decided to file a lawsuit and go to court.
Q. Are you familiar with the term settlement or settlement negotiations?
A. Sure, yes.
Q. Can you just explain what that means?
A. Sure. These refer to discussions between two parties that have a legal dispute about whether or not they can reach a consensual resolution of that dispute without the need for litigation or without the need to continue litigation if it has already been filed.
Q. Have you been involved in settlement negotiations in your line of work?
A. A number of times, yes.
Q. Are you familiar with the term mediation?
A. I am, yes.
Q. What is a mediation?
A. Mediation could be viewed as a subcategory of settlement disputes -- excuse me -- settlement discussions where there is,

however, a third party neutral present in the discussions, meaning it's not just the two parties arguing with each other. There is a neutral third party who has been invited to participate and mediate the parties' dispute.
Q. Who pays for that third party to come in and help resolve the dispute?
A. In a private dispute it's usually -- the question of who pays for the mediator's time is usually resolved by agreement by the parties before the mediator is brought in. And what's typical in my experience is the parties split the cost of the mediator.
Q. Generally, how would parties select a mediator to help resolve a dispute?
A. Again, by agreement. Each party might propose names of mediators they would like to work with or, in some instances, would go to a consulting firm that employ often retired judges who are available to serve as mediators.
Q. I believe you said the mediator was a third-party neutral, or something along those lines. Can you explain what that means, neutral?
A. Sure. What would be typical is that the mediator is not affiliated with either party, and so it's a neutral arbiter of the dispute.
Q. Now, a few minutes ago you testified that Nike was a client of yours.

Do you recall that?
A. Yes, I do.
Q. Was Nike a client of yours while you were at Boies Schiller?
A. It was, yes.
Q. Can you just explain, what does it mean to be a client?
A. Sure. So client is an individual or a company who has entered into an agreement with a law firm to represent that client's interests, whether in dispute or settlement talk or any other endeavor.
Q. Who was your main contact at Nike?
A. Principally, a gentleman named Robert Leinwand.
Q. And, generally, what was his position at Nike?
A. Mr. Leinwand is chief litigation counsel for the company charged with overseeing the litigation and investigations work for Nike.
Q. Is he an attorney?
A. He is, yes.
Q. Is he an attorney in a law firm or is he employed directly by Nike?
A. He's an in-house attorney. He is employed by the company. He works at the company.
Q. Just so for avoidance of doubt, what type of company is Nike?
A. Nike is a large publicly traded American company engaged in

the business of manufacturing and selling footwear and athletic apparel.

Q. Where does Nike do business?

A. Nike is headquartered outside of Portland, Oregon, but it does business throughout the United States and around the world.

Q. You mentioned a few moments ago that it's publicly traded. What did you mean by that?

A. So I meant by that that it is a company whose shares are available for purchase by members of the public on public securities markets.

Q. Who can buy or own shares of Nike stock?

A. Anyone who buys stock from an individual to a large public pension fund, anyone who is in the market.

Q. You mentioned earlier that you currently work at DLA Piper. What is that?

A. DLA Piper is a law firm, a large global law firm with offices in more than 40 countries.

Q. Approximately when did you join DLA Piper?

A. At the beginning of November of last year, 2019.

Q. Did you go directly from Boies Schiller to DLA Piper?

A. I did, yes.

Q. Did your leaving Boies Schiller and joining DLA Piper have anything to do with the circumstances of this case?

A. No, it did not.

Q. Is Nike still a client of yours at DLA Piper?

A. It is, yes.

Q. Now, at the beginning of your testimony you mentioned that the defendant threatened to harm your client, Nike, in March of 2019.

Do you recall that?

A. I do, yes.

Q. How did he threaten to harm? What sort of harm did he threaten?

A. He threatened specifically to take billions of dollars off the market cap of the company by engaging in a media war to publicize these allegations of corruption.

Q. And so we understand, what was the subject matter of the allegations?

A. Sure. He suggested that he had come into possession of evidence, that there were Nike employees who had been involved in making payments to young basketball players that were corrupt.

Q. Before we get further into that, I want to ask you some background so I can understand why that might harm Nike.

What involvement does Nike have, if any, with amateur basketball?

A. Nike certainly sells shoes and apparel to basketball players all around the country, including amateur players, and, more specifically, it sponsors a prominent league for youth

basketball players called the Elite Youth Basketball League.

Q. What does it mean to sponsor that league? What does Nike do?

A. So the league is a tournament-style league in which 40 different teams participate, and Nike had sponsorship agreements with each of those programs that field the teams. And under the sponsorship agreements Nike provides product for the kids to wear and also money in many cases to defray the expenses of those programs and having their kids participate in the events.

Q. So you mentioned that it's kids playing in these leagues. What ages are we talking about?

A. The EYBL teams that compete are 17-and-under teams. But the programs from which they are drawn also have children playing in earlier age brackets, so teenagers generally.

Q. Are you familiar with what's known as the National Collegiate Athletic Association?

A. I have heard of it, yes.

Q. Also usually called the NCAA?

A. Right, yes.

Q. Generally, what is the NCAA?

A. The NCAA is an organization that organizes competition among college basketball teams.

Q. Does the NCAA have any rules regarding who may play basketball in the competitions you have described that it

organizes?

A. To my knowledge, it has a thick book of rules governing that subject matter.

Q. At a very high level, may any player play for an NCAA team, or are there particular rules about who may play?

A. One of the principal rules that I'm familiar with is that the player has to have maintained their amateur status to participate in the NCAA basketball.

Q. What does amateur status mean?

A. Amateur status is defined under a number of NCAA rules that contain exceptions and subparts, but in general the player can't have been paid to play basketball. That would generally cause the player to lose his amateur status.

Q. You say generally. Are there some instances in which an amateur player can receive money but still not lose amateur status?

A. Yes. There is a particular exception that I'm aware of for players receiving money in connection with the reasonable expenses that they incur in participating in something like the EYBL, the Elite Youth Basketball League.

Q. Just so I understand, as long as an EYBL player, that is, a 17-and-under player, maintains amateur status, that player could go on to play an at an NCAA school, is that correct?

A. That's my understanding, yes.

Q. Did there come a time when you learned of an investigation

by the United States Attorney's Office in the Federal Bureau of Investigation here in New York into payments made by athletic companies to amateur basketball players?

A. Yes.

Q. Generally, how did you learn of that investigation?

A. I learned of the investigation from news reports of the arrest of an Adidas executive.

Q. What is Adidas?

A. Adidas is a company that, like Nike, is engaged in the manufacture and sale of shoes and athletic apparel.

Q. Do you recall approximately when you learned of the arrest of an Adidas executive?

A. I do. It was in September of 2017.

Q. And can you explain what your understanding of what that investigation was concerned with?

A. My understanding of what the government charged in that case is that the Adidas executive was involved in secretly bribing a player or the family of a player in exchange for that player agreeing to go to an NCAA school sponsored by Adidas.

THE COURT: When you say a particular school, you mean a college or a university?

THE WITNESS: That's correct.

Q. And, to your understanding of that case, why would an Adidas executive or employee pay a player to go to a particular college or university?

A. My understanding is that among the colleges and universities considered to be strong in basketball, only a couple of them are sponsored by Adidas and, therefore, I suppose that the motivation that the government described in its charge was that it would contribute to the success of that school in competition and potentially lead that talented player to sign with Adidas as a sponsorship when that player went pro, if indeed that player went pro.

Q. To your understanding of the theory of that case, would it always be unlawful for Nike to give money to an EYBL player or family of an EYBL player?

A. No. My understanding under the theory of that case is that it would have had to have been a secret payment in exchange for a player agreeing to go to a particular NCAA school.

Q. Now, did there come a time when Nike received a subpoena from the United States Attorney's Office here in the Southern District of New York relating to its investigation into Payments to amateur basketball players?

A. Yes, it did.

Q. Do you recall when that was?

A. I do.

Q. When was it?

A. It was within 24 to 48 hours of the news of the Adidas executive arrests breaking in the press.

Q. And just, first, can you explain what a subpoena is?

A. Yes. A subpoena is a written document that requests the recipient to produce documents or sometimes testimony to the law enforcement agency that's issuing the subpoena.

Q. And for anyone who has not seen a subpoena, what does it look like? What is it?

A. It's usually pretty short. The cover page would tell you what agency is requesting the documents or testimony, when they are due, to whom you should deliver them. And after that cover page there are usually instructions about how to bundle up electronic documents to the extent that the documents being sought are electronic. And then following that there is typically a list of topics, meaning these are the topics of the documents that the government wants you to give them.

Q. Let's talk first at a general level. When a company like Nike receives a subpoena, generally, what steps are taken in response?

A. Large companies receive any number of subpoenas. Depending on the perceived seriousness of it, they might engage outside counsel to help respond to the subpoena, or they might respond to it internally using their own lawyers employed at the company.

Q. Let's take the example of asking about an outside firm to help. Was Boies Schiller engaged in that kind of assistance for companies like Nike?

A. Yes. In fact, we were engaged by Nike to assist in

responding to this.

Q. Again, generally, what steps are taken to respond to a subpoena like this?

A. Sure. There are internal steps and there are external steps. On the internal side, counsel works with in-house counsel to locate documents that might respond to the subpoena and collect them and review them. And externally counsel may interact with the law enforcement office that's issued the subpoena to find out essentially what they are looking for.

Q. In the case of the subpoena to Nike concerning amateur basketball, were you involved in responding to that subpoena?

A. Yes, I was.

Q. Did attorneys interact with the United States Attorney's Office regarding what was requested by that subpoena?

A. Yes.

Q. At a high level what types of documents was that subpoena looking for?

A. The subpoena had approximately eight or nine numbered items, topics, excuse me, that it was looking for. But, in general, they related to the topic of payments to amateur or NCAA players.

Q. Did Nike provide documents to the government in response to that subpoena?

A. With the assistance of counsel, yes, it did.

Q. Did it provide all those documents at once or provide it

over time?
A. No. The company made what we call rolling production, meaning an initial production, and then as more documents were identified and ready to be produced, those were sent over as well.
Q. I believe you testified a few moments ago that Nike received the subpoena just after the Adidas executive was arrested in September 2017.
Do you recall approximately when Nike began producing documents to the government?
A. I do. Our first production was within several weeks of the company's receipt of the subpoena.
Q. Now, did there come a time when Nike believed it had complied with the subpoena and produced all the documents requested?
A. Yes. In May of 2018, we informed the United States Attorney's Office for the Southern District of New York that Nike had substantially completed its production of documents that the subpoena called for.
Q. Now, if that was in May of 2018, did Nike at any time after that produce additional documents?
A. There were subsequent occasions on which we produced more documents.
Q. Do you remember approximately when after May 2018 Nike produced further documents?

A. There were additional document productions in very early 2019, I believe February.
Q. And what prompted the production that you recall began in February?
A. There was very little contact with the U.S. Attorney's Office in the second half of 2018. But in January 2019, a prosecutor with the office reached out to Boies Schiller and asked for production of additional documents with respect to some specific youth basketball programs.
Q. Were there any productions after that?
A. Yes.
Q. What caused later production?
A. In addition to producing the documents sought by that request, there were some small additional follow-up requests from the prosecution. And then later, after I met Mr. Avenatti, we produced additional documents as well.
Q. We will come back to that a little bit later.
I'll just ask one other bit of background quickly, which is, has Nike been asked for documents relating to amateur basketball by any other government agency?
A. Yes, it has.
Q. What agency is that?
A. The United States Securities and Exchange Commission.
Q. What is the Securities and Exchange Commission?
A. The Securities and Exchange Commission, or the SEC, is a

level regulator. It's a federal agency charged with enforcing the nation's securities laws.
Q. And do you recall approximately when the SEC asked for documents?
A. I believe it was April of 2019.
Q. And, generally, what did they ask for?
A. Not too dissimilar from the U.S. Attorney's Office subpoena. The SEC asked for documents relating to payments to players.
Q. What is your understanding, if you have one, of what that SEC inquiry or request is about?
A. I understand it to be focused on the topic of the subpoena, payments to amateur players. Beyond that, I don't know.
Q. Do you know whether documents were requested only of Nike in that investigation?
A. When we received the subpoena, I noted that the caption on the subpoena, including the name of the case or the name of the matter under which they issued the subpoena, was called in re or in the matter of something like athletic companies or athletic apparel companies, which led me to believe that this was a request in connection with an investigation broader than just Nike.
Q. With that background in mind, let's now focus on March of 2019.
I want to start by asking you, are you familiar with

somebody named Mark Geragos?
A. Yes, I am.
Q. Who is that?
A. Mr. Geragos is the attorney whose office I mentioned earlier on Fifth Avenue in Manhattan, which is where I met Mr. Avenatti.
Q. Did there come a time when you spoke to him?
A. I first spoke to Mark Geragos in March of last year.
Q. Had you heard of Mark Geragos before the first time you spoke to him in March?
A. Yes, I had.
Q. Just generally, what did you know about him?
A. I knew that he had represented celebrities in criminal defense matters in Los Angeles for at least the past couple of decades, and I also knew that he had interacted with Nike in connection with the sponsorship agreement for an athlete that he represented.
MR. PODOLSKY: Let's pull up just for the witness for the moment what has been marked for identification as Government Exhibit 203.
Q. Mr. Wilson you should be able to see it on your screen. Can you?
A. I do, yes.
Q. Do you recognize this document?
A. Yes.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page95 of 263

K1SWAVE3 Wilson - Direct

Q. What type of document is it?
A. It's an e-mail chain between myself and Mr. Geragos.
Q. And what's the date of the top e-mail?
A. The last e-mail is dated Thursday, March 14, 2019.

MR. PODOLSKY: Your Honor, at this time the government offers Government Exhibit 203.

THE COURT: Is there any objection?

MR. H. SREBNICK: No objection.

THE COURT: Government Exhibit 203 is received.

(Government Exhibit 203 received in evidence)

MR. PODOLSKY: May I publish, your Honor?

THE COURT: Yes.

Q. Mr. Wilson, now that everyone can see what we are looking at, can you explain, what is this document?
A. This is an e-mail chain that began when I reached out to Mr. Geragos on Wednesday, March 13.

MR. PODOLSKY: So just to orient ourselves to the timeline here, Mr. Hamilton, can you bring up the bottom of the first page and the top of the second page.

Q. Is what we are looking at now on the screen that goes over the first to the second page the first e-mail in this chain, Mr. Wilson?
A. The first and the second, yes.
Q. Let's focus on the first. Who wrote that bottom e-mail, the very first e-mail in the chain?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1SWAVE3 Wilson - Direct

A. I did.
Q. And what's the date and time on that e-mail?
A. It's dated Wednesday, March 13, 2019, at 10:20 a.m.
Q. Who is this e-mail to?
A. It was to Mark Geragos.
Q. Why don't you go ahead and read, if you don't mind, the top of the second page, what you wrote to Mr. Geragos.
A. Sure. I wrote: Dear Mr. Geragos, we are counsel to Nike, and I am reaching out in response to your call to Casey Kaplan. Please let us know when today would be convenient to speak and what number to call. We should have some availability in the early afternoon. Regards, followed by my signature block.
Q. Let me ask first, who is Casey Kaplan?
A. Casey Kaplan is a lawyer in the legal department of Nike.
Q. Why did you write this e-mail to Mark Geragos?
A. I understood at this time that Mr. Geragos had reached out to Mr. Kaplan indicating that Mr. Avenatti wanted a meeting with the company.
Q. At this point had you ever spoken or met with Mr. Avenatti?
A. No.
Q. What did you know about him at this time?
A. I was aware that he was an attorney in private practice in California and that he had represented individuals in a couple of high-profile matters. And in connection with one or both of those matters he had appeared on television dozens of times.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1SWAVE3 Wilson - Direct

Q. Now, did you speak to Mr. Geragos after you sent this e-mail?
A. I did. I was impatient to speak to him, so I called after I sent the e-mail and he had not responded.
Q. Why were you impatient to speak with him?
A. We were pretty concerned and eager to find out what it was that these guys wanted to talk to the company about.
Q. Why were you concerned and eager to find out?
A. Well, I understood that when Mr. Geragos had reached out to Mr. Kaplan, he had indicated that Mr. Avenatti was insisting on meeting with someone from the company. And, in my experience, when a plaintiff's attorney wants a meeting, it's not to give you something. It's to ask you for something.
Q. Let me just ask one or two follow-ups on what you just said.

First of all, you mentioned plaintiff's attorney. What did you mean by that?
A. I meant an attorney who typically represents plaintiffs, rather than defendants, in civil litigation.
Q. Who is the plaintiff's attorney you were referring to?
A. Mr. Avenatti.
Q. You mentioned that it was your understanding that he had insisted on meeting with someone from the company. Did I get that right?
A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1SWAVE3 Wilson - Direct

Q. What did you understand that to mean?
A. Well, I understood that he had said he wouldn't meet with Boies Schiller. He wanted to meet with someone from the company. Usually, one of the benefits of sending your outside lawyer to meet with someone is that that outside lawyer can always say, I have to check with my client before I can agree to anything. So it suggested to me that he would have a demand, and he wanted someone in the room from the company to hear that demand directly or potentially to be able to agree to it or to respond to it on the spot.
Q. Now, who participated in the call that you referenced a few moments ago with Mr. Geragos after you sent this e-mail?
A. I called Mr. Geragos on speaker phone, and I had a junior associate in my office sit in on the call to take notes.
Q. Is that common practice, to have a note taker?
A. I don't know if it is everyone's practice. It's certainly my practice.
Q. And what did Geragos say on that phone call?
A. Mr. Geragos said that he was in Rhode Island participating in a mediation, that he was going to be back in New York the next day, and that he had something that we should talk about that was too sensitive to discuss over the phone.
Q. What was your reaction to him saying that it was too sensitive to discuss over the phone?
A. I think my pulse accelerated, and I was concerned.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000095

Q. Why?
A. In my experience, one of the only reasons to insist that something can't be discussed over the phone is that you are concerned that the FBI or someone else may be listening to your phone calls.
Q. Did he tell you anything about what he wanted to speak to you about?
A. All Mr. Geragos was willing to say is that he had been shown some stuff or some documents, I don't remember which word he used, that suggested that Nike might have an Adidas problem.
Q. What did you understand Adidas problem to mean?
A. He didn't elaborate on the call, but the context I had was that the arrest and subsequent conviction of the Adidas executive that we were talking about earlier was in the press around this time.
Q. Now, what, if anything, else do you recall Geragos saying about the meeting or discussion he wanted to have?
A. He suggested that we would have a mediated discussion.
Q. What did you understand mediated discussion to mean?
A. At that time I didn't know what he meant and I didn't ask.
Q. Did you understand the meeting that he was proposing to be a mediation?
A. Since there had not been a client or claim identified, I didn't know what possibly we could be mediating, so no.
Q. Let me follow up on that. Did he mention a client?

A. No.
Q. Did he mention any legal claim?
A. No, he did not.
Q. How were things left at the end of the call?
A. It was left that we would follow up over e-mail to set the location and time of the meeting he had requested.
Q. Why don't we look back at the e-mail to orient ourselves. Who wrote the very next e-mail on the chain?
A. The next e-mail was written by Mr. Geragos.
Q. What did he say?
A. He wrote: Thanks for reaching out and does late tomorrow a.m. work.
Q. Was that sent before or after your phone call?
A. This was after he and I had gotten off the phone.
MR. PODOLSKY: If we can go back to the e-mail. Maybe we can just blow up the top half.
Q. Do you see that you then responded to his e-mail: Yes. Could you do 11:30 a.m. at our offices at 55 Hudson Yards?
A. I see that, yes.
Q. What is 55 Hudson Yards?
A. That's the name of the office building where my office was.
Q. Do you see that Geragos responds: Can you do 11:30 at my office at 256 Fifth Avenue?
A. Yes, I see that.
Q. You respond. How do you respond?

A. I wrote back: Due to our schedules tomorrow, we will need to meet here if you would like to meet in person.
Q. Who wrote the next e-mail?
A. I wrote again the next day when I had not heard back from him.
Q. What did you write?
A. I wrote: Hi, Mark. Should we expect you at 11:30 today or do we need to reschedule. Regards, Scott.
Q. Did he respond?
A. He responded in the afternoon also on Thursday.
Q. To summarize, can you explain what happened between the call you have on the morning of Wednesday, March 13 and the following day, March 14?
A. Yeah. We were supposed to meet on Thursday, but after I had responded to his request that we do the meeting in his office by saying I want to do it in my office, he just didn't get back to me then before Thursday at 11:30 had come and gone.
Q. Did you speak to him again?
A. I spoke to him again the next day after his last e-mail here. We spoke on Friday, March 15.
Q. Who was on that call?
A. I had the call with Mr. Geragos on speaker phone and I had, I believe, a different junior associate at my law firm to sit in and take notes.
Q. What did Geragos say on that call?

A. On that call I think we talked a little bit where we were going to meet, and I asked him who was going to attend. He said that it would be Mr. Avenatti and him. I asked him if Mr. Avenatti was his client. He said no. There was a client. But that that client wasn't attending the meeting.
Q. Did you say who would attend from your side?
A. I told him that Mr. Leinwand would join me at the meeting.
Q. Where did you understand this meeting would take place?
A. He was insisting it take place at his office at that address on Fifth Avenue we were looking at.
Q. Is that here in morning?
A. It is. In the twenties.
Q. Where was Mr. Leinwand located at that time?
A. Mr. Leinwand was in Portland, Oregon.
Q. Why were you going to have Mr. Leinwand fly across the country for this meeting?
A. As I mentioned earlier, we were pretty much on red alert because we were concerned, what do these guys want to meet about, what's the subject matter. We wanted to find out what they had to say. And so if he was going to insist on me bringing a client representative to the meeting, if that was the price of admission to the room to hear what they had to say, we decided we would do that.
Q. Do you recall Geragos saying anything else on that call about the subject matter of the meeting?

A. Only, again, that he was trying to be discreet, that it was too sensitive to discuss over the phone, but that Nike would thank him or it would be good for Nike to take the meeting.

Q. How were things left at the end of that call?

A. It was left that we would meet at his offices on Tuesday of the following week.

Q. And did you meet at his office on the Tuesday the following week?

A. I did, yes.

Q. Do you happen to recall the date of that meeting?

A. It was Tuesday, March 19, 2019.

Q. Who was at that meeting?

A. I was accompanied by my client, Mr. Leinwand, and a junior associate from my firm. Also at the meeting were Mr. Avenatti and Mr. Geragos. There may have been someone else in Mr. Geragos' firm on the floor, but not attending the meeting that we were having.

Q. Can you describe the room that you were in?

A. Sure. It was a conference room on the fourth floor of his building. He told me at some point that he owned the building with a conference room table parallel to Fifth Avenue, big, tall, bright windows overlooking Fifth Avenue and with an office adjacent to the conference room but blocked off by a glass as a see-through wall.

Q. Was there anyone in that office while you were meeting?

A. There may have been an assistant coming in and out. I don't have a strong recollection.

Q. Can you describe how people were arranged at the meeting, where people were sitting?

A. I sat at the head of the table, so the north end of the table. My client and my colleague sat to my left with their backs facing the windows, their backs at Fifth Avenue. Mr. Geragos sat to my immediate right and next to him further down the table was where Mr. Avenatti was sitting.

Q. Who did most of the talking at this meeting?

A. I would say Mr. Avenatti and I did most of the talking.

Q. Do you remember word for word everything that was said at this meeting?

A. No, I do not.

Q. Do you remember some of the words that were said?

A. I do, yes.

Q. Why do you remember some of the words that were said?

A. This was a very unusual meeting for me to be taking. Some of the language was shocking. Some of the language involved expletives. I was already very focused going into the meeting that I might be required to remember what was said because we were dealing with a potentially volatile situation.

Q. Let's start talking about what happened at that meeting. To your recollection, what happened first when you sat down?

A. So as we were getting situated, I think there was some

chitchat about our offices, Hudson Yards versus Fifth Avenue. And the first thing I really remember is saying to Mr. Geragos and Mr. Avenatti: Look, I'm here now. I don't know what this is about. What's it about?

Q. What was the response?

A. Mr. Avenatti responded by asking me if this would be a 408 discussion.

Q. What was your understanding of that phrase, 408 discussion?

A. I understood him to be referring to Rule 408 of the Federal Rules of Evidence.

Q. Just generally, what did you understand that would mean in this context?

A. Rule 408 is a rule that governs the admissibility of offers and demands for settlement in a settlement talk. So if you have a settlement conversation and you offer to settle a case for a hundred bucks and then later in court you are arguing that the case is worth a million dollars, the other side can't say, aha, when we were having our settlement discussion you agreed the case was worth $100. It's a rule that provides some confidentiality with respect to offers and demands made in a settlement talk.

Q. Did you understand at this point that this was a settlement discussion?

A. Absolutely not.

Q. Why not?

A. Because I didn't know who the client might be. I didn't know what claim we might potentially be discussing settling. I have never been asked to engage in a Rule 408 discussion without knowing at least those things.

Q. Now, after asking about the meeting being a 408 discussion, what did Avenatti say next?

A. Well, the next thing that happened was I responded yes, that I would agree to it being a 408 discussion.

Q. Why did you do that?

A. Again, just as our reasoning behind flying Mr. Leinwand across the country, I wanted to get these guys to say whatever it was they wanted to say.

Q. And what happened after you agreed this was a Rule 408 discussion?

A. So once I said that, Mr. Avenatti launched into what felt like a rehearsed speech. He began by saying he represented a whistleblower, a whistleblower who had information about payments to amateur players by Nike, including in particular the top pick in the 2018 NBA Draft.

Q. How did you respond?

A. I asked him who was the top pick in the 2018 NBA Draft.

Q. Why did you ask him that?

A. To throw him off because he seemed like he was about to launch into a speech.

Q. What did he say next?

A. He seemed a little surprised that I asked, and he said it was DeAndre Ayton.

Q. What happened after that?

A. Then he resumed his remarks. He said that he had documents and other information from his whistleblower indicating that specific named Nike employees were involved in this misconduct, in this corruption. He named two employees who he said were involved. He said a third employee was involved and a fourth employee might have been involved. He said that the payments related to other players as well and later named two other players.

And then I started to talk about -- he told me that he was aware that Nike had received a grand jury subpoena in 2017, that he suspected that Nike had not been forthcoming with the government in its response to that subpoena and that could be a big problem for Nike as well.

Q. Now, a little bit ago you testified about your understanding of the government's theory in the Adidas case and investigation.

Do you recall that?

A. I do, yes.

Q. You recall testifying regarding that the theory had to do with payments to get a player to go a particular college or university?

A. Secret payments, hidden payments to the player or the

family of the player in exchange for that player agreeing to go to a college or university sponsored by Adidas, yes.

Q. During this speech that you have described, what, if anything, did Mr. Avenatti say about the purpose of the payments that he was identifying as corrupt?

A. He didn't say anything about their purpose.

Q. What happened next after he laid out the speech and described -- named the employees that you mentioned?

A. What I recall next, and the order of my recollection might not be perfect, was that he said Nike was going to do two things. Nike was going to pay a civil settlement to his client, who he said had breach of contract, tort, or other claims, and Nike was going to hire Mr. Avenatti and Mark Geragos to conduct an internal investigation into corruption in basketball.

Q. Did he at that point explain any further what he meant by those two requests or demands?

A. Not at that point in the conversation, no.

Q. You mentioned that he said that there was some kind of breach of contract or tort claim. Did he provide any other information about what legal claims his client might have?

A. He literally just used those words, the phrase breach of contract, the phrase tort or tortious conduct or other claims. There was no elaboration or detail offered I remember because I was very focused on hearing what he might be trying to explain.

Q. What was your reaction to his description of his client's claim?

A. It sounded like he didn't know whether or not his client in fact had claims.

Q. What did you understand him to be saying when he said that Nike would hire him and Geragos to do an internal investigation?

A. I had initially no idea. I was flabbergasted. My jaw nearly hit the table.

Q. Why were you flabbergasted by that request?

A. I have never asked a company to hire me that I'm adverse to. This is someone who is sitting down with me saying, I have a client that's adverse to. I'm opposing counsel. One of the things I want from you is for your client to hire me. That would be extremely unusual, in my experience.

(Continued on next page)

BY MR. PODOLSKY:

Q. Before we go on, you had testified that the beginning -- the conversation began with a speech about corruption at Nike and that Avenatti's client was a whistleblower. Do I recall that correctly?

A. Yes.

Q. Did he -- Avenatti explain what connection his client had to this so-called corruption?

A. I asked a couple of times who the client was, and he initially declined to identify him. He said that he was the head of a program or a program director who had been involved in these payments in connection with the Nike employees making the payments.

Q. What was your reaction to him telling you that his client was involved in these payments that he was describing?

A. Again, I -- it made me highly suspicious that he might not be representing his client, he might not be acting in the best interest of his client because --

MR. H. SREBNICK: Objection, your Honor.

THE COURT: Sustained.

MR. H. SREBNICK: Move to strike.

THE COURT: Yes, the motion is granted.

BY MR. PODOLSKY:

Q. Without going into what you thought Mr. Avenatti might be thinking, what about describing a client as being involved in

these payments surprised you?

A. I said it out loud in response to him. I said that if you believe your client has been involved in criminal activity, have you contacted the Department of Justice or the Securities and Exchange Commission. I was shocked that he was, seemingly out of the bat with somebody he has just met, implicating his own client in criminal activity. That struck me as an incredibly odd thing for the representative of a client to do on that client's behalf, saying my client is a criminal.

Q. What -- how did he respond to your question about whether he had gone to one of the government agencies you referenced?

A. He seemed surprised and indicated that he had not.

Q. What happened next at this meeting?

A. When he said that, I asked him, "How do I know you're not wearing a wire?"

Q. And how did he respond to that?

A. He responded by laughing and opening his jacket and saying, in essence, or sum and substance, I'm not.

Q. Why did you ask him if he was wearing a wire?

A. Again, because I felt like what was happening was he was saying I have someone with information that could be relevant to a criminal investigation by the Department of Justice and I'm not going to go public with that if you pay me off. So I felt like he was asking me to engage in something improper.

Q. Now, how did you respond to the demands that you laid out

earlier, the settlement and the internal investigation?

A. Well, initially I just started talking to buy myself time to think. And the first thing I remember saying is, You know, there's an Adidas executive who has been charged but the company, Adidas, hasn't been charged with any criminal conduct.

Q. And how did he respond to that?

A. I recall that he said that he was going to blow the lid on this scandal, that it was going to be a major scandal, that he had a reporter, Rebecca Ruiz, at the New York Times either on speed dial or on call and that he could reach out to her and have her write a story at a moment's notice.

He also said, when I was asking him for the identity of his client, that the identity of his client wasn't going to drive the news coverage, that he could generate this negative news coverage without him.

Q. What did you understand him to mean by that?

A. I understood him to be threatening -- and he elaborated on this later in the meeting -- that he would go to the press, use his other abilities and platforms to generate negative media attention to Nike on the basis not of his client's purported claim but, rather, on the basis of there being scandalous evidence of Nike employees participating in criminal conduct.

Q. When he explained that, what was your reaction? Were you concerned by that?

A. Based on what I had seen in the past of his ability to

generate media attention, I was very concerned, yes.

Q. And what concerned you?

A. I felt like we had a full-blown corporate communications crisis through it, and the reason it concerned me was twofold. One, Nike is a consumer goods company with an exceptionally strong brand, and it depends on the strength of its brand and its popularity with consumers to sell shoes and T-shirts and other athletic apparel. So damaging the company's reputation in the press could hurt its business. And he had also specifically threatened to harm the share price, to take billions of dollars off the company's market cap.

Q. Did he say that?

A. He did.

Q. What do you recall him saying?

A. That he would hold a press conference the next day and he would -- he could and would take billions of dollars off the company's market cap.

Q. I think used the term "market cap." Did I hear that correctly?

A. Yes.

Q. What does that mean?

A. "Market cap" refers to the value of a company calculated by multiplying the number of shares outstanding times the dollar value of the shares. So if you had ten shares worth $100 each, the company's market cap would be a thousand bucks.

THE COURT: Mr. Podolsky, whenever you reach a convenient point. We're currently at 4:30, but whenever is convenient.

MR. PODOLSKY: Your Honor, this meeting does go on for quite some time, so I am happy to break whenever the -- now if it is preferable to the Court, it is fine for me.

THE COURT: OK. So, ladies and gentlemen, I am going to break for the evening. It's currently 4:30.

As you will hear me say many times during the trial, don't discuss the case with anyone. Don't do any research. Don't read anything about it. Don't listen to anything about it. Keep an open mind because there is more evidence to hear.

We'll resume at 9:30 tomorrow morning.

Mr. Ruocco will lead you to the jury room. Thank you all very much.

THE CLERK: All rise.

(Continued on next page)

(Jury not present)

THE COURT: Please be seated.

All right. What do we need to discuss now?

MR. RICHENTHAL: I don't know that we need to discuss anything. I have one administrative question and then just one note for the record. I don't think either of them affects him, but I am happy to wait for him to leave.

MR. H. SREBNICK: Judge, could we just invoke the rule at this time --

MR. RICHENTHAL: I'm sorry, Mr. Srebnick, I don't know what rule you are referring to.

MR. H. SREBNICK: The rule that when the witness is on the witness stand --

THE COURT: No, that doesn't apply until the witness is on cross. The government is free to talk to Mr. Wilson as much as they want between now and when he is on cross-examination.

MR. H. SREBNICK: Understood. I just wanted to invoke it now for the trial. I understand how it applies.

THE COURT: So I think it's generally understood, at least in this district, that when a witness is on cross-examination, it is not permitted for them to speak with their lawyer. So it sort of goes without saying that until the witness is on cross-examination, the lawyer is free to talk with their witness as much as they want.

Mr. Richenthal.

MR. RICHENTHAL: Then the two matters to which I referred. This will be very brief.

First, our team hasn't had a trial before your Honor. Is it your Honor's expectation we should ask for permission to publish, but once an exhibit is in evidence, we presume, absent some other reason --

THE COURT: I prefer that the lawyer ask before they put something up. So, if you wouldn't mind --

MR. RICHENTHAL: Of course.

THE COURT: In 99.99 percent of the cases, I'm sure there won't be any problem, but I would prefer that you ask.

MR. RICHENTHAL: No problem.

Then, second, consistent with an agreement that the parties reached some time ago that I think was actually docketed, I just wanted to put on the record we transmitted to the defense last night by email a complete list of all the exhibits that we intend to offer during Mr. Wilson's direct examination.

THE COURT: All right. Now, I wanted to ask Ms. Perry about this pending motion to quash a subpoena for documents that was addressed to Boies Schiller.

And I wanted to understand from you, Ms. Perry, when you thought the documents that you are seeking, when it would be necessary for you to have them? And the reason why I'm

asking is I thought you suggested that you needed them for purposes of Mr. Wilson.

Did I misunderstand you?

MS. PERRY: No, your Honor.

THE COURT: OK. So as I understand it, these are notes that junior associates made of certain conversations. These aren't notes of Mr. Wilson's, right?

MS. PERRY: I don't know, your Honor. I think he said that they were produced by his junior associates. We don't know yet the extent, if any, to which he was involved in the drafts or editing.

MR. SOBELMAN: Your Honor, they were not his notes.

THE COURT: I am sorry?

MR. SOBELMAN: Our understanding is they are not his notes, and there has been no suggestion from Boies Schiller or otherwise. I think their motion set this out was in great detail.

THE COURT: All right. So just so I'm clear, you think that your application, your motion, implicates Mr. Wilson in some fashion? Or you think -- to put it another way, you think you have a right to these notes to use in some fashion with Mr. Wilson? Is that the theory? Because the reason I'm struggling is that if they are not his notes, obviously they couldn't be used to impeach him. I'm not sure what the purpose is.

Now, if Mr. Homes is going to testify and Mr. Homes took notes, then I understand; but I'm struggling with understanding how notes that junior associates took of conversations, struggling to understand how those could be used to examine Mr. Wilson in some way.

MS. PERRY: Yes, your Honor.

Well, first, with respect to the notes right after the March 19th meeting, those will reflect his reaction to that meeting. He was just talking about it on direct, he will talk about it more. He has already said he was very concerned, he felt threatened. The notes immediately follow the meeting, and the government has said he was present at at least one of those phone calls with the U.S. Attorney's Office.

In any event, clearly his input went into the content of those calls. So his reaction, his take on these meetings would have been incorporated into the calls. But they will reflect what he thought in almost realtime about what happened at that meeting. So, was he actually concerned? Did he feel threatened? And is that reflected in the almost, you know, I think the immediate transmission of what he says happened?

THE COURT: The problem is they are not his notes. And so I don't understand what you would propose to do with them. They are not his notes.

So suppose the associate wrote something different than what Mr. Wilson just testified to. Let's just assume that

Case 21-1778, Document 61, 04/04/2022, 3290318, Page101 of 263

arguendo. So what exactly do you do with that? You can't impeach him with somebody else's notes.

MS. PERRY: Well, your Honor, if he's testifying on direct how frightened and concerned he felt personally, you know, as a result of the conversation, and then if, you know, within a matter of moments or hours he's saying something very different to the U.S. Attorney's Office, according to notes of the conversation in which he was present, and if they reflect something different, then I think we have a good faith basis to try and impeach him. If he testifies different than what the notes say, then, you know, we can handle that in our case in chief. But I think it's highly relevant to his state of mind.

MR. RICHENTHAL: This is like basic rules of evidence. You can't confront one witness with another witness' notes.

THE COURT: Yes. I just -- that's why I'm asking the question, because I still am struggling to understand how Mr. Homes' notes could be used to impeach Mr. Wilson. But I need to read the papers more carefully, and I will try to rule on the motion tomorrow morning before we begin. So I want the lawyers here at 9 o'clock so I can rule. I mean, obviously that is predicated on the -- the premise for that is that the papers tell me everything I need to know about the application. If they do, I will rule on it at 9 tomorrow.

MR. SKINNER: Your Honor.

THE COURT: Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. SKINNER: Peter Skinner. I am a lawyer for Nike.

THE COURT: Yes.

MR. SKINNER: We will be here tomorrow. If you have questions about those notes, I am happy to answer them.

THE COURT: You are welcome to be here, and if you want to say something at 9 o'clock, I am happy to hear you at that time.

MR. SKINNER: Thank you, your Honor.

THE COURT: OK.

MS. PERRY: Thank you, your Honor.

MR. H. SREBNICK: Your Honor, are we on the same schedule, 9:30 to -- or 9 until what time tomorrow?

THE COURT: So let me tell you that for tomorrow I would like to sit a regular day. For Friday we will do the 9:30 to 2:30 that I told you about, and I want to see how much progress we make. And then depending on the progress, we'll make a decision about what our trial days are going to look like from that point forward.

Anything else?

MR. H. SREBNICK: One moment, your Honor.

THE COURT: Yes.

MR. H. SREBNICK: Judge, we are going to remain here until 5:30 with Mr. Avenatti with the marshals.

THE COURT: I hope so.

MR. H. SREBNICK: Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT: Is that all right with the marshals?

A MARSHAL: Yes.

THE COURT: Thank you, sir.

Anything else?

MR. RICHENTHAL: No, your Honor.

THE COURT: Anything else from the defense?

MR. H. SREBNICK: No, your Honor.

THE COURT: All right. So we will resume at 9 a.m. tomorrow. Thank you.

(Adjourned to 9 a.m. January 30, 2020)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

INDEX OF EXAMINATION

Examination of: Page

SCOTT RONALD WILSON

Direct By Mr. Podolsky . . . . . . . . . . . . 178

GOVERNMENT EXHIBITS

Exhibit No. Received

203 . . . . . . . . . . . . . . . . . . . 200

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000101

Case 21-1778, Document 61, 04/04/2022, 3290318, Page102 of 263

228
K1udave1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 19 CR 373 (PGG)

MICHAEL AVENATTI,

Defendant. Trial
------------------------------x
New York, N.Y.
January 30, 2020
9:18 a.m.

Before:

HON. PAUL G. GARDEPHE,

District Judge
-and a Jury-

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: MATTHEW D. PODOLSKY
DANIEL RICHENTHAL
ROBERT B. SOBELMAN
Assistant United States Attorneys

BLACK SREBNICK KORNSPAN & STUMPF, P.A.
Attorneys for Defendant
BY: HOWARD M. SREBNICK
-and-
SCOTT A. SREBNICK
JOSE M. QUINON
MICHAEL D. DUNLAVY
-and-
PERRY GUHA, LLP
BY: E. DANYA PERRY
GEORGE BARCHINI

Also Present:
DeLeassa Penland, Special Agent (USAO)
Andrew Hamilton, Paralegal
Juliana Manrique, Paralegal
Michael Lyon, Trial Technician

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

229
K1udave1

(Trial resumed; jury not present)

THE COURT: Be seated.

I'm going to rule on Nike's motion to quash the subpoena for documents.

On December 30, 2019, Defendant Avenatti served a Rule 17(c) subpoena duces tecum on Boies Schiller Flexner, which is counsel to Nike. Citing docket number 139-1. On January 13, 2020, Nike moved to quash the subpoena. Citing docket numbers 138, 139

As a result of Defendant's agreement to narrow the scope of the subpoena (see Defense Brief (docket number 187) at pages 10 to 11; also the January 29, 2020 trial transcript at pages 114 to 119 and 121 to 122), there are three categories of materials in dispute:

The first category is notes taken by Boies Schiller associate Benjamin Homes of what was said during two telephone calls on March 20, 2019, and during a meeting on March 21, 2019 at Mark Geragos' Fifth Avenue office. I understand that those on the March 20 calls include Defendant Avenatti, Geragos, and Boies Schiller lawyers Scott Wilson and Ben Homes. I understand that the March 21, 2019 meeting was attended by Avenatti, Geragos, Wilson and Homes. The March 20 telephone calls and the March 21, 2019 meeting were recorded by the FBI, and transcripts of those recordings were produced to the defense long ago. The government does not have the Homes'

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

230
K1udave1

notes of the March 20 telephone calls and the March 21 meeting.

The second category of materials in dispute consists of notes that Homes took of what was said at an unrecorded meeting on March 19, 2019, at Geragos' Fifth Avenue office. I understand that the attendees at that meeting included Avenatti, Geragos, Nike in-house lawyer Robert Leinwand, and Boies Schiller lawyers Wilson and Homes. The defendant already has Homes' handwritten and typed notes of the March 19, 2019 meeting. Defendant claims that he is also entitled to drafts (including metadata and edits by others) of Homes' notes of the March 19, 2019 meeting. These materials are likewise not in the possession of the government.

The third category of materials in dispute consists of notes taken by Boies Schiller associate Valecia Battle of two telephone conversations between Assistant United States Attorneys and Boies Schiller lawyers on March 19, 2019. I was told yesterday that one of these telephone calls was quite brief while the other was more substantive. Boies Schiller lawyers Andrew Michaelson, Peter Skinner, Homes, Battle and Wilson were on at least one of the calls. The government said yesterday that Wilson was on one of the calls only briefly. The U.S. Attorney's Office does not have the Battle notes that Defendant seeks. Citing January 29, 2020 voir dire transcript at pages 396 to 400.

I'll also note for the record that Boies Schiller

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

231
K1udave1

lawyer Scott Wilson is currently on the witness stand. The government does not intend to call any other Boies Schiller lawyer, with the possible exception of Homes, about whom it has not made a decision. (Id.)

Yesterday, defense counsel argued that Defendant is entitled to the Homes and Battle notes, because they might contain information that could be used to impeach Wilson. Citing the January 29, 2020 trial transcript at pages 221 through 224.

I have previously set forth the standard for Rule 17 subpoenas, and I will not recount in detail the applicable legal standards now. Suffice it to say that the standards set forth in United States v. Nixon, 418 U.S. 683 at 700 (1974), applies to both Rule 17(c) subpoenas issued prior to trial and those issued at the time of trial. See United States v. Percoco, 2018 WL 9539131, at *2 (S.D.N.Y. June 14, 2018). Pursuant to that standard, a defendant seeking to enforce a Rule 17(c) subpoena must demonstrate relevancy, admissibility and specificity. Citing Nixon, 418 U.S. at 700. Where a party's Rule 17(c) subpoena seeks documents that could contain impeachment material, that party, in order to meet the Nixon standard, must demonstrate that there is reason to believe that the materials that party seeks could in fact be used to impeach the witness.

On the record as it stands now, there is no basis for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000102

me to require Boies Schiller to produce the Homes and Battle notes. Notes taken by Homes and Battle are clearly not admissible at trial as direct evidence because they're hearsay. Moreover, Wilson can't be impeached with notes that someone else prepared.

If the government were to call Homes to testify, obviously this issue would be revisited, or if Defendant developed a record showing that Wilson played some role in editing notes prepared by Homes or Battle, that could affect the determination. But at present, there is no reason to believe that Wilson played any role in editing the notes of either Homes or Battle. Because there is no basis at this point for me to find that Homes and Battle's notes are admissible, or that their notes could be used to impeach Wilson, Nike's motion to quash is granted without prejudice to Defendant renewing its application -- renewing his application on the basis of a change in circumstances.

Is there any update with respect to the discussions between the parties about the financial evidence we talked about earlier, or with respect to Professor Engstrom's testimony?

MR. PODOLSKY: Your Honor, there haven't been further discussions on the finances. We have reached a stipulation as to the personal debts that were at issue specified by your Honor in your prior ruling on what could come in, so I think

those will come in by stipulation. We're also guided by your Honor's previous ruling and comments as to what Ms. Regnier could testify to and what's admissible on her direct testimony. So we're happy to continue to discuss with the defense, but I'm not sure there is a live issue at this point with respect to the financial evidence, at least on the government's direct case.

I think the only potentially outstanding issue there is: I don't think we really finally joined issue or resolved the FBI financial analyst who would put on evidence simply of the bank account status of the defendant and his law firm at the time of the conduct at issue here. I'm not sure -- as I recall, the last thing the defense said on that was that they wanted to discuss with their client. I'm not sure there has been a further opposition or comment on that person's testimony, which would not be until next week, in any case.

THE COURT: Do you anticipate that the witness would use charts of some sort?

MR. PODOLSKY: My sense would be a very limited chart, which would simply summarize the bank account -- I suppose it would be the amounts in the account in early 2019 -- so January, February, March -- simply summarize the amounts. Perhaps it would somehow summarize how much has gone in and out. I think that would be the extent of it.

THE COURT: Does the defense wish to comment on the

bank account information and possible testimony of an FBI analyst?

MR. S. SREBNICK: I think I need to see more of what they're planning to do. I understood that there was still somewhat of a live issue about the scope of Ms. Regnier's testimony and that we were going to speak further about it.

Candidly, we just haven't had the chance with everything happening. I understood that she's come in next week at some point. So, I plan to meet with them ASAP on that issue and see if there is any common ground. If there are any issues, we will bring them to the Court --

THE COURT: OK.

MR. S. SREBNICK: -- as soon as possible.

THE COURT: How about with respect to Professor Engstrom's proposed testimony?

MR. PODOLSKY: We have begun discussions with the defense on a stipulation that might remove the necessity of calling Professor Engstrom. We haven't reached an agreement, but we will continue to work on it this week, hopefully to resolve by next week, when she should be called.

THE COURT: All right. So the lawyers will keep me posted on those two issues.

Are there other issuers the lawyers want to raise.

MR. PODOLSKY: One small evidentiary issue for today, your Honor.

As you may recall, yesterday I asked several questions to Mr. Wilson about a grand jury subpoena received by Nike from the United States Attorney's Office. I asked those in part because Mr. Wilson also testified to yesterday afternoon Mr. Avenatti made reference to that grand jury subpoena in the course of his discussions -- I will just call them discussions for now -- with Mr. Wilson. I believe they are also referenced in the recordings.

I understand from the defense that they intend to actually offer into evidence the subpoena itself. We would object to that on the basis that the defendant has never seen it, and it is, frankly, quite long and confusing. It is several pages of instructions on how to respond, how to reply. So we just -- we understand that the fact that there was a subpoena is relevant. I drew it out on direct. We understand that the defense is likely to cross-examine, and we haven't objected to this on the defendant's knowledge -- excuse me, the witness' knowledge that Nike was under investigation. We just don't see how the document itself, which is frankly highly confusing for a lay jury, is relevant and should come into evidence.

MR. S. SREBNICK: Judge, yesterday -- this is at page 193, 194 of the transcript from yesterday -- Mr. Podolsky, as he just indicated, did elicit from Mr. Wilson that the U.S. Attorney's Office had served Nike with a subpoena, asked them

Case 21-1778, Document 61, 04/04/2022, 3290318, Page104 of 263

236
K1udave1

basically explain what a subpoena is. That's at line 25 at page 193.

Question, at line 4 of page 194: "For anyone who has not seen a subpoena, what does it look like? What is it?"

Mr. Wilson then answered what a subpoena looks like.

Mr. Podolsky asked him about the responses that were made in response to the subpoena, what types of documents the subpoena was looking for, the timing of the production of documents in response to the subpoena. Those were all questions elicited by Mr. Podolsky on direct examination.

We want the jury to actually see the subpoena, because we will cross-examine Mr. Wilson about production under the subpoena, whether it was timely production, whether at the time that Mr. Franklin's claims were brought to the attention of the Boies lawyers in March of 2019, whether Boies had actually sufficiently complied with the subpoena on Nike's behalf, the efforts that were then taken by Nike and by Boies to supplement the subpoena response in order to avoid any issues with the U.S. Attorney's Office. All of that we believe is relevant for cross-examination, and we want the jury to actually see the subpoena, category 3 of the subpoena, which directly involves payments to amateur athletes. And the government has gone into the subpoena. We think the jury should be able to see it, and that's fodder for cross-examination.

THE COURT: I need to see a copy of the subpoena,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

237
K1udave1

obviously.

MR. PODOLSKY: I will hand it up, your Honor.

(Pause)

THE COURT: Is there going to be testimony about some of the names that are mentioned in the subpoena, such AS Nassir, N-a-s-s-i-r, Little, Showtime, Hoops? There is also a reference to the University of Arizona and to Merl, M-e-r-l, Code. Is there going to be testimony about these matters.

MR. PODOLSKY: No, your Honor. My understanding is that they have absolutely nothing to do with anything in this case.

MR. S. SREBNICK: Judge, I would propose that we redact some of those categories to the extent that they are not pertinent to this case.

The paragraph that's actually relevant to this case is paragraph number 3. And I would like for the Court to consider -- and I am happy to hand up the transcript from yesterday's direct testimony of Mr. Wilson, in which Mr. Podolsky specifically asked him about Nike's production in response to that particular category. And Mr. Wilson testified that by May of 2018, Nike's production was substantially complete, and thereafter there were a few additional productions that -- supplemental productions that Mr. Wilson made it seem were just a few documents that were produced thereafter that were sort of not really a bulky production. We

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

238
K1udave1

know that that's simply not the case.

By May of 2018, Nike had produced about 11,000 documents. After May of 2018, and predominantly after Mr. Avenatti was arrested in March of 20 -- after May of 2018, predominantly after March of 2019, Nike produced an additional 6,000 pages. So, more than 33 percent of the production came after Mr. Avenatti was arrested, a year and a half after the subpoena was issued. So we have a very credible, we think really bullet-proof argument and evidence that what was happening here was that Nike had not complied sufficiently with the subpoena, that Nike had been taking the position with the U.S. Attorney's Office for quite some time that it had substantially complied, there is nothing to see here, that there was no corruption of amateur athletics by Nike. And we had proof -- we have proof that there was not substantial compliance and that Nike was in fact very concerned that it had not fully disclosed all of the conduct that's at issue in this case.

THE COURT: All right. Well, let me say the obvious, which is that the government, to some extent, went into this in its examination already of Mr. Wilson. So, I mean, the issue of the productions and when they happened, that's already been laid before the jury.

What I would suggest is that the lawyers discuss the subpoena and particularly the parts of it that should be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

239
K1udave1

redacted. I've indicated I'm troubled by lots of references to people and organizations that won't be discussed at the trial, so it seems to me they might be appropriate to redact.

With respect to the boilerplate at the beginning of the subpoena about the definitions, instructions, I'm not sure all of that is particularly relevant, but I'm not sure it's prejudicial either.

Yes.

MR. PODOLSKY: I just want to just make a comment on what the defense said. I'll be very brief, your Honor.

The facts are much more complicated and, frankly, different than what defense counsel just represented. And this the issue with putting in the subpoena. In fact, what happened was Nike was in -- Nike's attorneys were in frequent contact with the United States Attorney's Office to discuss what was responsive to the subpoena. And as Mr. Wilson testified to yesterday, they -- there were additional requests beyond the scope of the subpoena that Nike responded to.

The concern with putting the subpoena itself in evidence is that then defense counsel will go up to the jury and make their own argument about what is responsive to the subpoena or not, and the jury really has no ability to assess what is responsive to a grand jury subpoena in the abstract.

Now, we don't object to cross-examination on this topic, and of course the defense is welcome to refresh

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000104

Mr. Wilson's recollection about what was requested in the subpoena, if they want to try to argue that they didn't comply. But we think that putting the actual subpoena language from which a lay jury really can't reach an appropriate conclusion would be confusing, prejudicial, and, frankly, a waste of time.

THE COURT: I can't spend a lot of time on this now. The jury is here. I need to begin. But you're going to need to tell me with specificity what language you think in the subpoena is problematic, and then we'll have a conversation about it. We're not going to have an abstract discussion about it, because I will tell you, quite frankly, much of what's in here I don't see as prejudicial at all. And you chose to go into this, including the seriatim nature of the production. So, I'm going to allow them to pursue that. You've already raised that issue with the witness, so they're going to be allowed to go into it, obviously.

Now, if you think there is something prejudicial in the subpoena, we can talk about the language and we can talk about redacting it. But an amorphous discussion, an abstract discussion about language in it that you think is difficult for a jury to understand, that's not useful to me.

MR. PODOLSKY: Very well, your Honor. I'm honestly pointing to all of the instructions, including instruction 3, but we are happy to --

THE COURT: It may be that the instructions aren't

significant to the defense, and it may be that all of that can be redacted. It may be that it should be. But the two of you need to have a conversation about it.

MR. S. SREBNICK: Yes, your Honor.

THE COURT: The defense has identified one paragraph, so far, that it thinks is actually relevant. The rest of the material I'm not sure what their position is, and they may well be amenable to just redacting it because they want to talk about that one paragraph. So it may be that the two of you can reach agreement on it.

MR. PODOLSKY: Absolutely, your Honor.

THE COURT: OK. We're ready, Mike?

THE CLERK: Yes, your Honor.

THE COURT: All right.

MR. PODOLSKY: Your Honor, would you like me to get the witness?

THE COURT: Yes, please. If the witness could take the stand.

(Continued on next page)

(Jury present)

SCOTT RONALD WILSON,

Resumed, and testified further as follows:

THE COURT: Please be seated.

Good morning, ladies and gentlemen.

We will continue with the direct examination of Mr. Wilson.

Mr. Wilson, you remain under oath.

Please proceed.

MR. PODOLSKY: Thank you, your Honor.

DIRECT EXAMINATION (Resumed)

BY MR. PODOLSKY:

Q. Mr. Wilson, yesterday when we broke we were in the middle of discussing a meeting that took place on March 19, 2019. Do you recall that?

A. Yes, I do.

Q. And I want to focus -- I want to try to continue to take us through this meeting chronologically as best we can, so I want to continue our focus on really the beginning of the meeting that you described yesterday.

And you testified, I believe, that the defendant said that Nike would do two things. What were those two things?

A. He said that first Nike would enter into a settlement, pay a settlement to his client, the whistleblower to whom he had referred, and, second, that Nike would hire the defendant and

Mr. Geragos to conduct an internal investigation.

Q. Did you understand those to be separate requirements?

A. Separate but both mandatory. That was my understanding.

Q. And when he explained or said that Nike would have to enter into a settlement with his client, what claims did you understand he was referring to?

A. I didn't have an understanding in any depth. He said that he believed his client had breach of contract, tort, and maybe other claims. That was all he said about that.

Q. Did you have any understanding as to the value of those claims?

A. Not from what he said. I was familiar with -- excuse me, not at that time in the conversation.

Q. And as to the second requirement, can you just explain to the best of your recollection exactly how he described it early in the meeting?

A. He came back to this later, but early in the meeting what he said was that Nike would hire himself and Mr. Geragos to conduct an internal investigation into corruption in amateur basketball at Nike.

Q. At that point, did he explain what would happen at the conclusion of such an investigation?

A. Not that I recall.

Q. And what did he explain would happen if Nike -- again, focusing on the beginning of the meeting -- would happen if

Nike did not agree to do those two things?
A. He talked about his intention to hold a press conference the very next day. He talked about the fact that he had a New York Times reporter on call or on speed dial and that she would write what he called and told her to write, and that between these things and other steps that he would take, he would be able to create a media scandal that would hurt the company, harm its stock price, and would persist for some time.
Q. Did he explain what he was going to publicize through The New York Times or other media?
A. What I recall is when I asked him, and I asked him a couple of times, for the name of his client, he resisted answering initially, and he said something to the effect that he didn't think the name of his client was relevant to the media coverage, that that wasn't what was going to create this scandal.
Q. What did you understand he would publicize if not the name of his client?
A. What he was emphasizing were the names of certain high-profile basketball players, the names of Nike employees, and these allegations that these employees had been involved in bribing these players.
Q. What, if anything, did he say about filing a complaint?
A. He made no reference to filing a complaint or to a complaint at all.

THE COURT: Now, when you say "a complaint," do you understand the questioner to be referring to a legal complaint or some other kind of complaint?
THE WITNESS: I understood the question to be referring to a written document filed in court, a legal complaint.
THE COURT: OK.
MR. PODOLSKY: Let me clarify, your Honor.
BY MR. PODOLSKY:
Q. What, if anything, did the defendant say about filing a lawsuit at that time?
A. He didn't say anything about that.
Q. Are you familiar with the term "complaint"?
A. Yes.
Q. What is a complaint in the legal world?
A. A complaint is a written statement of facts followed by a description of the legal violations that the person filing the complaint believes those facts establish.
Q. And what is the --
A. I say "facts" but I should say factual allegations, alleged facts.
Q. And what is the purpose of a complaint? When is a complaint filed?
A. Filing a complaint is essentially the first step in getting a court involved in a dispute. That is how you initiate the

lawsuit.
Q. So with that definition in mind, what, if anything, did the defendant say about filing a complaint?
A. He never said anything about filing a complaint on behalf of his -- this whistleblower client to whom he referred.
Q. What was the next thing that you recall happening in this meeting?
A. After he had described these two demands?
Q. Yes.
A. I recall, as I mentioned yesterday, that I asked him if he was telling me that his client had been involved in bribery with Nike employees, had he taken that information to the Department of Justice or the SEC.
Q. And why did you ask that?
A. My frame of mind at the time was that I was representing a company that had been cooperating with federal authorities for a long time, and cooperating for a corporate -- for a company under investigation means in my understanding sharing information with the government as you come into possession of it. So one of the things that was in front of mind for me was whatever he is about to tell me about bribery, I'm going to have to turn around and tell the government immediately, because I'm working for a company that's cooperating with the government.
Q. And how did he respond to your question regarding reporting

to the DOJ or a government agency?
A. He seemed visibly surprised and he responded in the negative, that he hadn't done that.
Q. What happened next?
A. I asked him if he was wearing a wire.
Q. How did he respond to that?
A. By opening his jacket like this, laughing, and saying, in effect, no.
Q. And what happened after he showed his jacket?
A. So I was still reeling from these demands and talking a little bit just to buy myself time to think. So, I said a couple of things. One of the things I said was that while there had been Adidas individuals or an employee who had been charged, the company hadn't been charged with wrongdoing.
Q. And what did he -- how did he respond?
A. I recall him responding to that by emphasizing that he could generate a scandal, he could hold this press conference. If I thought the Adidas scandal had been bad or Adidas had had a problem, this was going to be a lot worse. This was going to be one of the biggest sports scandals I don't recall if he said of the year or ever but it was going to be a big, big scandal.
Q. Let's just go back just for one moment.
Why did you ask him if he was wearing a wire?
A. It was, to my knowledge, public knowledge that Nike was cooperating with the government. And I say that because Nike

had said a couple of times publicly, we are cooperating with the government investigation. So here I am sitting across from a lawyer who to me seems to be asking me to get into a deal with him where information might not go to the government and instead we might agree to keep it secret, or at least to keep him from publicizing it, and frankly, I was slightly concerned that I was being asked to do something wrong and that maybe he was recording because he wanted to get me in trouble.

Q. Why did you think that he was asking to keep something secret, as you said a moment ago?

A. By that point in the meeting, I think the principal reason I thought that was both the things that Mr. Geragos said about it being too sensitive to discuss in person, and then when I came in and asked what is this all about, that Mr. Avenatti wouldn't even agree to say what it was about until I had agreed that it was a confidential settlement discussion under this federal rule I mentioned yesterday, Rule 408.

Q. You also mentioned a moment ago that Mr. Avenatti said he would hold a press conference or contact The New York Times if you -- if Nike did not agree to the two demands.

What did you understand would happen at that point in the meeting if Nike did agree to the two demands?

A. I understood that it was an either/or. If we agreed to the demands, that press conference, that media campaign, him going public with these allegations would not happen.

Q. Now, I want to continue with the chronology. I believe you testified a moment ago that you made reference to the fact that Adidas, the company, had not been charged. Do you recall that?

A. Yes.

Q. And so how did he respond to that question?

A. He responded by returning to a description of his ability to make this a big public story. He was responding, in essence, if you thought it wasn't bad for Adidas, it's going to be a lot worse for Nike because I am going to be able to make it a lot worse.

Q. What happened next?

A. I said that Nike had an interest in three things. I often like threes when I am speaking to a court or to an adversary. I don't know that I knew the third one when I started talking, but I said we have an issue with three things. The first -- and I don't know if this order is correct. The first is we have an interest in not being dragged through the mud in the press. That is not in the company's interest. Second, the company has an interest in complying with the government's investigation. And, third, the company has an interest in conducting an internal investigation in assessing its own conduct.

Q. So let me just walk through those quickly.

The first one you mentioned was the company has an interest in not being dragged through the mud. What did you

mean by that?

A. I meant that any company, and in particular Nike, would not welcome being the subject of a lot of negative media stories.

Q. Was that true?

A. Absolutely.

Q. The second thing you mentioned a moment ago was that Nike had an interest in complying with a government investigation. Why did you say that?

A. Mr. Avenatti had speculated that Nike had received a grand jury subpoena and hadn't -- maybe hadn't been forthcoming with the government. I wanted to make it clear that in fact the company was cooperating with the government.

Q. And was that statement true?

A. Yes.

Q. The third thing you mentioned was that Nike had an interest in conducting an internal investigation. Why did you say that?

A. I said that because it was true, and also because I sensed that if I made him think, after he made these demands, that there was no chance on this earth that the company was going to hire him to do work for it, much less an internal investigation, that that might be the end of the meeting and he might leave and hold his press conference and execute on the threat immediately. I said it in part to not rule out what he was demanding for so as to buy time to think about what to do.

Q. And why did you feel that in that moment that you needed to

buy time?

A. Because the next day was not very far away, and I wanted to figure out what I was going to do in response to his demands.

Q. What happened after you responded with those three things?

A. So either my client, Mr. Leinwand, or I asked again for the name of Mr. Avenatti's client. We said that that was -- that was relevant and important to us in assessing what he was saying, and we also said that we wanted to review these documents that he said he had as fast as possible.

Q. How did Mr. Avenatti respond?

A. Eventually he named his client and then allowed me an opportunity -- just me, he said -- to look at these documents.

Q. We'll get to the documents in a moment.

Who did he say his client was?

A. He said his client was Gary Franklin.

Q. Did you know who that is?

A. I did.

Q. Who is Gary Franklin?

A. Mr. Franklin is a gentleman from the Los Angeles area who had run a youth basketball program called Cal Supreme there for a number of years and Cal Supreme had been a participant in the UIBL, Nike's elite basketball league.

Q. Did you have any other awareness of Mr. Franklin at that time before Mr. Avenatti mentioned him?

A. Not that I indicated or said in response to hearing the

Case 21-1778, Document 61, 04/04/2022, 3290318, Page108 of 263

252
K1udave1 Wilson - direct

name, but yes.
Q. Generally, what did you know?
A. I knew that Mr. Franklin had certain dealings between him and Nike employees and others outside the company had been the subject of repeated conversations between Boies Schiller, Nike and the Department of Justice going back for more than a year. This was an individual whose program and relationship between that program, Nike and certain of his players was something that we had been proffering on to the investigators for well over a year. These were long, detailed meetings.
Q. What does "proffer" mean?
A. Proffer is a term of art for when attorneys offer facts up to someone, in this instance to the government.
Q. What was your awareness, if any, as to Mr. Franklin's relationship with Nike as of March 2019?
A. My understanding was that Mr. Franklin's last sponsorship agreement, or, rather, I should say Cal Supreme's last sponsorship agreement with Nike, had run out at the end the last season, so it ran out during 2018.
Q. And did you under -- what, if any, continued interaction had Mr. Franklin had with Nike, to your understanding, in this meeting?
A. At that time, I don't think I was aware of recent interactions between Nike and Mr. Franklin.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

253
K1UMAVE2 Wilson - Direct

Q. What happened next in the meeting?
A. After Mr. Avenatti named his client, he let me look at a small package of documents. Mr. Geragos, who had been sitting on my right, stood up and I swung around, sat next to Mr. Avenatti and began looking at this package of documents.
Q. Walk me through exactly how it worked that you looked at the documents.
A. Sure. I was seated to the left of Mr. Avenatti. It was a package of documents maybe 30, 40 pages by thickness. It was stapled, as I recalled. And I flipped through and looked at them and occasionally asked Mr. Avenatti clarifying questions while I was reading.
Q. Did Mr. Leinwand or the other Boies Schiller attorney with you review the documents as well?
A. No. Mr. Avenatti, before I swung around and started looking at them, said that I could look at them.
Q. About how long did you look at them, you think?
A. I would say between five and 10 minutes.
Q. And were you able to take them with you?
A. No.
Q. What do you recall seeing when he showed you these documents?
A. I recalled seeing a collection of e-mails, text messages, invoices, redacted bank statements grouped behind a table of contents type, what I call cover sheets.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

254
K1UMAVE2 Wilson - Direct

Q. To the extent you could tell in that time, what did the documents seem to show?
A. It was a fleeting review. They looked like they were communications between Mr. Franklin and a Nike employee family member of Mr. Ayton from 2016. And then there were other communications involving Mr. Franklin from 2017.
Q. What did the communications seem to be about, if you can remember?
A. The 2016 communications seemed to be about a trip that the Nike employee asked Mr. Franklin to take to Phoenix, Arizona to meet with the mother, Mr. Ayton's mother.
Q. What did you do when you finished looking through the documents?
A. I asked if I could have time to confer with my client privately.
Q. Why did you ask that?
A. Two reasons, really. First, I hadn't had a chance to speak to my client since this meeting began, and I wanted to confer with him about what we were going to do next.

THE COURT: When you say the client, you mean Leinwand?

THE WITNESS: Mr. Leinwand. The client who was in the room.

The second reason was because I hadn't taken notes when I was looking at the documents, and I wanted to huddle

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

255
K1UMAVE2 Wilson - Direct

with my junior colleague to regurgitate, tell him as quickly as I could everything I remembered seeing in the documents right away because I envisioned needing to report as many of these facts as I could remember to the government very promptly.
Q. You mentioned that you wanted to regurgitate what you say. Was anyone taking notes on the documents while you were looking at them?
A. While I was looking at them, I was not taking notes and I'm not aware that anyone else was.
Q. Why didn't you take notes on what you saw?
A. Mr. Avenatti in fact spoke to my junior associate, instructed him to stop taking notes.
Q. You said that you wanted to speak to your client. Why did you want to speak to your client at this time?
A. As an attorney, everything I do is supposed to be within the bounds of the authority and direction given to me by the client. So, for example, I couldn't have accepted these demands on my own decision. So I wanted to speak to Mr. Leinwand to discuss how we were going to respond to what we had just heard when we returned to the meeting a few minutes later.
Q. And did you meet with your client?
A. I did.
Q. Where did you do that?
A. So Mr. Geragos showed us some unfinished office space on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000108

the sixth floor of his building, and I remember making a half-joking comment about how did I know he didn't have that floor wired so that they can listen to my conversation.

Q. Why did you make that joke?

A. It was on my mind, this question of people listening in because, as I mentioned, Mr. Geragos had said that this was all a topic too sensitive to discuss by phone.

Q. About how long did you meet with your client in this separate space?

A. Five to 10 minutes.

Q. What happened when you were done?

A. We went back downstairs to the fourth floor.

Q. And what happened when you went back downstairs?

A. First, I regained my composure because my discussion with my client had been very intense. But, again, I wanted to appear collected in front of Mr. Avenatti and Mr. Geragos. And when we came back we made the point, Mr. Leinwand and myself, to Mr. Geragos and Mr. Avenatti that this is a big company, and we understood this threat to hold a press conference tomorrow, but we were going to need more time in order to come up with a response to what he had said and what he had demanded.

Q. Who responded to that?

A. I recall that we made that point several times, and I recall Mr. Avenatti responding.

Q. At the point when you came back to the meeting and made

that point, do you recall what Mr. Avenatti said?

A. I don't recall if he used the word special or unique, but he said that the day we were meeting or the next day, it was the next day, the day of the press conference, it was unique or important or special to him for two reasons.

Q. Did he explain what those reasons were?

A. He did.

Q. What were they?

A. He said that this was an important date because it was on the eve of March Madness and it was on the eve of a Nike earnings call.

Q. Let's take those in order. Did you understand what March Madness was when he said it?

A. Yes.

Q. What is that?

A. March Madness is one of the most watched sporting events of the year. It is an annual competition of college basketball teams.

Q. What did you understand the significance to be, if any, of the fact that March Madness was starting?

A. My understanding is that many of Nike's customers were interested in basketball, would be really intense and focused on basketball, about news around basketball at that time in March.

Q. And what was the second reason that day was significant or

important?

A. He said -- he pointed out that Nike had an earnings call coming up on Thursday, the day after his threatened press conference.

Q. What is your understanding of what an earnings call is?

A. My understanding is that on a quarterly basis large companies will report their financial results to the markets, and an earnings call is a call on which a company's leadership would share those results and take questions from analysts and others that followed the stock.

Q. What did you understand the significance of this earnings call to be with respect to that day for Mr. Avenatti?

A. Paired with what he had said in the meeting about his ability to take billions of dollars off the company's market cap, that is, to tank or partially tank its stock price, I understood him to be noting that this was a moment when the stock price might be particularly volatile and particularly subject to the impact of news stories breaking right then.

Q. What happened after he told you about those two things?

A. I don't have a complete sequential recall of the meeting, but I know that we tried a couple additional tacts to buy time, convince him to hold off and give us more time.

The first was that we pointed out that Mr. Leinwand's boss, general counsel of Nike, was currently in Europe. This was the middle of the afternoon on Tuesday, March 19. So with

the five or six-hour time difference that was going to complicate our ability to get in touch with her and handle the matter.

Q. Why did you say that to Mr. Avenatti?

A. Both because it was true and also because I thought it might strike him as a reasonable justification for giving us more time.

Q. How did he respond?

A. He responded that she should be easily reachable by phone at any hour. The phrase I specifically remember him using is, this isn't complicated or, this shouldn't be complicated. And Mr. Leinwand responded half humorously that as a senior officer at the company she wasn't -- he might have to be available to her by cell phone 24 hours a day, but that didn't necessarily mean he was going to be able to reach her in the middle of the night in Europe.

Q. What happened after the exchange about reaching the general counsel?

A. So that didn't seem to be resonating. So I tried something else that was on my mind. I said to Mr. Avenatti, you know, you may not care about the company, you may not care about me. But from watching the Adidas mess, it seems like if you go live with allegations to name this or that 17-year-old or 18-year-old player, you know, you could really destroy the life or destroy the career of some of these kids -- they are

Case 21-1778, Document 61, 04/04/2022, 3290318, Page110 of 263

260
K1UMAVE2 Wilson - Direct

teenagers -- at a moment's notice.

Q. How did he respond?

MR. H. SREBNICK: May we have a sidebar at this point?

THE COURT: Yes.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

261
K1UMAVE2 Wilson - Direct

(At sidebar)

MR. H. SREBNICK: Judge, I expect that Mr. Podolsky is going to want to elicit from Mr. Wilson that Mr. Avenatti's response about Wilson's purported concern about the kids was that Mr. Avenatti said he doesn't give an expletive about the kids.

Is that a fair summary?

MR. PODOLSKY: Yes.

MR. H. SREBNICK: We would move to preclude that kind of testimony both as essentially irrelevant and, under 403, more prejudicial than probative. What Mr. Avenatti said, even if he believed it, about the consequences flowing to unrelated basketball players, some of whom are no longer kids, of course, is besides the point of this case.

MR. PODOLSKY: Your Honor, let me make a few observations.

The first is, this was in 3500 that was given to the defense weeks ago. They raised it days ago, weeks after getting the 3500. We said we do intend to elicit this because it is relevant, in our view, which I'll get to in a moment.

The defense decided not to raise this until I had already asked the question, what did you say to Mr. Avenatti, which they knew would elicit this response. Now we have a potentially misleading issue because the defense wants to permit me to ask that question, but not the response by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

262
K1UMAVE2 Wilson - Direct

Mr. Avenatti.

Second, of course, this is relevant. They are meeting and where Mr. Avenatti is putting time pressure on these demands, that is a fact of relevance.

I believe the Second Circuit in *Jackson* pointed specifically to facts of time pressure as facts a jury could rely on in reaching a conclusion that the defendant extorted or attempted to extort the victim and that's exactly what this goes to. They asked for additional time and the defendant responding saying, I don't care about this or that. I am not giving you any other time.

These are the defendant's own words, these are the defendant's own demands, and the jury is entitled to hear what he said.

MR. H. SREBNICK: I don't think that survives the Rule 403 and relevance objection. Whatever Mr. Avenatti said, I don't care about the kids, I don't give an expletive about the kid has nothing to do with the issue of whether the demands are extorted or not.

THE COURT: What do you expect him to say?

MR. PODOLSKY: I expect him to say, I don't give a shit about the kids or I don't give a fuck about the kids. I don't think he remembers which expletive it was.

Let me point out, the defense opened on the fact that Mr. Avenatti uses expletives and is brash, and they are allowed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

263
K1UMAVE2 Wilson - Direct

to make those arguments and explain exactly what Mr. Srebnick has just said. They can make whatever arguments they want.

But they also opened on the idea that the defendant was here all about justice and this was a negotiation and this is just lawyers being lawyers. The jury is entitled to hear the words that Mr. Avenatti used when he was making these demands. It goes directly to his intent and directly to the conduct.

THE COURT: I think it's relevant to the issue of pressure. The witness was clearly trying to come up with reasons to delay the press conference that Mr. Avenatti was threatening to call, and he came up with a number of ideas.

One was to say that the general counsel was in Europe and the response to that, well, you can wake her up. And then, as he said, when it became clear that his argument about the general counsel and waking her up did not have resonance, then he turned to, what about the effect that your press conference might have on these players. That was another effort to delay.

I think it's relevant for the jury to hear that Mr. Avenatti would not delay and he was very focused on applying pressure to get resolution on the demands that he was making. So the objection is overruled.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000110

(In open court)

Q. Mr. Wilson, a moment ago you referenced efforts to delay the press conference. I just want to reorient us. What did you say to try to delay the press conference at that point in the meeting?

A. Well, after Mr. Avenatti seemed unconvinced by issues of where the general counsel was, as I said, I said to him I thought he might not care about Nike, he might not care about me, but that he should consider that if he went live with allegations that this or that named player was part of corruption that, as I had seen in the Adidas scandal, that could end the career, really harm the life of one of these kids that he was naming.

Q. How did he respond to that?

A. I don't remember which of these two expletives he used, but I remember he leaned forward and he shouted at me: I don't give a fuck about these kids, or, I don't give a shit about these kids.

Q. What happened next?

A. I said again that the company needed time to respond and we would have to circle up with the right people. It was fairly tense at this point. And Mr. Avenatti sort of sat back and said, you know, I'm considering this, but I'm thinking about it. You are trying to find some way to fuck me.

Q. What did you understand him to mean by that?

A. It was in connection with giving us more time. I could give you more time, but I'm worried about you using that in some way to fuck me.

Q. How did you respond?

A. I thought that an appealed humor might sort of help take some of the tension out of the situation. I thought this might be his kind of humor. So I said, in effect: Michael, you're perfectly pretty, but I'm not trying to fuck you.

Q. How did he respond to that?

A. He laughed. It did seem to resonate with him.

Q. Now, at this point in the meeting, after you come back, did he explain any further what his demands were?

A. He did. He returned to and elaborated on those two demands that he had made before the break.

Q. What did he say?

A. He put a dollar amount on the first component, so he said that you are going to pay a settlement to my guy, to my client, of $1.5 million.

Q. What was your action to that?

A. That it seemed like a number plucked out of thin air.

Q. Why?

A. I knew the dollar amount of Mr. Franklin's annual sponsorship agreement. I knew that that agreement had run out. It reached the end of its time by its own terms. And Mr. Avenatti hadn't articulated any civil claim for damages

that Mr. Franklin might have against the company.

Q. What else did he say at that point?

THE COURT: Did you know the value of Franklin's contract, annual contract, at that point?

THE WITNESS: I did, yes.

THE COURT: And what was it, to your understanding?

THE WITNESS: The last contract he had was valued at $72,000 in cash consideration per year.

THE COURT: Go ahead.

Q. Just to round that out, you said per year. How many years was the last contract for, if you know?

A. I can't recall if it was two years or three years, but it had an optional extension of one year, meaning the last year of his contract had actually been optionally, meaning Nike had the option to extend or not extend and, yes, they had extended it and given him the last optional year on his contract. That was the year that had finished with the 2018 season.

THE COURT: Was that spring of 2018?

THE WITNESS: The season runs into June, the June tournament for EYBL, the league.

Q. What else did Mr. Avenatti say at this point in the meeting about his demands?

A. Then he spoke about the second demand, that he and Mr. Geragos be hired to conduct an internal investigation. And he said that if Nike hired some other law firm to conduct an

internal investigation, he would get a most favored nations clause.

Q. Did you know what that meant?

A. I had no idea what he meant until he went on and explained what that meant to him.

Q. What did he say?

A. He said that if Nike hired another law firm to do an internal investigation that he would get paid two times the fees that Nike paid to that other law firm for actually doing work. So I understood that to mean, if you hired another law firm, they did a lot of work and it cost $5 million, he would get paid $10 million or two times that for no work.

Q. Did he put any parameters on what other law firm he was referring to, what other law firm could do the work?

A. No. He said if Nike hired any other law firm, another law firm.

Q. Did he link this demand in some way to the legal claims that he said Gary Franklin had?

A. No. He described these as two separate demands. We had to satisfy both of them, but there was a first demand, 1.5 million dollar settlement, and a second demand that he and Mr. Geragos be hired and paid or not hired and paid to do an internal investigation.

Q. Now, aside from the requirement that if he didn't do the work he would be paid twice as much as a firm that did, did he

Case 21-1778, Document 61, 04/04/2022, 3290318, Page112 of 263

268
K1UMAVE2 Wilson - Direct

reference a cost to the internal investigation that he proposed to do at this time?
A. He threw out a number in the course of the meeting, but he didn't explicitly link it to that component of his demand.
Q. What did he say?
A. At some point in the meeting, it may have been before the break, he told me a little story that started with a potential $31 million settlement that apparently he offered or that a company could have gotten early on. But then the company decided not to take this $31 million settlement and it later got much, much worse for the company, and there was some bad result in the hundreds of millions of dollars. And when I say company, I don't mean Nike. He named some other company that he said he had been adverse to in some prior work of his.
Q. Have you ever heard of a proposal like what Mr. Avenatti described as a most favored nations clause before?
A. No, I had not.
Q. Now, did the defendant at any time say that he himself had any claim against Nike?
A. No, he didn't say anything like that.
Q. Did you understand him to himself have any type of legal claim against Nike?
A. No.
Q. What did you understand the basis for his demand to pay him or to hire him and Mr. Geragos to do an internal investigation

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

269
K1UMAVE2 Wilson - Direct

to be?
A. That he thought he had leverage. He thought he had explosive information and the platform and ability through Twitter, through news occurrences, through calls to reporters who apparently he said would take his call at any time, to gin this up, gin these allegations up, true or false, into a massive media scandal for Nike.
Q. What effect did you think this press conference or reporting to the press might have on Nike?
A. I thought that it could damage the brand's reputation in front of consumers. I was aware there is a lot of speculation following the Adidas arrest that all the shoe companies must be doing this. A lot of people think that's true. I thought that he could capitalize on that sentiments. Even if this information turned out later to not be true, even if the government looked at the information and decided it wasn't criminal, that, regardless, the damage was going to be done. There would be first-day damage, first-week damage that could hurt the company's ability to sell shoes, damage the brand with consumers, and also, as he explicitly threatened repeatedly, hurt the stock price, which hurts investors in the company.
Q. Did you believe at this time that he would in fact carry through with this threat if his demands were not met?
A. I recall telling him in the meeting that I understood the threat was real, and I was being sincere.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

270
K1UMAVE2 Wilson - Direct

Q. Do you recall how he responded to that, if at all?
A. At this point in the meeting we were talking about the need for delay and I was trying to tell him, I get that you can do this, but give me more time to work with the company to see how we are going to respond. And I recall Mr. Leinwand, I believe, saying, in effect, what's the difference holding off a couple of days. It would still be during March Madness.
Q. By the end of the meeting did he agree to delay the press conference or publicizing this information?
A. No. It was left ambiguous. Mr. Geragos said he had to get to Brooklyn, and we agreed that he and I would speak again later that day, but as far as I knew leaving the meeting, the press conference was still threatened for the following day, for Wednesday.
Q. Now, I asked this earlier about the beginning of the meeting. By the end of the meeting had Mr. Avenatti at any time made reference to the filing of a complaint?
A. No, he had not.
Q. Now, you also have a few times said that there were two demands. What, if anything, did the defendant say about Mr. Franklin's sponsorship deal with Nike?
A. I don't recall him saying anything about it, and I really -- I don't recall him asking about it or asking that he extend it or that he get a new one. The only thing I recall asking him for with respect to Mr. Franklin was $1.5 million.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

271
K1UMAVE2 Wilson - Direct

Q. What, if anything, do you recall the defendant saying about firing any employees of Nike?
A. I don't recall that coming up in our meeting.
Q. And you testified yesterday that this meeting began with Mr. Avenatti making a reference to 408 discussion.
Do you recall that testimony?
A. Yes.
Q. By the end of this meeting did you believe that you had engaged in settlement negotiations?
A. No, absolutely not.
Q. Why not?
A. I still hadn't heard a claim that Nike could potentially settle, and I also didn't know what connection at all to any claim Mr. Franklin could have, the idea of us paying millions of dollars to Mr. Avenatti and Mr. Geragos could possibly have. It was not a settlement discussion from my perspective.
Q. Now, about how long did that meeting last, if you can recall?
A. I believe, including the break where we up to the sixth floor and back, between an hour and 90 minutes, maybe less.
Q. Did there come a time after that meeting when you spoke to law enforcement?
A. Yes.
Q. About how long after the meeting do you think that was?
A. Within several hours.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000112

Case 21-1778, Document 61, 04/04/2022, 3290318, Page113 of 263

272
K1UMAVE2 Wilson - Direct

Q. What law enforcement agency did you contact?
A. I called the U.S. Attorney's Office for the Southern District of New York and specifically one of the prosecutors working on the investigation into payments to amateur players.
Q. Just generally, what was the subject of that call?
A. The subject of the call was me relaying to the prosecutor the information, some of it new, that we had heard about Mr. Franklin and potentially payments involving Nike employees to players in his program, in Mr. Franklin's program, and a description of Mr. Avenatti's and Mr. Geragos' conduct and the demands that they had made.
Q. You said some of the information was new. What do you mean by that?
A. As I mentioned earlier, we have been disclosing to the government information about Mr. Franklin's program and players in the program for well over a year. Some of the names and individuals that I saw featured in the documents that Mr. Avenatti briefly let me review were familiar to me. Text message or two in that package or maybe an e-mail looked familiar to me, but much of it did not. Much of it I had never seen before and a lot of it was not Nike documents.
Q. Did you speak to Avenatti or Geragos again that day, March 19?
A. I had a call with Mr. Geragos later that day.
Q. Do you remember about when during the day that was?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

273
K1UMAVE2 Wilson - Direct

A. I believe it was early evening, maybe around 6 or so.
Q. Who was on that call?
A. I was on the call, Mr. Geragos was on the call, and I believe I took it on speaker phone and had one or more of my former colleagues at Boies Schiller in the room with me.
Q. What happened on that call?
A. I was -- we were speaking as we planned at the end of the in-person meeting about what was going to happen next, and Mr. Geragos told me that he had convinced Mr. Avenatti to sit tight until Thursday.
Q. Do you remember what he said?
A. I'm sorry?
Q. Do you remember how he said that?
A. That he had -- I believe he said that he was -- that he gotten or told -- not prevailed upon, but got Mr. Avenatti to sit tight until Thursday.
Q. What day of the week was that, if you can recall?
A. We were speaking early on Tuesday evening. So that represented to me maybe a one-day extension from Wednesday when he was going to hold a press conference, to Thursday.
Q. And what did you understand would happen on Thursday if you did not agree to his demands?
A. The threatened press conference and everything that would come with it.
Q. Before we move on, you said a moment ago that you spoke to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

274
K1UMAVE2 Wilson - Direct

the United States Attorney's Office about the information that you believed was new, or at least new to you.

Do you recall that?
A. Yes.
Q. In the meeting, the March 19 meeting that we went through yesterday and this morning, what, if anything, did Avenatti say Nike would have to report to the government if he were hired to conduct this internal investigation?
A. All I recall in that regard is that when he was referring to an internal investigation, he said it would be up to Nike what to do with the results of that internal investigation.
Q. What did you understand that to mean?
A. I understood him to be suggesting that we could stick it in a drawer, if an internal investigation was done that the company could decide to not share it but just stick the results in a drawer.
Q. When we spoke a moment ago about another call you had on March 19, when was the next time you spoke to either Geragos or Avenatti?
A. I spoke to Mr. Geragos again a couple of times following the day, Wednesday, March 20.
Q. Let's try to take them in order. We will focus on the first call. First of all, did you discuss these calls with law enforcement before you made them?
A. I did, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

275
K1UMAVE2 Wilson - Direct

MR. PODOLSKY: Your Honor, may I approach the witness?

THE COURT: Yes.
Q. Mr. Wilson, I've handed you a disk that is labeled for identification as Government Exhibit 3.

Do you recognize that disk?
A. Yes, I do.
Q. How do you recognize that disk?
A. I signed my initials on it.
Q. And what's contained on that disk?
A. This is an audio recording of the first telephone call I had with Mr. Geragos on Wednesday, the 20th of March.
Q. Who recorded that phone call?
A. The FBI.
Q. Did you agree to let the FBI record that phone call?
A. Yes, I did.

MR. PODOLSKY: Let me just pause for a minute.

Your Honor, I would like to read a brief portion of a stipulation into the record.

If we could pull up what's marked as Government Exhibit S10.

If we could publish this for the jury, your Honor.

THE COURT: You are offering S10?

MR. PODOLSKY: I am, your Honor.

THE COURT: Any objection?

MR. H. SREBNICK: No objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000113

Case 21-1778, Document 61, 04/04/2022, 3290318, Page114 of 263

276
K1UMAVE2 Wilson - Direct

THE COURT: S10 is received and you may publish.

(Government Exhibit S10 received in evidence)

MR. PODOLSKY: Thank you.

Q. I am just going to read a portion of this stipulation into the record. The title at the top is stipulation regarding certain audio and video recordings and the first paragraph reads:

It is hereby stipulated and agreed, by and between the United States of America, by Geoffrey S. Berman, United States Attorney for the Southern District of New York, and it gives the names of the prosecutors, and Michael Avenatti, the defendant, by his attorneys, and provides their names that:

1. If called to testify, a representative from the Federal Bureau of Investigation, FBI, would testify as follows.

If we could skip to the second page and blow up paragraph 1C.

Government Exhibit 3 is a true and accurate copy of an audio recording of a telephone call made at approximately 3:58 p.m. eastern time on March 20, 2019.

Your Honor, the government offers Government Exhibit 3 at this time.

THE COURT: Any objection?

MR. H. SREBNICK: No, your Honor.

THE COURT: Government Exhibit 3 is received.

(Government Exhibit 3 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

277
K1UMAVE2 Wilson - Direct

MR. PODOLSKY: Your Honor, at this time we will be offering transcripts as an aid to the jury. Could Mr. Hampton hand out binders of the transcripts to the jury?

THE COURT: Yes. Before he does that, let me explain the use of transcripts.

Ladies and gentlemen, in just a moment the government is going to be handing you binders that contain transcripts of certain conversations. The transcripts are provided to you to assist you in listening to the recordings, but I want you to understand that the transcripts are only an aid to you. They are not the evidence themselves.

What matters here is what you hear on the recording, and you are certainly welcome to refer to the transcripts as an aid in doing so. But ultimately what matters is what's on the tape, what you hear on the tape. And so, for example, if you were to hear something on the tape that's not reflected in the transcript, what you should be focused on and what constitutes evidence is what you hear on the tape recording.

You can distribute the binders.

MR. PODOLSKY: Thank you, your Honor.

Q. Mr. Wilson, I believe the binder next to you has them as well, if you can confirm that.

A. Yes. Thank you.

MR. PODOLSKY: Your Honor, at this time the government will offer Government Exhibit 3T as an aid to the jury.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

278
K1UMAVE2 Wilson - Direct

THE COURT: Any objection?

MR. H. SREBNICK: One moment, your Honor.

We have no objection to the government offering it and relying it in the way that your Honor described. There may be from time to time a disagreement about a word or an unintelligible, but we don't adopt verbatim the content, but we understand its permissible use as your Honor has described.

THE COURT: Ladies and gentlemen, just to reemphasize what I said before, the transcript is only being provided to you as an aid and, as I've said, what matters here, what is evidence is what you hear on the transcript. And to the extent you hear something different on the tape than what is reflected in the transcript, you must accept as evidence what you hear on the recorded call.

(Government Exhibit 3T received in evidence)

MR. PODOLSKY: If we could turn to the tab in the binder labeled 3T.

Q. Mr. Wilson, I'll just ask you, do you see on the cover page it says date, March 20, 2019; time, 3:59 and 46 seconds p.m.?

A. I do, yes.

Q. Let's go ahead and turn to the first page of the actual transcript. What I'd like to do is, we will play the recording itself. I may pause along the way to ask you some questions about what we are listening to.

MR. PODOLSKY: With the judge's permission, if we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

279
K1UMAVE2 Wilson - Direct

could publish Government Exhibit 3 at this point.

THE COURT: Yes. Go right ahead.

MR. PODOLSKY: You can start.

(Audio played)

Q. I want to make sure we understand some parts of this. If we look at the bottom of page 2 of the transcript, do you see on line, I think it's 24 or 23 you say: I think that -- I think there is a way to get this done. I think we can give you much of what Michael asked for.

First of all, who is Michael in that sentence?

A. I was referring to Michael Avenatti.

Q. What were you saying?

A. I was saying -- I was trying to give the impression that the company might agree to the demands that had been made at the meeting the day before.

Q. At this point was the company going to agree to those demands?

A. That was a complete nonstarter. I was saying these things in cooperation with law enforcement in order to buy more time.

Q. Buy more time for what?

A. Well, at this point, when I'm speaking to Mr. Geragos, as far as I know, Mr. Avenatti is still planning to hold his press conference the following day, Thursday, the 21st.

MR. PODOLSKY: Why don't we go ahead and just listen to the rest of the call, Mr. Hamilton.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000114

Case 21-1778, Document 61, 04/04/2022, 3290318, Page115 of 263

280
K1UMAVE2 Wilson - Direct

(Audio played)

Q. Mr. Wilson, let me just ask you a couple of quick questions about this. On page 4, line 6 to 7 Geragos says: It's very difficult to put the wraps on Avenatti.

What did you understand him to mean by that?

A. The day before, when we had spoken and he told me that he had prevailed upon Mr. Avenatti to not hold the press conference Wednesday, to sit tight until Thursday, I had said something humorous to him, like you may be one of the only people in America that can keep Mr. Avenatti under wraps. And Mr. Geragos had responded: Yeah. I try to keep a tight lid on him at all times.

I understood him here to be referring back to that conversation we'd had and then referring to his limited ability to hold Mr. Avenatti off from going public.

Q. You see you respond below, line 14: Rob, who you met with, has flown back to Beaverton.

Do you see that?

A. I do, yes.

Q. Who is Rob?

A. Rob was referring to Mr. Leinwand at Nike, who joined me at the meeting the day before.

Q. Where is Beaverton?

A. Beaverton is where Nike's headquarters is. It's a few minutes outside of Portland, Oregon.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

281
K1UMAVE2 Wilson - Direct

Q. Do you see below you say: I want to come to this meeting with appropriate authority.

Do you see that?

A. Yes.

Q. What did you mean?

A. I meant that, again, as outside counsel I don't have the authority to bind the company to some deal unless the company has given me authority or authorization to do so. So as a sort of term of art I was saying to him, the next time we get together I want to be able to agree to a deal. I want to have authority from my client to do a deal.

Q. Did you understand that the next time you met you would have to agree at that meeting to any deal?

A. I don't know what the plan was from their perspective at this point. I was trying to find out how we could keep the conversation going, again, from the objective of pushing back in time this threat that we were worried about.

Q. Did you speak again on March 20 with either Geragos or Avenatti?

A. I had a subsequent call again just with Mr. Geragos.

Q. We will go through the same thing.

Your Honor, may I approach the witness again?

THE COURT: Yes.

Q. Mr. Wilson, I've actually given you three disks this time. If we could focus on the one that is labeled for identification

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

282
K1UMAVE2 Wilson - Direct

as Government Exhibit 4.

Do you see that?

A. Yes.

Q. Do you recognize that disk?

A. I do.

Q. What is it?

A. This is a recording -- this is a disk containing an audio recording of the next call I had with Mr. Geragos on the afternoon of Wednesday, March 20.

MR. PODOLSKY: Your Honor, may I republish Exhibit S10 again, government exhibit?

THE COURT: Yes.

MR. PODOLSKY: Mr. Hamilton, if you can just pull that up. We don't need to read the introductory material again. But on the second page of 1D the stipulation reads: Government Exhibit 4 is a true and accurate copy of an audio recording of a telephone call made at approximately 4:49 p.m. eastern time on March 20, 2019.

Your Honor, the government offers Government Exhibit 4.

THE COURT: Any objection?

MR. H. SREBNICK: One moment, your Honor.

No objection to the audio recording.

THE COURT: Government Exhibit 4 is received.

(Government Exhibit 4 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

283
K1UMAVE2 Wilson - Direct

MR. PODOLSKY: At this time, your Honor, under the same description, we offer as an aid to the jury Government Exhibit 4T.

THE COURT: Yes.

(Government Exhibit 4T received in evidence)

THE COURT: Under the same conditions I mentioned a moment ago, ladies and gentlemen. You're welcome to use Government Exhibit 4T as an aid to you as you listen to the conversation that's recorded on Government Exhibit 4.

Q. Mr. Wilson, if you don't mind just turning to your binder to Government Exhibit 4T.

Do you see that this one also has a date March 20, 2019 on it?

A. Yes.

MR. PODOLSKY: We can go ahead and just turn to the page with the text?

Your Honor, at this time may we publish Government Exhibit 4 to the jury.

THE COURT: Yes. Go right ahead.

MR. PODOLSKY: We will do the same thing. I may pause it in the middle or play it to the end. But why don't we start.

(Audio recording)

Q. Just briefly, to make sure we understand, if you look at the first page of text, the conversation on line 7, Geragos

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000115

says: What can I tell him as to why we are not going to meet tomorrow, which is what he's demanding.

You see that?

A. Yes.

Q. Who did you understand Geragos to be referring to by him?

A. I understood Mr. Geragos to be saying that he had spoken to Mr. Avenatti.

Q. Do you see that Geragos says: Why we are not going to meet tomorrow, which is what he is demanding?

A. I see that, yeah.

Q. What was your understanding as to why Avenatti was demanding to meet the next day?

A. My best understanding was that he was trying to keep the pressure on. He had indicated reluctance at the end of our in-person meeting the prior day to give me any more time. In fact, he had said he was worried that if he gave me more time I would figure out some way to fuck him, whatever that meant.

Q. Did you speak to Geragos or Avenatti again that day?

A. Yes. I had a third call initially just with Mr. Geragos, which then Mr. Avenatti joined.

Q. If you could find the disk in front of you that's labeled for identification as Government Exhibit 1.

A. I have it.

Q. Do you recognize that disk?

A. I do.

Q. How do you recognize it?

A. I signed my initials on it.

Q. What's on that disk?

A. This is an audio recording of the third call I had with Mr. Geragos on the afternoon of Wednesday, March 20, which Mr. Avenatti joined as well.

MR. PODOLSKY: Your Honor, if we may pull up the stipulation one more time.

THE COURT: Yes.

MR. PODOLSKY: Mr. Hamilton, can you pull up Government Exhibit S10. On the first page next to A it reads: Government Exhibit 1 is a true and accurate copy of an audio recording of a telephone call made at approximately 5:09 p.m. eastern time on March 20, 2019.

Your Honor, the government offers Government Exhibit 1 at this time.

THE COURT: Any objection?

MR. H. SREBNICK: No, your Honor.

THE COURT: Government Exhibit 1 is received.

(Government Exhibit 1 received in evidence)

MR. PODOLSKY: With the same understanding as before, with respect to the transcript, the government offers Government Exhibit 1T as an aid to the jury.

THE COURT: Yes. The jury can refer to government 1T as an aid as it listens to Government Exhibit 1, the recording.

(Government Exhibit 1T received in evidence)

MR. PODOLSKY: Why don't we turn our binders to the tab marked 1T.

Before we listen to it, I just want to be clear who participated in this call.

(Continued on next page)

Q. Before we listen to it, I just want to be clear, who participated in this call?

A. The speaking participants were myself, Mr. Geragos, and Mr. Avenatti.

MR. PODOLSKY: Why don't we go ahead -- with the Court's permission, may we publish Government Exhibit 1 at this time?

THE COURT: Yes.

MR. PODOLSKY: Mr. Hamilton, if you could go ahead and play it.

(Audio played)

BY MR. PODOLSKY:

Q. Mr. Wilson, I just want to ask you a few questions about what we heard.

Do you see the top of page 4 on the transcript?

A. Yes.

Q. Avenatti says, "I mean, we're gonna get a million five for our guy. "Do you see that?

A. Yes.

Q. What did you understand that to be a reference to?

A. To the first component of his demand, the $1.5 million settlement for Mr. Franklin.

Q. And he continues, "and we're gonna be hired to handle the internal investigation." What did you understand that to be in reference to?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page117 of 263

288
K1udave3 Wilson - direct

A. The second component of his demand, that he and Mr. Geragos be hired to conduct an investigation.

Q. Did you understand whether, pursuant to his demands, Nike could hire any other law firm or entity to conduct an internal investigation?

A. It was getting confusing at this point, because one of the things he had said in our meeting the previous day was that Nike could hire someone else and then just have to pay him two times the money they paid that firm to actually do work, but here he was saying we are going to be hired. So there was -- it wasn't entirely clear to me at this point.

Q. And he says, "and if you don't wanna do that, we're done." What did you understand him to mean by that?

A. He was going to stop talking to me. He was going to go public and try to gin up this scandal to hurt the company.

Q. Then you see below, Avenatti says: "I'm not fucking around with this, and I'm not continuing to play games. And I don't -- you know, this isn't complicated."

Do you see that?

A. Yes.

Q. What was your reaction to the statement, "this isn't complicated"?

A. That it was intended to put pressure on me, because in fact it was very complicated and we'd only been talking for less than 24 hours. So he seemed to be very angry and very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

289
K1udave3 Wilson - direct

demanding.

Q. Why do you say it was complicated?

A. As I said before, the company had been cooperating with the government for a long time, and it was our intention and we in fact did share with the government what he had told us. I never had a settlement discussion where I'm being asked to not only settle claims but they haven't been described to me. I don't know what claims he thinks Mr. Franklin may have. Maybe Mr. Franklin did have claims, but he didn't say what they were. Much less have I ever been asked by someone who is threatening me, is threatening my client, that that client has to turn around and hire to do trusted, important legal work an attorney that's been threatening them. So, this was an extraordinarily odd and complicated situation.

Q. You see, he says, on line -- beginning on line 18: "A few million dollars" -- when I say "he," I'm referring to Mr. Avenatti -- "A few million dollars doesn't move the needle for me." Do you see that?

A. Yes.

Q. Which part of his demand did you understand that to be in reference to?

A. I understood it to be in reference to the second part of his demand, particularly in light of the previous thing he had said on this call, which was that it was worth more in exposure to him to just blow the lid on this thing. I understood him to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

290
K1udave3 Wilson - direct

mean -- by saying "exposure" meaning raising -- further raising his media profile, and so that struck me as something that was for his benefit.

Q. What did you understand him to mean when he said "A few million dollars doesn't move the needle for me"?

A. That the amount of money I was likely to hear him demand shortly in fees that he would get paid under this second part of his demand was probably going to be more than a few million dollars because he was saying, in essence, I'm not going to be satisfied with a few million dollars.

Q. Do you see on the next page, he continues, "you're gonna hire us to do an internal investigation, but it's" -- excuse me. "So if you guys think that, you know, we're going to negotiate a million five, and we're gonna, you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done."

Focusing on the "capped at 3 or 5 or $7 million," what did you understand him to be communicating to you?

A. So it's typical for attorneys working on an internal investigation for a company to charge by the hour. And so if you do thousands of hours of legal work or hundreds of hours of legal work, the cost of the investigation would be the number of hours times the hourly rate of all the lawyers or other staff doing the work. By "cap" I understood him to be saying an overall cap on how much that hourly billing adds up to. So

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

291
K1udave3 Wilson - direct

he was saying it's not going to be something where the maximum billing is going to be 3 or 5 or $7 million.

Q. Now, just for some being background, what -- how does one generally determine or estimate the cost of an internal investigation? What types of factors might come into play?

A. The principal drivers of the cost would be the scope of the work required, and that would be driven by things like how many years of conduct are you looking at, so how many years of emails that you have to review, how many employees are involved in the conduct and, therefore, how many employees might the lawyers have to interview, and the size and scale and complexity of the business transactions under review. Are we talking about a billion-dollar real estate deal, or are we talking about a single $10,000 payment?

Q. Now, when Mr. Avenatti said -- and now I'm referring back to page 4 -- "a few million dollars doesn't move the needle for me," had you had any discussions with him about what the scope of such an internal investigation would entail?

A. No, we had not.

Q. And finally, before we move on, Mr. Avenatti, on lines 10 to 12 of page 5, says, "I'll go take $10 billion off your client's market cap. But I'm not fucking around."

What did you understand him to mean at that point?

A. That he was repeating, maybe elaborating on the threat he made the day before, that he would launch a media assault on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000117

Case 21-1778, Document 61, 04/04/2022, 3290318, Page118 of 263

292
K1udave3 Wilson - direct

the company, and his intention would be to drive the stock price down so that the value of the company as reflected in market cap would drop by billions of dollars.

MR. PODOLSKY: All right. Mr. Hamilton, if we could continue planing the recording.

(Audio played)

BY MR. PODOLSKY:

Q. Mr. Wilson, just a couple of questions about this exchange that we've listened to.

Well, first of all, just to summarize, what was this back and forth about?

A. This back and forth was about Mr. Avenatti putting a price tag on the second part of his demand to the company not to go public with these allegations.

Q. Do you see on page 12 a remark Avenatti says, he is saying, "Never in a million years could I hire, could anybody else hire Boies Schiller to do a competent internal investigation in a matter of this magnitude for $9 million." Do you see that?

A. I do.

Q. What did you understand him to mean by "a matter of this magnitude"?

A. I wasn't sure what he meant by that.

Q. Had you had any discussions about the magnitude of what this investigation would entail?

A. No, we had not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

293
K1udave3 Wilson - direct

Q. You see below, you say: "Could an investigation like this hit the 10 to $20 million range? I suppose it could."

Do you see that?

A. I do.

Q. Why did you say that?

A. So we had been going round and round here for a few minutes, and he initially said that he wasn't going to be satisfied with something with a cap of 3 or 5 or $7 million, and he kept coming back to the idea that single-digit millions wasn't going to be adequate. And I came back and said, yes, I think it should be single-digit millions.

So, again, throughout these conversations, I was always trying not to scare him off. I was worried that if I gave him the impression that Nike wouldn't pay, which it never would have considered doing, that he would have cut off the discussions and immediately gone to the press and started executing on his threat. So in order to keep the conversation going, since he repeatedly said he didn't think that the payment on the second component could be less than in the single-digit millions, I picked the first double-digit millions, 10 to 20, and said, well, maybe -- maybe it could be that.

MR. PODOLSKY: All right. Why don't we keep listening, Mr. Hamilton.

(Audio played)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

294
K1udave3 Wilson - direct

BY MR. PODOLSKY:

Q. Mr. Wilson, you see on page 13, you say, "We're gonna" -- this is starting on line 20: "We're gonna get terms on paper, you know, the releases that we want."

What's a release?

A. A release is an agreement by one party that may have claims against someone else not to pursue those claims. It is a typical feature of a settlement agreement.

Q. What claims were being released to your understanding at this point?

A. I had no idea. I was just using typical terminology for settlement agreements, again, to make it appear that we were seriously entertaining the idea of doing this deal.

Q. You say at the bottom of page 13: "And Michael, I don't mean to, you know, to put not too fine a point on it, you don't hear me saying no."

Why did you say that?

A. Well, as you can hear earlier in the call, as I began to try to speak about the components of his demand, he kept interrupting and sounded pretty angry. I wasn't trying to give him the impression that we were going to say no. So at this point I just came out and explicitly said, hey, by the way, we're not saying no to your demands.

Q. How did he react to that?

A. Well, what was notable to me is that his tone changed, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

295
K1udave3 Wilson - direct

he and Mr. Geragos suddenly sounded more friendly and started joking around and laughing.

Q. All right. Why don't we keep listening.

(Audio played)

BY MR. PODOLSKY:

Q. I just want to understand a couple of things.

On page 15, there is a reference to "papering it." Line 15 to 16, for example. Do you see that?

A. I do, yes.

Q. What does it mean -- what did you understand it to mean, "paper it"?

A. That's lawyer jargon for reducing an agreement between the parties to some kind of written contract.

Q. Then you see, on line 19, Mr. Avenatti says, "This is very straightforward." And you respond, "It's not complicated."

Do you see that?

A. Yes.

Q. Why did you tell him it's not complicated?

A. Again, I thought if I spooked him and he thought that this deal wasn't going to happen, that I would not get more time, he wouldn't agree to hold off on his press conference.

Q. He says, "We're talking about a settlement agreement, on a relatively -- you know, on a million five with adequate releases, etc., and we're talking about an engagement letter."

What was your understanding of what he was saying

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000118

Case 21-1778, Document 61, 04/04/2022, 3290318, Page119 of 263

296
K1udave3 Wilson - direct

there?
A. I understood him to be talking about how the two components of his demand would be papered or put in writing, and that the settlement agreement referred to the $1.5 million payment for Mr. Franklin. And that engagement letter referred to an agreement between Nike and some entity of his or Mr. Geragos' -- we had some discussion of that earlier -- to hire them and pay them fees purportedly to do legal work for the company.
Q. Did you understand those to be two separate papers or papering?
A. Two separate documents, yes.
MR. PODOLSKY: OK. Why don't we keep listening.
(Audio played)
BY MR. PODOLSKY:
Q. Let me just ask you a couple of follow ups.
On page 19, do you see there is some dialogue about an accident that your wife had?
A. I see that, yes.
Q. Did she have an accident?
A. She did.
Q. Did she have an accident right around this time?
A. No.
Q. How long before?
A. A few weeks earlier.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

297
K1udave3 Wilson - direct

Q. Why did you mention it here?
A. Mr. Avenatti was asking to meet the very next day, and without meaning to doubt the capabilities of the FBI, I wasn't sure whether or not they would be prepared for me to meet with him that quickly, so I wanted to buy time at least to the afternoon of the following day.
Q. And you see the next page, on page 20, Geragos says, "And 1:30 tomorrow, 256."
First of all, what's 256? What was your understanding?
A. That is a reference to the street address of his office on Fifth Avenue.
Q. "We'll even do it on the sixth floor that we've got all wired up for you, OK Scott?"
Do you see that?
A. Yes.
Q. What did you understand him to mean by that?
A. I understood him to be referring back to dialogue we had the day before when he showed me up to unfinished office space on the sixth floor of his building, and I'd asked him if he was going try to listen into the conversation I was having with my client up there by miking the space which he owned, or something like that.
Q. So at the end of this phone call, how were things left, to your understanding?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

298
K1udave3 Wilson - direct

A. It was left that I was going to meet with Mr. Avenatti and Mr. Geragos again the following day, Thursday, March 21st.
Q. Your Honor, at this point, the next segment is somewhat lengthy. I thought this might make sense for our morning break, but of course I would defer to the Court.
THE COURT: I just wanted to ask one follow up question that was testified about, a reference to taking $10 billion off your client's market cap. Could you explain how a company's market cap would be reduced?
THE WITNESS: Sure. So market cap is, as I understand it, an abbreviation for market capitalization. A company's ownership is reflected in the shares that are outstanding. Shareholders own pieces of the company. So if there are 10 shareholders who each own a share that's worth $100, then 10 times a hundred, your market capitalization is a thousand dollars.
What I understood him to be saying in terms of reducing the market cap would be that he would say things that would cause the public to be less interested in buying Nike's stock, it would cause the stock price to drop, so that the market cap would be less. So in my example, the stock price might now be $50 a share. There are still 10 shares outstanding. Now the company is worth $500 rather than a thousand dollars.
THE COURT: All right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

299
K1udave3 Wilson - direct

Ladies and gentlemen, we will take our morning recess.
Don't discuss the case. Keep an open mind because there is more evidence, and we will be back to you shortly. Thank you all very much.
THE CLERK: All rise.
(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000119

(Jury not present)

THE COURT: You can step down, Mr. Wilson.

Is there anything we need to discuss?

All right. We will resume shortly.

(Recess)

THE COURT: The witness should re-take the stand.

MR. PODOLSKY: Your Honor.

THE COURT: Yes.

MR. PODOLSKY: Since we have a moment, this is really not our request, but I was asked to remind the Court that there was a request by Nike's attorneys for a 502(d) order. I am just flagging it because I think we will go on to cross-examination my guess is right after lunch.

THE COURT: Yes. I am going to be issuing an order on that very shortly.

MR. PODOLSKY: Thank you, your Honor.

MR. H. SREBNICK: Judge, I'm having difficulty hearing Mr. Podolsky and the witness. If there could be some adjustment to the microphone, I would appreciate that.

THE COURT: I will ask the witness to speak more directly into the microphone, and, Mr. Podolsky, if you could do the same.

MR. PODOLSKY: Yes, your Honor. I believe one of the problems is the height of the chair and depth. We actually added another book during the break. Maybe that will help a

little bit so the mic will be closer to his face.

THE COURT: OK.

(Continued on next page)

THE CLERK: All rise.

(Jury present)

THE COURT: Please be seated.

Please proceed.

MR. PODOLSKY: Thank you, your Honor.

BY MR. PODOLSKY:

Q. Mr. Wilson, we -- just before the break, we finished listening to the phone call that was recorded on March 20th involving the defendant. Do you recall that?

A. Yes, I do.

Q. Now, you testified earlier that law enforcement had recorded the calls that we have listened to. Do you recall that?

A. Yes.

Q. At this point, on March 20th, did you have any idea what law enforcement's -- the intentions of law enforcement were with respect to the defendant?

A. What I understood at this point --

MR. H. SREBNICK: Objection, your Honor. Objection.

THE COURT: Sustained.

BY MR. PODOLSKY:

Q. Did you have any knowledge as to how this scenario would end? You testified earlier several times that you were concerned about the timing of the press conference. Did you still believe at this point that that press conference may

happen?

A. Yes.

Q. All right. Let's turn now to March 21st.

You testified before the break that it was left at the end of the call that you would meet with Mr. Avenatti the next day. Do you recall that?

A. Yes.

Q. Did you in fact meet with him the next day?

A. I did.

Q. Was that meeting recorded?

A. It was recorded both audio record and video recording.

Q. Now, do you see in front of you there is a disk marked for identification as Government Exhibit 2?

A. I see it.

Q. And do you recognize that disk?

A. I do.

Q. How do you recognize that disk?

A. I signed my initials on it.

Q. What is on that disk?

A. It contains an audio/visual recording of the meeting I had on Thursday, March 21st with Mr. Avenatti.

MR. PODOLSKY: And, your Honor, if we may publish Government Exhibit S10 again briefly?

THE COURT: Yes, go ahead.

MR. PODOLSKY: Thank you.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page121 of 263

304
K1udave3 Wilson - direct

Mr. Hamilton, if you could take us to the second page. And I'll read where it is next to the letter "b."

"Government Exhibit 2 is a true and accurate copy of a video-recording made at approximately 1:26 p.m. Eastern Time on March 21, 2019."

Your Honor, at this time, the government offers Government Exhibit 2.

THE COURT: Any objection?

MR. H. SREBNICK: No, your Honor.

THE COURT: Government Exhibit 2 is received.

(Government's Exhibit 2 received in evidence)

MR. PODOLSKY: And with the same description as before, the government offers Government Exhibit 2T as an aid to the jury.

THE COURT: Yes. As with the other recordings, ladies and gentlemen, you may refer to the transcript as an aid in considering the recording reflected in Government Exhibit 2.

(Government's Exhibit 2T received in evidence)

BY MR. PODOLSKY:

Q. Now, before we watch Government Exhibit 2, I just want to ask you a couple of questions, Mr. Wilson.

Where did this meeting take place?

A. It took place in the same conference room where I had met with Mr. Avenatti on Tuesday of that week at Mr. Geragos' offices on Fifth Avenue.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

305
K1udave3 Wilson - direct

Q. Who attended this meeting?

A. This time it was myself and the same junior colleague of mine at the Boies Schiller firm who had come to the Tuesday meeting and Mr. Avenatti and Mr. Geragos.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

306
K1UMAVE4 Wilson - Direct

Q. How did you get to Mr. Geragos' office that day?

A. I walked from a few blocks away.

Q. And what did you do when you got to the office?

A. As we were arriving and either as I was pressing the buzzer or was going to press the buzzer, there was somebody else entering the building who let us in and took us up to the fourth floor, where Mr. Geragos' office is.

Q. What happened when you got to the conference room?

A. We spent some time settling in and initially Mr. Geragos was not in the conference room. I recall that he was in his office, which I could see because there were glass walls, speaking, I think, to this woman who had brought us up from downstairs. We had made small talk for a while before Mr. Geragos joined the meeting.

Q. Who made small talk?

A. Myself and -- mainly me and, to an extent, Mr. Avenatti, and then Mr. Geragos.

Q. What is your recollection of Mr. Avenatti's demeanor during that small talk?

A. I recall that he seemed impatient to get to it. He seemed a little tense.

MR. PODOLSKY: Your Honor, may we publish Government Exhibit 2 at this point?

THE COURT: Yes.

MR. PODOLSKY: Mr. Hamilton, what I'd like to do is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

307
K1UMAVE4 Wilson - Direct

skip the portion of small talk and go straight to the mark at around 13 minutes and 46 seconds.

Q. And before we play it, Mr. Wilson, I think we can turn our binders to tab 2T, page --

MR. H. SREBNICK: Your Honor, if I could have a moment with counsel.

THE COURT: Yes.

MR. PODOLSKY: Having conferred with counsel, why don't we go ahead and watch the whole tape of the meeting. Why don't we start at 808. We will just go ahead and listen to the conversation as the meeting began.

You can pick this up at around page 2, line 20, give or take, on the Government Exhibit 2T.

(Video played)

Q. Mr. Wilson, can you just explain what we have listened to for the past few minutes?

A. Yeah. Lawyers talking about offices and other law firms, just small talk. I was happy to engage in small talk as long as they wanted to before we got down to business.

MR. PODOLSKY: Why don't we go ahead and watch.

(Video played)

Q. We saw on the video, it appeared Mr. Avenatti handed over a piece of paper.

Do you recall that?

A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000121

Q. What was that piece of paper?
A. It was a draft settlement agreement between a Nike entity on the one hand and Mr. Franklin and his program, California Supreme, on the other.
Q. What part of the demand did that settlement agreement apply to?
A. The first part, the 1.5 million dollar payment that Nike was supposed to make under the settlement agreement with Mr. Franklin.
Q. Do you see on page 10 of the transcript Avenatti says: If you need additional release language or confidentiality language, language relating to other terms, no problem.
Let's pause there for a moment. What did you understand him to be talking about?
A. I understood him to be talking about boilerplate or fairly standard terms that appear in the back of most settlement agreements, including releases. As I explained earlier, that's when the parties that are settling say, this is the end of our dispute. We release any claim that we might have had against you. And confidentiality language referring to either the settlement itself and even sometimes the very document that the settlement is reflected in being confidential.
Q. It continues: No problem. But we are not going to negotiate the amount or the date.
What did you understand that to mean?

A. By amount I understood him to be referring to the 1.5 million dollar amount. I didn't know what he meant by date, so I asked him.
Q. What did he say?
A. He said it was the date of payment.
Q. What payment did you understand him to be referring to?
A. The 1.5 million dollar payment.
Q. If you go to the next page of the transcript, you say on line 2: But JAMS, things like that.
What is JAMS?
A. JAMS is a private organization that provides mediators and arbitrators, many of them former judges, who can sit to privately adjudicate parties' disputes.
Q. What's the relevance of JAMS to a settlement agreement?
A. It's typical in a settlement agreement that it provides either what court the parties are going to go to if they have a dispute under the settlement agreement, like you didn't actually pay me or you did something in violation of the settlement agreement, or, as an alternative to going to court publicly, the parties can agree to a confidential dispute resolution mechanism like arbitration before an arbitrator, according to the rules of certain private organizations.
JAMS is one organization that has arbitration rules that the parties can incorporate into their agreement by writing a clause that says, we agree that if we have a dispute

under this agreement, we will arbitrate under JAMS rules.
Q. You mentioned JAMS or arbitration could be confidential? What did you mean by that?
A. As opposed to when you go to court and make filings and members of the public and press can usually read those filings or most of them. And arbitration, the proceedings are private. They are not registered on the website of any court. They are just a private adjudication between the parties with the involvement of the arbitrator.
Q. If you look at lines 8 to 9 of page 11, Avenatti says: I don't think it serves anybody to pick a nonarbitration option.
What did you understand him to mean?
A. That he thought that if we did the settlement that it would be -- he didn't think it would be -- would serve or be in anyone's interest for any dispute under that settlement to be public, it should all be kept quiet.
MR. PODOLSKY: Why don't we go ahead and continue watching the video.
(Video played)
Q. Mr. Wilson, do you see on page 13, as we just watched, Avenatti says beginning at line 11: Our attention shall remain confidential fully, entirely confidential, and will only be disclosed on a need-to-know basis by the company. And he goes on.
What did you understand him to be saying?

A. It was an odd thing to emphasize, to my understanding, because when a company hires a lawyer, it's generally a confidential thing. But he was emphasizing to me that the retention of Mr. Geragos and Mr. Avenatti to do whatever this was going to be was not going to be publicized.
Q. You see below he says on line 19: But we are not going to be issuing any press releases or responding to any press inquiries or leaking anything to the press or anything of that nature whatsoever.
Do you see that?
A. Yes.
Q. What did you understand him to be saying to you?
A. I understood him to be trying to reassure me that notwithstanding that I understood he was a lawyer that was often in the media with respect to his case, that in this case he would not be talking to the press, that this would all be kept confidential.
Q. At the top of page 14 he continues: None of that happens unless we are directed to do so by Nike. And on line 4: Because Nike is our client.
What did you understand him to be saying?
A. That he intended that Nike hire him to act on its behalf as a lawyer.
Q. You mentioned yesterday, and I think this morning, that you found it unusual to hire someone who is an adverse party.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page123 of 263

312
K1UMAVE4 Wilson - Direct

Can you explain why it would be unusual or why would it be surprising to you to hire an adverse party as your lawyer?

MR. H. SREBNICK: Objection, your Honor. Relevance.

THE COURT: Overruled.

A. It struck me as incredibly unusual for a general reason and a specific reason.

Generally, because there are conflicts rules that mean that if you are a lawyer acting in someone's interest, you can't act for someone with adverse interests because how would you be loyal to both clients at the same time. I thought it was a very bizarre thing in general to suggest -- I never heard of it, that I'm adverse to you, but I can also represent you in a tense, high-profile, problematic criminal investigation.

The specific reason that I found incredibly problematic is that I thought it would look like to the Department of Justice that Nike had hired the lawyer for a whistleblower, for a third party outside of the company, that we hired his lawyer to try to get our stories straight with this guy or otherwise to sit on this individual. It's highly unusual in a criminal investigation, unheard of, and sometimes the Department of Justice objects, if a defense lawyer represents two unrelated parties who may be caught up in the same criminal investigation.

MR. PODOLSKY: Why don't we go ahead and continue with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

313
K1UMAVE4 Wilson - Direct

the video.

(Video played)

Q. Before we move on I want to focus for a moment on page 14, starting at line 6.

Do you see that, Mr. Wilson?

A. Yes.

Q. And we can go straight to line 7. Do you see Avenatti says: $12 million retainer upon signing evergreen.

Do you see that?

A. Yes.

Q. What did you understand him to be telling you at this point?

A. Well, my understanding of what he was saying changed over the course of that phrase. Throughout this I'm trying to keep a straight face, sort of even demeanor, but I was really quite shocked.

A retainer is usually when a client gives money to a law firm as sort of a deposit, like an escrow account. And then as the law firm does work it earns money and it can take money out of the retainer to pay itself. If you had a $12 million retainer and you did a million dollars worth of legal work, you could take a million dollars out of the retainer, but there is still $11 million sitting there in the account. That's not the attorney's money yet. It's just a retainer.

Evergreen is a term of art that means when the client,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

314
K1UMAVE4 Wilson - Direct

by asking for legal work, draws down on the retainer. In my example, a million dollars worth of legal work has been done, the law firm has paid itself a million dollars, there is only 11 million left in the account. Evergreen means that the client is agreeing to always keep topping up the account, refreshing it, keeping it evergreen. So that would mean at that point the client would have to stick another million dollars in the account so it's always up at 12 million.

Q. According to the description of a retainer you just explained, if a lawyer had a $12 million retainer but ended up only working a little bit earning, say, a few thousand dollars, what would they walk away with at the end of the day?

A. A few thousand dollars. The other millions of dollars would be returned to the client.

Q. And then Avenatti continues: That's going to be deemed earned when paid.

What did you understand him to be saying?

A. That's what really nearly made me fall out of my chair because that's not a retainer. Retainers, as we were just talking about, is, again, basically like an escrow account to be drawn down on. Earned when paid means that the second the money hits the law firm's account, it's been earned, that the client is agreeing, you've earned $12 million now, no matter how much work you do or don't do.

Q. As I said a moment ago, if the attorney or in this case

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

315
K1UMAVE4 Wilson - Direct

Avenatti did a few thousand dollars worth of work, how much would he walk away with if you agreed to his demands?

A. $12 million.

Q. And he continues: We will cap it at $25 million, minimum of $15 million unless the scope changes.

What did you understand that to mean?

A. I didn't know what he meant by unless the scope changes because we hadn't discussed any scope, but I understood him to be, by cap, saying that Nike would ultimately have to pay at least $15 million and up to $25 million.

Q. Let me ask one more question before we continue. There is a discussion there on line 21 and below regarding blended hourly rate.

Do you see that?

A. I do, yes.

Q. Can you explain what your understanding of the blended hourly rate of $950 an hour for attorneys and so on means?

A. Attorneys generally have an hourly billing rate that reflects their seniority or experience. A more junior attorney right out of law school would generally charge less per hour. A senior partner would charge more.

I understand blended hourly rate to refer to charging the same hourly rate for all of the attorneys within a firm, regardless of their experience. So the junior associate whose rate might be $500 an hour is billed at 950 and the senior

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000123

Case 21-1778, Document 61, 04/04/2022, 3290318, Page124 of 263

316
K1UMAVE4 Wilson - Direct

partner, whose rate is $1300, also billed at 950.

Q. Whose work did you understand would be billed at $950 an hour?

A. This was unclear to me. I had asked to question in a prior call about who exactly, which firm Nike was being asked to engage. But I understood Mr. Avenatti to be saying, whoever the attorneys were who were going to be staffed on this matter purportedly, each time one of them worked an hour, that would cost $950.

Q. Let's say the entire engagement, there was one hour of work done at a rate of $950 an hour. According to the full description of what Mr. Avenatti described Nike should agree to, how much money would Avenatti or his entity be paid?

A. For that one hour of work? $15 million.

MR. PODOLSKY: Why don't we continue with the video, Mr. Hamilton, if you could play it.

(Video played)

Q. Mr. Wilson, do you see that at the top of page 16 Geragos refers to a subcontract for PIs and things of that nature?

A. Yes.

Q. What did you understand him to mean by a subcontract for PIs?

A. I understood him to be saying that whatever entity Nike was supposed to do a contract with, that entity would then enter into a subcontract purportedly with private investigators, or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

317
K1UMAVE4 Wilson - Direct

PIs.

Q. You see below Avenatti says: Whether it be through attorneys or PIs or others.

Do you see that?

A. I do, yes.

Q. Just generally, in an internal investigation conducted by a law firm, who performs the investigation?

A. Attorneys.

Q. Do you have any experience with PIs conducting internal investigations?

A. No.

Q. What was your understanding at this point as to whether Avenatti and Geragos had the staff to conduct this internal investigation?

MR. H. SREBNICK: Objection, your Honor.

THE COURT: Sustained.

Q. Based on what was said here, did you have any understanding as to whether they had staff to conduct an internal investigation?

MR. H. SREBNICK: Same objection.

THE COURT: Sustained.

MR. PODOLSKY: Your Honor, may we approach briefly on that question?

THE COURT: Yes.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

318
K1UMAVE4 Wilson - Direct

(At sidebar)

THE COURT: You have to lay a foundation for knowledge about what their resources were. You have not done that. That's why I'm sustaining the objection.

MR. PODOLSKY: I just wanted to make sure I understood for future purposes.

MR. H. SREBNICK: May I address the Court because I think the issue here is, the other side, the government, had indicated that -- for example, objected in my opening statement to discussing Geragos' resources, the law firm, any of that. I thought that we had an understanding that the amount that was being proposed for internal investigation was not going to be a contested issue by the government.

THE COURT: I see those as two separate issues.

One is whether there is just, in a very practical sense, the people resources necessary to do an investigation. That's a different issue than the amount and cost. What the government is getting into is whether there were enough bodies to even do the investigation that was being discussed. I see that as different than the amount of money that the investigation would cost.

MR. H. SREBNICK: I assume then that would allow on cross for me to develop that Mr. Geragos had eight or nine lawyers at his law firm. They could hire additional lawyers. They could staff. Geragos is the one speaking about bringing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

319
K1UMAVE4 Wilson - Direct

in investigators to accompany lawyers to participate in.

THE COURT: I don't know that this man is going to have the capacity to testify about what Geragos could do. I don't know whether Mr. Wilson has any knowledge about what Mr. Geragos' law firm capacity might be.

MR. PODOLSKY: I'm simply trying to understand what he understood was going on in this meeting.

THE COURT: I understand. I am just saying that before you can ask somebody whether there are resources available to do it, you have to lay a foundation demonstrating that the person has knowledge such that he could testify about whether Geragos' firm has the people to do --

MR. PODOLSKY: I understand. I intend to move on.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000124

(In open court)

Q. Mr. Wilson, we were speaking a moment ago about page 16 on the transcript.

Do you recall that?

A. Yes.

Q. And you see on line 18 to 19 you mention, you said something about a multiplier. I wanted to understand what you meant by that.

A. Yes.

Q. What were you referring to?

A. I was referring to Mr. Avenatti's description at the first in-person meeting we had on Tuesday of a scenario where Nike decided to have some other law firm conduct an internal investigation, and in that scenario he would be paid two times the fees that Nike paid to that law firm under what he called a most favored nations clause.

Q. And you see below Geragos responds: Oh, that was your penalty clause, favored nations.

Do you see that?

A. Yes.

Q. What did you understand him to be referring to?

A. That he was recalling that discussion at the Tuesday meeting.

Q. And then there is an exchange. Avenatti says: We are basically, and you cut in and you say, we are beyond that.

Do you see that?

A. Yes.

Q. Why did you understand you were beyond that?

A. Because he just articulated a dollar amount, a specific dollar amount, 15 to $25 million rather than something that was going to be a multiple of some other number.

Q. And at this point in the discussion did you understand that if Nike wanted to conduct some additional or new internal investigation it could hire anyone other than Avenatti?

A. No. That was not my understanding.

MR. PODOLSKY: Why don't we continue with the recording.

(Video played)

Q. Mr. Wilson, on page 17, you see a rather long paragraph of Mr. Geragos speaking?

A. Yes.

Q. What did you understand him to be talking about there?

A. He was talking about, as I understood it, criminal charges that had been brought in connection with parents paying bribes to get their children into USC.

Q. You see he says on line 18 to 19 -- before I ask this question, do you understand that the parents paying bribes to students had anything to do with the matters at issue here?

A. No. Unrelated.

Q. Just so we know, what is USC? Did you have an

understanding of what that is?

A. University of Southern California.

Q. Do you see on lines 18 to 19 Geragos says: So this kind of ensures that we will get to the bottom of it. It's not going to happen again.

What do you understand him to mean by that?

A. I understood him to be implying that he believed there was misconduct at Nike and that an internal investigation would be a way to root it out to address it.

Q. And then Avenatti says: And ultimately it's going to be up to the client as to whether they want to self-disclose.

What did you understand him to mean by self-disclose?

A. I understood him to be referring to a decision that a company makes when it hires lawyers to conduct internal investigation or otherwise as to whether or not to take information and voluntarily provide it to the government.

Q. So he continues: Or whether they want to do it or anything else, just like any other client.

And then continuing on page 18, line 5 he says: Those aren't our decisions to make. Our decisions are to investigate this, report back to Nike, and then Nike makes a decision on what they want to do.

What did you understand him to be telling you?

A. I understood Mr. Geragos to be talking about the purpose of internal investigation being to root out misconduct,

Mr. Avenatti to be repeatedly interrupting him to assure me that whatever work they were going to do, if Nike wanted to stick it in a drawer after they were done, that was going to be Nike's call.

Q. If you had hired or agreed to these demands and hired Mr. Avenatti, what did you understand would happen at the conclusion of any internal investigation he might have done?

A. That whatever he learned or reported to the company, it could be kept nonpublic and not disclosed to the government or to the public.

Q. Do you see on line 10 he says: Presumably in consultation with you and others.

What did you understand him to be saying?

A. I understood him to be saying that he understood that Nike would likely or presumably take the advice of the Boies Schiller law firm as to whether or not to voluntarily self-disclose any information developed in any internal investigation to the government, or others. I don't know to which others he was referring.

Q. At the end of this purported internal investigation, whose advice would be given as to whether Nike should disclose the information to the government?

A. My law firm could advise them on that.

MR. PODOLSKY: Why don't we continue with the recording, Mr. Hamilton.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page126 of 263

324
K1UMAVE4 Wilson - Direct

(Video played)

Q. Mr. Wilson, let me just focus you on the top of page 20 that we just listened to. Do you see the defendant says: I don't think that it makes any sense for Nike to be paying an exorbitant sum of money to Mr. Franklin in light of his role in this.

Do you see this?

A. Yes.

Q. Who did you understand Mr. Franklin to be in that sentence?

A. Mr. Avenatti's own client.

Q. What did you understand Mr. Avenatti to be saying to you at this point?

A. I understood him to be pushing back on the idea of more money going to Mr. Franklin.

MR. PODOLSKY: Why don't we continue listening.

(Video played)

Q. Can you just describe what was happening at this moment.

A. Yeah. At this point in the meeting, when Mr. Geragos started to speak again, Mr. Avenatti interrupted him and asked if they could have a minute to step out.

Q. Did they step out?

A. They did.

Q. About how long were they gone, if you can remember?

A. A few minutes, to my recollection.

MR. PODOLSKY: Why don't we fast-forward through when

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

325
K1UMAVE4 Wilson - Direct

they are out of the room and pick up, if we can, at around 30 minutes and 10 seconds on the video, Mr. Hamilton.

(Video played)

Q. Let's go back for a moment to page 23, line 13. Actually, we can start at line 8. Do you see you say: I have never gotten a 12 billion retainer from this client Michael?

A. Yes.

Q. You see he responds a few lines below: Have you ever held the balls of your client in your hand where you can take five, six billion dollars in market cap off of him.

What you understand him to be saying to you?

A. I thought this was a crazy thing to be saying to me because he seemed to be suggesting that the way lawyers negotiate fees with the clients who are going to trust him to represent their interests is to threaten those clients, to have leverage over those clients and demand that they pay more. It just struck me as we were in the twilight zone. But what I understood him to be saying was he had that power, he had the power and the will and a plan to damage the company. So to avoid that the company was in fact going to have to hire him and pay him these millions of dollars.

MR. PODOLSKY: Why don't we go ahead and play the video.

(Video played)

Q. You see at the top of page 25 Avenatti says: And we are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

326
K1UMAVE4 Wilson - Direct

done. They can buy that for 22 and a half million dollars and we are done.

Do you see that?

A. Yes.

Q. What was your understanding of where the 22 and a half million dollar figure came from?

A. I didn't have an understanding other than that it was -- it sounded close to the 25 million dollar top figure that he had given earlier in the meeting.

Q. What connection, if any, did you think it had to the value of Mr. Franklin's legal claims, if any?

A. I didn't think that $22.5 million or even $1.5 million bore the slightest connection to any legal claims that Mr. Franklin might have.

Q. You see Mr. Avenatti continues: Fully confidential. We can leave it to Nike and its other lawyers to figure out what to do with this and handle it appropriately and full confidentiality as we ride off into the sunset.

Do you see that?

A. Yes.

Q. What did you understand Mr. Avenatti to be saying?

A. That if Nike paid $22.5 million, this press conference and this all-out media war he was threatening to wage wouldn't happen, that he would refrain from doing that in exchange for the company paying 22 and a half million dollars.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

327
K1UMAVE4 Wilson - Direct

Q. He continues: If you need assistance from us as it relates to Mr. Franklin, we'd be happy to provide that. Obviously, we are not going to do anything illegal or he's not going to do anything illegal.

Do you see that?

A. Yes.

Q. And then he continues: And then they can hire Boies or whoever else they want to hire to do what they want to do and you guys can figure out what you want to do.

Do you see that?

A. Yes.

Q. First, what did you understand him to be saying Mr. Franklin would be available to do?

A. I wasn't sure what he meant by that.

Q. When he said, They can hire Boies or whoever else they want to hire to do what they want to do, what do you understand him to be saying?

A. I understood him to be saying that in this scenario where the company made a payment of 22 and a half million dollars, it would be up to the company to select a law firm, if it wished to, to conduct an internal investigation or no.

MR. PODOLSKY: Why don't we keep going.

(Video played)

Q. I am not going to read through the entire speech from page 26 to 27. Let me just ask you, what was your understanding of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000126

what he was telling you?

A. He was describing the threat to try to add pressure. This is what's going to happen if I don't get paid off. This is what this media assault is going to look like. It's not just a press conference tomorrow. It's me trying to gather more information to build more and more of a negative drumbeat against the company. He was brandishing the stick over our head to try to get us to agree to pay him off.

Q. Did you believe that threat was serious?

A. I did, based on my -- based on what he was saying and my experience of his ability to generate press coverage.

Q. Do you see on page 27 Avenatti says: They are going to have to self-report, in my view. Again, that's not ultimately up to me.

Do you see that?

A. Yes.

Q. What did you understand him to mean?

A. That's sort of like he was talking to himself and going back and forth. But ultimately, as in prior points in this meeting, he seemed to be taking care to reassure me that if we made this payment, it would be up to the company whether to go public. We could keep it all secret and that would be the company's decision, not his, if we paid him.

MR. PODOLSKY: Why don't we continue with the video.

THE COURT: Actually, Mr. Podolsky, we are going to

take our luncheon recess. It's 1:00.

Ladies and gentlemen, don't discuss the case with anyone. Don't do any research about it. Don't do any investigation on your own. Keep an open mind because there is more evidence.

We are going to resume at 2:00. Thank you all very much.

(Jury not present)

THE COURT: Is there anything the lawyers want to take up?

MR. PODOLSKY: Not for the government, your Honor.

THE COURT: Anything for the defense?

MR. H. SREBNICK: One moment, your Honor.

Nothing at this time, Judge.

THE COURT: Is there someone here on behalf of Nike who wants to discuss this request under Federal Rule of Evidence 502(d)?

MR. SKINNER: Yes, your Honor, I would be happy to.

THE COURT: You may approach.

Everyone else is free to go. It is up to you.

THE COURT: Could you please state your name for the record.

MR. SKINNER: Yes, your Honor. Peter Skinner on behalf of Nike, Inc.

THE COURT: So the background is, I received a letter.

It is dated January 27. It asks me to enter an order pursuant to Federal Rule of Evidence 502(d). And 502(d) provides, and I quote: "A federal court may order that a privilege or protection is not waived by disclosure connected with the litigation pending before the Court, in which event the disclosure is also not a waiver in any other federal or state proceeding."

Now, the problem, Mr. Skinner, is, I don't know whether Nike has waived the privilege or not. I don't know, for example, what happened in the interviews that the U.S. Attorney's Office conducted of Nike lawyers, including Mr. Wilson who has just testified. But, also, I'm aware from the 3500 material that Mr. Homes was interviewed as well as Mr. Leinwand. I don't know to what extent the privilege survives.

And so if I were to issue any order, it would be very clear that it would only be as to the testimony in this proceeding because I can't retroactively do anything with respect to whether the privilege has already been waived.

What is your position?

MR. SKINNER: That's exactly what we are seeking for the Court to do. We are only concerned about testimony in this court. It's our position that the privilege has not yet been waived. Whatever happened between us and the government happened between us and the government and the Court can't

change that.

What we are concerned about, as we explained in our letter, despite the fact that the company is not waiving the privilege and despite the fact that we believe the folks testifying wouldn't have the authority on their own in the middle of being cross-examined to waive the privilege, that perhaps something might be construed later as having been an inadvertent waiver and somebody might try and argue that it was a broader subject matter waiver, either in this court or otherwise.

All we are saying is, ahead of time we would like a ruling from the Court that any disclosures that are made and testimony in this court do not constitute a broader waiver of the privilege so we have some clarity on that.

We think that while it's a somewhat unusual request, it's a somewhat unusual proceeding with witnesses being lawyers being cross-examined as to their thought processes and the like, and this is probably the best way to try and deal with that, particularly to avoid -- logistically it's virtually impossible to police the privilege in the middle of his testimony.

THE COURT: I will issue an order that is very specific to testimony that we are going to hear at this trial. It will make clear that I'm not retroactively granting absolution for any waiver of privilege that may have happened

Case 21-1778, Document 61, 04/04/2022, 3290318, Page128 of 263

332
K1UMAVE4

before today in connection with interviews of the lawyers by the U.S. Attorney's Office or otherwise. I'll be issuing that order later today.

MR. SKINNER: Very well. Thank you, your Honor.

THE COURT: Anything else before we break for lunch?

MR. PODOLSKY: No, your Honor.

MR. H. SREBNICK: No, your Honor.

THE COURT: We will resume at 2.

(Luncheon recess)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

333
K1udave5 Wilson - direct

**A F T E R N O O N  S E S S I O N**

2:02 p.m.

(Jury not present)

THE CLERK: All rise.

THE COURT: Please be seated.

The witness should re-take the stand.

MR. PODOLSKY: Your Honor, just as far as the subpoena issue, do you want to deal with that?

THE COURT: You are going to have to talk into the mic.

MR. PODOLSKY: I'm sorry, your Honor.

The subpoena issue, do you want to deal with that at the break or --

THE COURT: What subpoena issue?

MR. PODOLSKY: The redaction of the subpoena. We would like to hand up a proposed limiting instruction.

THE COURT: OK. Sure. Do you want to hand it up.

MR. PODOLSKY: Apparently we've agreed on redactions.

THE COURT: OK.

MR. RICHENTHAL: There are two issues, your Honor.

One is the redaction of the subpoena and one is the proposed limiting instruction. Taking them in order, the parties are in partial agreement, but, unfortunately, only partial agreement, as to redactions. And with respect to the limiting instruction, we actually are in agreement.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

334
K1udave5 Wilson - direct

(Pause)

THE COURT: Let me ask Mr. Podolsky, how much longer do you have with the witness?

MR. PODOLSKY: Depending on his answers, I would guess 30 to 45 minutes.

THE COURT: All right. Go ahead, Mr. Richenthal.

MR. RICHENTHAL: I'm sorry. It sounds like Ms. Perry had agreed but Mr. Srebnick would like to look at it, so maybe we don't have an agreement on the instruction yet either. I was hopeful that we did.

THE COURT: I don't want to keep the jury waiting, so I guess we are going to have to take a break before cross if this is going to still be a problem.

The witness needs to re-take the stand.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

335
K1udave5 Wilson - direct

THE CLERK: All rise.

(Jury present)

THE COURT: Please be seated.

Mr. Wilson, you remain under oath.

Please proceed.

MR. PODOLSKY: Thank you, your Honor.

DIRECT EXAMINATION (Resumed)

BY MR. PODOLSKY:

Q. Mr. Wilson, when we broke for lunch, we were going through the Government Exhibit 2, the recording of the meeting on March 21st. So, we will pick up with that.

MR. PODOLSKY: Mr. Hamilton, if you could just bring us back to maybe a few seconds before we ended the last time or so.

(Audio/visual played)

BY MR. PODOLSKY:

Q. Just so that everyone can be on the same page, Mr. Wilson, can you turn to page 27 of the transcript?

A. Yes, I'm there.

Q. OK. And do you see that I think where we ended, there was a question about there's an appetite -- "I mean is there an appetite to just be done." Do you see that?

A. Yes.

Q. That is on line 21.

A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000128

Case 21-1778, Document 61, 04/04/2022, 3290318, Page129 of 263

336
K1udave5 Wilson - direct

MR. PODOLSKY: I just want to give everyone an opportunity to make sure they were caught up.

So if we could go ahead and play it.

(Audio/visual played)

BY MR. PODOLSKY:

Q. Mr. Wilson, if you turn back just for a moment to page 28 of the transcript. Do you see at line 8, Avenatti says, "No, it's 22 and a half. It was always 22 and a half. There's something magical about that number."

Do you see that?

A. Yes.

Q. To be clear, what is the "22 and a half" referring to, to your understanding?

A. This is the 22-and-a-half-million-dollar payment that he said could be made. Then there would be full confidentiality. He'd ride off into the sunset.

Q. And he says, "There's something magical about that number." What did you understand the basis of that number to be?

A. I have no idea what he meant or what the basis for it was.

Q. And if we go now to page 29 on the transcript. You see Avenatti says, "I don't wanna hear about somebody on a bike trip." He continues, "I don't wanna hear that somebody's grandmother has passed away or something, I don't -- look -- the dog ate my homework, I don't wanna hear, none of it is gonna go anywhere unless somebody was killed in a plane crash."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

337
K1udave5 Wilson - direct

Do you see that?

A. Yes.

Q. What did you understand he was telling you?

A. That he had given me as much rope as he was willing to give me and the company, and that if we didn't reach agreement on Monday, no matter, even if someone died, that there were going to be no more extensions. He was going to go public if we couldn't agree to his demands by Monday.

Q. At this point, how long was it since you had first heard of his demands or what he was talking to you about?

A. I had spent less than 48 hours communicating with Mr. Avenatti at this point.

Q. At this point, did you understand what Mr. Franklin's legal claims, if any, were?

A. I never gained any understanding of what legal claims Mr. Franklin might have against Nike.

MR. PODOLSKY: Why don't we continue with the recording.

Mr. Wilson, could you just make sure the mic is close to your mouth when you are speaking. Some people are having a little trouble hearing.

THE WITNESS: Sure. My apologies.

MR. PODOLSKY: Thank you.

(Audio/visual played)

BY MR. PODOLSKY:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

338
K1udave5 Wilson - direct

Q. So you see there has been some more reference to "408"?

A. Yes.

Q. And you can you just remind us, what is 408?

A. Sure. That's the number of a rule in the Federal Rules of Evidence that prevents parties who participate in settlement discussions from using offers or demands, usually the dollar amount, as evidence in a subsequent litigation about that claim. So if Mr. Franklin had come forward later and said I think my claims are worth $40 million, I wouldn't have been able to say, if it was a real settlement discussion, if I'd agreed to Rule 408, yeah, but in our settlement discussion, you only demanded as much as 1.5, so clearly now you're exaggerating. That's the kind of thing that Rule 408 is supposed to prevent.

Q. You referred to "settlement discussions" a number of times. Did you understand what you were engaging in at this meeting to be a settlement negotiation?

A. Not at all, no.

Q. Why not?

A. Because what I thought I was engaging in was a stickup. I was not agreeing, I was not going to agree to anything that Mr. Avenatti wanted, but I wanted him to feel like there was still a possibility that he would get paid off so he wouldn't pull the trigger -- he wouldn't give up on the talks and pull the trigger on his media campaign immediately.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

339
K1udave5 Wilson - direct

Q. Do you see, Geragos also has a reference, on page 31, lines 2 to 3, to "mediation" at the beginning of line 3. Do you see that?

A. Yes.

Q. Did you understand this to be a mediation?

A. No. We hadn't agreed to mediation.

Q. Was there anything about this meeting that resembled a mediation in your mind?

A. No.

MR. PODOLSKY: OK. Why don't we continue with the video.

(Audio/visual played)

Q. Thank you.

Mr. Wilson, what happened at this point in the meeting?

A. We were done with most of the substance of what we were talking about, and we -- there was an extended period of smalltalk, because Mr. Avenatti sought to print out a new version of that settlement agreement that he had handed me earlier in the meeting, but there was a whole thing with, first, it couldn't be emailed to the Assistant and then it wasn't on the USB key. There was a long wait as he was working to get this document printed. All I wanted to do was get out of there, so I made some smalltalk while we were waiting for that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000129

Case 21-1778, Document 61, 04/04/2022, 3290318, Page130 of 263

340
K1udave5 Wilson - direct

Q. How were things left at the end of this meeting?
A. At the end of the meeting, I had the -- I had the demand. The way it was left was that I would go to my client, try to work to get agreement purportedly to that, and that we would meet again on Monday. So this was on a Thursday, so four days later, on Monday, at which point I was supposed to come with authority to agree with his demands. We were going to have that meeting at my prior law firm's offices in Hudson Yards.
Q. So what did you understand would happen on Monday?
A. When I left this meeting on Thursday, I understood that I would be sitting down with Mr. Avenatti and Mr. Geragos again on Monday.
Q. And, again, at that point, what did you think would happen at that meeting?
A. At that meeting, I wasn't sure what would happen because ultimately I wasn't going to sign something or agree to something, but that he would expect me to show up and either agree to his demands or not, and if not, that he would begin his reputational assault on the company after he heard a no.

MR. PODOLSKY: All right. Why don't we take down Government Exhibit 2 and pull up just for the lawyers and the Court and Mr. Wilson what has been marked for identification as Government Exhibit 205.

I think at this point we can put aside our transcripts as well.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

341
K1udave5 Wilson - direct

BY MR. PODOLSKY:
Q. Mr. Wilson, do you recognize the document on the screen in front of you?
A. Am I able to look through the subsequent pages?

MR. PODOLSKY: Could you, please.

(Pause)

A. Yes, I recognize it.
Q. What is that document?
A. This is a copy of the settlement agreement that Mr. Avenatti reprinted and let me leave the meeting with.

MR. PODOLSKY: Your Honor, the government offers Government Exhibit 205.

THE COURT: Any objection?

MR. H. SREBNICK: No objection.

THE COURT: 205 is received.

(Government's Exhibit 205 received in evidence)

MR. PODOLSKY: Thank you, your Honor.

May we publish?

THE COURT: Yes.

BY MR. PODOLSKY:
Q. All right. Now that it is on everyone's screens, Mr. Wilson, what are we looking at here in Government Exhibit 205?
A. We're looking at the first page of a draft settlement agreement between a Nike entity on the one hand and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

342
K1udave5 Wilson - direct

Mr. Franklin and the Cal Supreme basketball organization on the other hand.
Q. And when did you get this document?
A. Shortly before I left Mr. Geragos' office, handed to me by Mr. Avenatti, on Thursday, March 21st.

MR. PODOLSKY: Mr. Hamilton, could we blow up the top of the document. Perfect.

Q. So do you see title of this document is, "General Release and Settlement Agreement"?
A. Yes, I do.
Q. And it reads: "This general release and settlement agreement (this "Agreement") dated and effective as of this 25th day of March, 2019, is made and entered into by and between Gary Franklin and California Supreme Youth Basketball, Inc. on the one hand (collectively "Franklin"), and Nike USA, Inc. ("Nike") on the other (each a party and collectively "the parties"). "

Do you see that?

A. Yes.
Q. Let's skip down.

Do you see there is, next to 1, a bolded title, "Payment"?

A. I see that.
Q. Could you just read the paragraph below that?
A. Paragraph 1.1 reads: "On or before March 26, 2019, Nike

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

343
K1udave5 Wilson - direct

shall pay by wire transfer to an account designated by Franklin's counsel by email, in good funds, free of all liens, claims, encumbrances, and issues of any kind, the total sum of [insert]."
Q. So, first of all, there are two dates that we've looked at at the top. It says it is dated and effective as of this 25th day of March 2019. What day was that?
A. That was Monday, the date we were supposed to sit down again together at my offices.
Q. Did you understand that this document would have to be signed on Monday?
A. Yes, subject to what we discussed in the meeting about the possibility that we might be able to negotiate some of the terms other than payment and date of payment -- payment amount and date of payment.
Q. And when would, if this document were signed, would Nike have to pay the money?
A. The next day, Tuesday, March 26th.
Q. And where would Nike have to send that money?
A. To whatever account Mr. Avenatti told us to send it to.
Q. And do you see there is a heading below that says, "Strict Confidentiality"?
A. I see that.
Q. What does that paragraph say?
A. It says that the contents of the agreement and discussions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000130

Case 21-1778, Document 61, 04/04/2022, 3290318, Page131 of 263

344
K1udave5 Wilson - direct

leading to it were to be held strictly confidential and not disclosed except in certain specified circumstances.
Q. And the section that says, "General Release and Waiver of All Claims," do you see that?
A. I do.
Q. What do you understand that section of the agreement to be?
A. A general release, as opposed to a specific release, of particular claims. A general release is when one party says to the other I release any claim I might possibly have against you, without specifying what some such claim might be.
Q. Are any claims of Mr. Franklin specified in this settlement agreement?
A. You would expect to find that, but there is nothing about any claim specifically that Mr. Franklin had or thought he might have against the company reflected in this document.
MR. PODOLSKY: If we could go to the second page and we can just zoom out. We are not going to dwell here but just so that we can see it.
OK.
And there is a third page.
And the final page.
Q. And do you see there are some blanks for signatures there?
A. Yes.
Q. Do you see the top one is for Nike U.S.A., Inc. and then Gary Franklin and then California Supreme Youth Basketball,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

345
K1udave5 Wilson - direct

Inc. by Gary Franklin. Do you see that?
A. I see those three signature blocks, yes.
Q. Could you point to the part of this agreement that references an internal investigation?
A. There is not anything anywhere in this document about an internal investigation.
MR. PODOLSKY: We can take that down, Mr. Hamilton.
And, your Honor, at this point I would like to offer and read another stipulation. This is Government Exhibit S13.
THE COURT: All right. You may proceed.
MR. PODOLSKY: Thank you, your Honor.
May I publish it to the jury?
THE COURT: There is no objection to S13?
MR. H. SREBNICK: No objection.
THE COURT: S13 is received, and you may publish it.
MR. PODOLSKY: Thank you.
(Government's Exhibit S13 received in evidence)
MR. PODOLSKY: Mr. Hamilton, if you could just maybe blow up the top.
So the top of the stipulation is entitled, "Stipulation Regarding Twitter Materials," and it has the same introductory material as the prior stipulation we read.
And I'll start at paragraph 1.
"If called as a witness, a representative of Twitter, Inc. ("Twitter") would testify that:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

346
K1udave5 Wilson - direct

"A. Twitter operates a social media website, accessible at Twitter.com, and application that permits users to post publicly statements, photographs, and/or videos, commonly referred to as 'Tweets.' A tweet may also contain a link to another Twitter post or other website on the Internet.
"B. A user of Twitter may tweet from any electronic device connected to the Internet, including a phone. The exhibits set forth in Annex A, below, are accurate copies of posts from the Twitter account @MichaelAvenatti made by Michael Avenatti, the defendant."
We can take that down.
Pursuant to that stipulation, your Honor, the government offers Government Exhibit 106.
THE COURT: Any objection?
MR. H. SREBNICK: One moment, your Honor.
(Pause)
No objection, your Honor.
THE COURT: 106 is received.
(Government's Exhibit 106 received in evidence)
MR. PODOLSKY: And may I publish, your Honor?
THE COURT: Yes.
MR. PODOLSKY: Thank you.
BY MR. PODOLSKY:
Q. Mr. Wilson, do you recognize what we're looking at?
A. Yes, I do.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

347
K1udave5 Wilson - direct

Q. What is it?
A. This is a tweet from Mr. Avenatti's Twitter account.
Q. And do you recall seeing this tweet at or around the time it was publicized?
A. I saw it immediately within minutes of it being sent out.
Q. Let's just walk through this so we know how to read this.
Do you see at the top, it says, "MichaelAvenatti@Michael Avenatti." Do you see that?
A. Yes.
Q. What does that refer to?
A. That's the name on the account, the Twitter account.
Q. And let's skip the text for a moment.
Do you see at the bottom, it reads "3:52 p.m., Mar. 21, 2019," do you see that?
A. Yes.
Q. What does that refer to?
A. As I understand, that's the date, March 21st, and the time, 3:52 p.m., that this tweet was published.
Q. And approximately how long after -- well, let me start with this question.
Was that before or after you concluded your meeting on March 21st that we watched in Government Exhibit 2?
A. It was after we met.
Q. About how long after you finished meeting?
A. I believe it was within an hour or so of leaving

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000131

Mr. Geragos' office.

Q. And do you see that the post says, "Something tells me that we have not reached the end of this scandal. It is likely far broader than imagined;" do you see that?

A. Yes.

Q. And do you see there is a picture below?

A. I do.

Q. And it reads, "College Basketball Corruption Trial: Ex-Adidas exec sentenced to nine months in prison, two others..."

Do you see that?

A. Yes.

Q. What did you understand that portion of the tweet to be?

A. I understood that to be a linked -- text from a linked article on the website cbssports.com.

MR. PODOLSKY: If we could very quickly, before we finish this, pull up for the witness what has been marked for identification as Government Exhibit 601.

Q. Mr. Wilson, do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is an article published on the website of cbssports.com on March 5, 2019.

MR. PODOLSKY: Your Honor, the government offers Government Exhibit 601.

THE COURT: Any objection?

MR. H. SREBNICK: No objection.

THE COURT: 601 is received.

(Government's Exhibit 601 received in evidence)

MR. PODOLSKY: And may we publish?

THE COURT: Yes.

BY MR. PODOLSKY:

Q. We won't dwell on this, but, Mr. Wilson, what is the document labeled as Government Exhibit 601?

A. This is the article about a former Adidas executive being sentenced to prison that was linked in the tweet by Mr. Avenatti sent out shortly after I met with him on March 21st.

Q. So we can just be clear, generally, what was the subject matter of this article?

A. So the subject matter of the article was that not only had an Adidas executive been charged by the government for a scheme involving paying bribes to a player to go to a particular college but had been convicted by a jury and was being sentenced to prison for that -- for that crime.

Q. If we could turn to Government Exhibit 106, please.

Mr. Wilson, what was your reaction to seeing this tweet on the afternoon of March 21, 2019?

A. My reaction was extreme alarm. I was initially worried that I had spooked Mr. Avenatti and that he was starting his assault on Nike. But then when I read it a second time, I

realized it didn't mention Nike and so I took it instead as a shot across the bow, of him trying to flex his muscles and show me that he, with hundreds of thousands of Twitter followers, that he could start ginning up coverage and chatter about this topic, make good on the threats that he had made.

Q. Now, before we continue, you referenced earlier in your testimony that you saw some new information or documents in your first meeting with Mr. Avenatti. Do you recall that?

A. Yes, I do.

Q. What, if anything, did you do after seeing new documents that you were not familiar with?

A. The first thing I did, as best I could remember them, was to describe them to my junior associate during that break I talked about taking on the sixth floor of the office building during my meeting. And then, in calls with the government later that day, again as best I could recall, having only been given a few minutes to look at these documents, I described what I had seen to the prosecutors, because, as I said before, the company was cooperating with the government's investigation and I felt responsible for promptly sharing these new pieces of information with the government.

Q. Did you provide any additional documents or information to the government thereafter?

A. We did, yes.

Q. Can you just generally describe what that was?

A. Well, we -- with new information, you can go back and see if there are other documents, the relevance of which might not have been apparent to you the first time around. So that's what we did. Based on what I could remember, we tried to go back and find other documents in the company's possession that might be relevant or of interest to the government. But it wasn't until a little while later when we got more information about what had been in those documents that I only briefly saw that we were truly able to do that follow-up work.

Q. Now, you stated earlier that you understood you would be meeting with Mr. Avenatti again on March 25th. Do you recall that?

A. Yes.

Q. So let me focus your attention on the morning of March 25th.

At that time, did you still intend to meet with him that day?

A. By that point, the morning -- the following Monday, no, I did not intend to meet with him in person.

Q. Why not?

A. The government had informed me that Mr. Avenatti would be arrested when he arrived at my office that day, on Monday, before the scheduled meeting, and they indicated that they would not ask me to be with him in a room but, rather, that he would be arrested upon arrival.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page133 of 263

352

K1UDAVE5

MR. PODOLSKY: Your Honor, if I may just have one moment?

THE COURT: Yes.

(Pause)

MR. PODOLSKY: Your Honor, the government has no further questions at this time.

THE COURT: All right. Do we need to take a recess to address the legal issue that we talked about?

MR. S. SREBNICK: Yes, your Honor.

MR. RICHENTHAL: Yes.

MR. PODOLSKY: I believe so, your Honor.

THE COURT: All right. Ladies and gentlemen, we are going to have to take a brief recess for me to rule on a legal issue. So we will be back to you as soon as we possibly can.

Thank you very much.

THE CLERK: All rise.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

353

K1UDAVE5

(Jury not present)

THE COURT: You can step down, Mr. Wilson.

THE WITNESS: Thank you, your Honor.

(Witness not present)

THE COURT: Please be seated.

Do you want to hand up what the current version of the subpoena is, or what you've agreed to?

MR. RICHENTHAL: We don't have a version that is redacted. We just understand what the defense's position is, and it's our view that more should be redacted.

THE COURT: OK.

MR. RICHENTHAL: Does your Honor have a copy from earlier?

THE COURT: I do.

MR. RICHENTHAL: OK. And, also, Ms. Perry had advised me to bring a limiting instruction, but perhaps that is not so.

MR. S. SREBNICK: We were still communicating internally, that is all.

MR. RICHENTHAL: So taking those issues in order, with respect to the subpoena -- and, obviously, I can't speak for the defense, but I think I understand its position sufficiently to provide it. My understanding is that the defense has no issue with redacting all of the numbered categories on pages --

THE COURT: Could we just start with the first page so I understand what is coming in?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

354

K1UDAVE5

MR. RICHENTHAL: Of course. I'm sorry.

THE COURT: So the first page is a cover letter. So what's the party's agreement with respect to that?

MR. RICHENTHAL: There is no agreement with respect to this page. We had expressed a view that it would probably be better for the word "felony" to be redacted, because it is not clear to me that the jury needs to be exposed to that word for the defense to explore whether Nike has fully complied with the subpoena. It is a word that obviously has a certain meaning and can cause a certain emotional reaction in people. We had requested that that word and that word alone on that page be redacted. The defense rejected that proposal.

THE COURT: All right. Do you have any other problems with the first page?

MR. RICHENTHAL: No, your Honor.

THE COURT: All right. The first page is going to come in in its current form.

MR. RICHENTHAL: Would your Honor now like me to speak to the second page?

THE COURT: Please, yes.

MR. RICHENTHAL: So on the second page we had requested that the statutes be redacted. Our reason for that is the same. They are not necessary to the defense's asserted purpose for the offering of this document. At the same time, they are also confusing.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

355

K1UDAVE5

These not only the statutes that were charged in the Adidas case, these include statutes that, to my knowledge, have not been charged in any case like this. As the Court knows and the lawyers know but the lay jury does not know, it's common practice to list far more statutes than are likely to be charged. Because the jury doesn't know that, the jury may misapprehend why there are this many statutes here or speculate as to what they mean.

The witness presumably once shown this document might be asked what they mean. Those answers themselves could be deeply confusing. For example, just to pick one, the last section is for money laundering. There has been no discussion, even in the defense opening, of money laundering, as opposed to corruption. We think the statues themselves are not necessary to the asserted purpose, and even if there is some theoretical relevance to the statute, we think it could be confusing and distracting for the jury. We simply wanted to redact that line.

THE COURT: What does the defense say?

MR. S. SREBNICK: It rejected that proposal as well.

Our position is that it goes to Mr. Wilson's state of mind. We have heard him now this morning and this afternoon testify about his understanding, about his emotional reactions, about his comments on Mr. Avenatti and the words that Mr. Avenatti was using, all of those things the Court heard,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000133

Case 21-1778, Document 61, 04/04/2022, 3290318, Page134 of 263

356

K1UDAVE5

and now it is time for him to be cross-examined about what his state of mind was about the investigation and his bias. So all of these statutes are relevant to his concern about what Nike was being investigated for, what these documents related to. So, yes, we do intend to go into that with Mr. Wilson.

MR. RICHENTHAL: So, your Honor, that's only heightened our concern. Here's why. Mr. Srebnick just said "what Nike was being investigated for." But that's not what a subpoena is. A subpoena is simply a demand for documents. It doesn't indicate that the person or company to whom it is directed is under investigation, much less has committed misconduct. In fact, that's why we think a limiting instruction is so critical here.

Certainly we have no objection to the defense cross-examining Mr. Wilson as to the subject matter of the subpoena. In fact, I believe my colleague asked him that very question. But the literal statutes listed on it are not relevant to that purpose.

And Mr. Wilson is a sophisticated white-collar practicer. He would understand that the statutes commonly are broader than what is under investigation, but the jury will not. They won't know whether Mr. Wilson is speaking from experience or not. They won't know how to even weigh that answer. We would have to then probe that on redirect.

It goes down a path that is just not relevant for the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

357

K1UDAVE5

asserted purpose of bias.

THE COURT: I'm overruling the objection.

MR. RICHENTHAL: I'm sorry. Will the defense be allowed to explore what the statutes mean, your Honor?

THE COURT: Yes. Yes. I mean, the witness who is currently on the stand, Mr. Wilson, as I understand it, was responsible for dealing with the U.S. Attorney's Office with respect to the subpoena that we're talking about now. And he talked about the company's desire to cooperate, the fact that it was in full cooperation mode with the government and had been for more than a year. So that issue is already front and center, and I believe that the defense is entitled to explore with Mr. Wilson why the company had decided to fully cooperate with the government's investigation, and this is part of that exercise. I guess that's how the exercise started; it probably started with this subpoena. So I'm not going to redact the statutory references.

MR. RICHENTHAL: Let me just make two small notes, your Honor. I am not asking for reconsideration. I just want to note two things.

It is our understanding Mr. Wilson was not believed in dealing with our office by any means, that other lawyers were. He had some involvement --

THE COURT: It may be, but that's not what he testified to. So if you intended to elite from him that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

358

K1UDAVE5

actually he wasn't the point person, you did not do that. In fact, to the contrary, I came away with the distinct impression that he was the point person for dealing with the U.S. Attorney's Office. So I guess that will be clarified on cross-examination, maybe on redirect, but I came away with the impression that he was responsible for the contacts with the U.S. Attorney's Office. And, in fact, that impression was only deepened by his testimony that he felt it necessary to call the U.S. Attorney's Office very soon after his encounter with Mr. Avenatti when he was shown those documents. He felt that it was necessary for him to contact the U.S. Attorney's Office very quickly. That communicated to me that he was in fact the point person for Nike's interactions with the U.S. Attorney's Office.

MR. RICHENTHAL: I can't speak for Mr. Wilson, but I think he was talking about that decision, not production a year ago, but this will be the subject, I suspect, of cross and that is fine. It is just my understanding he was not the lead.

And then, second, just to preview for the Court: I assume that if the defense were to explore the statutes, my colleague would be permitted on redirect to explore, for example, that these are not crimes charged against the Adidas executives, that a subpoena commonly lists more than the government necessarily believes it can charge except --

THE COURT: I don't know what the connection to Adidas

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

359

K1UDAVE5

is or is not. I don't know anything about the Adidas case or what was charged in it. I know nothing about that. I don't know whether Mr. Wilson does or not.

But if you wanted to -- if the government wants on redirect to get into whether all statutory references in a subpoena wind up in a later indictment, I don't see any problem with that if that issue is gone into on cross-examination.

MR. RICHENTHAL: That's why I'm exploring it. I would rather tee this up sooner.

And for the same reason -- and, again, I am not asking your Honor to reconsider, but I just want to explain our view of why this gets complicated quickly. The defense has proposed to redact all but one of the categories on pages 4 to 5 of the materials to be produced.

THE COURT: Could we, like, just continue with page 3 and find out what the agreement or lack of agreement is as to page 3?

MR. RICHENTHAL: I'm sorry. The reason I skipped ahead is neither side is seeking to redact page 3.

THE COURT: OK. So we have no other issues with page 2. There are no issues with page 3. And now we are on page 4?

MR. RICHENTHAL: Yes, your Honor.

So pages 4 to 5, the defense has proposed redacting all categories except category 3, consistent with what I think it said before we broke for lunch. It has asked that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000134

numbering remain, so the jury is aware that there were eight categories, but that all save number 3 would be redacted. We have no problem with that proposal.

The reason I mentioned it in connection with the statutes is -- maybe this needs to be explored again on redirect -- I think Mr. Wilson would well understand the statutes don't line up with every category. That's just not how subpoenas work. Right? They are listed up front and there are a bunch of categories. If my colleague needs to explore that on redirect, he will, but that is again why we think it is very confusing to get into what the statutes mean and don't mean.

MR. S. SREBNICK: I want to be clear about one thing. It would be my preference that none of it be redacted. As an accommodation, so that we could move on, I said, well, then let's redact all seven, all other categories other than the ones that pertain to what I believe this case is about. So that's why I thought I was making an accommodation to leave only number 3 and take out everything else. And so I didn't realize I was going to create confusion for the government by doing so. If the government wants them all back in, that is fine. That fine with me.

MR. RICHENTHAL: I'm not suggesting that. I am just previewing some of the complexity that may arise during cross and redirect about the statutes and the relationship to

documents.

THE COURT: I have ruled on that. Nothing you said changes my mind.

MR. RICHENTHAL: OK. So where we stand, I believe, your Honor, is that the redactions will be kept on all the categories on pages 4 and 5 other than category 3.

THE COURT: Right. So that the language -- on page 4, the language above "Materials to be Produced," that language is going to remain as it is?

MR. RICHENTHAL: May I just have one moment to confer?

THE COURT: Sure.

(Pause)

MR. RICHENTHAL: I mean, thank you for the moment.

If we are going to redact the other categories to be produced, it occurs to the government that, similarly, the other categories to be preserved should be redacted. In other words, if the defense is interested in exploring category 3, the fact that Nike was asked to preserve things that are not relevant to category 3 is likely to cause the jury to speculate about what's under the redaction boxes.

(Pause)

I mean, frankly, I think the whole preservation part can come out entirely. There has been no questioning of any kind or even a suggestion that Nike failed to preserve documents.

MR. S. SREBNICK: This just shows the breadth of the subpoena. It doesn't get into any of the details.

THE COURT: Well, no, but the Assistant is making the point that it seems logical there would be symmetry, right, between the materials to be preserved and the materials to be produced. So that's the argument and it seems logical.

MR. S. SREBNICK: I think the materials to be preserved, 1 through 4, which are at pages 3 and 4 of the subpoena, relate to each one of the categories of materials to be provided. I think it talks about documents --

THE COURT: Right. But you've -- we're redacting everything but paragraph 3 under "Materials to be Produced." That's what I understand the parties' agreement to be.

MR. S. SREBNICK: Right.

THE COURT: And so the Assistant's point is that, well, having reached that agreement to redact everything but paragraph 3 under "Materials to be Produced," that there should be symmetry between that category and the category of materials to be preserved.

MR. S. SREBNICK: What I'm saying, Judge, is that those four categories don't correlate to the eight other categories to be produced. All four of those categories of materials to be preserved pertain to each one of the eight categories of materials to be produced. It is just these are just broad categories of the types of communications to be

preserved.

I don't feel strongly enough about this issue to waste any more of the Court or the jury's time. The important thing to us is that the jury know that this is a subpoena, what is being investigated, and in category number 3. So if we can reach an accommodation that if the Court wants to do something additional with that category of materials to be preserved, you know, we want to move on.

MR. RICHENTHAL: I think the entire category should simply be redacted. I don't know the mental state of the drafter of the subpoena; it was not me or any member of my team. But by my reading and sort of by definition, it is other stuff. Otherwise, it would be what's demanded rather than what's requested.

MR. S. SREBNICK: Let me make it easy, Judge. We can redact the entire category of the materials to be preserved. This is about a production of documents. I'm fine with that.

THE COURT: OK. So the heading and everything beneath the heading of "Materials to be Preserved" will be redacted. And then with respect to the heading "Materials to be Produced," the only paragraph that won't be redacted is paragraph number 3.

MR. RICHENTHAL: Correct. We can try to see if our paralegals can do that in realtime. I don't know if the defense wants to publish the exhibit. Obviously, we wouldn't

Case 21-1778, Document 61, 04/04/2022, 3290318, Page136 of 263

364

K1UDAVE5

want publication of information that is going to be redacted.

MR. S. SREBNICK: We will work on our redaction and show it to the government before we publish it.

MR. RICHENTHAL: That is perfect.

THE COURT: OK.

MR. RICHENTHAL: May I have one moment, your Honor?

(Pause)

MR. S. SREBNICK: Judge, while they are doing that --

THE COURT: I just need -- this last page isn't coming in, right, "Declaration of Custodian of Records," that's eliminated, right?

MR. RICHENTHAL: Correct, your Honor. I'm sorry. I should have finished our discussion before looking at the defendant's proposal.

May I just have a minute just to read the defense limiting instruction proposal? I just saw it for the first time.

THE COURT: OK.

MR. H. SREBNICK: I just have a logistical request.

Rather than being positioned all the way there, may I just have the podium here and speak from a microphone and do my examination from right here?

THE COURT: Sure.

MR. H. SREBNICK: Thank you.

MR. RICHENTHAL: I don't think we have agreement, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

365

K1UDAVE5

I wish we did. I'm happy to hand up the parties' two proposals. I'm happy to explain my concerns about the defense proposal.

Let me preview by saying I don't think we are far apart -- that is the good news -- but they are not the same.

The two proposals are close to the same, if not identical, with respect to redactions. I think this is the first time the jury will have seen redaction boxes, and I think both parties think it is appropriate the jury be told what that is, not to speculate about it. That is the goods news.

The second part of the instruction, perhaps unsurprising, is the part where we diverge a bit, which is about what a subpoena means and what the jury should be told about it in this case.

I can hand them up. The defense is the handwritten one. The government's is the typewritten one.

(Pause)

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

366

K1umave6

THE COURT: First of all, redactions. I am just going to tell them, this is way too lengthy and more complicated than it needs to be. I would just simply tell them, as I generally do, that the material that's been redacted is irrelevant, and they are not to speculate what was redacted. That's 10 words, I think. That's what I'll say. I am not sure I totally understand the difference between the two proposals on tell them what a subpoena is.

MR. RICHENTHAL: I agree, your Honor. I think it's close. The difference is, the defense proposal seems to suggest falsely that a group of lay citizens known as the grand jury requested these documents. That's just false. Everyone in this courtroom knows it's false, and I don't think the jury should be told something that's false.

MR. S. SREBNICK: I don't have a problem with substituting government body for grand jury. That's fine. I was actually trying to be accurate. I don't have a problem substituting the words Department of Justice for the grand jury.

THE COURT: Just give me a minute.

I am going to give the following two instructions. The first is: You will notice that some parts of the subpoena have been deleted, such as telephone numbers and e-mail addresses, as well as categories of materials to be produced. This material has been deleted because it's irrelevant to this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

367

K1umave6

case. Don't speculate about what was deleted.

Secondly, as to what a subpoena is, it is the vehicle by which the government obtains documents it wants for purposes of its investigation. The fact that the government has issued a subpoena to a person or entity does not mean that the recipient has committed a crime or that the government believes that the person or entity has committed a crime. Instead, subpoenas are issued to people and entities who might have documents relevant to the government's investigation.

Any problems with that?

MR. RICHENTHAL: No objection from the government.

MR. S. SREBNICK: That's fine.

MR. RICHENTHAL: Mr. Srebnick just advised us, and I don't really understand the contours of it, that he intends to elicit from the witness that certain human beings are in the audience that are from the Boies Schiller firm. We are troubled by that. If he wants to subpoena people and seek to make them witnesses, that's fine. To point to them and somehow suggest the jury should infer somebody we think is both irrelevant and deeply confusing for the jury to understand. Why lawyers might be here requires a whole side show that we don't think is appropriate.

MR. H. SREBNICK: All I intended to do is have Mr. Wilson confirm that the lawyers from Boies Schiller are here observing the testimony, his former colleagues that he worked

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000136

Case 21-1778, Document 61, 04/04/2022, 3290318, Page137 of 263

368
K1UMAVE6 Wilson - Cross

with. They are observing his testimony and I believe they are in the courtroom. I think it's Mr. Skinner, Mr. Michaelson, and perhaps an associate.

THE COURT: I don't see the relevance of that. You will not do that.

MR. H. SREBNICK: Understood.

THE COURT: The witness should take the stand.

(Jury present)

THE COURT: Please proceed, Mr. Srebnick.

MR. H. SREBNICK: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. H. SREBNICK:

Q. Mr. Wilson, my name is Howard Srebnick. We have spoken before, correct?

A. No, we have not.

Q. In fact, you declined to speak to us despite our request to speak to you, correct?

A. Through counsel I declined a request to speak with you before trial.

Q. In other words, we reached out through your lawyers, your lawyer, to speak to you and you declined?

A. That is correct, yes.

Q. And you testified to the jury today about many different things about Mr. Avenatti, what you understood him to say, but, of course, we have the tape recordings of two out of the three

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

369
K1UMAVE6 Wilson - Cross

encounters you had with Mr. Avenatti, correct?

A. There are audio or video recordings of two of the three times I spoke to Mr. Avenatti, yes.

Q. The third encounter was actually the first encounter you had with Mr. Avenatti, correct?

THE COURT: I'm sorry. I don't understand the question.

Q. Of the three, the one that's not recorded was the very first encounter you had with Mr. Avenatti, correct?

A. Yes. The meeting I had with him on Tuesday, March 19 was not recorded, to my knowledge.

Q. To your knowledge, no one recorded that meeting, correct?

A. That's correct.

Q. However, there was an associate from the law firm of Boies Schiller who was making notes at that meeting, correct?

A. Yes.

Q. His name is Mr. Homes, Benjamin Homes?

A. That is his name, yes.

Q. H-o-m-e-s, correct?

A. That is the correct spelling of his last name, yes.

Q. He made notes of that meeting and got input from other members of the firm preparing those notes?

A. From my understanding, because I was in the room with him, he prepared the notes on his own while we were either sitting in the meeting with Mr. Avenatti and Mr. Geragos or during the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

370
K1UMAVE6 Wilson - Cross

brief time up on the sixth floor of the building where it was just Mr. Homes, Mr. Leinwand, and me.

Q. After the meetings of that day do you recall he prepared a typewritten set of notes that memorialized his best recollection of the events of that meeting?

A. I understand that he did, yes.

Q. Did you ever review Mr. Homes' typewritten notes?

A. No, I have not.

Q. Have you ever reviewed any of Mr. Homes' notes of any of the meetings that occurred or any of the encounters or conversations you had with Mr. Avenatti and/or Mr. Geragos?

A. With respect to Mr. Geragos, I believe that Mr. Homes prepared the notes of one of the calls, at least, that I had with Mr. Geragos before meeting Mr. Avenatti, and I don't know if I reviewed his notes per se, but I did review his typed-up notes of that call. By notes, I don't know that I reviewed his handwritten notes.

Q. Now, you were telling the jury about some of the, quote, understandings you had about what Mr. Avenatti may have meant when he said certain things to you.

Do you recall telling the jury that?

A. I recall there were some questions where the government asked for my understanding of what Mr. Avenatti meant, yes.

Q. One of those things was about the concept of self-reporting.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

371
K1UMAVE6 Wilson - Cross

Do you recall that?

A. There was a phrase Mr. Avenatti used I was asked about during my questioning by the government. I don't remember if it was self-reporting or self-report. It was close to that, yes.

Q. Self-report, right. So the jury understands, that's in connection with the company, in this case Nike, having had law firms or having law a firm do an internal investigation and deciding whether to report the findings of that internal investigation to let's say the government?

A. I generally understand self-report to refer to voluntary disclosure to the government. Mr. Avenatti had also mentioned that he was somehow aware that the company had a grand jury subpoena. I don't regard producing materials sought by a grand jury subpoena as quote/unquote self-reporting.

Q. Let's explain that to the jury about a grand jury subpoena. In 2017, approximately September, Nike received a grand jury subpoena, correct?

A. Yes, it did.

Q. And a grand jury subpoena is effectively an order of the Court to produce records, correct?

A. I am not sure I regard a grand jury subpoena as a court order, but it is a request for the production of documents.

Q. Well, it comes from the Court, right? It's a court document?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000137

Case 21-1778, Document 61, 04/04/2022, 3290318, Page138 of 263

372
K1UMAVE6 Wilson - Cross

A. It is a court document, but it's usually used by the grand jury at the request of the prosecutors.
Q. And when a grand jury subpoena, what they call *duces tecum*, is issued to a company, it calls for the production of documents, correct?
A. That is the Latin phrase for a subpoena that seeks documents, to my understanding, yes.
Q. Is that the kind of subpoena that Nike received in September of 2017?
A. Yes, that's right.
Q. And compliance with such a subpoena does not necessarily require that Nike have lawyers meet with the government. Nike can simply produce the records, right?
A. It is not a requirement when you respond to a grand jury subpoena that you do so through lawyers. That's right.
Q. In this case, however, Nike was concerned that it might have criminal exposure?
A. I don't know whether that's the case.
Q. Did Nike have multiple meetings with the U.S. Attorney's Office for the Southern District of New York after Nike received the grand jury subpoena?
A. I am aware of two meetings that Nike had with the U.S. Attorney's Office between its receipt of the subpoena and the time that I met Mr. Avenatti.
Q. Was there a meeting in approximately October of 2017

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

373
K1UMAVE6 Wilson - Cross

between lawyers on behalf of Nike and the U.S. Attorney's Office for the Southern District of New York?
A. I recall there was a meeting in person within -- not that long after I received the subpoena. Sitting here today, I am not sure whether it was in October.
Q. You recall there was a second meeting with the U.S. Attorney's office in November of 2017.
THE COURT: Let me break in for a second. Did you attend either meeting on behalf of Nike with the U.S. Attorney's Office?
THE WITNESS: No, I did not.
Q. Were you aware of a second meeting that occurred in November of 2017?
A. I don't recall the date of either meeting with precision, but I do recall the Nike, along with counsel, met with the U.S. Attorney's Office in person twice between the receipt of the subpoena and when I met Mr. Avenatti.
Q. There were multiple phone calls between Nike and its lawyers and the U.S. Attorney's Office for the Southern District of New York?
A. No. I don't believe that's correct.
Q. No calls at all?
A. There weren't phone calls with Nike participating in the call. There were calls between the lawyers for Nike at Boies Schiller and the U.S. Attorney's Office for the Southern

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

374
K1UMAVE6 Wilson - Cross

District of New York.
Q. So we are clear, the law firm that was representing Nike in connection with that grand jury investigation was Boies Schiller?
A. Correct, yes.
Q. That was the law firm where you were working at the time?
A. That's right, yes.
Q. You no longer work there. You work at a different law firm now?
A. True, yes.
Q. But at the time Boies Schiller was Nike's law firm and Nike was having Boies Schiller communicate with the government in connection with that grand jury subpoena, right?
A. Yes.
Q. And Nike was professing to be, quote, cooperating with the investigation, correct?
A. I am not sure what communications you are referring. As I stated earlier, Nike stated publicly that it was cooperating with the government's investigation.
Q. This grand jury subpoena was really not much of a secret, correct?
A. I don't know whether or not it was a secret. I believed it to be not public knowledge at the time.
Q. When you say that Nike announced that it was cooperating with the investigation, that's an announcement, a public

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

375
K1UMAVE6 Wilson - Cross

announcement?
A. That was a public statement, but it was not a statement referring to a subpoena.
Q. Just referring to an investigation, right?
A. Correct.
Q. And the government, the Federal Government, investigates by way of grand juries, correct?
A. The Federal Government has a number of ways that it conducts investigations, including by having grand juries issue subpoenas.
Q. In terms of any felony investigation, the government must proceed by way of a grand jury unless a citizen waives its rights to a grand jury, correct?
A. I am not sure I followed that question. Sorry.
Q. When we talk about a federal investigation, under our Constitution --
THE COURT: I think we are getting pretty far afield here.
MR. H. SREBNICK: Understood, Judge.
Q. In all events, there was a public announcement that Nike was, quote, cooperating with this federal investigation, correct?
A. The company stated publicly that it was cooperating with the government's investigation into corruption in amateur basketball.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000138

Case 21-1778, Document 61, 04/04/2022, 3290318, Page139 of 263

376
K1UMAVE6 Wilson - Cross

THE COURT: Do you know approximately when it made that announcement in relationship to the grand jury subpoena in September 2017?

THE WITNESS: I believe that statement was provided to the media within weeks of the Adidas arrest and the company's receipt of the grand jury subpoena, but I don't recall specifically.

Q. Now, we were talking earlier about self-reporting, and you were the one who brought up the issue that responding to a grand jury is something different than self-reporting, correct?

A. I was drawing a distinction between voluntarily reporting information to the government and producing documents sought or the production of which is compelled by a subpoena, yes.

Q. By the time Michael Avenatti and Mark Geragos met with you in March of 2019, Nike had indicated it had already substantially complied with the subpoena from 2017, correct?

A. In March -- in May 2018, we informed the government that we had substantially completed our production of documents as called for by the grand jury subpoena.

Q. And so we will get to more detail in a moment. But when Mark Geragos and Michael Avenatti meet with you in March of 2019, presumably Nike had already produced all of the records related to the payments that might go to family members, players, handlers in amateur basketball, correct?

A. Any documents that we had identified as responsive to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

377
K1UMAVE6 Wilson - Cross

grand jury subpoena, by that point in time we had produced to the government.

Q. When Mr. Geragos and Mr. Avenatti meet with you and they are showing you documents that relate to Nike being involved in payments to players, families, and handlers, those documents presumably would have already been produced by Nike to the federal grand jury, correct?

A. Some of the documents that Mr. Avenatti let me briefly review were documents that it was unlikely they would have ever have been in Nike's possession like, for example, bank records of Cal Supreme, a third-party entity not part of Nike.

Q. But the records in Nike's possession, for example, fake invoices, text messages by Nike, officers directing Mr. Franklin to pay family members of players from Nike executives, that should have been produced to the grand jury by the time you met with Mr. Geragos and Mr. Avenatti?

A. To the extent that there was a document that we identified, meaning it came into our possession and we identified it as being responsive to the grand jury's request, at the time I met Mr. Avenatti and Mr. Geragos all such documents had been produced to the government.

Q. Right. So you told the jury that even before you met with Mr. Avenatti and Mr. Geragos you were on, quote, red alert, correct?

A. That sounds like what I said yesterday. I think that's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

378
K1UMAVE6 Wilson - Cross

right.

Q. Red alert. What you are saying is, you were anxious or nervous or I think you said your pulse started to go up just because you heard the name Avenatti?

A. No, that's not what I said. I was concerned, however, that because I knew of Mr. Avenatti as someone who had launched aggressive sustained media campaigns in the past, that that might be what was about to happen here.

Q. Now we are going to get into the nitty gritty here, but at no time in any of your meetings with Mr. Avenatti did he ever ask you to conceal a thing from the federal grand jury, correct?

A. I'm sorry. Could you ask that again.

Q. At no time did Mr. Avenatti ever ask you to conceal a thing from the federal grand jury?

A. He didn't ask me to conceal something that I recall, no.

Q. At no time did Mr. Avenatti ever condition these settlement discussions in any way on forcing Nike to fail to cooperate with the federal grand jury investigation?

THE COURT: That's kind of a confusing question. You are going to have to rephrase it.

Q. Mr. Avenatti never conditioned the proposed settlement on Nike withholding documents from the federal grand jury or in any way interfering with a federal grand jury investigation, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

379
K1UMAVE6 Wilson - Cross

A. I didn't regard these settlement discussions, but in my communications with Mr. Avenatti I don't recall him saying something about Nike's production of documents other than to say repeatedly that it was going to be Nike's call whether or not to report something or share something with the government.

Q. Mr. Avenatti never indicated that his client, Mr. Franklin, would conceal any facts or information from the federal grand jury, correct?

A. He didn't talk much about Mr. Franklin. I don't recall him saying that, no.

Q. And so I want to be clear, when we are talking about self-reporting, you've already explained, that's something different than the issue of complying with grand jury subpoenas, correct?

A. I don't know exactly how he intended to phrase. What I said earlier was I think of self-reporting as more of a voluntary action as opposed to the production of documents in response to existing compulsory process, like a grand jury subpoena.

Q. What you're talking about in the context of self-reporting is when you as counsel for Nike sit down with your client and you advise the client whether the client, in this case Nike, should report to the authorities evidence or information that Nike may have that's not already called for by the grand jury subpoena?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000139

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Why don't you explain then in your own words the concept of self-reporting as you've described it. What does that mean?

A. My understanding of self-reporting is sort of a legal term of art that's often used to refer to when the company becomes aware of evidence that it or its employees may have been involved in illegal conduct and makes a decision, even if there is no pending government investigation, to take that information and report it to the appropriate law enforcement authorities.

Q. And a company can decide whether to self-report or choose not to self-report, correct?

A. I have described it as voluntary, right, meaning the decision is in the company's purview to make, yes.

Q. When a company makes that decision, in your experience, they rely on the good advice of its lawyers, for example, in your case, from Boies Schiller, correct?

A. Sometimes companies will make the decision to self-report, in my experience, on the advice of outside counsel. It's also a decision that a company can reach on the advice of internal lawyers, or with no lawyers involved at all in the sense that people often call the authorities when they think they are a witness to a crime, as I did.

Q. When you're engaged as counsel for a company that's

deciding whether or not to self-report, it's your job as counsel to advise the company on whether it should or shouldn't self-report, correct?

A. If the subject matter on which my legal advice is sought is whether or not to self-report, then, yes, that's what I would give legal advice on, yes.

Q. And can your legal advice include deciding not to self-report?

A. It would depend on the circumstances, I suppose, what advice I would give.

Q. You'd have to exercise your professional judgment in deciding what advice to give?

A. I usually try to, yes.

Q. Ultimately, the company can decide to follow your advice or to reject your advice?

A. That's generally true, yes.

Q. Now, did you ever give Mr. Avenatti or Mr. Geragos any reason to believe that you would compromise your independence or you would compromise your integrity in any way?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. So as you were describing to the jury, I think you said that you understood Mr. Avenatti to say that you could stick the information in a drawer, meaning the information that would come to light as part of either an investigation or whatever

information Nike would discover as part of the internal investigation?

MR. PODOLSKY: Objection, your Honor.

Q. Do you recall using the phrase stick it in a drawer?

MR. PODOLSKY: Objection, your Honor.

THE COURT: He can ask him whether he recalls using the phrase stick it in a drawer on direct. He can ask the question.

A. I do recall saying something about sticking something in a drawer on direct.

Q. Were you trying to imply to the jury that Mr. Avenatti had suggested that Nike should stick the information in a drawer?

A. I wasn't trying to imply anything other than to answer counsel's questions.

Q. You said that was your understanding. Did Mr. Avenatti anywhere in the recorded conversations or the unrecorded conversation that your colleague, Mr. Homes, took notes of, did Avenatti ever say anything that sounded like, just stick it in a drawer?

A. Yes. To me he did.

Q. What did he say? Didn't he just say that it would be up to you in your capacity as counsel for Boies Schiller, representing Nike, to make independent judgments about what should or shouldn't be disclosed?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. No, that's not what I recall him saying.

Q. Isn't that exactly what he said, it would be up to Boies Schiller, the lawyers for Nike, and Nike to decide whether to self-report or not?

A. No. He repeatedly said it would be up to the company to decide.

Q. Who is he speaking to when he said that? Wasn't he speaking to you from Boies Schiller?

A. When he was speaking to me, yes. He was talking to me.

Q. And you represented Nike for how long?

A. Several years before these meetings.

Q. How many years?

A. I first represented Nike. They became a client at Boies Schiller in 2014.

Q. So did Mr. Avenatti have a reason to believe, from anything you had ever told him, that you would do anything other than exercise your independent judgment?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Mr. Avenatti said to you that in his view Nike should self-report, didn't he?

MR. PODOLSKY: Objection, your Honor.

THE COURT: That's a question about what was said. You may answer the question.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page141 of 263

384
K1UMAVE6 Wilson - Cross

A. At one point I recall he said that he thought in his view they would have to self-report but that it wasn't up to him. It was up to the company.
Q. And isn't that the way it works? It is up to the company to decide whether to self-report. Didn't you just tell that to the jury?
A. It should be the client's decision whether or not to authorize lawyers to share information with the government, yes. It's the client's call.
Q. When you say the client, you mean the company in our example, right, Nike?
A. Here my client was Nike.
Q. But he knew because you told him that you represented Nike, right?
MR. PODOLSKY: Objection.
THE COURT: Sustained.
Q. Now, I'd like to talk a little bit about your history with Nike. You said you had been representing Nike since 2014?
A. I did say that, yes.
Q. And is that the earliest you began representing Nike?
A. Yes, sir.
Q. Important client to you at the time?
A. In 2014?
Q. Yes.
A. Not especially.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

385
K1UMAVE6 Wilson - Cross

Q. Did it become an important client to you?
A. It did, yes.
Q. And that's because?
A. I'm sorry?
Q. You became the relationship partner with Nike?
A. I was the relationship partner with Nike from the beginning.
Q. What does that mean?
A. It means I was the partner at the law firm in charge of staying in touch with this client about any work that any of the lawyers at the law firm did for them.
Q. Does that mean that you have a general understanding for most of the matters that Boies Schiller was handling for Nike?
A. Yes, I do.
Q. Would that not have included the grand jury investigation? Would that have included the grand jury investigation?
A. The investigation into corruption in amateur basketball and the grand jury subpoena you were referring to earlier?
Q. Yes.
A. Yes. I was familiar with that matter.
Q. And Nike became an important client for you financially as well?
A. Nike was a client on which I spent a fair amount of my time in certain years working, yes.
Q. Much of your compensation was based on the work you did for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

386
K1UMAVE6 Wilson - Cross

Nike?
A. I wouldn't say much. But in some years it would have been more than others.
Q. Would it measure in the hundreds of thousands of dollars a year for you personally?
THE COURT: I don't understand the question.
Q. Would your compensation from work you did for Nike measure in the hundreds of thousands of dollars per year for you personally?
A. We had a compensation system at Boies Schiller where there were bonuses, but it was a bit of a black box as to exactly what made up your bonus. There was discretion left with management. I was not part of management. Also, I was an equity partner, and I received certain equity payments which were not linked to any particular client or billable hour in any particular year.
Q. What percentage of your work was related to Nike by the end of your tenure at Boies Schiller?
A. 2019, I would say maybe 10 to 20 percent of my time that I spent working.
Q. 2018?
A. Probably a little more.
Q. 2017?
A. More still. Probably 30 to 50 percent of my time.
Q. In the year where you had 30 to 50 percent, would that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

387
K1UMAVE6 Wilson - Cross

translate into hundreds of thousands of dollars of compensation?
MR. PODOLSKY: Objection, your Honor.
THE COURT: Sustained.
Q. Now, you have, as Nike's lawyer at the time, a duty of loyalty to Nike, right?
A. I certainly have a duty of loyalty to my clients, yes.
Q. That would include Nike?
A. Yes.
Q. Now, you still represent Nike, do you not?
A. I do. They have engaged my law firm, DLA Piper.
Q. You changed law firms, but Nike came along as a client at the new law firm?
A. Nike was an existing client of DLA Piper. They also engaged me at DLA Piper.
Q. I'm sorry?
A. They have also engaged me at DLA Piper.
Q. I'd like to now talk about the buildup to the meeting with Mr. Avenatti and Mr. Geragos at Mr. Geragos' office. Before you ever met with either of them --
THE COURT: You mean the first meeting?
MR. H. SREBNICK: Yes, your Honor.
Q. The first meeting was March 19, 2019, correct?
A. Yes.
Q. So we get the calendar in our mind, that was a Tuesday?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000141

Case 21-1778, Document 61, 04/04/2022, 3290318, Page142 of 263

388
K1UMAVE6 Wilson - Cross

A. Yes, the 19th was a Tuesday.
Q. You met with the two men -- you had a phone call with both of them on the 20th, Wednesday? You follow that?
A. Yes, that's right.
Q. And you had a meeting with them that was video-recorded on Thursday, the 21st?
A. Yes.
Q. But you had several other interactions with Mr. Geragos apart from Mr. Avenatti, correct?
A. Yes, that's right.
Q. Now, you knew who Mr. Geragos was even before you met him with Mr. Avenatti, correct?
A. Yes.
Q. You knew that Mr. Geragos was a lawyer from California who had offices in New York?
A. By the time I met him in person?
Q. Even before you met him.
A. I knew he was a lawyer in California. I can't recall when I learned he had offices in New York. It must have been the first day or so I was talking to him, and he asked us to meet there.
Q. And you knew that he had handled a matter with Nike involving a high-profile NFL football player, correct?
A. He had handled a matter adverse to Nike on behalf of his client, who was a high-profile athlete.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

389
K1UMAVE6 Wilson - Cross

Q. What that means is, he had a matter where he represented a client who was a high-profile football player who was adverse to Nike, correct?
A. Right. There was a dispute between Nike and that athlete. He represented the athlete in connection with that dispute.
Q. In connection with that dispute Mr. Geragos ultimately reached settlement negotiations with Nike over that dispute, correct?
A. I'm not aware of that.
Q. You're not aware of the settlement between Nike and Mr. Geragos' high-profile NFL football client?
A. I'm aware that Nike and this athlete continued to have a commercial relationship, but I'm not aware of or familiar with any settlement talks, which I thought is what you referred to.
Q. I'll take the word settlement out. They resolved whatever dispute they had, Nike and the football player, and Mr. Geragos was the one who handled it, right?
A. I don't have knowledge of what happened between the company and the athlete other than to know that they continue to have a commercial relationship today.
Q. Mr. Geragos had interfaced in Casey Kaplan in connection with that NFL football player. Did you know that?
A. I was aware of that, yes.
Q. And you knew also that Mr. Geragos, I think you testified on direct, not only handled civil matters, he also handled

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

390
K1UMAVE6 Wilson - Cross

criminal matters as well?
A. Prior to the matter involving the athlete interacting with Nike, my knowledge was just that he was a criminal defense attorney in Los Angeles.
Q. The very first time you interacted with Mr. Geragos was by telephone?
A. Well, I sent him an e-mail, if you can call that interacting. But the first time he responded was when I called his cell phone.
Q. What I'd like to do, with the Court's permission, using a visual aid, just build up the timeline between the contacts of Mr. Geragos and Mr. Avenatti and yourself.
A. OK.

MR. H. SREBNICK: Let me just ask permission from the government if they can see that.

MR. PODOLSKY: Can we have a sidebar, your Honor?

THE COURT: Yes.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

391
K1UMAVE6 Wilson - Cross

(At sidebar)

MR. PODOLSKY: I have never seen this before. It appears to be some kind of closing slide. I am not sure what it is.

THE COURT: Ordinarily, what would happen is, as you elicit the contacts from the witness, you could show a visual aid.

MR. H. SREBNICK: We can do that.

THE COURT: I would prefer that because, as a technical matter, he has not really gone into any of this yet.

MR. H. SREBNICK: We can do it.

THE COURT: Did you want to say something?

MR. PODOLSKY: No.

THE COURT: In other words, what will happen is, as the witness agrees with him as to the phone calls on this date and the e-mail was on that date, then the screen will be populated.

MR. PODOLSKY: We have no problem with that. We are likely to object to admitting this into evidence as a demonstrative. If he follows that procedure, I am not going to object.

MR. H. SREBNICK: We have the technology to build it or, as they say in the Six Million Dollar man, to rebuild it.

THE COURT: Thank you.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000142

Case 21-1778, Document 61, 04/04/2022, 3290318, Page143 of 263

392
K1UMAVE6 Wilson - Cross

(In open court)

MR. H. SREBNICK: With the Court's permission, we are going to build this timeline line by line.

THE COURT: Yes.

Let me say to the jury if any of you need a break, raise your hand, we will take a break. Otherwise, if you will allow me, I am going to push through to 4:30, but I don't want to pressure anyone. If someone needs a break, raise your hand and we will take a break.

Go ahead, sir.

MR. H. SREBNICK: Thank you, Judge. If I need to, can I raise my hand?

THE COURT: No, you can't. Of course you can raise your hand. If anyone needs a break, particularly the jury.

Q. Government Exhibit 203, I think you already commented on it, those are the string of e-mails between you and Mr. Geragos.

Do you recall?

A. I don't recall the exhibit number. I apologize.

MR. H. SREBNICK: Do we have a stipulation from the government it's 203, so I don't have to publish it?

Q. I'll have to show you Government Exhibit 203 so we can do it step by step. If you could take a look, so maybe we can build this quickly.

You recall this, Government Exhibit 203?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

393
K1UMAVE6 Wilson - Cross

A. Yes. I see now the exhibit number was 203.

Q. And if you count the number of e-mails between you and Mr. Geragos --

A. I might need to you zoom out for me to count the individual e-mails.

Q. I am going to give you a hard copy of 203, make it easy.

A. Counsel, I think I have one in my binder.

Q. OK. Perfect.

A. I see seven individual e-mails in this chain.

Q. On the very first day, March 13, how many do you see?

A. On March 13, I see five e-mails.

Q. And on the other dates you see?

A. Two.

Q. That would be March --

A. 14. Thursday, March 14.

MR. H. SREBNICK: So if we could return to our demonstrative, when Mr. Lyon is ready.

Q. On March 13, there were five e-mails between you and Mr. Geragos?

A. I counted seven a moment ago.

Q. For that one day? I thought it was five on March 13.

A. For the 13th, five e-mails.

Q. Fair enough.

I don't know if the jury is able to see the visual, but assuming so, on that day both Geragos and Nike or Nike's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

394
K1UMAVE6 Wilson - Cross

lawyers, that would be you, are interacting, correct?

A. I interacted with Mr. Geragos on Wednesday, the 13th.

Q. We will just check that off, if we could.

Mr. Avenatti was not part of that communication?

A. May I ask a question? I was interacting with Mr. Geragos on the 13th. That was a Nike lawyer. I am not sure what Nike/Nike lawyers is. To my knowledge, no one from Nike was communicating with Mr. Geragos on the 13th.

Q. We will change that to Nike lawyer. Would that be more acceptable to you?

A. I can agree that Nike lawyers were communicating with Mr. Geragos on that day.

Q. You told us about two on March 14, I believe, right?

A. Yes, that's right.

Q. Two e-mails.

A. Correct.

Q. And Mr. Avenatti was not part of that exchange, correct?

A. He was not copied on any of the e-mails that we are referring to in this exhibit.

Q. March 14. The next time you communicated with Mr. Geragos would have been by phone?

A. After the last of the e-mails in this document?

Q. Yes.

A. Yes. I spoke to him -- well, we also exchanged text messages, but, to my knowledge, I spoke to him again on Friday,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

395
K1UMAVE6 Wilson - Cross

the 15th.

Q. Now, when you spoke to Mr. Geragos, he advised you that he wanted to have a discussion about a highly sensitive matter, correct?

A. He had told me that he wanted to have a meeting and that the topic was too sensitive or wanted to be discreet and didn't want to say what it was over the phone.

Q. I'm sorry. I'm having trouble hearing you.

A. I apologize. He said that the topic was too sensitive to discuss over the phone or that he wanted to be discreet and not give more information over the phone.

Q. By the time you spoke to Mr. Geragos, did you already know about contacts he had had with Casey Kaplan?

A. Yes.

Q. You had spoken to Mr. Kaplan?

A. I don't recall whether I spoke to Mr. Kaplan, who was in China at the time, I believe, directly, or had just been in China.

Q. Did you know what the matter was that Mr. Geragos had communicated with attorney Casey Kaplan about?

A. What I knew was that he had alluded to an Adidas problem that Nike might have something like or similar to an Adidas problem.

Q. By Adidas problem you understood that be some sort of corruption in amateur basketball?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000143

Case 21-1778, Document 61, 04/04/2022, 3290318, Page144 of 263

396
K1UMAVE6 Wilson - Cross

A. I expected that Mr. Geragos was making reference to the very public arrest and criminal charges of an Adidas executive for corruption related to amateur basketball.

Q. Also by then Adidas had also been sued by a player named Bowen, correct? You knew about that?

A. I don't recall whether I was aware of that at the time.

Q. Do you know what I'm referring to, a Brian Bowen had filed a public lawsuit against Adidas?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Do you want to approach?

MR. PODOLSKY: Yes, your Honor.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

397
K1UMAVE6 Wilson - Cross

(In open court)

THE COURT: Where are we going with this?

MR. H. SREBNICK: Long before the meetings occur the witness Wilson knows that this is what this is about. This is about --

THE COURT: But the pending question has to do with some lawsuit, I gather, that was brought by a basketball player against Adidas. I'm asking you, where is this going?

MR. H. SREBNICK: That lawsuit, which was part of the package that Mr. Avenatti got from Auerbach, so we will get to that when we examine Auerbach as well, deals with a player who sued Adidas in connection with this amateur basketball corruption issue, and Nike clearly was following that lawsuit and an Adidas problem should have signaled to this witness that it was a potential lawsuit against Nike, just like the Adidas lawsuit by Brian Bowen.

MR. PODOLSKY: Your Honor, he just said he wasn't aware of this lawsuit. I don't understand the relevance. If he wants to ask Mr. Auerbach about what he was --

THE COURT: He said he wasn't aware of it at the time, so that's why I asked where are we going with this. Because if he wasn't aware of it at the time, he wasn't aware of it at the time.

MR. H. SREBNICK: I may just ask him, when did he become aware of it? We will get his answer and move on.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

398
K1UMAVE6 Wilson - Cross

MR. PODOLSKY: Why is it relevant? When and if he ever became aware of it, why is that relevant?

MR. H. SREBNICK: I say it's hard to believe, given the publicity of the case, that the lawyer would not be aware of a highly public lawsuit against Adidas regarding the amateur basketball scandal. I think I should have just a little bit of latitude to probe him on his absence of knowledge on something this sensitive to Nike.

THE COURT: I don't understand really the point because what you seem to be trying to establish is what he would have understood when he was told that Geragos said that Nike had an Adidas problem. So he said, I wasn't aware of the lawsuit at this time. So he just didn't know.

Is it your point that it's relevant at some later date that he found out? This is all very compressed. If he didn't know it as of March 13, do we really care?

MR. H. SREBNICK: If I can just ask him when he learned it, I'll move on, Judge.

MR. PODOLSKY: Again, I don't understand how that's relevant.

MR. H. SREBNICK: Let me just say this. This witness is claiming that he did not anticipate that Avenatti and Geragos were essentially threatening a lawsuit if the case didn't settle. Geragos tells him, they have got an Adidas problem. Adidas had been sued. For this witness to say, he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

399
K1UMAVE6 Wilson - Cross

did not perceive that a potential lawsuit was in the pipeline --

THE COURT: I'm sustaining the objection.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000144

(In open court)

Q. You were describing the March 15 conversation with Mr. Geragos and his proposing to set up a meeting face to face to discuss a potential sensitive matter, yes?

A. He said either that or the call that I had with him on Wednesday that it was something too sensitive to discuss by phone and Nike would thank him or I would thank him if we took the meeting in person.

Q. When he said that, that Nike would thank him, you understood that to mean that he was coming to Nike to propose something that would be potentially acceptable to Nike, at least that's what he was proposing?

A. I don't know that I had that understanding. I just understood that he was trying to encourage me to take the meeting, even though I didn't know exactly what the meeting was about.

Q. And he said, let's talk about it face to face and you agreed to do that?

A. I agreed that we would be willing to meet with him and Mr. Avenatti the following Tuesday ultimately.

Q. Now, I had mentioned the name Casey Kaplan. He is a lawyer?

A. He is an attorney, yes.

Q. For Nike?

A. He is a lawyer employed by Nike.

Q. You had mentioned another lawyer that was involved in these meetings, a Mr. Leinwand, correct?

A. Mr. Kaplan was not involved in the meetings, but the lawyer who was at one meeting was Robert Leinwand.

Q. And Mr. Leinwand was the lawyer who flew from the west coast to attend the meeting I think on March 19, correct?

A. Yes.

Q. I'd like to ask you some questions about that meeting on March 19. That's the meeting that's not recorded, correct?

A. It is not recorded, to my knowledge, yes.

Q. That's the meeting where an associate made handwritten notes and converted it into a typewritten notes that you never reviewed, correct?

A. I saw my associate taking notes during the meeting. I don't know that he converted them into something typed while we were there. I believe he did it later.

Q. Now, the very first thing that is discussed in this meeting on March 19 is Mr. Geragos explaining why the meeting was occurring, correct?

A. What I recall at the very beginning of the meeting was, after maybe some chitchat, me saying, we are here, I am not sure why we are here. Can you tell us now. And Mr. Avenatti responding by asking if we could have a Rule 408 discussion.

Q. Geragos said something to the effect of that Michael Avenatti was telling me two weeks ago that he had something

about Nike that he was going to go public with. And Geragos continued and said: I had worked with Nike before, these were reasonable people, I contacted Casey Kaplan at Nike, who I dealt with on that other matter involving the NFL football player.

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained. You are going to have to break it down. That's a lot of information there.

MR. H. SREBNICK: Understood.

Q. First, Geragos tells you that Michael Avenatti had something about Nike he was going to go public with, correct?

A. I don't recall Mr. Geragos speaking to that effect at the very beginning of the in-person meeting on the 19th, if that's when you are asking about.

Q. Do you recall Geragos pointing out that Geragos had worked with Nike or resolved a matter with Nike in the past and that's why Geragos had reached out to Casey Kaplan, the lawyer from Nike?

A. I have a recollection of Mr. Geragos saying something to that effect in the phone calls we had had, and I know that a couple of times in our subsequent conversation he referenced having interacted with Nike. Again, I don't recall that as something that was said at the very outset of the in-person meeting on the 19th.

Q. It appeared to you that Mr. Geragos was a proponent,

meaning he was in favor of having this meeting to try to resolve the matter that he and Mr. Avenatti were there for?

A. I'm sorry. Could you ask that again, please.

Q. Mr. Geragos appeared to be a proponent in favor of having this meeting to resolve the matter that he and Avenatti were there to see you about?

A. Before the meeting he had encouraged me to take the meeting, but didn't talk about resolving something. He just said I should take the meeting.

Q. Now, did you in truth know why they were there, what matter they were there about?

A. Not until they told me other than, in Mr. Geragos' words, it might relate to a so-called Adidas problem.

Q. Had you heard anything about a Mr. Auerbach having contacted a Mr. Slusher at Nike to alert Slusher about Gary Franklin's claims?

A. I was aware that an individual named Jeffrey Auerbach had plans to place a call to John Slusher, an executive at Nike.

Q. John Slusher is a pretty high executive at Nike, right?

A. I believe his title is head of global sports marketing.

Q. Head of global sports marketing. Is that what you said?

A. Yes.

Q. And before the meeting you had with Avenatti and Geragos, you were informed that Auerbach had reached out to Slusher, right?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page146 of 263

404
K1UMAVE6 Wilson - Cross

A. I was aware that he had reached out to Mr. Slusher, Mr. Auerbach had.
Q. Mr. Slusher had contacted Boies Schiller?
A. To my recollection, Mr. Slusher, upon receiving the communication from Mr. Auerbach, contacted his legal department.
Q. Was Boies Schiller contacted?
A. Boies Schiller was subsequently contacted by the Nike lawyers.
Q. Who at Boies Schiller was the contact person in regard to Auerbach having spoken to Slusher about the Franklin matter?
A. I worked on this matter with two other partners in the firm, and I recall that a couple of us were aware of it, but I can't recall sitting here today whether one of us first heard about the Auerbach call versus the other.
Q. When Boies Schiller heard about the Slusher Auerbach call, did that put Boies Schiller or Nike on red alert?
A. My recollection is that the substance of the call as was conveyed to me was pretty vague and that what we did in response was invite Mr. Auerbach to provide more information if he would like to.
Q. My question was, did it put you guys on red alert?
A. I don't recall it putting us on red alert, no.
Q. That didn't create any anxiety or pulse pounding when it was Auerbach calling Slusher, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

405
K1UMAVE6 Wilson - Cross

A. It was a little weird, but it didn't cause my pulse to pound, and we had a way, we thought, of responding to it, which was inviting Mr. Auerbach, if he had information relevant to the investigation, to come forward.
Q. When you heard it was Avenatti, that did cause the red alert, right?
A. Subsequently, when I understood that Mr. Avenatti wanted to have a meeting with the company about something too sensitive to even discuss what it was over the phone, yes, that caused me a great deal of concern.
Q. Did Auerbach contact Boies Schiller? Did you all ever interact with Auerbach?
A. Mr. Slusher sent an e-mail back to Mr. Auerbach providing him the name and contact information of one of my partners informing him that the company took this very seriously and inviting him to contact Boies Schiller, and he never did.
Q. So you are telling the jury when Avenatti and Geragos show up you did not connect the Slusher/Auerbach event to the Avenatti/Geragos meeting. Is that your testimony?
A. I don't recall drawing any connection prior to the first meeting with Mr. Avenatti.
Q. Avenatti then raises the issue of Rule 408, correct?
A. Correct. At the beginning of the meeting.
Q. And Rule 408 is a rule of evidence that I think you have described it in part, it ensures that the statements made by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

406
K1UMAVE6 Wilson - Cross

the parties to the conversation can't be used against the parties in the way you describe, to hold them to any settlement amount, correct?
A. I understand Rule 408 to be a rule regarding admissibility of offers to compromise.
Q. Which means that when Mr. Avenatti, for example, said, Mr. Franklin would take a million, five, it turns out the case ends up going to court and Mr. Avenatti asks for more than a million, five, you can't say in court to the jury or the judge, hey, wait a second, they were willing to settle for a million five, they should be limited to a million five, correct?
A. If there had been some case to take to court and Mr. Franklin had made a demand in a different amount, that is correct. The fact that his counsel in a 408 discussion had demanded a lower amount, a lower amount is something that I don't believe would have been properly admitted in that litigation.
Q. Rule 408 in no way inhibits or prohibits Nike from reporting information as part of the grand jury investigation, correct?
A. I did not feel that it did, no.
Q. Now, you told the jury that you didn't think this was a Rule 408 meeting. Is that what you said?
A. Yes.
Q. But that's not what you told Avenatti and Geragos?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

407
K1UMAVE6 Wilson - Cross

A. Correct.
Q. You told Avenatti and Geragos that, yes, Rule 408 does apply to this meeting?
A. Before learning who the identity of Mr. Avenatti's purported client was or the nature of any claims he might claim to have, I said that I was agreeing to a 408 discussion, not believing the fact that I was having a 408 discussion.
Q. Here is what I'm trying to understand. The meeting has not even started yet and you're already, in your mind, deceiving these two gentlemen. In your mind, this is not a Rule 408 meeting, even though you told him that it is?
MR. PODOLSKY: Objection, your Honor.
THE COURT: Sustained.
Q. You are telling the jury in your mind this wasn't covered by 408, and you hadn't even heard the first thing out of their mouths?
A. I had been asked to agree to 408, which is a rule that governs compromise offers between parties without having been told who the party was or what particular claim there was. I didn't think anyone in that scenario could technically agree to a Rule 408 discussion.
Q. Why didn't you just say that? Hey, gentlemen, before I can agree to a Rule 408, I need to know who your client is.
A. Because I had asked who the client was. I had asked what this was about. His first response was, can we have a 408

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000146

Case 21-1778, Document 61, 04/04/2022, 3290318, Page147 of 263

408
K1UMAVE6 Wilson - Cross

discussion. And I made a snap judgment that I wanted him to start telling me why we dragged the client across the country, and so I agreed to what he asked.

Q. Are you saying that before, before this Rule 408 invocation was made by Avenatti and Geragos, you had actually asked for the client's name first and they declined. Is that your recollection of the sequence of what happened?

A. On the Friday call that I had with Mr. Geragos I asked him if Mr. Avenatti was the client, was Mr. Geragos' client, or if there was another client, and Mr. Geragos had informed me, no, Mr. Avenatti was not his client and there was a client, but without identifying that individual.

Q. Right. But the first time you meet Mr. Avenatti, the very first thing he says, even before you say anything, is, hey, these meetings are covered, this meeting is covered by Rule 408?

A. My recollection is that after maybe some hellos and chitchat that I said, in essence, hey, guys, we are here, you insisted we meet at your office. I have brought the client. Can you finally tell me what this is about. And then Mr. Avenatti responded to that by saying, can this be under 408.

Q. And you said --

A. I said yes.

Q. But you are telling the jury that you didn't really mean

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

409
K1UMAVE6 Wilson - Cross

yes?

A. I didn't think that it was possible to agree to a 408 in that setting and, yes, I said yes, and I did not mean that I thought we were actually having the 408 discussion.

Q. So the very first thing you say to Mr. Avenatti was misleading to Mr. Avenatti?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. You could have said to Mr. Avenatti before we talk Rule 408 I would like to know who the client is?

A. I could have said that, yes.

Q. But you chose not to.

A. I chose to say what I said.

Q. And then Mr. Avenatti, after you agree that these are settlement discussions, he proceeds to tell you what he is there for in terms of what the allegations are, correct?

A. He then proceeded to talk about having a whistleblower client and to name Nike employees and basketball players who he said his client had been involved in making corrupt payments to -- payments to the players. Excuse me.

Q. In substance he said, I'll cut straight to the chase, Nike has a problem that makes the Adidas problem look small.

A. I don't recall that phrasing, but I do know that on a couple of occasions he made the point that whatever scandal Adidas had gone through, he felt that he was going to be able

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

410
K1UMAVE6 Wilson - Cross

to create a bigger scandal with respect to Nike.

Q. Avenatti said he represents a whistleblower who has information that Nike directed the whistleblower to make payments in regard to a No. 1 NBA draft pick, correct?

A. I recall him using the word whistleblower to describe his client, and he did say that he had information about Nike employees being involved in making a corrupt payment to the last year's, so this would have been the 2018, No. 1 NBA draft pick.

Q. When Avenatti said that, you knew that was true, right? There had been payments made to a family member of the last year's No. 1 draft pick?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Grounds?

MR. PODOLSKY: We would be happy to approach, but relevance.

THE COURT: All right.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

411
K1UMAVE6 Wilson - Cross

(At sidebar)

THE COURT: Where are we headed?

MR. H. SREBNICK: Judge, this is the conversation they were having.

THE COURT: You are not asking him about the conversation. You are asking him whether he knew something. That's different than what they talked about. This isn't about the conversation they had. This is about his knowledge about whether corrupt payments had been made to the No. 1 draft pick.

MR. H. SREBNICK: That's right. So what I intend to establish is that at no time during the conversations does the witness deny the truth of any of the allegations or suggest that there are no valid claims here. It leads Mr. Avenatti and Geragos to believe that the claims are out.

MR. PODOLSKY: Your Honor, we have no objection to otherwise admissible questions as to what was said in the meeting. We object to asking about whether he knew some fact was true or not based on information outside --

THE COURT: I have sort of a different concern and it's already come up a number of times. A number of your questions are phrased as whether they led Mr. Avenatti to believe X, Y, and Z, and there have already been a number of objections. I have sustained them. You can't ask him what was going on in Avenatti's mind and Geragos' mind. And if you do, I am going to sustain the objections. And if it becomes

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000147

Case 21-1778, Document 61, 04/04/2022, 3290318, Page148 of 263

412
K1UMAVE6 Wilson - Cross

repetitive, I am going to do more than sustain the objection.

Everyone here understands that you can't ask one witness what was going on in somebody else's mind, so please don't do that.

MR. H. SREBNICK: I won't do it, Judge. Frankly, I apologize. That's why I used the phrase lead someone to believe. I thought that was -- anyway, I'll rephrase it. Sorry.

THE COURT: Anyway, just to return to this, you want to ask him if he knew that it was true that Nike employees had made corrupt payments to a No. 1 draft pick.

MR. H. SREBNICK: Yes. But they should have disclosed it during the grand jury investigation, Nike and Boies Schiller. That was the whole grand jury production, as you know from the grand jury subpoena, Judge. So it goes to, at a minimum, bias.

MR. PODOLSKY: Your Honor, he is asking if he knew that the allegations were true. We have been over this over and over again. The truth of the allegations are not relevant here. He said a moment ago that the reason he was asking these questions was, he wanted to know if Mr. Wilson had led Mr. Avenatti to believe X, Y, and Z. If he wants to ask the witness, did you say that this was false, we have no objection to that. But to ask him whether the underlying allegations are true is not relevant.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

413
K1UMAVE6 Wilson - Cross

THE COURT: I think that's actually a good formulation, which is, you can ask him whether Avenatti said X, Y, and Z, and you can ask him what his response was, or you can even say, did you deny X, Y, and Z. But that avoids the issue of having the jury opine whether this actually happened or that actually happened, and I suspect that the witness has no personal knowledge of whether any of it happened, actually, I suspect.

MR. H. SREBNICK: I understand the Court's ruling, but I think you will see the documents that were produced during the meeting establish exactly that.

THE COURT: Again, I don't know what the documents are.

MR. H. SREBNICK: I'll follow the Court's ruling. When we get to the issue of the documents that the witness saw, we will take it up then because the witness was shown the payments and presumably it had been produced to the grand jury. So for the witness to now say he didn't realize what payments were going to the draft pick's mom is highly.

MR. PODOLSKY: At no time he has testified to that.

THE COURT: I don't remember him saying that. I don't remember him denying that.

MR. H. SREBNICK: He has not yet. That was my question. That's the pending question.

THE COURT: Your pending question was different.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

414
K1UMAVE6 Wilson - Cross

Again, your question was, did this happen? This was true. No. Because it's not an investigation. This case, this trial is not an investigation of whether Nike made corrupt payments. That's not what this case about. You're welcome to elicit from him the back and forth between him and Avenatti, and you can elicit from him that when Avenatti said X, did you deny X.

MR. H. SREBNICK: I'll do it your way, Judge. No problem.

THE COURT: You can do that.

MR. H. SREBNICK: Thank you, Judge.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

415
K1UMAVE6 Wilson - Cross

(In open court)

Q. Mr. Wilson, I'll ask the question this way. When Mr. Avenatti said Nike has a problem that makes the Adidas problem look small, did you deny it?

A. I don't recall him using that exact phrasing, but I also, in answer to your question, did not comment one way or the other, that I recall, about what Nike had or hadn't done.

Q. Let me phrase it this way. Mr. Avenatti indicated that the whistleblower had information that Nike directed the whistleblower to make payments to the No. 1 pick in last year's NBA draft, correct?

A. I recall him saying something along those lines, yes.

Q. Did you deny that Nike had directed the whistleblower to make such payments?

A. I was in listening mode, and in response to him saying that I specifically recall I asked him who was the No. 1 draft pick from the previous year.

Q. Did you not know or did you actually know who the No. 1 draft pick was?

A. I knew who it was, but I wanted him to identify what player he was trying to inform me had allegedly been involved in a bribery scheme.

Q. When Mr. Avenatti said the whistleblower had made payments to the No. 1 pick in last year's draft, as you've said, you knew exactly who that was and who Avenatti was referring to,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000148

right?

A. I was aware in March of 2019 that DeAndre Ayton had been the No. 1 draft pick the year before.

Q. And as part of your representation at Nike, had you produced records to the grand jury in connection with those payments that Avenatti was referring to?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Do we need to approach on this?

MR. H. SREBNICK: I'll save the question for later to save the time, Judge. No problem.

Q. Avenatti told you that he had e-mails, text messages, bogus invoices, and travel records that indicated that Carlton DeBose and Jamal James were directing the payments, is that right, he said that?

A. Mr. Avenatti said a lot of things. I do recall him making reference to invoices, and I recall him using those two names.

Q. Did you know who Carlton DeBose was when Mr. Avenatti mentioned that name?

A. Yes, I did.

Q. Did you know who Jamal James was when Avenatti told you that he and DeBose had been directing the payments to the draft pick?

A. I was familiar with who Mr. James was at that time, yes.

Q. And did you deny to Mr. Avenatti or to Mr. Geragos the existence of text messages, bogus invoices, and travel records

indicating that DeBose and James directed payments to the NBA draft pick? Did you deny it to Mr. Avenatti or Mr. Geragos?

A. I didn't share, to my recollection, with Mr. Avenatti any facts or my understanding of any facts regarding my client. I was there in listening mode to hear what he had to say.

Q. Now, Avenatti said he was aware that Nike had received a subpoena from the Southern District of New York?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. I recall him saying that he was aware that the company had received a subpoena. I don't know whether he identified who had issued the subpoena.

Q. Do you recall he indicated it was from the Southern District of New York, SDNY?

A. I don't recall if he identified what government agency had issued the subpoena he purportedly heard about.

Q. The letters SDNY, is that a short term for the prosecutor's office here in the Southern District of New York?

A. SDNY, referring to the Southern District of New York, is sometimes used to refer to this court and it's also sometimes used to refer to the U.S. Attorney's Office for the Southern District of New York.

Q. And you recall Mr. Avenatti saying he didn't know what the subpoena called for. You recall him saying that?

A. I don't recall his words to that effect. What I recall him

saying about the subpoena was that he was aware that Nike had received one, and he didn't know what Nike had or hadn't produced in response to that subpoena.

Q. Do you recall Mr. Avenatti telling you and Mr. Leinwand and Mr. Homes that Avenatti had reason to believe that Nike has known about the conduct, the payments to the NBA draft pick which could create a significant issue for Nike for failing to disclose to the SEC?

A. I didn't recall it being phrased by him at that meeting in terms of the SEC, but I do recall him suggesting that Nike hadn't been forthcoming with the government and that could be a big problem for the company.

Q. And you do know that the SEC now has an open inquiry of Nike, correct?

A. I subsequently became aware of a subpoena issued by the Dallas Fort Worth office of the SEC to Nike, but I didn't have that knowledge until it was issued sometime later.

Q. Do you recall that Mr. Avenatti said he represents a whistleblower who is a former youth director of an EYBL team?

A. I recall that he described his client as a whistleblower and as the head of a youth basketball program. I don't recall whether he described him as a current or former head of the program.

Q. Do you recall Mr. Avenatti saying that Carlton DeBose and Jamal James squeezed out Mr. Avenatti's client from the

contract that the client had with Nike?

A. I don't recall that. I don't recall that coming up.

Q. Do you recall Mr. Avenatti saying that he believed that his client had claims for breach of contract, tortious interference, and potentially other claims?

A. I do recall Mr. Avenatti saying that he believed his client had breach of contract, tort -- could have been tortious interference, some kind of tort claims or other claims against Nike.

Q. When we say tortious interference, that's what we call a cause of action, a basis to sue someone for interfering with a contract?

A. There are a couple different causes of action in my understanding that could be referred to by the phrase tortious interference. I don't recall whether Mr. Avenatti used the phrase tortious interference. I recall the word tort or tortious coming up.

Q. Avenatti said there were potentially other claims, correct?

A. I recall the expression other claims, yes.

Q. And did you deny to Mr. Avenatti at that point anything he had said?

A. Anything what? I'm sorry?

Q. Let me rephrase. At that point did you suspect that Avenatti was there on behalf of Mr. Franklin, given what you knew about the Auerbach call?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page150 of 263

420
K1UMAVE6 Wilson - Cross

A. At the point that Mr. Avenatti referenced the No. 1 draft pick in 2018, DeAndre Ayton, because I knew that Mr. Ayton had played for Cal Supreme, I had a suspicion that the program director he was referring to would be Mr. Franklin.

Q. How do you know who Gary Franklin was? You're at Boies. How did you know who Gary Franklin was at that point in time?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Suffice it to say, you already knew who Gary Franklin was when you walked into that meeting on March 19?

A. Yes, that's true.

Q. Did you know the name of all 40 coaches from the EYBL league?

A. I may have read them at some point, but I probably couldn't have recited them.

Q. But you certainly knew who Gary Franklin was, right?

A. Yes. I knew who Mr. Franklin was as of March 19.

Q. Before March 19.

A. A long time before, yes.

Q. Why did you know who Gary Franklin was?

A. Because as part of the company's cooperation with the investigation by the U.S. Attorney's Office for the Southern District of New York, we had produced a number of documents to the government and conducted in-person proffer sessions with the government to share information about Mr. Franklin's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

421
K1UMAVE6 Wilson - Cross

program and certain players in that program.

Q. And when you shared that information to the prosecutors, did that include sharing information that DeBose and James, the two Nike executives, had directed Mr. Franklin to pay money to the first round draft pick?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Do we need to approach on this?

MR. H. SREBNICK: I can save it if you want to do it at the end of the day. Save time.

THE COURT: OK.

Q. Do you recall Mr. Avenatti saying that his client was directed to pay $10,000 to the mother of the first round draft pick?

A. I recall him referring to his client being involved in a $10,000 payment. I don't remember whether he said to the mother or to the player himself or to the family generally.

Q. Do you recall Mr. Avenatti saying that DeBose and James, the two Nike executives, had directed that Coach Franklin -- excuse me. Let me rephrase because the name Franklin hadn't been mentioned yet.

Do you recall Avenatti telling you that the client was told to break the payment into two $5,000 payments to avoid compliance issues?

A. Whether it was at that point in the meeting or another, the notion of the $10,000 amount being broken into two payments

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

422
K1UMAVE6 Wilson - Cross

sounds familiar. I don't recall the specific statement you described.

Q. Do you recall Mr. Avenatti telling you that Nike had paid for the client, Avenatti's client, to fly to Phoenix from California to hand cash to the mother of the NBA player, NBA draft pick?

A. The notion of a flight from Los Angeles to Phoenix did come up during the meeting, but in my recollection it didn't come up until later.

Q. Do you recall Mr. Avenatti saying that his client was directed to make multiple payments to two other NBA prospects?

A. Mr. Avenatti maimed two other young players in addition to Mr. Ayton.

Q. One was Bol Bol?

A. Yes. That's one of the other young men he named.

Q. The other was Brandon McCoy?

A. Yes, that is correct.

Q. Both of them are now adults?

A. I don't know their exact ages, but I believe they are both over 18 now, yes.

Q. When Mr. Avenatti proffered that information that his client had and was giving to you, you didn't deny any of that, correct?

A. I don't recall at any point in my conversations with Mr. Avenatti affirming or denying any facts about Nike's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

423
K1UMAVE6 Wilson - Cross

conduct to him, a lawyer I just met for the first time.

Q. You're there on behalf of Nike at that meeting, correct?

A. Correct.

Q. You're being approached by two high-profile lawyers, correct?

A. I viewed both Mr. Geragos and Mr. Avenatti as high-profile lawyers.

Q. One of the lawyers, Mr. Geragos, Nike had dealt with before and had successfully resolved the matter, correct?

A. I am not sure from whose perspective you mean successful, but I was aware that Mr. Geragos had represented a client adverse to Nike in connection with a dispute.

Q. And your job in that meeting is to protect the interests of Nike, correct?

A. It's generally my job when I'm acting as Nike's counsel to act in the company's interest and according to the instructions I have for my client.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000150

Case 21-1778, Document 61, 04/04/2022, 3290318, Page151 of 263

424
K1udave7 Wilson - cross

Q. And these two lawyers are presenting facts that are adverse to Nike?

It is alleging that Nike executives are engaging in misconduct that has just been described to the jury, correct?

A. Mr. Avenatti was telling me that his client had information about Nike employees participating in corruption.

Q. And you didn't deny it?

A. I neither affirmed nor denied statements that Mr. Avenatti made about the conduct of my client or its employees.

Q. Mr. Avenatti then told you what the ask was, the demand was, on behalf of his client, and there were two prongs to it, correct?

A. I didn't understand what he was asking for to be solely on behalf of his client, but he did make a two-part demand at that point.

Q. He said, "First, my client's claim is settled and he agrees to cooperate," right?

A. I recall the first component of Mr. Avenatti's demand, as he described it in the first part of that meeting before there was a break, as being a civil settlement for his client.

Q. Avenatti said that, "He and we," meaning Geragos, He and Geragos will include express language in the settlement agreement that will not prevent the client from giving any future testimony to the government.

A. I apologize. Could you repeat that question?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

425
K1udave7 Wilson - cross

Q. Sure. Avenatti told you that he and Geragos would include express language in the settlement agreement that will not prevent the client from giving any future testimony to the government.

A. I don't recall that.

Q. You don't recall that?

A. No, I do not recall that.

Q. That would be a pretty significant condition of a settlement, correct?

MR. PODOLSKY: Objection.

THE COURT: Sustained.

BY MR. H. SREBNICK:

Q. Do you recall Mr. Avenatti saying, "I'm sure you'll agree that this will be in both of our clients' interest"?

A. I don't recall him making that statement, no.

Q. Do you recall Avenatti saying, "Second, Nike agrees to conduct an internal investigation related to this conduct which will be led by Geragos and Avenatti"?

A. I do recall that during the first half of that first in-person meeting, that the second part of his demand was that he and Mr. Geragos be engaged to conduct an investigation.

Q. Avenatti then said that he and Geragos, leading that investigation, will discuss anything that Geragos and Avenatti find with Nike, who can then decide whether it should be disclosed to the Southern District of New York prosecutor?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

426
K1udave7 Wilson - cross

A. At various points in my communications with Avenatti, he kept bringing up this concept that it would be the client's decision whether or not an internal investigation will be disclosed to the government.

THE COURT: When you say, "the client's decision," you mean Nike's decision?

THE WITNESS: I mean Nike's decision, my client's, but I suppose -- or his client, because he was proposing that it become his client, but I don't recall the exact phrasing used that you just used.

BY MR. H. SREBNICK:

Q. Let me make sure we're clear.

It was Nike who would have the decision to make about what to disclose; wasn't that the way it would work -- not Mr. Franklin?

A. Mr. Avenatti never made reference to Mr. Franklin at all in connection with this internal investigation idea.

Q. What he said was, "We," meaning Geragos and Avenatti, "will discuss anything that we," Geragos and Avenatti, "find with Nike, who can then decide whether we," Geragos/Avenatti, "should disclose that information to the Southern District of New York"?

A. I don't recall the language that you just used, but the concept is that he told me that the results of whatever he and Geragos were going to do be reported to the company, Nike, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

427
K1udave7 Wilson - cross

that it would then be Nike's decision whether or not to disclose that to the government. I do recall that -- him expressing that concept.

Q. I think that's the way you described how an internal investigation works, that the lawyers gather all the information, present it to the client, and then the client decides whether to report, not to report, perhaps with consultation of counsel?

A. I don't recall exactly what I described. It is generally my understanding that lawyers perform confidential work for a client. It is the client's decision whether or not to permit those lawyers to disclose their work or confidential information to any third party, such as the government.

Q. Now, had Nike already done the internal investigation about this matter that Avenatti and Geragos were approaching you about?

A. Yes, we had.

Q. OK. You did not reveal that to Geragos and Avenatti, correct?

A. No, I did not.

Q. And how long had that investigation gone on, the internal investigation that Boies Schiller conducted for Nike?

MR. PODOLSKY: Objection, your Honor.

THE COURT: All right. I'll hear the lawyers at sidebar about this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000151

Case 21-1778, Document 61, 04/04/2022, 3290318, Page152 of 263

428
K1udave7 Wilson - cross

(At the sidebar)

THE COURT: So, first of all, was this witness involved in any sort of internal investigation?

MR. PODOLSKY: I believe so.

THE COURT: OK. So where are we headed?

MR. H. SREBNICK: Just to find out --

THE COURT: I guess I should say internal investigation of what? In other words, the whole concept of making payments to the family and players or --

MR. PODOLSKY: I don't know the contours of that investigation, but I think it relates to the subpoena matters generally. I don't know exactly what they did.

THE COURT: Go ahead.

MR. H. SREBNICK: I was going to develop that in fact the ask of Franklin, Avenatti, Geragos, whatever you want to attribute it to, was consistent with conducting an internal investigation that even Boies Schiller thought would be appropriate to do. The dispute is over who should conduct it. But the propriety of an internal investigation --

THE COURT: I guess I thought I understood the investigation had already been conducted. Did I miss something?

MR. PODOLSKY: No, that is correct, your Honor.

THE COURT: So the investigation had already been done by March of 2019?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

429
K1udave7 Wilson - cross

MR. PODOLSKY: It is hard to say when it ends, but yes.

MR. H. SREBNICK: I don't know if it ended, but, of course, Geragos and Avenatti didn't know that.

THE COURT: Right.

MR. H. SREBNICK: The suggestion has been that why should there be any internal investigation at all, and I think this establishes that an internal investigation under these circumstances would be perfectly appropriate, and the fight is over who is going to conduct it.

THE COURT: No. I guess it seems like it is a little bit different. The investigation had already been conducted, so actually what they were asking him to do was have the client do -- pay for another internal investigation when one had been done already.

MR. H. SREBNICK: Judge, our client didn't know that. That is the whole point.

THE COURT: I know that, but you have already elicited that. That is already on the record.

MR. H. SREBNICK: Oh.

THE COURT: You've already elicited that, that he didn't tell him. That was the last question, I think.

MR. H. SREBNICK: May I just have a moment?

MR. S. SREBNICK: May I add, Judge?

THE COURT: Sure.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

430
K1udave7 Wilson - cross

MR. S. SREBNICK: The issue is also that if they had already done an internal investigation and at the conclusion of the internal investigation Mr. DeBose, Mr. James, all of the actors who were involved were still employed by Nike. The point is that this was a whitewashed to the investigation, which goes directly to Mr. Wilson's bias in routing out favorably to the government.

When the government stood up before the Court a number of times in this case and in writing and said that the tapes are not controversial, there is really not a lot to cross-examine Mr. Wilson about because everything is on tape, we didn't expect the government to go so far beyond that and have Mr. Wilson opine that when Mr. Avenatti says you have to self-report, that actually means you need to stick it in the drawer. And so he has editorialized extensively on direct examination about the meaning of words on tape that are 180 degrees contrary to what he is saying they mean. That is his opinion. That's trying to stick it to Mr. Avenatti, in my view. And I think we're entitled to show that his internal investigation was a complete whitewash and that's what he is worried about now when he is testifying.

MR. PODOLSKY: Your Honor, we are talking about completely different topics here.

THE COURT: All right. I'm going to send the jury home. We will have a longer conversation about this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

431
K1udave7 Wilson - cross

(In open court)

THE COURT: Ladies and gentlemen, I am dealing with a legal issue that's going to take a little bit of time. So we're going to break a little bit early today.

I did want to remind you that tomorrow we would be sitting 9:30 to 2:30, and we're going to try that as an experiment and see how much we can get done. So, again, the way it's going to work is we will start at 9:30, and we'll go until, say, 11:15 or so, take a 15-minute break. You might want to bring a granola bar, a piece of fruit or something to sustain you, and then we'll go a couple of more hours and take another break. And, again, you might want to have an apple or a granola bar or something. And then we'll go to 2:30 and then we will break for the day. So, there will be no lunch. That's why I am suggesting you bring a snack with you. We'll break at 2:30 for the day.

So it is an experiment. And how productive we are depends, to some extent, on whether we get started on time. So, please do try to be on time.

As always, don't discuss the case. Don't do any investigation or research about the case. Don't talk to anyone about the case. Do keep an open mind because there is more evidence, and we will resume at 9:30 tomorrow morning.

Thank you all very much.

THE CLERK: All rise.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000152

Case 21-1778, Document 61, 04/04/2022, 3290318, Page153 of 263

432
K1udave7 Wilson - cross

(Jury not present)

THE COURT: You can step down, Mr. Wilson.

(Witness not present)

THE COURT: Please be seated.

MR. S. SREBNICK: Your Honor, we will invoke the rule of sequestration.

THE COURT: Yes. So as we discussed yesterday, once a witness is on cross-examination, he is not to have any communication with the counsel who put him on on direct.

All right. So let's talk about the legal issues that were raised at sidebar.

Mr. Srebnick, is there -- Scott Srebnick, is there something else you wanted to add to what you were saying at sidebar?

MR. S. SREBNICK: No, your Honor.

THE COURT: So I think the argument, to put it in a nutshell, is that the defense is arguing that this witness, Mr. Wilson, was involved in an internal investigation of these allegations at Nike and did some sort of whitewash investigation, and, therefore, the defendant should be entitled to explore the whitewash -- the alleged whitewash investigation he conducted. I think that's the argument.

What does the government say?

MR. PODOLSKY: To begin with, your Honor, I really have no idea what the defense means by "whitewash." But this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

433
K1udave7 Wilson - cross

case is not about, as we discussed many times, whether payments were or were not made, whether Boies Schiller conducted a whitewash, whatever that may mean. It is about the demands that Mr. Avenatti made, whether they were criminal.

When we were at the sidebar, Mr. Srebnick, Scott Srebnick, made the point that Mr. Wilson was asked on direct -- appropriately, in our view -- to explain his understanding of what was happening in the meetings as well as his reactions, which are clearly relevant for an extortion charge. If the defense would like to cross-examine him about his interpretation of the statements and argue to the jury that he got them wrong or was misleading the jury or whatever they want to allege, they're welcome to do that. But it has nothing to do with the underlying investigation that they're claiming was a whitewash. That simply has nothing to do with anything that's going on in this courtroom.

Now, the defense is permitted, as we've gone over many times and we haven't objected, to talk, inquire -- to ask the witness as to whether they complied with the subpoena or had some motive to curry favor or whatever else. But to simply go into the parameters of an investigation which Mr. Avenatti knew nothing about, as the defense just made clear, is completely irrelevant, and it is going to distract the jury from anything that's actually at stake in this trial.

THE COURT: All right. What does the defense says?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

434
K1udave7 Wilson - cross

MR. S. SREBNICK: What I heard Mr. Wilson say on direct a number of times, things of the sort of my pulse was pounding, my jaw dropped, I was flabbergasted, I was concerned, this was unusual, I've never seen anything like this before. That's not testimony about the facts of what Mr. Avenatti said. Those are his reactions. And I think we're entitled to probe whether his jaw dropped and whether his pulse was pounding because of Mr. Avenatti threatening to go to the press or whether his pulse was pounding because he now knew that there was somebody who was preparing to demand an internal investigation into payments to the number one pick in the NBA draft by executives at Nike who, after Mr. Wilson apparently conducted an internal investigation, Boies found nothing wrong, and apparently these two individuals who were making these payments were still employed there -- a number of people who were involved were still employed -- and apparently Boies found nothing wrong.

And so it is our position that the reason his pulse was pounding and the reason he was flabbergasted and his draw dropped is because he was concerned about being exposed, and I think he was concerned his client was about to get exposed, and that it would be viewed by the U.S. Attorney's Office here that Nike had actually conducted a meaningless internal investigation. And we are entitled -- we believe we are entitled to probe into that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

435
K1udave7 Wilson - cross

And his bias is -- he's put his bias at issue by editorializing on the witness stand and obviously being, you know, so aligned with the U.S. Attorney's Office in this case. It's come across at least so clear to this side that he has an agenda, and we think we should be entitled to explore that agenda.

MR. PODOLSKY: Your Honor, first of all, at no time has this witness opined that Boies reached any conclusion that nothing was wrong, that nothing bad had happened, that there was no misconduct. That simply has not been the subject of the testimony.

THE COURT: No. But Mr. Srebnick says he wants to get into that. That is kind of his point.

I don't think Mr. Srebnick is saying that there has been any testimony about that. Actually, he's advocating for the right to do that. And he's saying that it is relevant to this witness' statements about why he was experiencing anxiety. The way Mr. Wilson expressed it is that he was experiencing anxiety because he was worried that this press conference and the allegations that Mr. Avenatti was going to make would cause substantial financial and reputational harm to Nike.

And Mr. Srebnick is saying that, to some extent, the reason for his anxiety was much more personal in that he had been involved in conducting an internal investigation, which had not led to any ramifications to Nike executives who were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000153

Case 21-1778, Document 61, 04/04/2022, 3290318, Page154 of 263

436
K1udave7 Wilson - cross

allegedly involved in misconduct, and now it was being brought to his attention that the alleged misconduct by those Nike executives, that according to Mr. Srebnick had not been addressed at all, that that might actually come to light.

So he's saying that's what was really driving Mr. Wilson's anxiety and not anxiety about the effect on Nike of what would be revealed at the press conference but actually a much more personal anxiety which is related to having been involved in conducting an internal investigation that led to no ramifications to anyone at Nike but now would be exposed.

MR. PODOLSKY: Your Honor, I fully understand your point. What I understood Mr. Srebnick to be saying is that the foundation for getting into the specifics of the investigation was because Mr. Wilson has said enough, they concluded that nothing had ever been done wrong. He has not testified to that.

If Mr. Srebnick, Mr. Howard Srebnick, wants to inquire as to his bias because he was afraid about that the government would discover that the productions were incomplete or in fact Nike representatives had lied to the government or not -- in the in-person meetings to the government, which, by the way, this witness did not attend, then he is welcome to do that. But their assertion that they believe that they reached any conclusions or lied to the government should not sort of be able to pull up by the bootstraps opening the door to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

437
K1udave7 Wilson - cross

completely irrelevant questions about what was the length of the investigation, what was the cost of the investigation, how many witness, etc.

THE COURT: Yeah, I don't want to get into -- you know, the trial is not about whether Boies Schiller did a thorough investigation at Nike, and we're not going to spend time on that. But if the idea is you want to explore with the witness whether essentially Boies Schiller gave Nike a clean bill of health when there was substantial evidence that Nike executives had made improper payments, that I will allow you some leeway on. But I don't know exactly what your intentions are. So, I need to understand better.

MR. H. SREBNICK: Exactly as you describe it, Judge.

MR. PODOLSKY: Again, we objected to questions about the length of the investigation and so on, so that's what we are objecting to.

THE COURT: OK.

MR. H. SREBNICK: Judge, I would ask then, just to make a record, if the government could inquire of the witness and report to the Court how much money was billed for that internal investigation?

THE COURT: No, we're not going to get into that, because that's a variant to what I've already said we are not going to spend time. We're not going to spend time on how much was spent, how many people were interviewed, how many Boies

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

438
K1udave7 Wilson - cross

lawyers worked on it. No, no, no, we're not going to be spending time on that.

But if your point is you want to try to explore with him whether, as I said, Boies Schiller gave Nike a clean bill of health and you want to explore with him whether he was now concerned because these allegations of misconduct might come forth, I think there is a germ of possible bias there that you should be allowed to explore.

MR. PODOLSKY: I completely agree with the Court. I just want to sort of be alert to one issue, which is I think there was a distinction here that could create problems between say what the Boies Schiller lawyers reported to the government and legal advice that Boies Schiller gave to their client, Nike, that I think raise privilege issues. So I just want to be alert to that. I am not saying right now what the line is, but the way it is being characterized, I just want to be careful about it.

THE COURT: I have, of course, issued an order that provides that by virtue of the testimony we're going to hear at the trial from Nike lawyers, Nike will not be found to have waived the privilege. So, that might have a bearing, I don't know.

MR. S. SREBNICK: So just to understand the Court's ruling -- because, obviously, we are going to go back tonight and make sure that we are abiding by the Court's ruling and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

439
K1udave7 Wilson - cross

going as far as we are allowed to go -- I think it would be our intent to question Mr. Wilson about whether they interviewed Gary Franklin, whether they interviewed Auerbach, whether they interviewed a number of people relating to these claims, because he's taking the position that there was no claim here. And I think -- and he's also saying that they did an internal investigation, and so we want to inquire as to at least with respect to the Franklin/Auerbach issues, what the extent of their investigation was. And --

THE COURT: I will certainly allow you to ask him whether -- and, again, I don't -- I mean, the lawyers know what his role was in the investigation. I have no idea. I have absolutely no idea. But at sidebar it was suggested to me that he had some role in the investigation. I don't really know what his role was. I don't know whether he interviewed everybody. I don't know whether he was involved in any interviews. No idea.

But I can tell you, I would be predisposed to allow you to ask him whether Franklin was interviewed as a result -- you know, in connection with the internal investigation of Nike, whether Auerbach was interviewed. I don't see any problem with that. Once you get beyond those two witnesses that are central here, then I'm going to have more concern.

MR. S. SREBNICK: OK.

THE COURT: Other issues?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000154

MR. PODOLSKY: Not for the government, your Honor.

MR. H. SREBNICK: Nothing else.

THE COURT: All right. I do have another matter, but, obviously, as we've agreed, the defense is welcome to stay here. It's just a PI that I need to address.

MR. H. SREBNICK: I couldn't hear you.

THE COURT: I have a preliminary injunction that I have to address but you are welcome to stay.

MR. H. SREBNICK: We will clear out this area.

THE COURT: OK.

MR. PODOLSKY: Your Honor, we don't have to deal with this now, we could deal with it tomorrow, but we did file a letter last night about some of the opening the door to some -- I think to text messages by Jeffrey Auerbach. I just want to mention that so that is on the radar.

THE COURT: Yes. I am aware of the letter. I haven't read it but I am aware of it.

MR. PODOLSKY: Thank you, your Honor.

(Adjourned to 9:30 a.m., January 31, 2020)

INDEX OF EXAMINATION

| Examination of: | Page |
|---|---|
| SCOTT RONALD WILSON | |
| Direct By Mr. Podolsky | 242 |
| Cross By Mr. H. Srebnick | 368 |

GOVERNMENT EXHIBITS

| Exhibit No. | Received |
|---|---|
| S10 | 276 |
| 3 | 276 |
| 3T | 278 |
| 4 | 282 |
| 4T | 283 |
| 1 | 285 |
| 1T | 286 |
| 2 | 304 |
| 2T | 304 |
| 205 | 341 |
| S13 | 345 |
| 106 | 346 |
| 601 | 349 |

Case 21-1778, Document 61, 04/04/2022, 3290318, Page156 of 263

K1VMAVE1 442

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 19 CR 373 (PGG)

MICHAEL AVENATTI,

Defendant. Trial
------------------------------x
New York, N.Y.
January 31, 2020
9:30 a.m.

Before:

HON. PAUL G. GARDEPHE,

District Judge
-and a Jury-

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: MATTHEW D. PODOLSKY
DANIEL RICHENTHAL
ROBERT B. SOBELMAN
Assistant United States Attorneys

BLACK SREBNICK KORNSPAN & STUMPF, P.A.
Attorneys for Defendant
BY: HOWARD M. SREBNICK
-and-
SCOTT A. SREBNICK
JOSE M. QUINON
MICHAEL D. DUNLAVY
-and-
PERRY GUHA, LLP
BY: E. DANYA PERRY
GEORGE BARCHINI

Also Present:
DeLeassa Penland, Special Agent (USAO)
Andrew Hamilton, Paralegal
Juliana Manrique, Paralegal
Michael Lyon, Trial Technician

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 443

(Trial resumed; jury not present)

THE COURT: I understand the parties have an issue they want to raise.

MR. PODOLSKY: Two items, your Honor. The first I don't think really is an issue. I just want to explain an evidentiary item.

What I understand the defense is going to do during cross-examination with respect to the recordings is they have synched up audio to the same transcripts so that they play simultaneously. We have no objection to that being used as an aid to the jury of course.

With respect to the media-recorded meeting, the March 21 meeting, there are actual multiple recordings. We played a video recording yesterday. There was a separate audio recording. And I understand the defense, rather than playing the video, has synched up the audio recording to the transcript. We have no objection to them using that. It may make sense to offer that into evidence before the jury comes in simply because it will be played to the jury.

THE COURT: We can't offer anything without the jury here, but once the jury is here, if somebody wants to offer it, if there is no objection, I will receive it.

MR. PODOLSKY: Very well, your Honor.

The other item which we can either deal with now or I understand from Mr. Srebnick it can wait for a break, last

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 444

night we received a series of exhibits that I understand the defense will seek to put into evidence later today. We think these are not admissible pursuant to the discussions we had yesterday. So we could deal with them now or I understand it would be OK to deal with them at the first break, Mr. Srebnick has assured me.

MR. H. SREBNICK: Yes, Judge. I won't go into it until you've had an opportunity to rule. We can give you the exhibits. They are government documents provided in discovery. They are the Nike production documents. They are the evidence of Nike executives having arranged to create fake invoices and all discussions about paying players and their families and the others.

MR. PODOLSKY: Your Honor, I can hand them up.

Just to put some context, these are documents that were produced by Nike to the government pursuant to the subpoena before Mr. Avenatti ever got involved. Some were produced, I think, back in January 2018. These are all quite old documents that Mr. Avenatti has never seen until we produced them in discovery. But I can hand them up, your Honor.

THE COURT: Obviously, I'll need time to take a look at them. I gather from what the government has said, Mr. Srebnick, that you are not going to be starting with these this morning.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 445

MR. H. SREBNICK: Correct. I am going to leave that for later so your Honor has time to look at them.

THE COURT: Is there anything else the lawyers want to say?

MR. H. SREBNICK: Not me.

MR. PODOLSKY: No, your Honor.

THE COURT: I wanted to put on the record a number of principles that I believe apply here. I think many of them I've previously articulated in rulings, but I wanted to remind everybody of them.

First, it's not a defense to any charge here that Nike was engaged in corruption in connection with amateur youth basketball. Truth is not a defense to any of the charges here. In other words, even if Mr. Avenatti was threatening to disclose misconduct that Nike employees had actually committed, that would not provide him with a defense to the charges against him.

Whether or not Nike had or would conduct a meaningful internal investigation of whether its employees had engaged in misconduct in connection with amateur youth basketball is not a fact that makes it more or less likely that Mr. Avenatti committed extortion or honest services wire fraud, particularly where Mr. Avenatti had no knowledge of the underlying facts at the time. In general, information about which Mr. Avenatti was unaware at the time is not relevant to his state of mind.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000156

Any questions to Mr. Wilson about any investigation he and/or Boies Schiller conducted should be focused on misconduct with allegations that involve Mr. Franklin. Again, to the extent that Mr. Avenatti had no knowledge of these matters at the time, this area is of tenuous relevance. To the extent that Mr. Wilson knew or believed that he or Boies Schiller had not properly investigated allegations involving Mr. Franklin, it could conceivably have some bearing on his credibility.

In other words, when Mr. Avenatti approached him with allegations of Nike misconduct that involved Mr. Franklin, it's conceivable that Mr. Wilson's actions and motivations could have been affected by a belief or concern that his investigation or that of his law firm as to Mr. Franklin had not been adequate or that Mr. Wilson or the Boies firm had not been forthcoming with the U.S. Attorney's Office about Nike's dealings with Mr. Franklin.

That is why I'm allowing examination in this area. But the questions have to be focused on Franklin and on Nike misconduct that involved him.

Those are the principles I have in mind as we proceed with the case. These comments are not in any way related to the exhibits that you told me you had issues with because I didn't even know what the exhibits were, but these are thoughts that I wanted to spread on the record today. As I said, many of them I have previously articulated in other decisions.

I understand we have all the jurors. Is everyone prepared to proceed?

MR. H. SREBNICK: Yes, your Honor.

THE COURT: I would ask Mr. Wilson to retake the stand.

(Jury present)

THE COURT: Ladies and gentlemen, good morning. We will continue with the cross-examination of Mr. Wilson.

Mr. Wilson, you remain under oath.

THE WITNESS: Yes, your Honor.

THE COURT: Mr. Srebnick, please proceed.

MR. H. SREBNICK: Thank you, your Honor. Good morning, everybody.

SCOTT RONALD WILSON, resumed.

CROSS-EXAMINATION CONTINUED

BY MR. H. SREBNICK:

Q. Mr. Wilson, I just wanted to create our time line so we can reorient ourselves where we were yesterday.

With the help of the trial tech person, Mr. Lyon, we have on the screen communications between Nike lawyers and Geragos and/or Avenatti. We spoke yesterday about the March 13 e-mails.

Do you recall that?

A. I do.

Q. Do you recall it was Mr. Geragos and the Nike lawyers who

exchanged e-mails, correct?

A. Correct.

Q. There was a phone call on March 13 with you and Mr. Geragos?

A. Yes. I spoke to Mr. Geragos by phone on the 13th.

Q. On March 14, the next day, there were two e-mails between Geragos and a Nike lawyer, yourself?

A. There were two more e-mails in that same e-mail chain on Thursday, the 14th, yes.

Q. Then on March 15 there was a phone call?

A. I spoke with Mr. Geragos by phone on Friday, the 15th.

Q. On March 19, I think that's where what we were talking about yesterday, that was a face-to-face meeting?

A. Yes.

Q. And that meeting was attended by Mr. Avenatti, Mr. Geragos, and yourself?

A. Along with a couple of others, yes.

Q. I think this is out of sequence, because there be a call later in the day on March 19 between you and Mr. Geragos, right?

A. I had a short phone call with Mr. Geragos later that day, after the in-person meeting.

Q. That's where we are in terms of the timeline of our examination of yesterday, correct?

A. I believe so.

Q. Now, yesterday I had asked you about some of the statements that Mr. Avenatti made to you during the course of the March 19 conference, and some of them you said you did not recall him making certain statements. For example, do you recall Mr. Avenatti, as part of his ask on behalf of his client, Mr. Franklin, who at the time you didn't have his name, Avenatti said: We will include express language in the settlement agreement that will not prevent my client from giving any future testimony to the government?

A. I don't recall Mr. Avenatti saying that.

Q. Do you recall Mr. Avenatti saying: His client would agree to cooperate?

A. No, I do not.

Q. And do you recall Mr. Avenatti saying: I'm sure you will agree that this will be in both of our clients' interests?

A. No, I do not.

Q. Now, you, of course, were not the only lawyer present when Mr. Avenatti made his statements to you. A Mr. Homes was present, another lawyer from Boies Schiller?

A. There were five lawyers in the room, including Mr. Homes, yes.

Q. And another lawyer, the Nike lawyer, Rob Leinwand, correct?

A. Rob Leinwand, yes.

Q. Now, I'd like to ask you a few questions about Mr. Homes. Mr. Homes was tasked with the responsibility of taking notes

Case 21-1778, Document 61, 04/04/2022, 3290318, Page158 of 263

K1VMAVE1 Wilson - Cross 450

during the course of that meeting?

A. Mr. Homes took notes for most of the meeting except a period of time after which Mr. Avenatti directed him to stop taking notes.

Q. But Mr. Homes was taking notes at your direction. He worked for you?

A. Mr. Homes worked at my law firm under my supervision, yes.

Q. And had you worked with Mr. Homes before?

A. Yes.

Q. And he also was the person who had taken notes of the phone calls that you had with at -- at least one phone call that you had with Mr. Geragos?

A. Mr. Homes sat in and took notes of, I believe, one phone call I had with Geragos prior to this March 19 meeting.

Q. Had Mr. Homes ever taken notes for you in other occasions, whether related to this case or not, where you relied on him to take notes?

A. I can't recall sitting here right now.

Q. Now, I think you told me that you did not review Mr. Homes' notes of the March 19 meeting, is that correct?

A. Yes. I did not review Mr. Homes' notes of the in-person meeting of the 19th.

Q. You did review his notes of the phone calls, of the phone call?

A. I reviewed his notes of the call that I had had with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 451

Mr. Geragos. I don't recall whether he took the notes of the call on the 13th or the 15th, but I did -- excuse me. I reviewed, I believe, a type-up of his notes. I don't recall I reviewed his handwritten notes.

Q. Let me phrase it that way. Did it appear that Mr. Homes was taking pretty accurate notes of at least the call?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Now, you said you don't recall Mr. Avenatti saying that his client would agree to cooperate, that there would be express language in the settlement agreement not preventing --

THE COURT: When you say cooperate, cooperate with who? Cooperate with Nike?

MR. H. SREBNICK: Cooperate with the investigation.

THE COURT: I'm just trying to understand what you are asking the witness about the cooperation piece of it. Is there anything, any more you can add to that or is it just simply something about cooperating?

MR. H. SREBNICK: Cooperating with Nike with the investigation.

THE COURT: OK.

Q. To see if I can refresh your recollection, I am going to show you an exhibit, Defense Exhibit AA3.

MR. H. SREBNICK: If I may approach the witness without objection from the government.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 452

THE COURT: Yes.

Do you have a copy for me, Mr. Srebnick?

MR. H. SREBNICK: I think I can get one. It would be on your screen, Judge, but not on the jury screen, but it's only to refresh recollection.

THE COURT: I don't have anything on my screen right now.

MR. H. SREBNICK: I just want to make sure it's not on the jury screen.

Q. I would direct your attention to the second page towards the bottom of the page, which I highlighted for you in yellow to direct your attention. If you can take a moment and tell us perhaps if that refreshes your recollection.

A. Which part would you like me to read?

Q. You can see it has a number 1 with a paren.

A. OK. It doesn't refresh my recollection beyond that to which I have already testified.

Q. If you will take a look at No. 2, does that refresh your recollection that Mr. Avenatti told you and the other Nike lawyers: We will discuss anything that we find with Nike who can then decide whether we should disclose that information to the Southern District of New York?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Can you just ask him to read the paragraph and then ask him whether it refreshes his recollection? Can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 453

you do it that way, please.

MR. H. SREBNICK: Sure.

THE COURT: Reading the second paragraph, does that refresh your recollection?

THE WITNESS: It does not refresh my recollection beyond that to which I have already testified.

Q. Also yesterday we had talked a moment about Mr. Auerbach having contacted Mr. Slusher and alerting Mr. Slusher to Gary Franklin's claims. You said you had learned about that.

Do you recall when it was that you learned about the conversation Auerbach and Slusher had?

A. I do not recall learning that the conversation between Mr. Auerbach and Mr. Slusher related to claims by Mr. Franklin. But as to when I learned of that call, I believe it was within maybe days or a week of it taking place, whatever that date was.

Q. Do you recall that the conversation between Auerbach and Slusher at Nike occurred approximately February 6, 2019?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. I have -- my recollection is that it happened within a month or two before my meeting with Mr. Avenatti.

Q. To clarify, the Avenatti meeting occurs March 19 and your best recollection is that you learned about the Slusher/Auerbach conversation a month earlier?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000158

Case 21-1778, Document 61, 04/04/2022, 3290318, Page159 of 263

K1VMAVE1 Wilson - Cross 454

A. About a month earlier is my recollection, yes.

Q. Now, I'd like to then return back to our conversation about the March 19 meeting and the matters that were discussed.

There came a point in time where Mr. Avenatti indicated that if the case or if the matter didn't settle that he would hold a press conference, right?

A. He indicated that he would hold a press conference the next day if his two demands -- first, the civil settlement for Mr. Franklin and, second, the hiring of him and Mark Geragos or, as he later described it, the payment of them two times the fees paid to a different law firm if those two demands were not met.

Q. Mr. Geragos was present throughout the meeting of March 19, correct?

A. Yes.

Q. And we spoke yesterday. Mr. Geragos, you identified him as a lawyer that you recognized, nationally known lawyer, high profile, criminal defense, a civil case with Nike. That's what we are talking about, right?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. I'll break it down. Do you recall that Mr. Geragos, he is the lawyer who you knew to have a national profile?

A. Yes.

Q. He is the lawyer who had resolved a civil matter on behalf

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 455

of an NFL football player with Nike?

A. I knew that he had represented an NFL player adverse to Nike and, to my knowledge at the time of the meeting, Nike and that athlete still had a commercial relationship. I wasn't familiar with the details of what might have been resolved or not resolved.

Q. Do you recall that Mr. Geragos had actually described that matter involving the NFL football player and Nike as having been perceived as a win-win, a win for the football player and a win for Nike?

A. I recall him suggesting that it had been a positive successful resolution.

Q. Finally, you knew Mr. Geragos as someone who practiced criminal law in addition to civil?

A. Apart from the athlete representation we are talking about, I actually wasn't familiar with him as a civil practitioner. I was familiar from the media that he had represented celebrities in Los Angeles in shoplifting or other high-profile criminal cases.

Q. The reason I'm asking is, Mr. Geragos throughout the meeting, he appeared to be an active participant working together with Mr. Avenatti, correct?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. Mr. Avenatti did the vast majority of the talking between

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 456

the two of them. Mr. Geragos was sitting next to him throughout the meeting and didn't voice objection or disagreement with Mr. Avenatti that I recall.

Q. Mr. Geragos appeared to be calm during the meeting?

A. Yes, he did.

Q. He appeared to be serious during the meeting?

A. At points he seemed serious and at points he seemed jovial or making jokes or being funny.

Q. And when Mr. Avenatti indicated that if the matter wasn't resolved with the urgency that Avenatti was suggesting it should be resolved that there would be a press conference and all of that, Mr. Geragos appeared to be in synch with that proposal by Avenatti?

THE COURT: Sustained.

Q. You know what the phrase spit take means?

THE COURT: I'm sorry?

MR. H. SREBNICK: Spit take.

THE COURT: Spit take.

Q. Is that a phrase that you ever used? Do you know spit take?

A. I've heard the phrase. I don't think I have ever used it.

Q. In any event, Geragos did not voice any objection or any concerns about the proposal that Mr. Avenatti was articulating to the Nike lawyers, correct?

A. During our meeting on the 19th -- pardon me. During the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 457

meeting on the 19th, Mr. Geragos did not contradict or voice any objection or concern about what Mr. Avenatti was saying.

Q. Now, I'd like to then ask you, during the course of that discussion you asked Mr. Avenatti to identify who the client was?

A. There were several points in the meeting before I was allowed to review the package of documents. Then we had a break. In that earlier half of the meeting there were several points where I asked Mr. Avenatti who the client was.

Q. Can I ask you to put the microphone closer to you.

MR. H. SREBNICK: I'm sorry, Judge. I can't hear.

THE COURT: That's quite all right.

A. I'll try to speak louder. I apologize. Is that better?

Q. It is better. Thank you.

A. Thank you.

Q. And I think yesterday you told us that Mr. Avenatti said that the press conference and the identity of his client would not make a difference as part of the press conference that Mr. Avenatti was suggesting what happened if the case did not resolve. That was your testimony?

A. When I was asking -- one of the points when I was asking for the identity of the program director that he represented, he indicated that he didn't believe that was what was going to drive the press conference, the name of the individual.

Q. Do you recall that it was Mr. Geragos who then said,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000159

wouldn't the identity of the individuals at Nike drive this story?
A. My recollection was that it was Mr. Avenatti who was talking about that, but it could be that it was Mr. Geragos who said it.
Q. It could have been Mr. Geragos as well?
A. Yes.
Q. Mr. Avenatti told you that he could show you text messages from Nike executives directing payments to family members of players, correct?
A. Prior to actually showing me the documents earlier in the meeting, he said that he had a few different types of documents. I recall him mentioning the e-mails, text messages, and invoices.
Q. The last thing is invoices?
A. Invoices.
Q. At some point you started to wonder maybe Mr. Avenatti was wearing a wire?
A. I asked him if he was wearing a wire.
Q. A wire meaning like he was recording you?
A. Yes.
Q. And Avenatti opened up his jacket and revealed that at least you couldn't see a wire, and to this day you have no reason to suspect that he was wearing a wire, correct?
A. That's right.

Q. Now, in response to Mr. Avenatti telling you that he had text messages, e-mails, invoices to support his factual assertions, you said that your client, Nike, had three primary interests, correct?
A. I recall asking to see the documents, either myself or Mr. Leinwand asking to see the documents. I also described the company having three interests prior to having an opportunity to review those documents.
Q. One interest was avoid being dragged through the press, correct, one was complying with the government?
A. Yes.
Q. And the third one was an interest in conducting an internal investigation surrounding these allegations.
A. More or less, yes.
Q. So you did not dispute the propriety, the appropriateness of having an internal investigation when Mr. Avenatti suggested an internal investigation would be part of his ask, correct?
A. There is nothing wrong with a company having an internal investigation, and I did not say to him that it would be wrong for Nike to conduct an internal investigation.
Q. You said you actually had an interest in conducting an internal investigation surrounding these allegations?
A. I said the company had an interest in conducting an internal investigation, not in paying him with respect to such a thing.

Q. The dispute was over who was going to do it and who was going to get paid to do it, right?
A. I don't believe there was a dispute at this point. There was just his demand.
Q. In your mind that was, as you told the jury, you thought it shouldn't be Avenatti and Geragos, right?
A. For a variety of reasons, including that Mr. Avenatti presented himself as representing the client adverse to the company. I didn't think it would be appropriate for Mr. Avenatti to turn around and suggest that he could represent Nike as well.
Q. So your opinion was, Avenatti and Geragos are not the right people to do the investigation. Fair statement?
A. I did not think it would be appropriate in the eyes of the company or the Department of Justice for Mr. Avenatti, representing a client adverse to the company, representing a client who he had just told me was engaged in criminal conduct with employees of the company, to turn around and purportedly represent the company in conducting an internal investigation while there was a parallel FBI/DOJ investigation going on.
Q. In answer to my question, it was your opinion that Avenatti and Geragos were not the right people to conduct the internal investigation, correct?
A. My view was that it was a complete nonstarter, this suggestion.

Q. Now, in fact, by that point in time, in March of 2019, you and your law firm had at least already started, if not finished, an internal investigation surrounding the very same allegations that Mr. Avenatti and Geragos were bringing to your attention, correct?
A. Following the company's receipt of the grand jury subpoena that we talked about yesterday in September of 2017, Boies Schiller was engaged to assist the company in responding to the government's subpoena and to conduct an internal investigation with respect to the allegations.
Q. And when did that internal investigation conclude?
A. I'm not aware that it is concluded.
Q. It is ongoing to this day as we speak?
A. To the best of my knowledge, yes.
Q. Roughly two and a half years since that subpoena in 2017, you are saying that the internal investigation conducted by Boies Schiller is still ongoing?
A. My understanding is that the government's investigation is ongoing and with it the internal investigation is ongoing.
Q. Just as a footnote, you have left Boies Schiller. Does that mean you're no longer working on the internal investigation or are you still a part of that process?
A. I am not currently working on the internal investigation in light of my role as a witness in these proceedings.
Q. As of March 19, 2019, when you were in the room at

Mr. Geragos' office, were you then and there still part of the team conducting the internal investigation of Nike for the allegations regarding the paying of amateur athlete basketball players' families and such?

A. I was part of the team of Boies Schiller lawyers at that time engaged by the company to conduct an internal investigation, yes.

Q. Boies Schiller at that point in time represented Nike in many other matters?

A. I would not characterize it as many, but I don't believe it was the only matter in which we represented Nike.

Q. And how important a client was Nike at that point in time to Boies Schiller, if you know?

A. I don't have -- I didn't discuss that with anyone at the firm.

Q. I can't hear you.

A. I didn't discuss that question with anyone else at the firm at the time.

Q. Did Nike represent millions of dollars of revenue a year to the Boies Schiller firm?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. As of what time?

Q. 2017, 2018, 2019. Until you left.

A. I don't know the answer to that as of the end of 2019. I

left before the end of 2019. I think there was billing in 2018 that was more than a million dollars, but I don't remember how many millions of dollars it was.

Q. Mr. Geragos commented that in his opinion the documents implicating Nike were concerning, correct?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Grounds.

MR. PODOLSKY: When are we talking about at this point?

MR. H. SREBNICK: We are still in that March 19 meeting. I'm sorry.

Q. During the meeting Mr. Geragos described the documents implicating Nike that he and Avenatti -- we will in a few moments present to you -- as concerning to him, yes?

A. On one of the two calls I had with Mr. Geragos the prior week, he had said that he had been shown some stuff that suggested to him that Nike might have an Adidas problem. I don't recall him making a similar statement in the in-person meeting on the 19th.

Q. Do you have AA3 to attempt to refresh your recollection?

A. I do.

Q. If we can go to the bottom of page 3, the last entry that you see there.

A. I've read it.

Q. Does that refresh your recollection that Geragos said, I've

seen the documents implicating Nike and it is concerning?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Yes. Again, I'm not going to repeat it. I want you to pay attention. You can ask him to review portions of documents. You are not to read the documents to him. They are not in evidence. OK?

MR. H. SREBNICK: Understood.

A. Would you mind asking the question again, please.

Q. I asked you a question earlier, does that document refresh your recollection?

A. It doesn't refresh my recollection beyond the testimony I have already given.

Q. Do you recall that you then told Avenatti and Geragos that Rob Leinwand, the other lawyer, one of the other two lawyers with you in the room, is the No. 2 guy in the legal department? Do you recall telling him that?

A. I described Mr. Leinwand's position at the company during that meeting, yes.

Q. Did you describe him as the No. 2 guy in Nike's legal department?

A. I don't recall if I used that exact phrase, but I think I called him the head of litigation or the lead for litigation. I don't remember if I said No. 2.

Q. Is he is in fact the No. 2 lawyer at Nike?

A. I would consider the No. 1 lawyer at Nike to be the general

counsel, and she has a number of direct reports and Mr. Leinwand is one of those direct reports. Certainly in the area of litigation I would describe him as the No. 2. But there are other types of legal work the lawyers in the department do.

Q. Do you know roughly how many lawyers Nike has in house that work with Leinwand and the general counsel?

A. Overall, irrespective of subject matter?

Q. Overall at Nike, yes.

A. I believe they have a few dozen lawyers.

Q. A few dozen.

As to whether you describe Mr. Leinwand as the No. 2 guy, could I ask you to review AA3, top of page 4, and see if that refreshes your recollection?

A. I've read it.

Q. Does that refresh your recollection?

A. It refreshes my recollection that I emphasized to Mr. Avenatti and Mr. Geragos that I have brought a senior member of the legal department to the meeting in order to demonstrate the seriousness with which the company was taking their request for a meeting.

Q. And you told Mr. Geragos and Mr. Avenatti that Leinwand, the lawyer, was there. He is, however you described him, head of litigation, or whatever. And you told Avenatti and Geragos that, you see, we are taking these allegations seriously,

correct?

A. I don't recall saying those exact words, no.

Q. Do you recall saying to Geragos and Avenatti, you have Rob Leinwand here, so we are taking these allegations seriously?

A. No. I still don't recall that phrase, but, as I mentioned a minute ago, I do have a clear recollection that I indicated I've got Mr. Leinwand here. We are taking this seriously. I don't know if I said these allegations, but we are taking this seriously, as evidenced by the fact I had flown a senior executive of the company across the country to sit with you.

Q. Do you recall then telling Avenatti and Geragos that Adidas has somehow been able to avoid indictment, even after one of their midlevel executives has been convicted?

A. I did make a point in that meeting that even in the scenario where an employee at a competitor was convicted for corruption in amateur basketball, that did not, at least as of that time, result in any adverse government action against the company.

Q. So at that point in the meeting you've told Avenatti and Geragos you are taking it seriously, Leinwand is there, and at no point did you dispute the allegations that Avenatti and Geragos were presenting to you, correct?

MR. PODOLSKY: Objection.

THE COURT: Can I just ask a question. By this time in the conversation had he laid out the allegations to you?

THE WITNESS: At a high level he had indicated that they named a few Nike employees. He named three players and he said that they were involved in -- Mr. Franklin -- excuse me. He had not named Mr. Franklin yet, but his whistleblower client had been involved in making corrupt payments to these players, and I also recall that he made reference to a 10,000 dollar payment. That's about the extent of my recollection of the allegations in the first half of this meeting before I reviewed the documents.

THE COURT: You can reask the question.

Q. I'll just ask the next question. Shortly after that Avenatti identified Gary Franklin as the client, correct?

A. He identified Mr. Franklin very shortly before we stopped talking and I was allowed to review the documents.

Q. Let's talk about that. Avenatti then identifies Gary Franklin as his client. That's a name that was familiar to you, correct?

A. It was familiar to me at the time he named him, yes.

Q. And you and Mr. Leinwand asked to see the documents that Geragos and Avenatti have to show you?

A. We asked to see the documents that Mr. Avenatti said that he had.

Q. And he showed them to you, correct?

A. Mr. Geragos stood up, I swung around to sit where he had been sitting, and Mr. Avenatti either handed me or left on the

table in front of me a small package of documents.

Q. I'd like to go through some of those documents with you, see if I can ask you a few questions preliminarily.

The way it worked is, you were allowed to see the documents and then -- we will get to it in a moment -- you couldn't keep copies of the documents and you weren't actively taking notes of the documents. You later reported what you saw to your colleague, Mr. Homes, who then made handwritten notes about what you said you saw in the documents. Fair statement?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Grounds.

MR. PODOLSKY: Compound and confusing.

THE COURT: Sustained.

Q. Suffice it to say then, you saw the documents, yes?

A. I spent some time flipping through the package reviewing most, if not all -- I believe not all pages of the package.

MR. H. SREBNICK: If I could just have a moment, Judge.

THE COURT: Yes.

MR. H. SREBNICK: Judge, at this time we are going to offer excerpts from Defense Exhibit D. Maybe I should confer with Mr. Podolsky.

THE COURT: Why don't you do that.

MR. H. SREBNICK: Thank you.

Judge, we have an agreed procedure. Judge, what I

propose to do is show the witness, not the jury for the moment, some documents to see if it accords with the documents he recalls seeing at that meeting on March 19. This should not be displayed to the jury, but the witness and your Honor should be able to see it. And this is from Defense Exhibit D.

Q. Just to make the record, do you see that it has a Bates number on the bottom ending with 0016?

A. I do, yes.

Q. If I could ask you to take a look at that and see if that appears to be one of the documents you were shown.

A. So, putting aside the obvious point that I didn't see a document with Bates numbers on the bottom right, but you are asking --

MR. H. SREBNICK: Let me clarify for the jury. Forgive me, everybody.

Q. There is something that we call Bates stamps, right? We lawyers stamp documents on the bottom of the page.

MR. PODOLSKY: Objection, your Honor. Can he just ask him if he recognizes this document?

THE COURT: Yes. Absent the identifying numbers, do you remember seeing the document?

THE WITNESS: Some of the text on this text message exchange looks familiar to me from my time flipping through documents in Mr. Geragos' office.

MR. H. SREBNICK: I would request permission to

publish, Judge.

THE COURT: Is there an objection?

MR. PODOLSKY: If he is offering it into evidence, we don't object to it being offered into evidence, this one page.

THE COURT: Defense Exhibit D is received.

(Defendant's Exhibit D1 received in evidence)

MR. H. SREBNICK: For clarity, Judge, D as a compositive would just be that one page, which I have identified as ending in Bates number 0016. Because D will be offered later with another witness.

THE COURT: This is D. It's 0016. If you want to introduce another document with someone else, it will be called something else, maybe D1. But this is going to be D. This will be Exhibit D. OK?

MR. H. SREBNICK: Yes. Fine.

THE COURT: When you reviewed this document, did it have the red circles around it?

THE WITNESS: I don't recall.

THE COURT: Go ahead.

MR. H. SREBNICK: Request permission to publish.

THE COURT: Yes.

Q. Do you recall seeing this document which appeared to be text messages between Carlton DeBose and Gary Franklin?

A. I recall seeing this exchange which was labeled at the time as being texts between Mr. DeBose and Mr. Franklin.

THE COURT: So this was one of the documents that you saw at the March 19 meeting.

THE WITNESS: This page I can confirm I recall seeing this page, yes. Possibly with annotations now that are different than what I saw. But what I'm recognizing is the underlying text of the text messages.

MR. H. SREBNICK: So if we could then turn off the screen of the jurors and publish or show the witness the next document.

Judge, it's been suggested, would it be more efficient to call the first one we showed D1 and then just go D2, D3? Would that be better?

THE COURT: Sure. That's fine. It will be registered as D1.

MR. H. SREBNICK: Thank you, Judge.

Q. I am showing you what we are going to mark as D2, which bears the last four Bates numbers on the bottom right, 0017.

Do you see that?

A. I see that Bates number, yes.

Q. Does D2 appear to be a document you were shown by Avenatti on March 19?

A. I don't recall whether this is a page that I saw.

Q. You just don't recall.

A. That's right.

MR. H. SREBNICK: Let's go to D3.

Q. I'm showing you now what we are identifying as D3. You see with your reading glasses on the bottom right it bears the Bates number 0020.

Do you see that?

A. I see 20 at the bottom right.

Q. Does this appear to be a document that Mr. Avenatti showed you on March 19?

A. I saw this text message exchange in the package that I reviewed on March 19.

MR. H. SREBNICK: Request permission to publish, your Honor.

THE COURT: You're offering it, right?

MR. H. SREBNICK: Offering it, yes.

THE COURT: Any objection?

MR. PODOLSKY: No objection.

THE COURT: Defense Exhibit D3 is received.

(Defendant's Exhibit D3 received in evidence)

THE COURT: And you may publish.

Q. You see this is a text message between DeBose from Nike and Mr. Franklin?

A. I see that it's labeled as such in the upper right.

Q. And in the box that's red do you see an exchange that DeBose asks: Who can get on a flight to Phoenix for Wednesday from your program that you trust?

The response from Franklin is: It depends but for how

long I may be free.

DeBose: In and out same day.

Franklin: I'm open and free to go.

DeBose: OK. I'm going to have Gabby make you a flight for Wednesday.

Franklin: OK. Let me -- and I'm assuming you will fill me in on my mission.

You see that?

A. I see the text you've read, yes.

Q. At the time of the meeting on March 19, do you recall Avenatti describing that as Franklin being directed by DeBose of Nike to fly to Phoenix to take cash to the mother of then amateur basketball player Ayton, who later became the first draft pick of the NBA?

A. Earlier in the meeting, before I was allowed to look at any documents, Mr. Avenatti made reference to a purported 10,000 dollar payment to either Mr. Ayton or some member of his family that Mr. Franklin had been involved in. To clarify, excuse me, he didn't name Mr. Franklin at that point. It was still at the point in the meeting that he was referring to him as his client, his whistleblower client.

Q. By the time you saw the document it was clear Franklin, being directed by DeBose, to carry money to a family member in Phoenix?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

MR. H. SREBNICK: D4. If we could just show it to the witness.

Q. Do you see D4 has a Bates number 0021 at the bottom right?

A. Yes, I see that.

Q. And do you recall seeing this document presented to you by Mr. Avenatti? We are going to make it larger for you.

A. I saw a version of this document in the package.

MR. H. SREBNICK: Judge, move for the introduction and publication of D4.

THE COURT: Is there any objection?

MR. PODOLSKY: No objection, your Honor.

THE COURT: D4 is received.

(Defendant's Exhibit D4 received in evidence)

THE COURT: You may publish.

Q. Did this appear to be an e-mail from DeBose at Nike to another Nike person to make flight arrangements for Mr. Franklin to go to Phoenix up and back same day?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Are you asking him if that's what the e-mail says?

MR. H. SREBNICK: That summarizes the e-mail. I can have him read it if you would prefer, Judge.

THE COURT: Have you published this?

MR. H. SREBNICK: Yes. I asked for permission. I

thought you said it was OK.

THE COURT: Yes. You can either have him read it or you can read it yourself. It's in evidence. Whichever you prefer.

Q. It's an e-mail from DeBose who works for Nike, to Olivares who works at Nike, yes?

A. Ms. Olivares, at least at the time, was also a Nike employee.

Q. It says: Gabby, I need for Gary to fly into Phoenix on Wednesday a.m. and then fly back to LA a couple of hours later. Can you please make the travel arrangements for him? Thank you. Gab. Signed Carlton.

Yes?

A. I see that you read that and switched in the word Phoenix for the word PHX.

Q. You are correct. Did you understand PHX to mean Phoenix?

A. During the number of years that I have worked for Nike I often fly back and forth from New York to the Portland airport. The acronym for the Portland airport is PDX. When I glanced at these documents in the room, I was at least initially confused because I hadn't focused on the middle letter and I thought these documents, as I was -- as I saw this in the room, was about Nike administrative staff member arranging for a flight for Mr. Franklin to fly to Portland, to Nike headquarters, which would not necessarily be a surprising thing to see. I

later understood that the document I had seen was referencing PHX, not PDX, but in my mind I fly to PDX and that's what it struck me as initially.

MR. H. SREBNICK: If we can turn off the screen for the jury and go to D5.

One moment, your Honor.

THE COURT: Yes.

Q. Mr. Wilson, if you could look on the screen and see if D5, which ends with a Bates number 0023, is one of the documents you recall seeing?

A. I saw this or some version of the package of documents that I was shown in the meeting a few weeks later. And sitting here right now I can't distinguish in my mind whether I saw this page in the package that I saw a few weeks later or what I saw in the room.

MR. H. SREBNICK: I move for its admission and publication, even if the witness gave the answer he gave.

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Without commenting on the exhibit, do you recall seeing exhibits shown to you or documents shown to you by Avenatti that identified Ayton's mom?

A. When I was in the room on March 19, I recall seeing text messages between Mr. Franklin and Mrs. Ayton.

Q. You do recall that?

A. Yes.

MR. H. SREBNICK: Without showing it to the jury, can we go to the next one.

Q. If you could take a look at D6 ending in Bates No. 0030 and see if that looks familiar to you from the meeting of March 19.

A. There is a sentence in the text messages here that I did see during my review of documents in the meeting of March 19, which leads me to believe it's likely this is the page that I saw -- a page that I saw. Excuse me.

MR. H. SREBNICK: Move for its admission and publication, your Honor.

THE COURT: Any objection?

MR. PODOLSKY: No objection, your Honor.

THE COURT: D6 is received. You may publish.

(Defendant's Exhibit D6 received in evidence)

Q. You see this is a text message with a Shaun Manning and Gary Franklin?

A. I see -- I can't see it right now, but a moment ago -- it's labeled as such in the upper right-hand corner of the document.

Q. And do you see it's an exchange. It says: Hey, do you want me to get an order or cashier's check, and if so, who name do I put on it, groundup or urs? They will only allow me to get 5K cash today.

You see that?

A. Yes.

Q. At the bank now, so need to know or just do the rest later. Decision, double question mark.

You see that?

A. I see the text that you have read.

Q. Response: I thought he said cash, but you can put it in my name. Lincoln Prep Boys Basketball Foundation, all caps. If you need to do it by check.

Then it responds: Cashier's check or program.

You see that?

A. I see the text that you have read.

Q. And that was described to you by Avenatti as payment directed by Nike to have Franklin give money to a handler named Manning, right?

A. Prior to my time spent reviewing the documents in the middle of the March 19 meeting, he did refer to a player who had a connection to Mr. Manning as one of the players whom his client alleged had received corrupt payments.

Q. You see the date Thursday, June 30, 2016?

A. I do, yes.

Q. And do you recall, as I asked you earlier, when you looked at these documents, you didn't take notes, but you later reported to your colleague, Mr. Homes, what you had seen, right?

A. Mr. Avenatti, I remember it because it bothered me, he instructed my colleague to stop taking notes, and I did not

take notes while I was reviewing the documents.

Q. My question was, do you recall later reporting to your colleague, Mr. Homes, what you had seen?

A. As best I could, after we went upstairs, we were showed to the sixth floor by Mr. Geragos --

Q. Can you recall describing --

MR. PODOLSKY: Objection, your Honor. The witness was speaking.

THE COURT: Please don't cut off the witness. Please allow him to finish his answer.

MR. H. SREBNICK: I'm sorry. I didn't realize.

THE COURT: Did you have more to say?

THE WITNESS: I was about to say that I huddled in the corner on the sixth floor and did try as fast as I could to recall what I had seen while Mr. Homes was furiously taking notes to try to get it down.

Q. I offer my apologies. I was looking at my notes. I thought you were finished.

A. I was probably speaking too softly.

Q. Do you recall describing to Mr. Homes this document as referencing a payment to Brandon McCoy through Brandon McCoy's handler, Shaun Manning?

A. I don't specifically recall describing this document to anyone.

Q. I couldn't hear the last part.

A. To anyone. I don't recall that this was a document that I made a description of to Mr. Homes during our break.

Q. If I could ask you to see if AA3, the other document I have asked you to use to perhaps refresh recollection, if you could turn to page 4 of AA3. This is not to be published to the jury. If I direct your attention to the second-to-last paragraph at the bottom of the page.

A. OK.

Q. See if that refreshes your recollection of how you described the text message exchange.

A. It doesn't refresh my recollection of how I characterized what documents I had seen in the package. I did mention the names of that player and Mr. Manning in my conversations with Mr. Homes.

MR. H. SREBNICK: If you could go to the next D7 without publishing it to the jury.

Q. I would ask you to take a look at D7, ending with Bates 0031.

A. I see that.

Q. Does that document appear to be one of the documents you were shown by Avenatti?

A. Not that I recall.

MR. H. SREBNICK: Let's move on then to D8.

Q. Does D8 ending in Bates No. 0047 appear familiar to you from the meeting on March 19?

A. As with another page I was shown a little while ago, I'm struggling to recall whether I saw this when I was shown the packet during the middle of the meeting on the 19th or when I subsequently saw either the same or a different version of that package a few -- packet of documents a few weeks later.

Q. Suffice it to say, you recognize that document as one you've seen in connection with the March 19 meeting?

A. No. As I just said, I can't recall sitting here today whether I saw this document in the packet as it was handed to me in person at the March 19 meeting or a few weeks later, when either the same packet or a close version of it came into my possession because it was published.

Q. Came to your possession?

A. Because it was published.

MR. H. SREBNICK: One moment, your Honor.

One moment, your Honor.

THE COURT: Yes.

MR. H. SREBNICK: Thank you.

If we could turn to the next document in the D series. That would be D --

THE COURT: It's D9.

MR. H. SREBNICK: D9, Judge.

Q. You see D9 ends in Bates No. 0014?

A. Yes.

Q. Does that document look like one of the documents that you

saw on March 19?

A. Yes, it does.

MR. H. SREBNICK: Request for permission to move into evidence and publish, your Honor.

MR. PODOLSKY: No objection.

THE COURT: D9 is received, and you may publish.

(Defendant's Exhibit D9 received in evidence)

Q. Do you recall that this was described to you as one of the invoices that DeBose instructed Gary Franklin to create to conceal payments to handlers?

MR. PODOLSKY: Objection, your Honor. When and by whom, your Honor? It's vague.

THE COURT: Sustained. If you could just make it a little clearer, Mr. Srebnick.

MR. H. SREBNICK: Yes, sir.

Q. On March 19, when you were with Avenatti, Geragos, and your colleagues from Nike, how was this document described to you?

A. This document, to my recollection, wasn't described to me in any way. When I was reviewing the hard copy documents, Mr. Avenatti was I think sitting next to me, but I was mostly left to my own devices. I was flipping through and look at the various documents.

Q. Now, do you recall seeing communications that describe Mr. McDonald, a Mr. McDonald, as the handler for a basketball player named Bol Bol?

A. During the March 19 meeting?

Q. Yes. Forgive me. Everything I'm asking you is about March 19. During the March 19 meeting with Avenatti and Geragos you recall that you saw documents evidencing communications that describe McDonald, a Mel McDonald, as Bol Bol's handler?

A. No. I don't recall that.

Q. You don't recall that?

A. No, I do not.

Q. Again, can I ask you to take a look at AA3, page 5, middle of the page, not to be shown to the jury.

Does that refresh your recollection?

A. If we are referring -- if you are referring to the sentence I imagine you are referring to now, no, it does not.

Q. Do you recall seeing a communication between Franklin and DeBose in which DeBose told Franklin to give money to Mr. McDonald?

A. No, I do not.

Q. Can you take a look at AA3, same page, second paragraph of that refreshes your recollection?

A. No, it does not.

Q. Now, Mr. Avenatti described these documents to you as the evidence or some of the evidence he had where his client, Franklin, was being directed by Nike executives to pay money to handlers and players family members, right?

A. He told me he had documents, including invoices, e-mails,

text messages, that related to certain Nike employees being involved in, along with Mr. Franklin, corrupt payments to, and I'm calling it three specific players.

Q. When you finished looking at these documents, just to fast forward, you went up to another office on I think a different floor, is that right?

A. I asked if we could have a moment so I could confer with my client and Mr. Geragos, who had told me that he owned the building, showed us up to the sixth floor, which was a wide loft-like unfinished space.

Q. And present for that caucus was yourself, Leinwand from Nike legal, and your colleague, Mr. Homes?

A. That's right. Mr. Geragos left and went, I presume, back downstairs.

Q. For some minutes the three of you, who represent Nike, caucused, fair statement?

A. We huddled near the window. And I remember, I think Mr. Leinwand wanted to talk about something and I said, stop. I got to get out this information that I sort of just saw in these documents because -- and the reason I said that was because I knew I needed to share this information with the government as soon as possible, and I had not been allowed to take notes. So the best I could try was to try to download it very quickly to my junior colleague.

Q. My question was, the three of you caucused, right?

A. I don't know what you mean by caucused. We stood there and did what I just said we did.

Q. Was your colleague, Mr. Homes, taking notes of everything you were saying or as much as he could take, from your observation?

MR. PODOLSKY: Objection.

THE COURT: Overruled.

A. I believe I asked him to take notes of my description of what I had seen in the documents, but not our subsequent consultation with our client.

Q. Now, after you spoke to Leinwand and Homes on the sixth floor you returned to the meeting with Avenatti and Geragos, correct?

A. Yes, that's right.

Q. And Mr. Leinwand addressed Geragos and Avenatti at that point in the meeting, right?

A. Mr. Leinwand spoke on a few occasions. I'm not sure whether he was the first to speak when we sat back down. He did speak after the break, among other things, to speak to whether the general counsel was accessible or not at that time.

Q. And what Mr. Leinwand told Avenatti and Geragos was, I get the claims, but we need to look at Nike's contract with Gary before we make any decisions.

Do you recall Mr. Leinwand saying I get the claims?

A. I don't recall that statement.

Q. Take a look at AA3, page 5, and see if that refreshes your recollection, bottom of the page, with a notation 2, paren.

A. I have read it and it does not refresh my recollection beyond my prior testimony.

Q. Do you recall Mr. Leinwand saying, I also do not know what he, meaning Franklin, is seeking? Do you have a number in mind?

A. After -- soon after we came back from the meeting Mr. Avenatti went over part 1 and part 2 of his demand again, and it's consistent with my recollection that we asked him to clarify what the exact demand was, but I don't recall if I asked that or Mr. Leinwand asked that.

Q. Isn't it true that Mr. Leinwand said, I also do not know what Franklin is seeking. Do you have a number in mind?

A. As I said a moment ago, I believe that we asked for clarification as to what exactly the demand was. I can't recall whether I asked that or Mr. Leinwand asked that.

Q. And isn't it true that Leinwand told Geragos and Avenatti that he gets the claims, meaning he understands what the claims are?

MR. PODOLSKY: Objection, your Honor.

THE COURT: That's asked and answered.

Q. Mr. Leinwand did not dispute the claims, correct?

A. At this meeting with Mr. Avenatti, who neither of us had known before he walked into the room when we walked into the

room, it was not our intention to share any information about the company, what it had or hadn't done with him. I have no recollection of at any point in the meeting us either affirming or denying the allegations that Mr. Avenatti was articulating.

Q. Without disputing the claims you all asked Avenatti what's the ask?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained. Compound.

Q. Let's discuss what a claim means. I think you told the jury yesterday that when someone has a legal claim they can file a complaint in court, correct?

A. That's one step someone could take when they have a legal claim, yes.

Q. And when someone drafts a complaint, either on their own or through a lawyer, it can include all the factual allegations that the plaintiff, the person suing, thinks are relevant to the claim, correct?

A. There are some limitations on what factual allegations you can include in a complaint filed in court, and from time to time a judge will strike certain allegations; for example, if they are slanderous or libelous. But, in general, yes, a plaintiff can put factual allegations into the complaint they file in their lawsuit.

Q. If a party or plaintiff brings a claim through a complaint it gets filed in court and that becomes public information,

correct?

A. It's rather rare for a complaint to be filed under seal nonpublicly in general. When a complaint is filed in court, depending on how public that court's records, it's a public document after that point, yes.

Q. When a complaint is filed in court it is typically a public document, correct?

A. Are you referring to civil complaints?

Q. I am referring to a civil complaint, yes.

A. Civil complaints are filed in court. They are typically public documents, yes.

Q. And that means the media can have access to it, correct?

A. Yes, the media can have access to court documents that are public.

Q. And the news can report about it, correct?

A. The news media can report on public court filings.

Q. And what a complaint does, it initiates a legal process that includes court proceedings, correct?

A. A complaint is, in the jurisdictions I'm familiar with, one of the documents that has to be filed to initiate court proceedings. It's not always sufficient on its own.

Q. After a complaint is publicly filed it could then lead to what we call discovery in those proceedings where the parties exchange evidence, information, depositions, things of that nature, correct?

A. If a complaint survives motions to dismiss or other motion practice that the defendant may bring and in jurisdictions where discovery is only permitted thereafter, then you'd have discovery at that point. In some places discovery starts as soon as the complaint is filed. It depends which civil jurisdiction you are in, to my understanding.

Q. To be clear, because I'm having a little trouble hearing you, when a civil complaint is filed in some jurisdictions, the discovery process starts right away, in other jurisdictions it might wait on motion practice. Fair statement?

A. Yes, that's my understanding.

Q. And if a case makes its way all the way to a trial, that also is a public event that the media can report on, correct?

A. Trials are generally open to the public, yes.

Q. Now, filings of complaints can be accompanied by press conferences, correct?

A. It is possible to hold a press conference in connection with the filing of a complaint.

Q. In fact, your law firm has done just that, filed complaints, hold press conferences, correct?

MR. PODOLSKY: Objection.

THE COURT: Sustained.

Q. A litigant can hold a press conference in anticipation of filing a complaint, correct?

A. There are not general laws prohibiting folks from holding

Case 21-1778, Document 61, 04/04/2022, 3290318, Page168 of 263

K1VMAVE1 Wilson - Cross 490

press conferences. It's not a practice I'm familiar with.

Q. Isn't it true, now that you said it's not a practice you are familiar with, that your own law firm has held press conferences in anticipation of filing a lawsuit?

MR. PODOLSKY: Objection.

THE COURT: Sustained.

Q. In lieu of filing a complaint, meaning instead of filing a complaint, parties can choose to attempt to settle the case before the complaint is filed, fair statement?

A. Yes.

Q. Before it goes public.

A. Sorry. Before what goes public?

Q. Before the complaint or the claim goes public.

A. Could you repeat that.

Q. Sure. A plaintiff can approach a defendant, the suing party versus the party to be sued, and the plaintiff can propose to the defendant a settlement instead of going to court, filing a public complaint, and going through the whole process I just described, correct?

A. It's not atypical in a civil suit to engage in settlement discussions before anything has been filed in court.

Q. Because I want to make sure I heard right, it's not atypical, meaning it's not unusual for parties to engage in prelawsuit settlement conferences?

A. It's not unusual for there to be settlement discussions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 491

between parties before a lawsuit is filed in court.

Q. And during those discussions the parties can reach agreements, including confidentiality, correct?

A. Potentially they could, yes.

Q. Keep the terms of the settlement confidential. Could be one of the terms of the agreement reached by the plaintiff with the defendant.

A. Yes. There are confidential settlement agreements.

Q. But there is no obligation for a plaintiff to approach the defendant and try to settle beforehand. The plaintiff can just go to court and file the complaint if that's what the plaintiff prefers to do?

A. Having litigated a little bit in California, my understanding is, at least in California, there may be presuit mediation requirements. But I think the answer to your question depends on the jurisdiction that you are in. Excuse me. Not mediation. But presuit attempt to compromise requirements in the court's rules.

Q. When parties engage in these prelawsuit settlement conferences, you've participated in some of those, have you not?

A. I have, in the course of my career, participated in settlement discussions, yes, including before a lawsuit has been filed.

Q. You have, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 492

A. Yes.

Q. And as the party being sued, the defendant, one of the concerns you might have is how the public will react if the lawsuit is filed?

MR. PODOLSKY: Objection, your Honor.

THE COURT: We are getting kind of abstract, Mr. Srebnick.

MR. H. SREBNICK: I'll be more concrete, Judge.

Q. If Gary Franklin were to file a lawsuit instead of proposing a presuit settlement, it would be a concern of yours, would it not, how the public would react to Gary Franklin filing a complaint making the allegations that were shown to you by Mr. Avenatti?

MR. PODOLSKY: Objection.

THE COURT: Sustained.

Q. Is it fair to say that you were concerned that Gary Franklin's claims, it they went public, would be a problem for Nike?

A. That's not what I was concerned about, no.

Q. You were concerned that there would be a press conference announcing Gary Franklin's claims.

A. There was never any suggestion that the press conference that was threatened would be to announce claims by Mr. Franklin. What Mr. Avenatti said is that he would hold a press conference to publicize this alleged activity by Nike

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 493

employees, and he would name these famous young basketball players.

Q. Those were part of the allegations that Avenatti and Geragos presented to you in connection with Mr. Franklin's claims?

A. I had no inkling of how that information could relate to civil claims with respect to a gentleman who had a $72,000-a-year commercial agreement with the company.

Q. Mr. Franklin was alleging, as Avenatti told you, that he had been pushed aside and lost his team because executives at Nike were requiring that he pay a handler and a guy named Freedman, right?

A. Other than to say that he believed his client had a breach of contract, some kind of tort or other claims, Mr. Avenatti did not describe to me what Mr. Franklin's claims might be.

Q. Did you ask him to describe them more in depth?

A. Not that I recall.

Q. And so you understood that Mr. Avenatti and Mr. Geragos, having shown you the allegations, having described them for you -- let me break that down.

Mr. Avenatti had told you that his client had claims, correct?

A. Mr. Avenatti said he believed that his client who wasn't named yet had breach of contract, tort something, or other claims, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000168

Case 21-1778, Document 61, 04/04/2022, 3290318, Page169 of 263

K1VMAVE1 Wilson - Cross 494

Q. He told you that the evidence was what he had shown you, some of which you have looked at with the jury, correct?
A. He didn't draw a connection of evidence to his client's claims. The only discussion of claims by Mr. Avenatti I recall was a brief passing reference at the beginning of the March 19 meeting to his belief, he phrased it in terms of I believe Mr. Franklin's breach of contract, tort something, or other claims. He didn't come back to link something to these purported claims, if any, that Mr. Franklin had.
Q. Do you agree that it's improper for executives at Nike to condition Mr. Franklin's contract on having to make payments to handlers?
MR. PODOLSKY: Objection, your Honor.
THE COURT: Sustained.
Q. After Leinwand asked for a number or you asked for a number to settle Franklin's claims, do you recall telling the jury that Mr. Avenatti described a settlement discussion that he had had in another case unrelated to this involving Kimberly-Clark, a company?
MR. PODOLSKY: Objection, your Honor.
THE COURT: Sustained.
MR. H. SREBNICK: One moment. Let me see if I can rephrase.
Q. Do you recall telling the jury about a case involving a proposed settlement of 31.5 million?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 495

A. I mentioned a 31 million dollar settlement or proposed settlement that Mr. Avenatti had referenced at some point during the March 19 meeting. Yes, I recall that.
Q. So you have already told the jury that Avenatti discussed with you this settlement conference or mediation he had involving a potential 31 million dollar settlement, fair statement?
MR. PODOLSKY: Objection.
THE COURT: No. That's overruled. You can answer.
A. That's not exactly what I recall testifying yesterday. I recall that I said that he told a story that began with the prospect of a 31 million dollar settlement that a company could have gotten, and then that I suppose they didn't take the settlement and things got worse for them and there was some kind of result in the hundreds of millions of dollars. That's what I recall.
Q. Do you recall what he told you was that he, Avenatti, proposed that company, name doesn't matter, pay approximately $31 million as a settlement, that the company rejected the settlement proposal, and that it later led to a jury trial where an award of $400 million was imposed by a jury.
Do you recall him telling you that?
A. That question doesn't refresh my recollection. What I recall is what I said a moment ago, was that there was a 31 million dollar offer on the table. The company didn't take it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 496

And they had a bad result later that was in the hundreds of millions of dollars. That's the extent of my recollection of that.
Q. See if AA3 at page 6, center page, refreshes your recollection.
A. This does not refresh my recollection beyond the testimony I have already given.
Q. A moment ago you indicated that you asked Mr. Avenatti at that point in the meeting to summarize his ask or demand on behalf of his client, right?
A. Pretty soon after we got back from the break he went over the two parts again with a little more detail.
Q. The first part Mr. Avenatti told you is that he wanted $1.5 million for Gary Franklin, correct?
A. Yes. That was the first time, the 1.5 million dollar number was used.
Q. Avenatti indicated, this includes a full release both ways, correct?
A. A couple of times during the three communications I had with Mr. Avenatti releases came up. I can't say whether they came up during that rearticulation of part 1 and part 2 of the demand.
Q. Do you recall Avenatti saying any agreement will include language that protects the company and will make clear that Nike is not buying Gary Franklin's testimony?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 497

A. No, I don't recall that.
Q. Could I ask you to turn to AA3, page 7, top of the page, paren 1.
A. I've read this text.
Q. Does that refresh your recollection?
A. It does not refresh my recollection beyond the testimony I've already given.
Q. As the second component Mr. Avenatti was proposing an internal investigation, correct?
A. He was proposing that either he and Mr. Geragos be hired to conduct an internal investigation or, when we came back from break, if Nike hired a different firm, not these two guys to do that work, he and Mr. Geragos would be paid two times whatever legal fees Nike paid to that firm for no work.
Q. My question was, he proposed an internal investigation as the second component. Is that yes or no?
MR. PODOLSKY: Objection, your Honor.
THE COURT: He has already answered that question. It was a two-part answer.
Q. What Mr. Avenatti said is whatever the internal investigation costs, it costs.
Do you recall him saying that?
A. No, I do not.
Q. If I could ask you to take a look at AA3, page 7, paren 2.
Does that refresh your recollection?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000169

Case 21-1778, Document 61, 04/04/2022, 3290318, Page170 of 263

K1VMAVE1 Wilson - Cross 498

A. It does not refresh my recollection as to the question that you just asked me.

Q. Now, you were saying that Mr. Avenatti said that he would get paid for doing no work if Nike brought in another lawyer.

Is that what you were telling the lawyer?

A. He described it as something I didn't initially understand. He said he would have a most favored nations clause where if Nike hired a different law firm to conduct an internal investigation, whatever that firm charged, Nike would nonetheless be penalized and have to pay two times that amount to him and Mr. Geragos.

Q. Did Mr. Avenatti say, if Nike brings in any other firms, the minimum amount of fees we are paid has to be two times the amount of fees paid to any other firms?

A. The phrasing of what he said is that, to my recollection, is what I described a minute ago. I don't recall the phrasing that you just used there.

Q. Could I ask you to take a look at AA3 again.

A. Sure.

Q. Paren 2.

A. I see that text.

Q. Does that refresh your recollection as to what Avenatti actually said?

A. I recall that he said the amount they would be paid was two times what the other firm would be paid, not a minimum of two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 499

times what the firm -- what the other firm would be paid. It does not refresh my recollection.

Q. Do you recall Avenatti saying, we think we are well situated to handle this investigation?

A. In reading the document I was just looking at, my recollection was refreshed that he said something about that he thought that he, given he was well known, would be someone that people would be willing to talk to.

Q. Do you recall Avenatti saying we are not asking you to pay for nothing?

A. No, I don't recall that statement.

Q. Take a look at AA3, same paren 2.

A. I've read the whole paren 2 and it does not refresh my recollection in that regard.

Q. Do you recall Avenatti saying, we will share the findings of the investigation with whoever you want us to share it with?

A. I recall on a number -- as I've testified before, there were a number of points in our communications, not just at this meeting, where I indicated the decision as to whether or not to share the result of this internal investigation, or whatever it was going to be, would be the decision of the company. So what you have just said is consistent with my recollection, but it came up several times in our communications.

Q. We talked yesterday about self-reporting, so I won't go back into that. But do you recall that after he made those two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 500

demands him saying more about Gary Franklin's claims, describing with more precision the claims?

A. No, I do not.

Q. Do you recall asking Avenatti, what would Gary Franklin say to complement the documents?

A. I did ask in those words or words close to it, your question refreshes my recollection, if Mr. Franklin would have information to say -- to share with us beyond what was reflected in the documents.

Q. And Avenatti responded to your question by saying: Franklin would say that he was directed to make multiple payments to players and that he was threatened that he would lose his program if he refused to make these payments. He would say that he was told how to structure the invoices by Nike and that he facilitated payments to Ayton, Bol, and McCoy.

Isn't that what Avenatti described Franklin's claims as?

A. As I testified a couple times, Mr. Avenatti certainly said that his client would say that he had been involved with certain Nike employees in making corrupt payments to certain named players, and it struck me again because here is a gentleman I have never met before who is implicating his client in criminal activity in his statements to me. That stuck in my memory.

Q. I think it was yesterday that you told the jury that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 Wilson - Cross 501

Mr. Avenatti was urged to delay the press conference because it could hurt the reputation of the case.

A. After we tried to make the point that the general counsel with whom we needed to consult was not immediately available, because she was five or six hours ahead in Europe, and that was not -- didn't seem to be resonating, I said to Mr. Avenatti that he might not care about the company, he might not care about us, but that there was another group of people who might be affected by him going forward with the press conference the next day, and that was these young teenagers with budding basketball careers who might be innocent in all this.

Q. In the first instance, these were not kids at this point in time. These were already adults that we were talking about, Bol and McCoy and Ayton, right?

A. I consider teenagers kids. I wasn't implying a statutory rule that 18 or 19 or 17 is a kid or not a kid. These are young guys. They are kids, in my view.

Q. And Avenatti said: Fair point. If the kids don't know about it, you have a fair point about tarnishing their reputation if they didn't really know?

A. That's not how I recall him responding to my request that he delay the press conference. I said he might be damaging the future careers of these kids. I recall him responding: I don't give a fuck about these kids or I don't give a shit about these kids. That was burned in my memory.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000170

Q. Forgive me for interrupting you.

A. No problem.

Q. Isn't what happened, you said to Avenatti: It's not clear that all the kids knew they were being paid, same goes for the college admissions scandal. It's not clear that all the kids realized they were being given extra help to get into college. And Avenatti said: That's a fair point.

A. As I said a minute ago, I do recall mentioning that the kids might be innocent, and what I meant by that was it's possible that some family member could receive money and the kid know nothing about it. But I do recall saying something to that effect. The statement back to me from Mr. Avenatti that I recall is the one that I just repeated.

Q. Do you recall Mr. Avenatti saying that's a fair point?

A. I don't, no.

Q. Take a look at AA3 to refresh your recollection, bottom of page 7.

A. I've read it, and it does not refresh my recollection beyond the testimony I have given.

Q. Now, when Nike executives were directing monies be paid to handlers for these kids, did it appear to you that Nike gave a hoot about the kids?

MR. PODOLSKY: Objection.

THE COURT: Sustained.

Q. Now, this meeting, this first meeting on March 19, it's

clear that Avenatti was trying to create a sense of urgency, fair statement?

MR. PODOLSKY: Objection.

THE COURT: Sustained.

Q. Avenatti was giving deadlines?

A. Mr. Avenatti said that he was going to hold a press conference the next day. It was odd. It was ambiguous when we left the meeting whether I had a deadline. What we had agreed was I would speak to Mr. Geragos again later in the afternoon.

Q. And the meeting on March 19, the face-to-face meeting, concluded with an understanding that you were going to speak to Mr. Geragos later that day?

A. Yes, that's right.

Q. And, in fact, did you speak to Mr. Geragos later that day, on March 19?

A. I had one phone call with Mr. Geragos later in the day.

Q. Was that at approximately 6:21 p.m.?

A. I don't recall the minute, but it was in the early evening, yes.

Q. And do you recall who participated in that phone call on behalf of Nike at your office at Boies Schiller?

A. The only speaking participant was me from Boies Schiller.

Q. Was Mr. Homes present listening to the call?

A. I took the phone call on speaker. I don't recall which of my colleagues were in the room with me.

Q. Do you recall that the participants were yourself, Mr. Homes, and another lawyer from Boies Schiller named Peter Skinner?

A. I don't recall who the participants from Boies Schiller who were in the room with me, and they did not speak on the call.

Q. I am going to ask you to take a look for refreshing recollection purposes only at a different document, AA5. If you could look at the top of the page and tell us, does that refresh your recollection?

A. It refreshes my recollection that the colleagues, my former colleagues at Boies Schiller who were in the room with me for that call were Mr. Homes and Mr. Skinner.

Q. Mr. Skinner is another lawyer at Boies Schiller?

A. Mr. Skinner is a partner at Boies Schiller, yes.

Q. Was he the partner involved in the response to the grand jury investigation by the Department of Justice, Southern District of New York? Was he handling that?

A. Mr. Skinner was one of several partners involved in that work for Nike.

Q. Now, that call at approximately 6:21 p.m. on March 19, to your knowledge, did not include Mr. Avenatti, correct?

A. My understanding was the only person I was talking to was Mr. Geragos.

Q. Geragos told you he was about to board an airplane?

A. The next day he was in Miami, and I think he said something

about that he was leaving. He was flying out.

Q. During that conversation did Mr. Geragos say anything to you that would suggest that he dissented from the approach that was taken in the meeting earlier that day?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Did Mr. Geragos withdraw any of the demands that had been made by Mr. Avenatti earlier that day?

A. There was not discussion on that phone call of the demands.

Q. Did Mr. Geragos apologize for anything Mr. Avenatti said during the meeting earlier that day?

A. Mr. Geragos told me that he had prevailed upon Mr. Avenatti to sit tight until Thursday, and then sort of made a joke about that he tried to keep Mr. Avenatti under wraps at all times. So I took it as sort of a commentary on Mr. Avenatti's impatience. But Mr. Geragos didn't say I'm sorry or express any apology.

Q. And did you tell Mr. Geragos anything about, hey, I think Avenatti crossed the line or I think Avenatti did something wrong, or Avenatti is trying to do something improper? Did you say anything like that to Mr. Geragos?

A. The only discussion with Mr. Avenatti on the phone call was when he was or was not going to hold this press conference he threatened and when we would speak again or be back in touch.

Q. You did not tell Mr. Geragos that you thought Mr. Avenatti

had acted improperly during the conference earlier that day, correct?

MR. PODOLSKY: Objection.

THE COURT: Overruled.

MR. PODOLSKY: Asked and answered, your Honor.

THE WITNESS: May I proceed?

THE COURT: Yes. Go ahead.

A. I didn't make any comment on Mr. Avenatti's behavior one way or another on that phone call.

MR. H. SREBNICK: Your Honor, what time did you want to take a break?

THE COURT: 11:40.

MR. H. SREBNICK: 11:40.

Q. I'd like to move now from March 19 to March 20.

On March 20, you had some phone calls with Mr. Geragos again, right?

A. On Wednesday, the 20th, I had first two phone calls with just Mr. Geragos and then a third phone call that Mr. Geragos conferenced Mr. Avenatti into.

MR. H. SREBNICK: What I'd like to do now is, if I can just consult with Mr. Podolsky for a moment about the evidence.

THE COURT: Yes. Go right ahead.

Ladies and gentlemen, why don't we take a standup break.

Mr. Wilson, you can take a standup break.

MR. H. SREBNICK: Your Honor, at this time I am going to ask, with the government's consent, to play the audio of the call on March 20 at 3:59 p.m. I think it's Government Exhibit No. 3. And what we have done is, the jury, of course, has the transcripts. We have also synchronized the transcripts to the audio so the jury and the public can follow along on the screen, if they prefer.

MR. PODOLSKY: Your Honor, I understand that the defendant is offering an aid to the jury which includes the transcript. We have no objection to that being shown to the jury with the same caveats that we had yesterday.

THE COURT: Yes. Same rules, ladies and gentlemen. Again, what is evidence is what you hear on the tape. The transcript that accompanies it is just provided to you as an aid. The evidence is actually what you hear.

Go ahead, Mr. Srebnick.

MR. H. SREBNICK: Thank you, Judge.

To orient everybody, I am just going to start at page 2 of the transcript. That's 3T, Mr. Podolsky?

MR. PODOLSKY: Yes.

MR. H. SREBNICK: It would start on line 19, so we don't have to hear the whole thing again. Let me just give everybody a second to get oriented.

May I proceed, please, is your Honor?

THE COURT: Yes.

MR. H. SREBNICK: I'll ask Mr. Lyon to play it.

(Audio played)

Q. You recognize your voice and Mr. Geragos' voice?

A. Yes, I do.

Q. And in that conversation you indicate to Mr. Geragos there is a way to get this done, lines 23 and 24. You see that? Page 2, lines 23 and 24.

A. I see that, yes.

Q. You say: I think we can give you much of what Michael asked for.

You see that?

A. Yes, I do.

Q. Not all. I'm not saying that we like your demand. As you would expect, we think it's too much. But we are prepared.

And then Geragos jumps in, right?

A. Yes.

Q. And so you're communicating to Geragos exactly what you said there. There is no misunderstanding of you saying that you are going to make some sort of offer?

MR. PODOLSKY: Objection.

THE COURT: Sustained.

Q. You indicate to him that an offer should be forthcoming, yes?

A. There is a distinction between what I said and what I intended. By this point I was cooperating with investigators

from the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation, FBI.

Q. Maybe I should take a step back. On the night of the 19th or the afternoon of the 19th, you contacted the federal prosecutor's office?

A. I contacted the U.S. Attorney's Office for the Southern District of New York.

Q. This is the same office that was investigating Nike as part of that grand jury investigation that started with the subpoena about a year and a half earlier?

A. Yes. I called a member of the team investigating Nike.

Q. And after you spoke with those prosecutors they authorized you to record Geragos and Avenatti?

A. I had two calls with the members of the U.S. Attorney's Office for the Southern District of New York that evening, and I believe it was in the second call I was asked whether I would cooperate with an investigation by the government.

Q. And they authorized you to record Geragos and Avenatti?

A. The FBI agents provided me with a technical mechanism for recording phone calls and asked that I use it in my subsequent communications with Mr. Avenatti and Mr. Geragos, and I agreed to do so.

Q. And so during any of the phone calls were there any FBI agents present when you spoke to Geragos or Avenatti?

A. There were at times investigative agents either employed

directly by the United States Attorney's Office for Southern District and/or the FBI in the room with me on the afternoon of Wednesday, the 20th.

Q. And did someone from either the FBI or the prosecutor's office give you some coaching on how to record Avenatti or Geragos?

A. One of the agents explained to me and showed me instructions for how to use the technical mechanism for recording phone calls.

Q. Did any of the FBI agents or someone from the prosecutor's office, any federal or law enforcement officer, suggest how you should conduct the conversation, what to say, the script that you should use?

A. I was not provided a script at any point. What I recall being directed to do was to keep these gentlemen talking.

Q. The day before, on March 19, you had your own ideas in mind about how to conduct that conversation. You have told the jury about that, right?

A. Could you clarify which conversation are you talking about?

Q. On the 19th, the one we just spent the morning talking about, you had your own game plan you told us about it. You had your own game plan, right?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Did you have a plan for that conversation on March 19?

THE WITNESS: For the in-person meeting?

THE COURT: Yes.

THE WITNESS: I didn't know -- my plan for that meeting was to try to get Mr. Avenatti and Mr. Geragos to tell me whatever it was that Mr. Geragos had indicated on the calls the week before was too sensitive to be discussed over the phone. I didn't know what it would be, but that was certainly my objective in attending that meeting.

Q. The next day, March 20, you are now cooperating with the federal agents to record Avenatti and Geragos, fair statement?

A. That is correct.

Q. And they, the FBI, wanted you to keep Geragos and Avenatti talking?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Who did you speak with at the government about the call that you were supposed to have on the 20th?

THE WITNESS: I spoke with an investigator with the U.S. Attorney's Office for the Southern District of New York and two agents of the FBI.

THE COURT: And did any of those people give you any guidance or instruction about how you were to conduct the call?

THE WITNESS: Apart from trying to get the individuals to keep talking, to let them do the talking, I don't recall specific instructions.

Q. So the conversation of 3:59 p.m. that we just heard on

March 20, was there anyone from the federal law enforcement listening to that conversation?

A. There were three agents, one employed by the U.S. Attorney's Office, two employed by the FBI that I recall being at my office on the afternoon of Wednesday, the 20th. What I don't recall is in any particular one of these calls whether one, two, or three of them were in the room. I believe on each of the calls there was an agent or more than one agent in the room listening on speaker while I spoke.

MR. H. SREBNICK: I'd like to return now to the transcript and audio of that call on March 20 at 3:59 p.m.

Q. Do you recall telling Geragos that you didn't like his demand but that Nike was going to consider making an offer?

A. What I was doing at beginning of this call, as I mentioned yesterday, was operating on my own belief that if I spooked these guys and made them feel as was in fact the case, there was no possibility we'd ever engage in this deal that they wanted us to engage in, that Mr. Avenatti would pull the trigger and hold his press conference immediately.

It would be a weird dialogue between a plaintiff's attorney and a defense attorney if the defense attorney said, you know what, the first thing you asked for, good, we will give you that.

I said what I said to Mr. Geragos here, that I think we can do something, but it's not going to be everything, to

create the impression in his head and Mr. Avenatti's head that I was engaged in a real negotiation when in fact, again, I was cooperating with the government and there was no chance we would have agreed to this.

Q. So is it fair to say you were misleading Mr. Geragos?

A. I was saying things that were different from my intention, yes.

Q. Geragos responds: Have you ever said, when somebody made a demand, have you ever said, you know what, that's too low, I think you guys deserve more?

A. I recall him saying that.

Q. Did you understand Mr. Geragos to be saying that the demand is always higher than the ultimate settlement?

A. I understood him to be referring to, as I mentioned a minute ago, exactly why I said what I said, which is that a lawyer conducting a negotiation wouldn't expect the counterparty to, right out of the bat, agree to absolutely everything that the other side demanded. So I felt that saying what I just said accomplished exactly what I hoped it was, which was sort of putting Mr. Geragos at ease as he laughed listening to me.

Q. And you said nothing to Mr. Geragos to indicate that there was anything improper about the demand, correct?

A. Again, I was not there in my personal capacity. I was there in my capacity as a lawyer for Nike. On behalf of my

client I had reported this conduct to federal investigators. It would have been inconsistent with the -- my obligations to my client if I had said things that would have spooked these gentlemen because what I believed the likely consequence of that would be is that Mr. Avenatti would go public immediately and attempt to gin up a scandal with his allegations, whether or not they were true.

Q. My question was, you did not indicate to Geragos there was anything improper about the demand, yes or no?

A. On this phone call, no.

MR. H. SREBNICK: If we could then cue up, this will be page 4, line 14 of the transcript. I'm sorry. Page 3. Forgive me. Page 3, line 14.

Are you there, Judge?

THE COURT: Yes. Thank you.

(Audio played)

Q. That was Mr. Geragos proposing that the meeting happen sooner than you were proposing, right?

A. Yes, that's right.

Q. And when you said on line 25, we are operating in very good faith, what does that mean, good faith?

A. I don't know what it meant to Mr. Geragos. It was me expressing, as I had at the meeting the day before, when I referenced to here we have brought the senior executive to meet with you that we were paying careful attention to this, that we

were being responsive, all in service of the goal of making it appear to Mr. Geragos and Mr. Avenatti there was a possibility of a pod of money for them at the end of this because I thought once that possibility disappeared from view, the press conference would be held and the media crisis would ensue. I was looking to buy time.

Q. Is it fair to say you were misleading Geragos into thinking that you and he and Avenatti were engaging in active settlement negotiations?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Is it fair to say that you communicated to Geragos words indicating that you were engaging in serious settlement negotiations?

A. I wasn't intending to convey that these were settlement negotiations, but I was intending to convey that we were seriously entertaining the demands that Mr. Avenatti had articulated.

Q. Isn't that exactly what a settlement negotiation is?

A. No. I didn't regard the second component of Mr. Avenatti's demand to be related to a settlement at all.

MR. H. SREBNICK: I'd like to turn our attention to a later call at 4:50 p.m. That would be Government Exhibit 4, I believe. This starts at page 2, line 1.

MR. PODOLSKY: Your Honor, I understand that the

defense is offering, again, this synchronized video as an aid to the jury.

THE COURT: Yes. Same rules apply.

MR. H. SREBNICK: Permission to play it.

THE COURT: Yes. Go right ahead, Mr. Srebnick.

(Audio played)

Q. In this conversation at 4:50 p.m. you indicate to Mr. Geragos that you want to come prepared. He uses the words to make a concrete offer, and you say right.

A. Yes.

Q. So an offer would be understood as an offer to settle the claims?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

MR. H. SREBNICK: I'll rephrase it.

Q. Did you communicate to Mr. Geragos that you were preparing to make an offer?

MR. PODOLSKY: Objection. Same grounds.

THE COURT: Overruled.

A. What I believe I intended to say -- it's a phrase I used repeatedly in subsequent communications -- was, to come with authority. That was the phrase I had in mind.

Q. And what that meant is that up until that point in time, all times, you didn't have the authority to make an offer or settle the claims?

MR. PODOLSKY: Objection.

THE COURT: Sustained.

Q. Did you communicate that you lacked the authority to settle any claims?

THE COURT: In prior conversations or in this conversation?

MR. H. SREBNICK: I'll start with this conversation.

A. Could you repeat the question.

Q. Were you indicating to Mr. Geragos here you lack authority to settle claims?

A. I was indicating to him that I couldn't until Monday have a response from the company to the demands that have been made.

Q. And do you see at line 19 you describe the meeting of the day before as chitchat?

A. That's not what I was intending to do. I was saying I didn't want to have a subsequent meeting where we just sat around and had chitchat.

Q. And you say: I don't want to sit down and have another meeting where we just chitchat.

A. That is the text. Those are the words I used, but I was referring not wanting to come and sit down and not have authority to do a deal but instead to just chitchat at that meeting. I didn't mean to imply the meeting the day before. I just meant chitchat.

Q. And this conversation, just like the one before it, was

Case 21-1778, Document 61, 04/04/2022, 3290318, Page175 of 263

K1VMAVE1 518

done in collaboration with the FBI and the prosecutors, right?

A. With my consent, the FBI was recording this call.

MR. H. SREBNICK: Your Honor, I see it's 11:40. Is this the time you wanted to break?

THE COURT: Yes.

Ladies and gentlemen, we are going to take our midmorning recess. We are going to take 15 minutes. Don't discuss the case. Keep an open mind. We will be back to you in 15 minutes. Thank you.

(Jury not present)

THE COURT: Should we discuss these documents that were handed up to me when I came out beginning with Defense Exhibit SS and RR and QQ, JJ1, JJ2, JJ3, JJ4 and KK3.

Is the defense going to be seeking to introduce these documents?

MR. S. SREBNICK: Which one does the Court want to start with?

THE COURT: The order I have, and I can rearrange them, was Defense Exhibit SS is at the top. We should address them in whatever way you think is logical.

MR. S. SREBNICK: If your Honor can pull up JJ1.

THE COURT: Yes, I have it.

MR. S. SREBNICK: This actually has two components. I understand that the Court had previously indicated at the beginning of this morning's session certain principles that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 519

Court was going to apply throughout the trial.

THE COURT: Could we step back for just a second. Are these documents that Mr. Wilson was shown at the March 19 meeting, or is this something else?

MR. S. SREBNICK: Something else.

THE COURT: This is not included in the documents that Mr. Wilson was shown during his encounters with Mr. Avenatti?

MR. S. SREBNICK: That's correct. These are Nike produced documents. These were produced by Nike in response to the grand jury subpoena. They are text messages between Nike executives. The one that's on the screen shows the broader -- let's call it the broader misconduct. I'm using that word very broadly relating to payments to amateur players, offers of payment, discussions about payments. This particular document on the screen was actually attached to my motion to dismiss for vindictive prosecution. It reflects discussions among Nike executives to pay certain high-profile players.

THE COURT: Does this have to do with Franklin?

MR. S. SREBNICK: Part of it, yes; part of it, no. The first part, no. Where you see the names that are on the screen that has 20, 35 plus, and 15, those do not have to do with Mr. Franklin. And then there is some discussion right below that about Gary, California Supreme.

As many of these text messages are, there is interspersed discussions of matters related to Mr. Franklin and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 520

matters not related to Mr. Franklin.

The matters that are not related to Mr. Franklin really relate to the issue of the concern. They would go to the issue of Mr. Wilson's concern about broader misconduct, about the response to the grand jury subpoena, about whether or not he needed to protect Nike, that sort of thing, which the Court has -- let me just frame that. That's a separate issue. It's the broader issue of Nike's misconduct. There are a number of documents that relate to that. Then there are a few documents that relate specifically to California Supreme.

THE COURT: What are you intending to do with this document?

MR. S. SREBNICK: As I understand Mr. Wilson, the way he has portrayed it and the way Nike and Nike lawyers at the Boies firm have presented their narrative to the government is that Nike has done nothing wrong, that there were more, and there are specific instances in the phone calls between Nike lawyers. When I say Nike lawyers, I'm referring to the Boies lawyers and the U.S. Attorney's Office in which the Boies lawyers are telling the U.S. Attorney's Office there are no instances in which players or their families have been paid by Nike. Early on, in response to the grand jury subpoena, where there were phone calls between the U.S. Attorney's Office and Nike, that was Nike's narrative to the U.S. Attorney's Office.

The documents that were produced, either at the same

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE1 521

time or subsequent, show that that narrative is not accurate. It shows in fact that there were multiple discussions between Nike executives about paying amateur players and, in fact, there were payments to amateur players.

THE COURT: These documents, were they known to Mr. Avenatti in March of 2019?

MR. S. SREBNICK: Certainly not.

MR. PODOLSKY: Not only that, your Honor, but despite the assertions Mr. Srebnick is saying, these were produced to the government by Nike in January of 2018, so these were not hidden from the government. The government had these documents. And Mr. Avenatti had no idea they existed until the government produced them in discovery in this case.

MR. S. SREBNICK: That's correct. Let me be clear about our intention. Our intention is simply to impeach Mr. Wilson and to impeach the Nike lawyers on the grounds --

THE COURT: The problem is, Mr. Wilson has not offered any testimony that I recall, he has not offered any testimony that Nike did anything wrong here. So you are trying to impeach him on something that there hasn't been any testimony about yet.

MR. S. SREBNICK: I think he testified that there was nothing illegal about what Nike did.

THE COURT: I don't remember that, sir. I'm happy to look at the transcript if you have something in mind. I don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000175

remember him offering an opinion about whether Nike did anything wrong here. I don't remember that. I'm happy to have my memory refreshed, but I don't remember that. You are trying to impeach him on something he has not testified about.

MR. S. SREBNICK: Let me be a little bit more precise. I'm trying to impeach him on bias, bias and motive. He knows that the Boies lawyers have made representations to the United States Attorney's Office that there were no instances in which Nike paid players. There are several debriefing notes that we have received in which the Nike lawyers were taking that position wit the U.S. Attorney's Office. They said Adidas did, we heard that Adidas and under Armour did, but Nike does not pay players. Those were comments that were made immediately after the grand jury subpoena was served.

We have evidence that Nike has produced that show that those statements are not accurate, and we want to be able to show that Mr. Wilson has a bias in favor of the government because he knows that Boies has taken the position that there were no instances of payments to players and that's simply not accurate. That's our position, Judge.

I've teed it up the only way I know how as to the non-Franklin related text messages. I think we can show there were numerous discussions in which Nike executives are talking about paying high-profile players, how to recruit them to come to Nike, and payments that were in fact made.

THE COURT: I've already, I think, commented on this type of evidence many, many times.

The first principle, and that's why I reviewed these principles with you this morning, I've stated this before, but I wanted everyone to have it clearly in mind, material that Mr. Avenatti was not aware of at the time in March of 2019 could not have had any effect on his state of mind whatsoever. I told you that I would permit some cross-examination of Mr. Wilson on the point of Nike's dealings with Franklin, and I explained why.

But to state the obvious, Mr. Wilson has testified that Nike has been under investigation for at least since September of 2017. He testified that, to his understanding, the investigation is continuing and so it's already obvious that his credibility can be challenged in that he represents Nike. His client is under investigation. And so the defense already has an argument that he has a motive to curry favor with the government and to testify in a fashion that makes them happy. That's already present. It's already in the record.

I further told you this morning that to the extent you wanted to cross-examine Mr. Wilson about matters that involve Mr. Franklin, it seemed to me that that might be relevant because he has testified that was a name that was known to him. I think he testified yesterday that he then had proffer sessions with the government which Franklin was discussed at

length. So those are sort of the parameters, as I see it.

I'm not understanding why you think it would be appropriate to embark on a broader exploration of whether Nike was involved in corruption that goes beyond the allegations of Franklin. I told you several times why I don't think that's appropriate. It seems to me that's what you are trying to do.

MR. S. SREBNICK: It is what I'm trying to do, Judge. You announced your principles this morning. We have given the government the documents last night. I understand what the Court's principles are now. You asked me to explain what the documents are. I told you that they are consistent with what the Court announced its first principle was this morning, and I understand that that's the Court's view.

THE COURT: With respect to these documents, what I can tell you is that to the extent they involve Mr. Franklin, I've told you that cross-examination about Franklin, about Mr. Wilson's knowledge about Franklin and what he did, I am going to allow you to do that. But to the extent it goes beyond Franklin, no. Then I think we are just getting too far afield.

I suppose you could ask Mr. Wilson whether he is familiar with these texts. I suppose you could ask him whether he turned them over to the U.S. Attorney's Office because you suggested in papers that the company withheld materials from the U.S. Attorney's Office pertinent to Franklin. You can pursue that.

But as I've said many times, we are not going to pursue a broad exploration of whether Nike was involved in extensive corruption in the area of amateur athletics. We are not going to do that because Nike is not on trial here. Mr. Avenatti is. And, most importantly, whether or not Nike was engaged in broad-scale corruption of the amateur athletics, it's not a defense in any fashion for Mr. Avenatti, and that's why I can't permit that sort of broad exploration.

What we have here is, it's a narrow area that goes to Mr. Wilson's credibility. As I've said, I think you already have in the record a basis to challenge his credibility and that basis is, he's aware that his client is under investigation by the same office that's asking the questions. And so there is an obvious motive there to curry favor with the government, and the defense is welcome to suggest that to the jury. But, no, we are not going to embark on a broad-scale exploration of corruption that Nike might have been engaged in that has nothing to do with Franklin. We are not going to do that. I am not going to permit that.

MR. S. SREBNICK: I understand the Court's ruling.

THE COURT: I have not had a chance to look at these documents. Are these documents mainly about Franklin or are they about the broader issues that I have expressed concern about?

MR. S. SREBNICK: They are both.

What I will do is, I will confer with the government and my brother, and we will make sure that we obviously abide by the Court's ruling. We are not going to get into anything that deals with the broader misconduct that is unrelated to Franklin.

Let me just ask the Court how the Court would propose in terms of making the documents part of the record. Is it possible that the documents we have handed up to the Court, that those exhibits be made part of the record and that we also include at some point -- what I'd like to include is just notes from calls that the U.S. Attorney's Office had with the lawyers from Boies in which the Boies lawyers had made the representation, at least according to the notes, that there are no instances in which players knew Nike had paid players.

THE COURT: No. We are also not going to get into a broad exploration of what Boies has said to the U.S. Attorney's Office. Again, you're welcome to cross-examine Mr. Wilson about his dealings with the U.S. Attorney's Office and what representations he has made. Again, to the extent it's focused on Franklin, you're welcome to do that. But, no, we are not going into get into a broader exploration of whether Boies, on behalf of its client, has urged to the government that the client didn't do anything wrong. No, we are not going to do that.

MR. S. SREBNICK: I wasn't suggesting we would, in

light of the Court's ruling. I want to make part of the record just the notes of the Boies calls with the -- not the evidence record in this case, but obviously the record.

THE COURT: The record that ultimately an appellate court might want to see.

MR. S. SREBNICK: That's all.

THE COURT: Absolutely. You can make that record so that in the event someone later wants to see what was at issue, it will be available to them.

MR. S. SREBNICK: What I will do is, I will simply file it -- let me not file it because of other issues. I don't know the appropriate way. May I hand two documents to the Court and make it part of the court record in some way that's the nonadmitted evidence, I guess you would call it, that doesn't get filed in the public record?

THE COURT: There are a couple of different ways we could do it. You can docket it. You can send me a letter saying, Judge, these are the documents I had in mind that I wanted you to consider admitting. I don't know whether there is anything sensitive in the documents or not. If there is, then I suppose you or the government can make an application that it be filed under seal. But I don't know enough about the documents to know at this point.

MR. S. SREBNICK: We will work it out with the government.

I know the jury is waiting. One last thing and perhaps we can wait until the end of the day. In light of the Court's ruling, there are subpoenas that we have issued to Nike employees that some of whom fit within the categories that the Court has discussed. I don't want to withdraw the subpoenas, but perhaps we could discuss them at the end of the day and the Court can simply rule on them, in light of the Court's principles, so that the witnesses know their status and so we know their status for next week.

THE COURT: I'm happy to talk about the subpoenas at the end of the day.

MR. S. SREBNICK: Thank you, your Honor.

MR. PODOLSKY: Two quick items, your Honor.

I just want to put on the record, and we can deal with this as it goes, but I understand, as you've said multiple times now, the defense can inquire as to Mr. Wilson about his bias that might have been created by some knowledge of Franklin. We still do intend to object to extrinsic evidence proving up the truth of Mr. Franklin's allegations, which the Court has repeatedly said is not relevant to this case. I just want to note that as we move forward.

The second thing I want to note quickly is, I didn't ask for a sidebar when these documents were introduced because I didn't want to waste everyone's time.

THE COURT: What documents?

MR. PODOLSKY: The documents of D1 through 9, and there were some gaps.

I just want to note, we did not object to their introduction, but we believe they should be introduced not for the truth of the statements made within the documents. They are merely being offered for what Mr. Avenatti was shown and what he showed to Mr. Wilson. We would ask at an appropriate time for that limiting instruction.

THE COURT: Do you have any objection to my telling the jury that D1, etc., were not admitted for their truth?

MR. H. SREBNICK: Judge, can we think about that? Are you going to need that instruction right now?

THE COURT: It does seem to me that the documents were admitted to the extent they shed light on the state of mind of Mr. Avenatti and possibly on the state of mind of Mr. Wilson, and that's why they were introduced. But you're welcome to take some time to think about it, and you will let me know what your position is.

MR. H. SREBNICK: Can I have two minutes to run to the wash room?

THE COURT: We will take an additional five minutes. We will make the jury wait a little bit later. I'd like to begin at 12:05.

(Continued on next page)

(Jury not present)

THE COURT: Be seated. Are we prepared to proceed?

Mr. Podolsky, did you have something you wanted to raise?

MR. PODOLSKY: I just want to put this on the record, your Honor. There was some suggestion about these documents with respect to the timing of production, and I just want to note that we produced to the defense back in December -- December 23 -- exactly when each of the Nike documents by Bates stamp were produced to the government.

So, for example, each of the documents in the stack you were given today were produced either in January of 2018 -- I believe there may have been a few produced in February of 2019, all prior to the events in this case. So I just want to put on the record we have told the defense exactly when all of these documents were produced, so they know which ones were produced at what time in this case.

THE COURT: All right.

MS. PERRY: Just to very briefly respond and preview what we expect to put in the letter over the weekend. There were productions that were made up in May of 2018, and then they started again in mid-February of 2019. Immediately after Mr. Auerbach reached out to Mr. Slusher which was then related to Boies Schiller, and there were new documents that relate to Mr. Franklin, the California Supreme, including invoices and

remittances and checks and the like. So there were additional documents that were produced. They are highly relevant to corrupt payments that were made with respect to California Supreme. So I know the jury is waiting.

THE COURT: Well, again, if you believe that Mr. Wilson might have knowledge of that, you're welcome to cross-examine him about it. For example, if you think that he was involved in some sort of effort to deprive the government of relevant documents, you're welcome to cross him about it.

MS. PERRY: Thank you.

MR. PODOLSKY: Because I want to be clear, there is no dispute whatsoever with what your Honor just said, but I want to be clear about the record, because Mr. Wilson testified that additional documents were produced in early 2019 in response to additional requests from the government. We have produced the e-mails from the government requesting those documents and the response, so the defense is well aware of what prompted those productions.

THE COURT: OK.

Mr. Wilson needs to take the stand.

(Continued on next page)

(Jury present)

THE COURT: Please be seated.

Ladies and gentlemen, we will continue with the cross-examination of Mr. Wilson. Please proceed.

SCOTT WILSON, resumed.

CROSS EXAMINATION (Continued)

BY MR. H. SREBNICK

Q. Mr. Wilson, I would like to turn your attention now to the call on March 20, 2019 at 5:10 p.m. That was the one where Mr. Avenatti joined the call. Is that consistent with your recollection?

A. That was the third call of the day, yes.

Q. I'd like to -- I've got a few clips from that. The jury has already heard the whole thing, so I would like to go through a few sections. If we can begin with the same protocol as we've discussed before, Judge. We're going to have a scrolling transcript. The jury can rely on either that or their own notebook.

THE COURT: Just for the record, what's the exhibit number?

MR. H. SREBNICK: This is Government Exhibit 1.

THE COURT: OK. So the jury should be looking at Government Exhibit 1T.

MR. PODOLSKY: Just because defense counsel said the jury can rely on the transcript or the recording, I just want

to make clear the judge's instructions with respect to the use of the aid to the jury.

THE COURT: Yes, I have said many times that the evidence is what is on the tape and not what is on the transcripts, so I'm sure the jury understands that at this point. Please proceed.

MR. H. SREBNICK: If we could go to page 4, line 1 of the transcript that's the aid, and just play that for the jury and then I will ask you some questions.

(Audio played)

Q. Mr. Wilson, this is Mr. Avenatti using some pretty harsh language, using the F word several times, correct?

A. He was swearing, yes.

Q. And he is telling you that this is urgent essentially. That's the message he is conveying to you?

A. He told me that he might hold the press conference the very next day.

Q. He wants you to talk to your people at Nike?

MR. PODOLSKY: Objection, your Honor.

Q. I will rephrase. He is communicating to you he needs you to contact the people who can make a decision about an offer to settle the case. Isn't that what he's communicating to you?

A. I understood him to be communicating to me that if at this point a deal with these two components wasn't possible, that our discussions were at an end and he would proceed with his

press conference.

Q. And you had told him you don't have the authority to make that decision; you need to consult with your client at Nike.

A. I don't believe -- I don't recall whether I said that earlier in this call or not.

Q. The day before you had told him you didn't have the authority?

A. The day before I certainly mentioned that we needed to consult with the general counsel who is in Europe.

Q. You had told Geragos an hour or two before this call on March 20 that you were convening people at the highest levels, you were taking it seriously and all of that, right? We just went through that.

A. I recall the call we listened to from earlier in the day.

Q. And so we're clear, both Avenatti and Geragos are on this call at 5:10 p.m., the one we're listening to now.

A. The one we are listening to now was the three of us, yes, speaking.

Q. Mr. Avenatti, this is the prelude to him asking you to provide or to agree to an internal investigation at a particular price. He says to you, page 5, line 6 and 7, "You're going to hire us to do an internal investigation, but it's not gonna be capped at 3, or 5, or 7 million dollars." Do you see he that?

MR. PODOLSKY: Objection.

THE COURT: Well, that's not exactly what it says, Mr. Srebnick.

MR. H. SREBNICK: I will rephrase.

Q. Do you see lines 6 around 7 -- or 5, 6 and 7?

A. I do.

Q. Let me start at line 3. "So if you guys think, you know, we're gonna negotiate a million five, and we're gonna -- you're gonna hire us to do an internal investigation, but it's gonna be capped at 3, or 4, or 5 --

THE COURT: You have to read exactly what's on the page.

MR. H. SREBNICK: Did I miss something?

THE COURT: Well you added something that wasn't there. You just need to read it as it appears on the page.

Q. "But it's gonna be capped at 3, or 4, or 5, or 7" --

THE COURT: There is no 4 there, sir.

MR. H. SREBNICK: I just said 5.

THE COURT: You said 4. You've said 4 several times now. All I want you to do is read it as it appears on the page.

Q. 3 or 5 or 7.

A. OK.

THE COURT: OK.

MR. H. SREBNICK: Forgive me, Judge. I thought I did, but I apologize.

THE COURT: Not according to the transcript and not according to what I heard.

MR. H. SREBNICK: I apologize.

THE COURT: Anyway, ask your question.

Q. Mr. Avenatti is resisting a cap at those numbers.

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. So, if we -- do you recall Mr. Avenatti then wants to find out how much Boies Schiller would charge?

MR. PODOLSKY: Objection, your Honor.

MR. H. SREBNICK: How about if we just play the tape then.

THE COURT: The problem -- and we have talked about this before -- when you ask questions that go to someone else's state of mind, it's objectionable. That's why the government is objecting, and that's why I'm sustaining the objection.

You can't frame the questions as to what Mr. Avenatti was wanting, what he was thinking, what was in his mind. No, you can't ask this witness that, because he can tell you about his state of mind; he can't testify about Mr. Avenatti's state of mind. That's the problem. That's the reason why I'm sustaining the objections.

MR. H. SREBNICK: May I ask, Judge, did Mr. Avenatti ask you to tell him what Boies Schiller would charge for such an internal investigation?

THE COURT: Yes.

Q. Do you recall Mr. Avenatti asking you that question?

A. Yes, more than once.

Q. So if we could go to page 7, line 13.

(Audio played)

Q. We just stopped at approximately page 8, line 7 -- do you see that -- of the transcript?

A. I see where we stopped, yes.

Q. So do you count four times where Mr. Avenatti is asking you to set a price for what an internal investigation would cost?

A. He was all over the map, expressing various dollar amounts ranging into the hundreds of millions of dollars that he purported to tell me my prior law firm had charged or would charge for an internal investigation, and he returned several times to asking me this concept what would your firm charge.

Q. So at page 7, line 14 -- or 13 and 14 -- there he says, "What would you guys ask for for an internal investigation of this nature?" Do you see that?

A. I see that text, yes.

Q. If we go to page 8, line 2, Avenatti says, "Scott, what would you quote? We will go with your quote." Do you see that?

A. I see that, yes.

Q. It continues, "You tell me what Boies Schiller would quote." That's the third time he's trying to ask you what

would Boies Schiller quote, right?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. I don't know if at that point he's asking me or telling me, but it's a third time in the text we've looked at that he referenced this concept of what dollar amount Boies Schiller would charge for something.

Q. He then says, "and you tell me what that number is, and I'm highly confident that that number will probably be acceptable, or something very close to it. As long as it is a real quote." Do you see that?

A. Yes, I do.

Q. Now, up to that point you're not giving him an answer, correct?

A. I had not responded other than to say -- no, I had not said a number out loud up to that point.

Q. I'm going to ask Mr. Lyon to continue playing the tape.

(Audio played)

Q. In response to what we just went over, you speak to Mr. Avenatti and you indicate that this is a major matter. Line 18 of page 8, correct?

A. I used that phrase, yes.

Q. You indicate it, being the internal investigation, would cost in the millions of dollars, correct? Line 17 and 18.

A. I said that I thought fees in the millions of dollars would

be the going rate on the street.

Q. And line 19 you indicate that your law firm, Boies Schiller, would charge millions of dollars for an internal investigation like that, that that would be the going rate on the street, right?

A. Yes, that's an approximation of what I said, yes.

Q. OK. Now, at that point in time you're not suggesting to Mr. Avenatti that it would be unacceptable to have Avenatti and Geragos manage the internal investigation, correct?

A. I took care to not express to Mr. Avenatti that it was a complete nonstarter that he and Mr. Geragos conduct an internal investigation at Nike, because I believed if I did so it would spook him and he would proceed to execute on his threat to harm the company's reputation.

Q. So you did not say anything about rejecting the idea of Geragos and Avenatti managing the internal investigation, correct?

A. At points in --

Q. Correct?

A. At what point, sir?

Q. Right there.

A. Nothing like the words you just described were said at this point in this conversation.

Q. Isn't it fair to say that on the day prior, March 19 -- we went over it earlier -- item I think it was number 3 of the

interests that Nike had, item three was conducting an internal investigation as to the allegations related to Mr. Franklin's claims. Do you recall that?

A. I recall saying that the company had an interest in conducting an internal investigation into its conduct. I don't know that I linked it to -- I don't recall linking it to Mr. Franklin's claims, whatever those might have been.

Q. If we could go now to page 11, line 23.

(Audio played)

Q. Would that be approximately the fifth time that Mr. Avenatti is trying to find out how much would Boies Schiller charge for an internal investigation of this sort?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. It was hard to keep a straight face by this point, because he had asked me this so many times, which suggested to me he had no idea what internal investigations should cost, and probably didn't have experience in that area, but I think your number would be -- up to four or five times at this point, that sounds about right.

Q. In we could continue.

(Audio played)

Q. So, at page 12, lines 12 through 14 you respond to Mr. Avenatti that an investigation like this could hit the 10 to $20 million range, correct?

A. Yes, I did.

Q. Now I'd like to turn to page 12, line 19.

(Audio played)

Q. So, Mr. Wilson, Mr. Geragos is an active participant in this facet of the discussion, correct?

A. He spoke up at this point.

Q. He spoke up at the point when the discussion was turning on the issue of how to structure the internal investigation.

A. Yes, I asked whether he and Mr. Avenatti were part of the same law firm and how exactly we would -- the client was supposed to contract with whoever to do this purported work.

Q. And Mr. Geragos said that that's hardly the speed bump here.

A. Yes, he did.

Q. At the top of that -- excuse me -- at page 12, line 23 you're talking about papering all of this. Do you see that?

A. I do, yes.

Q. And you're communicating to Mr. Avenatti and Mr. Geragos that all of this would be documented. Is that what you mean by papering something? Documented, having formal documents describing the terms of the engagement, the parameters, however it's documented in Boies Schiller's opinion?

A. I was asking them, rather, how they were proposing that this would be papered. And by papered I was referring to putting writing on a piece of paper.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page181 of 263

K1V7AVE2 Wilson - cross 542

Q. These would be formal documents to be executed by all the relevant parties? Is that what you were communicating?
A. I didn't know. I was asking them. And I let some of my skepticism show through when I said "through whatever". I didn't know what this was, but I wanted them to tell me how it was we were supposed to write this up.
Q. And when you do an internal investigation like you've done on behalf of Nike in this case, is it papered, as you describe here?
A. When I'm doing work for Nike, it is under an engagement letter that the law firm that I'm employed by has entered into with the client.
Q. Signed off by all the relevant parties to the engagement?
A. Typically the engagement letters would be signed by a representative of Nike on behalf of the company and myself on behalf of my law firm.
Q. So I'd like to turn to page 18, line 16 -- page 18, line 16. Excuse me. Hold on one second, Mr. Lyon.
I think we can just start at line 16, please. Thank you.
(Audio played)
Q. So, at this point in the conversation do you recall that you are discussing with Mr. Avenatti having a face-to-face meeting the next day, March 21? Correct?
A. Yes, Thursday the 21st.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 543

Q. And Michael Avenatti is saying he is -- page 18, line 24 -- "I'm not expecting an answer tomorrow. Just to be clear, I'm happy to modify my position."
A. He said those things, yes.
Q. And you understood that to mean that you'd have the time to get whatever authority you needed come Monday to make an offer in response to the demand.
A. I understood that at the meeting the next day he would articulate -- put a number on the second part of his demand, because in this meeting there were a bunch of different numbers thrown around, and then that I would have until Monday to come up with the company's final response to his demands.
Q. Lines 9, 10 and 11 -- or 8, 9, 10, 11. "We meet tomorrow in New York you and me. You can give me the definitive terms so I have something to actually get approvals on." That's your words, right?
A. Yes.
Q. Now, you said on line 5 "with a minor modification". Was that the business about you had a family member who had an accident or something?
A. The request was that we meet the following afternoon rather than the following morning.
Q. Did you indicate you had a family member that needed to have a medical appointment?
A. I did, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 544

Q. And was that true? Did you actually have a family member who needed a medical appointment?
A. Not that following morning, no.
Q. So that was effectively a lie?
A. I gave him inaccurate information because I was concerned about whether or not the F.B.I. -- with all due deference to their capabilities -- would have the equipment ready for me to record an in-person meeting, because thus far I had just been cooperating with them to record telephonic calls, and so I wanted to buy a little more time in order to confer with the government about how they'd like me to proceed with the meeting.
Q. So that was a lie.
A. It was not true that I had a medical appointment -- a family member of mine had a medical appointment the next day.
Q. So, after the meeting of -- excuse me. After the phone call of March 20, did -- let me withdraw that.
Did Mr. Geragos during this phone call indicate anything that he would disagree with the proposal that Mr. Avenatti had been making?
A. We listened to the entire call. I don't recall him expressing disagreement on the Wednesday afternoon call with Mr. Avenatti.
Q. Now, the next day was Thursday the 21st. Did you meet with the F.B.I. in anticipation of recording Mr. Avenatti and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 545

Mr.Geragos?
A. I did, yes.
Q. And did they wire you guys up?
A. I was provided with technological means to make audio video recordings of our meeting.
Q. Colloquially, does ha that mean wire up? Does that sound right?
MR. PODOLSKY: I'm going to object to that question.
THE COURT: Sustained.
Q. Did someone have a camera?
MR. PODOLSKY: Objection. If we need a sidebar, we will be happy to speak about it.
THE COURT: All right.
(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000181

(At the side bar)

MR. PODOLSKY: Your Honor, the F.B.I. uses certain techniques to record. Those techniques are not public. That could compromise future investigations. There is no relevance to how the cameras were placed, what kind of cameras they were or anything like that. He has testified that he brought recording equipment in, and there is no relevance to these questions.

MR. H. SREBNICK: I wasn't going to go down the road he thought. I was just confirming that someone gave him the camera. I won't go into the techniques or any of the technology.

THE COURT: OK.

(Continued on next page)

(In open court)

BY MR. H. SREBNICK:

Q. It was the F.B.I. who gave you some sort of camera device to video the event?

A. The equipment I received to create audiovisual recordings of the event came from the F.B.I.

Q. And did they -- did the F.B.I. give you instructions -- without getting into detail -- on how to do your job as a person recording Mr. Avenatti and Mr.Geragos?

A. The only instruction I recall was while I was walking to the meeting that I not engage in conversation because it would be picked up by the recording devices.

Q. Did anyone from the F.B.I. or federal law enforcement, U.S. Attorney's Office, suggest any I'll say script but I mean any kind of approach on how to steer the conversation?

A. Again, what I recall in that regard is that I was asked to get the individuals I was meeting with to articulate their demands, to let them do the talking, to hear them out.

Q. F.B.I. wanted you to get a number associated with the internal investigation?

MR. PODOLSKY: Objection, your Honor, as to what the F.B.I. wanted.

THE COURT: Sustained.

Q. Did the F.B.I. communicate to you that you should find out from Avenatti and Geragos how much money they were proposing

the internal investigation would cost?

A. No.

Q. If I could turn the attention to page 13, line 1. Excuse me. This is Government Exhibit 2, right?

MR. PODOLSKY: It's 2T, your Honor. We actually discussed this earlier, the offering of a separate recording.

MR. H. SREBNICK: If I could explain, Judge.

MR. PODOLSKY: Your Honor, can we just deal with this at the side bar rather than explain?

MR. H. SREBNICK: I will short circuit this.

Q. There was also an audio recording -- can I ask the question? You need a sidebar? OK.

(Continued on next page)

(At the side bar)

THE COURT: What's the problem?

MR. PODOLSKY: All he needs to do is rather than get into the technicalities of it is offer this other recording and we won't object.

THE COURT: What other recording is it we are talking about?

MR. PODOLSKY: As I mentioned this morning, your Honor, there was both a video recording and a separate audio recording. I understand Mr. Srebnick wants to play the audio recording which is technically not yet in evidence.

THE COURT: Then that's different from what was already played.

MR. PODOLSKY: Correct.

THE COURT: Is there any reason we can't use the same one?

MR. H. SREBNICK: Because the synchronization was done to the audio, separate audio, but it's the same exact content, Judge.

THE COURT: All right. I guess if we have to use a different recording it will have to be admitted as a defense exhibit.

MR. H. SREBNICK: Very well.

THE COURT: I don't understand why we can't use the same one that's already in, but if that's not practical, you will

offer it and I will receive it. So what's the defense exhibit going to be?

MR. H. SREBNICK: Judge, we will give it UU.

THE COURT: All right. So when we go back, you will offer Defense Exhibit UU. I will explain to the jury it's just a copy of the same audio they've already heard.

MR. PODOLSKY: Just so you know why I'm objecting, I just don't want the defense to be commenting on the evidence before the jury. I just want questions and answers. That was the reason I was raising a few of those objections to the commentary.

THE COURT: OK.

(Continued on next page)

(In open court)

THE COURT: Mr. Srebnick, you are offering Exhibit UU?

MR. H. SREBNICK: Yes, your Honor.

THE COURT: That's received.

(Defendant's Exhibits UU received in evidence)

THE COURT: Ladies and gentlemen, this is just another copy of the audio for this conversation, which has been received as Government Exhibit 2. This is a copy. For technical reasons, we need to receive another copy of it and receive it as UU so Mr. Srebnick can use it with you.

Go ahead, Mr. Srebnick.

(Audio played)

BY MR. H. SREBNICK:

Q. Mr. Wilson, so in this recording we hear the ask or the demand from Mr. Avenatti regarding the price for the internal investigation, correct?

A. This was an occasion on which he described what the ask was for that component of his demand.

Q. And the amounts he, Avenatti, discussed was $12 million retainer -- that's at page 14, line 7 -- $12 million retainer upon signing Evergreen. "That's gonna be deemed earned when paid, we'll cap it at $25 million, minimum of $15 million, unless the scope changes." Correct?

A. I see that.

Q. Now, the day before you had indicated to Mr. Avenatti that

an internal investigation of a matter like this could be 10 to $20 million. Do you recall we just went over that?

A. I recall the statement I made during the call the day before.

Q. At the bottom of the page -- excuse me -- bottom of page 14, lines 21 through 23, there are hourly rates proposed and I think you described yesterday as a blended hourly rate. You explained that to the jury of 950 an hour, paralegal rate of 450 an hour.

A. Blended hourly rate was the phrase that Mr. Avenatti used and I explained what I understood that to mean.

Q. Now, in fact Boies Schiller has lawyers who charge in excess of 950 an hour?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. In all events, you explained to the jury what you understood that to mean. And did you voice any objection to Mr. Avenatti or Mr.Geragos as to these terms as was proposed by Mr. Avenatti?

A. Later in the meeting I asked how could I explain to the client why we would be hiring -- excuse me -- my client would be hiring them. But I did not in the course of this investigation being recorded by the F.B.I. object to these terms of Mr. Avenatti's demand.

Q. If we go to page 15, starting at line 1. Hold on one

second. I will ask Mr. Lyon to play that.

(Audio played)

Q. You heard Mr.Geragos speak at that point?

A. I recognize it was Mr.Geragos' voice saying "correct, it would just be one entity."

Q. So the discussion is over how the retainer agreement or the engagement agreement for the internal investigation would be structured, and Geragos says it would be just one entity. Right?

A. I was asking who did they want Nike to contract with with respect to this purported internal investigation.

Q. And Geragos said it would just be one entity, correct?

A. I see that language, yes.

Q. If we could continue.

(Audio played)

Q. Did you hear Mr.Geragos discuss a contract or subcontract for PIs?

A. That was his voice we just heard.

Q. And PI, did you understand that to mean private investigators?

A. Yes.

Q. And talking about "need people on the ground to do interviews and things of that nature along with witnesses."

Do you see that?

A. I do.

Q. In your experience. when lawyers interview witnesses, do they from time to time bring a witness or an investigator to participate in the interview?

A. It's a practice I'm more familiar with when the government is conducting interviews. It's not a practice I'm familiar with with respect to corporate counsel conducting an internal investigation.

Q. When you do an internal investigation, do you have two people attend an interview or just one?

A. In my experience I typically have two people -- two lawyers for the company at least attend the interview.

Q. And one of those persons, at least one is taking notes usually?

A. Generally yes. It's hard to ask the questions and also take good notes at the same time, so I will usually have a more junior attorney there with me to prepare notes of the interview.

Q. As a substitute for an attorney taking notes, you never had the practice of using an investigator to serve as the note taker?

A. Never.

Q. We can continue.

(Audio played)

Q. So Mr. Avenatti is explaining that "we would adequately staff the engagement. Whether it be through attorneys, or PIs,

or others." then he says "we will retain individuals to conduct the investigation - beyond what we already have, as needed."

Did you hear that?

A. I see that text, yes.

Q. Do you recall hearing it?

A. There was a bit of a garbled bit in the middle, but that was said, among other things he said.

Q. So did you understand from that that the staffing of the internal investigation would occur as needed?

A. My impression was that I caught them both off guard with the question and that they were acknowledging that they didn't have staff for this investigation they were proposing to conduct immediately, and so they were sort of spinning their wheels talking about -- they recognized the kind of soft spot I was poking at, and they were trying to say, well, sure, we will hire people to do the work, including what to me was a very odd class of contractors to suggest that you would hire a private investigator to conduct employee interviews.

Employees are interviewed in internal investigations at the request of the company. You don't send someone out to stop them when they're coming out of their home.

Q. During internal investigations, from time to time you can speak to someone outside of the company, correct?

A. It is atypical in my experience, very highly unusual to speak to someone outside of the company in connection with an

internal investigation when there is a pending government investigation. In fact, it's something the government might view as obstruction of justice in some instances.

Q. To interview somebody? Just to interview somebody is obstruction of justice?

A. It could absolutely get counsel in trouble with the Department of Justice if you speak to other subjects or targets of a criminal investigation that you know to be ongoing as counsel to another party that may also be under investigation. The department of justice could view that as you trying to get your story straight with the person outside of the company. There is a term of art for this, it's called deconfliction. It is the best practice for conducting internal investigations. If you are going to speak to somebody outside the company, to raise that with the government before you do it, because, as I say, it can be regarded as misconduct by the Department of Justice.

Q. Mr. Wilson, not all internal investigations occur with the government's participation. You're not saying that, are you?

A. I was referring to instances when an internal investigation is being conducted by a company during the pendency of a federal criminal investigation.

There are certainly internal investigations that happen when there isn't a federal criminal investigation pending. In this instance there was one.

Q. And are you suggesting that -- are you stating that it's improper for a lawyer to interview someone with a private investigator to ask questions, that that's improper?

A. I stated that it would be highly unusual and possibly improper for the lawyer for a company to interview people outside the company like third parties if that lawyer had an understanding that the government might be investigating the interactions between the company and that person.

Maybe the F.B.I. wanted first crack at that person and would view the company reaching out to that person as interfering with the government's criminal investigation. This is a standard aspect of corporate white collar practice.

Q. Mr. Wilson, you're saying it's improper just to interview somebody? Is that what you're saying?

MR. PODOLSKY: Objection.

THE COURT: We have been over this now this is the third time. We're not going to go over it again.

MR. H. SREBNICK: Understood, Judge.

Q. If we could turn to page 16, line 16.

(Audio played)

Q. This is a discussion about what Geragos describes as the penalty clause. Do you see that?

A. I was referring back to this notion that Mr. Avenatti had raised at our previous in-person meeting that if Nike decided to engage some other law firm to conduct an internal

Case 21-1778, Document 61, 04/04/2022, 3290318, Page185 of 263

K1V7AVE2 Wilson - cross 558

investigation, that Nike would have to pay him and Mr. Geragos two times the dollar amount of the fees paid to the law firm actually doing the work.
Q. And Geragos called it a penalty clause?
A. Here I think he was referring to the same thing that I was referring back to, yes.
Q. And so if we turn to page 17, line 7.
(Audio played)
Q. So, do you hear that Mr. Geragos is defending what had been described as a favored nations clause, or he called it a penalty clause? He was explaining why he thought it was appropriate.
MR. PODOLSKY: Objection, your Honor.
THE COURT: I will allow the witness to answer.
A. I understood Mr. Geragos to be offering reasons for why an internal investigation should be conducted into corruption in amateur basketball and Nike.
Q. Well, do you have the transcript, page 17 -- starting the top of page 17, line 1, the actual transcript. We can play it again, but this follows your question about the penalty clause, doesn't it?
A. It follows Mr. Avenatti's response to my question.
Q. And Mr. Geragos is expressing concern that the investigation shouldn't be a whitewash.
A. He was telling me a little story about, as I took it, his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 559

connection to or involvement in some way with USC about prior investigations at that university.
Q. At page 17, line 13, he says, "Every time USC" -- and you understood that to be University of Southern California?
A. I did.
Q. "Every time USC hires the same law firm, who will remain nameless, who does a quote unquote, investigation, that quote unquote investigation, is nothing but a whitewash ..." Do you recall him saying that?
A. I heard it, yes.
Q. And Mr. Geragos was communicating to you that the investigation should be done by lawyers who won't conduct a whitewash, right?
A. I understood him to be telling me an anecdote about USC conducting internal investigations, and I took him to be using the phrase white wash in a negative pejorative way.
Q. Boies Schiller conducted an internal investigation and continues to conduct an internal investigation of the allegations that we have been talking about here, paying players, directing false invoices, things of that nature?
A. Boies Schiller began to conduct an internal investigation on behalf of Nike when we were retained following the company's receipt of the grand jury subpoena in September 2017. The internal investigation was certainly continuing at the time of the meetings I had with Mr. Avenatti.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 560

Q. I think you told us today it's continuing on as we speak.
A. To the best of my knowledge. I'm not aware that it's concluded.
Q. Have any of the Nike executives who were directing Franklin to make fake invoices, pay family members of players, pay handlers, have any been terminated?
MR. PODOLSKY: Objection, your Honor.
THE COURT: Sustained.
Q. Has Boies Schiller found any misconduct in the course of its internal investigation?
MR. PODOLSKY: Objection. Objection, your Honor.
THE COURT: I will hear the parties -- the lawyers at side bar.
(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 561

(At the side bar)
THE COURT: I thought I was clear about this, but apparently not clear enough. So what I allowed you to do was ask this witness -- first of all, he was involved in the investigation and the investigation that concerned Franklin. I told you ask him about that. I thought I was pretty clear that we're not going to get into, you know, everything that Boies Schiller did or did not uncover with respect to Nike's involvement with amateur athletics. That's not what we're doing here.
MR. H. SREBNICK: Understood.
THE COURT: The reason I went through it this morning was I was trying to communicate with you that questions in this area have to be very focused.
MR. H. SREBNICK: I will focus them.
THE COURT: And we're not going to talk about Boies Schiller as the firm. You're going to ask him what he knows and what he did, and it's always got to be in the context of Franklin.
MR. H. SREBNICK: Will do.
(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000185

Case 21-1778, Document 61, 04/04/2022, 3290318, Page186 of 263

K1V7AVE2 Wilson - cross 562

(In open court)

BY MR. H. SREBNICK:

Q. Mr. Wilson, I want to focus my questions. When I say internal investigation, I'm talking specifically about the Franklin matter, the evidence that you saw Mr. Avenatti present to you. You were part of the internal investigation team at Boies Schiller until you left?

A. I was part of the team at Boies Schiller engaged by the company following its receipt of the grand jury subpoena -- in addition to assisting the company and responding to the government's subpoena -- that conducted an internal investigation at the company.

Q. Specifically with respect to the allegations that Mr. Avenatti presented to you in March of 2019, did you as the person participating in the internal investigation make any findings or recommendations regarding -- I will stop the question.

Judge, I prefer that you ask the question at this point, so I don't --

THE COURT: I'm actually not going to ask the questions here. You are. I have tried to be very clear about what is relevant and what is not, so I think you can ask the question.

Q. Just wait for an answer if he has an objection, please.

A. Sure, of course.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 563

Q. I'm talking about Scott Wilson now as part of the internal investigation team, related to the allegations that Mr. Avenatti presented regarding Mr. Franklin at the meetings in March 2019. Do you know what I'm referring to? Those allegations, directing payments, directing Franklin to make payments, involved with Franklin to make payments, things of that nature. That's what I'm referring to. OK?

A. I understand you're referring to the allegations by Mr. Avenatti beginning with the March 19 meeting.

Q. An internal investigation was already underway. You were participating in it at the time?

A. There was an internal investigation that had been under way since September 2017, and I was part of the Boies Schiller team working on that investigation.

Q. As of March 2019 you were working at Boies Schiller, correct?

A. Yes.

Q. When you met ET with Mr. Avenatti you were working at Boies Schiller.

A. I was a partner in the firm.

Q. You told us you had already heard of these allegations that Mr. Avenatti brought to your attention during the course of your internal investigation; is that correct?

A. No, I believe I said I had already heard of Mr. Franklin and his program. Some of the specific allegations that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 564

Mr. Avenatti raised were new to me.

Q. Those were new to you?

A. Some of the things that he said, some of the documents I saw -- which were not Nike documents -- were knew to me.

Q. But the allegations, were those new to you? Or did you already know as part of your performing an internal investigation at Nike for some 16 months by then that DeBose and James were directing Franklin to create false invoices to pay cash to family members? Did you know that -- you, Scott Wilson -- know that as the person participating in the internal investigation?

A. The interactions between Mr. Franklin and Mr. Ayton and his family were, as I've said before, part of what Boies Schiller had been sharing with the government for more than a year -- proffering with the government -- for more than a year before I met with Mr. Avenatti.

As to the specific allegations that he raised in the meeting, I don't have perfect recall of them, but certainly we produced many documents relating to Mr. Franklin and Mr. Ayton, Cal Supreme. There had been in-person meetings with the government at which those two individuals in that program came up, to my understanding, although I didn't attend those meetings. And also there were a number of phone calls that I or colleagues of mine at Boies Schiller had with the U.S. Attorney's Office with the Southern District of New York in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 565

which one or more players in the Cal Supreme program were discussed.

Q. You said you listened to calls that Boies Schiller made to the U.S. Attorney's Office?

A. I said that I and others of my colleagues had called with the U.S. Attorney's Office during the course of our work.

Q. And did you document your participation in those calls?

A. I don't recall how many of the calls I personally participated in.

Q. Would there be records showing which calls you participated in? Billing records, for example, where you bill for your time.

A. I did bill for my time on an hourly basis, and in general if I participated in a call with the government, I would reflect that in my billing entries.

Q. Do you know if you participated in a call with the government in November of 2017 where Boies Schiller or representatives of Boies Schiller called the government to make a proffer -- without getting into the details -- November of 2017.

A. I recall that --

THE COURT: What year are we talking about?

MR. H. SREBNICK: November 2017.

THE COURT: Oh, it's just November 2017. OK.

MR. H. SREBNICK: I can get a more precise --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000186

THE COURT: No, that's fine.

November 2017, do you remember participating in a call?

THE WITNESS: Without -- I am aware that Boies Schiller attorneys spoke to the government in the fall of 2017 by phone. I don't recall whether I participated.

Q. Would your billing records answer the question of whether you were a participant or at least a listener on the call?

A. They might.

Q. But as you sit here today, you just don't remember?

A. I don't.

Q. Let me show you a document and see if this refreshes your recollection. I'm going to show you what we are marking as VV, V, Victor.

Can I approach?

THE COURT: Yes.

MR. PODOLSKY: Your Honor, can we have a copy?

Q. If I could just announce for the record, this is VV, V, Victor with a Bates number 3552-034.

A. Would you like me to read this?

Q. Yes, to see if it refreshes your recollection.

Do not publish it to the jury, please.

A. I apologize. I'm only able to read about --

Q. I'm having trouble hearing you.

A. I am only able to read about 60 to 70 percent of this

cursive handwriting. which is why it's taking me some time.

OK, I've read it as best I can.

Q. The only question is whether it refreshes your recollection whether you participated in a phone call in November of 2017 with the government.

A. It does not refresh my recollection in that regard.

Q. Do you recall if you participated in a conversation with the government on behalf of Boies Schiller in December of 2017, perhaps more precisely on December 14, 2017?

A. I do not recall.

Q. If I may show you what we're marking as WW. The Bates number is 3552-035.

May I approach, Judge?

THE COURT: Yes.

A. I'm sorry. What was the question, counsel?

Q. Yes, the question is: Does that refresh your recollection whether you personally participated or listened in on a conversation between Boies Schiller on behalf of Nike and the federal prosecutor sometime in or about December 2017, perhaps December 14, 2017?

A. It does not refresh my recollection. The recollection I have is that certain partners of mine took lead responsibility for communicating with the U.S. Attorney's Office.

Q. Did you provide any input to those partners?

A. I spoke often to my partners about the work we were doing

together.

Q. I want to revert back to the questions that got me into this issue of talking to the government.

I was asking you earlier when Mr. Avenatti presented you with the documents regarding Franklin being asked by DeBose and James to pay family members of players, handlers, specifically Franklin's matters, were you aware of that at the time Mr. Avenatti brought it to your attention?

A. I apologize. Could you ask that one more time?

Q. The documents that Mr. Avenatti presented to you, the allegations that he presented to you, were you already familiar with the allegation that Franklin had been directed by Nike executives to pay handlers, that Franklin had been directed to falsify invoices, that Franklin had been directed to structure cash payments $5,000 here, $5,000 there? Were you already familiar with those allegations?

MR. PODOLSKY: Your Honor, I'm going to object at this point. It's vague and compound, and I think it's been asked and answered as well.

THE COURT: The problem is it's compound, so I think you're going to have -- in order to get a clear answer you have to go category by category.

MR. H. SREBNICK: Very well.

Q. When Mr. Avenatti presented you documents showing you that Mr. Franklin had been asked to get on a plane and fly to

Phoenix for a turn-around trip to give cash to a mother of an NBA prospect, were you already aware of that?

A. I recall very specifically that this flight to Phoenix was something that I newly learned about in the course of the meeting on March 19. That was not something of which I had been focused or recall being aware of before my meeting with Mr. Avenatti.

Q. Were you aware that Nike executives had directed Mr. Franklin to give cash to the mother of Mr. Ayton?

A. No, I was not aware of that allegation prior to Mr. Avenatti stating it in our meeting.

Q. Had you as part of your internal investigation already interviewed either DeBose or James, employees at Nike?

A. Yes.

Q. And that internal investigation didn't reveal that these -- that this payment was made, correct.

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Did you ask DeBose or James during the internal investigation whether either of them had directed Franklin to get on a plane, go deliver cash to the mother of an amateur basketball player?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. You're asking me to describe communications I had in my

capacity as counsel to Nike with employees of my client?

Q. Yes.

A. It's difficult for me to see how, because internal investigations, as we discussed a few times, are privileged. It's difficult for me to see how I can answer that question when phrased in terms of what I may have discussed with any Nike employee when I was acting in the capacity as counsel to the company and interviewing them in my capacity as such.

MR. S. SREBNICK: Judge, may I ask if he is asserting a privilege?

THE COURT: I will see the lawyers at side bar.

(Continued on next page)

(At the side bar)

THE COURT: It might make sense to have Mr. Skinner come up.

MR. H. SREBNICK: I see it's 1:25. Did you want to do this during a break for the jury?

THE COURT: Does anyone on the jury need a break at this point? All right. So we will take a brief recess.

OK. To sort of summarize the pending question, Mr. Srebnick was asking Mr. Wilson whether he asked Mr. DeBose and Mr. James whether they had asked Mr. Franklin to make certain payments. That's sort of what the pending question is, right?

MR. H. SREBNICK: Yes.

THE COURT: And then Mr. Wilson seems to be asserting privilege.

MR. SKINNER: Yes, and I think properly so. He asked a question that seeks privileged information. Privilege has not been waived. What I might suggest is if questions be framed as to what Mr. Wilson's understanding is of the communications that were made by the company to the government, which of course would not be privileged.

THE COURT: How about that?

MR. H. SREBNICK: Well, that would certainly be an additional area I would like to go into, but the Court had foreclosed me from doing that unless I could prove Wilson was

the one who made the statement.

MR. SKINNER: Well, ask him what he knows, and then he can testify as to what he knows. But you are asking him about a down-the-middle privileged communication.

MR. H. SREBNICK: So, your Honor, I'm not convinced it's privilege. It may be work product, but I don't know it's an attorney/client privilege. The lawyer, Mr. Wilson, is not representing either DeBose or --

MR. SKINNER: Can I explain Upshine, your Honor?

THE COURT: I don't think you need to. Let me ask you this. What was the point of me issuing a 502 order?

MR. SKINNER: The point of the 502 order was to protect inadvertent disclosures of privilege. What he is being asked to do right now is he is asking a lawyer to testify as to a communication with his client to gather information in the course of gathering legal advice when the company has made clear it's not waiving its privilege.

So, the 502 was to protect against inadvertent bleed-outs. I am up here on behalf of the company asserting privilege. This is not an inadvertent bleed-out, and you're asking for a privileged communication.

I have offered another mechanism to try and elicit the information if he knows what was communicated to the government, because that would not be privileged. But he is asking about something I think is plainly privileged.

MR. S. SREBNICK: If I may respond. As I understand Mr. Wilson's testimony, Nike through Boies Schiller has been cooperating with the government for the last two and a half years now. They have orally downloaded a lot of information to the government through proffers, through meetings. They have turned over a lot of information. They have received multiple notes of discussions that they've had, and I would suggest that they have waived any privilege.

There is a case I litigated called SEC. v. Herrera out of the Southern District of Florida that when a law firm in connection with an internal investigation orally downloads the results of the investigation to the U.S. Attorney's Office, that that's a waiver of the privilege.

I know this court has ruled in a case about six or seven years ago -- and I think the name of the case was Guirm -- that where there have been meetings with law enforcement relating to investigations, that the law firm waives the privilege.

So, what we're dealing here with is I think really fact work product. There was questions about whether he, Mr. Wilson, asked certain questions of Mr. DeBose and Mr. James and what the results of those questions were. So, I think that's probably the lowest form of privilege in our system. We would submit that that privilege would have been waived.

MR. SKINNER: No, I disagree with that

characterization. To the contrary, it's the highest form of privilege because it's a question by an attorney -- it's an interview by an attorney of his client. This is an attorney/client communication. This is not an attorney work product.

The waiver argument -- look, I'm going to put the waiver argument to the side because we don't have anything close to a sufficient factual argument to suggest that there has been a broad subject matter waiver over all of our interviews with company employees.

The problem that I have with this is a specific questioning about what happened in an interview with Mr. DeBose. What we're talking about here is the bias and motive of a witness who is testifying on the stand. You want to get into his mind what he knows about what was communicated to the government? I think all of that is irrelevant and doesn't go to bias or motive anyway, but I think you've been allowed some leeway there. Stick to that.

THE COURT: You're not really here to talk about what's relevant or irrelevant. Your only role here is to talk about what you think is privileged. You're not here to talk about relevance.

MR. SKINNER: I have told you what I think is privileged, and I think I have offered an alternative mechanism for them to ask their question.

THE COURT: See, one problem is I know from the 3500 material that a number of Boies lawyers were interviewed by the government, but I don't really have a sense of what was disclosed at those meetings. So can somebody enlighten me?

MR. RICHENTHAL: I don't know that this will be meaningfully enlightening, but we have produced every page of every set of notes ever taken by a member of the United States Attorney's Office of which we are aware to both the Court and to the defense, so all of that material has been produced. To our knowledge -- and I think Mr. Wilson just testified -- he was present at exactly zero of those meetings. But to the extent that any --

THE COURT: But that is not really responsive to this issue. What we're talking about now is whether Nike has waived the privilege or not.

So, I take your point that he wasn't at meetings with the government -- although I think he has indicated that he did participate in some conversations with the government.

But setting that aside, we're having a conversation now about whether Nike has waived the privilege or not, and I pointed out that I am aware from the 3500 material that a number of Nike lawyers went in and talked to the government, and so I asked, well -- and you've seen these 302s presumably.

MS. PERRY: I can speak to that, your Honor.

THE COURT: So the question is whether privilege was

asserted during those meetings or whether a waiver took place, and so that's what I'm trying to find out.

MR. RICHENTHAL: I think I misunderstood the Court's framing. None of the members of his team were at any of those meetings, so our knowledge is actually limited to the same notes. We can obviously inquire if the Court directs us to do so. I'm not aware in our conversations with the team that was part of that investigation of any ask that privilege be waived. I am not aware of that subject arising, but my awareness is really limited to conversations I have had and review of notes, and so I really don't want to overrepresent my state of knowledge.

MS. PERRY: Your Honor, there is one set of notes from January 31, 2018 with a number of Boies Schiller lawyers and members of the government in which they debrief the government on a conversations, an interview they had had with DeBose specifically -- which I believe is what this question was geared towards -- in which they gave exculpatory statements about how Mr. DeBose -- this is a quote, I guess -- was paying cash and that the money, however, was not given directly to players or families. There are a couple of other statements in addition.

THE COURT: This is in the 3500 material?

MS. PERRY: Yes, your Honor, it's 3552-038.

THE COURT: OK. I'm looking a the 3552-038. Is there

a particular page I should be looking at?

MS. PERRY: It's not particularly easy to decipher.

MR. H. SREBNICK: If I can retrieve it from the witness, I used it to refresh.

THE COURT: Sure.

MS. PERRY: I will just preview. There is one section where Boies -- there is a couple of sections. One is at the top of page 6. Earlier there is a discussion about a company named Position Sports through which a lot of payments to players and their families have been made with fake invoices, and at the top of page 6 it says "DeBose estimated he handed out about 20K cash this way a year. No receipts. Not given directly to players or families."

There is another section where they're talking about payments I believe it's right underneath that. It says also on page 6, 9/16, "two payments to Mel McDonald made through Position Sports. These are the 35K "repayment" to McDonald."

And there is other discussion within these notes about how Mel McDonald had paid approximately $65,000 to the family of DeAndre Ayton and how Nike through DeBose had paid back approximately 35,000 in cash. They were saying that it was not -- Nike employees including DeBose were saying that that money was not to go to players but actually to just repay for certain expenses Mr. McDonald had paid out and expenses that he had in connection with the California Supreme merger.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page190 of 263

K1V7AVE2 Wilson - cross 578

So DeBose was specifically saying that these payments that he was acknowledging were for no illicit purpose and they were not going to players or their families.

MR. RICHENTHAL: So, I think we've gone several layers beyond the Court's question. If I understand the Court's question, the Court's question was limited to one fact and one fact only, which is in this meeting did representatives of Nike describe what Mr. DeBose said. I believe, based on my review of notes, the answer is no. And I believe that because these notes, among many other sets of notes we produced, specifically refer to tabs, t-a-b. Those tabs refer to binders, that is, actual documents, e-mails, text messages and the like, that were previously produced by Nike to the United States Attorney's Office and have been provided to the defense in this case.

My understanding -- but I just want to be clear it's based on the four corners of the document alone -- is that what is going on in this meeting is that the participants are going through a binder tab by tab, and representatives of Nike are describing their understanding of the facts based on those text messages and e-mails. I don't believe based on the four corners of this document they are describing what the human beings told them. It may be so. I don't want to go too far. But I don't think the Court has a sufficient record to deem this a waiver when the notes themselves refer to tabs.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 579

I also want to make a small point -- or maybe a foundational point. As I understand the Court's ruling of yesterday, the defense was permitted to ask Mr. Wilson whether he had interviewed Mr. Auerbach and Mr. Franklin. This is about another person, Mr. DeBose. We did not object because we're trying to give the defense some leeway here. We don't want to object too much. But this is beyond what we understood the Court to think was proper.

Whether Mr. Wilson asked Mr. DeBose a question, in our view -- and I'm staying in my lane -- is not relevant. It's not relevant because what he asked Mr. DeBose is not the point. As I understand the point -- if there is any point -- it's whether in the room on March 19 Mr. Wilson had prior knowledge of certain facts and whether that prior knowledge influenced his reaction to Mr. Avenatti's threats. I think that is a modicum of relevance, if any, and I think it's very confusing to the jury. The Court has previously ruled that defense can go there, but if that's the germ -- to use your Honor's point -- if that's the germ of relevance, it should be focused on when Mr. Avenatti said X, did Mr. Wilson have prior knowledge of X, not whether he interviewed his own client and what his own client said, which gets into the truth or lack thereof of X, which under Jackson the Second Circuit has said it is irrelevant and certainly doesn't go to Mr. Wilson's reaction.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 580

MS. PERRY: Your Honor, I'll respond first to the small point, and then I understand we are arguing something that your Honor has ruled on.

But at the top of page 6 it says, "DeBose estimated he handed out about $20,000 of cash this way a year." That's -- clearly, it's not based on a document there. It's talking about What he said.

THE COURT: Does anyone know who was at this meeting on behalf of Nike? It just says meeting with Nike.

MR. SKINNER: I was at the meeting, Judge.

THE COURT: You were at the meeting. So you and who else?

MR. SKINNER: And Mr. Michaelson, who is behind me.

THE COURT: All right. So, we know who was there.

You know, all I can tell you is that companies cannot selectively wage the privilege. You can't do that. In other words, you can't go into the government and present an exculpatory argument in which you use information to persuade the government not to indict the company and then argue later that somehow the privilege was preserved. That you cannot do. So, I don't know whether that's what happened here or not, but I am clear on the legal point.

So, what I think Ms. Perry is saying is that this looks like a report of what DeBose told you, that you are then reporting to the government in an effort to persuade the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 581

government not to charge the company. Is that wrong?

MR. SKINNER: Well, first of all, we weren't -- at this point in time we were reporting facts as we understood them to the government. We were not making any effort to persuade them what to do one way or another. This was our first meeting with the government. Any kind of discussion about what the government might do with the information we had gathered would have been well down the road.

But I think with respect to the privilege, what we were attempting to do was explain to them what was in documents that we have gathered, and we were also attempting to do what corporate counsel does routinely when going in to proffer with the government, which is synthesize a lot of information that were obtained from a lot of different witnesses during interviews. So, it was a combination of sources with information.

There certainly wasn't an intent to waive attorney/client communications over the specific interviews, so going back to who said what on what day and what question and the like, but I'm also not going to dispute that we did provide an overview of the facts that we had gathered in our information. Facts are facts; you can communicate facts. Privileged communications are privileged communications. What a lawyer says to his client is privileged; the fact of what happened is not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000190

Case 21-1778, Document 61, 04/04/2022, 3290318, Page191 of 263

K1V7AVE2 Wilson - cross 582

THE COURT: But DeBose wasn't his client.

MR. SKINNER: DeBose was an employee of the company, so it's encompassed within Nike's privilege.

THE COURT: Well, I've already told you what my view is. So, you know, you can and should give me the fullest understanding that you can of what exactly it was you told the government and what the source was so that I can evaluate the privilege.

But, you know, I've told you my understanding of the law now: You can't go in and meet with the government and present what you claim to be an exculpatory spin on things and then later prevent another party from accessing the same information that you voluntarily disclosed to the government. That you cannot do.

MR. SKINNER: I don't dispute that, Judge. What I think we can do is communicate facts as we understand them to the government without having a broader waiver of privilege over all of the interviews that we conducted.

We have our own detailed notes of that meeting. I'm happy to come back with a more detailed proffer as to what our understanding is of what was said and what the basis is for those communications. But what is being talked about here is a question that just goes to a privileged communication, and I think we have offered ways for them to get this information to the extent it is relevant to bias and motive that don't go the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 583

more complicated question of whether there was a waiver or not as a result of our proffers on the 18th.

THE COURT: Well, to state the obvious, I would need briefing on this. If the two of you can't reach sort of a compromise, it's going to have to be briefed. I can't allow you to pursue the pending question at this point without resolving whether there has been a waiver or not.

MR. RICHENTHAL: May I make a related suggestion? Could the defense proffer where it intends to go? Because here is why. I don't know the answer to the question. Let's assume the witness says, yes, I asked that. Is the defense then going to say, what did he say? Because then we're going into the truth or lack thereof the allegations. Let's say he says I did not ask that. Are we done here? Are they trying to somehow probe the integrity of the investigation -- which your Honor has already ruled they cannot do? In other words, I don't see a yes answer or a no answer goes to anything the Court has ruled as acceptable.

Again, I understood -- and I could have been wrong -- that the Court had said they can allow the defense to probe whether Mr. Wilson was aware of core facts to the extent that could have bore on the degree of concern he had or did not have.

THE COURT: As it relates to Franklin.

MR. RICHENTHAL: Yes, your Honor. This actually is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 584

one removed from that. Remember this is Mr. DeBose. I understand Mr. DeBose is related, but it's not the same man, so it's already, I think a level beyond.

THE COURT: But isn't it wrapped up with Franklin? Isn't it directly related to Franklin? I mean I don't know, because I mean the lawyers here know the facts much better than I do, but I thought the idea was -- and somebody correct me if I'm wrong -- that DeBose is one of the Nike employees that allegedly directed Franklin to pay money to the families of players. I thought that's what we were talking about here. So, it seems to me that DeBose is intimately wrapped up in the Franklin allegations, as I understand them to be. Am I confused about that?

MR. RICHENTHAL: No, your Honor, but Mr. DeBose deals with more than three dozen coaches of which Mr. Franklin is only one. Mr. Franklin has specific allegations with respect to his interactions with Mr. DeBose. So, there is a core to what your Honor has just said that's a hundred percent correct, but this gets into why I think both sides have repeatedly been litigating and raising this, and rightly so, because this gets real complicated real quickly.

What we understood the Court to say in sum was that to the extent one could argue that Mr. Wilson's contemporaneous reaction to Mr. Avenatti was informed on Mr. Wilson's contemporaneous knowledge or lack thereof of what he was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1V7AVE2 Wilson - cross 585

hearing, the defense could ask him what was knew and what wasn't new? What did you know about before? What didn't you know about before?

THE COURT: This isn't helpful to me. OK? It's not helpful to me. So, the pending question is about Franklin; it's about Franklin's allegations. It not about anyone else's allegations; it's about Franklin's allegations. So, it does seem to be focused on the area that I told the defense they could explore with him.

So, I take your point that DeBose was involved with 40 other coaches, but it's not a point that's particularly useful to me, because their pending question is focused on Franklin's allegations.

MR. SKINNER: Can I ask another question that hopefully might nullify some of this?

THE COURT: Sure.

MR. SKINNER: Can I get a representation from the defense that if I can get an agreement from my client as to a limited waiver with respect to this question -- which I am speculating Mr. Wilson is not going to know the answer to or remember -- but maybe he will -- but if we get an answer to this question, can we just move on? Or are you then going to say I've now opened the door and I can ask about all sorts of other stuff from all sorts of other interviews? In which case I'm going to be vigorously policing the privilege.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000191

THE COURT: Well, I don't want to speak for the defense, but I think the point that they're trying to make is that Mr. Wilson was aware of Mr. Franklin's allegations that he had been told to pay money to people, and that despite that knowledge nothing bad happened to the Nike employees that allegedly had told Franklin to do this.

MR. SKINNER: Look, as a factual matter I think what he just testified to was he wasn't aware of this specific allegation, but he was aware -- it's all over the 3500 -- of payments that were being made to another guy named Mel McDonald who said that he had paid the Ayton family.

THE COURT: Does Mel McDonald have anything to do with Franklin?

MR. SKINNER: Yes. It's all the same program. So that's what we knew about. That's what was disclosed to the government. What he is saying is I didn't know about this one trip to Phoenix.

THE COURT: Well, he has said that.

MR. PODOLSKY: Your Honor, I would like nothing more than to move on with the cross and not deal with this, but the defense can ask what his knowledge was without asking did you ask Carlton DeBose a particular question.

MR. S. SREBNICK: Judge, there is a broader issue here which is really troubling me, which is that Mr. Wilson has testified -- and I don't want to use this term too

pejoratively -- on a high horse about how investigations are conducted and that you can't use private investigators and you can't interview people outside the company as if almost he is an expert on internal investigations.

THE COURT: Well, I might say that everything he said about internal investigations is really consistent with my own knowledge. I mean it's not typical for a law firm that's conducting internal investigation of a corporation to hire PIs to do it. That's just not typical. You use lawyers to do it to protect the privilege. So, that's not exactly crazy testimony; that's pretty consistent with the way the world really works.

And his other point is if you are conducting an internal investigation, it would not be common. As the name would indicate, the reason why it's an internal investigation is because it's an internal investigation. You would not typically interview people who are not associated with the company.

And the third point he made is that were you to approach people outside the company, the government might well be concerned about that, that you're trying to improperly tamper with their testimony, etcetera.

So, there is nothing that Mr. Wilson has said on these points that strikes me as illogical or crazy. It's actually consistent with my understanding of the way things work.

In any event, your point is what?

MR. S. SREBNICK: My point is that after a year and a half of doing this internal investigation, as of March 2019, this investigation that was so consuming Nike employees, the central allegation of payments to players, especially the number one pick in the NBA draft, they were still taking the position that there were no payments to players or their families.

MR. SKINNER: Your Honor, why we are even down the rabbit hole of what we said to the government I don't know, but I have to respond to that. We never took the position that there were no payments to players. We said -- and we still stand by it -- that we have never uncovered evidence of a payment to a player to send them to a particular college. That's what we said.

MR. PODOLSKY: Your Honor, we have a lay jury that does not know how investigations work. Mr. Srebnick wants to say all of these things, how it's crazy that an investigation could last a year and a half, two years, when everyone here knows there is nothing atypical about this at all.

The government has been receiving proffers and documents from this company. And so what Mr. Srebnick wants to do is get into details of an investigation, to say to the jury this is crazy, because they don't have the ability to judge what is normal, crazy, typical, atypical in this situation.

And none of this -- none of this -- is relevant to the conduct of Mr. Avenatti.

MR. S. SREBNICK: Judge, let me just make two points relating to phone calls that Nike lawyers from Boies -- it doesn't say who from Boies -- had with the government. The first is November 21, 2017. This was Exhibit VV. I am reading the government's notes. That's all I have. It says, "No instance in which Nike paid money to a player or his family." The following month, December 14, 2017, again a call with Nike lawyers, "No evidence that Nike employees were playing players." That's the information we have been getting. We can only rely on the information we have.

THE COURT: But I guess my response is, so what? So lawyers for Nike said the company didn't do anything wrong. OK, so what? Why is that relevant to anything?

MR. S. SREBNICK: It's relevant because Mr. Wilson, who was participating in that investigation, actually knows to the contrary now.

MR. RICHENTHAL: He never said that on the stand.

MR. SKINNER: That's what you guys can try to ask him about, and I'm just saying you should be able to do this in a way that doesn't invade the company's privilege.

MS. PERRY: Just back to the point of the privilege specifically with respect to Mr. DeBose. There is another set of notes, and it's 3552-006, in which Nike is again discussing

in great detail a number of documents including documents with respect to this trip to Phoenix where they're quoting Mr. DeBose. Mr. DeBose does not remember directing Gary Franklin going to Phoenix for the 5,000 payment. It's at page 5. And there is a number of other direct quotes.

So, you know, maybe I'm just trying to avoid briefing on this topic, but it does seem as though they specifically waived the privilege with respect to Mr. DeBose. It's 3552-006.

MR. SKINNER: If there was a waiver, again it would not be a broad waiver.

THE COURT: I thought you said 3552-006. I don't see anything that you just said.

MS. PERRY: I'm sorry. 3512-006. I did misspeak.

THE COURT: Whose notes. You don't know?

MR. SKINNER: It's also the distinction between -- there is also a distinction between sharing facts and sharing -- your Honor, if we're going to actually deal with this, I don't want to be up here making representations on the fly. I want briefing and I need briefing.

THE COURT: All right.

MR. PODOLSKY: This goes directly to the 403 issue here. This is all being brought up in terms of his bias. As your Honor pointed out, they brought out that his client is under investigation. It's been brought out that he was under

investigation at this time. What we're now going to, all for the purpose of showing additional bias, is whether he asked a particular question of Mr. DeBose or what documents he was aware of at a particular time, none of which the jury has any ability to assess. And this has just gone way far beyond any marginal value that the defense can draw from it, given that they've already brought out the bias, as your Honor said on the record already.

THE COURT: Where do you want to go with this exactly? What's going to be the chain of questions? So I guess the pending question is what he asked DeBose?

MR. PODOLSKY: I believe the question is did you ask DeBose in an interview about payments, in substance.

THE COURT: OK. All right. So where is this going from there?

MR. H. SREBNICK: So, the context was Mr. Geragos concerned about white washes. That was the tape recording conversation. And Geragos --

THE COURT: But we're getting -- I mean I do -- I have to say I'm getting concerned about the same issues that I raised at the outset of today, where I tried to signal to the lawyers that the case was not about the adequacy of the investigation that Nike had done or was doing. It's not what the case is about, and that's where you seem to want to go, and that's not what this case is about. It's not about whether

Nike did an adequate investigation. It's not about whether Nike did a whitewash investigation. That doesn't have any bearing on Mr. Avenatti's guilt or innocence.

So, I have concerns, because it seems like that's where you want to go, and I have told you over and over again we can't go there. This is not an exploration of whether Nike did a good investigation or not, and that's where you want to go. I can't allow you to do that, because that's not what this case is about.

MR. H. SREBNICK: What I would like to say is that the point of Wilson is that suggesting pejoratively that Avenatti and Geragos aren't competent to conduct an internal investigation compared to Boies Schiller, which is, was the implication.

THE COURT: Well, actually he made a different point -- which everyone standing here knows has enormous merit -- which is that there is an obvious conflict. You can't both represent someone who is adverse to a company and purport to represent the company also. Everyone standing here knows that very basic proposition. That's what Mr. Wilson has said to the jury. So, it hasn't been so much that they're incompetent. What it has been is that they have an obvious conflict, and that is what it is.

So, back to my question. We're not going to get into whether Nike did, or has done, or is currently doing a thorough

investigation of these allegations. That's not what this case is about. I told you at the very outset this was a very narrow limited exploration that went only to his credibility. And as the government points out, you have a lot of ammunition on that front already, which I have said, which is that he has an obvious motive, and Nike has an obvious motive to curry favor with the government because they're currently under investigation. There is nothing hard to understand about that. Or, as Mr. Avenatti would say, it's not complicated.

MR. AVENATTI: Your Honor, can I have a moment to speak with my counsel?

THE COURT: Yes, thank you.

MR. AVENATTI: Just one minute.

MR. RICHENTHAL: May we also step out? I am not going far.

MR. AVENATTI: Your Honor, thank you.

THE COURT: Does the government want to come back.

MR. S. SREBNICK: So just two additional points, the first point being that Mr. Wilson has testified repeatedly -- certainly starting on direct -- that Nike has fully cooperated with the investigation, and so I think we're entitled to probe whether they really cooperated with the investigation, what they learned at least with respect to the Franklin allegations and how that differed from what they had been telling the government before and how it affects his own personal bias, his

own concerns about what they had told the government before. So that's point number one, to impeach his testimony about full cooperation which is the government brought out.

Number two, just on the issue of the conflict, I understand the Court's point about that. We understand that once Mr. Franklin's claims are settled, that any conflict is waivable at that point. So, I just wanted to react to the Court's point on that. So, we have a slight difference of opinion on whether it's a waivable conflict once Mr. Franklin's claims are settled and based on what Mr. Franklin had articulated to Mr. Avenatti he wanted to do.

THE COURT: Listen, anything is probably waivable, but any client would have to be out of their mind to hire a plaintiff's lawyer to do an internal investigation of them; and everyone standing here knows that.

But as to your point about whether Nike fully cooperated, or whether it held stuff back, I have already told you you can pursue that. I ruled on that a long time ago.

And so, for example, if you have this theory that they withheld documents until this issue first came to a head, and then they turned over a bunch of stuff, and if you wanted to pursue that, I have already told you you can.

But now what we're getting into is a very thorny area of privilege, which I cannot resolve now, so that the examination cannot proceed on this point, because I would have

to take briefing from Boies Schiller, as well as briefing from the defendant, and then I would have to have a much more thorough understanding of what was actually disclosed to the U.S. Attorney's Office back in 2017.

So, that's where we're at. So, if you want to get into that investigation with that level of detail, we're not going to be able to proceed now. It's as simple as that.

MR. H. SREBNICK: Today is Friday, and I will continue my examination without this matter since I have more to do, so we can table it until we break for the day, and we can go from there. So, I will just divert to other things we need to cover.

THE COURT: Good.

(Continued on next page)

(In open court; jury present)

THE COURT: Mr. Srebnick, please continue.

MR. H. SREBNICK: Thank you, your Honor.

Q. Mr. Wilson, I am going to ask you some questions on a different topic. I want to talk to you about page 17, line 21. This deals with the issue of self-reporting or self disclosing any findings of the internal investigation.

THE COURT: What exhibit is it we are in?

MR. H. SREBNICK: Sorry, Judge. We are on the transcript of March 21, 2019. We are using the audio file. It pertains to transcript 2T, I believe.

THE COURT: We are on page 17, 2T.

MR. H. SREBNICK: That's right.

THE COURT: Go ahead.

MR. H. SREBNICK: The clip will start at line 21.

(Audio played)

Q. Did you hear that Mr. Avenatti talks about self-disclose and Mr. Geragos also participates in that discussion?

A. I heard the recording we just listened to.

Q. Sorry? I couldn't hear you.

A. I heard what we just listened to, yes.

Q. And it's consistent with the transcript?

A. Yes, I think it was.

Q. And what Mr. Avenatti says is: It is up to the client, line 21, whether they want to self-disclose or whether they

want to do it or anything else just like any other client.

You saw that?

A. Yes.

Q. Avenatti says at line 5: Those aren't our decisions to make. Our decisions are to investigate this, report back to Nike and then Nike makes a decision on what they want to do.

Geragos then says: Right.

You see that?

A. It's a little bit of talking over each other, but I see the text in the transcript.

Q. Avenatti says, presumably, in consultation with you and others.

You see that, right?

A. I do.

Q. When he said you, he mean Scott Wilson?

MR. PODOLSKY: Objection, your Honor.

MR. H. SREBNICK: I'm sorry. I'll rephrase it.

Q. Did you understand you to mean Scott Wilson?

A. I understood him to mean me personally or my law firm generally.

Q. Isn't that consistent with how an internal investigation works?

A. Is what consistent? I'm sorry?

Q. The self-reporting, self-disclosure report the findings back to the company, company consults with its counsel and

Case 21-1778, Document 61, 04/04/2022, 3290318, Page195 of 263

K1VMAVE3 Wilson - Cross 598

decides what to report to the government what, if anything?

A. In the context of an internal investigation being conducted in the absence of government investigation, I would say that's fairly typical. If there is a pending government investigation and, therefore, for example, already an outstanding grand jury subpoena, there would be consideration given to what's required by the grand jury subpoena as well as what, if anything, in addition to what's required, the company might share with the government.

Q. To be clear, a grand jury subpoena particularly is asking for documents, correct?

A. Grand jury subpoena can request documents or testimony.

Q. In the case of the Nike grand jury subpoena, it was for documents?

A. Yes.

Q. The subpoena didn't require any lawyer on behalf of Nike to speak to the government, did it?

A. The subpoena itself did not require that.

Q. The subpoena only required that Nike make a full and thorough production of records called for by the subpoena?

A. The subpoena called for Nike to produce documents from its files to the government.

Q. The decision whether lawyers for Nike would meet with the government is independent of the subpoena, not required by the subpoena, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 599

A. The decision -- Nike's decision whether to engage lawyers to engage with the government was related to the company's receipt of the grand jury subpoena certainly.

Q. It was not compelled by the subpoena, correct?

A. The government can't compel, no. It was not compelled by the subpoena to engage lawyers.

Q. And so, if we turn to the next clip, page 27, line 6.

THE COURT: Page 27.

MR. H. SREBNICK: Yes, please.

(Audio played)

Q. So Mr. Avenatti tells you that his opinion, line 9 -- let me take it back. Line 7. Company's best interests to avoid this becoming public and to deal with this in an organized, legal manner where the company self-reports in some way, shape or form.

You heard that?

A. I did hear the words there, yes.

Q. They are going to have to self-report in my view.

A. I heard him say that as well.

Q. At that point in time, you didn't disclose to Mr. Avenatti that Nike was cooperating with the government in its investigation of Nike, did you?

A. I had said in the meeting on Tuesday that Nike had an interest in complying with the government. I don't see that I said something about the company cooperating with the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 600

government at this point in the meeting.

Q. When you say complying with the government, that's not necessary, the same as active cooperation with the government, is it, or is that what you intended?

A. I'm sorry. Could you ask that again.

Q. What did you describe to Mr. Avenatti is the nature of the relationship between Nike and the government at that point in time?

THE COURT: At what point in time?

MR. H. SREBNICK: March 2019.

THE COURT: No. We are going to be more specific than that because we have been talking in the context of a particular conversation and so that conversation took place on March 21. So I think we need to understand whether you are talking about this conversation or another conversation. Otherwise, the record is not going to be clear.

Q. On March 19, the first meeting you had with Mr. Avenatti, you told him that Nike had an interest in complying with the government to comply. Was that the word?

A. I word I recall using was complying.

Q. And what did comply signify to you?

A. As I've said before, I didn't intend to communicate any factual information to Mr. Avenatti about what my client had done or hadn't done or was doing or wasn't doing. At that moment in the meeting on March 19, I was just describing three

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 601

interests that I said my client had. It was not my intention with someone I just met to discuss with him what interactions the company had or had not had with the Federal Government.

Q. I am just trying to understand, when you told Mr. Avenatti that it was in Nike's interests to comply with the government, were you trying to imply that Nike was having a cooperation agreement with the government?

A. I was aware at that time that Nike had stated publicly on more than one occasion that it was cooperating with the government's investigation. As I believe I testified yesterday, there was a point in the first half of my meeting on March 19 where I was so shocked by what was going on that I just started saying some things that I thought were unobjectionable out loud to try to give myself time to think, and I specifically recall saying Nike has an interest in three things, not being entirely sure what I was about to say, but just wanting to buy myself time hopefully without him interrupting me to say three generic things. I then said three generic things, including that Nike had an interest in complying with the government. In my view, American companies all have an interest in complying with the government.

Q. All citizens have that same interest, right?

A. I believe so.

Q. To follow the law.

MR. PODOLSKY: Objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000195

THE COURT: Sustained.

Q. In any event, Mr. Avenatti suggested that in his view Nike is going to have to self-report, but that would be up to Nike in consultation perhaps with its lawyers. Is that the gist of what Mr. Avenatti communicated to you?

A. On more than one point, including now, he said that the decision whether or not to report the result to whatever work he and Mr. Geragos purportedly were going to do, that decision would rest with Nike.

Q. I'd like to turn to page 18, line 11.

A. We are going back?

Q. Yes. We are back to a different subject. We just finished self-report.

I would like to ask you about this, if you hold one second.

MR. H. SREBNICK: If we can go ahead and roll.

(Audio played)

Q. So at lines 15 you begin to speak. And you say: Let me include that preface. As I said before, I don't think that the settlement of Mr. Franklin's civil claims for $1.5 million is going to be the stumbling block here.

You recall telling that to Avenatti and Geragos?

A. I do.

Q. And you were communicating that Franklin's claims, which you said you didn't ask for more description of, can be settled

for a million and a half dollars, maybe, wouldn't be a stumbling block, but you didn't have authority at that point to really commit Nike. Is that fair?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. At that point in time, on March 21, 2019, you had told Avenatti and Geragos you didn't have authority to make an offer, correct?

A. I had, prior to this meeting on Thursday, said that I wanted to seek authority, and I think implicit in that was I didn't have authority at that time.

Q. So you didn't have authority, but you were still suggesting or -- let's just say suggesting that you thought $1.5 million to Franklin would not be a stumbling block?

A. At this point, again, I wanted to not spook Mr. Avenatti and Mr. Geragos by giving any indication that, as was in fact true, this was a complete nonstarter and the company was not going to make any payments.

Q. Is it fair to say you were misleading them to believing that Gary Franklin could likely get a million and a half dollars for his claims? That was misleading them?

A. I did not believe that Mr. Franklin could likely get $1.5 million for any claim of which I was aware.

Q. So this was not an offer of any sort at that point in time, correct?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. Was this an offer for $1.5 million?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. At no point in reality did I intend to offer any money to Mr. Geragos or Mr. Avenatti. I made statements during the period of my cooperation with the FBI and the government's investigation suggesting that the company would be open to making such payments.

Q. I couldn't hear the last part. I'm sorry.

A. I said I made statements intended to imply that the company would be open to making such payments.

Q. Geragos then pipes in at page 19, line 2: It's kind of a strange question. You then ask whether: Can we settle this. Could we do this all under the civil settlement agreement. That's what I'm asking.

You heard that?

A. Yes.

Q. And Geragos posits: Without doing any investigation, something to that effect?

A. I heard him say that.

MR. H. SREBNICK: If we can turn to page 19, line 7 and we will start the tape from there.

(Audio played)

Q. Is this the point where you are now going to ask Geragos and Avenatti if they would consider a settlement that would exclude an internal investigation?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Overruled.

A. I had just asked the questions that I asked about whether there was a way to avoid the press conference without hiring them to do a so-called internal investigation, and then I asked if the money went higher could we do it all under the civil settlement agreement.

MR. H. SREBNICK: If we turn to page 21, line 14, we roll that.

(Audio played)

Q. You indicated that on page 21, line 22: I have not done a 25 million dollar internal investigation for Nike. I have not -- we have not done one for Nike that breaks $10 million.

Was that true?

A. I am pausing because I'm considering whether information about what Nike may have spent on a matter unrelated to this is or isn't confidential information that I, as an attorney for Nike, am authorized to share in response to your question.

Q. An assertion of a privilege of some point?

A. I can't assert a privilege, counsel. I'm an attorney for Nike. If there was a privilege here, it would be a privilege of the company's. But there is also information, confidential

information that attorneys come into possession of, and they are not always authorized to share their client's internal information, confidential information.

MR. PODOLSKY: Your Honor, object to this line of questioning, or we can take a sidebar.

MR. H. SREBNICK: We can take it up at the end of the day. Is that all right?

THE COURT: All right.

Q. That conversation starts, that little episode, with Mr. Avenatti asking at page 21, line 14: Help me better understand. Is there an appetite to just be done, is that the thought. Page 21, line 14.

A. I see that, yes.

Q. And you say: Yes. Yeah.

A. I heard myself respond that way, yes.

Q. And it talks about on line 17, page 21, line 17: I appreciate you saying there will be no press conferences during the course of your internal investigation, but, you know, you'd be up -- all up in the business of the company for -- for years.

You see that?

A. Yes.

Q. Was that communicating to Mr. Avenatti and Mr. Geragos that the internal investigation could take years?

A. No. I was not intending to communicate that.

Q. But aside what you were intending, isn't that what you told them?

A. I told them the words that I used. I wasn't intending to suggest that an internal investigation would necessarily last years. I anticipated from my experience watching Mr. Avenatti in other high-profile matters.

MR. H. SREBNICK: Objection, your Honor. Nonresponsive.

THE COURT: Why don't you just ask whatever question you want to ask, and we will move on.

MR. H. SREBNICK: Yes.

If we could then resume playing the recording, Mr. Lyon.

THE COURT: Where do you want to start?

MR. H. SREBNICK: We are on page 22, line 3.

(Audio played)

Q. That's Mr. Geragos speaking when we just tailed off?

A. Yes.

Q. It's Mr. Geragos who is explaining why he thinks it's appropriate to handle the internal investigation?

A. Appropriate for --

Q. Let me say this. I'll rephrase.

He says a couple of things. One is that he thinks an internal investigation would be appropriate, generally speaking, right?

A. That's a concept I understood him to be conveying.

Q. But the first thing he says at page 22, line 12: First of all, they do know me.

Did you understand that to be Nike knows him, people at Nike?

A. Yes.

Q. Second of all, I dealt with them in sensitive situations.

You understand Geragos to mean he dealt with Nike in a sensitive or multiple sensitive situations?

A. I was only aware of one particular interaction or matter in which he had been interacting with Nike. I did not have an understanding of what he meant by using the plural situations.

Q. You discussed it before. That one dealt with a high-profile NFL football player, right?

A. That's correct.

Q. That's the one you knew about, right?

A. Yes.

Q. Geragos says: Which is why I picked up the phone and called in situations where they did not want a certain story to be sold, um, at the same time and that's why I was giving the USC example.

You see that?

A. I do see that.

Q. And did you understand Mr. Geragos to indicate when he said: In situations where they did not want a certain story to

be told, he was referring to Nike?

A. It wasn't clear to me what he was referring to because all I was aware of his prior interactions with the company was his involvement on behalf of an athlete in connection with a commercial arrangement between Nike and that athlete.

Q. Didn't you understand him to be saying that Nike was concerned about a certain story being told in regard to that Nike-sponsored athlete?

A. No. Again, he is using the plural. I didn't know what he meant at this point in situations where they did not want a certain story to be told. I didn't follow it exactly.

Q. Without getting into the details, you knew exactly what matter he had dealt with, Geragos had dealt with, right?

MR. PODOLSKY: Objection, your Honor.

THE COURT: That's a yes or no question. With respect to the one situation you have talked about or that you've mentioned, you did know the individual involved, right?

THE WITNESS: The identity of Mr. Geragos' client?

THE COURT: Yes.

THE WITNESS: Yes.

Q. And there comes a point in time where Mr. Avenatti and Mr. Geragos step outside of the room to consider making a different demand or different ask that would exclude them participating in the internal investigation, right?

MR. PODOLSKY: Objection, your Honor.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page198 of 263

K1VMAVE3 Wilson - Cross 610

THE COURT: Sustained.

Q. Do you recall Geragos and Avenatti stepping outside the room?

A. Yes. At least one point the two of them stepped out together.

Q. And they were gone for about five minutes or so?

A. Yes. That sounds right.

MR. H. SREBNICK: If I could just have a moment.

If we go to page 24, line 18.

(Audio played)

Q. After the five-minute break, at some point after the two men break for five minutes, the conversation resumes, you are trying to ask if there is a negotiation.

To start the discussion at page 24, line 18: Is there room to negotiate on the specific millions we're talking about?

A. Yes.

Q. Ultimately, Avenatti proposes 22 and a half million dollars and we're done, right?

A. Yes.

Q. That would be part of the civil settlement for their client, Mr. Franklin?

A. He referred to one confidential settlement agreement for -- that we could buy for 22 and a half million dollars.

Q. He actually brought to the room a draft settlement agreement for discussion purposes that day, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 611

A. Early in the meeting. By this point I think he had already handed me a copy of a draft settlement agreement.

Q. At some point in the meeting he takes it back, correct?

A. Yes.

Q. And he makes some adjustments to it, does some typing?

A. Yes.

THE COURT: We are going to have to leave it there, Mr. Srebnick.

Ladies and gentlemen, we are at 2:30 and I did say we would break at 2:30 today. I am going to say good-bye to you for the weekend.

Don't discuss the case with anyone. Don't do any research. Don't do any investigation. Don't talk about the case with anyone. Do Keep an open mind because there is more evidence.

We will resume at 9:30 a.m. on Monday. We will be going to 4:30 on Monday afternoon. Have a very pleasant weekend and we will see you 9:30 Monday morning. Thank you very much.

(Jury not present)

THE COURT: What are the issues we need to take up?

MR. PODOLSKY: I don't think we have additional issues. I think the only outstanding question that is on the top of my mind is whether the defense intends to return on Monday to the question of what was asked in an interview of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 612

Mr. DeBose. I have expressed at sidebar, I think at this point, certainly under 403, that question really should be excluded. As I understand it, that's the pending issue from today.

THE COURT: As I said at sidebar, if we are going to get into an issue of whether there has been waiver or not, I am going to need briefing both from the defense and from Nike addressing what happened at these proffer sessions, who attended, what was said, etc., etc., etc. If that's where we are headed, I am going to set a schedule for getting letters from you on Saturday because it's going to be a naughty issue that I am going to have to focus on on the weekend.

What are the defense's intentions?

MS. PERRY: Your Honor, I think it makes more sense to get a letter first from Nike. We don't know yet who was at all those meetings. We can respond in short order. But we are at a disadvantage here because we don't have the information. They have it.

THE COURT: First of all, we have got to be specific about what it is we are talking about.

As you know, I have narrowed the scope of what Mr. Wilson could be asked about in the sense that I've said it has to be Franklin related. And so the only questions that could possibly be asked of him with respect to his interactions with the government or with a witness is Franklin-related material.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 613

Now, I could ask Mr. Skinner to go through every meeting and who was there, etc., etc. I could do that. But I'm not sure that's really going to be very efficient because this is -- we are already talking about a very narrow scope.

So I take your point that you don't know who was at the meetings, but you do know the questions that you propose to ask. I think it actually has to start with you within the confines, within the parameters that I have set, what is it that you want to ask, what is it that you want to get into with Mr. Wilson, and then we can then focus on what proffer sessions or what meetings took place between Boies and the government and what was said at them and what was not said and circumstances, etc. But I think it's too amorphous at this point to say to the Boies firm, well, tell me about every proffer session you had with the U.S. Attorney's Office, what was discussed, who was there. No. Because we are already dealing with a very confined universe already.

It may be that you do an initial letter and then Boies does a response letter and then you do another letter saying what you think is appropriate. It might be that that's, you know, a briefing schedule that might make sense.

But I think it has to start with what you want to get into with Mr. Wilson, acknowledging the parameters that I have set, and you should point to the proffer sessions that you think implicate this information. And I take your point. You

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000198

don't know who was there. It just says Mikey. You have no idea who was there. You will do that. You will go through that exercise. You will tell me what information you wish to elicit from Mr. Wilson, and you will suggest what proffer sessions, what notes might be pertinent to that.

And then Mr. Skinner will have an opportunity to put in a response. If he wants to assert privilege, he will tell me why he thinks privilege hasn't been waived.

Then you'll have an opportunity to tell me why you think privilege was waived.

MS. PERRY: May we have until 10 a.m. tomorrow morning?

THE COURT: The first letter will be due 10 a.m.

Mr. Skinner, how about 5:00 from you?

MR. SKINNER: I don't think we have much choice, Judge. We will do our best to respond.

THE COURT: That's exactly right. You have no choice. I was trying to be pleasant about it. You are right, you have no choice.

It might be that conversations could be had between the lawyers and this can be resolved in an amicable way.

MR. SKINNER: That's kind of what I was going back to, your Honor. We have this clear guidance from the Court that the two things they are not supposed to get into are the actual underlying Nike conduct and whether this was a proper

investigation or not. And a question about --

THE COURT: That's too broad. That's too broad.

MR. SKINNER: What is the guidance? I feel part of this should be --

THE COURT: This goes to Mr. Wilson's credibility, so that's the context in which this is being received. As I understand it, the defense wants to essentially elicit from Mr. Wilson that he -- I don't know what they want to elicit. I think what they want to suggest is that he looked at these Franklin allegations and rejected them out of hand, something that's inadequate. I am not sure where they are going exactly. But they want to suggest -- they want to question him. They want to cross-examine him about whether what he did with respect to the Franklin allegations that he has admitted that he knew of, at least some of them, before he ever met Mr. Avenatti, they want to question him with a view towards suggesting that what he did wasn't adequate, and I do think that this has some bearing on his credibility as a witness, and so that's why I'm permitting it.

I understand this might be complicated because I have said that this case is not about whether Nike was involved in corruption in connection with amateur basketball and it's not a case about whether Boies did an adequate job in investigating. However, we have a Boies lawyer on the stand, or a former Boies lawyer, who was involved in the investigation, so, therefore,

his credibility is at issue, and he's a very important witness, which is why he has been on the stand for a substantial period of time already and is likely to be on the stand for a substantial period in the future.

He is an important witness. His credibility is at issue. One of the meetings that he testified about was not recorded, and so his credibility is at issue. And they want to challenge his credibility from the point of view of saying, you knew about these allegations that Franklin was making, you have told us that you were involved in the investigation of those allegations, and they want to pursue whether what he did was reasonable under the circumstances. That's the context.

MR. SKINNER: I think they know he didn't know about some of these specific allegations. Now they want to say, did you ask him about what you didn't know about in an interview. We will talk to them and perhaps we can reach some common ground on a permissible level of questions. I would think this could be set up along the lines of, what did you know about payments to players? What do you know about what was communicated to the government? In the course of your investigation were these individuals interviewed?

We may be able to set it up along those lines where we don't actually have, was this question asked, was that question asked during an interview.

THE COURT: Obviously, what was said to the government

was not privileged, and everyone here knows that, so there is a piece of it that's not subject to a privilege objection.

I do want to say to the defense, I am sensitive to the pending question, which gets directly at what Mr. Wilson's interview was of this fellow DeBose. I would encourage the lawyers to talk between themselves and attempt to reach a resolution because it's going to present a thorny issue of whether there has been waiver. I am going to have a very clear understanding of what happened at a number of proffer sessions involving a number of Boies lawyers, and then I am going to have to consider what the law says about waiver. It's a thorny issue and it's going to require significant effort both by the lawyers and by me, which is all a long way of saying, if there is a way to avoid that, it should be avoided. If it can't be avoided, obviously, I'll have to address it.

MR. SKINNER: Your Honor, there was also some discussion about addressing motions to quash with respect to some of the individual Nike employees. I don't know if you want to entertain that or not.

THE COURT: I have not looked at the papers. I think there was something filed maybe last night, motions to quash, I think, for two Nike employees. I have not looked at the papers.

But, Mr. Srebnick, you can tell me what's come in.

MR. S. SREBNICK: I think I can help sort of move this

process along with those.

We issued seven subpoenas to Nike employees. Two of them we withdrew this morning. We withdrew the ones to Mr. Merritt and Mr. Harrison. The remaining five, there is Mr. DeBose, Mr. James, Mr. Stovall, Ms. Baker, and John Slusher. I can tell the Court that with respect to Mr. Stovall and Ms. Baker, they really fall in the category of one of the principles the Court articulated this morning that it would not allow us to get into, which is the broader misconduct. Rather than withdraw him, I would just ask that the Court rule, given that now I'm proffering what they are -- they have not actually filed the motion. Mr. Stovall did file a motion to quash. Ms. Baker has not. I can proffer to the Court that their testimony would be really related to the broader issue of Nike's misconduct. I understand where the Court's head is on that. We would actually invite the Court to rule on that now so this matter is not pending with respect to them.

THE COURT: I, of course, have no idea what their testimony would be about. I accept their representation that they don't have information that relates to Franklin's allegations. Is that what you are telling me?

MR. S. SREBNICK: Not directly that would be anything we would want to elicit. What we would want to elicit is just text messages, things of that nature, which shows that they were involved or had knowledge of monies being paid to others

not related to Mr. Franklin.

THE COURT: Yes. Consistent with what I said at the outset of today's proceedings, I do not believe that the broader scope of misconduct that Nike may have been involved in, separate and apart from the allegations regarding Gary Franklin, I don't believe those matters are relevant.

MR. S. SREBNICK: Fair enough.

That leaves three subpoenas, Judge. Two of them are to Mr. DeBose and Mr. James, who did have direct involvement with Mr. Franklin. Mr. DeBose has moved to quash. We have not received the one yet from Mr. James.

What I would suggest as to those two is to wait until we hear the completion of Mr. Wilson's testimony, and then we can visit that issue to see where the Court's thinking is on those two. They were the individuals who were directly interacting with Mr. Franklin. We may have to in fact wait until Mr. Auerbach and Mr. Franklin testify. As of right now, we would ask that those remain in abeyance, and the third remaining subpoena is to Mr. Slusher, who was the individual who interacted with Mr. Auerbach. And we would ask that that one also remain outstanding until we hear Mr. Auerbach's testimony.

That leaves three remaining subpoenas, and I will work out with counsel for Nike the issue of payment for travel and things of that nature. We have been holding off on that

because, obviously, these motions are pending. I will be in touch with them, and we will try and work that out as conveniently as possible.

THE COURT: What you're proposing as to DeBose, James, and Slusher is that they be held in abeyance?

MR. S. SREBNICK: Yes.

THE COURT: Are you comfortable with that, Mr. Skinner?

MR. SKINNER: The only issue we had was just, we are now at a point where the rubber has pit the proverbial road and folks need to travel, and we hadn't received any payment for them to travel or the like. If we have a representation that that's going to be worked out, we will work that out.

I had been hoping to avoid the inconvenience of having people fly across the country to sit here in New York because they potentially might testify, only to find out that they are not going to testify because they filed proper motions to quash, regardless of what comes out from Mr. Wilson and the like and what defendants think they might want to do with them.

THE COURT: What's the earliest that these witnesses could conceivably get on the stand?

MR. SKINNER: We had been told Tuesday, which was why they have been trying to travel on Monday. We were told to have them in New York by Tuesday.

THE COURT: I would be very pleased if there was any

possibility of that, but it strikes me as highly unlikely.

What does the government say?

MR. PODOLSKY: Your Honor, I would say the cross-examination of Mr. Wilson has gone on substantially longer than we expected based on our conversations with counsel. I can't imagine their case will be until the very end of next week, if then, given how things have gone so far.

THE COURT: I don't think they are in any jeopardy of testifying on Tuesday, Mr. Skinner. You need not worry about that.

MR. S. SREBNICK: I'd like to find out who told them Tuesday.

MR. SKINNER: We were told to have the witnesses in New York by February 5. Maybe that's not Tuesday, but in my head I thought we had to have them here on Tuesday.

Judge, this is something we can work out with defense counsel. If they are not going to be starting their case until the end of next week or perhaps the beginning of the week after, then they don't have to get on a plane on Monday or Tuesday. Maybe we can hold some of this in abeyance.

Nike intends to move pursuant to the Court's suggestion when you denied our initial motion for lack of standing. We will probably move to intervene so we can have a voice in these as well. I do think that it would be preferable, if they are never going to testify, regardless of

Case 21-1778, Document 61, 04/04/2022, 3290318, Page201 of 263

K1VMAVE3 Wilson - Cross 622

what these other witnesses said, because all of their testimony relates to Nike's conduct, to clear that up earlier rather than later. But, nevertheless, I think maybe we can at least wait another couple of days to see where we are, given the way the schedule seems to be unfolding.

MR. PODOLSKY: I do want to comment. Obviously, it's not immediate at this point.

But what's being contemplated is three witnesses from Nike who had nothing to do with Mr. Avenatti's conduct to come and testify about payments, the precise thing that the Court said is not at issue here, under some theory that their testimony about payments would go to the bias of Mr. Wilson. This is a complete side show and clearly just to distract the jury and focus on what this trial is not about.

I just raise that to the Court because I think at the end of the day this is actually a fairly simple question. But that's just what I would submit at this point.

THE COURT: I am going to rule on another issue, unless somebody has something else they want to say.

MR. SKINNER: Your Honor, with respect to the schedule on this, let me talk to Mr. Srebnick. I have a feeling we will be asking your Honor for a ruling earlier than what he thinks, but we don't need this one this afternoon. Let's discuss and we will get back to the Court.

MR. PODOLSKY: Your Honor, just a logistical issue on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 623

potential briefing on privilege. Depending on what the defense proffers, if they can't reach an agreement they might want to inquire about, we may file a letter about the relevance.

THE COURT: You're welcome to.

MR. PODOLSKY: I would ask that the defense confer with us regarding the applicability of a protective order before they file anything on this issue.

THE COURT: OK.

MR. S. SREBNICK: No problem.

THE COURT: Please do that.

The government submitted a January 29, 2020 letter, which is docket No. 223, asking me to "preclude the defendant from describing or making any arguments based on the content of text messages between Jeffrey Auerbach and Gary Franklin, Sr. Not seen by the defendant unless (1) a witness testifies in a manner that is materially inconsistent with those messages and (2) the Court determines that a specific message may be offered as a prior inconsistent message." *Id.*

The application is denied at this point because it's premature. We are at the outset of the case. I have very little idea at this point what evidence the defendant will seek to introduce or what evidence will actually be admitted. I don't know, for example, whether Franklin and Auerbach will testify in a manner that's consistent or inconsistent with the text messages that have been cited by the parties or whether

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 624

any of their text messages will actually be received in evidence.

Accordingly, I'm in no position to make rulings about what the defendant will be permitted to argue in summation, which is probably two weeks down the road, and there is no point in arguing the issue now. We will see what the evidence is before making rulings about what someone can argue in their closing.

The government also complains that defense counsel violated my ruling that he was not to tell the jury in the opening about text messages between Franklin and Auerbach that might not come into evidence.

I don't find any violation in defense counsel's opening. The defense did not refer at any point to text messages. There is one sentence in defense counsel's 45-minute opening that refers to "an exchange of communications" between Franklin and Auerbach. I can understand why the lawyers in the room might have understood that to be a reference to the text messages, but I'm not sure that there is any reason to believe the jury would have picked up on that or, in fact, that the brief reference would have registered with them at all.

The government also argues that because of defendant's opening it should now be permitted to use in its direct case two text messages sent by Jeffrey Auerbach to Avenatti after his arrest. I find this application also to be premature. The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1VMAVE3 Wilson - Cross 625

Auerbach text messages at issue are found in Government Exhibit 310. Both text messages are dated March 25, 2019.

The first Auerbach text message, which is time stamped 9:58 a.m. in Government Exhibit 310, was apparently sent after Avenatti posted a Tweet saying that he intended to hold a press conference to announce Nike's alleged misconduct. In the Tweet Avenatti writes: "Tomorrow at 11 eastern time we will be holding a press conference to disclose a major high school/college basketball scandal perpetrated by Nike that we haven't uncovered. This criminal conduct reaches the highest levels of Nike and involves some of the biggest names in college basketball." Citing Government Exhibit 107. Avenatti posted this Tweet after learning that Franklin had been approached by the FBI.

Auerbach apparently sent the following text message to Avenatti after seeing Avenatti's Tweet: "Michael, very upsetting, to say the least. Please call me before going public in any way. Gary and I would like to discuss strategy with you." Citing Government Exhibit 310.

As I have said before, Avenatti's Tweet, in effect, marks the termination of his alleged criminal scheme, which was premised on threatening Nike with reputational harm flowing from the disclosure of the alleged misconduct of Nike employees, and Avenatti was arrested a short time after, in any event.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000201

While Auerbach's reaction to the Tweet indicates that Avenatti may not have been authorized to "go public" with the allegations against Nike, it does not shed light on the central question in this case, which is whether Franklin had authorized Avenatti to seek as part of a settlement with Nike 15 to $25 million for himself to conduct an internal investigation.

To the extent that the government argues that Avenatti breached his duty to Franklin by "going public," that is also potentially confusing to the jury because the breach of duty underlying the honest services wire fraud count is not that breach.

Auerbach's second text message to Avenatti was apparently sent in response to a CNN story about the charges and allegations in the U.S. Attorney's Office's criminal complaint. Auerbach wrote: "Just saw CNN. Are you fucking kidding me? Please call." Citing Government Exhibit 310.

What is relevant here is not Auerbach's reaction to the allegations and charges set forth by the U.S. Attorney's Office, allegations and charges that Avenatti disputes. What is relevant here is the instructions Franklin and Auerbach gave Avenatti in connection with his approach to Nike, what Avenatti told them about the demands he was making on Nike, and whether they authorized him to make those demands.

Were Auerbach to testify that (1) he first learned about Avenatti's demands on Nike from the CNN story and (2) was

surprised and/or upset to learn of the demands that Avenatti was allegedly making, because he had not been authorized to make such demands, and (3) were defense counsel to suggest that Auerbach is lying on these points, Auerbach's reaction to the CNN story might be relevant to rebut a claim of recent fabrication. But at this point we are nowhere near to having the necessary predicates that would permit use of this text message.

It is true that I said that the text messages might become admissible once Auerbach's credibility was intact to rebut a claim of recent fabrication, citing docket No. 223-1 at pages 7-8.

In his opening, defense counsel suggested that Franklin and Auerbach's story at trial about their dealings with Avenatti might change from what they told Avenatti back in March 2019, citing docket No. 232-2 at pages 175-176. That is the start of an attack on their credibility but we will have to see whether that attack is pursued on cross-examination.

The government's motion for admission of the Auerbach text messages is denied.

Are there other issues that the parties want to raise?

What about these documents that were handed up to me at the start today? Are the lawyers talking about those documents?

MR. PODOLSKY: I believe we addressed those documents

at one of the breaks, your Honor, if I know which documents you are referring to. JJ and SS and so on?

THE COURT: Yes. The defense exhibits that start with JJ1 and end with Defense Exhibit SS.

MR. PODOLSKY: My understanding is, we addressed that at the break.

MR. S. SREBNICK: I think the best thing is for us to take them back, unless the Court wants to keep them. We can discuss over the weekend.

THE COURT: I'm happy to give them back to you.

MR. S. SREBNICK: I was worried you didn't have enough paper, Judge.

THE COURT: You'll take custody of them. If it becomes a live issue, you will let me know.

Are there other issues we should talk about now?

MR. PODOLSKY: Not for the government, your Honor.

MR. RICHENTHAL: For the record, as we kept doing, we advised the defense last night who our next witness was. We thought that might happen today. It didn't. And we also advised the defense of the entire set of exhibits that we intend to offer during that witness' direct examination.

THE COURT: Is that Auerbach?

MR. PODOLSKY: Yes, your Honor.

THE COURT: We will resume at 9:30. As always, if there are issues that come up over the weekend, please let me

know and it may be that we meet earlier than 9:30.

Otherwise, if I don't hear from you, I'll see you at 9:30.

(Adjourned to February 3, 2020, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of: Page

SCOTT RONALD WILSON

Cross By Mr. H. Srebnick . . . . . . . . . . . . 447

DEFENDANT EXHIBITS

Exhibit No. Received

D1 . . . . . . . . . . . . . . . . . . . . 470

D3 . . . . . . . . . . . . . . . . . . . . 472

D4 . . . . . . . . . . . . . . . . . . . . 474

D6 . . . . . . . . . . . . . . . . . . . . 477

D9 . . . . . . . . . . . . . . . . . . . . 482

UU . . . . . . . . . . . . . . . . . . . . . . 551

Case 21-1778, Document 61, 04/04/2022, 3290318, Page204 of 263

K239AVE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 19 CR 373 (PGG)

MICHAEL AVENATTI,

Defendant. Trial
------------------------------x

New York, N.Y.
February 3, 2020
9:35 a.m.

Before:

HON. PAUL G. GARDEPHE,

District Judge
-and a Jury-

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: MATTHEW D. PODOLSKY
DANIEL RICHENTHAL
ROBERT B. SOBELMAN
Assistant United States Attorneys

BLACK SREBNICK KORNSPAN & STUMPF, P.A.
Attorneys for Defendant
BY: HOWARD M. SREBNICK
-and-
SCOTT A. SREBNICK
JOSE M. QUINON
MICHAEL D. DUNLAVY
-and-
PERRY GUHA, LLP
BY: E. DANYA PERRY
GEORGE BARCHINI

Also Present:
DeLeassa Penland, Special Agent (USAO)
Andrew Hamilton, Paralegal
Kristina Kotyza, Paralegal
Michael Lyon, Trial Technician

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE1

(Trial resumed; Jury not present)

THE COURT: I understand the lawyers have an issue they want to raise.

MR. PODOLSKY: Good morning, your Honor. Not so much an issue. Just looking back at our discussions over the course of last week and where we finished on Friday, I just want to make sure that I'm clear on a certain aspect of the permissible scope of cross so that I can object to objectionable questions and not object when they're not objectionable.

And I understand where we left off is that in the buckets of bias, I'll call it, there's certainly the notion that's already on the record that Nike was under investigation by the United States Attorney's Office throughout this time period. We can put that aside. There's the bucket where if the defense could show that Mr. Wilson somehow refused or failed to produce documents or somehow misled the U.S. Attorney's Office in response to the subpoena or discussions with the U.S. Attorney's Office, if those questions have a good faith basis or are otherwise admissible that's fine and we're not objecting to that.

There's then a third bucket that I think some questions have gone to which go to the I'll call the adequacy or scope of Boies Schiller's parallel internal investigation that was conducted for the purpose of providing advice to Nike. I am understand that those would not be within the permissible

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE1

scope of cross because that doesn't go to bias. The U.S. Attorney's Office isn't investigating whether Boies Schiller did a good or bad investigation when they gave advice to Nike and so questions about whether they should have interviewed more people or asked certain questions or figured more stuff out would not go to bias and therefore would not be relevant on cross-examination. I want to just make sure that I'm addressing these in a correct manner.

THE COURT: I think this ties into the privilege issue that we were discussing at the end of yesterday. So where are we on that? Has that been resolved or not?

MS. PERRY: Your Honor, we spoke with Mr. Skinner from Boies over the weekend. We're essentially punting for right now. We told him it will not come up with Mr. Wilson. It may yet with another witness. And so we'll wait for another day on that one.

THE COURT: All right. And what do you say to Mr. Podolsky's query about whether the defense is going to try to explore the adequacy of the internal investigation that Boies was doing?

MR. H. SREBNICK: So, Judge, the question that I had asked that we never got an answer to and I told the Court we would defer until the end of the day. It's at page 421, line 2, is the question to Mr. Wilson, "And when you shared that information to the prosecutors did that include sharing

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE1

information that DeBose and James, the two Nike executives, had directed Mr. Franklin to pay money to the first round draft choice?"

THE COURT: I haven't looked at the transcript but I actually don't think that's the pending question. I think the question that got us into the lengthy sidebar was something about what Mr. Wilson had asked, was it DeBose or James.

MR. PODOLSKY: My understanding it was a question about whether in interviewing a Nike employee DeBose, or I think it was DeBose, whether he had asked certain questions in that interview.

THE COURT: That's my recollection. And at that point we had to go to the sidebar because there was a privilege issue. And we talked about that at some length. And so back to my original question with respect to Mr. Podolsky's point that this case is not about the adequacy of the internal investigation that Boies was doing I guess at the same time that the facts were being developed here. So I think that that's the pending question is: Are you going to be trying to cross-examine Mr. Wilson essentially about whether Boies did a good investigation or an adequate investigation. And I have some concerns about that because it seems that we're going to get right back into the privilege issue that we got hung up on on Friday.

MS. PERRY: That's I think part of that same issue as

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000204

your Honor just noted that we'd like to punt for right now. We don't think it will come up with this witness and so that last question won't be reasked.

I think Mr. Srebnick was just referring back to an earlier question that he had withdrawn that does seem to be well within the parameters that your Honor had set out. And so I think we're all on the same page about that privilege issue.

THE COURT: OK.

We have all the jurors?

THE DEPUTY CLERK: Yes.

THE COURT: Anything else before I bring out the jury?

MR. PODOLSKY: No, your Honor.

THE COURT: Mr. Wilson should take the stand.

Mr. Srebnick?

MR. H. SREBNICK: I just want to make sure the question that I did read to the court I don't believe there's any objection to that from the government.

MR. PODOLSKY: My understanding is that what Mr. Srebnick is referring to is a question about what Mr. Wilson shared with the government with respect to Mr. Franklin's claims and to the extent he did that we don't object.

THE COURT: I think questions about what was shared with the government you can ask.

(Continued on next page)

(Jury present)

THE COURT: Welcome back, Mr. Wilson.

THE WITNESS: Thank you.

SCOTT WILSON,

called as a witness by the Government,

having been previously sworn, testified as follows:

THE COURT: Good morning, ladies and gentlemen. We will now continue with the cross-examination of Mr. Wilson.

Mr. Wilson, you remain under oath.

Please proceed, Mr. Srebnick.

MR. H. SREBNICK: Good morning everybody. Good morning, your Honor.

CROSS-EXAMINATION

BY MR. H. SREBNICK:

Q. Mr. Wilson, on Friday when we broke we were talking about the meeting of March 21, 2019. Do you recall?

A. Yes.

Q. I'd like to return to the segment where we left off. It was at page 24 of the transcript, line 18. I was going to ask Mr. Lyon to play that so we can all be back on the same page.

THE COURT: Sorry, Mr. Srebnick. Could we state for the record the exhibit that we're looking at.

MR. H. SREBNICK: Of course. It is T2.

THE COURT: It's 2T?

2T page 24 I think you said?

MR. H. SREBNICK: March 21 meeting.

MR. PODOLSKY: 2T.

THE COURT: So, ladies and gentlemen, we're at 2T, page 24.

MR. H. SREBNICK: Very well.

THE COURT: Go ahead, sir.

(Audio played)

Q. Mr. Wilson, do you recall that segment of the conversation with Mr. Avenatti?

A. Yes.

Q. And is it correct that that's the discussion about an alternative to the two-component proposal that Mr. Avenatti had made earlier?

A. Yes. I understood him to be proposing an alternative to that.

Q. In fact, you had asked Mr. Avenatti for a number to settle all the claims without an internal investigation?

A. Before he and Mr. Geragos had stepped out of this meeting I had asked if there was a way to not have the threatened press conference occur without having to hire, having Mr. Geragos to conduct an internal investigation. And then I stated the question a second way, as I recall, which was: What if we did more money in the civil settlement agreement.

Q. And the -- and when Mr. Geragos and Mr. Avenatti returned this conversation ensues and the proposal is 22-and-a-half

million dollars, correct?

A. This was a proposal he made for the first time after coming back from that little break, yes.

Q. And at line -- excuse me. Page 25, line 16 the discussion there is that Boies, your law firm, would then be responsible for whatever internal investigation might have to happen?

A. I understood Mr. Avenatti to be saying that after he had been paid and was out of the picture that either my former law firm or a different law firm could be hired or not. He seemed to be saying we'll just be out of the picture.

Q. If we can then turn to page 27, line 18.

MR. H. SREBNICK: Mr. Lyon.

(Audio played)

Q. And so what we just heard is consistent with what you and I were discussing a moment ago, two alternatives, the money 1.5 million to Mr. Franklin, the internal investigation run by Mr. Geragos and Mr. Avenatti. That's one proposal. This alternative proposal is just a 22-and-a-half million dollar settlement for Mr. Franklin for his claims, no internal investigation by Geragos and Avenatti, correct?

A. There was a -- there were two alternatives and I think that -- I'm not sure. It was a long question. I'm not sure I would describe them exactly as you had but that was the two alternatives.

Q. Now, at that moment in the negotiation or in the

conversation you had represented to Avenatti and Geragos you still did not have any authority to make an offer, correct?

A. The purpose of this meeting on the Thursday was for me to hear the final demand, a demand with a price tag attached to the internal investigation so that I could then go back to my client and prepare a response for Monday, the following Monday.

Q. So at that moment in time you represented to Avenatti and Geragos you still did not have authority to make an offer, accept the demand; you simply had no authority to make any decision on behalf of Nike, correct?

A. Yes. I believe I conveyed that, if not in words, in substance at that meeting.

Q. And indeed throughout the conversations with Geragos and Avenatti, you always indicated that you lacked the authority to make an offer or accept any proposal made by Avenatti and Geragos, correct?

A. Yes.

Q. In fact, you indicated you'd have to run it by management or go to Nike and get all the people in the flagpole to approve any offer or any settlement, correct?

A. I never felt that I was engaged in actual settlement negotiations. But I at many times represented to Mr. Avenatti that I had to go back to my client before I could respond to his demands.

Q. Now, the proposed settlement was going to be documented in

a settlement agreement reduced to writing? That was the proposal by Geragos and Avenatti, correct?

A. Mr. Avenatti handed me a draft settlement agreement during the course of that Thursday meeting.

Q. So what I'd like to do now is we're going to queue up the video because there were moments -- am I correct there were moments when Avenatti first presented you a draft settlement agreement, he then retrieved it, he made some modifications to it and then he presented it to you again, correct?

A. Yes.

Q. So I'd like to queue up the video at page 10, line 7. This will be the video. So we can watch when Mr. Avenatti presents the draft settlement agreement to you for the first time on March 21, 2019. OK?

THE COURT: So this is still Government Exhibit 2 that you're dealing with, right?

MR. H. SREBNICK: Yes, your Honor. Now we're going to use the video.

(Video/audio played)

Q. I'm pausing it. You saw when Avenatti handed you the draft agreement?

A. Yes, I did.

Q. That was earlier in the conversation on March 21, 2019, correct?

A. Earlier than what? I'm sorry.

Q. Earlier than -- forgive me.

That was early in the conversation, shall we say?

A. It was fairly early in that meeting, yes.

Q. That was before the alternative 22-and-a-half million dollar alternative proposal was made, correct?

A. Yeah, I recall that this was before -- when Mr. Avenatti and Mr. Geragos stepped out of the room.

Q. And we don't need to listen to it again in terms -- the jury has heard it before. But, there's discussion about arbitration clauses and other details that might be relevant to a settlement agreement, correct?

A. Yes.

Q. Now, during the March 21 meeting Geragos and Avenatti step out for five minutes or so and then they come back into the room, correct?

A. Yes.

Q. I'd like to turn to a video clip which corresponds to page 21, line 11. And we'll just play that. It will be very short. A few seconds.

(Video/audio played)

Q. Do you recall that as being the moment when Avenatti comes back into the room with Geragos and says could I see that for a minute and he retrieves the settlement agreement that he had given to you earlier in the meeting?

A. Yes. I handed it back to him at his request.

Q. Now, that piece of paper, that draft of the settlement agreement is the one that had proposed a 1.5 million dollar payment to Mr. Franklin, correct? In that draft?

A. The first version of the document, the one I had had in my hands until I handed it back in the clip we just saw, I believe had the 1.5 million dollar number in the payment clause.

Q. Mr. Avenatti then spends a little time doing some typing or some editing of this settlement agreement, do you recall that, on a computer?

A. He said he was editing the document on his -- it was a silver laptop. I saw him typing. I had no reason to believe that's not what he was doing.

Q. I couldn't hear the last part.

A. I have no reason to believe that's not what he was doing.

Q. So if we could queue up the video to correspond to page 35, line 17.

(Video/audio played)

Q. First, did you hear Mr. Avenatti say: I'll tell you what, so you have something to take with you, I will make a revision to this?

A. Yes.

Q. We'll continue with the video.

THE WITNESS: Could you direct me to the page? I'm sorry. The page of the transcript.

Q. Page 35, line 17.

A. Thank you.

(Video/audio played)

Q. On the video did you see that someone passes Mr. Avenatti what is colloquially known as a thumb drive or a flash drive?

A. Yes.

Q. And we see Mr. Avenatti is doing some typing.

A. Yes.

MR. H. SREBNICK: If we could roll the video.

(Video/audio played)

Q. Did you observe Mr. Avenatti pass the thumb drive back to somebody?

A. I recall him going that at the moment. I was looking at the transcript just now. But I do recall him doing that.

Q. And then do you recall that at some point in time the new draft settlement agreement, I'll call it the second draft settlement agreement, is then presented to you after it's printed out?

A. There was an administrative struggle about USB drives and e-mail but eventually I was handed back a new copy of the draft settlement agreement, yes.

MR. H. SREBNICK: And that would, Mr. Lyon, correspond to page 44, line 6.

(Video/audio played)

Q. I paused the video. Does that appear to be the draft -- second draft settlement agreement that Mr. Avenatti has

received from another person?

A. Yes.

Q. And we will roll the tape, we'll watch Mr. Avenatti handle it.

(Video/audio played)

Q. Did you observe Mr. Avenatti handing it back and then it is given to you?

A. Yes.

Q. Now, I'd like to ask you about that very document, the one that you got -- what I'm referring to as the second draft settlement agreement. I'd like to -- if there is no objection to Government Exhibit 205, the settlement agreement. Not in evidence yet?

MR. PODOLSKY: 205. I believe is it in.

MR. H. SREBNICK: It is in evidence. OK. Sorry.

I'd like to publish then what's already in evidence, your Honor, as Government Exhibit 205. I believe that's the document titled general release and settlement agreement.

THE COURT: Go right ahead.

Q. Do you recognize that as the document that I've referred to in this morning's examination as the second draft?

A. Yes.

MR. H. SREBNICK: So if we could just expand the top like you just had it, Mr. Lyon.

Q. So if we follow along it says, "This general release and

settlement agreement (this agreement) dated and effective as of this 25th day of March, 2019 is made and entered into by and between Gary Franklin and California Supreme Youth Basketball, Inc., on the one hand, (collectively Franklin) and Nike USA, Inc. (Nike) on the other hand (each a party and collectively the parties)."

Do you see that?

A. Yes.

Q. And so this document is going -- being presented to you in your capacity as Nike's lawyer, correct?

A. Yes.

Q. And as the document will further detail, it purports to settle the claims that Mr. Franklin has with Nike?

A. It doesn't actually describe any claims that Mr. Franklin may or may not have had but it does include a general release of any and all claims.

Q. So that we understand what that means, when parties are negotiating claims, a settlement of claims, the lawyers can structure the settlement to be a specific release as to a specific claim or the lawyers can negotiate that it's a general release as to all claims the party has against the counterparty, correct?

A. I'd never had any prior experience with a settlement agreement that didn't release specific claims.

Q. My question is: Lawyers can negotiate a settlement

agreement that does specific releases or another option is to do a general release, correct?

A. I suppose lawyers can do that but it's not -- as I just said, a settlement agreement that doesn't identify specific claims and release them is not a practice of lawyers that I'm familiar with personally.

Q. So this was a draft, correct?

A. It was presented to me as an unsigned draft, yes.

Q. Any kind of specific language to specify details or claims, in fact, Mr. Avenatti invited you to make revisions to that effect, correct?

A. He did not invite me. Well, put it this way. I asked if there were -- if I could have opinions on parts of the draft and he indicated that the amount of the payment and the date of the payment were nonnegotiable. Of course that was earlier in the conversation. And I asked questions about whether certain boilerplate provisions like dispute resolution were the sorts of things that we could negotiate. And he indicated that, yes, we could.

THE COURT: Could you explain, you used the term boilerplate. Could you explain what that means.

THE WITNESS: Apologies. I used boilerplate as a jargon term of the -- that lawyers use for the somewhat standard provisions in the back of a settlement agreement like confidentiality or separability, various technical legal

provisions.
Q. Now, a general release would be more beneficial to Nike than a specific release because a general release waives any and all of Franklin's potential claims against Nike, correct?
A. If Mr. Franklin had claims, then a general release would be broader than a specific release.
Q. When you say "broader," it would be more beneficial to Nike than a narrower, specific release, correct?
A. It's hard for me to take my lawyer hat off. I would not like a settlement agreement that didn't contain a release of specific claims and only contained a general release because I would worry that the other side could argue that the general release was boilerplate, it was just a standard term, and they hadn't intended to release some particular claim. So the normal thing the parties do or at least that I do is make sure that if my client is paying to settle a claim, that the written document by which we do that indicates which claims were being settled; otherwise, I think you leave some room for the other party to argue: Oh, I didn't know the general release was just boilerplate that my lawyer had me sign, I didn't know I was giving up X, and Y, and Z. So, yes, general releases are broader than specific releases but I wouldn't like to have a settlement agreement without specific releases in it if my opponent had a claim.
Q. So you could, for example, modify that boilerplate language

of general release, which we'll get to in a moment, and say this releases all claims including but not limited to claims A, B, and C? That might be one way to redraft that provision, correct?
A. I would not, in this instance, have felt in a position to edit in specific claims because any specific claims that Mr. Franklin might have had against Nike were never articulated to be by Mr. Avenatti. I wouldn't have known what to write.
Q. So let's take a look at paragraph one, payment. Do you see that?
A. I do, yes.
Q. Now, the original draft settlement agreement -- let me read this one.

"1.1 on or before March 26, 2019, Nike shall pay by wire transfer to an account designated by Franklin's counsel by e-mail, in good funds, free of all liens, claims, encumbrances, and issues of any kind, the total some of [insert]."

Do you see that?
A. Yes.
Q. This second draft settlement agreement left open the amount for the "total some of," do you see that?
A. That is the change that I recall Mr. Avenatti made between the version of the document I saw at the beginning of the meeting and the version of the document that I left the meeting carrying, that the sum was changed to open brackets insert

close brackets.
Q. The original draft, the number 1.5 million was in the space that is now bracketed as insert, correct?
A. As you saw in the video, I was handed it. I put it down. I was listening to Mr. Avenatti. I'm not certain but that's -- my best recollection is that there was some 1.5 million dollar number where we now see open brackets insert close brackets.
Q. Then during the course of the conversation Avenatti proposes the lump sum 22-and-a-half million but he doesn't put that number in the second draft settlement agreement, correct?
A. There is no number here, just a notation "insert" where a number could be put in.
Q. I'm correct?
A. You said that he proposed it. I asked him if he -- if there was a way to put more money in the civil settlement agreement and not have a press release. We had a break. He came back and said we could do $22.5 million.
Q. And the number, so we're clear as day, is nowhere in this settlement agreement second draft, correct?
A. That number, $22.5 million is not in this document.
Q. If we can scroll down to the general release. Paragraph four. This is what you and I were just discussing, the concept of a general release, correct?
A. That paragraph 4.1 is the general release language in this draft.

Q. And that has some, what you might describe as, boilerplate language?
A. Yes.
Q. We can scroll down.

If we can scroll down. So this document has other provisions, other perhaps what you might describe as boilerplate language, correct?
A. Yes.
Q. Now, and Avenatti had discussed certain I'll call them preferences, you can choose a different word, for whether Oregon law would apply or California law. Avenatti gave you the draft and said get back to me on those kinds of matters, correct?
A. At some point in the conversation I noted that Nike in its contracts generally specifies that Oregon law would be the state's laws that governs. We did have a dialogue, some of which I think we listened to this morning, about whether or not I could have opinions on, by which I meant: Can I ask for changes with respect to things like JAMS, arbitration, venue.

So, yeah, we left it open that on those kinds of what I would call boilerplate provisions, he was open to changes.
Q. And, indeed, Avenatti told you -- this would be -- we don't need to play it again unless you'd like, at page 10 of the transcript, line 17, "If you need additional release language or confidentiality language, language relating to other items,

Case 21-1778, Document 61, 04/04/2022, 3290318, Page209 of 263

K239AVE1 Wilson - Cross

no problem, but we're not going to negotiate the amount or the date."

Do you recall that, Avenatti telling you that?

A. With the modification I think it's "other terms" here, not "other items," yes, I do recall that.

Q. Now, if we could go to paragraph three, strict confidentiality.

"3.1. The parties hereby agree that the terms and conditions of this agreement and the underlying negotiations leading to settlement and discussion of the agreement shall remain strictly confidential among the parties to this agreement and shall not be disclosed to any other person or entity,"

I'm going to stop there. Is it correct to say that that first clause, I'd like to underline the words "terms and conditions of this agreement," first line. And I'd like to underline the words "underlying negotiations leading to settlement and execution of this agreement." According to this paragraph what would remain confidential are the matters now highlighted.

A. If this agreement had been executed and subject to the exception later in the clause, yes, those are areas of information that this clause would render confidential.

Q. Hold that highlighting.

I'm going to start reading again after the comma.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE1 Wilson - Cross

"except their attorneys and accountants, provided, however, that nothing herein shall restrict the disclosure of this agreement and its terms in a proceeding brought for the purpose of enforcing this agreement and/or in connection with responding to a lawfully issued subpoena or request by a government body."

Do you see that?

A. Yes.

Q. Is it clear that at least in this draft the confidentiality provision in no way restricts Mr. Franklin from responding, second to last line, responding to a lawfully issued subpoena or request by a government body?

A. That clause at the end of that paragraph in my reading only modifies "nothing herein shall restrict the disclosure of this agreement and its terms." So this is a confidentiality clause with respect to -- excuse me, the carve-out here is with respect to if the government issued a subpoena that called for the production of the settlement agreement itself, this carve-out or exception in the back of the paragraph would allow Mr. Franklin or any other party to the document to hand over this document to the agency issuing the subpoena.

Q. And in this draft of the settlement agreement there is no other confidentiality provision? This is the entire scope of the confidentiality?

A. It's been a while since I looked at it. I have to scroll

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE1 Wilson - Cross

through. But I don't recall another confidentiality provision.

Q. So we can scroll slowly.

A. Thank you.

Q. So, is it correct to say that that provision that we just covered with the jury was the entire scope of the confidentiality provision?

A. It's the only confidentiality clause in the document.

Q. And that document was presented to you after Mr. Avenatti proposed a 22-and-a-half-million-dollar settlement for Mr. Franklin, full confidentiality, we ride off into the sunset, those were basically Avenatti's words, right?

A. I received this revised draft after he made those statements in the meeting.

Q. And based on your reading of the confidentiality provision it does not restrict Mr. Franklin giving testimony or providing documents related to any activities he had with Nike, correct?

A. It does not speak to that topic so it doesn't restrict it either.

Q. And if we go to the very last page, it has some signature lines for Nike USA, Inc., for Gary Franklin in his individual capacity and Gary Franklin with regard to California Supreme Youth Basketball, Inc., correct?

A. I see those.

Q. One more question about the disclosure issues. Is it correct that if Nike settles with someone like Franklin and is

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE1 Wilson - Cross

going to pay millions of dollars to settle claims that would need to be reported to -- for the books and records of Nike for one thing, correct?

A. Nike records payments it makes under legal settlement agreements in its books and records.

Q. So I'd like you to give a listen then to page 34, starting at line 6. We're going to play the audio and we'll scroll the transcript, starting page 34, line 6.

(Audio played)

Q. I'm referring now to what's on the screen at line 14, you're speaking. Do you see that?

A. Yes.

Q. Say something to the effect, "Yeah, the company will need to -- if the company makes multimillion dollar payments -- the auditors will need to be able to..." and then it sort of trails off.

Is that to make some sort of disclosure? Is that what you were suggesting to Mr. Avenatti and Mr. Geragos?

A. I was referring to -- back to what I think we were talking about a little higher in the transcript which I don't have on my screen which is to make sure that the confidentiality clause and settlement agreement permits the settlement agreement to be shared with the firm's accountants or auditors -- excuse me attorneys or auditors as needed.

MR. H. SREBNICK: OK. We can continue to scroll.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000209

(Audio played)

Q. And this then returns us to the part where Avenatti is arranging to make copies for you, a copy for you, correct?

A. Yes.

Q. And you, in fact, kept that copy after that meeting?

A. I handed it to the FBI after the meeting.

Q. And that's what ultimately is now as the government exhibit we're now talking about in terms of the settlement agreement, correct?

A. Yes.

MR. H. SREBNICK: If I could just have a moment.

THE COURT: Yes.

(Counsel and defendant confer)

Q. Do you recall Avenatti inviting you to bring your own version of a settlement agreement if you preferred one or if Nike has one that it prefers to use?

A. I heard that in the recording, words to that effect in the recording we listened to just now.

Q. So, to sum up, the conclusion of this discussion between you an behalf of Nike, Avenatti and Geragos on behalf of Franklin, Avenatti tenders to you a draft of a settlement agreement, the second draft of the day, correct?

A. Yes.

Q. He invites you to make any changes to what you may describe as boilerplate language?

A. He invited me to make some changes. He had earlier said there were two points that couldn't be changed.

Q. Earlier he had said the amount of money couldn't be changed when it was 1.5 million, correct?

A. Yes.

Q. But when he hands you the document now he leaves blank the amount of money?

A. Yes. But I had also said 22 million dollars and he corrected me and said no, 22.5 million, that number is magical to me. I don't know what he meant by "magical," but I took that to mean that 22.5 was the new demand.

Q. And still that number doesn't appear in the settlement agreement, correct?

A. There was an open brackets insert close brackets where the dollar figure had originally been.

Q. That number doesn't appear in the document, correct?

A. Yes. That's right.

Q. And you're invited to even use your own form document to prevent -- to put whatever provisions that Nike might insist upon, correct?

A. He made reference to me that I could bring my own version.

Q. I'd like to talk to you now about a different subject and I think this may bring us to the conclusion here. In September of 2017 Nike received a grand jury subpoena, correct?

A. Yes.

MR. H. SREBNICK: If we could just show the witness, not the jury, Defense Exhibit OO.

Q. I'd like you to take a look at Defense Exhibit OO. I'm going to do one page at a time so you can see if you can identify it. There is page 1?

A. OK.

Q. Page 2, please. Tell us when you've had a chance.

A. OK.

OK.

All right.

OK.

OK.

Q. Mr. Wilson, do you recognize Defense Exhibit OO which has some redactions we'll talk about in a minute?

A. With the redactions, yes, I do recognize the document.

Q. And do you recall that being a letter from the government to Nike with a grand jury subpoena attached?

A. Yes, I do.

MR. H. SREBNICK: Your Honor, at this time I would seek the admission of and publication of Defense Exhibit OO.

THE COURT: Is there any objection?

MR. PODOLSKY: Subject to the appropriate limiting instruction we do not object.

THE COURT: Defense Exhibit OO is received.

(Defendant's Exhibit OO is received in evidence)

THE COURT: Members of the Jury, I want to give you a couple of instructions about the subpoena that you're about to see. You will notice that some parts of the subpoena have been deleted such as telephone numbers and e-mail addresses as well as categories of materials to be produced. This material has been deleted because it's irrelevant to this case. Please don't speculate about what might have been deleted.

As to what a subpoena is, it is the vehicle by which the government obtains documents it wants for purposes of an investigation it is conducting. The fact that the government has issued a subpoena to a person or entity does not mean that the recipient of the subpoena has committed a crime or that the government believes that the person or entity receiving the subpoena has committed a crime. Instead, subpoenas are issued to people and entities who might have documents relevant to the government's investigation.

Please go ahead, Mr. Srebnick.

MR. H. SREBNICK: Yes, your Honor.

BY MR. H. SREBNICK:

Q. So if we could take a look at the first page of Defense Exhibit OO. Do you see that it is a letter from the Department of Justice dated September 26, 2017?

A. Yes.

MR. H. SREBNICK: If we could go wide screen.

Q. It's addressed to Nike, Inc. Do you see that?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page211 of 263

K239AVE1 Wilson - Cross

A. I do.
Q. And it reads as follows, follow along, please, "Please be advised that the accompanying grand jury subpoena has been issued in connection with an official criminal investigation of a suspected felony being conducted by a federal grand jury."
Do you see that?
A. Yes.
Q. "The government hereby requests that you voluntarily refrain from disclosing the existence of the subpoena to any third party. While you are under no obligation to comply with our request, we are requesting that you not to make any disclosure in order to preserve the confidentiality of the investigation and because disclosure of the existence of this investigation might interfere with and impede the investigation."
Do you see that?
A. I see the text.
Q. "If you intend to disclose the existence of this grand jury subpoena request to a third party, please let me know before making any such disclosure. Thank you for your cooperation in this matter."
Do you see all that?
A. Yes.
Q. The subpoena compels Nike to produce documents, correct?
A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE1 Wilson - Cross

Q. The letter that I just read makes a request in the second sentence beginning with the words, "the government hereby requests," that Nike refrain from disclosing the existence of the subpoena to any third party.
Do you see that?
A. I see that request.
Q. If Nike wants to disclose it, it can but the government is asking that Nike refrain from disclosing the existence of the subpoena. Correct?
A. Yes. That's what it says.
Q. But even though that's a request that Nike not disclose the existence of the subpoena, Nike is under an obligation to produce documents, correct?
A. The subpoena obligates Nike to produce documents.
Q. And the government described for Nike that there was a subpoena or this subpoena was, end of first line "in connection with an official criminal investigation of a suspected felony."
Do you see that?
A. Yes.
(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - cross

Q. If we turn to the next page, this is what would effectively be the first page of the subpoena itself?
A. Yes, that's right.
Q. If we go wide screen.
You see that the subpoena commands Nike, six Lines down, approximately, to testify and give evidence in regard to an alleged violation of, and then it has several federal criminal statutes, correct?
A. Yes.
Q. Do you recognize those statutes to include the crimes of bribery under 666, correct?
A. Yes.
Q. You recognize those federal statutes to include the crimes of fraud, wire fraud, mail fraud?
A. Yes.
Q. You recognize those statutes to include the crimes under the Travel Act?
A. Yes, Section 1952.
Q. And you recognize those statues to include the crime of money laundering?
A. Yes.
Q. And this subpoena was issued by the U.S. Attorneys for the Southern District of New York, correct?
A. By that office, yes.
Q. The same office that's prosecuting Mr. Avenatti, correct?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - cross

A. Yes, that's correct.
Q. And so when you received -- did you actually see this subpoena in or about the time it was served on Nike?
A. Shortly thereafter, yes.
Q. And when you received this subpoena, did it make your jaw drop?
A. No, it struck me as fairly routine.
Q. Did you say it's fairly routine?
A. The subpoena itself struck me as fairly routine.
Q. Are you saying that when the federal prosecutor's office indicated it was investigating these felonies and wanted Nike's records, that was routine to you?
A. It did not surprise me in the context of the arrest of a former Nike employee a couple of days before.
Q. It did not surprise you?
A. In the context of the arrest of a former Nike employee a couple of days before, it did not surprise me that the government would issue a subpoena for records to Nike.
Q. Did you understand that the government was investigating these suspected felonies and wanted records in the possession of Nike?
A. That's what I understood the subpoena to mean when I read it.
Q. And did it get your pulse to go up a little bit when you saw it?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000211

Case 21-1778, Document 61, 04/04/2022, 3290318, Page212 of 263

K23dave2 Wilson - cross

A. No. This is what I do for a living. It didn't make my pulse go up.

Q. I think we discussed that the subpoena commanded Nike to produce the records, but the subpoena does not command that Nike cooperate with an investigation, does it?

A. All grand jury subpoenas say that they command you. Cooperation in my view is may go above and beyond what a grand jury subpoena requires.

Q. So when you use the term that Nike cooperated with the investigation, that means it went above and beyond what the subpoena required, is that correct?

A. Yes, we did.

Q. OK. And in your mind, in your definition of "cooperate," what does that mean? What did Nike do above and beyond what the subpoena required.

A. In addition to producing to the government the documents technically required by the subpoena, we also provided additional documents and information that we believed might be of interest to the prosecutors, based on our conversations with them, and we provided that information not only through the production of documents from Nike's files but also through in-person meetings and telephone calls conducted by, for the most part, my former colleagues so that we could bring that information to the attention of the prosecutors in a prompt manner.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - cross

Q. And is it true that those conversations with the government began in the fall of 2017, shortly after the -- within weeks of Nike's receipt of the subpoena?

A. Yes.

Q. And you and your colleagues -- you and/or your colleagues made statements to the prosecutors about your perception of the investigation, correct?

A. I would say instead that we gathered facts and we presented those facts to the government.

Q. And -- I'm sorry.

A. Rather than other perception of facts, we presented the factual information that we could to the government.

Q. And when you say you gathered facts and then presented them to the government, how did you gather facts?

A. In addition to collecting and reviewing company documents, including, for example, emails, text messages, payment records, contracts, invoices, and other types of documents, Boies Schiller also conducted interviews of a number of Nike employees.

Q. Without telling us for the moment what was said in those interviews, did those interviews include interviewing DeBose or James?

A. Mr. DeBose and Mr. James were among the individuals who were interviewed.

Q. And when you shared that information with the government,

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - cross

did you share information that DeBose and James, the two Nike executives, had directed Franklin to pay money to a first-round drafter?

A. Prior to meeting Mr. Avenatti in March of 2019, that is not information we had, and so that's not information that we presented.

Q. I thought you just said you had interviewed DeBose and James. Did you not interview them before you met Mr. Avenatti?

A. They were interviewed before my meeting with Mr. Avenatti, but you just asked me if there was a particular piece of information that we presented to the government, and we did present to the government but not until after we met with Mr. Avenatti because it is not a piece of information that had come into our possession prior to him raising it.

Q. So let me see if I understand. You interviewed DeBose, you interviewed James, you spoke to the government before you ever met Mr. Avenatti, correct?

A. Those two gentlemen were interviewed, and there were numerous communications with the Southern District prior to March 2019.

Q. In fact, in November of 2017, members of your team at Boies Schiller told the government that there was no instance in which Nike paid money to a player or his family, isn't that right?

A. I don't recall that, no.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - cross

Q. Take a look at what might refresh your recollection.

MR. H. SREBNICK: If I may approach, your Honor?

THE COURT: Yes.

(Pause)

Q. I am going to show you what's marked VV, and see if that refreshes your recollection.

I will direct your attention to the highlighted portion.

A. I literally can't read more than half of this cursive handwriting. It's not my handwriting. It does not refresh my recollection on anything.

MR. H. SREBNICK: OK.

Judge, may I stand here for one more question?

THE COURT: Sure.

BY MR. H. SREBNICK:

Q. Isn't it true that a month later, in December of 2017 -- more precisely, December 14 -- members of the Boies Schiller team representing Nike told the prosecutors that there was no evidence that Nike employees were paying players?

A. This doesn't refresh my recollection, and there is a very specific reason why I don't think that happened, which I am happy to share.

Q. Let me just for the record say I've shown you defense Exhibit WW in an attempt to refresh your recollection, is that correct?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000212

Case 21-1778, Document 61, 04/04/2022, 3290318, Page213 of 263

K23dave2 Wilson - cross

A. That's the document you showed me, yes.

MR. H. SREBNICK: One moment, your Honor.

THE COURT: Yes.

(Pause)

Q. Let me see if I can clear it up.

The subpoena is delivered to Nike in September of 2017, correct?

A. Yes.

Q. Did Nike lawyers from Boies tell the Southern District of New York prosecutors, in 2017, within months of the subpoena, that there was no evidence that Nike executives were paying the players, and in particular the ones that Franklin brought to your attention through Mr. Avenatti, in March of 2019?

A. When -- when we conduct an internal investigation, it is typical that we update the government as we're going as to what we're finding. It's quite possible that there were points in the early stages of our investigation where we said to the government to date we have seen no evidence of X. That is very different from saying, sorry, guys, there is no evidence of X.

Remember, what we're doing with these ongoing communications with the government is saying we've looked at this and that so far, and so far we have not seen evidence of X. If we receive new information, we might update what we say to the government, we would provide it to them. So I have no recollection, certainly not in 2017, that we ever told the

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - cross

government there is no evidence of Nike paying players.

Q. 2018, did you tell the government that DeBose and/or James were directing Franklin to pay players to travel to Phoenix to do any of the things that Avenatti brought to your attention in March of 2019?

A. Prior to Mr. Avenatti sitting down with me in on March 19, 2019, my team was unaware of an allegation that Mr. Franklin himself was involved in getting money to the Ayton family. That was new information to me when I sat down with him.

Q. It was new information to you, but it was after you had already spoken to DeBose, after you had already spoken to James as part of the internal investigation, correct?

A. Either myself or someone on my team had spoken to those two gentlemen before March of 2019.

Q. And as of March of 2019, DeBose and James continued to be employed by Nike, correct?

A. Yes.

Q. And as of today they continue to be employed by Nike, correct?

A. Yes.

Q. A couple of more questions.

You told the jury that when you first met Mr. Avenatti on March 19 and he was giving you his presentation, it sounded rehearsed to you. I think those were your words. Do you recall telling the jury that?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - cross

A. I think I said like a rehearsed speech, something to that effect.

Q. In preparation for your testimony here in this court, did you spend some time rehearsing your direct testimony with the prosecutors?

A. No. I spent time with the prosecutors but not rehearsing.

Q. How many times did you meet with the prosecutors to prepare to deliver your testimony to this jury?

A. I met with the prosecutors several times.

Q. So Mr. Avenatti was arrested in March of 2019. Do you recall that you met with the prosecutors in June of 2019, more precisely, June 26, I believe?

A. I do recall that I had a meeting with the prosecutors in last summer. I don't remember the date.

Q. And do you recall that you met with them again just before Christmas, December 19, 2019?

A. Yes, that I do recall.

Q. And do you recall you met again with the prosecutors on January 10, 2020?

A. I don't recall the dates, but I don't have a reason to doubt I met with them several times.

Q. Sorry?

A. I don't have a reason to doubt that date. I met with them several times.

Q. Do you recall you met with the prosecutors on January 17,

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - cross

2020?

A. The same answer. I met with them several times. I don't remember the calendar dates in January.

Q. January 20, 2020?

A. The same answer.

Q. January 24, 2020?

A. Again, I don't recall which days I met with them but that could be correct.

Q. January 26, 2020?

A. That's the date before the first day of trial, yes, I recall that.

Q. On a Sunday you met with the government to prepare to be a witness in this case, correct?

A. I met with the government at their request.

Q. You met with them at least seven times to prepare to testify in this courtroom, correct?

A. The -- I don't recall my testimony being a topic of meetings last year, but certainly in January I met with them several times in advance of the trial.

Q. Also spoke to them by phone, correct?

A. Not that I ever recall. No, I've usually -- usually counsel has spoken to them by phone.

MR. H. SREBNICK: One moment, your Honor.

THE COURT: Yes.

(Pause)

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000213

BY MR. H. SREBNICK:

Q. And the U.S. Attorney's Office you were meeting with in anticipation of testifying here at Mr. Avenatti's trial is the same U.S. Attorney's Office investigating Nike, correct?

A. A different team of prosecutors within the office. The same office is investigating Nike, yes.

Q. The same boss, the same U.S. Attorney, correct?

A. There is one U.S. Attorney for the office.

Q. And when I reached out to you to ask you if I could speak to you about the case, you declined to meet with us, correct?

A. Yes, I declined to meet with counsel for Mr. Avenatti.

MR. H. SREBNICK: Those are all the questions I have. Thank you, Judge.

THE COURT: All right. Redirect.

MR. PODOLSKY: Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. PODOLSKY:

Q. Why don't we start with some of the topics we just heard about.

You were asked a number of questions about Boies Schiller's internal investigation and about communications with the government. Do you recall those questions today and last week?

A. Yes, I do.

Q. So let's start -- let's try and just be clear about how an

internal investigation works in real life. And I'd like to focus on circumstances, like we have here, where you conducted -- you are retained, your firm is retained by a company to help conduct an internal investigation to help the company in parallel with a government investigation. Do you understand what I'm referring to?

A. Yes.

Q. Now, first of all, when a company retains a law firm to conduct an internal investigation, does the law firm do that work for the company or for the government?

A. For the company.

Q. Does the government conduct its own independent investigation in these circumstances?

A. Yes.

Q. To your understanding, does the United States Attorney's Office and the FBI and other law enforcement have the ability to access or obtain information beyond what a law firm conducting an internal investigation can access?

A. Yes. They have much greater access to facts outside the company, sometimes even within the company.

Q. Generally, can you explain your understanding of the type of things federal law enforcement can do that a law firm conducting an internal investigation cannot?

A. Sure. The federal government has access to grand jury subpoenas to compel other parties to produce documents or

testimony. They can engage in wiretaps or consensually recorded communications in order to gather additional information. They can approach witnesses through the FBI or other agencies. They have a lot more tools at their disposal than a private law firm conducting an internal investigation.

Q. So, again, let's speak in general. In your practice, you conduct internal investigations. Is it in a company's interest to hide or not provide accurate information to the government when they are conducting their own investigation?

A. No. That would be very much against the interest of the company.

Q. Why?

A. The United States Department of Justice has policies that provide that even if a crime has been committed by employees of a company or by a company, if the company cooperates in a very thorough and prompt way with the government, the government may exercise leniency in terms of the remedies it seeks against the company. So even if something bad has already happened, the company still has an interest in cooperating effectively and promptly with the government because it might earn them some credit when it comes time to decide what the government is going to do.

Q. So what do you think would happen if a company hid or withheld or misled information from the government but the government through their own investigation found out that same

information?

MR. H. SREBNICK: Objection, your Honor.

THE COURT: Sustained.

Q. In the course -- now, you were asked some questions today about cooperating with the government. Do you recall that?

A. I do, yes.

Q. Can you just explain to the jury what it means to cooperate with a government investigation as counsel to a company?

A. To me it means a few things. It means providing the government not only documents that their subpoenas might seek but also additional documents that they might not know to ask for but which appear relevant to counsel. In addition, it means responding to any supplemental requests that the government may have. And I believe it means refraining from taking steps that the government might view as interfering with its investigation, particularly if there are people outside the company with information that might be relevant to the conduct at hand.

Q. When a company is cooperating the way you describe it with a government investigation, what do you believe the reaction of the government would be to hiring the lawyer of another individual involved in the subject matter of the investigation to run an investigation for the company?

MR. H. SREBNICK: Objection, your Honor.

THE COURT: I'll see the lawyers at sidebar.

(At the sidebar)

THE COURT: I think there is another way to get at this issue without asking him was does he think the reaction would be, and this man has testified to his knowledge all about internal investigations. He knows how they are conducted, and so he can speak to whether in his own experience it would be normal to hire someone who has threatened to sue the company to do an internal investigation.

MR. PODOLSKY: Yes, your Honor. I am happy to rephrase. There has been a lot of questions about his bias, so what I am trying to get at is in his thinking about these things, what his mental process is.

THE COURT: I think that's fair. It is just that when you say what do you think the reaction would be, it is so directly asking for what's going on in someone else's mind. That is the issue.

MR. PODOLSKY: I understand.

THE COURT: I agree with you, you are entitled to get into this, it is just that you can phrase the question differently.

MR. PODOLSKY: No problem, your Honor. I will.

(Continued on next page)

(In open court)

BY MR. PODOLSKY:

Q. Let's just back up for a minute, make sure we know where we are in terms of internal investigations.

Based on your experience, what concern would you have if your client hid or withheld information from the government during the course of an investigation that's parallel to a government investigation?

A. I would have a range of concerns ranging from that the company would probably not be able to get cooperation credit, or leniency, if there was something criminal that had happened, to the company being held in contempt for violating the requirements of the subpoena, to in a worst-case scenario the company or someone involved in hiding that information being charged criminally with obstruction of justice by the prosecutors.

Q. And in the same context, what concern, if any, would you have about hiring or paying the attorney for an individual who was also involved in conduct under investigation by the federal government?

A. Could you say that again, please?

Q. Sure. What concern -- in the same context, based on your experience and in the context of conducting an internal investigation parallel to a government investigation, what concern, if any, would you have about hiring or paying an

attorney for an individual who was also involved in the conduct subject to the government's investigation?

MR. H. SREBNICK: Judge, objection.

THE COURT: Overruled.

A. I would have a concern that it would appear to the Department of Justice that my client was trying to get its story straight with the client of the other attorney and that we were buying, in one way or another, that person not coming forward or testifying about criminal activity. I would, moreover, be worried that the Department of Justice might object on conflict grounds to the attorney representing both parties, if that was part of the arrangement, and essentially go to court to try to obtain court supervision or review of that double representation.

Q. Can you just explain in your answer what you mean by "conflict"?

A. Sure. Attorneys owe a duty of loyalty to their clients. And if you represent two clients that have conflicting positions that are adverse to each other or disagree on something significant or just in general have different legal interests, you've a conflict. It is impossible to represent loyally both those parties at the same time.

Q. Now, you were also asked, just a few minutes ago, a number of questions about a subpoena that Nike received in September of 2017. Do you recall that?

A. Yes, I do.

MR. PODOLSKY: Mr. Hamilton, if we could just have it up on the screen so that we can talk about it?

BY MR. PODOLSKY:

Q. We have Defense Exhibit OO on the screen. Is this the subpoena that Nike received in September 2017?

A. Along with a cover letter, yes.

Q. Why don't we actually go to the first page of the subpoena, the second page of the document.

Now, do you recall that you were asked just a few minutes ago several questions about whether your pulse raced when you received this document?

A. Yes, I do.

Q. Well, let me ask you this: Is this the only subpoena that Nike has received since September of 2017, to your knowledge?

MR. H. SREBNICK: Judge, could we clarify, is he referring to a grand jury subpoena as opposed to a civil subpoena?

Q. Let's just start with any subpoena. Is this the only one?

A. This is not the only subpoena I am aware of Nike having received since September 2017.

Q. Do you believe this is the only grand jury subpoena that Nike has received, ever?

A. No, I don't believe that.

Q. Does a company like Nike -- let's focus on Nike. Does Nike

receive subpoenas -- how often do you think Nike receives a subpoena, a grand jury subpoena?
A. I would describe it as fairly routine. I don't have a sense of the exact quantity, but I would say they get grand jury subpoenas regularly.
Q. Can you -- I'm not asking about any particular subpoena or investigation, but can you give the jury a sense of what kinds of document subpoenas Nike receives generally?
A. In the context of grand jury subpoenas alone, or more broadly?
Q. Let's start with grand jury subpoenas.
A. Sure. Nike is a large global company with tens of thousands of employees and operations all around the world. It could receive subpoenas in connection with its own conduct; it could receive subpoenas in connection with conduct of its business partners that it interacts with; it could receive subpoenas in connection with athletes or other entities that it sponsors; it could receive subpoenas in connection with the personal activities of employees on their own personal time, among other reasons for a company like Nike receiving subpoenas.
Q. And do you see, there is -- it says in the middle here, 18 U.S.C. -- there is section symbols and a number of statutory citations. Do you see that?
A. Yes.

Q. Do you recall, defense counsel asked you a number of questions about what those statutory citations mean?
A. He did. It was like going back to law school.
Q. Did the fact that there were one, two, three, four, five, six, seven statutes listed in this part of the subpoena strike you in any particular way when you saw the subpoena?
A. It struck me as typical, and the particular statutes listed struck me as unsurprising given what I knew about the Adidas arrest that had happened a couple of days earlier.
Q. Let me ask you just a brief question about the Adidas arrest.

I believe in response to one of the questions by defense counsel, you said that you weren't surprised by the subpoena in light of a Nike arrest that had happened recently. Was that correct, or did you misspeak?
A. If I said Nike arrest, what I meant to say was the arrest of an employee -- a former employee of Nike, someone who had left Nike years before.
Q. And where did that employee work, to your understanding, at the time of the arrest?
A. At the time of his arrest, my understanding is that he was a consultant for Adidas.
Q. Now, you were also asked some questions about -- both today and last week about the prosecutor's office that had issued this subpoena, the United States Attorney's Office here in New

York; do you recall that?
A. Yes.
Q. Do you recall that last week defense counsel even pointed to this table, to the government's table? Do you remember that?
A. I don't recall the pointing, no.
Q. Well, let me ask you this. To your understanding, does anyone involved for the government in the conduct of this trial today have any involvement in any investigation of Nike?
A. My understanding is that it is a completely separate team.
Q. Sitting here today, do you believe that your testimony in this courtroom has anything to do with whether the United States Attorney's Office and that other team of prosecutors might charge or not charge anyone from Nike with any crime?

MR. H. SREBNICK: Objection, your Honor.

THE COURT: Overruled.

A. No. I believe that the team -- the other team will make its own decisions.
Q. Let me ask just one more question.

If we can go to the first page, the cover letter of the subpoena. Do you see -- maybe we can blow up the first full paragraph in the cover letter.

Do you recall defense counsel went through this and read with you the portion where it says, "The government hereby requests that you voluntarily refrain from disclosing the

existence of the subpoena to any third party?"
A. Yes.
Q. In your experience, would it be -- would a company generally or typically broadcast or publicize the details of its own internal investigation when it has received a grand jury subpoena?
A. No. That would be extremely unusual.
Q. Why?
A. First of all, because an internal investigation is typically conducted under privilege, and discussing it publicly could deprive the company of some of the protections -- the confidentiality protections that come with hiring lawyers.

THE COURT: Could you explain what you mean by "privilege"?

THE WITNESS: Sure. When a law firm does work for a company, its communications and advice to the company are confidential under a special rule called privilege, attorney-client privilege, or the attorney work product.

BY MR. PODOLSKY:
Q. And I believe you said that was one reason that a company would not generally broadcast its findings or details of its investigation. Were there others?
A. The second and potentially more important is that when you are aware that the government is conducting a covert investigation, broadcasting that you've received a subpoena or

Case 21-1778, Document 61, 04/04/2022, 3290318, Page217 of 263

K23dave2 Wilson - redirect

that you're conduct an investigation yourself could, again, be viewed as interfering with the government's investigation in any number of ways, including by leading people to destroy documents or to refuse to talk to the government. So in general, we would try to respect the request from the government to stay very quiet, if that's what they asked.

Q. Now, let's change topics.

You made a reference earlier to the duty of loyalty. Do you recall that just a few minutes ago?

A. Yes.

Q. And, actually, you were asked some questions about the duty of loyalty last week by defense counsel. Do you recall that?

A. Yes.

Q. Do you recall that you were asked whether you have a duty of loyalty to your client, Nike? Do you remember being asked that?

A. Yes.

Q. And what was the answer to that question?

A. Yes, I do.

Q. Can you just help the jury understand, at a high level, what is a duty of loyalty?

A. I understand the duty of loyalty to mean that if I'm taking actions, I should not act adverse to the interests of my client, that I should respect the client's wishes and directions, I should keep the client informed of information I

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - redirect

obtain relevant to their matter, and, again, act in accordance with the instructions and interests of my client.

Q. Do all lawyers have a duty of loyalty to their clients?

A. Yes.

Q. Now, as between that duty of loyalty to your client and the oath that you swore to tell the truth in your testimony before this Court, which would you have to follow if there was ever any tension between the two?

A. My oath to tell the truth.

Q. Why?

A. Because, among other things, I don't think it's against my client's interests to have me tell the truth, but in any event, that's my obligation as an attorney.

Q. Let's turn to just one more topic.

Do you recall that last week and a few moments ago, you were shown and the jury was shown a chart with some X's and three columns? Do you recall what I'm talking about?

A. Yes, the blue chart.

Q. And do you recall that that chart appeared to mark how many times you spoke to Mr. Geragos?

A. I recall it was a chart that had columns for Geragos, Nike and Avenatti.

Q. Now, so let me ask you a couple of questions about communications with Geragos and Avenatti.

During the course of your communications with the two

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - redirect

of them, who appeared to you to take the lead?

A. Mr. Avenatti took the lead and did the vast majority of the talking.

Q. So, for example, on March 19th, that's the first time you met in person, is that correct?

A. Yes.

Q. Who told you that he had two demands of Nike?

A. Mr. Avenatti.

Q. On March 19th, who told you that he would hold a press conference if you did not agree to those demands?

A. Mr. Avenatti.

Q. On March 19th, who told you that if Nike did not hire him, you would have to pay him twice as much as any firm Nike did hire for doing nothing?

A. It was Mr. Avenatti who made those statements.

Q. You also spoke to Mr. Avenatti and Mr. Geragos on March 20th in a recorded phone call. Do you recall that testimony?

A. Yes.

Q. On that March 20th call, who told you that a few million dollars doesn't move the needle for him?

A. Mr. Avenatti.

Q. On March 20th, who said that he would take $10 billion off of Nike's market cap if you didn't hire him?

A. Again, Mr. Avenatti.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - redirect

Q. Do you recall that you testified that you met with Mr. Avenatti and Mr. Geragos on March 21st?

A. Yes.

Q. And do you recall that that meeting was -- you testified that that meeting was recorded?

A. Yes.

Q. In that March 21st meeting, who asked you why you would want to pay more to Mr. Franklin in light of his role in this?

A. Mr. Avenatti.

Q. On March 21st, who demanded $12 million up front deemed earned when paid?

A. Mr. Avenatti.

Q. On March 21st, when you said you had never gotten so much money for doing work for Nike, who asked whether you had ever held the balls of your client in your hand where you could take billions of dollars off its market cap?

A. That was Mr. Avenatti.

MR. PODOLSKY: Just a moment.

(Pause)

Nothing further, your Honor.

THE COURT: All right. Anything else?

MR. H. SREBNICK: Your Honor, may we approach on one matter?

THE COURT: Yes.

MR. H. SREBNICK: Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000217

Case 21-1778, Document 61, 04/04/2022, 3290318, Page218 of 263

K23dave2 Wilson - redirect

(At the sidebar)

MR. S. SREBNICK: Good morning, your Honor.

THE COURT: Hi.

MR. S. SREBNICK: So do you recall, we had agreed to a redaction of a grand jury subpoena as to seven of the eight categories. One of those categories pertained to Merl Code.

THE COURT: Merl Code, yes.

MR. S. SREBNICK: Merl Code is the former employee who then became the consultant for Adidas. Mr. Wilson testified that he was not surprised by the subpoena given the arrest of Mr. Code.

Now, there are eight categories --

THE COURT: So just so I'm clear, he's the fellow who used to work for Nike but then later worked for Adidas; is that who we are talking about?

MR. PODOLSKY: Correct. He was arrested in connection with this conduct with Adidas.

MR. S. SREBNICK: So Mr. Wilson said he wasn't surprised by this subpoena given the arrest of the employee who he knows to be Mr. Code. He didn't mention Mr. Code's name for the record, obviously. So I think the jury needs to know now that there was a separate category in the subpoena that pertains directly to Mr. Code, directly to the former Nike employee, such that the other seven categories had nothing to do with Mr. Code. So he should have been surprised that not

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - redirect

only was the government requesting documents as to Mr. Code, they were requesting seven other categories of documents, including category three, which was much broader than Mr. Code; it involved documents that were in existence after Mr. Code left Nike. I think Mr. Code left in 2014.

THE COURT: But that's already clear from category three, which is not redacted. The jury has access to that. Nobody brought it to their attention, but they -- category three is there and makes it clear that the government is seeking all documents regarding payments to players and players' families. So that's already there.

MR. S. SREBNICK: I'm concerned that the jury believes that category three was in response to the issue of Mr. Code, or the former Nike employee, being arrested, and it is not. Category three has to be something that is much beyond Mr. Code. So I think he has created the impression -- Mr. Wilson has created the impression with the jury that the subpoena was routine given the arrest of the former Nike employee, and the subpoena was hardly routine, given the breadth of the requests that were made in that subpoena.

THE COURT: I didn't understand it that way. The way I understood it was a fellow had been arrested who worked for Adidas as a consultant, and I can't recall whether the jury has been told that that had something to do with the players. Is that already in the record?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - redirect

MR. PODOLSKY: We've had about five days of testimony that there was an investigation into payments to amateur players, that the government was interested in payments to amateur players, that he spoke to Mr. James and Mr. DeBose. I mean, there is no mystery here that the government asked about names beyond Merl Code. His name has never been mentioned in testimony at all.

THE COURT: Anyway, just to get back. So the way I understood his testimony was that given the fact that this other fellow working for Adidas had been arrested a couple of days earlier in connection with an investigation about payments to players, it seemed natural to him that the government would be subpoenaing another company, a competing company, in the same space to see whether they had also made payments to players and their families. That's the way I understood it. And there has just been no reference to Merl Code at all. So what you are suggesting, the jury has no idea about Merl Code. They don't even know who he is.

MR. S. SREBNICK: So our ask is that the Court allow us to unredact I believe it is paragraph 8 of the documents to be produced so that the jury does know who Merl Code is and so that we can recross Mr. Wilson on the issue of that Merl Code and category eight was the former Nike employee, that that's just simply one category relating to the requests of the subpoena, and that category three goes far beyond Merl Code.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave2 Wilson - redirect

That would be our ask.

THE COURT: Yes. That is denied, because category three isn't limited at all. It's not limited at all. It is not limited to Merl Code or anybody else. It is completely broad, open-ended. So the limitation that you're suggesting, it is not in front of the jury now, and if I was to do what you said, there would be a greater risk that they actually think that category three has something to do with Merl Code. So, your application is denied.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000218

(In open court)

MR. H. SREBNICK: Judge, may I have one moment?

THE COURT: Yes.

(Pause)

MR. H. SREBNICK: Your Honor, I would be requesting a brief recross on the subject that your Honor ruled on.

THE COURT: OK.

MR. H. SREBNICK: Judge, is this a good time to take a break so that we can confer with our client, or is it too early?

THE COURT: If we must, we must.

MR. H. SREBNICK: Thank you, Judge.

THE COURT: Ladies and gentlemen, we will take our mid-morning recess a little bit early. Don't discuss the case. Keep an open mind. We will be back to you shortly.

Thank you all very much.

THE CLERK: All rise.

(Jury not present)

THE COURT: You can step down, Mr. Wilson.

THE WITNESS: Thank you, your Honor.

THE COURT: Please be seated.

(Pause)

(Witness not present)

THE COURT: Is there anything we need to discuss?

MR. H. SREBNICK: No. I wanted to confer with my

client. Thank you.

MR. PODOLSKY: Nothing for the government.

THE COURT: All right. We will resume in about ten minutes.

MR. PODOLSKY: Thank you, your Honor.

THE CLERK: All rise.

(Recess)

(Continued on next page)

(Jury not present)

THE COURT: Mr. Srebnick, are you going to have additional questions for Mr. Wilson?

MR. H. SREBNICK: Yes, please.

THE COURT: Mr. Wilson, please take the stand.

THE DEPUTY CLERK: Ready for the jurors, your Honor?

THE COURT: Yes.

MR. H. SREBNICK: May we approach about one issue while the jurors come in.

THE COURT: OK.

(At the sidebar)

MR. H. SREBNICK: Your Honor, I'm holding what's Jencks material 3516006 at page five. These are purportedly the interview notes taken by someone on the prosecution team of the witness Wilson. And what it appears to say is Mark Geragos next to Michael Avenatti, active participant, not on the phone, following along, calm, serious, didn't react with any surprise, SW, I assume is Wilson, never were counsel for opposing party hired by; then it says Mark Geragos showed no surprise, no spit take, in quotes. You may recall which I had asked the witness about that term. I confess I had never heard it before.

THE COURT: Me either.

MR. H. SREBNICK: This is where I got it from. And I would like to know if the government will -- I've asked, they won't answer, if that was the witness's words, Wilson's words.

I don't know who the author of this Jencks material is. The government has declined to tell us but I assume that's a direct quote. In redirect.

THE COURT: What do you want to ask him?

MR. H. SREBNICK: I want to impeach his redirect with this exact line of statement in the Jencks material.

THE COURT: What exactly --

MR. H. SREBNICK: Did you tell prosecutors that Geragos was an active participant, not on the phone, following along, calm, serious, didn't react with any surprise, showed no surprise, no spit take.

THE COURT: So you're going to ask him if he said this?

MR. H. SREBNICK: Yes.

MR. PODOLSKY: I mean I think he can first ask the question and if he says something that Mr. Srebnick thinks is inconsistent he can refresh him, confront him. I'm not sure what Mr. Srebnick --

MR. H. SREBNICK: What I'd like to find out is who among the prosecution team noted in quotes spit take.

THE COURT: I got to confess. I have no idea why you're pursuing the spit thing. You and I haven't heard of it. What makes you think the jury is going to have some understanding of it. But if you want to ask the question you have a good faith basis for doing so.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page220 of 263

K239AVE3

MR. H. SREBNICK: Understood.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Wilson - Recross

(In open court; jury present)

MR. H. SREBNICK: May I proceed?

THE COURT: Yes.

RECROSS EXAMINATION

BY MR. H. SREBNICK:

Q. Mr. Wilson, when you were questioned moments ago by the prosecutor he was asking you about Mr. Geragos' participation in these events, is it true that you've told the government that Mr. Geragos was, in fact, an active participant in the discussion?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Grounds.

MR. PODOLSKY: The calls for hearsay.

THE COURT: I don't think it's offered --

MR. H. SREBNICK: I'll start again.

THE COURT: Yes.

BY MR. H. SREBNICK:

Q. Isn't it true, Mr. Wilson, that Mr. Geragos was an active participant in the conversations that you engaged in with Avenatti and Geragos?

A. I viewed him as an active participant in our conversations.

Q. That Mr. Geragos was following along with the conversation?

A. That was my impression for the most part.

Q. That he was serious, Mr. Geragos was?

A. Well there were times when he was laughing or making jokes

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Wilson - Recross

but for the most part it was a serious discussion.

Q. That Geragos did not react with any surprise to the proposals made by Mr. Avenatti?

A. I recall surprise when I was asking questions about settling without a press conference. There was some discussion about putting on their Nike hats and then they -- Mr. Avenatti asked for a separate meeting and they left the room. This was during the Thursday, March 21 meeting.

Q. Are you referring to when you proposed an alternative settlement not involving the internal investigation?

A. When I asked whether there were -- whether we could do some alternative arrangement, yes.

Q. But otherwise Mr. Geragos did not express any surprise to the proposals Avenatti was making, correct?

A. I don't recall him expressing surprise, no.

Q. And, indeed, on March 24, this Sunday after the meeting that was videotaped, Mr. Geragos text messaged you about scheduling a Monday -- what was going to be a Monday meeting on March 25?

MR. PODOLSKY: Objection. Scope, your Honor.

THE COURT: Overruled.

THE WITNESS: Prior to Monday, probably the weekend, I do recall Mr. Geragos asking if he could change the time of the Monday meeting.

MR. H. SREBNICK: If I could just put on your screen

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Wilson - Recross

only Defense Exhibit TT. Thomas, Thomas.

If you could just review that and see if that appears to be the text message exchange you had with Geragos.

THE WITNESS: Yes, it does.

MR. H. SREBNICK: Judge, I'd offer TT and request permission to publish.

THE COURT: Is this all of TT, this one page, or is there more?

MR. H. SREBNICK: That's it.

THE COURT: Do you have any objection to TT?

MR. PODOLSKY: No, your Honor.

THE COURT: TT is received.

(Defendant's Exhibit TT received in evidence)

MR. H. SREBNICK: If we could publish for the jury.

Q. Do you recall this is the text message exchange between Mr. Geragos and yourself on the Sunday, March 24 before the planned meeting of Monday, March 25?

A. I couldn't tell you sitting right here, right now if it was Saturday or Sunday but it was that weekend.

Q. But it was?

A. That weekend.

Q. Fair enough.

And Mr. Geragos at the top is trying to reschedule the meeting to a later time, 2:30, correct?

A. That's what I read him to be asking.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000220

Q. And it turns out you all couldn't reschedule the meeting because you were working with the FBI so you left it at the noon time, right?
A. I don't recall whether I consulted with the FBI before sending my response.
Q. But Mr. Geragos was indicating he had some conflict that morning, he might not be able to get to the meeting by noon and so he was asking to move it to 2:30 but that was rejected, correct?
A. What I recall about this is what's written right here. We didn't talk.
Q. Now I'd like to ask you some questions about the grand jury subpoena which is OO, if we could put that on the screen.
Now, we looked at the cover letter, scroll to the next page, we looked at the face page. I'd like to turn our attention then to the next page, top of the page, paragraph 1.
Do you see that the subpoena called for: One, the preservation of specific documents, including e-mails, in the possession, custody or control of Nike, Inc. or any employee, officer, principal, or board member of Nike, Inc.
Do you see that?
A. Yes.
Q. And second, the production of specific documents, including e-mails and text messages, in the possession, custody or control of Nike, Inc. (Nike) or any employee, officer,

principal, or board member of Nike, Inc. for the time period January 1, 2013 to the present.
Do you see that?
A. Yes, I do.
Q. Now, you had indicated that there was a former Nike employee who had moved to Adidas and was the subject of the Adidas case, correct?
A. This individual was an Adidas consultant. I don't know if he moved to Adidas as an employee. I was familiar with news reports with the idea that he was an Adidas consultant.
Q. That person, the Adidas consultant, had left Nike about three years before this subpoena went out, correct? Back in 2014 more or less?
A. I believe he had left around -- the company's employment around 2014.
Q. The subpoena was requiring the production of records extending up until the present date which at that time would have been 2017, correct?
A. Yes. That's right.
Q. So approximately three years of records after this Adidas consultant had left the employee of Nike, correct?
A. The date range ran about that many years after his departure, yes.
Q. And it included e-mails and text messages generally speaking that needed to be produced, correct?

A. The subpoena specified that those were types of documents that the subpoena was looking for.
Q. So that would include, if we go to the next page, category three, please.
Do you see it says, "3. All communications or documents pertaining to any monies promised or provided -- whether as a purchase, gift, loan, donation, or for any other purpose -- to (i) any other amateur athlete competing on any amateur basketball team, including any high school basketball athlete, or any family member, friend, or representative of such an athlete, or (ii) any player on any basketball team subject to the NCAA rules, or any family member, friend, or representative of such an athlete."
Do you see that?
A. I see request three.
Q. So, the subpoena was commanding Nike to produce records from 2013 through 2017 including text messages and e-mails related to this subject matter in item number three, correct?
A. Yes. That's right.
Q. And that should include the records of DeBose and James with regard to the activities of the California Supreme team and any payments?
MR. PODOLSKY: Objection, your Honor.
THE COURT: Sustained.
Q. So, when you saw the subpoena that listed those federal

criminal statutes, money laundering, fraud, bribery, are you saying -- you did not consider that as something indicative that the government was investigating those crimes in connection with payments to amateur athletes by Nike? Is that what you're saying?
A. I think the subpoena says on its face that it's investigating a potential violation of those statutes. That's what I understood it to mean. And that the topics of documents that they sought from the company included the documents sought in request three.
Q. So wasn't it clear to you that the U.S. Attorney's Office Southern District of New York was launching an investigation that included Nike, whether Nike was making payments to amateur athletes as described in paragraph three?
A. I came to understand that Nike was the subject of the investigation by the U.S. Attorney's Office, yes.
Q. This went beyond that Adidas consultant that you made reference to, correct?
A. The government never indicated to us that the scope of their investigation was limited to that particular individual.
Q. And so are you saying that it was not a pulse-pounding event for Nike that Nike was now under investigation for these criminal statutes, for these types of payments?
MR. PODOLSKY: Objection, your Honor.
THE COURT: Sustained.

Case 21-1778, Document 61, 04/04/2022, 3290318, Page222 of 263

K239AVE3 Wilson - Recross

Q. Now, the government asked you whether the prosecutors who are handling the Avenatti case are part of a different team of prosecutors than are handling the Nike investigation. You heard those questions, right?

A. I did. Yes.

Q. And did you observe any of the Nike prosecutors observing your testimony while you have been in court here?

MR. PODOLSKY: Objection, your Honor.

THE COURT: Sustained.

Q. All of these prosecutors work for the same U.S. Attorney, right?

A. All of the prosecutors we're referring to work in the -- they work for the U.S. Attorney's Office that is helmed by the same single United States Attorney.

MR. H. SREBNICK: If I may have a moment?

THE COURT: Yes.

(Counsel confer)

Q. Mr. Wilson, I think you -- and correct me if I'm wrong -- you said it's routine for Nike to get grand jury subpoenas? Was that what you were suggesting?

A. I don't recall my exact testimony. It's routine for large companies to receive a number of subpoenas and Nike certainly received more than one grand jury subpoena.

Q. Since 2017 September Nike has received additional grand jury subpoenas? Is that your testimony?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K239AVE3 Wilson - Recross

A. I'm not aware of whether or not Nike has received additional grand jury subpoenas in that specific timeframe.

Q. And you understand that the investigation of Nike remains open and ongoing?

A. The government has never informed us that it has closed its investigation of Nike's conduct.

Q. You understand that the investigation of Nike is ongoing, correct?

A. Yes. As I said before, yes.

Q. Since 2017, we're now in 2020, for three years, it's still ongoing, correct?

MR. PODOLSKY: Objection, your Honor. Asked and answered several times now.

THE COURT: Sustained.

MR. H. SREBNICK: Thank you, your Honor. That's all I have.

THE COURT: Anything else?

MR. PODOLSKY: Not from if government, your Honor.

THE COURT: You can step down, sir.

THE WITNESS: Thank you, your Honor.

THE COURT: Government call its next witness.

MR. SOBELMAN: The government calls Jeffrey Auerbach.

JEFFREY AUERBACH,

called as a witness by the Government,

having been duly sworn, testified as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K239AVE3 Auerbach - Direct

THE COURT: Please proceed.

DIRECT EXAMINATION

BY MR. SOBELMAN:

Q. Good morning, Mr. Auerbach.

A. Good morning.

Q. What do you do for work?

A. I'm a managing director of Bedford Consulting, a business consulting and advisory firm I founded in 2011.

Q. What does a consulting firm do?

A. I provide business consulting and advisory services to C-level executives, CEOs, chief financial officers, high net worth individuals, startups in entertainment, sports, and technology.

Q. What is a C-level executive?

A. It's usually senior management and, again, chief operating officers, CFOs, or CEOs.

Q. Mr. Auerbach, if you could just make sure you're speaking into the microphone. I want to make sure everyone can hear you. Thank you so much.

Where do you live?

A. I live in Los Angeles, California.

Q. Do you know someone named Michael Avenatti?

A. I do.

Q. Have you met him?

A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K239AVE3 Auerbach - Direct

Q. Just generally how did you come to meet him?

A. When I was helping out Gary Franklin and we needed an attorney I had suggested Gary -- I had suggested to Gary Michael Avenatti and reached out to him.

Q. I'll ask you some more questions about Mr. Franklin in a few moments.

A. Sure.

Q. If you could please look around the courtroom and let us know if you see Mr. Avenatti.

A. I do.

Q. And can you please tell us where he's located and an item of clothing that he's wearing.

A. Yes. He's seated over there at that table.

Actually standing up now with the striped tie and the suit.

MR. SOBELMAN: Your Honor, may the record reflect that the witness has indicated the defendant.

THE COURT: Yes. The record will so reflect.

Q. I'll ask you some more questions about the defendant in a minute.

A. Sure.

Q. Mr. Auerbach, you mentioned Mr. Franklin. Who is Gary Franklin?

A. Gary Franklin is the founder and program director of California Supreme, an elite youth basketball program that was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000222

Case 21-1778, Document 61, 04/04/2022, 3290318, Page223 of 263

K239AVE3 Auerbach - Direct

sponsored by Nike and was my son's coach in middle school, basketball coach.

Q. And what's your relationship with Mr. Franklin now?

A. Gary and I are friends and I've been helping him out as an adviser on a pro bono basis.

Q. What do you mean by pro bono basis?

A. I'm not charging him anything.

Q. What does Mr. Franklin do for a living?

A. He runs Cal Supreme basketball program and he's a coach and that's what he does.

Q. What is Mr. Franklin's role with Cal Supreme?

A. He's the program director and head coach.

Q. And who, if anyone, sponsored Cal Supreme prior to the end of 2018?

A. Nike sponsored Cal Supreme for almost fifteen years, eight of which were in Nike EYBL which is the Elite Youth Basketball League.

Q. Did there come a time when Mr. Franklin asked you for assistance in dealing with Nike?

A. Yes.

Q. Approximately when did Mr. Franklin first ask for your assistance?

A. I believe it was in 2018 February, or January or February in 2018.

Q. What was your understanding of why Mr. Franklin asked you

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Auerbach - Direct

for assistance?

A. He and I had discussed what was going on with him at the time and he knew that I had a prior relationship or an ongoing relationship but prior working relationship with Phil Knight, the cofounder of Nike, and some high-ranking executives there.

Q. What types of assistance did Mr. Franklin ask you for?

A. Well, he was under a lot of stress and had endured a lot of corporate bullying and abuse, from what he told me, and wanted -- we had discussed going to Nike because it would be to their benefit to find out about what was going on as well. And I told him I would do that.

Q. And I'll ask you some more questions about what Mr. Franklin told you about his experiences with Nike a little later.

Generally, what, if anything, did you do to help Mr. Franklin?

A. When we first started talking about this I helped him put together documents or a master document that outlined all the actions that happened over a two-year period that he was involved in and that he was directed to participate in. And then pulled together all the evidentiary documents, the backup texts, e-mails, bank statements, falsified invoices and such.

Q. Why did you help him do that?

A. In the beginning it was both, I thought it was going to be helpful to go to Nike with or to whatever legal representation

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Auerbach - Direct

down the road, but it was also for myself, proof of concept, before I go to people at Nike or possibly Phil Knight on his behalf.

Q. What do you mean by proof of concept?

A. Meaning that I wanted to really do my due diligence homework and put together a roadmap of what he had gone through and proof.

Q. Why did you want to do that before you reached out to anyone at Nike?

A. Because I only know what I know, what Gary has told me and I really wanted to have the evidence there before reaching out.

Q. Directing your attention to March 2019, did there come a time when you assisted Mr. Franklin with finding someone else to help him as well?

A. I did.

Q. What kind of person did you help him find?

A. We went first to an attorney just for advice, not seeking representation, but advice on criminal matters. And then afterwards we reached out to Mr. Avenatti.

Q. When you say criminal matters, without telling me what you and Mr. Franklin discussed with that other attorney, just generally what do you mean by that?

A. That Mr. Franklin might have some criminal exposure based on activities he was directed to participate in.

Q. To be clear that's what you went to go talk about?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Auerbach - Direct

A. That's right.

Q. That was a concern you had?

A. A concern I had. And I had talked to Gary about.

Q. Why did you assist Mr. Franklin with finding a lawyer to represent him after that initial conversation?

A. Well, I had reached out to John Slusher at Nike on Gary's behalf who is the de facto second in command at Nike and the executive vice-president of sports marketing and explained to him what Gary said he endured over a two-year period by Nike executives, Nike EYBL, Elite Youth Basketball executives, Carlton DeBose and Jamal James. And after explaining what Gary wanted and hoped to accomplish, and I expressed that Gary is a big fan of Nike, he has no issues with Nike, he just wanted to report this.

I received communication from John saying that any further discussions, that they take this matter very seriously, and that any further discussions at this point he thinks it's best that I reach out to Andrew Michaelson who is at Boies Schiller and Nike EYBL's outside counsel.

Q. Did you have a prior relationship with Mr. Slusher?

A. Yes.

Q. And just generally can you describe that for us?

A. Sure. I had been president of Phil Knight's animation company at one point many years ago and a company called Laika Entertainment.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000223

THE COURT: How do you spell that?

THE WITNESS: L-A-I-K-A.

And John had assisted -- John Slusher had assisted Phil Knight in the acquisition of the company and I was president of the predecessor company called Vinton Studios. And so then I ran -- I was president of Laika and worked with John who was a board member of Laika for a while. It was an animation studio, both of them.

Q. After you spoke with Mr. Slusher and he referred you to Andrew Michaelson at Boies Schiller, who, if anyone, did you reach out to on Mr. Franklin's behalf?

A. I had talked to Gary and decided that, you know -- or suggested that we reach out to Mr. Avenatti and Mr. Avenatti is the only attorney we reached out to.

Q. Generally how were you familiar with the defendant before you reached out to him?

A. I had known of and watched Mr. Avenatti during the -- his representation of Stormy Daniels and I had seen him on television.

And I was familiar with a lot of, at that point because I did some research, some of the plaintiff cases that he represented.

Q. Why did you reach out to the defendant specifically as opposed to some other lawyer?

A. I had seen his track record and thought that he was very

effective in some of the plaintiff cases that he represented.

Q. Before you reached out to the defendant did you talk to Mr. Franklin about him?

A. Yes.

Q. Generally what, if anything, did you tell Mr. Franklin about the defendant at that time?

A. I told him that I thought he would be the perfect guy and he would be very effective and I think we should reach out and meet with him and gave him some reasons why I thought that.

At that time to me he carried himself well and that he had won a lot of big awards and that I thought he could be diplomatic at the time, the hope was he would be diplomatic.

Q. Why did you talk to Mr. Franklin about the defendant before reaching out to the defendant on Mr. Franklin's behalf?

A. Well, it's Gary's case, Gary's matter and he would be representing Gary so it's something he should decide.

Q. What, if anything, did you send Mr. Franklin about the defendant before you reached out to him?

A. I had sent Gary some articles and a number of videos -- video links, I'm sorry.

Q. Why did you send Mr. Franklin those articles and videos?

A. Because I wanted to make sure before we reached out to him that he could see for himself and decide for himself.

Q. And generally what was the defendant doing in those videos?

A. It was Mr. Avenatti I believe having some interviews,

one-on-one interviews on CNN. I think there might have been a press conference as well.

Q. Did you send videos of the defendant doing interviews or holding press conferences because you wanted him to hold a press conference or do a TV interview regarding Mr. Franklin?

A. Absolutely not.

Q. Why not?

A. Because we were in the process of discussing Gary's matters with Nike and we were trying to reestablish the relationship and forge a good future together and that would have been really detrimental and damaging.

Q. I'll ask you some more questions about that later.

Approximately when did you reach out to the defendant?

A. I believe I called Mr. Avenatti about -- on March 1.

Q. Let me just pause here for a moment. Before you reached out to the defendant around March 1, approximately how long had you been talking with Mr. Franklin about his issues with Nike?

A. We had been discussing his situation and carefully planning what to do since February 2018. So it was almost -- it was a little over a year.

Q. How did you and Mr. Franklin communicate about his issues with Nike?

A. Either by text, e-mail, or phonecall.

Q. And in your text messages or e-mails what types of things did you and Mr. Franklin discuss?

A. Oh, God. We discussed a variety of things. We were discussing the ongoing Adidas basketball scandal that was going on. We were discussing, you know, Nike, his case and strategizing, you know. And we were really working on putting this definitive document together and accompanying documents.

Q. In those conversations, were you in a rush in any way?

A. No, obviously. It took a year.

Q. Did you ever share any of your and Mr. Franklin's text messages with the defendant?

A. No.

Q. I'm going to ask you some more questions about the defendant now.

A. Sure.

Q. How did you first reach out to the defendant?

A. I called his office which was a number off his website.

Q. Did you speak to him at that time?

A. No. I got through to a night service, nobody at his physical office, who suggested I call in the morning.

Q. What happened -- did you call back in the morning?

A. I did and I got an assistant at the office who said he wasn't there. And I left a message with him.

Q. What, if any, message did you ask be passed along to the defendant at that time?

A. I said tell Mr. Avenatti this is about a potential case against Nike.

Q. At that time did you provide any additional detail about who you were calling on behalf of or the nature of the issue?
A. No.
Q. Did the defendant call you back after you left that message?
A. He did. That afternoon.
Q. In substance, what did you say to the defendant on that call?
A. I told him a little bit about Gary and what he had endured, you know, over the last two years and basically asked him if he was familiar with the Adidas college basketball scandal and case and -- yeah. And that's basically it.
Q. On that call, specifically what did you tell the defendant about how Mr. Franklin was treated by the two Nike executives you mentioned earlier?
A. I told him that Gary had been directed and he was abused and bullied into carrying out certain acts that he was -- he felt like he was going to lose his sponsorship if he didn't do it. And he felt really terribly about it. And was wanting to report it to the authorities, report it to Nike and that he wanted to go with them to the authorities and that he also wanted to reestablish his relationship with Nike but he wanted justice above all and that to him meant making sure that these two executives at Nike EYBL, Carlton and Jamal, did not hurt any other coaches and program directors.

Q. On that call, specifically what did you tell the defendant about the actions that you mentioned earlier?
A. I told him what I just said to you. I told him that Gary had been directed to make cash payments to several players' families. He was directed to falsify invoices and resubmit them to Nike. He was directed to receive wire payments and forward them to players' handlers and do many other things.
Q. In substance, what did the defendant say to you on that call?
A. He listened and said interesting and he -- wow, very interesting and I'd like to hear more.
Q. Based on that call, what was your impression of how familiar the defendant was with the case involving Adidas employees?
A. I felt like he knew a little bit about it but wasn't very well versed.
Q. How could you tell that?
A. It was just an instinct that he -- I asked him if he knew about it and he said yeah, a little.
Q. Approximately how long was that call?
A. I would say that call was about 20, 25 minutes.
Q. Who ended that call?
A. He did.
Q. Would you have been willing to continue speaking with the defendant if he had more that he wanted to discuss?

A. Yes.
Q. On that call what, if anything, did the defendant mention about holding a press conference?
A. Nothing.
Q. On that call, did you bring up holding a press conference?
A. Never.
Q. Why did you not bring up holding a press conference?
A. Well, it would be damaging and detrimental to reaching Gary's goals. It's just not something I would ever entertain.
Q. What is your understanding of what Mr. Franklin's goals were at the time you first spoke with the defendant?
A. My understanding was that, again, Gary wanted to advise the company what had gone on and rid the company of what we called the bad operators in Nike EYBL executives, Carlton DeBose and Jamal James, and stop them from doing this with other people.

He wanted to -- his brand and his program had been really damaged and he wanted to be compensated. But, first and foremost, he wanted to reestablish the relationship with Nike and get back on the page. He had enjoyed a fifteen-year relationship with them that was really good prior to these two executives overseeing the division.
Q. What is your understanding of how, if at all, a press conference publicizing the information you shared with the defendant would have affected Mr. Franklin's goals at that time?

MR. QUINON: Objection, your Honor.

THE COURT: Sustained.
Q. On that call what, if anything, did the defendant mention about an internal investigation?
A. He never mentioned anything.
Q. On that call did you bring up an internal investigation?
A. No. Never.
Q. On that call why did you not bring up an internal investigation?
A. Well, Gary and I -- well, Gary knew what happened and he didn't need an internal investigation.
Q. On that call what, if anything, did the defendant mention about asking Nike to make any types of payments to him?
A. Never. Nothing.
Q. On that call did you bring up Nike making any payments to the defendant?
A. No. Never.
Q. Why did you not bring up Nike making payments to the defendant on that call?
A. It's just something I didn't -- it didn't even dawn on me, I would never do, never OK, never permit. It's totally counterintuitive and detrimental to Gary's case and his settlement.
Q. How would it be detrimental to Mr. Franklin for Mr. Avenatti to ask Nike or demand money from Nike for himself?

A. Well it's a total conflict of interest and every dollar or moment you're discussing what's good for Mr. Avenatti or taking away from -- you're taking away from the client, Gary.

MR. SOBELMAN: Mr. Hamilton, if you could please show the witness what's been marked for identification as Government Exhibit 301.

Q. Mr. Auerbach, do you recognize this?

A. Yes.

Q. What is it?

A. This is an e-mail that I sent Mr. Avenatti on March 1, 2019 at 5:53 p.m. Pacific time.

MR. SOBELMAN: The government offers Government Exhibit 301 not for its truth but for the defendant's state of mind.

THE COURT: Any objection?

MR. QUINON: No, your Honor, except I believe there's an attachment to that exhibit.

THE COURT: What's the government's intentions with respect to the attachment?

MR. SOBELMAN: Your Honor, the government offers the full exhibit with the same proviso.

THE COURT: Any objection to 301?

MR. QUINON: No, your Honor.

THE COURT: All right. Ladies and gentlemen, I'm receiving 301. It's being offered not for the truth of the

statements made in it but rather for the effect that this document had on Mr. Avenatti's state of mind.

(Government's Exhibit 301received in evidence)

Q. Mr. Auerbach just so we're clear, what was Mr. Franklin's relationship with Nike prior to the end of 2018?

A. Mr. Franklin had a great relationship as far as -- for many years up until I believe it was the 2017 season or 2016. I'm not sure where they end and where they begin. But he had -- he had one of the most respected clubs in the country in California Supreme or Cal Supreme. He had put, I don't know, 110 players in the last ten years into Division I scholarships. And he enjoyed a great relationship with the company.

Q. Just generally what, if anything, did Nike provide to Cal Supreme during the time that it was Cal Supreme's sponsor?

A. There is a travel team fee which is a club fee which is a yearly fee. There is product. They supply product. They have a contract for all kinds of gear and product. And that's really what they provide.

Q. As of 2017/2018 how much in fee or funding did Nike provide to Cal Supreme in that season?

A. The contract I think was for about 77,000. At one point it was 72. At one point it was 79. But in reality it was -- had a value of about 192,000 a year because of all the product and how that totaled up.

Q. Looking at --

MR. SOBELMAN: Your Honor, may we publish if we haven't already Government Exhibit 301?

THE COURT: Yes.

Could you tell us what you mean by product?

THE WITNESS: Sure. Sneakers, backpacks, I mean there's about probably 19 items, merchandise, clothing, shoeware, gameware, sweatsuits, all kinds of things. Does that --

THE COURT: Yes.

Q. Mr. Auerbach, looking at this document?

A. Yes.

Q. When in comparison to the phonecall you just told us about did you send this e-mail?

A. I sent it out that day.

Q. After the call or before the call?

A. It was after the call.

MR. SOBELMAN: Mr. Hamilton, you could just enlarge the text of the e-mail, please.

Q. What e-mail address did you send this e-mail to?

A. I sent it to jr@augustusllp.com.

Q. And who were you intending to send this e-mail to?

A. Michael Avenatti.

Q. What is the subject line of this e-mail?

A. "FYI, Thanks!"

Q. What does if FYI stand for?

A. For your information.

Q. Please read us the portion of the e-mail, beginning with "Hi, Michael," and ending right before the links.

A. "Hi Michael, great speaking with you today. Thanks for the prompt response, greatly appreciated. As I mentioned, you've been a source of much hope for me in a time of much despair.

"I look forward to further discussing Gary Franklin founder/program director of California Supreme Youth Basketball v. Nike Elite Youth Basketball and Nike, Inc. on Monday.

"In the meantime, I thought I'd send you both a copy of my bio (see attached), as well as the links below to California Supreme's website."

Q. What are these links to?

A. These links are to California Supreme's website and gives general information, historical about us and lists all the phenomenal alumni players.

Q. Why did you send this e-mail to the defendant?

A. I wanted to give him a full sense of Cal Supreme, what he -- what Gary was about, what his organization was about, and also I wanted him to have a copy of my bio so he knew some of my background when we were getting into discussions on Gary's behalf.

Q. By the way, what did you mean by, "you've been a source of much hope for me in a time of much despair"?

A. Well at that point for me I was not very happy with the

state of affairs on a human level with the campaign and the results and I had admired, you know, some of the way Mr. Avenatti was dealing with the president at the time.

Q. Let's take a look at the next page of the exhibit.

Mr. Auerbach, what is this page?

A. This is page one of my bio.

Q. Just what do you mean by your bio?

A. It's a professional history, my professional history.

Q. Why did you send your professional history to the defendant?

A. Again, I wanted Mr. Avenatti to get -- to be familiar -- I knew who he was. I wanted him to know who I was so that our discussions would be more fruitful.

Q. Could you please read the first sentence of the third paragraph.

A. Sure.

"Auerbach previously served as president, CEO and/or COO of numerous entertainment companies, including Laika Entertainment (Coraline Paranorman) the Academy-Award-winning animation company owned by Nike cofounder, Phil Knight. At Laika, Auerbach..." oh, OK.

Q. Why, if any, reason did you include this part of your bio in sending it to the defendant?

A. Well, it was always in my bio. But I wanted him to understand that I had this previous relationship with Phil and

Nike.

Q. Why did you want the defendant to be aware of that?

A. Just so he knew that when I was calling -- that he knew when I was reaching out to Nike because he had a memo to the file that I had written that he knew there was this prior relationship.

Q. I'll ask you a little bit about that memo to the file later.

Why was it important for you -- I'm sorry. Withdrawn.

Why did you want the defendant to be aware that you had a prior relationship with Mr. Night?

A. I think it was important for him to know that we weren't coming into this, just it wasn't a blind call to help Gary out. It was -- there was a relationship with John Slusher. I had decided not to call Phil because Phil would have, knowing Phil, would have probably said just call John Slusher. I just wanted him to know that. It was important to know that we were -- we were on a respectful basis and wanted to move this in a respectful way to forging a positive outcome together and hopefully reestablish Gary with Nike. That was our top goal.

Q. How important to you are your relationships with Mr. Knight and Mr. Slusher?

A. Very important.

Q. Why are they important to you?

MR. QUINON: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: In business, relationships are everything and you want to keep them positive. And we had history together. And just like any relationship or friendship, you treat each other with respect, and they were very important to me.

MR. SOBELMAN: Mr. Hamilton, could you please go back to the first page of Government Exhibit 301.

Q. Mr. Auerbach, did you speak to the defendant again after you sent this e-mail on March 1?

A. Yes, I did.

Q. Approximately when did you next speak to him?

A. The next day.

Q. On that call, did the defendant mention anything about holding a press conference?

A. No.

Q. On that call, did the defendant mention anything about filing a lawsuit?

A. No.

Q. On that call, did the defendant mention anything about an internal investigation?

A. No, never.

Q. On that call, did the defendant mention anything about asking Nike to make any types of payments to him?

A. Never.

Q. On that call, did you bring up any of those topics?

A. No.

Q. Do you recall specifically what you discussed with the defendant on March 2?

A. Yeah. We -- I know we continued talking about Gary, the Adidas case, and just, again, what Gary endured. It was just a rehash of the first call but moving it further.

Q. Approximately how long was that call?

A. It was about 20 minutes.

Q. Who ended the call?

A. He did.

Q. Would you have been willing to continue speaking with the defendant if he had more that he wanted to discuss with you?

A. Absolutely.

Q. Directing your attention to March 5, 2009, three days later. What happened that day?

A. Mr. Avenatti contacted us or contacted me and asked if Gary Franklin and I could come in and meet with him.

Q. Did you meet with him that day?

A. Yes.

Q. And approximately when on March 5 did you meet with the defendant?

A. It was around 5 or 5:30 p.m.

Q. Where was the meeting held?

A. It took place at Mr. Avenatti's highrise apartment

Case 21-1778, Document 61, 04/04/2022, 3290318, Page228 of 263

K239AVE3 Auerbach - Direct

building.

Q. Where is that located?

A. Ten thousand Santa Monica Boulevard in Los Angeles, California.

Q. Who suggested that the meeting be held there?

A. He did.

MR. SOBELMAN: Mr. Hamilton, could you please show the witness what's marked for identification as Government Exhibit 602.

Q. Mr. Auerbach, do you recognize this?

A. Yes.

Q. What is it?

A. This is the residence where we met and we met in a conference room in his building.

MR. SOBELMAN: Your Honor, the government offers Government Exhibit 602.

MR. QUINON: No objection.

THE COURT: 602 is received.

MR. SOBELMAN: May we publish?

THE COURT: Yes.

(Government's Exhibit 602 received in evidence)

Q. Mr. Auerbach, who was at the meeting at the defendant's building?

A. It was myself, Gary Franklin and Mr. Avenatti.

Q. Could you please describe the room that you met in?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Auerbach - Direct

A. Yes. It was a rather large conference room with dark walls.

Q. Could you please describe where you, the defendant, and Mr. Franklin were sitting?

A. Yes. Mr. Avenatti was at the head of the table and I was on one side and Gary Franklin was on the other.

Q. Approximately how long was the meeting?

A. I would say the first meeting was about 40 to 45 minutes.

Q. In substance, what did you say to the defendant at that meeting?

A. Well, I had told him about what Gary had endured at the hands of Carlton DeBose and Jamal James at Nike EYBL and we reiterated what he participated in and then went down what justice meant to Gary and what he wanted out of this.

Q. I'll ask you what you said about justice in a moment but could you please just be a little more specific. What, if anything, did you tell the defendant about what Mr. Franklin, as you put it, endured from Mr. James and Mr. DeBose?

A. I had told him that he was -- from Gary's point of view he was coerced and pressured into making payments to players' families, accepting payments, wire payments from Nike to then pass onto handlers and make payments to the families of the players, resubmitting fake invoices to Nike and things of that nature.

Q. What, if anything, did you tell the defendant at that

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Auerbach - Direct

meeting about Mr. Franklin losing control of his 17s team?

A. I got into detail about a plan that was hatched whereby Nike EYBL took away his elite 17 team which is the team that features players, the top players no older than 17.

Q. And what, if anything, did you tell him happened with respect to that team?

A. (No response).

Q. Him being the defendant?

A. I told him that there was a handler and a parent that was involved with Carlton DeBose and Jamal James and they came to Gary and took away, for that season, his 17 team, the control of the 17 team. It was still California Supreme, though.

Q. What do you mean by control of the team?

A. Gary was no longer in charge of the decisions that had to do with the roster. He was not coaching the team. They brought in outside coaches that year. And I think that covers it.

Q. You mentioned that you told the defendant that Mr. Franklin wanted justice?

A. Yes.

Q. What, if anything, did you tell the defendant justice meant for Mr. Franklin?

A. First and foremost, for Gary I think was making sure that Carlton and Jamal were no longer at Nike EYBL. He was really concerned not so much what had been done to him but -- at that

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE3 Auerbach - Direct

point, but what others around the league, other coaches, other players would suffer because of their actions. So he wanted to ensure that the company knew and wouldn't let that happen.

He wanted to report his involvement and the actions to the government. But because of wanting to forge and reestablish the relationship with Nike he wanted to do it with Nike. And then he wanted to be financially compensated just to, you know, for the damage the club and the brand had suffered.

Q. What, if anything, did you tell the defendant about Mr. Franklin wanting to continue his relationship with Nike?

A. Told him it was very important.

Q. And what did you mean or tell the defendant -- let me ask it this way. What did you tell the defendant that continuing a relationship meant?

A. Well, he'd like to -- again, he had a fifteen-year great relationship with them and he wanted to continue that, and that meant hopefully signing a new contract and moving forward.

Q. By signing a new contract, do you mean a contract for Nike to sponsor Cal Supreme in the next season?

A. Yes, and beyond.

Q. Aside from those I think there were four things, did you tell the defendant that justice meant anything else to Mr. Franklin?

A. No.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000228

Q. Were you very specific when you described those four things?
A. Yes. And it was in my memo to the file.
Q. Is that a document you gave the defendant at some point?
A. Yes.
Q. We'll look at that in a little while.
In that meeting what, if anything, did you tell the defendant about Mr. Franklin's loyalty to Nike?
A. How deep it ran. And actually Gary had mentioned it too. I mean fifteen years is a long time. He's helped a lot of people. And he lived and breathed -- I think we said he lived and breathed Nike. And made it known that he had no problem with Nike. His problem was with the two guys that ran Nike EYBL.
Q. Lived and breathed, those are the exact words you used in that meeting?
A. Yes.
Q. You said Mr. Franklin lived and breathed Nike?
A. I said that, yes.
Q. What, if any, documents did you show the defendant at that meeting on March 5?
A. I showed Mr. Avenatti a 41-page memorandum of actions which was the document that I had put together with all the evidentiary documents.
MR. SOBELMAN: Mr. Hamilton, please show the witness

what's marked for identification as Government Exhibit 312.
(Continued on next page)

Q. Mr. Auerbach, do you recognize this?
A. Yes.
Q. What is it?
A. This is the memorandum of actions, which highlights or itemizes what we believe to be the actions or wrongdoings, if you will.
MR. SOBELMAN: Your Honor, the government offers Government Exhibit 312 not for its truth but for the defendant's state of mind.
THE COURT: Any objection?
MR. QUINON: No, your Honor. No objection.
THE COURT: Government Exhibit 312 is received.
Again, ladies and gentlemen, this is received not for the truth of any of the statements in the document but rather for the effect that these statements would have had on Mr. Avenatti's state of mind.
(Government's Exhibit 312 received in evidence)
MR. SOBELMAN: Your Honor, may we publish?
THE COURT: Yes.
MR. SOBELMAN: Thank you.
BY MR. SOBELMAN:
Q. Who created this document?
A. I did.
Q. Could you please read the title of the document?
A. Yes. "Memorandum of Actions Regarding Nike Elite Youth

Basketball-California Supreme Youth Basketball in Connection with Nike Elite Players DeAndre Ayton, Bol Bol and Brandon McCoy in 2016 and 2017."
Q. Who are DeAndre Ayton, Bol Bol and Brandon McCoy?
A. They are all three players that were elite players at Cal Supreme who were at the height of their game.
Q. As far as you know, what are they doing now?
A. DeAndre Ayton was the number one draft pick in the NBA, plays for the Phoenix Suns, and the other two are in the NBA.
Q. Could you please read the first paragraph of the documents.
A. "The actions listed below were initiated, authorized and directed by Nike Elite Youth Basketball (Nike EYB) executives Carlton DeBose in 2016, and Carlton DeBose and Jamal James in 2017, and carried-out on Nike's behalf by Gary Franklin, California Supreme Youth Basketball (Cal Supreme)."
Q. What does this paragraph mean?
A. It means that both Carlton and Jamal had directed Gary and Gary carried out these actions on -- at their direction on Nike's behalf.
Q. How did you learn about those actions, as you put it?
A. Gary had told me.
Q. To be clear, were you personally involved in any of this?
A. No, I wasn't.
Q. You have no firsthand knowledge of whether any payments were actually made?

A. No.
Q. You have no firsthand knowledge of what Mr. DeBose or Mr. James ever said to Mr. Franklin?
A. No.
Q. You've talked to Mr. Franklin about it?
A. I've talked to Mr. Franklin about it, and I've seen the texts, the emails, and the bank statements.
Q. But you learned about all of this, to the extent it happened, after any of this might have happened?
A. Yes. I had no knowledge of it during.
Q. Underneath that first paragraph, there is an underlined heading that says, "2016 Actions." Do you see that?
A. Yes.
Q. Generally, what did you list under that heading?
A. Again, I listed the specific bank wire payments, the payments that Gary had made to the handler for DeAndre Ayton, for Bol Bol -- for DeAndre Ayton, payments to DeAndre's mother and cash payments to Shaun Manning, and so there were various payments and then, yeah.

MR. SOBELMAN: Mr. Hamilton, can you please display page 2 of this exhibit.
Q. Do you see the underlined heading "2017 Actions"?
A. Yes.
Q. Generally, what did you list under that heading?
A. I had listed here bank wire payment to Mel McDonald, Bol

Bol's handler, who is also DeAndre Ayton's handler. I had listed a falsified invoice that Cal Supreme submitted to Nike for payment for Mel McDonald, and a bank wire payment that Cal Supreme received to and then gave to Mel McDonald.
Q. You've used the word "handler" a few times.
A. Yes.
Q. What does that mean in this context?
A. A handler is -- depending on your view of it is either somebody who latches on to a very, very talented young player and convinces the parents, the mother or the player, that they could provide services to them and let them help facilitate and navigate the waters for them, so like a de facto manager/agent that they are not supposed to have.
Q. Are there documents attached to this memorandum?
A. Yes, there are.
Q. Who organized all those documents?
A. I did.
Q. What are some of the types of documents that you attached to this memorandum?
A. I had text messages between Gary and a lot of people, Nike executives, Carl DeBose, Jamal James, DeAndre Ayton, and others, emails, bank statements for Cal Supreme -- and I'm trying to think what else -- and false invoices.
Q. Generally, what types of information do those documents show, to your understanding?

A. Yes. They were either directives from Nike to Gary to do certain things, make certain payments, facilitating him getting on planes, not getting on planes, and they just showed the activity as backup and supported the claims.
Q. How did you get all those documents?
A. Gary Franklin provided them for me.
Q. Let's take a look at just a few of the attached documents.

MR. SOBELMAN: Mr. Hamilton, if you could please display page 12 of this exhibit.
Q. Who wrote this?
A. I did.
Q. What does this page show?
A. This is 2016, and it is a $10,000 cash payment to Andrea Ayton, who is DeAndre Ayton's mother, and the payments were made -- or payment was made in Phoenix, Arizona.
Q. And what's listed under "Exhibits"?
A. It lists bank withdrawals from Cal Supreme's bank that then -- totaling 10,000, 5,000 each, that Gary then paid to Andrea Ayton.

It is a text message between Carlton DeBose and Gary Franklin, with Mr. DeBose directing Gary to fly to Phoenix to make such payment.

It's an email correspondence from Carlton DeBose to a Nike sports marketing assistant requesting travel so Gary could

fly to Phoenix and make the payment.

And then a text message between Gary Franklin and Andrea Ayton confirming that he arrived there and her address.
Q. By the way, did Mr. Franklin ever tell you what, if anything, these payments were for?
A. No.
Q. Do you have any personal knowledge why these payments, if they were made, were made?
A. No.
Q. Let's go to the next page, page 13. What is this?
A. This is a California Supreme bank statement from Bank of America.
Q. And who put the black boxes over part of this statement?
A. I did.
Q. Why did you do that?
A. Because it was non-related sensitive information, and we were trying to focus on telling that other story and correlating the evidence.
Q. To be clear, this is the same as the version that you showed the defendant?
A. Yes.
Q. And who put that red rectangle over two of the entries?
A. I did.
Q. Why did you do that?
A. Just to highlight the payments that correlate to the cover

sheet.
Q. Go to the next page, page 14, please.
What is this?
A. These are text messages between Carlton DeBose and Gary Franklin.
Q. Who put the red square on this page?
A. I did.
Q. Generally, what is your understanding of what this page shows?
A. This is when Carlton DeBose reached out to Gary and said who can get on a flight to Phoenix right away.
Q. Let's go to page 15 of the exhibit.
What is this?
A. This is an interoffice email between Carlton DeBose and Gabriella Olivares at Nike requesting travel for Gary Franklin to go to Phoenix and for her to book the flight.
Q. Who put the red rectangle on this page?
A. I did.
Q. Take a look at page 16. What is this?
A. This is a text message page of texts from Carlton DeBose -- with Carlton DeBose and Gary Franklin.
Q. And who put the red rectangle on this page?
A. I did.
Q. Who put the red ovals on the page?
A. Gary.

Q. Generally, what does this page show?
A. This is Carlton finding out if Gary made contact, if he had talked to Andrea, and he said, yes, she just gave me her address.
Q. Could you please go to the next page, page 17.
What is this?
A. These are texts between Andrea Ayton, DeAndre Ayton's mother, and Gary Franklin.
Q. Who put the red circle on the page?
A. That was Gary.
Q. And who put the red rectangle on the page?
A. I did.
Q. Generally, what does this page show?
A. This is a correspondence with Gary telling Andrea he just landed and what's your zip code and that it was nice seeing her and just a conversation between them.
Q. Did any of documents we just looked at make any mention of why these payments were being made?
A. No, they did not.
Q. Anywhere in this memorandum or in the attachments, is there any explanation of why these payments are being made?
A. No.
MR. SOBELMAN: Mr. Hamilton, could you please go back to the first page of the exhibit.
BY MR. SOBELMAN:

Q. I'm now going to ask you some more questions about your meeting with the defendant on March 5th.
For approximately how long did you show this memorandum of actions to the defendant?
A. It was anywhere between five and eight minutes.
Q. What was the defendant's demeanor as you showed him this memorandum?
A. I just remembered him going, "Wow." Really, that was, "Wow." He seemed excited about it and surprised that it was all there, laid out.
Q. At that point, what was your expectation regarding the defendant -- whether the defendant would keep the information you provided confidential?
A. 100 percent.
Q. Why was that your expectation?
A. Well, first and foremost, it is just what attorneys do, and I had been very clear, it was an expectation that it was very sensitive material.
Q. And did Mr. Franklin speak during the meeting?
A. Yes.
Q. In substance, what did Mr. Franklin say during that meeting?
A. He reiterated what he had been through and how taxing and stressful it was and what it had done to his family and his health and was remorseful for his role even though he knew that

he was doing it to save his business, his club, and his family.
Q. In substance, what did the defendant say at that meeting, aside from "Wow"?
A. He was -- he gave a whole speech about justice and that we're going to get you justice. He talked about -- he was very, very adamant that if Gary were approached by the FBI, or any official, that he not speak to whoever approaches him and tell them to talk to your attorney and that's me. So that's at the moment we felt he was representing Gary, that he had decided to.
And he was -- he said that 70/75 percent of the people in prison wouldn't be there if they just said I'm not talking, talk to your -- talk to my lawyer. And so he said that we need to get you immunity.
Q. When he said "you" immunity, was he referring to you, Mr. Auerbach, or Mr. Franklin, or both?
A. Gary Franklin.
Q. What did you understand the defendant to mean by "immunity"?
A. That Gary would not be prosecuted for his involvement in any of these actions.
Q. What, if anything, did you say at that meeting about recordings?
A. Just that there were some.
Q. And what specifically did you say?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page232 of 263

K23dave4a Auerbach - direct

A. I said that apparently Gary was feeling very pressured and was confused on how to handle things, he didn't trust Carlton Jamal or Mel McDonald, and he decided to record his meetings and phone calls with those people, those executives, and some others.

Q. What, if anything, did you say to the defendant about the contents of those recordings?

A. Nothing.

Q. What, if anything, did the defendant say in response to you telling him about those recordings?

A. We didn't get into them.

Q. Did the defendant ask you to provide him with copies of the recordings?

A. No.

Q. At any point, did you provide the defendant with copies of those recordings?

A. No.

Q. What, if anything, did the defendant ask you for during that meeting?

A. We had talked about some other documents, correspondence with John Slusher, the memo to the file. And then I said that I would put a cast of characters together which basically would talk about who each of the people involved on Nike's behalf was, Cal Supreme, and other people like the players, and show the hierarchy of the reporting structure between Cal Supreme,

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4a Auerbach - direct

Nike, YBL and Nike, and some other documents and correspondence and I would send them over.

Q. Did the defendant take any notes during that meeting?

A. No.

Q. Who ended the meeting?

A. He did.

Q. Who is "he"?

A. Oh, the defendant, Mr. Avenatti.

Q. Would you have been willing to continue speaking with the defendant if he had more that he wanted to discuss with you?

A. Absolutely.

Q. In that meeting, what, if anything, did the defendant say about the urgency of resolving Mr. Franklin's issue with Nike?

A. Nothing.

Q. In that meeting, what, if anything, did you or Mr. Franklin say about the urgency of resolving Mr. Franklin's issues with Nike?

A. Nothing.

Q. In that meeting, did the defendant mention anything about a retainer agreement?

A. No, there was no mention of it.

Q. In that meeting, did the defendant mention anything about getting paid to represent Mr. Franklin?

A. No.

Q. In that meeting, did the defendant mention anything about

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4a Auerbach - direct

filing a lawsuit on behalf of Mr. Franklin?

A. No.

Q. In that meeting, did you or Mr. Franklin mention anything about filing a lawsuit?

A. No.

Q. Why did you not mention filing a lawsuit in that meeting?

A. Because we -- I had initiated discussions with Nike. Nike had asked that we further the discussions with Andrew Michaelson and Boies Schiller, and at that point there was no need to let's see how they were responding and this may all just be a discussion at that point and we may need not to file a lawsuit.

Q. In that meeting, did the defendant mention anything about holding a press conference?

A. No.

Q. In that meeting, did you or Mr. Franklin mention anything about holding a press conference?

A. Never.

Q. Why did you not mention holding a press conference in that meeting?

A. Again, it would be detrimental, damaging, and totally adverse to meeting Gary's objectives.

Q. Who did you think a press conference would damage?

A. Oh, damage the relationship with Nike.

Q. Whose relationship with Nike?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4a Auerbach - direct

A. Gary's relationship with Nike first and foremost.

Q. Why would it damage Gary's relationship with Nike?

MR. QUINON: Objection.

THE COURT: Sustained.

Q. Who, if anyone else, were you concerned that a press conference would damage?

MR. QUINON: Objection.

THE COURT: Overruled.

A. Mostly it was Gary. It was only Gary.

Q. In that meeting, did the defendant mention anything about an internal investigation?

A. No, never.

Q. In that meeting, did you or Mr. Franklin mention anything about an internal investigation?

A. No, never.

Q. Why did you not mention an internal investigation in that meeting?

A. It was something we never even entertained, we didn't need, because we know what happened, Gary knows what happened.

Q. In that meeting, did the defendant mention anything about asking Nike to make any types of payments to him?

A. No.

Q. In that meeting, did you or Mr. Franklin mention anything about Nike making payments to the defendant?

A. Never.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000232

Q. Why did you not mention Nike making payments to the defendant in that meeting?

A. It would be a total --

MR. QUINON: Objection.

THE COURT: Overruled.

A. It would be a total conflict of interest and totally detrimental, again, to Gary's goals and Gary.

Q. Why would it be detrimental to Gary or Gary's goals?

MR. QUINON: Objection, your Honor.

THE COURT: Overruled.

A. It would be such a conflict of interest and it's wrong. It's, you know, from my point of view, illegal, and it would be harmful because every dollar that he would ask for himself could possibly be a dollar taken out of Gary's settlement.

MR. QUINON: Objection, your Honor.

May we come to sidebar?

THE COURT: Yes.

(Continued on next page)

(At the sidebar)

MR. QUINON: Your Honor, I believe the witness testified that in his view it was illegal, so this is very prejudicial statement. He doesn't have any knowledge to express an opinion. He is not here has an expert.

I had objected to this line of cross before -- I'm sorry, of direct before the Court overruled me, and I understand that then the witness expanded to say that it is illegal. We think it is extremely prejudicial at this point, and we would move for a mistrial.

THE COURT: Yes. Well, that motion is denied.

But let me understand why you feel it is prejudicial. I mean, the witness has explained on a couple of occasions that in his view it would have been a conflict for him, that is to say, Mr. Avenatti, to demand money separate and apart from what was requested on behalf of his client. And he what said is he saw it as taking money out of Franklin's pocket to pay Avenatti. That's the way he's explained it. You, of course, are welcome to cross-examine on the point. But that's what he's used as the justification for why there was never any discussion about payments flowing separately to Mr. Avenatti.

MR. QUINON: Yes, your Honor, but now --

THE COURT: Now, on the illegal point, let me ask you, Mr. Sobelman, would you expect the witness was going to say illegal?

MR. SOBELMAN: I did not, your Honor. That being said, it is not surprising to me that he would say something like that, because that's what his honest view is. But he is not offering his opinion, but the defense has indicated in its opening statement that they are going to put Mr. Auerbach and Mr. Franklin's states of mind in those meetings squarely at issue in this case. They are highly relevant to Count Three. And Mr. Auerbach on direct is entitled to explain why he did not or did suggest certain things in the meetings with the defendant.

If the defense now is saying they will concede that Mr. Auerbach and Mr. Franklin did not want the defendant to do certain things, then maybe I can move on, but I'm assuming they are going to continue to put their states of mind at issue and question their credibility repeatedly. This is highly relevant testimony, and any unfair prejudice is far outweighed by the probative --

THE COURT: Let me ask you this. Counsel has objected specifically to the use of the term "illegal." It sounds like you are surprised by him using that term?

MR. QUINON: Yes.

THE COURT: Are you seeking some kind of instruction from me to the jury that Mr. Auerbach is not here to offer an opinion on the legality of conduct? Is that what you want?

MR. QUINON: Yes, your Honor. In all fairness, I

think that striking would be the remedy that we would ask at this point, because otherwise you are giving the impression that Mr. Avenatti committed some type of crime by doing this. That's what "illegal" would mean to a layman or it can be certainly interpreted that way. So we would like for the Court to give an instruction that be you are striking that particular part of the testimony.

THE COURT: So want me to strike the reference to illegal. Do you want me to also instruct the jury that Mr. Auerbach is not here to offer an opinion as to legality or illegality?

MR. QUINON: Your Honor.

THE COURT: Does the government object?

MR. SOBELMAN: We do. We think an instruction is perfectly appropriate. Of course, we are not going to argue to the jury at any point that because Mr. Auerbach thought that suggesting something to the defendant that he never suggested to the defendant might be illegal and, therefore, that's not why he suggested it therefore means that the defendant is guilty, because of Mr. Auerbach's personal view that something like that would be illegal.

However, the witness is truthfully explaining his state of mind and why he did or did not say things to the defendant, and a limiting instruction will more than deal with any potential prejudice that comes from the testimony, which

Case 21-1778, Document 61, 04/04/2022, 3290318, Page234 of 263

K23dave4a Auerbach - direct

the government thinks is virtually none.

THE COURT: All right. So I am going to, first of all, strike the reference to illegal. I'm also going to instruct the jury that Mr. Auerbach is not here to offer an opinion as to legality or illegality of conduct.

MR. S. SREBNICK: Your Honor, he' also not qualified to do so.

THE COURT: Well, I don't know enough about Mr. Auerbach's background to know whether he is qualified or not, but I am telling the jury that he is not here to testify about legality or illegality.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4a Auerbach - direct

(In open court)

THE COURT: Ladies and gentlemen, I'm striking the reference to "illegal" that you just heard. That is to be disregarded by you.

Secondly, I want you to know that Mr. Auerbach is not here to testify or to offer an opinion as to the legality or illegality of any of the conduct that you are going to hear about at the trial.

Go ahead, sir.

BY MR. SOBELMAN:

Q. Mr. Auerbach, at the end of that meeting on March 5th, what was your understanding of the status of the relationship between the defendant and Mr. Franklin?

A. That Mr. Avenatti was in fact Gary Franklin's attorney.

Q. What was that understanding based on?

A. He strongly said to Gary, Gary, if -- if anybody approaches you, FBI, anybody, you don't say a word, you tell them to talk to your lawyer, and that's me.

Q. Just to be clear, Mr. Avenatti specifically referenced the FBI?

A. Yes.

Q. After the March 5th meeting, did you and the defendant ever exchange text messages?

A. Yes.

THE COURT: Mr. Hamilton, could you please show the

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4a Auerbach - direct

witness what's been marked for identification as Government Exhibit 310R.

Q. Mr. Auerbach, do you recognize this?

A. Yes.

Q. What is it?

A. This is a text that I sent Mr. Avenatti on March 10th, 2019 at 6:12 p.m. Pacific Time.

Q. Just to be clear, is this exhibit a list of text messages you exchanged with the defendant?

A. Yes.

MR. SOBELMAN: The government offers Government Exhibit 310R.

THE COURT: Any objection?

MR. QUINON: No, your Honor. No objection.

THE COURT: 310R is received.

(Government's Exhibit 310R received in evidence)

MR. SOBELMAN: May we publish?

THE COURT: Yes.

BY MR. SOBELMAN:

Q. Mr. Auerbach, who sent the messages on the left in gray?

A. Avenatti did.

Q. And who sent the messages on the right in blue?

A. I did.

MR. SOBELMAN: Mr. Hamilton, can you please enlarge the three messages underneath the date March 10, 2019.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4a Auerbach - direct

Q. Mr. Auerbach, on what date were these three messages sent?

A. On 3/10/2019.

Q. Could you please read us the phone number that the messages on the left, which have a very, very light gray background and essentially a white background?

A. Yes. (949) 887-4118.

Q. You understood that to be Mr. Avenatti's number?

A. Yes.

Q. Could you please read just the first message that the defendant sent you?

A. "Jeff - Michael Avenatti here. Can you give me a call?"

Q. After you received that message, what did you do next?

A. I called Mr. Avenatti.

Q. In substance, what did the defendant say on that call?

A. Just that he was looking forward to talking again and getting together, but in the meantime could I resend him the original email that I had sent because he never received it.

Q. And did you understand that to mean the email we looked at earlier from March 1st?

A. Yes, the one with my bio and the links.

Q. In substance, what you did say on that call?

A. I said, sure, I'll look forward to getting together as well and with Gary, and said I'd be happy to resend it. And he then said I want to give you another email address to send it to.

Q. Approximately how long was that call?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000234

A. It was very short, maybe ten minutes.
Q. Who ended the call?
A. He did.
Q. Would you have been willing to continue speaking with the defendant if he had more that he wanted to discuss?
A. Absolutely.
Q. On that call, did the defendant mention anything about holding a press conference?
A. No, never.
Q. On that call, did the defendant mention anything about an internal investigation?
A. No.
Q. On that call, did the defendant mention anything about asking Nike to pay any types of payments to him?
A. No.
Q. On that call, did the defendant mention anything about asking Nike to hire him?
A. No, never.
Q. On that call, did you bring up any of those topics?
A. No.
Q. Turning back to Government Exhibit 310R, could you please read the second message you received from the defendant on March 10, 2019?

THE COURT: Actually, Mr. Sobelman, it is 1 o'clock so we are going to take our luncheon recess now.

Ladies and gentlemen, don't discuss the case. Keep an open mind because there is more evidence. We'll be back to you at 2 o'clock.

Thank you all very much.

THE CLERK: All rise.

(Continued on next page)

(Jury not present)

THE COURT: You could step down.

(Witness not present)

THE COURT: Please be seated.

Is there anything we need to take up before we recess?

MR. RICHENTHAL: Not from the government, your Honor.

MR. S. SREBNICK: No, your Honor.

THE COURT: All right. We will resume at 2 o'clock.

(Luncheon recess)

**A F T E R N O O N S E S S I O N**

2:07 p.m.

(Jury not present)

THE COURT: Please be seated.

Are we prepared to proceed?

MR. SOBELMAN: The government is ready, your Honor.

THE COURT: All right. Mr. Auerbach, can you please retake the stand.

JEFFREY AUERBACH,

resumed, and testified further as follows:

THE CLERK: All rise.

(Jury present)

THE COURT: Please be seated.

Ladies and gentlemen, we'll continue with the direct examination of Mr. Auerbach.

Mr. Auerbach, you remain under oath.

Mr. Sobelman, please proceed.

MR. SOBELMAN: Mr. Hamilton, could you please put back up Government Exhibit 310R, and just zoom in on the top three messages. Thank you.

BY MR. SOBELMAN:

Q. Mr. Auerbach, before the lunch break, you had just told us about a telephone call you had with the defendant on March 10, 2019, is that right?
A. Yes.

Q. And after you got off the phone, did he send you a text message?

A. He gave me this -- he gave me this text -- he texted me this email address for me to send him the materials, yes.

Q. Can you please read us that email address?

A. Yes. MA@augustusllp.com.

Q. What was your understanding of why the defendant sent you this email address?

A. He said he never received my first email address and that this was his private email address and to resend the material.

Q. And could you please read the text message you sent in response?

A. "Got it. Thanks."

Q. What did you do next?

A. I resent him the original email I forwarded to him at this email address.

MR. SOBELMAN: Mr. Hamilton, could you please show the witness what's been marked as Government Exhibit 302.

Q. Mr. Auerbach, do you recognize this?

A. Yes.

Q. What is it?

A. This is the email I forwarded -- I sent to Avenatti and forwarded the original on March 10, 2019, at 6:35 p.m.

MR. SOBELMAN: The government offers Government Exhibit 302 for the defendant's state of mind.

THE COURT: Any objection?

MR. QUINON: No, your Honor.

THE COURT: Government Exhibit 302 is received in evidence, again, to the extent it bears on Mr. Avenatti's state of mind.

(Government's Exhibit 302 received in evidence)

MR. SOBELMAN: Your Honor, may we publish?

THE COURT: Yes.

BY MR. SOBELMAN:

Q. Mr. Auerbach, what email address did you send this email to?

A. I sent this to ma@augustusllp.com.

Q. Who were you intending to send this email to?

A. Michael Avenatti.

Q. Can you please read what you wrote in this email, beginning with "FYI"?

A. "FYI. Here's my email (and attachment) from 3/1/19."

Q. And is the email below that message the same email you sent on March 1st?

A. Yes.

Q. Is that the one we looked at earlier?

A. Yes.

Q. Why did you send this email to the defendant?

A. I originally sent it -- well, I sent this because he asked for it, but I originally sent it to him as background

information on Cal Supreme and myself.

MR. SOBELMAN: Mr. Hamilton, can you please show the witness what's been marked for identification as Government Exhibit 303.

Q. Mr. Auerbach, do you recognize this?

A. Yes.

Q. What is it?

A. It's Mr. Avenatti's response to my email on March 10, 2019, at 6:30 -- I think that's 6:38 p.m. Pacific file.

MR. SOBELMAN: The government offers Government Exhibit 303 for the defendant's state of mind.

THE COURT: Any objection?

MR. QUINON: No, your Honor. No objection.

THE COURT: 303 is received.

(Government's Exhibit 303 received in evidence)

MR. SOBELMAN: May we publish?

THE COURT: Yes.

BY MR. SOBELMAN:

Q. Mr. Auerbach, what did the defendant write in his response?

A. "Thanks!"

Q. And is this a response to the email we were just talking about, Government Exhibit 302?

A. Yes.

MR. SOBELMAN: Mr. Hamilton, can you please display what's in evidence as Government Exhibit 310R again.

Q. Mr. Auerbach, after March 10th, when was your next text message exchange with the defendant?

A. It was on 3/18/2019 at 10:29 a.m.

MR. SOBELMAN: And, Mr. Hamilton, could you please zoom in on the text messages that begin at 10:29 a.m.

Q. Between March 10th and March 18th, did you speak with the defendant?

A. Yes.

Q. How did you speak with the defendant?

A. By phone.

Q. Did you speak with him just once or more than once during that time period?

A. I can't recall.

Q. So it might have been once, it might have been more than once.

A. Yes.

Q. On that call or calls, what, if anything, did the defendant say about the urgency of resolving Mr. Franklin's issues with Nike?

A. There was no discussion of urgency.

Q. On that call or calls, did the defendant mention anything about holding a press conference?

A. No.

Q. On that call or calls, did the defendant mention anything about an internal investigation?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page237 of 263

K23dave4b Auerbach - direct

A. No.
Q. On that call or calls, did the defendant mention anything about asking Nike to make any types of payments to him?
A. Never.
Q. On that call or calls, did the defendant mention anything about asking Nike to hire him?
A. No.
Q. On that call or calls, did you bring up any of those topics?
A. Never.
Q. Mr. Auerbach, could you please remind us, whose text messages are in blue and whose are with the white background?
A. Mr. Avenatti's is in the white with the grayish background and mine are in blue.
Q. Could you please read us the text exchange that's on the screen, which starts at 10:29 a.m. on March 18th?
A. Yes.
Q. And just explain for us, as you read them, who is sending which messages?
A. OK. Mr. Avenatti: Jeff, can you and Gary and I meet at 5 p.m. today?
I replied: Let me check. I'm sure we can.
And then he replied: Great.
And then I replied: Confirmed. See you at 5 p.m. Your building?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4b Auerbach - direct

By the way, sending over materials shortly. Sorry, had to run out unexpectedly yesterday to help my son and buddies who were stranded in Hollywood LOL.
Yes, please. You can bring the materials with you if that's easier.
Great, see you at 5 p.m.
Q. Did you send materials to the defendant after this text message exchange?
A. Yes, I did.
Q. How did you send those materials to the defendant?
A. Via email attachments.
MR. SOBELMAN: Mr. Hamilton, can you please show the witness what's been marked for identification as Government Exhibit 304.
Q. Mr. Auerbach, do you recognize this?
A. Yes.
Q. What is it?
A. This is the email I sent Mr. Avenatti on March 18th of 2019 at 3:09 p.m. Pacific Time and, yeah.
MR. SOBELMAN: The government offers Government Exhibit 304 for the defendant's state of mind.
THE COURT: Any objection?
MR. QUINON: No objection, your Honor.
THE COURT: Government Exhibit 304 is received, again, for Mr. Avenatti's state of mind.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4b Auerbach - direct

(Government's Exhibit 304 received in evidence)
MR. SOBELMAN: May we publish?
THE COURT: Yes.
BY MR. SOBELMAN:
Q. What is the subject line of this email?
A. "John Slusher Auerbach emails, Andrew Michaelson@Boies Schiller bio, Auerbach memo to file, Re call with John Slusher."
Q. Mr. Auerbach, could you please remind us, who is John Slusher?
A. John Slusher is the de facto second in command at Nike, and he's the executive vice president of sports marketing at Nike.
Q. Is that the person you told you us earlier you had called before you reached out to the defendant?
A. Yes.
Q. And do you know Andrew Michaelson?
A. No.
Q. What is your understanding of who Andrew Michaelson is?
A. Andrew Michaelson, per my conversation with John Slusher and his emails to me, is the Nike EYBL outside counsel at Boies Schiller.
Q. What did you write in the email we're looking at?
A. "See attached."
Q. Was there an attachment to this email?
A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave4b Auerbach - direct

MR. SOBELMAN: Mr. Hamilton, could you please display the second page of this exhibit.
Q. Mr. Auerbach, just generally, what was attached to the email?
A. I had attached my email to John Slusher, John Slusher's reply to me, and Andrew Michaelson at Boies Schiller, who is the general -- who is the outside counsel to Nike EYBL, his bio and contact info, and then my memo to the file of my -- documenting my conversation with John Slusher on March 6, 2019.
Q. Who wrote the memorandum on this page?
A. I did.
Q. Why did you provide this memorandum and these documents to the defendant?
A. Because they would inform him of what's transpired and the objectives and what Nike had asked us to do, which was to call Andrew Michaelson and, really, to prepare him.
Q. The top of the page states, "Privileged & Confidential." Who wrote that?
A. I did.
Q. What is your understanding of what "privileged" means?
A. Usually it's to keep it confidential and not shared between an attorney and his client.
Q. What, if anything, did you mean to communicate to the defendant by using the label "Privileged & Confidential"?
A. That this is highly sensitive material and should not be

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000237

shared with anyone unless it's agreed upon.
Q. Agreed upon by whom?
A. The client.
Q. Who was the client in this case?
A. Gary Franklin.

MR. SOBELMAN: Mr. Hamilton, could you please display the sixth page of this exhibit.

Q. Mr. Auerbach, what is this page?
A. This is a memo to the file that I had written right after my conversation that day with John Slusher at Nike, the executive vice president of sports marketing, who I called on Gary's behalf and Cal Supreme's behalf.
Q. What do you mean by "memo to the file"? What is that?
A. It's -- traditionally, it's a document, a memorandum that you want to write to officially state and so you have a future reference, if you need it, and it details what your conversation or meeting you had or discussion with somebody.
Q. Are these basically your notes of that call?
A. Yes.
Q. What is the date on this memorandum?
A. February 6, 2019.
Q. When did that call with Mr. Slusher occur?
A. That day.
Q. On February 6, 2019?
A. Yes.

Q. Why did you write this memo?
A. Again, to document and have a specific record of everything I discussed and everything he discussed with me regarding Gary Franklin and Nike.
Q. Why did you share this memo with the defendant?
A. Because it really states Gary's objectives, and it states clearly and it states John Slusher's reaction and what John Slusher said and said, you know, and Nike -- Nike's initial reaction.
Q. Could you please read the first paragraph?
A. Sure.

"I spoke with John Slusher at Nike today regarding Gary Franklin. I told John I was a good friend and adviser to Gary Franklin, one of Nike's EYB's longtime, most respected program directors (14 years with Nike Grassroots, 8 with Nike EYB), and I was calling him on Gary's behalf to inform him and Phil (Knight) and Nike about the following:"

Q. Would you please read the paragraph that's numbered 2?
A. "There was ongoing corruption and illicit schemes being carried out by DeBose and James and how they brought this corruption into California Supreme, directing Gary to submit fake invoices, make cash and bank-wire payments to handlers and family members of top Nike elite players like DeAndre Ayton and Brandon McCoy, actions similar to those in the recent DOJ-Adidas case.

Q. Could you please read the paragraph numbered six?

THE COURT: Before you do that, there's a reference to something called Nike grassroots. What does that refer to?

THE WITNESS: Grassroots is the original AAU term for youth basketball, grassroots meeting out in the communities. They are used interchangeably with youth basketball. It's one of those terms. It used to be called Nike grassroots because there's a lot of AAU clubs that are grassroots but aren't elite.

THE COURT: My next question was how does the grassroots relate to the elite?

THE WITNESS: A lot of elite programs have grassroots programs within the organization where there's different levels of kids in the community playing but they're not on the Nike elite level which is the circuit where all the college coaches come to those tournaments and games. They're not the top one hundred players.

THE COURT: Go ahead, Mr. Sobelman.

Q. Just to be clear, is grassroots a larger umbrella and the Nike EYBL is within that larger umbrella?
A. That's my understanding but some of these terms are interchangeable sometimes.
Q. Could you please read the paragraph numbered six.
A. Yes.

"Gary now wants justice. In addition, he's always

been loyal to Nike and wants to help the company clean up EYB, get rid of the corruption and corrupt execs."

At which point, John asked me, John Slusher, "So what does justice look like for Gary, firing DeBose and James?"

At which I replied, "Yes, for starters."

Q. What did you mean by "for starters"?
A. That was one of his goals, one of his objectives.
Q. And did you communicate to Mr. Slusher any other of Mr. Franklin's objectives on that call?
A. Yes.
Q. What did you say?
A. I told him that Gary and the brand had been hurt and he sustained a lot of financial burden and loss in the brand and he'd like to be compensated. I said but his real goal here is he's loyal to Nike and he would love to continue with Nike and get his program reestablished. And that he wants to report the -- his involvement in some of these acts to the government and he would like to do it in coordination and go together with Nike and do it.
Q. Does this memorandum mention a press conference?
A. No.
Q. Does this memorandum mention an internal investigation?
A. Absolutely not.
Q. Does this memorandum mention any threats that you made to Mr. Slusher?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page239 of 263

K239AVE5 Auerbach - Direct

A. No.
Q. Did you mention a press conference or internal investigation in your conversation with Mr. Slusher?
A. Never.
Q. Did you make any threats to Mr. Slusher?
A. Never.
Q. Why did you not make any threats to Mr. Slusher?
A. It's just not -- that would have been really damaging and counterintuitive and detrimental to Gary and his goals. It's just not what you do.
Q. A moment ago you referenced AAU when you were talking about grassroots and EYBL. What is AAU?
A. It's the amateur aspect of youth basketball: Amateur athletic -- I forget what the U stands for but it's like amateur athletic association.
MR. SOBELMAN: Mr. Hamilton, can you please display the fourth page of this exhibit.
Q. Mr. Auerbach, what is this?
A. This is Andrew Michaelson at Boies Schiller, Nike's outside counsel, Nike EYB's outside counsel that John Slusher specifically said all further communications and discussions about Gary and Nike should go through.
Q. How did you get this document?
A. He set up -- this was off the internet. Boies Schiller's website.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE5 Auerbach - Direct

Q. Why specifically did you provide the defendant with Mr. Michaelson's bio?
A. Because that was the directive. That was what was in the memo. That's what we discussed that Andrew Michaelson should be contacted.
Q. At the time you sent this e-mail on March 18 that had this bio attached, what steps did you understand the defendant had already taken on Mr. Franklin's behalf?
A. Absolutely nothing.
Q. What was that understanding based on?
A. Because we only had one meeting and we -- I sent him the material and during a conversation between the two meetings we said we'd get together again and we'd talk and we'd strategize and Mr. Avenatti never said he did anything.
Q. What do you mean by strategize?
A. We would -- Gary, the client, myself, and Mr. Avenatti would get together and talk about what next steps and how to proceed even though the most obvious one was calling Mr. Michaelson. And we never had that.
Q. At the time you sent this e-mail on March 18, what, if anything, had the defendant told you about whether he had already reached out to Nike?
A. Nothing.
Q. At that time what was your expectation about whether Mr. Avenatti would keep you appraised of any steps he was

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE5 Auerbach - Direct

taking on behalf of Mr. Franklin?
A. Oh, fully expected that he would discuss with me and Gary what the next steps were and if he had done anything let us know.
Q. Why was that your expectation?
A. Well, it's normal course of business. It's what an attorney and a client -- what happens. But we made it clear that we would strategize and we talked about it.
Q. At that time, meaning on March 18 when you sent this e-mail, who if anyone did you expect the defendant might reach out to on behalf of Nike?
A. No -- wait, the defendant on behalf?
Q. Sorry. At Nike on \behalf\behave of -- let me withdraw it.
At the time you sent this e-mail who if anyone did you expect that the defendant would reach out to on behalf of Mr. Franklin?
A. We -- I had no expectation that he would reach out to anyone until we strategized. But if there was anyone, it would have been Andrew Michaelson.
Q. Why did you expect that the defendant might reach out to Andrew Michaelson?
A. Again, it's who John Slusher directed us to not only in my memo to the file but from John Slusher's own e-mail said feel free to contact John -- I mean Andrew Michaelson.
MR. SOBELMAN: Mr. Hamilton, can you please show the

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE5 Auerbach - Direct

witness what's marked for identification as Government Exhibit 305.
Q. Mr. Auerbach, do you recognize this?
A. Yes.
Q. What is it?
A. This is an e-mail I sent Mr. Avenatti on March 18, 2019 at 3:15 p.m. Pacific Time.
MR. SOBELMAN: Your Honor, the government offers Government Exhibit 305 for the defendant's state of mind.
THE COURT: Any objection?
MR. QUINON: None your Honor.
THE COURT: Government Exhibit 305 is received for purposes of Mr. Avenatti's state of mind.
(Government's Exhibit 305 received in evidence)
MR. SOBELMAN: May we publish?
THE COURT: Yes.
Q. Mr. Auerbach, what was the subject of this e-mail?
A. The subject is Nike USA Cal Supreme 2010-2017.
Q. What did you write in this e-mail?
A. "Michael, see attached."
MR. SOBELMAN: Mr. Hamilton, can you please display the second page of this exhibit.
Q. Mr. Auerbach, generally what does this page show?
A. This is a memorandum coversheet that highlights the California Supreme travel contracts with Nike from 2010 to

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000239

2018.
Q. At the top of the page it says privileged and confidential. Do you see that?
A. Yes.
Q. What, if anything, did you mean to communicate to the defendant by using that label?
A. To keep this strictly confidential and not share it.
Q. What, if anything, was attached to this memorandum?
A. The travel team contracts, four of them.
Q. Where did you get those contracts?
A. Gary Franklin provided them to me.
Q. Why did you send the defendant those contracts?
A. I wanted him to see what the yearly values were and all the contracts and agreements and obligations that -- financial obligations that Nike had with -- and the terms with Cal Supreme.
Q. Let's take a look at one of them.
MR. SOBELMAN: Mr. Hamilton, would you please display page 21 of this exhibit.
Q. Mr. Auerbach, would you please read the title of this document?
A. Travel team contract.
Q. In the first paragraph who is the contract between?
A. It's between California Supreme and Nike USA, Inc.
Q. In paragraph A, what time period does this contract cover?

A. This contract is between October 1, 2016 and September 30, 2017.
Q. In paragraph C, how much was Nike required to pay California Supreme each year?
A. 72,000.
Q. In paragraph E, generally what else was Nike required to give California Supreme each year?
A. This is the Nike product we talked about earlier. So it was a lot of different items, a thousand T shirts, 250 pairs of shoes, coaches shoes, all kinds of backpacks, tops, travel bags.
MR. SOBELMAN: Mr. Hamilton, could you please show the witness what's been marked for identification as Government Exhibit 306.
Give me one moment, your Honor.
THE COURT: Yes.
MR. SOBELMAN: Mr. Hamilton, if we could just go back to Government Exhibit 305 which is in evidence, page 29, please.
Mr. Hamilton if you could please just zoom in on term.
Q. Mr. Auerbach, what is this document?
A. This is the key terms offer sheet for a two-year, 2016 to 2018 deal with a second year option.
Q. To your understanding, after September 30, 2018 did Nike offer Cal Supreme a new correct?

A. They did.
Q. There was a contract after September 30, 2018?
A. (No response).
Q. Or is this the last time?
A. I'm sorry. This is the last time to the best of my knowledge.
Q. This is the last contract?
A. Yes. Yes.
MR. SOBELMAN: Mr. Hamilton, now we can take a look and show the witness what has been marked as Government Exhibit 306.
Q. Mr. Auerbach, do you recognize this?
A. Yes.
Q. What is it?
A. This is an e-mail I sent Mr. Avenatti on March 18, 2019 at 3:38 p.m. Pacific Time.
MR. SOBELMAN: Your Honor, the government offers Government Exhibit 306 for the defendant's state of mind.
THE COURT: Any objection.
MR. QUINON: No, your Honor. No objection.
THE COURT: Government Exhibit 306 is received for purposes of Mr. Avenatti's state of mind.
MR. SOBELMAN: May we publish?
THE COURT: Yes.
(Government's Exhibit 306 received in evidence)

Q. Mr. Auerbach what is the subject line of this e-mail?
A. This is Brian Bowen racketeering suit against Adidas articles and filing.
Q. Who is Brian Bowen?
A. Brian Bowen is a former elite youth basketball player who played in the Adidas league.
Q. Do you know him personally?
A. No.
Q. What did you write in this e-mail?
A. "Michael, see attached."
MR. SOBELMAN: Mr. Hamilton, can you please display the second page of this exhibit.
Q. Mr. Auerbach, what was attached to this e-mail?
A. This is the official civil racketeering claim that Brian Bowen made against Adidas.
MR. SOBELMAN: Mr. Hamilton, could you please display the third page of this exhibit.
Q. Mr. Auerbach, this is the table of contents for that complaint?
A. Yes.
Q. Did this lawsuit involve Mr. Franklin?
A. No.
Q. Did this lawsuit involve Nike?
A. No.
Q. Why did you send this document to the defendant?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page241 of 263

K239AVE5 Auerbach - Direct

A. Although there were a lot of very different elements, there were still some actions that were similar and I sent it as a background information for Mr. Avenatti.

Q. Do you know whether any of the allegations in the complaint we just looked at are true?

A. No.

Q. Did you ever tell the defendant that they were true?

A. No.

Q. Did you discuss this complaint with the defendant at any point?

A. No. We never had a chance.

MR. SOBELMAN: Mr. Hamilton, would you please show the witness what has been marked for identification as Government Exhibit 307.

Q. Mr. Auerbach, do you recognize this?

A. Yes.

Q. What is it?

A. This is an e-mail I sent Mr. Avenatti on March 18, 2019 at 3:43 p.m. Pacific Time.

MR. SOBELMAN: The government offers Government Exhibit 307 for the defendant's state of mind.

MR. QUINON: No objection.

THE COURT: Government Exhibit 307 is received for purposes of Mr. Avenatti's state of mind.

(Government's Exhibit 307 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE5 Auerbach - Direct

MR. SOBELMAN: May we publish?

THE COURT: Yes.

Q. Mr. Auerbach, what's the subject line of this e-mail?

A. Adidas basketball corruption case and other related articles.

Q. Could you please read what you wrote to the defendant above the links?

A. "Michael see attached related articles. Also below are links to the same as well. I will also bring hard copies to our meeting today."

Q. Did you attach news articles to this e-mail?

A. I did.

Q. Generally what were those news articles about?

A. They were just articles explaining the Adidas case and how Adidas youth basketball executives were found guilty and really the whole investigation.

Q. Did any of those articles reference Mr. Franklin?

A. No.

Q. Did you later give the defendant hard copies of these articles?

A. I did. I brought them to the meeting.

Q. Why did you give him hard copies of those articles?

A. Just in case -- so he had them in case he didn't receive the e-mail.

Q. Why did you send him links to these articles at all?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE5 Auerbach - Direct

A. So he could familiarize himself with the case and take what he read and see the similarities for discussion purposes down the road.

Q. Did you discuss any of these articles with the defendant at any point?

A. No. We never had the opportunity.

MR. SOBELMAN: Mr. Hamilton, could you please show the witness what's been marked for identification as Government Exhibit 308.

Q. Mr. Auerbach, do you recognize this?

A. Yes.

Q. What is it?

A. It's an e-mail I sent Mr. Avenatti on March 18, 2019 at 4:02 p.m. Pacific Time.

MR. SOBELMAN: The government offers Government Exhibit 308 for the defendant's state of mind.

THE COURT: Any objection?

MR. QUINON: None, Your Honor.

THE COURT: Government Exhibit 308 is received for purposes of Mr. Avenatti's state of mind.

(Government's Exhibit 308 received in evidence)

MR. SOBELMAN: May we publish?

THE COURT: Yes.

Q. Mr. Auerbach, what's the subject line of this e-mail?

A. Nike EYB Cal Supreme memorandum of actions and exhibits

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K239AVE5 Auerbach - Direct

3-5-2018.

Q. Would you please read what you wrote to the defendant?

A. Yes.

"Privileged and confidential.

"Michael, see attached memorandum of actions re Nike EYB-California Supreme with exhibits (same as the one we gave you at our initial meeting)."

Q. Why did you write "privileged and confidential" at the beginning of this e-mail?

A. Because this had highly sensitive and potentially damaging material attached to it and we wanted to make sure that it was confidential and not released to anyone.

Q. Who, if anyone, were you concerned would be damaged if it would be released?

A. First Nike, then Gary, and then a lot of the kids who were playing.

Q. Who do you mean by kids?

A. DeAndre Ayton, Bol Bol, Brandon McCoy and some others.

Q. Why did you refer to them as kids?

A. Well, they're minors. They are kids. They may be big kids but they're kids, so.

Q. What, if anything, was attached to this e-mail?

A. This was my 41-page memorandum of actions that we put together with all the individual actions and all the backup bank statements, texts, falsified invoices and the like.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000241

MR. SOBELMAN: Mr. Hamilton, could you please display the second page of this exhibit.

Q. Mr. Auerbach, who wrote this?
A. I did.
Q. Who was this memorandum addressed to?
A. Michael Avenatti.
Q. At the top of the page it says privileged and confidential. Why did you write that?
A. Again, just to ensure that he or anybody knew this was highly sensitive and potentially damaging material.
Q. When you say he, who do you mean?
A. Michael Avenatti.
Q. Would you please read what you wrote to the defendant?
A. Sure.

"Michael, attached is a copy of memorandum of actions document regarding Nike elite youth basketball-Cal Supreme youth basketball in connection with Nike elite players DeAndre Ayton, Bol Bol and Brandon McCoy in 2019 and 2017."

THE COURT: Sorry. What year was that?

THE WITNESS: I'm sorry. "In 2016 and 2017 with exhibits. This is the one we shared with you at our initial meeting with bank statements, texts, invoices, phone records, etc."

MR. SOBELMAN: Mr. Hamilton, could you please display the third page of this exhibit.

Q. Who wrote this document?
A. I did.
Q. Generally what is this document?
A. Again, this document details all the -- what we considered to be the actions that Gary was directed to facilitate at the forcing or the, you know, at Carlton DeBose and Jamal James' direction on behalf of Nike.
Q. Is this the same document you showed the defendant at your first meeting with him?
A. Yes.
Q. We looked at that earlier?
A. Yes.

MR. SOBELMAN: Mr. Hamilton, you can take this down.

Q. Mr. Auerbach, after sending all these e-mails to the defendant on March 18, did you meet with him on that day?
A. We did.
Q. Approximately what time did you meet with him?
A. Approximately 5 or 5:30.
Q. Where did you meet with the defendant?
A. We met with him at his highrise apartment building, the same one we had the original meeting in the conference room.

MR. SOBELMAN: Mr. Hamilton, could you please display what's in evidence as Government Exhibit 602.

Q. Mr. Auerbach, who was at that meeting?
A. It was myself, Gary Franklin and Michael Avenatti.

Q. Where in the defendant's highrise building did you meet?
A. In a conference room. Not the same one as the one before. It was a different one.
Q. Could you please tell us where you, Mr. Franklin, and the defendant were sitting?
A. Sure. Mr. Avenatti was on one side of the table. Gary was on the other. And I was at the head.
Q. Approximately how long was that meeting?
A. It was approximately 20 minutes.
Q. How did that meeting begin?
A. With a shock and revelation. With him coming in and saying: OK, guys, I'm flying to New York on a red eye tonight and I'm meeting with Nike's outside counsel at Boies Schiller and I'm going to meet with a couple of litigators who are flying in from Portland and I'm meeting with them at 12 noon in New York tomorrow and I'll call you guys after the meeting. And then he told Gary I'm going to try to get you a million dollars.
Q. I'll ask you a couple of follow-up questions but first what is a red eye?
A. Overnight flight.
Q. What was your reaction when the defendant told you he was flying to New York that evening to meet with Nike's lawyers?

MR. QUINON: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: It was absolute shock.

Q. Why were you shocked?
A. I thought we were getting together to strategize at that meeting and I had no indication, Gary had no indication that he had done anything on Gary's behalf since our first meeting.

So I was just shocked that he was doing that.

Q. Just to be clear what, if anything, had the defendant said before this meeting about strategizing with you before he reached out to Nike?
A. In our phonecall we made it clear that we were going to get together and strategize and that's why I was sending over materials to him.
Q. That was a phonecall sometime between March 10 and March 18?
A. Yes.
Q. What was the defendant's demeanor like at the meeting on March 18?
A. He was extremely rushed and harried and said he had to go pack a couple of times and really didn't want to get into anything.

I had questioned him and said: Did you call Andrew Michaelson, the one guy John Slusher said to call.

And he said: No, I didn't call Andrew Michaelson.

I said: Well, who did you call.

And he said: I called his boss, Scott Wilson.

I said, OK. You know, did you bring up Gary Franklin, did you mention Gary? And he said no.

I said: You didn't mention Gary? He said no.

I said: What did you tell them to get them to meet.

And he said: I told them you got a big fucking problem and you're going to meet with me tomorrow in New York.

Q. Are those the words he used?

A. Yes.

Q. What was his demeanor like as he was answering your questions?

A. Quick. Strong. It was just short and strong. Wanted to get -- I could tell he really didn't want to get into anything.

Q. What was your reaction when the defendant told you he called Mr. Wilson instead of Mr. Michaelson?

A. I was just shocked because we made it very clear, the whole thing had been teed up with a discussion with John Slusher who is telling us to call this guy. And whenever you go above somebody's head it's not good.

Q. Why did you think that wasn't good?

A. It's disrespectful and it's not what we had talked about. We had a clear directive.

Q. During that meeting did the defendant say what, if anything, he would try to accomplish from Mr. Franklin in his meeting with Nike's lawyers?

A. Yes. He quickly said I'm going to get you a million

dollars. I'm going to try to get you a million dollars.

Q. At that time did you understand the defendant to mean that the only thing he would pursue for Mr. Franklin was a million dollars?

A. No.

Q. Based on your conversations with the defendant and Mr. Franklin in that meeting and before that meeting, what else did you think the defendant was going to pursue on behalf of Mr. Franklin at this meeting in New York the next day?

A. Well, it was brought up that he was going to try to reestablish, get Cal Supreme back in with Nike and reestablish that relationship. And then we had talked about and assumed that he was going to discuss getting Mr. DeBose and Mr. James terminated and that he was going to bring up Gary's desire to work with them to go to report some of the incidents and behavior to the authorities.

Q. Just to be clear, at the March 18 meeting I think you said it was brought up that Mr. Avenatti would try to help Mr. Franklin rejoin Nike's program; is that correct?

A. Yes.

Q. That's one of the things that you discussed with the defendant at that meeting?

A. Yes.

Q. And with respect to the other two things you mentioned, having Mr. James and Mr. DeBose fired and Mr. Franklin working

with Nike to self-report to the authorities, were those things that you had discussed prior to that meeting with the defendant?

A. Yes.

Q. Was that at that March 5 meeting?

A. March 5 meeting and in all the correspondence, the memo to the file and other documents.

Q. Were those also topics of some of the phonecalls you would have with Mr. Avenatti?

A. Yes.

Q. At any point did Mr. Avenatti say he wasn't going to pursue the things you had asked him to pursue?

A. No.

Q. Did you share with the defendant any documents at that meeting in addition to those that you e-mailed him that we looked at?

A. Yes.

MR. SOBELMAN: Mr. Hamilton, could you please display what's marked for identification as Government Exhibit 311.

Q. Mr. Auerbach, do you recognize this?

A. Yes.

Q. What is it?

A. This is a document that I had put together. I call it a cast of characters. But it basically is a description of the Nike reporting hierarchy and all the players involved, you

know, the people involved with Cal Supreme.

Q. Did you show this document to Mr. Avenatti at the meeting on March 18?

A. I did.

MR. SOBELMAN: The government offers Government Exhibit 311 for the defendant's state of mind.

MR. QUINON: No objection.

THE COURT: Government Exhibit 311 is received for purposes of Mr. Avenatti's state of mind.

(Government's Exhibit 311 received in evidence)

MR. SOBELMAN: May we publish?

THE COURT: Yes.

Q. Mr. Auerbach, could you tell us again just generally what does this document contain?

A. It details Nike hierarchy and the reporting structure of Cal Supreme, Nike EYB and then the Nike EYB executives to Nike, Inc. It also lists the players involved in the material that we submitted and talks about the handler, talks about various people who are involved.

This was a work-in-progress document, that there are to-be-continueds and it was not completed because Mr. Avenatti called at that point and I just brought over what was complete at that point.

Q. To be clear, at the time he called this is what you had written so far?

A. Yes.

Q. And you would expect he would not call for some additional time which is why you had not completed it?

A. No. I had expected that we would -- he would call. I would bring over what we had but this was an ongoing -- there would be further meetings and we would strategize. So I didn't think this was going to be the meeting that he was going to go meet with Nike. So it's what I had.

Q. At that point, March 18, did you feel any sense of urgency with resolving Mr. Franklin's issues with Nike?

A. No.

Q. Approximately how long did you spend showing this document to the defendant?

A. We, you know, it was a 20-minute meeting so we went through it fairly quickly. It was probably about six minutes, seven minutes.

MR. SOBELMAN: Mr. Hamilton, could you please display the fourth page of this exhibit.

Q. Mr. Auerbach, generally what does this page show?

A. Again, this shows the reporting hierarchy. It shows Cal Supreme and Gary, Carlton DeBose, director of EYB, Jamal James manager of EYB. And then at Nike, Inc., the two executives who oversee Nike EYB.

Q. Why did you include this information in this document?

A. I wanted Mr. Avenatti to have a sense of who the players

were and who was involved.

Q. And just for perspective, if Mr. Slusher were to be on this diagram would he be above or below or in the middle of these Nike employees?

A. By virtue of his seniority I would think he would be above.

Q. Is that the same with Mr. Knight?

A. Yes. And I would think they would be over here.

Q. Meaning in a separate group?

A. Yeah. They're not involved in this day-to-day or even probably weekly or monthly.

MR. SOBELMAN: Mr. Hamilton, could you please display the fifth page of the exhibit.

Q. What is on this page?

A. These are questions I thought were just good questions for discussion purposes for us to ask.

Q. Who wrote these questions?

A. I did.

Q. Why did you include them in this document?

A. Again, I wanted them for discussion purposes and thought they were good questions for us to discuss.

Q. By us you're referring to?

A. Mr. Avenatti, Mr. Franklin, yes.

Q. During that meeting did you discuss these questions with the defendant?

A. No.

Q. At any point did you discuss these questions with the defendant?

A. No.

Q. At any point did you ask the defendant to find out the answers to these questions?

A. No.

MR. SOBELMAN: Mr. Hamilton, could you please display the eighth page of this exhibit.

Q. Mr. Auerbach, what's on this page?

A. This is Gary's page to be continued in the document.

Q. It says to be completed?

A. Sorry. To be completed. Yes.

Q. And again just explain to us why do some of the pages say to be completed?

A. Because it's a work in progress and there was no time, once I got the call, to meet with him, with Mr. Avenatti.

Q. And why did you include this page?

A. Everybody -- all the major players in this have a page but I had included this picture with Gary and Phil Knight.

Q. Why did you do that?

A. I just thought it was a good picture, the two of them together.

Q. What, if anything, were you trying to communicate to the defendant by including a picture of Mr. Franklin with Mr. Knight?

A. Once again, Gary has no problem with Nike, never had a problem with Nike. He's loyal. This was his home for fifteen years and he just wanted to try to reestablish that relationship and get these two bad operators out of the way.

Q. But the two bad operators you're referring to Mr. DeBose and Mr. James?

A. Mr. James, yes.

MR. SOBELMAN: Mr. Hamilton, could you please go to the ninth page of this exhibit.

Q. Mr. Auerbach, what does this page show?

A. This is a page that just highlights the effectiveness of Gary and his program with the boys in the community in South Central Los Angeles and that he's been able to put these players through the program and in the last ten years I believe he had about 120 scholarship Division I players.

Q. Who is depicted in this photograph?

A. Shaquille O'Neil, Shareef O'Neil and Gary. I'm not sure who the fourth individual is. I know he's a former player. It says Coach Coleman. But that's a mistake.

Shareef O'Neal was a player in Gary's program in the 17 elite team at the time.

MR. SOBELMAN: Mr. Hamilton, could you please display the tenth page of this exhibit.

Q. What does this page show?

A. This highlights Nike EYB executives, Carlton DeBose and

Jamal James and gives their titles.
Q. In the bottom right corner it says "major offender" for each of them.
A. Yes.
Q. Who wrote that?
A. I did.
Q. What did you mean by major offender?
A. I just wanted to delineate that these were two guys that Gary said he had the most problems with.
MR. SOBELMAN: Mr. Hamilton, could you please display the 17th page of this exhibit.
Q. Mr. Auerbach, what does this page show?
A. This shows the three players who were involved in this whole matter, DeAndre Ayton, Bol Bol, Brandon McCoy and talks about DeAndre going number one overall in the NBA draft in 2018 playing at the University of Arizona and Bol Bol projected to be a top ten pick at the time at the 2000 NBA draft and going to University of Oregon. And Brandon McCoy.
Q. I think you said 2000. Did you mean the 2019 NBA draft?
A. 2019, yes.
Q. Why did you include this page in the document?
A. Just to give Mr. Avenatti information at a top level of who these players were.
MR. SOBELMAN: Mr. Hamilton, could you please take down the exhibit.

Q. Mr. Auerbach, what, if anything, did Mr. Franklin say during the meeting on March 18 with the defendant?
A. I think -- I got the impression Gary was as shocked as I was.
MR. QUINON: Objection. Nonresponsive.
THE COURT: Sustained.
THE WITNESS: Gary said that he -- I think he thought that the million dollars was reasonable. It was a number that he and I had talked about. And he didn't say much during that meeting. I got the -- you know.
Q. What was Mr. Franklin's demeanor in that meeting?
A. Shocked.
Q. Did you understand the defendant at that point to be Mr. Franklin's lawyer?
A. Absolutely.
Q. At that point what was your expectation regarding the defendant keeping the information you provided confidential?
A. One hundred percent confidential.
Q. At that point, did you expect that the defendant would show some of the documents provided to him to Nike's lawyers?
A. Yes.
Q. Did you expect that he would share the information you provided to him with anyone else?
A. No.
Q. What steps, if any, did you take to communicate that

expectation to the defendant?
A. Well, I -- lawyer confidentiality, client privilege. But I had put privilege and confidential on every document. And the one document I believe it wasn't on, it was on the coversheet of the document and the e-mail.
Q. At that time why did you want the defendant to keep Mr. Franklin's information confidential?
A. Because it's very sensitive material and could be very damaging to the individuals, to Nike, to the kids, to Gary.
Q. In that meeting did the defendant mention anything about filing a lawsuit on behalf of Mr. Franklin?
A. No.
Q. In that meeting did you or Mr. Franklin mention anything about filing a lawsuit?
A. No.
Q. In that meeting what, if anything, did the defendant say about the urgency of resolving Mr. Franklin's issues with Nike?
A. Nothing.
Q. In that meeting what, if anything, did you or Mr. Franklin say about the urgency of resolving Mr. Franklin's issues with Nike?
A. Nothing.
Q. At that meeting did the defendant mention anything about holding a press conference?
A. Never.

Q. At that meeting did you or Mr. Franklin mention anything about holding a press conference?
A. Absolutely not.
Q. At that meeting did the defendant mention anything about an internal investigation?
A. No.
Q. At that meeting did you or Mr. Franklin mention anything about an internal investigation?
A. Nothing.
Q. At that meeting did the defendant mention anything about asking Nike to make any types of payments to him?
A. Absolutely not.
Q. At that meeting did you or Mr. Franklin mention anything about Nike making any types of payments to the defendant?
A. Never.
Q. At that meeting did you or Mr. Franklin mention anything about Nike hiring the defendant?
A. No.
Q. Did the defendant mention anything about him asking Nike to be hired?
A. Never.
Q. How did the meeting on March 18 with the defendant end?
A. Very abruptly. Mr. Avenatti said all of a sudden: OK guys I got to go pack. I'll call you after the meeting tomorrow.
Q. Would you have continued speaking with the defendant if he

had more to discuss with you?
A. Yes.
Q. In this meeting or at any other time when you communicated with the defendant did he mention whether he was working with any other person on this matter?
A. Never.
Q. Would you have wanted to know if the defendant was working with any other person?
A. Absolutely.
Q. Why would you have wanted to know if the defendant was working with some other person?
A. We were pretty meticulous in our whole approach and whoever he's going to bring in is going to be representing Gary and we wanted to -- we would have wanted to know who that's going to be and it would reflect on Gary, his case, and the goals.
Q. Would you have wanted to meet that person?
A. Absolutely.
Q. Why would you have wanted to meet that person?
A. Because we'd want to sit face-to-face and have an understanding what -- if that person is in sync with what Gary's trying to achieve here.

MR. SOBELMAN: Mr. Hamilton, could you please display what's in evidence as Government Exhibit 310R.

Q. Mr. Auerbach, looking at the bottom of the page, who wrote the text messages underneath March 18, 2019, 9:21 p.m.?

A. I did.
Q. Would you please read us those text message.
A. Sure.

"Michael, thank you, thank you. You're the best. Let me know if there's anything I can do. Go get em. Travel safe. I know. Prayer prayer."

Q. Why did you send those messages?
A. You know, although I was really shocked that he was going and that he had set all this up with no discussion, there's a point where I was happy he's moving fast but at the same time I just decided it was better to be positive and hope there for a positive outcome.
Q. At the time you sent these text messages --
A. Yes.
Q. -- did you trust the defendant?
A. I had some doubts as to why he acted out on his own and didn't call Andrew Michaelson and didn't tell us what he was doing before he was doing it. But at that point, yes, I had trusted that he was going to go to Nike and try to achieve Gary's goals and partly because I had no choice.

MR. SOBELMAN: Mr. Hamilton, could you please display the second page of this exhibit.

Q. Looking at the page under March 19, 2019 12:43 p.m. there's a text message. Who sent that?
A. I did.

Q. Could you please read the message that you sent.
A. "Hi Michael. Can we do a three-way call at 1 p.m. I just spoke with Gary."
Q. Why did you send this text message?
A. Because Gary said that Avenatti reached out to him and wanted to have a call with the three of us so I was getting back to him and saying let's do it.
Q. Did you have a three-way call that day?
A. We did.
Q. Who was on that call?
A. It was myself, Gary, and Avenatti.
Q. What did you understand the purpose of that call to be?
A. An update.
Q. In substance, what did the defendant say on that call?
A. He got on the phone and said: Hi guys, meeting went great. And Nike wants to meet again on Thursday, which this was a Tuesday. And I'll call you guys after that meeting.
Q. What did you understand "great" to mean?
A. I assumed that he laid out all Gary's --

MR. QUINON: Objection, your Honor.

THE COURT: Sustained.

Q. Mr. Auerbach, when the defendant used the word "great," what did you understand him to mean?

MR. QUINON: Same objection.

THE COURT: Yes. You've got to lay a foundation for

that understanding.
Q. Mr. Auerbach, when the defendant told you the meeting went great, did you have an understanding of what he meant at that time?
A. I did.

MR. QUINON: Same objection.

THE COURT: Yes. Sustained.

MR. SOBELMAN: One moment, your Honor.

(Counsel confer)

Q. Mr. Auerbach, based on your prior conversations and meetings with the defendant did you have an expectation about what might happen in the meeting that he was having with Nike's lawyers?
A. Yes.
Q. And did you have an expectation of what a good outcome would be versus a bad outcome for Mr. Franklin?
A. Yes.
Q. And when you heard the defendant describe the meeting as having gone, quote, great, did you have an understanding of what great meant in that conversation?
A. Yes.

MR. QUINON: Same objection, your Honor.

THE COURT: Yes. Do we need to approach on this?

MR. SOBELMAN: Yes, your Honor.

THE COURT: OK.

(At sidebar)

THE COURT: There's just no basis for him to have any understanding of what Avenatti meant by "great." None whatsoever. So that's why I'm sustaining the objection.

MR. SOBELMAN: Your Honor, the defendant has testified --

THE COURT: The defendant hasn't testified at all.

MR. SOBELMAN: Sorry. I apologize, your Honor. The witness has testified that he had discussions, several discussions in person and on the phone with the defendant about Mr. Franklin's goals and objectives.

THE COURT: But the problem is we've totally veered off from that. Avenatti says to them I'm going to try to get you a million. They don't say I'm sorry we want you to reestablish the relationship with Nike, we're actually not -- our primary thing is not really the money, we want to rebuild the relationship with Nike. In contrast, apparently all Franklin said was a million dollars, yeah, that sounds reasonable.

MR. SOBELMAN: Your Honor, respectfully, the witness did say that at the March 18 meeting they also raised reestablishing a relationship with Nike and Mr. Avenatti --

THE COURT: I've ruled.

MR. QUINON: Judge, one more thing. After the government is done can -- are you going to take the afternoon

break so I can get organized in my papers and speak to my client?

THE COURT: How much longer do you have?

MR. SOBELMAN: Probably half an hour at most.

THE COURT: So the time now is about three.

MR. QUINON: No, no, that's all right.

THE COURT: So. I'll take a break, I think.

MR. QUINON: After he's done?

THE COURT: Yes.

MR. QUINON: Thank you, Judge, appreciate it.

(Continued on next page)

(In open court)

Q. Mr. Auerbach, in substance what did you say on that call?

A. Just -- I listened mostly. I was -- when he said great, I said great. And he just said I'll talk to you guys after the Thursday meeting. I'll call you as soon as it's over.

Q. Did Mr. Franklin say anything on that call?

A. No.

Q. How did the call end?

A. Mr. Avenatti, again, said: All right, guys. I'll call you after the Thursday meeting and give you an update.

Q. On that call did the defendant say anything specific about what had happened at the meeting with Nike's lawyers that day?

A. No.

Q. On that call did the defendant explain why there would be another meeting?

A. No.

Q. On that call did you ask any questions?

A. No.

Q. Why did you not ask the defendant any questions on that call?

A. I took his word for it. He was very emphatic that it was -- it went great and they want to meet again Thursday which in my mind is very quick to have a second meeting if it wasn't great. And so I just took him at his word.

Q. And at that time did you trust the defendant to act in

Mr. Franklin's best interests?

A. Yes.

Q. Approximately how long was that call?

A. I would say four or five minutes. Five minutes, maybe.

Q. Who ended the call?

A. He did.

Q. Would you have continued speaking with the defendant if he had more to discuss with you?

A. Yes.

Q. During that call did the defendant mention anything about holding a press conference?

A. Never.

Q. During that call did the defendant mention anything about an internal investigation?

A. Never.

Q. During that call did the defendant mention anything about asking Nike to make any types of payments to him or hire him?

A. No.

Q. During that call did the defendant mention anything about the NCAA men's basketball tournament?

A. Never.

Q. During that call did the defendant mention the timing of Nike's corporate earnings announcement?

A. No.

Q. During that call did you or Mr. Franklin bring up any of

those topics?
A. Never.
Q. After your call with the defendant on March 19, when did you next have contact with the defendant?
A. He called us right after his Thursday meeting.
Q. Who was on that call?
A. It was myself, Gary Franklin and Avenatti.
Q. In substance what did the defendant say on that call?
A. It was another: Guys, the meeting went great and Nike just wants to have one more meeting on Monday to wrap things up and I'll call you after that meeting.
Q. Did the defendant describe specifically what happened at the meeting that occurred earlier that day?
A. No. No details.
Q. What, if anything, did you say on that call?
A. Again, his -- so emphatic with his "great" and the fact that they wanted to meet again on Monday I just -- I said terrific. And he said OK. Have a great weekend guys, I'll call you.
Q. What, if anything, did Mr. Franklin say on that call?
A. He said great, it's really good news and that was the end of it.
Q. How did the call end?
A. Again, Mr. Avenatti said have a great weekend and I'll talk to you after the Monday meeting.

Q. Approximately how long was that call?
A. It was probably, again, five minutes; four or five minutes.
Q. Would you have continued speaking with the defendant if he had more to discuss with you?
A. Yes.
Q. After that call on March 21 did you ever speak to the defendant again?
A. No.
Q. On that call, did the defendant mention anything about a 22-and-a-half-million-dollar settlement?
A. Absolutely not.
Q. On that call did the defendant mention anything about holding a press conference?
A. No.
Q. On that call did the defendant mention anything about an internal investigation?
A. No.
Q. On that call did the defendant mention anything about Nike -- sorry, asking Nike to make any types of payments to him or hire him?
A. Never.
Q. On that call did the defendant ask for your or Mr. Franklin's permission to publicize the information that you had provided to him?
A. Never.

Q. On that call did the defendant mention anything about posting on Twitter?
A. No.
Q. Did you or Mr. Franklin bring up any of those topics on that call?
A. No.
MR. SOBELMAN: Mr. Hamilton, can you please display what's in evidence as Government Exhibit 106.
Q. Mr. Auerbach, do you recognize this?
A. Yes.
Q. What is it?
A. This is a post by Mr. Avenatti on his Twitter page on March 21, 2019 at 3:52 p.m.
Q. Approximately when did you first see this post?
A. I saw it that day, shortly thereafter, Pacific Coast Time.
Q. Was that before or after your call with Mr. Avenatti and Mr. Franklin that day?
A. That was after the call with Mr. Avenatti and Gary.
Q. Can you please read the message on this post?
A. It says, "Something tells me that we have not reached the end of this scandal. It is likely far, far broader than imagined..."
Q. What is beneath the message?
A. There's a link that says: "College basketball corruption trial: Ex Adidas exec sentenced to nine months in prison, two

others..." and a link to the article.
Q. Did you click on that link?
A. I did.
Q. Did you read the article?
A. Yes.
Q. Generally what did the article discuss?
A. It just discussed the Adidas case and how the jury had found them guilty and they were sentenced to the prison time.
Q. At the time you first saw this post, what did you understand it to mean?
A. Again, shocked and horror. I thought it was Avenatti sending a shot across the bow to warn Nike, don't mess with me. And I just couldn't understand why if everything was great.
Q. Did the defendant consult with you before posting this message?
A. No.
Q. Was this post consistent with what you had communicated to the defendant up to that point?
A. Absolutely not.
Q. Why not?
A. It's just, again, it's negative, disrespectful and threatening and counterintuitive to everything that we were trying to do and accomplish with Nike.
Q. At that time how did you think this was inconsistent with what you were trying to accomplish for Mr. Franklin?

A. You just don't threaten people you're trying to forge and reestablish a relationship who have said nothing to give you any concern at that point.
Q. After you saw this post did you reach out to the defendant?
A. No.
Q. Why not?
A. Because he had said everything is great. I wasn't happy with it. I was concerned. But we were so close to that Monday meeting I decided not to get into it and let Monday play out. I figured this was his methodology. I didn't agree with it. And -- but that's what he's doing.
Q. At that time did you trust the defendant to act in Mr. Franklin's best interests?
A. I did but I was starting to have concerns building up and I was hoping I was wrong and we were going to get to the Monday finish line in a positive way.
Q. I'm now going to ask you some questions about that Monday, March 25, 2019. What is your understanding of what was supposed to happen that day?
A. My understanding is after two great meetings, the third meeting was going to be the closer and we were going to be closer to reaching Gary's objectives.
Q. And based on your conversations with the defendant at the meetings and calls that we have talked about, what was your expectation of what was going to be achieved for Mr. Franklin

if the Monday meeting was successful?

MR. QUINON: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: My understanding was that his objectives that we would have achieved is that Gary was going to receive some financial damages or settlement for what he had been through and his brand was harmed. First and foremost, Nike would commit to getting rid of the bad operators in Carlton DeBose and Jamal James and that Nike would agree to report with Gary some of the activities to the authorities because it was very important to Gary. And Gary and Cal Supreme would be reinstated at Nike EYBL going forward.
Q. Were you in touch with Mr. Franklin on March 25?
A. Yes.
Q. How were you in touch with Mr. Franklin?
A. By phone.
Q. In substance, what was the first thing that Mr. Franklin told you that day?
A. Mr. Franklin called me in the morning of the 25th to tell me that the FBI was on his front lawn and knocking at the door.
Q. Who, if anyone, did Mr. Franklin say that he had contacted about the FBI showing up at his house?
A. I asked him if he had called Mr. Avenatti and he said yes, I did.

MR. SOBELMAN: Mr. Hamilton, could you please show the

witness what's marked for identification as Government Exhibit 107.
Q. Mr. Auerbach, do you recognize this?
A. Yes.
Q. What is it?
A. This is a post on Twitter that Mr. Avenatti posted on March 25, 2019 at 12:16 p.m. Eastern Time.

MR. SOBELMAN: The government offers Government Exhibit 107.

THE COURT: Any objection?

MR. QUINON: No objection.

THE COURT: 107 is received.

(Government's Exhibit 107 received in evidence)

MR. SOBELMAN: May we publish?

THE COURT: Yes.
Q. Mr. Auerbach, could you please read the message that the defendant posted?
A. Sure.

"Tomorrow at 11 a.m. Eastern Time we will be holding a press conference to disclose a major high school-college basketball scandal perpetrated by Nike that we have uncovered. This criminal conduct reaches the highest levels of Nike and involves some of the biggest names in college basketball."
Q. Approximately when did you first see this Twitter post?
A. It was somewhere between 9 -- I would say 9:20 and 9:30.

Q. Pacific Time?
A. Pacific Time. I'm sorry.
Q. On March 25?
A. Yes.
Q. And Mr. Auerbach just so we're all on the same page what's the time difference between Pacific Time in California and Eastern Time here in New York?
A. Three hours later in New York.
Q. So if it was 12:16 p.m. in New York it would be 9:16 a.m. in California?
A. Yes.
Q. And that's where you were?
A. Yes.
Q. At any point did you tell the defendant that there was criminal conduct that reached the highest levels of Nike?
A. No.
Q. Was this post consistent with what you had communicated to the defendant up to that point?
A. No.
Q. Why not?
A. It's -- we discussed the highest levels of Nike EYB and it was just utter shock and horror seeing this. I just didn't understand -- if everything is great this seemed like something really bad had happened.
Q. Was this post consistent with the goals that you and

Case 21-1778, Document 61, 04/04/2022, 3290318, Page250 of 263

K239AVE5 Auerbach - Direct

Mr. Franklin had described to the defendant?
A. No. Completely opposite.
Q. Why?
A. Again, it's -- you don't threaten, you don't hold press conferences with people you're trying to forge a positive relationship with.
Q. Without telling us the substance of any communication, what, if anything, did you do after reading this post on March 25?
A. I immediately -- this was prior to me talking to Gary and I immediately texted Avenatti.
Q. As far as you know what happened next with respect to the defendant?
MR. QUINON: I'm sorry. I didn't hear that.
Q. As far as you know what happened next with respect to the defendant?
A. He got arrested.
Q. And what was your reaction -- sorry. How did you learn that he was arrested?
MR. QUINON: Objection, your Honor.
THE COURT: No. The question was how did you learn he was arrested. Are you objecting to that?
MR. QUINON: How did you learn?
THE COURT: Yes. No objection?
MR. QUINON: Well I don't know the basis for it. I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K239AVE5 Auerbach - Direct

don't know the basis of his knowledge, Judge.
THE COURT: I'll overrule the objection.
THE WITNESS: I was on the phone with Gary and we were talking and he -- this was when he was telling me that the FBI had been on his lawn and that he reached out to Mr. Avenatti and while we were on the phone he -- I guess he had CNN on and he told me turn on the TV quick, look at CNN, you're not going to believe this, Avenatti's been arrested.
Q. What was your reaction to learning that the defendant had been arrested?
MR. QUINON: Objection.
THE COURT: Sustained.
Q. Without telling us the substance of any communication, what, if anything, did you do after learning that the defendant was arrested?
MR. QUINON: Objection.
THE COURT: Overruled.
THE WITNESS: I ended up texting Avenatti right away.
Q. After sending that message did the defendant make any attempts to contact you?
A. He did.
Q. How did the defendant try to contact you?
A. Call and text after he was let go that day later.
MR. QUINON: Objection, your Honor, unless he has a basis for the -- unless he has personal knowledge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K239AVE5 Auerbach - Direct

THE COURT: Well the question was how did the defendant try to contact you. Is that the question you're objecting to?
MR. QUINON: No. I was objecting to the answer.
THE COURT: All right. So the answer after "call and text," the rest of the answer will be struck.
Q. Did you return the defendant's call?
A. No, I did not.
Q. Why not?
A. At that point I figured --
THE COURT: Wait. Wait.
MR. QUINON: Objection, your Honor.
THE COURT: Grounds.
MR. QUINON: Relevance.
THE COURT: Overruled.
THE WITNESS: At that point I figured, after what he was being accused of and what was being said on the TV that there was another attorney involved that we had never heard of and that he was arrested for allegedly extorting Nike for $25 million, I just figured there was no way he could walk back what he --
THE COURT: Sustained at this point.
THE WITNESS: OK.
Q. Mr. Auerbach, if you learned that Mr. Avenatti had threatened Nike with a press conference using information you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K239AVE5 Auerbach - Direct

provided to him would that have mattered to you?
A. Absolutely.
MR. QUINON: Objection, your Honor.
THE COURT: Sustained.
MR. QUINON: Move to strike the answer.
MR. SOBELMAN: Your Honor can we have a brief sidebar.
THE COURT: Yes.
(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000250

(At sidebar)

THE COURT: He's not the client so you really don't care whether it would have mattered to him or not. I've allowed you to ask the questions about was it consistent with the instructions because he was essentially a mouthpiece for Franklin but now you're getting into would you have wanted to know this. He's not the client. Franklin is the client. So that's why I'm sustaining the objection.

MR. SOBELMAN: Your Honor, would it be permissible in the Court's view for us to ask Mr. Auerbach based on his conversations with Mr. Franklin whether these are things that would have mattered to Mr. Franklin as Mr. Auerbach's --

THE COURT: No. Absolutely not because Franklin has testified already. So he can -- he's an adult. He can answer that question himself.

MR. SOBELMAN: I understand.

THE COURT: So, I'm not going to let you ask.

MR. SOBELMAN: Thank you, your Honor.

THE COURT: Do you have much more?

MR. SOBELMAN: We're virtually done.

THE COURT: We'll take a break after that.

MR. SOBELMAN: Could I speak with them for one moment?

THE COURT: Of course.

(Continued on next page)

(In open court)

THE COURT: We're going to take a break very shortly, ladies and gentlemen. So you won't have to wait much longer.

MR. SOBELMAN: Just a couple more questions, Mr. Auerbach.

Mr. Hamilton, could you please put back up Government Exhibit 107.

Q. Mr. Auerbach, before you saw this post did the defendant ever consult with you about whether he should hold a press conference?
A. Never.
Q. Did he ask your permission before posting this?
A. Never.
Q. Was that ever the subject of discussion in any of the calls, e-mail, or meetings that you had with him?
A. Never.

MR. SOBELMAN: No further questions, your Honor.

THE COURT: All right. So, ladies and gentlemen, we'll take our midafternoon recess. Don't discuss the case. Keep an open mind because there's more evidence and when you return we'll hear the cross-examination of Mr. Auerbach. Thank you all very much.

You can step down, Mr. Auerbach.

So we'll resume in about ten minutes.

(Recess)

(Jury not present)

THE COURT: Are we prepared to proceed?

MR. QUINON: Yes, your Honor.

THE COURT: All right. Mr. Auerbach should retake the stand.

(Pause)

THE CLERK: All rise.

(Jury present)

THE COURT: Please be seated.

Ladies and gentlemen, now you will hear the cross-examination of Mr. Auerbach.

Please proceed.

CROSS-EXAMINATION

BY MR. QUINON:

Q. Good afternoon. Good afternoon, sir.
A. Good afternoon.
Q. You and I have never met before, have we?
A. No.
Q. All right. And in preparation for your testimony here, have you met with the prosecutors and the agents in the case?
A. Yes.
Q. OK. How many times have you met with them?
A. I'm not really sure.
Q. All right. The first time was in Los Angeles?
A. Yes.

Q. And that would have been May 16th of 2019?
A. I'm not sure of the date.
Q. Do you recall if it was around the month of May the first time?
A. It could have been.
Q. All right. And at that time, do you recall where you met with them and who was present?
A. Yes. We met at my attorney's office in downtown Los Angeles, and -- let's see here, I'm trying to think -- Mr. Sobelman was there, Mr. Podolsky was there. Let's see here. Ms. Penland was there -- oh, and I think that's it, actually.
Q. OK.
A. And myself and my attorney, Mark Harrison.
Q. Your attorney was Mark Harris?
A. Yes.
Q. Who you retained for purposes of this matter?
A. Yes. Initially, yes.
Q. All right. And how long was that meeting?
A. Several hours.
Q. And when you say "several hours," was the -- roughly, what would it be?
A. I can't recall. Several hours.
Q. Three/four hours?
A. It could have been but --

Q. It could have been more?
A. No, I don't think it was more.
Q. All right. And that was not the only meeting that you had with them in Los Angeles, correct?
A. No.
Q. All right. So there was another meeting in Los Angeles?
A. Yes.
Q. And the first meeting took place where? Where did you meet? At the attorney's office, you said?
A. Yes, in downtown LA.
Q. All right. And the second meeting would have been when? November?
A. You know, I'm sorry, I can't remember.
Q. All right. Where was this second meeting when you met with the prosecutors and the agents?
A. I think it was at the same -- the same office.
Q. At your lawyer's office, Mark Harris?
A. Yes.
Q. OK. How many hours was that meeting?
A. I think it was a couple of hours.
Q. A couple of hours?
A. Yes.
Q. All right. And aside -- any other meetings in Los Angeles that I have missed?
A. Yes, one other meeting.

Q. OK. Roughly, when was that?
A. It was a couple of hours, just with Mr. Sobelman in Los Angeles.
Q. All right. So right here, based on those three meetings alone, we have approximately eight hours a meeting?
A. Six to eight hours, yes.
Q. All right. And aside from those meetings, there were additional meetings that you have had with the agents and the prosecutors in preparation for your testimony, correct?
A. Yes.
Q. What were the other meetings?
A. I came into New York and met with them here.
Q. OK. And when was that?
A. Again, the dates, I can't tell you the dates, but it was obviously before this trip.
Q. Were you here in December of 2019?
A. I don't -- I really don't recall.
Q. Right around Christmastime, December 20?
A. I don't recall. I'm sorry.
Q. Do you recall being here in New York back in January again, January 4th, 2020?
A. Yes.
Q. OK. And who did you meet on that occasion?
A. I met with Mr. Sobelman and Mr. Podolsky.
Q. And where did that meeting take place?

A. The meeting, it took place here at the Department of Justice.
Q. In your office?
A. No. No. Here in New York.
Q. New York?
A. Yes.
Q. But not in their office?
A. At their office.
Q. At their office?
A. Yes.
Q. And how long was that meeting?
A. It was probably a couple of hours.
Q. OK. And after that same month, January, do you recall meeting with them on the 26th of January?
A. No. I said I met with them in January here.
Q. How many times?
A. I'm not sure.
Q. How about in February?
A. I can't recall.
Q. As far as even yesterday, did you meet with them to discuss matters about your testimony yesterday?
A. Yes.
Q. And how long was that meeting?
A. Yesterday was about 90 minutes.
Q. 90 minutes?

A. Yes.
Q. And to be fair to you, you don't recall the number of times that you met with them, correct?
A. I don't.
Q. But what we do know, based upon just what you have told us, that it had been a number of hours?
A. Yes.
Q. All right. And, again, never met with me, never talked to me about this matter, correct?
A. Never.
Q. All right. Now, let me bring your attention to Government Exhibit 310R.

MR. QUINON: You can publish that, please, Mr. Lyon.

Q. Do you remember, the prosecutor showed you this particular exhibit?
A. Yes.
Q. And this was in relation to the meeting of March 18th of 2019, correct?
A. Yes.
Q. All right. And this is after the meeting. This text here appears to say, 7:21 p.m.

MR. QUINON: Can you enlarge that part? Thank you.

Q. Do you see that, where it says 7:21 p.m.?
A. Yes.
Q. This is you saying thank you to Mr. Avenatti. You're the

best. Let me know if there's anything I can do. Go get-em. Travel safe.

Do you see that?

A. Yes.

Q. All right. That was the only text that you exchanged with Mr. Avenatti on that particular day, March 18th of 2019?

A. No. I had -- I believe that was the date I exchanged texts confirming the meeting that we were having.

Q. OK. And insofar as this subject matter of saying goodbye to him and good luck and all that, that's the only text that you exchanged with him, correct?

A. After the meeting.

Q. That's the only one, OK.

And you're sure about that?

A. To the best of my knowledge.

Q. All right. Now, did you -- now, this text didn't come here by accident; this is something you produced as a result of a subpoena that was served upon you to produce documents, is that right?

A. Yes.

Q. And when was that subpoena served upon you?

A. I can't remember.

Q. And I take it that you provided -- among the texts that you provided, this was one of them in compliance with that subpoena, is that correct?

A. Yes.

Q. All right. And you took your obligation to provide documents pursuant to a subpoena seriously, did you not?

A. Yes.

Q. OK. And this particular text -- you can bring it down.

This particular text, did you in any way, shape or form change it or do anything to it before you produced it to the government?

A. No.

Q. You didn't touch it?

A. Nope.

Q. OK. And this is a text exchange between you and Gary Franklin, is that correct?

A. Yes.

Q. And to the best of your knowledge, Mr. Franklin also received a subpoena to produce the texts, correct?

A. Yes.

(Pause)

Q. I'm sorry. And so let me show you next -- I apologize. I made a mistake. I said Franklin. Let me just go back.

This was a text between you and Mr. Avenatti, correct?

A. Yes.

Q. OK. And this is the only text that you exchanged with Mr. Avenatti concerning this subject matter on the 18th of March, correct?

A. Which subject matter?

Q. In other words, this part says: "Michael, thank you. You're the best. Let me know if there's anything I can do. Go get-em. Travel safe."

That's the only text that you sent to that address to Mr. Avenatti on that day, correct?

A. Yes, the sendoff, yes.

Q. OK. The sendoff text.

Now, prior to producing it, again, you didn't change it, you didn't do anything to it, you didn't alter it in any way, correct?

A. No.

Q. All right.

MR. QUINON: Would you show the witness, just the witness, not the jury at this point, Defense Exhibit XX.

Q. Now, do you recognize this text? Does it refresh your recollection?

A. Yes.

Q. And this is different than the one that we just saw, correct, the Government's 310R?

A. Yes.

Q. All right.

MR. QUINON: Your Honor, I move into evidence Defense Exhibit XX?

MR. SOBELMAN: Objection.

THE COURT: Grounds?

MR. SOBELMAN: Authentication, your Honor. I don't believe we have been provided this, and I'm not sure the witness just authenticated it.

May we have a moment, your Honor?

THE COURT: Do you want to approach?

MR. SOBELMAN: May I speak with counsel?

THE COURT: Yes, you can have a moment.

MR. QUINON: OK. This is MM.

MR. SOBELMAN: May we approach briefly?

THE COURT: Yes. I'll see you at sidebar.

(Continued on next page)

(At the sidebar)

MR. SOBELMAN: Your Honor --

THE COURT: Just so the record is clear, defense counsel's Defendant's Exhibit XX also reflects text messages from, or between Mr. Avenatti and Mr. Auerbach. And this version of the text messages appears to reflect a message back from Mr. Avenatti to Mr. Auerbach, and it's something to the effect of, Appreciate it, we need to take care of Gary. I'm paraphrasing but I think that's approximately what it says.

So, Mr. Sobelman, something you want to say?

MR. SOBELMAN: Yes, your Honor. Just for the record, we have not been produced a copy of this exhibit, so we are looking at it now. We haven't had a chance to go back and reference -- it has a Bates number -- and reference whether it is in fact something we produced to the defense or not.

The witness was asked what it appears to be. He has not said that he recalls that text or authenticated it in any way. There is an authenticity objection. I think we have a hearsay objection. But if he doesn't, then we object on authenticity grounds.

If the defense wants to enter into a stipulation as to authenticity, these are things we have to work out before the testimony.

THE COURT: You said that it has a Bates number?

MR. SOBELMAN: It appears from the Bates number that

it would be something we might have produced to them, but seeing it for the first time, I don't know what the source is or whether it matches up with what we actually did produce to them.

THE COURT: Do you represent that this document was produced to you in discovery?

MR. S. SREBNICK: Yes, it has a U.S.A.O. Bates number that was produced to us by the government. And we had an understanding before that anything that was produced to us, especially if it was produced by Mr. Auerbach, that there would be no authenticity objection to it.

MR. SOBELMAN: That's similar to our understanding but not exactly what our understanding was.

Our understanding included that you would provide us in advance with anything that we would stipulate to so we could confirm its authenticity. We were not provided that opportunity.

In any event, if the witness can authenticate it, we would not object to it.

THE COURT: I think he has already indicated he recognized it, because he was asked does that refresh your recollection and he said yes.

MR. SOBELMAN: That's not my reading from the transcript.

THE COURT: Well, that's my recollection of what he

said. So, we'll find out.

The question was, does that refresh your recollection? He said yes.

MR. SOBELMAN: OK.

THE COURT: So we'll take it from there.

MR. SOBELMAN: OK. Thank you, your Honor.

(Continued on next page)

(In open court)

BY MR. QUINON:

Q. Mr. Auerbach, the document refreshes your recollection?

A. I don't know. I don't know that I've seen it this way. I only know of my document.

Q. OK.

MR. QUINON: Excuse me.

(Pause)

Q. Isn't it a fact that this is a document that Mr. Avenatti sent to you in response?

A. I haven't -- I don't know. I really don't.

MR. QUINON: Your Honor, I would move this document into evidence at this point.

MR. SOBELMAN: Objection?

MR. QUINON: I request a sidebar.

THE COURT: OK. I'll need to see a copy of the document in hardcopy form.

(Continued on next page)

(At the sidebar)

MR. QUINON: I meant to say the texts, Judge. Instead of documents, I meant texts.

THE COURT: Do we not have a hardcopy of this?

MR. SOBELMAN: The government didn't because he didn't mark it as an exhibit and neither had they.

Your Honor, we can come back to this. We are not trying to be difficult. If we can trace it back and figure out where it came from and that it is authentic, we can stipulate to that later.

THE COURT: I was just hoping that somebody can show me the documents with the Bates number on it. Can no one do that?

MR. PODOLSKY: We're trying to find it, your Honor.

(Pause)

MR. RICHENTHAL: Just to be clear, the version on our screen appears to have a Bates number. We are just having trouble figuring out what it is from because we weren't told about it. We are trying to trace it back. Our paralegal is working as hard as he can. We are going to work as fast as we can using as very little time in front of the jury.

MR. QUINON: The Bates number is right on the screen.

THE COURT: Can you show me the document?

(Indicating)

THE COURT: Do you want to take a look at this?

MR. SOBELMAN: Your Honor, we looked at it. We are trying to find the original in our productions to make sure it matches up before we stipulate to the authenticity of anything. We are not trying to be difficult. The witness could not authenticate it. We don't know the source. And, again, I doubt the cross-examination will conclude today. Immediately after court, we will take a look and reach a stipulation of authenticity with the defense and we can go from there.

THE COURT: OK. Just going on a going-forward basis, I am going to need to understand why there is a document that has a U.S. Attorney's Office Bates stamp and there is an issue about authenticity.

MR. SOBELMAN: Your Honor, a couple of reasons. One is we produced all kinds of things, some of them from some sources and not others. I don't know what source this is from. I assume we got it from Mr. Auerbach. But obviously the version we put in at least we had thought was the full version of their text messages. Had we been aware of this or it come to our attention, we would have just put it in ourselves. So now it just raises a little bit of an uncomfortable issue just to make sure we know what it is and where it is from before we stipulate to its authenticity, which, like I said, we almost certainly will do. It is difficult for us to do this on the fly for things that we are not aware of.

MR. S. SREBNICK: I'm happy to identify it.

First, the government production was on June 4, 2019. There was a folder in that production that said documents and mail, something to that effect. When you click on that folder, it has a Franklin subfolder. And then underneath the Franklin subfolder, it has a whole bunch of pdfs. Within that pdf is this Bates range that has whatever that Bates number is. We got this from the government. We haven't made this up ourselves.

MR. SOBELMAN: I'm not accusing anyone of anything. What I'm saying is we have an agreement that we are going to stipulate to authenticity. We can't do that without seeing something. The witness wasn't able to -- we will, but I think we should just come back to this. We are almost done for the day, in any event.

THE COURT: All right. This is not going to happen again. OK? This is a one-time event.

From now on, there is going to be agreement about whether something that has a U.S. Attorney's office Bates number, whether there is a authenticity issue or not. All right?

MR. SOBELMAN: Thank you, your Honor.

MR. QUINON: Judge, this is an important point for us.

THE COURT: Well, I'm sorry, sir, but we can't resolve it now.

MR. QUINON: No. I was going to suggest we are almost

at the end of the day --

THE COURT: No.

MR. QUINON: No, OK.

(Continued on next page)

(In open court)

BY MR. QUINON:

Q. Mr. Auerbach, we are going to leave this subject matter now. I'll circle back to it. I am going to go to something else at this point to make use of our time.

So you got involved in this matter sometime around February 2019, correct?

A. Which matter?

Q. The matter that you are testifying about, helping Gary Franklin.

A. No. It was 2018.

Q. 2018. I'm sorry.

A. February.

Q. Yes, you're right, 2018. OK.

And so you learned that Mr. Franklin, he tells you he was having some problems with the executives at Nike, correct?

A. Yes.

Q. And he felt that he was being bullied and that they were abusive with him, correct?

A. Yes.

Q. And even though he told you that sometime in March of 2019 -- that's when those conversations took place, correct?

A. It was February, and I had heard through the source that somebody was trying to take away his 2017 -- his '17 team in 2018.

Q. OK. And so I believe, if my memory serves me correctly, he may have come to your office March 12 of 2019, and that's when he first gave you a more expansive view of what his problems were with Nike?

A. Yes.

Q. All right. And he so you learned then in -- sometime in March in more detail that not only is he being bullied by executives from Nike, in particular or specifically, shall we say, Mr. DeBose, Carlton DeBose, as well as this other individual, Jamal James, correct?

A. Yes.

Q. All right. And you talked to him at that time, but somehow after that, for a period of months Mr. Franklin kind of didn't come back and follow the conversations, he went on with his life, and you suspected maybe he had some type of family problem or issue, shall we say?

A. No.

Q. No?

A. No.

Q. When did he come back and talk to you about the problems with Nike then?

A. We continually talked about it.

Q. OK. And the problems got heated up a little bit in the fall of 2018, did they not?

A. I can't recall. I remember continually talking to him

about it.

Q. OK. Now, you recall that when the Adidas verdict came out -- and by that I'm referring to the fact that there had been a criminal prosecution of an Adidas' executive who had been involved in the payment of money to players, correct, you knew that?

A. Yes.

Q. And that had been all over the press, correct?

A. Yes.

Q. That not only Adidas' executives but coaches and handlers had been involved, correct?

A. Yes.

Q. And the subject matter of that investigation and that prosecution was payments under the table, shall we say, right?

A. Yes.

Q. And so when that happened in the fall of 2018, Gary Franklin is concerned that he may have some criminal exposure, correct?

MR. SOBELMAN: Objection.

THE COURT: Grounds?

MR. SOBELMAN: Personal knowledge. This goes to another person's state of mind.

THE COURT: You need to rephrase the question.

MR. QUINON: I will, your Honor.

BY MR. QUINON:

Q. Gary Franklin confides in you that he's concerned about his own criminal exposure, correct?

A. No.

Q. Well, you came to that conclusion yourself?

A. I was concerned -- it didn't even dawn on him at first, and I was concerned, and then we went to see somebody to confirm it.

Q. OK. And why were you concerned? What did you see that you felt, or you came to the conclusion that maybe Gary Franklin would have some criminal exposure?

A. Some of the -- some of the actions taken in the Adidas case were similar actions. Although it was very different, the overall picture, some of these specific actions were similar.

Q. So you saw some similarity between what Mr. Franklin had done and what some of the people who got convicted had done; is that what you are saying? There were some similarities?

A. There were similarities, but until that time nobody, to our knowledge, had ever been prosecuted and convicted for those similar actions so we were totally unsure.

Q. Right. And so once the verdict came down, then it kind of was a game changer, shall we say; now you realized that this could be more serious, correct?

A. Not so much a game changer, but it really informed us on what to do next.

Q. OK. And that led to going to see a lawyer, correct?

Case 21-1778, Document 61, 04/04/2022, 3290318, Page257 of 263

K23dave6 Auerbach - cross

A. Yes.
Q. And that is -- the lawyer's name is Trent Copeland?
A. Yes.
Q. And you went to that meeting yourself?
A. With Gary.
Q. With Gary, OK.
And in addition to that that was going on and going to see Mr. Copeland about potential criminal liability, you decided, around that time, you needed to compile records and take a look for yourself as to what was happening?
A. No. I already did it. I brought the same 41-page document with me to Mr. Copeland's meeting.
Q. OK. Mr. Copeland's meeting was in January of 2019?
A. I can't remember the date, I'm sorry.
Q. All right. When did you start compiling records for your memorandum of actions?
A. It was not long after -- I would say March 2018.
Q. OK.
A. But there were different stages.
Q. How is that? Explain that for us.
A. There were discussions about it, and then there were actual compiling.
Q. OK. And these were discussions that you had with Mr. Franklin as to what you needed to compile?
A. As to all the actions and then -- then deciding what we

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave6 Auerbach - cross

needed to compile.
Q. And I take it that in order to compile that document that is 41 pages, you must have met with Mr. Franklin throughout this?
A. Yes.
Q. OK. And it required the acquisition of bank records, for example?
A. Yes.
Q. Texts that had been exchanged?
A. Yes.
Q. What other type of communications did you look into?
A. Emails, invoices, and all his correspondence with these Nike executives.
Q. OK. And when did you get it done? When did you finish that memorandum of action?
A. I believe it was in either October -- it was October/November/December. I mean, there were different drafts of it. So I think I had a draft of it in October 2018, and then by mid-December 2018 it was finished.
Q. OK. Let's take a look at that. It is Government Exhibit 312 that has been admitted.
So this is a memorandum of actions. And this is a document that you created, correct?
A. Yes.
Q. All right. And it starts with an introduction, so to

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave6 Auerbach - cross

speak, that tells you what is contained in the document, is that correct?
A. Yes.
Q. And so as you go further into the document, you go more into the details, correct?
A. Well, I go into, in a chronological way, the actions and then the detail for the actions.
Q. All right. And these were the type of actions that were kind of Mr. Franklin had been directed to do after he had been directed to do by the Nike executives, correct?
A. Yes.
Q. And Mr. Franklin, I believe you testified before, felt that, you know, it was something that he was to do or otherwise risk the sponsorship with Nike, correct?
MR. SOBELMAN: Objection.
A. I testified --
THE COURT: Sustained.
Q. Did Mr. Franklin tell you why he did what he did?
A. Yes.
Q. And what did he tell you?
A. Well, it depends which time we had the conversation. There was a great deal of remorse and a great deal of frustration because he was -- felt pressured, and his bosses were telling him to produce invoices and take some wire transfers into Cal Supreme and to pass along the money to the handlers and make

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K23dave6 Auerbach - cross

certain payments and things of that nature.
Q. All right. So I misspoke. He felt pressured to do those things, then?
A. Yes.
MR. SOBELMAN: Objection.
THE COURT: Grounds?
MR. SOBELMAN: It calls for the state of mind of another.
THE COURT: Well, could you frame the questions as what he said.
MR. QUINON: Yes.
BY MR. QUINON:
Q. Did Mr. Franklin tell you that he felt pressure by his -- by the executives at Nike to do these things?
A. Yes.
Q. All right. Now, some of the things that he was asked to do was to take money that was in the bank accounts of the California Supreme team and wire it to other people, is that correct?
MR. SOBELMAN: Objection. Lack of personal knowledge.
THE COURT: The same problem.
MR. QUINON: All right. Let me rephrase that.
BY MR. QUINON:
Q. Did Mr. Franklin confide in you that he was asked to transfer money from the bank account of the California Supreme?

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

A000257

A. Yes.
Q. And that he had done so under the direction of the Nike executives?
A. Yes.
Q. And some of the individuals that -- well, first of all, you then detailed -- the information here that appears in this document you got from Mr. Franklin, correct?
A. Yes.
Q. Because you had no personal knowledge to be able to write it of your own knowledge, correct?
A. No.
Q. All right. So in here we see that there is a falsified invoice for $60,000. Do you see that there?
A. Yes.
Q. And this is something that you learned by talking to Mr. Franklin, correct?
A. Yes.
Q. Now, that money was meant to be, according to what Mr. Franklin told you, to make payments to -- $30,000 to Melvin McDonald, do you see that?
A. Yes.
Q. And did you learn from Mr. Franklin who Melvin McDonald was?
A. Yes.
Q. And who was Melvin McDonald?

A. Melvin McDonald was a handler for DeAndre Ayton and eventually Bol Bol.
Q. When we say a handler, what exactly does that entail? What did Melvin McDonald do on behalf of those players?
A. I don't know what he did on behalf of them.

MR. SOBELMAN: Objection, your Honor. Several of the questions now have been hearsay. We thought maybe counsel would move on, but the government is going to object at this point.

THE COURT: Again, we've been over this a number of times. You are welcome to inquire of the witness what Franklin said to him.

MR. QUINON: I will, your Honor.

THE COURT: But if you don't frame the question that way, then I am going to have to sustain the objections.

MR. QUINON: I will. I apologize.

MR. SOBELMAN: Your Honor, in addition, we do object to what Mr. Franklin told him as hearsay.

THE COURT: You object to things that are in this document that you introduced in evidence?

MR. SOBELMAN: No, your Honor, of course not.

THE COURT: All right. Then I don't understand the basis for your objection.

MR. SOBELMAN: Your Honor, may we have a brief sidebar?

THE COURT: You know, we're at almost 4:25. Can we go another five minutes, please, and then I can excuse the jury and then I will hear as much as you want to say.

MR. SOBELMAN: Of course, your Honor.

THE COURT: So ask questions consistent with what I've ruled.

MR. QUINON: Yes, your Honor.

BY MR. QUINON:
Q. So Mr. Franklin told you that he had made a payment of $30,000 to Mr. Melvin McDonald, correct?
A. Yes.
Q. And Mr. Franklin, did he explain to you who Melvin McDonald was in relation to DeAndre Ayton?
A. Yes.
Q. And what did he tell you?
A. He was DeAndre Ayton's handler.
Q. OK. And did you learn from Mr. Franklin that this individual, this handler, Melvin McDonald, also was the handler for another basketball player?
A. At that time he was not.
Q. OK. Now, in addition to that, we have a $15,000 payment here to, according to what you wrote in this document, to an AAU basketball coach, Shaun Manning. Do you see that?
A. Yes.
Q. And the document says that this coach, Shaun Manning, was

the handler for Brandon McCoy?
A. Yes.
Q. Again, out of the 60,000, $10,000 then goes to Andre Ayton, who is the mother of DeAndre Ayton, according to what Mr. Franklin told you, correct?
A. Yes.
Q. And Mr. Franklin told you that he also gave $5,000 for -- that he had $5,000 for travel expenses related to DeAndre Ayton's family; that's what Mr. Franklin told you as well, correct?
A. Yes.
Q. All right. Now, that is in relation to a falsified invoice, as it says there in paragraph 2, of $60,000, correct?
A. Yes.
Q. All right. Now, some of the payments, though, were made, according to what Mr. Franklin told you, in cash, that is, U.S. currency, cash, correct?
A. Yes.
Q. So that the mother of DeAndre Ayton, according to what Mr. Franklin told you, received $10,000 in cash, correct?
A. That's what I was told.
Q. And Mr. Franklin told you that he had given her the cash himself, is that correct? Did he tell you that?
A. At Carlton DeBose's direction, he went ahead and did that.
Q. Sure. All of this was done by Coach Franklin at the

direction of the executives of Nike, correct?
A. Yes.
MR. SOBELMAN: Objection.
Q. According to what Mr. Franklin told you, correct?
A. Yes.

THE COURT: All right. We are at 4:30, ladies and gentlemen, so we are going to break for the evening. Don't discuss the case with anyone. Don't research the case. Don't do any investigation on your own.

Keep an open mind because there is more evidence, and we'll see you tomorrow morning at 9:30.

Thank you all very much.

THE CLERK: All rise.

(Continued on next page)

(Jury not present)

THE COURT: You can step down.

Please be seated.

Are there issues that we need to take up?

MR. SOBELMAN: Yes, your Honor. I just wanted to address that objection after the witness leaves the courtroom.

THE COURT: All right.

Mr. Auerbach, can I ask you to vacate the courtroom, please

THE WITNESS: Sure. I was just looking for my jacket.

(Witness not present)

MR. SOBELMAN: Thank you, your Honor.

Of course, it is more than permissible for defense counsel to ask questions about the document and why Mr. Auerbach might have written certain things in it. However, the government's concern is that the defense is attempting to prove the truth of the underlying allegations as some type of defense and trying to do so through hearsay.

THE COURT: The document is in evidence. You put it in evidence. He has every right to read the document page after page after page to the witness, if that's what he wants to do.

MR. SOBELMAN: The government completely agrees with your Honor. But the questions that were being asked were not do you see Mel McDonald listed here, do you see that, or just

reading the document. But asking about facts that were not in the document that Mr. Auerbach only learned through conversations with another person that were being offered for their truth, none of those facts were shared with the defendant.

THE COURT: Well, again, this document is in evidence, and most of his questions are focused on the document and are based on the document that the government introduced into evidence, and so I don't understand how you think I can preclude him from asking questions that are premised on the document. At least 90 percent of the questions he's asked over the last 15 minutes have been premised on this document. They haven't always been framed as "did Franklin tell you," and that's why I've sustained the objections you've made. But to the extent that defense counsel is asking Auerbach whether Franklin told him this, I don't see how you expect me to sustain the objection. There is nothing that's improper about that.

MR. SOBELMAN: Your Honor, we have two issues. The first is the relevance. None of it was communicated --

THE COURT: If the document is irrelevant, why did you put it in evidence?

MR. SOBELMAN: I'm sorry, your Honor. I'm separating the content of the document, which of course Mr. Quinon can read in full or ask the witness to, if he wishes. We have no

objection to spending time on it or reading the document.

The questions, as the government understood them, go -- almost all use a term or person or number in the document and then ask Mr. Auerbach to relate information that was not contained in the document as related to him by another person for the truth of the matter asserted and no other purpose. Those facts stated by Mr. Franklin to Mr. Auerbach, before they met with the defendant, were never relayed to the defendant.

Of course, if Mr. Quinon wants to elicit from Mr. Auerbach what he and Mr. Franklin told the defendant as they went through this document with him, that would be perfectly permissible. But we think your Honor has two grounds to keep out the type of questions to which we are objecting, and that is both hearsay and relevance. This is, in our view, a Jackson issue, where the defense is yet again trying to prove the truth of the underlying allegations as some type of defense, which it is not, and trying to do so through hearsay that is irrelevant to the defendant's state of mind.

THE COURT: We are starting to go around and around. I told you that I cannot prevent him from asking questions that are premised on the document. And, you know, if you -- I disagree with you, as I've already said. Most of the questions have been premised on the document. You keep on saying that he's trying to elicit other information. That's lost on me.

The questions -- he went through four separate

subparagraphs of the document and asked him questions based on those payments. I don't have the document on the screen anymore, but I know there was a reference to $5,000, $10,000, $15,000, $30,000. That's all in the document.

MR. SOBELMAN: Yes, your Honor. But some of the questions -- at least some of the questions, and perhaps I'm off on the number, but at least some of the questions were, for example: Mr. Auerbach, do you see $30,000 to Melvin McDonald? Tell me everything you told -- Mr. Franklin told you about Melvin McDonald.

That second part is hearsay. It's not relevant to the defendant's state of mind, and it should not be admitted. In the government's view, it doesn't matter whether Mel McDonald was mentioned in the document. They can talk about what the documents says and what Mr. Auerbach meant when he wrote it and what he communicated to the defendant about it. But asking for other information that's irrelevant to the defendant's state of mind simply because there is a reference to the person or an amount of money in the document that was shown to the defendant in the government's view is not permissible.

THE COURT: All right. What you do say, Mr. Quinon?

MR. QUINON: Judge, this is a document that was given to Mr. Avenatti. It's a document that is in evidence, given to the lawyers for Avenatti. Obviously, I need to know how this document got put together, because it's given to my client, in

order to handle the matter at hand, and so it is totally relevant, totally proper.

And I agree that on a couple of occasions I asked him questions, sloppily, not asking whether the information that went into the document had come from Mr. Franklin, but then I did, obviously at the urging of the Court, rightly so, and I toed the line. But this document is in evidence, given to the client. I am entitled to cross-examine about it and to find out whether or not that in fact is the information that Mr. Franklin told him to put there.

THE COURT: Yeah. The Assistant is saying that you're going beyond the information contained in the document. That's what he's saying.

MR. QUINON: Well, again, the state of mind of -- this is the reason why Mr. Auerbach put this document together. He was acquiring information from Gary Franklin, and so I need to know what information was gathered from Gary Franklin in order to put this document together.

THE COURT: Well, he's already said that all of the information in the document came from Gary Franklin. I think you elicited that. So we already know that everything in the document came from Mr. Franklin. You elicited from the witness that he doesn't have any personal knowledge about anything that's in the document, and he has answered your questions that all the information came from Mr. Franklin. So, I don't think

the jury is under any confusion about where the information in the document came from.

MR. QUINON: If I start asking questions about the document without framing it in the way that, you know, the information comes from Franklin, I am getting an objection from the government and then you are sustaining it. So I just want to make sure, as I go through the document -- I intend to go through the document because it is in evidence -- that I can ask questions about it. As long as I say did you get the information from Franklin that appears here, then it should be allowed because the document is in evidence. I mean, your Honor already said that.

THE COURT: Well, the document is in evidence, and its relevance is that it was provided to Mr. Avenatti. So Mr. Avenatti had access to it, and, therefore, it theoretically could have had an effect on his state of mind.

But what the assistant is saying is that to the extent you go beyond the document to elicit other material that Mr. Auerbach got from Mr. Franklin, information that was never disclosed to Mr. Avenatti, the Assistant says that's irrelevant.

MR. QUINON: Well, should I do that, if I do that, then he can object and then we take it up at the time if in fact it was not relayed to Mr. Avenatti. We don't know that yet. So, I mean, we're just going to have to kind of go

depending on how the questioning goes. I'm aware of what the Court is saying, I'm aware of what the prosecutor is saying, and I'll try to kind of stay in my lane, so to speak.

THE COURT: All right.

All right. I'm going to rule on an issue that's been opinion raised about the proffer sessions that Mr. Geragos gave.

Mike, could you give that to the court reporter.

The government has moved in limine to preclude Defendant Avenatti from introducing certain statements that Mark Geragos made in proffer sessions with the government, during which Geragos was attempting to persuade the government not to indict him. (citing the government's motion in limine brief, docket number 96, at pages 23 to 28.)

In his proffer sessions, Geragos told the government, among other things, that he had had no intent to threaten or extort Nike. Defendant argues that Geragos' statements are admissible under Federal Rule of Evidence 807.

Rule 807, in pertinent part, provides as follows, and I quote:

"Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:

"(1) the statement is supported by sufficient

guarantees of trustworthiness -- after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

"(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."

(Citing Federal Rule of Evidence 807(a))

The Second Circuit has stated that the "'residual hearsay exception [set forth in Rule 807] will be used very rarely, and only in exceptional circumstances.'" (citing United States v. Ulbricht, 858 F.3d 71, 123 (2d Cir. 2017) (quoting Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991), abrogated on other grounds by United States v. Chambers, 751 F. App'x 44 (2d Cir. 2018)).

The circumstances of Geragos' proffer were as follows. Geragos had been referenced as an unindicted co-conspirator in both the government's criminal complaint against Avenatti and in the original indictment. As I have stated in the past (see January 26, 2020 order, docket number 215, at pages 2-7), in the complaint and original indictment, the government described Geragos as a full, active, and key participant in the charged extortion conspiracies, and as a potential beneficiary of the extortion.

Accordingly, when Geragos appeared at the U.S. Attorney's Office for his proffers -- proffers that took place

after both the complaint and the original indictment were filed -- he would have understood that he faced an extremely high risk of being charged. Although the government had not identified him by name in the charging instruments, he is clearly the "CC-1" referenced in the complaint and in the original indictment, and CC-1 is described as a full, active, and significant participant in the charged extortion conspiracies. Indeed, Geragos is presented in the charging instruments as Avenatti's partner in the charged extortion conspiracies. Geragos made the first calls to Nike; he introduced Avenatti to Nike; and he participated in the meetings and telephones calls in which the alleged extortionate threats and demands were made. As set forth in the criminal complaint and the original indictment, Geragos facilitated and assisted Avenatti in presenting the latter's extortionate threats to Nike.

Given these circumstances, Geragos had an overwhelmingly strong motive to attempt to exculpate himself at these proffer sessions, and to rebut any suggestion that he and Avenatti were engaged in criminal conduct. And given that the proffer agreements that Geragos signed provided that all of Geragos' statements could be used against him, he had an overwhelmingly strong motive not to say anything that would incriminate him, or that would tend to support the conspiracy charges in the complaint and in the original indictment.

Geragos' statements thus have none of the "circumstantial guarantees of trustworthiness" which are the prerequisites for application of Rule 807. To the contrary, his statements reek of self-interest and an understandable desire to escape criminal liability.

I would also note that Geragos' statements -- which were designed to exculpate Geragos and to rebut the assertions in the complaint and in the original indictment that Geragos had an intent to extort or otherwise harm Nike -- are also not relevant here. Geragos' intent is largely irrelevant here, given that no conspiracy is charged, and that the government is not proceeding on an aiding and abetting theory, and given that the defendant has not proffered an advice of counsel defense.

Finally, as I have stated previously, while Geragos' statements are exculpatory of Geragos, certain of his statements are inculpatory of Avenatti. (See January 26, 2020 order, docket number 215, at pages 23-24).

In sum, the statements Geragos made at his proffer sessions are not admissible under Federal Rule of Evidence 807. To the extent that Avenatti contends that the statements of Geragos' counsel are admissible under Rule 807, the ruling is the same.

The government's motion in limine is granted.

All right. Are there other issues we should talk about now?

MR. SOBELMAN: None from the government, your Honor.

(Pause)

MR. H. SREBNICK: Judge, may we understand your Honor's ruling that you just read is excluding then the evidence in our defense case and that will be preserved and we don't need to raise it again?

THE COURT: Yes. The government has moved to preclude any attempt to introduce statements that Mr. Geragos made at his proffer sessions with the government. I have granted that motion, and I think you have preserved the issue for purposes of appeal.

I received a letter sometime yesterday from the defense moving to exclude certain evidence about the responsibilities of lawyers in California with respect to continuing legal education, the Multi-State Professional Responsibility Exam and so forth.

I'm sorry, but did the government respond to that, or not?

MR. RICHENTHAL: It was filed a little after midnight, your Honor. I actually haven't read it yet, although I think I understand its contours based upon prior conversations between the parties, and I'm happy to talk about it orally or respond in writing, whatever would be of greater assistance to the Court.

THE COURT: Could you get me something tomorrow

morning?

MR. RICHENTHAL: Yes, sir.

THE COURT: OK. Anything else anyone wants to raise today?

All right. Then we'll resume at 9:30. As always, if something emerges overnight, please let me know and I'll come down sooner than 9:30. Thank you.

THE CLERK: All rise.

(Adjourned to 9:30 a.m. February 4, 2020)

INDEX OF EXAMINATION

Examination of: Page

SCOTT WILSON

Cross By Mr. H. Srebnick . . . . . . . . . . . 636

Redirect By Mr. Podolsky . . . . . . . . . . . 671

Recross By Mr. H. Srebnick . . . . . . . . . . 696

JEFFREY AUERBACH

Direct By Mr. Sobelman . . . . . . . . . . . . 705

Cross By Mr. Quinon . . . . . . . . . . . . . 821

GOVERNMENT EXHIBITS

Exhibit No. Received

301 . . . . . . . . . . . . . . . . . . . . 720

602 . . . . . . . . . . . . . . . . . . . . 727

312 . . . . . . . . . . . . . . . . . . . . 733

310R . . . . . . . . . . . . . . . . . . . 753

302 . . . . . . . . . . . . . . . . . . . . 760

303 . . . . . . . . . . . . . . . . . . . . 761

304 . . . . . . . . . . . . . . . . . . . . 765

305 . . . . . . . . . . . . . . . . . . . . 774

306 . . . . . . . . . . . . . . . . . . . . 777

307 . . . . . . . . . . . . . . . . . . . . 779

308 . . . . . . . . . . . . . . . . . . . . 781

311 . . . . . . . . . . . . . . . . . . . . 790

107 . . . . . . . . . . . . . . . . . . . . 813

DEFENDANT EXHIBITS

Exhibit No. Received

OO is . . . . . . . . . . . . . . . . . . 657

TT . . . . . . . . . . . . . . . . . . . . 698

---

**CERTIFICATE OF SERVICE**

I certify that a copy of this Appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **MATTHEW D. PODOLSKY, ESQ.,** Assistant United States Attorney, One St. Andrew's Plaza, New York, New York, 10007.

Dated: New York, New York
April 4, 2022

Daniel Habib

**DANIEL HABIB**
Assistant Federal Defender