# 21-1778(L)

To argued by: **DANIEL HABIB**

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
**Docket No. 21-1778(L), 22-351(CON)**

UNITED STATES,

Appellee,

-against-

MICHAEL AVENATTI,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX FOR
DEFENDANT-APPELLANT MICHAEL AVENATTI**

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street, 9th Floor
New York, New York 10007
Tel. No.: (212) 417-8742
Attorney for Defendant-Appellant
**MICHAEL AVENATTI**

**DANIEL HABIB,**
Of Counsel

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 4

STATEMENT OF THE ISSUES........................................................... 4

STATEMENT OF THE CASE ............................................................. 5

STATEMENT OF FACTS .................................................................. 6

    A. Nike Pressures Franklin To Make Secret Payments To Amateur
       Basketball Players, Then Drops Its Sponsorship Of Franklin's
       Program And Rebuffs His Entreaties Seeking "Justice." ................. 6

    B. Auerbach And Franklin Engage Avenatti, Who Agrees To Try To
       "Get" Franklin "A Million Dollars" And "Debose And James
       Fired." ..................................................................................... 10

    C. Avenatti Demands That Nike Settle Franklin's Claims Either By
       Paying Franklin $1.5 Million And Hiring Avenatti And Geragos
       To Investigate, Or By Paying Franklin $22.5 Million...................... 17

    D. After A Jury Convicts Avenatti Of Extortion And Honest Services
       Fraud, The District Court Denies Avenatti's Motion For Judgment
       Of Acquittal And Awards Nike Restitution. ................................... 26

SUMMARY OF ARGUMENT............................................................. 28

ARGUMENT .................................................................................. 28

    I. The Evidence On All Three Counts Was Insufficient..................... 28

i

A.   Standard Of Review ..................................................29

B.   Legal And Factual Background ...................................30

C.   As To The Extortion Counts, The Evidence Was Insufficient To Prove Wrongfulness. ............................................34

D.   As To The Honest Services Fraud Count, The Evidence Was Insufficient To Prove Intent To Defraud Or A Bribe. ..............45

II.  The District Court Erred By Refusing To Give Avenatti's Proposed Jury Instructions On The Allocation Of Authority Between Attorney And Client Under California Law. ...................................48

A.   Standard Of Review ..................................................49

B.   Factual Background ....................................................49

C.   The District Court's Refusal To Give Avenatti's Proposed Charge On An Attorney's Authority Under California Law Requires Reversal. .......................................................52

III. The Restitution Order Should Be Vacated. .......................................62

A.   Standard Of Review ..................................................63

B.   Factual Background ....................................................63

C.   The District Court Lacked Authority To Award Restitution 221 Days After Sentencing. ..........................................65

D.   Nike Was Not Entitled To Attorney's Fees Because The Corporation Incurred No Other "Pecuniary Loss." ...............69

CONCLUSION ..................................................................74

# TABLE OF AUTHORITIES

## Cases

*Black v. United States*, 561 U.S. 465 (2010) ............................................................46

*Bowen v. Adidas America, Inc.*, 18 Civ. 3118 (JFA) (D.S.C.) ...............................11

*Cisek v. Nat'l Surface Cleaning, Inc.*, 954 F. Supp. 110 (S.D.N.Y. 1997)............41

*Cotchett, Pitre & McCarthy v. Universal Paragon Corp.*,
   187 Cal. App. 4th 1405 (2010) ..........................................................................42

*Dolan v. United States*, 560 U.S. 605 (2010) .................................................. *passim*

*Fowlkes v. Ingraham*, 81 Cal. App. 2d 745 (1947)............................................53, 61

*Frangie v. Boren*, 2004 WL 2698849 (Cal. Ct. App. Nov 29, 2004) ...................60

*Lagos v. United States*, 136 S. Ct. 1684 (2018) .....................................................64

*Linsk v. Linsk*, 70 Cal. 2d 272 (1969).............................................................. *passim*

*Levy v. Superior Court*, 10 Cal. 4th 578 (1995)....................................................54

*Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985) .................................................42

*Mendoza v. United States*, 623 F.2d 1338 (9th Cir. 1980).....................................42

*Moore v. Nat'l Ass'n of Secs. Dealers, Inc.*, 762 F.2d 1093 (D.C. Cir. 1985)........42

*Nellis v. Massey*, 108 Cal. App. 2d 724 (1952).....................................................54

*Osornio v. Weingarten*, 124 Cal. App. 4th 304 (2004) .........................................52

*Ramirez v. Sturdevant*, 21 Cal. App. 4th 904 (1994) .................................... *passim*

*Redsted v. Weiss*, 71 Cal. App. 2d 660 (1945) .....................................................53

*Ross v. Ross*, 120 Cal. App. 2d 70 (1953) ......................................................52, 61

*United States v. Afriyie*, 27 F.4th 161 (2d Cir. 2022) ....................................63, 70

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co., Inc.*,
   6 Cal. 5th 59 (2018) ..........................................................................................52

*Skilling v. United States*, 561 U.S. 358 (2010)................................................31, 46

*Sup. Ct. of N.H. v. Piper*, 470 U.S. 274 (1985) ..................................................42

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011)................................71, 72

*United States v. Amato*, 540 F.3d 153 (2d Cir. 2008) .............................. 65, 70, 73

*United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) .........................................73

*United States v. Cabrera*, 13 F.4th 140 (2d Cir. 2021)..........................................49

*United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981)....................................30

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022).......................................29

*United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008) ............................ 63, 65, 68

*United States v. Dove*, 916 F.2d 41 (2d Cir.1990)....................................................55

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007)............................................46

*United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021).............................................11

*United States v. Gushlak,* 728 F.3d 184 (2d Cir. 2013)....................................66, 68

*United States v. Hymas*, 584 F. App'x 361 (9th Cir. 2014) ...........................67, 68

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) ("*Jackson I*").............. *passim*

*United States v. Jackson*, 196 F.3d 383 (2d Cir. 1999) ("*Jackson II*") ..................44

*United States v. Percoco*, 13 F.4th 180 (2d Cir. 2021) ...........................................31

*United States v. Pickett*, 612 F.3d 147 (2d Cir. 2010).............................................67

*United States v. Prawl*, 168 F.3d 622 (2d Cir. 1999) ......................... 49, 52, 55, 58

*United States v. Qurashi*, 634 F.3d 699 (2d Cir. 2011) ..........................................67

*United States v. Vasquez*, 82 F.3d 574 (2d Cir.1996) ............................. 49, 55, 58

*United States v. Xue*, 2021 WL 2433857 (E.D. Pa. June 15, 2021) ...............69, 72

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022) ............................................29

*White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445 (1982) ........................................42

*Young v. Rosenthal*, 212 Cal. App. 3d 96 (1989) ..................................................61

*Zumwalt v. Hargrave*, 71 Cal. App. 2d 415 (1945)................................. 53, 58, 59

*Zurich Gen. Acc. & Liab. Ins. Co. v. Kinsler*, 12 Cal. 2d 98 (1938)......................53

**Statutes**

18 U.S.C. § 875(d)........................................................................ *passim*

18 U.S.C. § 1343 ..................................................................... 5, 27, 30, 46

18 U.S.C. § 1346 ..................................................................... 5, 27, 31, 46

18 U.S.C. § 1951 ..................................................................... 5, 27, 30, 42

18 U.S.C. § 1951(b)(2)...............................................................................30

18 U.S.C. § 3231...........................................................................................4

18 U.S.C. § 3556 ........................................................................................65

18 U.S.C. § 3663A ......................................................................................72

18 U.S.C. § 3663A(a)(1) ........................................................ 65, 69, 70, 71

18 U.S.C. § 3663A(a)(2) ........................................................ 69, 70, 71, 73

18 U.S.C. § 3663A(b)(4) .......................................................................... *passim*

18 U.S.C. § 3663A(c)(1)(A)(ii)..................................................................70

18 U.S.C. § 3663A(c)(1)(B) .................................................... 70, 71, 72

18 U.S.C. § 3664(d)(5)........................................................... 62, 65, 67, 68

iv

18 U.S.C. § 3742...................................................................................4

28 U.S.C. § 1291...................................................................................4

Cal. Code Civ. Proc. § 664.6 (1994 ed.)................................................54

**Other Authorities**

1 Witkin Cal. Proc. Attorneys § 254 (6th ed. 2022)............................54

Fortune, *Nike: 2021 Fortune 500* (Feb. 2, 2022), https://bit.ly/376QeID ...........62

Goodwin, Fed. Crim. Restitution § 10:22 (Aug. 2021 ed.)...................68

Restatement (3d) of the Law Governing Lawyers § 21(3) (2000)...................51

Restatement (3d) of the Law Governing Lawyers § 21 cmt. b (2000)............51

**Rules**

Cal. R. Prof'l Conduct 1.2(a) .........................................................54, 58

Cal. R.Prof'l Conduct 1.4.1(a)(2) .........................................................37

Cal. R. Prof'l Conduct 1.7(a) .................................................................36

Fed. R. Crim. P. 29................................................................ 27, 36, 38, 47

## INTRODUCTION

Gary Franklin needed a lawyer. The founder of an accomplished Los Angeles youth basketball program, Franklin had been coerced by Nike executives to funnel secret payments to elite amateur players and submit bogus invoices to Nike to cover up what he'd done. These same executives then replaced Franklin as coach of his best team and cancelled his program's lucrative sponsorship contract. Franklin went up Nike's corporate ladder in search of relief but came away empty-handed.

So Franklin turned to Michael Avenatti. In March 2019, Avenatti was ubiquitous on television and on Twitter, an audacious plaintiffs' lawyer unafraid to antagonize the mighty. Franklin knew that he couldn't afford Avenatti. But Franklin's friend and advisor Jeffrey Auerbach assured Franklin that there was more "at play" than money for Avenatti—there was "the opportunity to really light the next fuse (Racketeering) in the Sneaker Company Scandal." When they met, Franklin showed Avenatti abundant documentary evidence of Nike's misconduct. He told Avenatti that he wanted "justice," which meant compensation, removing the corrupt

1

executives, and cleaning up Nike's youth basketball league. Avenatti promised to try to get Franklin a million dollars and the executives fired.

So when Avenatti confronted Nike, that's what he demanded—$1.5 million for Franklin, to resolve the coach's claims for breach of contract and tortious interference with contract, and that Nike hire Avenatti and another attorney, Mark Geragos, to investigate the company's misconduct. Avenatti and Geragos demanded $15–$25 million for that work, a figure based on the rate that Nike's outside counsel would have charged. Alternatively, Avenatti said, Nike could settle with Franklin alone for $22.5 million. But if the company refused to resolve Franklin's claims, Avenatti would hold a press conference, "blow the lid" on Nike's corrupt activities, and "take billions of dollars off the company's market cap." Nike contacted the United States Attorney's Office for the Southern District of New York and recorded the rest of its communications with Avenatti. Days later, he was arrested.

A novel and unprecedented prosecution ensued. The government contended that when Avenatti asked Nike to hire him, he committed both extortion (against Nike) and honest services fraud (against Franklin). In

2

denying Avenatti's motion for judgment of acquittal, the district court accepted those contentions but neglected powerful evidence that Avenatti's demand conformed to his client's goals and would not have been effected unless his client consented. And the court ignored that both Avenatti's threat to publicize Nike's wrongdoing and his demand for compensation were lawful under controlling precedent. The result was a dramatic expansion of federal criminal law—in effect, the federalization and criminalization of the California Rules of Professional Conduct—in a domain (the regulation of the legal profession) reserved to the states.

This Court should reverse outright. In the alternative, this Court should remand for a new trial based on the district court's failure to instruct the jury, in accordance with Avenatti's request and clear California case law, on the broad discretion that an attorney enjoys to take lawful measures to further his client's objectives. In any case, Avenatti's conviction cannot stand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231, entered

judgment on July 15, 2021, and entered amended judgment on February 18,

2022. 3A.813; 4A.847.[1] Avenatti filed timely notices of appeal. 3A.821; 4A.855.

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

I.     During ongoing settlement talks, Avenatti demanded that Nike hire

him to investigate misconduct in the company's youth basketball program.

That demand aligned with Franklin's goal of removing Nike's corrupt

executives, contravened no express directive of Franklin's, could not have

been consummated without Franklin's consent, and was not a prerequisite

to settling Franklin's claims. By making that demand, did Avenatti commit

extortion and honest services fraud?

II.     California law affords an attorney "unquestioned" "authority to

---

[1] The Appendix Volumes are cited "1A," "2A," and so on. Condensed
transcript pages are cited "T." The Special Appendix is cited "SPA." Entries
on the district court docket, *United States v. Avenatti*, 19 Cr. 373 (PGG)
(S.D.N.Y.), are cited "DE."

proceed in any appropriate manner" in "achieving the client's fundamental goals." *Linsk v. Linsk*, 70 Cal. 2d 272, 278 (1969). Did the district court err in refusing Avenatti's request to instruct the jury that an attorney has "broad authority" to take "any lawful measure" that is "reasonably calculated to advance a client's objectives"?

III.    Did the district court err in ordering restitution: (A) more than 90 days after sentencing, without providing the timely notice required by *Dolan v. United States*, 560 U.S. 605, 608 (2010); and (B) to reimburse Nike for its attorneys' fees, where the company sustained no other pecuniary loss?

## STATEMENT OF THE CASE

A grand jury in the Southern District of New York returned a superseding indictment charging Avenatti with (1) transmission of interstate communications with intent to extort, 18 U.S.C. § 875(d); (2) attempted Hobbs Act extortion, 18 U.S.C. § 1951; and (3) honest services wire fraud, 18 U.S.C. §§ 1343 and 1346. 1A.72–74. A jury convicted on all three counts. 3A.703. The district court (Gardephe, J.) sentenced Avenatti to an aggregate term of 30 months and ordered restitution of $259,800.50. SPA.79; 4A.853.

5

## STATEMENT OF FACTS

A. <u>Nike Pressures Franklin To Make Secret Payments To Amateur Basketball Players, Then Drops Its Sponsorship Of Franklin's Program And Rebuffs His Entreaties Seeking "Justice."</u>

In the mid-2000s, Franklin founded California Supreme, a Los Angeles-based youth basketball program. 2A.427 (T.1520). California Supreme fielded travel teams for middle- and high-schoolers, and Franklin coached the "premiere" team, the 17-and-under squad. 2A.427–28 (T.1520–21). Program alumni went on to play Division I college basketball and in the NBA. SPA.2–3. Nike sponsored the program, providing cash, equipment, and apparel pursuant to contracts. SPA.2–3; 2A.428–29 (T.1524–25); *see* 4A.1001–29. California Supreme participated in Nike's Elite Youth Basketball League ("EYBL"), a nationwide circuit of Nike-sponsored teams. SPA.2; 1A.92 (T.189–90); 2A.430 (T.1529). For each of the 2016–17 and 2017–18 EYBL seasons, Nike paid California Supreme $72,000 (from which Franklin drew a salary of $30,000–$35,000) and supplied gear worth $120,000 more. SPA.3; 2A.429 (T.1526–28); 4A.967–75.

In 2016, Franklin's relationship with Nike began to deteriorate.

Franklin blamed Carlton Debose and Jamal James, the director and manager of Nike Elite Youth Basketball ("EYB"). SPA.3. According to Franklin, Debose and James pressured him to funnel about $100,000 to the handlers and families of top amateurs and to file phony invoices with Nike to disguise the payments. SPA.3. For example, in 2016, Debose had Franklin fly from Los Angeles to Phoenix to pay $10,000 in cash to the mother of Deandre Ayton—the first pick in the 2018 NBA Draft—and to bill Nike for a fictitious "back-to-school event" and "travel expenses." 2A.453–54 (T.1622–26); 5A.1171–81. Later, Debose and James "squeezed" Franklin "out" as coach of California Supreme's 17-and-under team. SPA.3; 2A.455 (T.1628).

In early 2018, feeling "bullied" and "mistreated," Franklin sought advice from Jeffrey Auerbach, an entertainment-industry consultant whose son Franklin had coached. SPA.3; 2A.455 (T.1627). Auerbach touted his relationship with Nike's executives, including the co-founder Phil Knight and the "de facto second in command" John Slusher, and offered to approach them on Franklin's behalf. 1A.223 (T.708; T.710); 2A.457 (T.1636–37). Franklin "want[ed] justice above all else." 2A.460 (T.1648). He wanted

Debose and James, who "had no place in youth basketball," "investigated" and "fired." SPA.4; 2A.460 (T.1648). He sought to "stop further corruption" and "prevent harm" to other coaches and players. 2A.460 (T.1648–49).

Franklin and Auerbach "strategiz[ed]" about how best to handle Franklin's "case." 1A.224 (T.713–14). Auerbach helped Franklin compile documentary evidence of Nike's misconduct—emails and texts in which Debose and James instructed Franklin to pay players and prepare false invoices, as well as bank statements reflecting the movement of money from Nike, through Franklin, to the players. SPA.8; 1A.223 (T.708); 5A.1163–1205. They discussed bringing Franklin's grievances to Nike (2A.461 (T.1652–53)), going to the FBI (2A.474 (T.1703–04)), and suing Nike(2A.482 (T.1736–38)).

In September 2018, Nike declined to renew California Supreme's contract and cut Franklin's program from the EYBL. SPA.3; 2A.430 (T.1529). In January 2019, Franklin consulted with an attorney, Trent Copeland. SPA.4. Franklin said that he was "looking for justice and restitution." 2A.469 (T.1683–84). He wanted "to be reinstated" and expected "Nike to fully indemnify [him] and California Supreme from any ... wrongdoing and pay

for all [his] legal and other related expenses." 2A.469 (T.1684; T.1686).

Franklin also intended to "inform Nike's senior management of excessive corporate corruption" by Debose and James, whom he wanted "immediately terminate[d]." 2A.469 (T.1684). And he sought institutional reform. Nike had to "cleanup and reorganize Nike EYB" and "commit to installing new management ... and procedures to prevent this abuse and criminal activity from happening in the future." 2A.469 (T.1685–86).

Auerbach approached Debose and James, but got the brush-off. 2A.472–73 (T.1697–98; T.1700). He then turned to Slusher. Franklin, Auerbach said, "wants Justice." 1A.238 (T.769); 4A.999. He "wants to help the company clean up EYB, get rid of the corruption and corrupt execs." 1A.238 (T.770); 4A.999. Slusher asked: "[W]hat does justice look like for [Franklin], firing Debose and James?" 1A.238 (T.770); 4A.999. "Yes, for starters," Auerbach replied. 1A.238 (T.770); 4A.999. Franklin also wanted "to be compensated," "to continue with Nike and get his program reestablished," and "to report ... his involvement ... to the government." 1A.238 (T.770). Slusher referred Auerbach to Nike's outside counsel, Boies

9

Schiller Flexner. SPA.5; 4A.996. Auerbach realized that Franklin "would be best served with an attorney" too. 2A.271 (T.901). Auerbach was now "force[d] ... to devise a strategy that goes after Nike." 2A.281 (T.940).

B.  Auerbach And Franklin Engage Avenatti, Who Agrees To Try To "Get" Franklin "A Million Dollars" And "Debose And James Fired."

In mid-February 2019, Auerbach suggested that Franklin engage Avenatti, whom Auerbach "had seen ... on television" and found "very effective" as a plaintiffs' lawyer. 1A.224 (T.711–12). As Auerbach knew, Avenatti had represented the adult film actress Stormy Daniels against then-President Trump and sexual assault victims of the R&B singer R. Kelly. 1A.224 (T.711); 2A.272 (T.905). Auerbach sent Franklin text messages linking to videos of Avenatti appearing on television and holding press conferences. 2A.479 (T.1724–25). Auerbach acknowledged that Franklin "can't afford" Avenatti and that even a "percentage of settlement" arrangement "won't move" him. 7A.1732. Rather, "Nike is the part that will attract an Avenatti," specifically, "the opportunity to really light the next fuse (Racketeering) in the Sneaker Company Scandal." 7A.1731–32.

As Auerbach and Franklin had discussed, the United States

10

Attorney's Office for the Southern District of New York was then pursuing criminal charges against Adidas executives for bribing amateur basketball players to attend Adidas-sponsored colleges. 1A.224 (T.714); 2A.481 (T.1733); *see United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021). By mid-February 2019, several people—one of whom, Merl Code, was a former director of Nike's youth basketball program, 2A.343 (T.1186–87)—had been convicted of wire fraud and conspiracy. *Gatto*, 986 F.3d at 112. Adidas was also defending a civil suit. Auerbach emailed Franklin a copy of a complaint filed by a former amateur player against Adidas alleging civil RICO violations and told Franklin that he had "a much better civil racketeering case." 2A.478 (T.1720–22); *see Bowen v. Adidas America, Inc.*, 18 Civ. 3118 (JFA) (D.S.C.); 4A.1031–1115. Franklin's case, Auerbach said, "was a high profile matter because ... Adidas was all over the news." 2A.273 (T.907). So there was "a lot at play here for a guy like Avenatti." 7A.1731. Auerbach was plainspoken about his reasons for picking this particular lawyer. As he later texted Franklin: "[O]nce Slusher finds out you're now with Avenatti, he'll know I'm pointing heavy artillery his way, we mean business." 2A.490

11

(T.1767). Hiring Avenatti, Auerbach testified, was like "parking a battleship 200 miles off the coast of North Korea." 2A.281 (T.941).

Auerbach and Avenatti spoke on March 1, 2019. SPA.5. Auerbach recounted how Franklin "had been directed to make cash payments to several players' families," "to falsify invoices and resubmit them to Nike," and "to receive wire payments and forward them to players' handlers." 1A.225 (T.716). Franklin "felt really terribly" and wanted to "report it to the authorities, report it to Nike." SPA.5. He hoped "to reestablish his relationship with Nike, but he wanted justice above all." SPA.5. "[J]ustice" meant making sure that Debose and James "did not hurt any other coaches and program directors." SPA.5. After the call, Auerbach emailed Avenatti to thank him, adding: "I look forward to further discussing Gary Franklin, Founder/Program Director of California Supreme Youth Basketball v. Nike Elite Youth Basketball and Nike, Inc." 4A.986. The same day, Auerbach texted Franklin: "Got to go after Nike." 2A.482 (T.1736–37).

A few days later, Avenatti contacted Mark Geragos, an attorney whom he knew to have a relationship with Nike's general counsel, to tell him: "I

got called on a very big case against Nike. This might make a lot of sense

together." SPA.6; 4A.934. Geragos agreed. SPA.6.[2]

On March 5, Auerbach and Franklin met with Avenatti in person.

SPA.6–8. The group reviewed the documentary evidence of Nike's player

payments, which Auerbach had now marshaled into a 41-page

memorandum. SPA.7–8. Franklin "understood that at some point Avenatti

might share these documents with Nike." SPA.8. He testified, however, that

he "did not want these documents to be made public," because doing so

could "potentially harm" Nike and the amateur players, and could also

damage the reputation of California Supreme and Franklin himself. SPA.8;

2A.434 (T.1546–47). Franklin didn't relay those concerns to Avenatti.

Auerbach reiterated that Franklin "wanted justice," which "[f]irst and

_____

[2] In March 2019, Avenatti owed about $11 million in civil judgments.
6A.1696–97. His law firm had been evicted from its offices for failing to pay
rent. SPA.25. The firm's office manager testified that Avenatti told her "that
he was 'working on something that could potentially provide [the firm
with] a way to ... resolve a lot of the debt that had currently been hanging
over the firm.'" SPA.25 (quoting 2A.399 (T.1405–06)). As Judge Gardephe
observed, "Avenatti's financial condition was no more than a footnote
during the proof at trial," and the officer manager "was an inconsequential
witness." DE.373:17; 3A.790.

foremost" meant "making sure that" Debose and James "were no longer at Nike EYBL. SPA.7. Again, Auerbach emphasized institutional reform: Justice meant "assisting [Nike] in any way in helping ... change the situation ... so nobody could be bullied and abused like this." 2A.314 (T.1072). Avenatti asked Franklin: "[W]hat are you looking for and what do you want?" 2A.433 (T.1541). Franklin responded: "[M]y team back, have Jamal James and Carlton Debose fired, ... some sort of restitution for what I've lost," and "[g]et me covered as ... [a] whistleblower." 2A.433 (T.1541–42). Franklin's "most important" objective was to "[g]et my team back." 2A.433 (T.1542). The group did not discuss Avenatti's compensation, his threatening to hold a press conference, his demanding that Nike hire him to conduct an internal investigation, or suing Nike. SPA.8–9.

Meanwhile, Geragos told outside counsel, Boies's Scott Wilson, that he "had been shown ... some documents ... that suggested that Nike might have an Adidas problem." 1A.95–96 (T.203–04). Geragos was on to something: Nike had been the subject of an ongoing investigation into corruption in amateur basketball by the United States Attorney's Office since September

14

2017, when, days after Code's arrest, the company received a grand jury subpoena for records. 1A.160 (T.461); 1A.211 (T.662); 1A.222 (T.704); 2A.332 (T.1141–42); 7A.1859–64. Nike agreed to meet. SPA.10.

On March 18, Auerbach and Franklin had another in-person meeting with Avenatti. SPA.10. Auerbach "walked" Avenatti "through" a PowerPoint that he had prepared entitled: "Gary Franklin, California Supreme Elite Youth Basketball v. Nike USA, Inc., Nike, Inc., Nike EYB." 1A.243 (T.789–90); 3A.626 (T.2121); 5A.1210; 7A.1865. The PowerPoint contained a "cast of characters," including Nike executives and California Supreme players and handlers (5A.1215–36), and posed three questions:

- Question 1: Is this a case of rogue executives Carlton Debose & [Jamal] James committing egregious acts on their own, or was Nike, a [F]ortune 100 company, complicit in the corruption?

- Question 2: Is Nike a company which tolerates workplace bullying and abuse by its senior executives?

- Question 3: Is Nike's enterprise, Nike EYB ("the Racket") guilty of racketeering, having committed acts of fraud, bribery, coercion, conspiracy, illegal cash payments, wire fraud, mail fraud, bank fraud, money laundering, etc.?

5A.1214; *see* SPA.11 & n.3.

15

Avenatti informed the men that he had a meeting with the next day.
SPA.11. Franklin repeated that he hoped to be reinstated, but Avenatti
tempered those hopes: "[A]fter this, I don't think they're going to let you be
back with them." SPA.12; 2A.438 (T.1561). Instead, Avenatti promised to
seek three things on Franklin's behalf— "whistleblower protection," "a
million dollars," and "to get Debose and James fired." SPA.11. Franklin
"thought that [a] million dollars was reasonable." SPA.11–12; 1A.245 (T.796).
Once again, the men did not discuss Avenatti's compensation, his
threatening to hold a press conference, or his demanding to be hired to
conduct an internal investigation. SPA.12.

Afterward, Franklin texted Auerbach to ask: "Do you think Avenatti
will ask for me to be reinstate[d] along with the settlement?" 2A.489 (T.1763–
64). Auerbach responded: "Yes, but he said he believes Nike might have an
issue reinstating you." 2A.489 (T.1764). Auerbach assured Franklin that he
would remind Avenatti to make the request—in fact, he never did—but
cautioned: "I'm just afraid he'll think he might send Nike mixed messages in
trying to come down hard, get you a million dollar settlement, and oh, by

the way, [Franklin] wants to continue with Nike." 2A.489 (T.1764–65).

Franklin allowed that reinstatement "might be a tough ask" and that he

"would much rather take the bigger settlement." 2A.489 (T.1765). Auerbach

suggested: "I say we let [t]his first round of discussions play out [Avenatti's]

way." 2A.489 (T.1766). "OK, gotcha," Franklin replied. 2A.489 (T.1766).

C.    Avenatti Demands That Nike Settle Franklin's Claims Either By
      Paying Franklin $1.5 Million And Hiring Avenatti And Geragos To
      Investigate, Or By Paying Franklin $22.5 Million.

The next day, March 19, Avenatti and Geragos met in Manhattan with

Robert Leinwand, Nike's chief litigation officer, Wilson, and a Boies

associate. SPA.10; SPA.12. Avenatti inquired whether the meeting "would be

a 408 discussion," that is, a "settlement discussion" governed by Fed. R.

Evid. 408, and Wilson agreed that it would. SPA.12–13. Avenatti said that he

represented a "whistleblower" who had information about improper

payments Nike had made to amateur basketball players and had then been

"squeezed ... out of his contract." SPA.13; 1A.97 (T.211); 2A.415 (T.1469–70).

Avenatti said that Franklin had claims against Nike for "breach of contract"

and "tortious interference with contract." 2A.335 (T.1153). Avenatti let

17

Wilson review the evidence of misconduct that Auerbach had compiled. SPA.14. Leinwand said: "I get the claims but we need to look at Nike's contract with [Franklin] before we make any decisions." 2A.419 (T.1488).

Avenatti proposed a settlement: To resolve Franklin's personal claims, Nike would pay him $1.5 million; to address Franklin's concerns about systemic corruption, Nike would hire Avenatti and Geragos to investigate Nike's amateur basketball program. SPA.13; 1A.105 (T.242–43); 1A.111 (T.267). If Nike hired another law firm to conduct the investigation, then Avenatti and Geragos "would get paid two times the fees that Nike paid to that other law firm for actually doing work." SPA.15.

As Geragos would later explain, he feared that a firm of Nike's choosing would do "nothing but a whitewash." 4A.894. Indeed, Boies had been investigating Nike's amateur basketball program since September 2017, but no employees had been terminated. 1A.160 (T.461); 2A.380 (T.1335). Nike had not disclosed to the government that payments had been made to California Supreme players, had not produced inculpatory text messages from Debose to Franklin, and had not acknowledged that the invoices

18

Franklin submitted were fake. 2A.371 (T.1298); 2A.372 (T.1300–02); 2A.373–74 (T.1307–08); 2A.378–79 (T.1326–30). The penalty provision "ensures that we'll get to the bottom of it, it's not gonna happen again." 4A.894. Wilson agreed that Nike "ha[d] an interest in conducting an internal investigation in assessing its own conduct." 1A.107 (T.249); 2A.357 (T.1241). Avenatti stressed that settlement would not prevent Franklin from speaking to the government and would "make clear that Nike is not buying ... Franklin's testimony." 2A.356 (T.1236); 2A.358 (T.1244–45); *see* 4A.978.

If Nike refused to settle, however, Avenatti promised to take Franklin's allegations public. He would "blow the lid on this scandal," which "was going to be a major scandal," and "had a reporter ... at the *New York Times* ... on call and that he could reach out to her and have her write a story at a moment's notice." SPA.13. The timing was perfect, Avenatti said. The next day was "the eve of March Madness"—the annual NCAA men's basketball tournament—and "the eve of a Nike earnings call." SPA.14–15. The publicity would "take billions of dollars off the company's market cap." SPA.14.

After the meeting, Leinwand and Wilson contacted the United States

19

Attorney's Office to report Avenatti's allegations and demands; at the government's direction, Wilson recorded the rest of his communications with Avenatti. SPA.16. Later that day, Geragos called Wilson to report that he had "convinced ... Avenatti to sit tight" and delay the press conference. 1A.113 (T.273). For his part, Avenatti spoke with Auerbach and Franklin to tell them that the "meeting went great" and that he would give them another update after meeting with Nike two days later. 1A.246 (T.801). Avenatti crowed that he had told Nike that "they have a fucking problem." 2A.439 (T.1567). Nobody objected that he had taken an inappropriate tone. 2A.491 (T.1771). Once again, Avenatti did not mention working with Geragos, threatening to hold a press conference, or asking Nike to hire him and Geragos to conduct an internal investigation. SPA.16.

The next day, March 20, Avenatti and Geragos spoke by phone with Wilson. SPA.16. Avenatti reiterated: "[W]e're gonna get a million five for our guy, and we're gonna be hired to handle the internal investigation, and if you don't wanna do that, we're done." SPA.17. He elaborated: "I'm not fucking around with this, and I'm not continuing to play games. ... You guys

20

know enough now to know you've got a serious problem, and it's worth more in exposure to me to just blow the lid on this thing." SPA.17. "A few million dollars doesn't move the needle for me," he continued, "[s]o if that's what's being contemplated, then let's just say it was good to meet you, and we're done. And I'll proceed with my press conference tomorrow." SPA.17. Avenatti expected significant pay: "[I]f you guys think that … you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, … let's just be done. … And I'll go and take ten billion dollars off your client's market cap. But I'm not fucking around." SPA.17.

Wilson sought to clarify how much Avenatti wanted for the investigation, and Avenatti pegged his demand to Boies's own rate: "[W]hat would you guys ask for, for an internal investigation of this nature? … We'll go with your quote." 4A.863–64. Wilson admitted: "Could an investigation like this hit the ten to twenty million dollar range? I suppose it could." 4A.867–68. Avenatti acquiesced: "Okay. All I'm looking for is some degree of reasonableness. That's all. And do I think it's gonna be a hundred million? No. Do I think it's gonna be nine million? No." 4A.868.

The next day, March 21, Avenatti and Geragos met with the Boies
attorneys in Manhattan. SPA.18. Avenatti presented a draft settlement
agreement, calling for a $1.5 million payment to Franklin, that would have
required Franklin's signature, in his personal capacity and on behalf of
California Supreme. SPA.18; 1A.206 (T.642); 4A.887–88; 4A.981. Wilson
didn't "think that ... one point five million dollars to settle the civil claims
will be the sticking point" and Avenatti agreed. 4A.888. As to the internal
investigation, Avenatti requested a "12 million dollar retainer upon signing.
Evergreen. ... [T]hat's gonna be deemed earned when paid, we'll cap it at 25
million dollars, minimum of 15 million dollars, unless the scope changes."
SPA.19. The investigation would encompass "payments made to players in
order to route them to various colleges, or shoe contracts, prior to them
being eligible to receive any such payments." SPA.19. As is true of all
internal investigations, it would be "up to" Nike as the "client as to whether
they want to self-disclose" any misconduct uncovered. SPA.19; 4A.894–95.
"[T]hose aren't our decisions to make," Avenatti said. SPA.19.

In preparing the Boies attorneys for the meeting, the United States

Attorney's Office had "suggested that if, in natural discussion, ... [it] came up," the Boies attorneys should "see how Avenatti would respond to accepting a lump sum payment." 2A.408 (T.1441). So Wilson asked: "Is there a way to avoid your press conference without hiring you and [Geragos] to do an internal investigation? ... If the money went higher, could we do it all under the civil settlement agreement?" 4A.895–96. "[P]erhaps," Avenatti replied, questioning "why" Nike "would wanna do that" when "they're gonna have to do an internal investigation anyway." 4A.896–97. Avenatti didn't "think it makes any sense for Nike to be paying ... an exorbitant sum of money to ... Franklin in light of his role in this." SPA.20; 4A.897.

Avenatti and Geragos left the room to confer. 4A.898. When they returned, Wilson explained that even Boies had "not done a 25 million dollar investigation for Nike," so he was "struggling with how to sell" Avenatti's proposal to his client. 4A.898–99. Avenatti retorted: "Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em? This is gonna be a major fucking scandal .... [I]f we don't figure this out, from moment one, I'm gonna be asking, why Nike

23

hasn't been indicted." SPA.20. Avenatti promised to "bring the power of my platform to bear ... to expose what the fuck is goin' on here—appropriately." SPA.20. "This is not gonna be a single press conference," he warned, "[t]his is gonna be the biggest scandal in sports in a long time." SPA.20–21.

Avenatti then addressed Wilson's proposal to resolve the case with a single lump-sum payment to Franklin: "[I]f your client wants to have one confidential settlement agreement ... and we're done, they can buy that for 22 and a half million dollars. And we're done .... [F]ull confidentiality, we ride off into the sunset." SPA.21. The district court interpreted this as Avenatti's request that Nike "simply pay him $22.5 million." SPA.42; *see also* SPA.34. That interpretation is inaccurate. Avenatti was suggesting a settlement for Franklin. That's why, after making this proposal, Avenatti retrieved the draft settlement agreement from Wilson, opened his laptop, revised the draft to replace the $1.5 million settlement figure with "[insert]," and emailed the revision to one of Geragos's associates to print fresh copies. 1A.206–07 (T.641–44); *see* 4A.898; 4A.912–23; GX–2 (video), at 44:20–1:01:15. That version, like the original, called for Franklin's signatures. 4A.981.

Wilson therefore understood "the two scenarios" that would resolve Franklin's claims: "There's the 1.5, plus the internal investigation and the parameters [Avenatti] described, or ... 22 and a half." SPA.21; 4A.905.

The parties agreed to meet once more, on March 25, but if they didn't reach a resolution, Avenatti would publicize Franklin's allegations. SPA.21. "As soon as this becomes public, I'm gonna receive calls from all over the country, from parents, and coaches, and friends, and all kinds of people, ... and they're all going to say, 'I've got an email, or text message.'" SPA.21. "And then what's gonna happen is, this will snowball. And then it will be 5 players, and then it will be 9, and then it will be 15, and then it will be 25." SPA.21. "[E]very time we get more information," he warned, "that's gonna be the *Washington Post*, the *New York Times*, ESPN, a press conference—and the company will ... incur cut after cut after cut after cut." SPA.21.

Avenatti contacted Auerbach and Franklin to tell them that "the meeting went great and Nike just wants to have one more meeting on [March 25] to wrap things up." 1A.248 (T.807). Again, Avenatti assured them that he'd taken a hard line, telling Nike: "I'm not fucking around with this."

2A.440 (T.1569); 2A.491 (T.1774). Again, nobody questioned his approach.

Avenatti didn't discuss specifics, and neither Auerbach nor Franklin asked.

1A.248 (T.807–08); 2A.440–41 (T.1569–73). Nike had not made an

counteroffer (3A.624 (T.2114)), so Avenatti did not have one to convey.

The March 25 meeting never happened. That morning, FBI agents

appeared at Franklin's home. SPA.23–24. Franklin called Avenatti, who

advised his client to turn off his phone and not to speak to them. SPA.24.

Avenatti told Franklin that he was going to "go public," then hung up before

Franklin could respond. SPA.24. Avenatti tweeted: "[Tomorrow] at 11 am

ET, we will be holding a press conference to disclose a major high

school/college basketball scandal perpetrated by [Nike] that we have

uncovered. This criminal conduct reaches the highest levels of Nike and

involves some of the biggest names in college basketball." SPA.24; 4A.954.

He was arrested outside Boies's offices a few minutes later. SPA.24.

D.    After A Jury Convicts Avenatti Of Extortion And Honest Services
      Fraud, The District Court Denies Avenatti's Motion For Judgment Of
      Acquittal And Awards Nike Restitution.

Avenatti proceeded to trial on a superseding indictment charging him

with (1) transmission of interstate communications with intent to extort, § 875(d); (2) attempted Hobbs Act extortion, § 1951; and (3) honest services wire fraud, §§ 1343 and 1346. 1A.72–74.[3] After the district court refused to give Avenatti's proposed instruction on the allocation of authority between attorney and client under California law (*see infra* § II), the jury convicted on all three counts. 3A.703. The court denied Avenatti's Fed. R. Crim. P. 29 motion for judgment of acquittal. SPA.25–46; *see infra* § I. Judge Gardephe sentenced Avenatti to 24 months on Count 1 and 30 months on Counts 2 and 3, all to run concurrently. 3A.811 (T.48); 4A.849. Seven months after sentencing, over Avenatti's objection, the court awarded Nike $259,800.50 in restitution. SPA.59–79; 4A.853; *see infra* § III.

---

[3] The superseding indictment dropped two conspiracy counts and deleted references to Geragos as an unindicted co-conspirator. *Compare* 1A.72–74 *with* DE.8. At sentencing, Judge Gardephe commented that "it has never been cogently explained why" the government's "view changed," and cited the government's lenient treatment of Geragos as grounds for a downward variance from the Guideline range: Geragos "was a central figure in the criminal conduct" and "it would not be justice for ... Avenatti to be sentenced to a nine- to eleven-year term of imprisonment when ... Geragos was not even charged." 3A.810 (T.43–44).

## SUMMARY OF ARGUMENT

The evidence did not suffice to prove that Avenatti committed a crime. His internal-investigation demand was neither wrongful, nor fraudulent, nor the solicitation of a bribe. The district court erred by refusing to give Avenatti's instructions on the "broad authority" that California law afforded him to take "any lawful measure" "reasonably calculated to advance" Franklin's objectives. The restitution order was unlawfully imposed 221 days after sentencing and improperly compensated an entity whose only pecuniary losses were attorneys' fees.

## ARGUMENT

## I.    The Evidence On All Three Counts Was Insufficient.

The government pursued novel theories of criminal liability but didn't prove them. As to the extortion counts, the evidence failed to establish wrongfulness. An investigation would have served Franklin's objectives and, in seeking to conduct one, Avenatti did not disobey any of his client's instructions or impair his client's rights, in particular because any settlement would have required Franklin's consent. More

28

fundamentally, an attorney does not commit criminal extortion by pairing a threat of economic harm with a request for compensation. As to the honest services fraud count, the evidence failed to establish Avenatti's intent to defraud or the solicitation of a bribe. Avenatti did not condition settlement of Franklin's claims on a payment for himself, and the government otherwise failed to show that Avenatti offered to take any specific action with respect to Franklin's claims in exchange for pay.

A.   <u>Standard Of Review</u>

This Court "'review[s] *de novo* challenges to the sufficiency of the evidence,' viewing 'the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility.'" *United States v. Zhong*, 26 F.4th 536, 559 (2d Cir. 2022) (quoting *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010)). This Court "must affirm the conviction so long as, from the inferences reasonably drawn, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Connolly*, 24 F.4th 821, 832 (2d Cir. 2022)

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

B.     Legal And Factual Background

1.     Section 1951 punishes obstructing commerce by "extortion," which "means the obtaining of property from another, with his consent, induced by wrongful use of ... fear." 18 U.S.C. § 1951(b)(2). Section 875(d) punishes transmitting in commerce "any threat to injure the property or reputation of the addressee" "with intent to extort." Section 875(d) also "includes an element of wrongfulness." *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999) ("*Jackson I*"). "[T]he use of fear of financial injury is not inherently wrongful." *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981). A threat of economic or reputational harm is "wrongful" only where the threat "seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim or right, or where the threat has no nexus to a plausible claim of right." *Jackson I*, 180 F.3d at 71.

Section 1343 prohibits wire communications in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." "The term 'scheme or artifice to

30

defraud' includes a scheme or artifice to deprive another of the intangible

right of honest services." § 1346. However, "[h]onest-services fraud is

carefully circumscribed, and only criminalizes bribes and kickbacks."

*United States v. Percoco*, 13 F.4th 180, 189 (2d Cir. 2021) (citing *Skilling v.*

*United States*, 561 U.S. 358, 409 (2010)).

2. Avenatti moved for judgment of acquittal at the close of the

government's case, at the close of the defense case, and post-trial. 3A.571

(T.1902); 3A.627 (T.2127); DE.291:21–29; DE.294:1–4. The district court

reserved decision on the mid-trial motions and denied the post-trial motion.

3A.573 (T.1911); 3A.575 (T.1917); 3A.3A.627 (T.2127); SPA.25–46.

As to the extortion counts, the district court concluded that Avenatti

acted wrongfully in demanding that Nike hire him to conduct an internal

investigation. SPA.31–34. "Franklin did not ask Avenatti to seek an internal

investigation of Nike," and Avenatti "never told Franklin (or Auerbach)

that he had made such a demand to Nike, much less that Avenatti had

demanded that Nike pay him and Geragos millions of dollars." SPA.32.

"Nor did Avenatti tell Franklin and Auerbach that he intended to disclose

confidential information that they had shared with him—information that could damage Franklin's reputation and that of his [b]asketball [p]rogram—with the press." SPA.32. Instead, "Avenatti repeatedly used threats of economic and reputational harm to demand millions of dollars for himself, to which he had no plausible claim of right. Avenatti used Franklin's confidential information to demand that Nike pay him $15 to $25 million, and he did so without Franklin's knowledge and to Franklin's detriment." SPA.32. Avenatti "rejected" a proposal to "resolve [his] demands simply by paying Franklin." SPA.32. The court concluded:

> [A] reasonable jury could have found that Avenatti understood that he was acting in furtherance of his own interests, that he was not pursuing Franklin's objectives, that he had not been authorized—either explicitly or implicitly—to pursue the $15 to $25 million internal investigation, and that Avenatti's demands for millions of dollars for himself had no nexus to any claim of Franklin that Avenatti reasonably believed he had been authorized by Franklin to pursue.

SPA.33.

The district court dismissed Avenatti's argument that an investigation would have advanced Franklin's goals, finding "ample evidence that Avenatti had no genuine interest in pursuing a legitimate internal

32

investigation." SPA.33. Because Avenatti's retainer would be "due upon signing and 'deemed earned when paid,'" he and Geragos "would not have to demonstrate that they performed any investigation in order to obtain the $12 million fee." SPA.33. Also, Nike would "'make[] a decision on what they want to do'" with any investigation's results, including "'stick[ing] [them] in a drawer.'" SPA.33–34. Finally, Judge Gardephe understood Avenatti to have offered Nike "'full confidentiality' if it paid him $22.5 million," after which "[t]here would be no investigation and no disclosure, and Avenatti would simply 'ride off into the sunset.'" SPA.34.

As to the honest services fraud count: Avenatti "made clear that the lion's share of any payment from Nike should go to him rather than to his client." SPA.36. "In making any settlement paid to Franklin contingent on Nike paying Avenatti millions of dollars, Avenatti acted with intent to defraud his client. And in soliciting a multi-million dollar payment from Nike for himself in exchange for settling Franklin's claims, Avenatti was proposing a quid pro quo and soliciting a bribe." SPA.37.

C.    <u>As To The Extortion Counts, The Evidence Was Insufficient To Prove</u>
<u>Wrongfulness.</u>

1.    The government failed to prove that Avenatti "[did] not have,
and cannot reasonably [have] believe[d]" that he had, a "claim of right" to
demand that Nike hire him to investigate. *Jackson I*, 180 F.3d at 71.

An investigation aligned with Franklin's objectives. For more than a
year before meeting Avenatti, Franklin had expressed a desire for "justice
above all else." 2A.460 (T.1648) (March 2018); *see also, e.g.*, 2A.460 (T.1649)
(May 2018); 2A.469 (T.1683–84) (January 2019); 4A.999 (February 2019). He
wanted Debose and James "investigated" and "fired." 2A.460 (T.1648). He
sought to have Nike "cleanup and reorganize" EYB. 2A.469 (T.1685). And
he expected Nike to foot his legal bills. 2A.469 (T.1686).

Franklin conveyed those objectives to Avenatti. Their March 5
meeting "was mostly about justice," which meant "ridding Nike EYB of the
bad actors," "working with Nike to report this to the authorities," and
"assisting them in ... helping ... change the situation." 2A.314 (T.1072). At
their March 18 meeting, Auerbach "walked" Avenatti "through" a
PowerPoint that asked whether Nike was "complicit in the corruption" of

34

Debose and James, was "a company which tolerates workplace bullying and abuse," or was "guilty of racketeering." 1A.243 (T.789–90); 5A.1214; 7A.1865. Answering those questions necessitated investigation. Before the March 19 meeting with Nike, Avenatti promised that he would "get Debose and James fired." SPA.11. That, too, would have compelled disinterested and vigorous inquiry; Boies had been investigating Nike for years, but Debose and James remained on the payroll.

Avenatti's demand contravened no directive from Franklin, who gave no instructions on how to "get Debose and James fired" or "cleanup" EYB. Auerbach and Franklin agreed to "let [the] first round of discussions" with Nike "play out [Avenatti's] way." 2A.489 (T.1766). And as discussed below (§ II.C.1), California law gives an attorney "unquestioned" "authority to proceed in any appropriate manner" in "achieving the client's fundamental goals." *Linsk*, 70 Cal. 2d at 278. Moreover, Avenatti was only engaged in talks. Any settlement would have required Franklin's signature (4A.981). And a major corporation such as Nike would not have hired a plaintiff's lawyer to investigate without securing a conflict waiver from the plaintiff.

35

*See* 3A.660 (T.2256); 3A.860 (T.2337–38); Cal. R. Prof'l Conduct 1.7(a).

The district court's denial of Avenatti's Rule 29 motion rested on multiple errors. None of the evidence that Judge Gardephe adduced supported his view that Avenatti "had no genuine interest in pursuing a legitimate internal investigation." SPA.33. True, Avenatti requested a $12 million retainer "deemed earned when paid," but he also sought a minimum fee of $15 million, so his ask necessarily contemplated earning compensation by investigating. Avenatti and Geragos discussed with Nike the mechanics of the investigation, including subcontracting for private investigators to conduct witness interviews. 1A.183–84 (T.553–54); 4A.893. It was unremarkable that Nike would decide "what they want to do" with the results of any investigation. SPA.33–34. As Leinwand testified, that is true of all internal investigations, including those at Nike: "[T]he client is always in control" of the decision "whether or not ... to self-report to any governmental agency. ... [T]he client controls the decision, not the lawyer." 2A.356 (T.1237). But Avenatti made clear that no settlement would bar Franklin from speaking with law enforcement. And it is just not correct that

36

Avenatti would have abandoned the investigation if Nike "paid him" $22.5 million. SPA.34. That payment was for Franklin, which is why Avenatti revised the draft settlement agreement so that Nike could insert a larger settlement amount. Franklin might have preferred that alternative; indeed, Avenatti's internal-investigation demand, even if insincere, can be seen as a bargaining tactic deployed to elicit a larger offer for his client.

The district court also erred by inferring wrongfulness from the fact that Franklin "did not ask Avenatti to seek an internal investigation of Nike, and ... Avenatti never told Franklin (or Auerbach) that he had made such a demand." SPA.32. Franklin did not give Avenatti any specific directions about how to approach Nike, and for his part, Avenatti was not obliged to give Franklin a blow-by-blow account of talks that had not yet yielded an offer. *See* 3A.624 (T.2114). Rule 1.4.1(a)(2) of the California Rules of Professional Conduct only requires an attorney to communicate the terms of a "written offer of settlement." Many attorneys refrain from discussing with their clients the details of inchoate settlement talks in order to avoid creating unrealistic expectations. Had Nike made an offer, Avenatti would have

37

communicated its terms to Franklin when obtaining his signature.

Judge Gardephe erred, too, by divining wrongfulness from Avenatti's failure to share with Franklin his threat to "disclose" Franklin's "confidential information" to "the press." SPA.32. To be sure, Avenatti disclosed that information to Nike, but Franklin expected him to do so (SPA.8)—how could Avenatti have attempted to settle his client's claims otherwise? And the government conceded that Avenatti hadn't "breached [his] duty of loyalty or confidentiality by showing" Nike evidence of player payments. 3A.598 (T.2009–10). Nor did Avenatti breach Franklin's confidentiality by threatening—but not holding—a press conference. Hard bargaining often entails making threats one doesn't intend to execute. Even Avenatti's March 25 tweet (4A.954) didn't identify Franklin, his program, his players, or any information that Franklin had shared with his attorney. Finally, the district court wrongly found that Avenatti made settlement of Franklin's claims "contingent" on an internal investigation. SPA.23; SPA.37. Nike could have resolved Franklin's claims by paying him $22.5 million.

2.    The district court's denial of Avenatti's Rule 29 motion, like the

government's theory of prosecution, rested on a more fundamental mistake:

Even if Avenatti was acting out of self-interest and had no intention of

conducting a real investigation—so that his demand was, in essence, a

request for his own fees—that did not make it wrongful for purposes of the

federal criminal extortion statutes. An attorney may negotiate fees for

himself at the same time as he negotiates a settlement for his client. *See, e.g.,*

*Ramirez v. Sturdevant*, 21 Cal. App. 4th 904, 923–25 (1994). Doing so may

present a conflict of interest, violate the attorney's ethical obligations, or

result in an inequitable settlement. The law has mechanisms available to

address those hazards, such as judicial review of settlements and attorney

disciplinary proceedings. But the novel theory of prosecution pursued

below instead weaponizes federal criminal law to enforce the rules of ethics.

Under *Jackson I*, it was not extortionate for Avenatti to threaten to

hold a press conference publicizing misconduct relating to California

Supreme unless Nike agreed to resolve Franklin's claims. *See* 180 F.3d at 67

(not "wrongful" for "the purchaser of an allegedly defective product" to

"threaten to complain to a consumer protection agency or bring suit in a

public forum if the manufacturer does not make good on its warranty"). In the district court's estimation, however, Avenatti's conduct became unlawful when he added the internal-investigation demand because he was then "acting in furtherance of his own interests" rather than "pursuing Franklin's objectives." SPA.33. That was mistaken. An attorney's simultaneous negotiation of relief for his client and his own fees is not unlawful despite the conflict of interest that may result.

In *Ramirez*, which supplies the governing law (3A.680 (T.2336)), the California Court of Appeal addressed the settlement of a wrongful-termination claim in which the plaintiff's attorney negotiated a $150,000 recovery for his client and $215,000 in fees for himself. 21 Cal. App. 4th at 912. The Court of Appeal first noted that the attorney's "bifurcated" approach—settling both the client's recovery and his own fees—was not "prohibited," even though it was not "specifically authorize[d]" by the retainer. *Id.* at 922. *Ramirez* saw "no reason why, in an appropriate case, an attorney should not bifurcate a settlement" and "conceive[d] of situations where a bifurcated approach should be taken even over the client's

40

objection, at least when the client's interests are in fact being represented." *Id.* The Court of Appeal then held that even though the "dual negotiations" created an "inherent conflict," the settlement was not "necessarily invalid[]." *Id.* at 924. Instead of automatic invalidation, *Ramirez* substituted a rule mandating judicial review of such settlements. *Id.* at 924–25.

Other decisions accord. In *Cisek v. Nat'l Surface Cleaning, Inc.*, 954 F. Supp. 110, 110–11 (S.D.N.Y. 1997), Judge Kaplan approved a settlement resulting where plaintiffs' counsel had negotiated fees exceeding the clients' recovery. *Cisek* observed that counsel "had an inherent conflict of interest in that they reasonably should have perceived that every dollar the defendants agreed to pay them was a dollar that defendants would not pay to the plaintiffs." *Id.* at 110. However, Judge Kaplan explained, "a flat prohibition on settlements in which the defendants' total exposure— including both relief and attorney's fees—is fixed or capped would no doubt discourage settlements, which would be an undesirable result." *Id.* at 111. Like *Ramirez*, *Cisek* concluded that the remedy for settlements potentially affected by such conflicts is not invalidation but "careful"

41

judicial "scrutiny." *Id. See also, e.g.*, *White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 453 n.15 (1982); *Moore v. Nat'l Ass'n of Secs. Dealers, Inc.*, 762 F.2d 1093, 1104 (D.C. Cir. 1985); *Malchman v. Davis*, 761 F.2d 893, 904–05 (2d Cir. 1985); *Mendoza v. United States*, 623 F.2d 1338, 1352–53 (9th Cir. 1980) (all rejecting *per se* rules barring simultaneous negotiation of relief and attorneys' fees).

The law is not indifferent to the ethical and equitable concerns that such settlements present. Judicial review for fairness is one remedial tool. *Ramirez*, 21 Cal. App. 4th at 925. Attorney disciplinary proceedings are another. *See, e.g.*, *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.*, 187 Cal. App. 4th 1405, 1420 (2010). But treating as wrongful and criminally extortionate any settlement demand that benefits an attorney would work an unprecedented and unwarranted expansion of the federal extortion statutes. So construed, §§ 875(d) and 1951 would raise vagueness concerns. *See* DE.291:28. And by recasting attorney misconduct as federal crime, the decision below invades the states' prerogatives to regulate their bars. *E.g.*, *Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 283 n.16 (1985).

Put in *Jackson I*'s terms: Because the law permitted Avenatti to

negotiate fees for himself at the same time as he negotiated a settlement for Franklin, *see Ramirez*, 21 Cal. App. 4th at 922, 924–25, his internal-investigation demand—even if construed as a bald request for fees—sought "money" to which he possessed, or at least could reasonably have believed himself to possess, a "claim of right." 180 F.3d at 71. The size of Avenatti's demand was irrelevant. The district court instructed the jury that wrongfulness did not "turn on the precise amount of money that ... Avenatti was demanding." 3A.678 (T.2330). Indeed, the government was unabashed about the breadth of its position: "[T]he amount doesn't matter. It would have been extortion even if all [Avenatti] asked for was a million dollars. ... It's extortion if it's anything." 2A.369 (T.1288–89). So, on the government's theory, an attorney who (i) threatens to publicize a defendant's contractual breach or tortious conduct unless the defendant settles (lawful under *Jackson I*), and (ii) seeks attorneys' fees in the settlement (lawful under *Ramirez*) has attempted Hobbs Act extortion. Federal criminal law is not so boundless.

      3.    The government also failed to prove that Avenatti's "threat" to

hold a press conference publicizing Nike's misconduct had "no nexus to a plausible claim of right." *Jackson I*, 180 F.3d at 71. To the contrary, Avenatti promised to disclose the very facts that gave rise to Franklin's claims—the corrupt payments, directed by Nike executives, that cost Franklin his team and California Supreme its contract. His threat paralleled those that *Jackson I* deemed lawful—a consumer's threat to disclose a manufacturer's defective product, a club's threat to post a list of members delinquent on dues. 180 F.3d at 70. In each scenario, the requisite nexus exists because the threatener discloses the factual grounds for the claim.

The district court perceived no nexus between "Avenatti's demands for millions of dollars for himself" and Franklin's claims, SPA.33, but that muddled the analysis. *Jackson I* requires a nexus between the *threat* and the claim, not the *demand* and the claim. 180 F.3d at 71 ("[W]here the threat has no nexus to a plausible claim of right, the threat is inherently wrongful."); *see also United States v. Jackson*, 196 F.3d 383, 387 (2d Cir. 1999) ("*Jackson II*") (Section 875(d) "prohibits obtaining money ... from another by use of threats only if ... there is no nexus between the threat and the defendant's claim").

44

That nexus existed here because a press conference would have aired the misconduct that spawned Franklin's contract and tort claims. In any case, the internal-investigation demand did relate to those claims: An investigation aimed to uncover and remediated the illicit system of secret payments and influence-peddling that led to Franklin's ouster. Nor was the price tag implausible. The quote came from Wilson, not Avenatti, who ballparked Boies's rate at $10–$20 million. 4A.867–68.

D.    As To The Honest Services Fraud Count, The Evidence Was Insufficient To Prove Intent To Defraud Or A Bribe.

For the same reasons that the government failed to prove wrongfulness, the government also failed to prove that Avenatti intended to defraud Franklin. *See supra* § I.C. An investigation conformed to Franklin's stated goals of obtaining justice, removing Debose and James, cleaning up EYB, and receiving reimbursement from Nike for his legal expenses. Avenatti's demand disobeyed no instruction of Franklin's, and no settlement could have been reached without Franklin's consent. The district court erred in finding that Avenatti made "any settlement paid to Franklin contingent on Nike paying" him, because the $22.5 million settlement had

45

no such term. Construing §§ 1343 and 1346 to criminalize Avenatti's conduct just because he sought (and failed to disclose that he was seeking) personal benefit would raise vagueness concerns. *See Skilling*, 561 U.S. at 408; *see also Black v. United States*, 561 U.S. 465, 469, 474 (2010) (under *Skilling*, error to instruct jury "that a person commits honest services fraud if he 'misuse[s] his position for private gain for himself ... ' and 'knowingly and intentionally breache[s] his duty of loyalty'").

Independently, the government failed to prove that Avenatti solicited a bribe, which "requires some specific quid pro quo," that is, a "specific ... action in return for the payment or benefit." *United States v. Ganim*, 510 F.3d 134, 149 (2d Cir. 2007). Midtrial, the district court acknowledged as much. Avenatti requested an instruction that would have required the jury to find that in soliciting a bribe, he offered to take action "favorable to Nike." 3A.610 (T.2059). The court refused, instead charging that Avenatti need only have offered to take action that "[h]e believed would allow Nike to avoid harm." 3A.621 (T.2101); *see* 3A.681 (T.2341–42). Judge Gardephe explained that Avenatti's proposal "just doesn't fit the facts of this case. He wasn't

offering to take action favorable to Nike. He was offering to take action that would allow Nike to avoid harm, in other words, the press conference at which its alleged misconduct would be disclosed." 3A.621 (T.2102).

In denying the Rule 29 motion, the district court changed gears, now finding that Avenatti had "solicit[ed] a multi-million dollar payment for himself in exchange for settling Franklin's claims." SPA.37. Judge Gardephe had it right the first time around. Avenatti made no such offer, for the simple reason that he could not "settl[e] Franklin's claims"—only Franklin could do that. Perhaps, the government could have proceeded on a theory that Avenatti offered to exercise his influence in Nike's favor, for example, by understating to Franklin the value of his claims or urging him to accept a suboptimal settlement. But the government offered no evidence that Avenatti did. If anything, he inflated the value of Franklin's claims, promising his client "a million dollars" for the breach of a $192,000 contract. The government never specified what action Avenatti promised to take with respect to Franklin's claims if Nike hired him, let alone proved an action.

Forbearing to hold a press conference did not suffice. As Avenatti

47

pointed out below (3A.621 (T.2102)), wrongfully demanding payment in exchange for refraining from inflicting economic and reputation harm is extortion, and the government could not repackage that allegation as honest services fraud. In addition, under the jury instructions, the action that Avenatti promised had to "breach[] the fiduciary duty he owed Franklin." 3A.681 (T.2341). That would not have been true of not holding a press conference; to the contrary, the government argued that Avenatti would have breached if he had gone to the media.

## II. The District Court Erred By Refusing To Give Avenatti's Proposed Jury Instructions On The Allocation Of Authority Between Attorney And Client Under California Law.

As the district court recognized, "whether Franklin had authorized Avenatti to seek as part of a settlement with Nike 15 to 25 million for himself to conduct an internal investigation" was "the central question in this case." 1A.202 (T.626). Avenatti proposed jury instructions describing the "broad authority" that California law gives an attorney to take "any lawful measure" "reasonably calculated to advance a client's objectives." The court refused, leaving the jury with a cramped and ill-defined

48

understanding of Avenatti's authority to act on Franklin's behalf and

damaging Avenatti's main defense.

A.    Standard Of Review

"We review a jury instruction challenge *de novo.*" *United States v.*

*Cabrera*, 13 F.4th 140, 146 (2d Cir. 2021). "Instructions are erroneous if they

mislead the jury as to the correct legal standard or do not adequately inform

the jury of the law." *Id*. "We will vacate a conviction on account of a missing

requested instruction if (1) the requested instruction was legally correct; (2)

it 'represents a theory of defense with basis in the record that would lead to

acquittal'; and (3) "the theory is not effectively presented elsewhere in the

charge.'" *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999) (quoting

*United States v. Vasquez*, 82 F.3d 574, 577 (2d Cir.1996)).

B.    Factual Background

All three counts turned on the scope of Avenatti's authority as

Franklin's attorney. Accordingly, the district court's draft jury instructions

addressed the pivotal issue of how California law allocates authority

between attorney and client. The court proposed to charge:

Under California law, it is the client who defines the objectives of the representation and not the lawyer. A lawyer cannot act without the client's authorization, and a lawyer may not take over decision-making for a client, unless the client has authorized the lawyer to do so. A lawyer must abide by a client's decisions concerning the objectives of the representation and shall reasonably consult with the client as to the means by which the objectives are to be pursued.

Subject to requirements of client confidentiality, a lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. The client has the ultimate authority to determine the purposes to be served by the legal representation, however, within the limits imposed by law and the lawyer's professional obligations. A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions. A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself.

In the context of settlement, only the client may decide whether to make or accept an offer of settlement

SPA.48–49.

Avenatti objected and sought the language proposed in his pretrial

requests to charge. SPA.50–51; *see* SPA.47. In particular, Avenatti asked the

district court to add:

A lawyer begins with broad authority to make choices advancing the client's objectives. ...

In the absence of an agreement or instruction, however, a lawyer has

50

the authority to take any lawful measure within the scope of
representation that is reasonably calculated to advance a client's
objectives as defined by the client.

SPA.51 (quoting SPA.47). Both requests came "directly" from the

Restatement. SPA.52; *see* Restatement (3d) of the Law Governing Lawyers

§§ 21(3) & cmt. b (2000).

Avenatti's pretrial requests to charge also addressed settlement

authority in particular:

In the absence of a contrary agreement or instruction, a lawyer has
authority to initiate or engage in settlement discussions, although not
to conclude them. ....

Ultimately, the lawyer shall abide by the client's decision whether to
settle the matter and the client must sign the settlement agreement.

SPA.47; *see* SPA.50–51 (renewing request at charge conference).

The district court refused to modify the draft charge. SPA.52–53. In

the court's view, the draft charge already contained "incredibly broad"

language" allowing "[a]ny arguments the defense wants to make along

those lines"—namely, an instruction that "'[a] lawyer may take such action

on behalf of the client as is impliedly authorized to carry out the

representation.'" SPA.54 (quoting SPA.48). The court instructed the jury

51

pursuant to the draft charge. SPA.55.

C.   The District Court's Refusal To Give Avenatti's Proposed Charge On An Attorney's Authority Under California Law Requires Reversal.

Avenatti satisfies *Prawl*'s three-part test for reversal. *See supra* § II.A.

1.   Each of Avenatti's requested instructions was "legally correct." 168 F.3d at 626. At the threshold, Judge Gardephe erred in refusing to consider the Restatement, a source to which California courts often turn in formulating the law of attorney-client relations. *E.g.*, *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co., Inc.*, 6 Cal. 5th 59, 89 (2018); *Osornio v. Weingarten*, 124 Cal. App. 4th 304, 337 (2004). In any case, each of Avenatti's requested instructions adhered to California precedent.

Once a client has defined the objectives of the representation, an attorney does indeed possess "broad authority" in selecting the means of "advancing the client's objectives." SPA.47; SPA.51. "[A]n attorney has a broad authority in many matters affecting the managing and control of a case." *Ross v. Ross*, 120 Cal. App. 2d 70, 74 (1953). "The general authority of the attorney vests him 'with complete charge and supervision of the procedure to be adopted, the conduct of the trial and all cognate subjects,

provided only the attorney does not impair, compromise or destroy his client's cause of action or subject matter of the litigation without his client's consent.'" *Fowlkes v. Ingraham*, 81 Cal. App. 2d 745, 746–47 (1947) (quoting *Witaschek v. Witaschek*, 56 Cal.App.2d 277, 283 (1942)).

Likewise, an attorney "has the authority to take any lawful measure within the scope of the representation that is reasonably calculated to advance a client's objectives." SPA.47; SPA.51. "If counsel merely employs his best discretion in protecting the client's rights and achieving the client's fundamental goals, his authority to proceed in any appropriate manner has been unquestioned." *Linsk*, 70 Cal. 2d at 278. "[A]n attorney ... has, merely by virtue of the ... employment alone, the general implied authority to do on behalf of his client all acts, in or out of court, necessary or incidental to the prosecution or management of a suit ... , or the accomplishment of the purpose for which he was retained." *Zumwalt v. Hargrave*, 71 Cal. App. 2d 415, 420 (1945). *See also, e.g.*, *Zurich Gen. Acc. & Liab. Ins. Co. v. Kinsler*, 12 Cal. 2d 98, 106 (1938); *Redsted v. Weiss*, 71 Cal. App. 2d 660, 663–64 (1945).

Avenatti's requests correctly stated the division of attorney-client

authority as to settlements in particular. California law distinguishes between an attorney's "authority to initiate or engage in settlement negotiations," and a client's right "to conclude them." SPA.47; SPA.50. "Commonly, attorneys are employed by principals in all manner of ... negotiations not involving lawsuits, but it is not the rule that in such situations an attorney has, merely by virtue of his employment as such, plenary authority to enter into contracts on behalf of his client. His function in such matters is that of negotiating for and advising his client." *Nellis v. Massey*, 108 Cal. App. 2d 724, 728 (1952); *see also* 1 Witkin Cal. Proc. Attorneys § 254 (6th ed. 2022) ("[O]rdinarily, there is no implied authority to make binding contracts for [a] client, only authority to negotiate." (summarizing *Nellis*). Rule 1.2(a) of the California Rules of Professional Conduct provides that "[a] lawyer shall abide by a client's decision whether to settle a matter." *See* SPA.47; SPA.50. And then-applicable law required "the signature of a litigant," not just "the signature of the litigant's attorney," to execute a settlement. *Levy v. Superior Court*, 10 Cal. 4th 578, 580 (1995); *see* Cal. Code Civ. Proc. § 664.6 (1994 ed.).

2.    This set of instructions reflected "a theory of defense with basis in the record that would lead to acquittal,'" *Prawl*, 168 F.3d at 626 (quoting *Vasquez*, 82 F.3d at 577), namely: When Avenatti asked Nike to hire him and Geragos to conduct an internal investigation, he reasonably believed himself to be acting within his authority in pursuit of Franklin's objectives—removing Debose and James and eradicating corruption in EYB. *See, e.g.*, 3A.654 (T.2234–35); 3A.655 (T.2236–37); 3A.658 (T.2249; T.2251); 3A.661 (T.2261–62). Avenatti was incapable of impairing Franklin's substantive rights, and never intended to conceal anything from his client, because any settlement of Franklin's claims would have been "reduced to writing" and "signed by the parties"—including Franklin. 3A.656 (T.2241); 3A.659 (T.2254); 3A.660 (T.2256; T.2258).

Ample evidence supported that defense. *See United States v. Dove*, 916 F.2d 41, 47 (2d Cir.1990) ("[A] criminal defendant is entitled to instructions relating to his theory of defense, for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court."). Franklin wanted "justice," he wanted Debose and James "investigated" and

"fired," he wanted to "cleanup and reorganize" EYB, and he expected Nike

to cover his legal expenses. The district court instructed the jury that it

could draw inferences as to Avenatti's state of mind from such statements.

3A.674 (T.2312); 3A.694 (T.2389); 3A.699 (T.2409). During his meetings with

Avenatti, Franklin reiterated that he wanted Debose and James fired and

sought to "change" EYB. Auerbach "walked" Avenatti "through" a

PowerPoint that posed questions requiring investigation. That document

was in Avenatti's briefcase when he was arrested (*see* 6A.1693–95; 7A.1824),

and so (to use the government's words), went "directly to [his] state of

mind at the time that he was undertaking the conduct in this case."

DE.221:55. And any settlement would have required Franklin's consent.

Likewise, the jury could have found that Avenatti knew of and

reasonably relied on the rules of California law that afforded him

"unquestioned" "authority" to "employ[] his best discretion in ... achieving

the client's fundamental goals." *Linsk*, 70 Cal. 2d at 278. To gain admission

to the State Bar of California, Avenatti had to pass a Bar Exam that

"include[d] questions on ethics and professional responsibility," had to pass

the MPRE, which "measures knowledge and understanding of standards related to the professional conduct of lawyers." 7A.1715–16. He had to certify that he had completed CLE, including "training on legal ethics." 7A.1716. As the government argued, Avenatti "has been a lawyer for 20 years. He took ethics training. He passed the Bar in ethics." 3A.646 (T.2163).

Avenatti's defense, if credited, would have compelled acquittal on all three counts. With respect to the extortion counts, if the jury had a reasonable doubt whether Avenatti reasonably believed himself authorized to demand that Nike hire him, then the jury could not have found wrongfulness. *See* 3A.678 (T.2327) (threats and demands for money wrongful only if threatener "cannot reasonably believe that he has a right to receive" money); 3A.678 (T.2329–30) (Avenatti acted wrongfully only if he "understood that he ... was not pursuing Franklin's objectives" or if his threat and demand "had no nexus to any claim of Franklin's that Avenatti reasonably believed he had been authorized by Franklin to pursue"). Likewise, with respect to the honest services count, if the jury had a reasonable doubt whether Avenatti "honestly believed" himself authorized

57

to make the internal-investigation demand, then the jury could not have found specific intent to defraud. 3A.682 (T.2344). Finally, if the jury had reasonable doubt whether Avenatti would have presented any settlement to Franklin to sign, then the jury could not have found a bribe. *See* 3A.681 (T.2341) (defining "bribe" as "a secret payment that ... Avenatti sought from Nike—a payment secret from ... Franklin").

3. Avenatti's requests were "'not effectively presented elsewhere in the charge.'" *Prawl*, 168 F.3d at 626 (quoting *Vasquez*, 82 F.3d at 577).

Judge Gardephe told the jury: "[A] lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation." SPA.55 (quoting Cal. R. Prof'l Conduct 1.2(a)). That language begged a question—what is "impliedly authorized"?—to which California law supplied a clear answer: Avenatti "ha[d], merely by virtue of the ... employment alone, the general implied authority to do on behalf of his client all acts, in or out of court, necessary or incidental to the prosecution or management of a suit ... , or the accomplishment of the purpose for which he was retained." *Zumwalt*, 71 Cal. App. 2d at 420. His

"authority to proceed in any appropriate manner" in "achieving the client's fundamental goals" was "unquestioned." *Linsk*, 70 Cal. 2d at 278. Avenatti's proposed language—"any lawful measure ... reasonably calculated to advance a client's objectives," SPA.51 (quoting SPA.47)—tracked those precedents. And Avenatti's proposal would have given necessary content to an otherwise undefined term ("impliedly authorized").

Judge Gardephe thought that language "incredibly broad," SPA.54, but without the guidance that the California cases supply, the jury can easily have seen vagueness instead. Avenatti and Geragos, attorneys experienced in tangling with large corporations, perceived the relationship between Franklin's ends ("firing" executives and "cleaning up" a corrupt culture) and the proposed means (an internal investigation). From their vantage point, Nike would not take such far-reaching remedial action without a thorough and impartial internal accounting. At a minimum, Avenatti and Geragos can "reasonably" have "calculated" that an investigation was "necessary" to "the accomplishment" of their purpose in representing Franklin. *See* SPA.51 (quoting SPA.47); *Zumwalt*, 71 Cal. App.

2d at 420. But lay jurors may not have seen the same link, and may have—

mistakenly, in light of California law—deemed an internal investigation too

far afield to fall within the scope of Franklin's implicit authorization. A

significant risk therefore exists that the jury misunderstood "impliedly

authorized" not to include the internal-investigation demand.

The rest of the charge made matters worse. Judge Gardephe told the

jury: "A lawyer retained to represent a client is authorized to act on behalf

of the client, such as in procedural matters and in making certain tactical

decisions." SPA.55 (quoting Cal. R. Prof'l Conduct 1.2 cmt. 1). Read in

conjunction with the preceding instruction, this language narrowed what

Avenatti was "authorized" to do. The charge limited Avenatti's authority to

two circumscribed areas—"procedural matters" and "certain tactical

decisions"—neither of which captures the internal-investigation demand.

Asking to be hired to investigate corporate malfeasance is not a

"procedural matter[]." That term describes "routine" decisions such as

"taking a motion off calendar," *Frangie v. Boren*, 2004 WL 2698849, at *5 (Cal.

Ct. App. Nov 29, 2004), or entering "a stipulation resolving discovery

disputes," *see Young v. Rosenthal*, 212 Cal. App. 3d 96, 122 (1989). Nor does

"certain tactical decisions" do the work. Like "impliedly authorized," this

phrase, and in particular the limiting adjective "certain," begs the

question—which tactical decisions? Once again, California law provides an

answer: those that involve the exercise of "discretion" in "achieving the

client's fundamental goals," *Linsk*, 70 Cal. 2d at 278, but do not "impair,

compromise or destroy [the] client's cause of action,'" *Fowlkes*, 81 Cal. App.

2d at 746–47. And once again, Avenatti's proposal would have so informed

the jury. Without this clarification, the district court's charge left the jury

with a constrained and ill-defined understanding of the authority that

California law reserved to Avenatti, prejudicing his defense.

Finally, having understated the "broad authority" (*Ross*, 120 Cal. App.

2d at 74) that Avenatti enjoyed in certain domains, the district court failed

to convey an equally important limitation. An attorney cannot "conclude"

"settlement discussions" without his client's consent because "the client

must sign the settlement agreement." *See* SPA.50–51 (citing SPA.47).

Avenatti contended that he did not intend to conceal, and could never have

concealed, the terms of the settlement from Franklin. Judge Gardephe

alluded to this point, but only to summarize what the defense was arguing.

3A.678 (T.2329) ("Avenatti ... contends that the parties contemplated a

written settlement agreement, which would have required Franklin's

signature."). That paraphrase was no substitute for a direct instruction on

black-letter California law, because the court also told the jury that it, not

the lawyers, would supply the governing legal rules. 3A.672 (T.2304).

## III.    The Restitution Order Should Be Vacated.

To reimburse attorneys' fees paid to Boies, the district court awarded

Nike, a Fortune 100 corporation, restitution equal to about one-one

millionth of its market capitalization.[4] Two independent errors require

vacatur of that award. First, the court lacked authority to award restitution

221 days after sentencing, after 18 U.S.C. § 3664(d)(5)'s 90-day deadline

expired, because the court had not "made clear prior to the deadline's

expiration that it would order restitution." *Dolan*, 560 U.S. at 608. Second, 18

U.S.C. § 3663A(b)(4) does not authorize restitution to an entity whose only

---

[4] *See* Fortune, *Nike: 2021 Fortune 500* (Feb. 2, 2022), https://bit.ly/376QeID.

pecuniary loss is attorneys' fees.

A.     Standard Of Review

"There being no challenges to the [district] court's arithmetic

calculations or the evidence to support them," Avenatti's "restitution

challenges raise only issues of law, which we review *de novo*." *United States*

*v. Douglas*, 525 F.3d 225, 252 (2d Cir. 2008).

B.     Factual Background

Before sentencing, the government sought restitution of $1 million for

Nike, an amount attributable entirely to attorney's fees that Nike paid

Boies. DE.321:17–19. *See also* DE.329:3–4; DE.329–1:1. The government relied

on § 3663A(b)(4), which provides that a restitution order "shall require that

[the] defendant ... in any case, reimburse the victim for lost income and

necessary ... other expenses incurred during the participation in the

investigation or prosecution of the offense." *See United States v. Afriyie*, 27

F.4th 161, 163 (2d Cir. 2022) ("'other expenses'" under § 3663A(b)(4) may

include attorneys' fees, provided the statute's other strictures are met").

Avenatti objected that Nike had not "suffered an actual pecuniary loss

63

as a direct result of the offenses of conviction" other than attorneys' fees,

and so was "not a 'victim' ... entitled to recover ... 'other expenses.'"

DE.332:1. At sentencing on July 8, 2021, the district court concluded that the

"submissions to date" were "not adequate to permit me to make a

determination as to restitution." SPA.56. Nike had "redacted" Boies's billing

records "in such a way as to make it impossible to determine whether the

fees sought fall within the recoverable categories" under *Lagos v. United*

*States*, 136 S. Ct. 1684, 1687 (2018), which holds that "investigation" and

"proceedings" in § 3663A(b)(4) "are limited to government investigations

and criminal proceedings." SPA.56. Judge Gardephe "g[a]ve the

government and Nike another opportunity to make a submission ... that

complies with *Lagos*" and "deferred" the "determination as to restitution ...

in the interim." SPA.58. A week later, the court entered judgment and

checked a box stating: "The determination of restitution is deferred until

10/8/21. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered

after such determination." 3A.819.

After the parties filed supplemental submissions, the district court

ordered restitution on February 14, 2022, 221 days after sentencing. SPA.59–

79. The court determined that it had authority to do so notwithstanding

§ 3664(d)(5), which permits deferral of "the final determination of the

victim's losses," but only to "a date ... not to exceed 90 days after

sentencing." In Judge Gardephe's view, "an extension of the 90-day

statutory period is permitted 'unless the defendant can show that the

extension caused him actual prejudice.'" SPA.64–65 n.3 (quoting *Douglas*,

525 F.3d at 253). On the merits, the court concluded that Nike was a

"victim" because "the attorneys' fees ... incurred in assisting the

Government's investigation and prosecution of Avenatti's crimes 'were a

direct and foreseeable result of [his] offenses.'" SPA.70–72 (quoting *United

States v. Amato*, 540 F.3d 153, 162 (2d Cir. 2008)). The court therefore

awarded Nike $259,800.50. SPA.79; 4A.846; 4A.853.

C.   The District Court Lacked Authority To Award Restitution 221 Days After Sentencing.

A district court must award restitution "when sentencing a

defendant." 18 U.S.C. § 3663A(a)(1). *See also* 18 U.S.C. § 3556 ("in imposing a

sentence"). Section 3664(d)(5) provides a limited exception to that time-of-

sentencing rule: "If the victim's losses are not ascertainable by ... 10 days prior to sentencing, ... the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." "[A] sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount." *Dolan*, 560 U.S. at 608.

*Dolan*'s holding comes with a "proviso"—to award restitution more than 90 days after sentencing, a district court must have "made clear," before 90 days have run, that it "would" award restitution, and may defer only the computation of the amount. *United States v. Gushlak*, 728 F.3d 184, 191 & n.4 (2d Cir. 2013). "*Dolan* contemplates" a defendant who is "at all times fully aware that the sentence announced at his sentencing hearing contain[s] a blank space to be filled in with a dollar amount once restitution proceedings ha[ve] run their course." 728 F.3d at 191 n.4. Thus, *Gushlak* upheld an untimely restitution order because "the district court 'made clear prior to the deadline's expiration that it would order restitution'—it said so

on the record at Gushlak's sentencing hearing—and 'le[ft] open (for more than 90 days) only the amount.'" *Id.* at 191 (quoting *Dolan*, 560 U.S. at 608). Post-*Dolan*, this Court has indicated that timely notice of the intent to award restitution is necessary to excuse noncompliance with § 3664(d)(5)'s deadline. *E.g.*, *United States v. Qurashi*, 634 F.3d 699, 705 (2d Cir. 2011); *United States v. Pickett*, 612 F.3d 147, 149 (2d Cir. 2010).

Conversely, where a district court does not "make clear prior to the expiration of the 90-day deadline that it intend[s] to order restitution," *Dolan* does not apply and § 3664(d)(5) precludes an untimely award. *United States v. Hymas*, 584 F. App'x 361, 362 (9th Cir. 2014) (vacating order entered 521 days after sentencing where "it could not have been clear before the ... court issued its order that restitution necessarily would be imposed").

This case falls outside *Dolan*'s proviso because the district court did not "make clear" that it would order any restitution before the statutory 90-day period elapsed. At sentencing, Judge Gardephe said that the government's and Nike's submissions were "not adequate to permit me to make a determination as to restitution," and that it was "impossible to

67

determine" whether the fees Nike sought were "recoverable." SPA.56. The

court therefore "deferred" "[a] determination as to restitution." SPA.58.

Judge Gardephe deferred decision not on the amount of restitution, but on

the question of restitution *vel non*. Also, as in *Hymas*, Avenatti contested

Nike's status as a "victim," but the court had not ruled. With that

"threshold question" "yet to be resolved," the court could not have "made

clear" that restitution would follow. 584 F. App'x at 362.

The district court erred by relying on *Douglas* for the proposition that

§ 3664(d)(5) countenances delays greater than 90 days as long as the

defendant does not show "actual prejudice." SPA.64–65 n.3. *Douglas*

precedes *Dolan*, and *Dolan* "does not use a harmless error analysis."

Goodwin, Fed. Crim. Restitution § 10:22 (Aug. 2021 ed.). *See Gushlak*, 728

F.3d at 191 (this Court's pre-*Dolan* cases applied "the somewhat different

prism of harmless error analysis"). Rather, under *Dolan*, the single, simple

prerequisite for exceeding § 3664(d)(5)'s deadline is actual notice within the

statutory 90-day period that the court "would order restitution." 560 U.S. at

608. Prejudice does not matter; indeed, a defendant who has suffered

prejudice but has also received notice cannot assert § 3664(d)(5) error.

Goodwin, *supra*, § 10:22. "On the other hand," that broad rule comes with a

counterbalancing limitation: *Dolan* "is potentially narrow in that it states

that the court retains authority 'particularly where' the court has provided

timely notice." *Id.* Notice, not prejudice, is the touchstone. Here, Avenatti

lacked notice, so this Court must enforce § 3664(d)(5)'s deadline.

D. <u>Nike Was Not Entitled To Attorney's Fees Because The Corporation Incurred No Other "Pecuniary Loss."</u>

The restitution order must be vacated for a second, independent

reason: § 3663A(b)(4) does not authorize restitution for attorney's fees

absent antecedent pecuniary loss. *See United States v. Xue*, 2021 WL 2433857,

at *6 (E.D. Pa. June 15, 2021) ("[E]xpenses for legal fees and costs incurred

during an investigation and prosecution of a defendant would only arise

after a victim suffers a pecuniary loss 'as a result of the commission of an

offense.'" (quoting 18 U.S.C. § 3663A(a)(2)). Nike incurred no losses besides

attorneys' fees, so restitution was improper.

Section 3663A(a)(1) provides: "[W]hen sentencing a defendant

convicted of an offense described in subsection (c), the court shall order ...

that the defendant make restitution to the victim of the offense." "'[V]ictim' means a person directly and proximately harmed as a result of the commission an offense." § 3663A(a)(2). And 18 U.S.C. § 3663A(c)(1)(B) limits mandatory restitution to certain offenses (including, as applicable here, those "against property," 18 U.S.C. § 3663A(c)(1)(A)(ii)), "in which an identifiable victim ... has suffered a physical injury or pecuniary loss."

If restitution is available, § 3663A(b)(4) provides that the order "shall require" the defendant to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." "[O]ther expenses" may encompass attorneys' fees, but only if "the statute's other strictures are met." *Afriyie*, 27 F.4th at 163. *See also Amato*, 540 F.3d at 160 (statute "also requires ... these expenses be incurred by a 'victim' within the meaning of [§ 3663A(a)(2)]").

The "stricture" not met here is the condition precedent to all restitution orders arising from property crimes—a "victim" who has suffered "pecuniary loss." § 3663A(c)(1)(B); *see also* §§ 3663A(a)(1),

3663A(a)(2), 3663A(b)(4). As § 3663A(b)(4)'s text makes plain, a district court may only reimburse "other expenses" incurred by a "victim"—that is, one who has otherwise been harmed by the offense of conviction. This Court "interpret[s] statutes 'to give effect, if possible, to every clause and word.'" *United States v. Al Kassar*, 660 F.3d 108, 124–25 (2d Cir. 2011) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). If the foreseeable outlay of attorneys' fees always merits restitution, as Judge Gardephe thought, then the statutory term "victim" in § 3663A(b)(4) does no work, because everyone who incurs those fees is a victim.

Section 3663A's structure compels the same conclusion. Section 3663A(a)(1) directs that before the statute applies at all, a court must first classify the offense of conviction as one "described in [§ 3663A(c)]"—that is, one in which a "victim" "has suffered ... pecuniary loss," § 3663A(c)(1)(B). Here, however, Nike's only "pecuniary loss" was its attorneys' fees. If that suffices to satisfy § 3663A(c)(1)(B), then that provision is superfluous as to the § 3663A(b)(4) expenses. It is always foreseeable that committing a crime will trigger a criminal investigation in which people will participate and a

71

prosecution at which they will appear and testify. Under the district court's approach, it will never be necessary for any of these people to show "pecuniary loss" in order to obtain restitution. This Court eschews "'statutory interpretations that render provisions superfluous,'" *Al Kassar*, 660 F.3d at 125 (quoting *United States v. Anderson*, 15 F.3d 278, 283 (2d Cir. 1994)). That canon governs here.

*Xue* is persuasive. There, the district court declined to award restitution for attorneys' fees and costs incurred by the defendants' employer, which "had suffered no pecuniary loss." 2021 WL 2433857, at *3. As *Xue* reasons, 18 U.S.C. § 3663A "in its entirety only applies if the victim 'has suffered a physical injury or pecuniary loss,'" (quoting § 3663A(c)(1)(B)), so "[t]he fact that [the employer] suffered no pecuniary loss precludes application of § 3663A(b)(4)." *Id.* at *4. Section 3663A "distinguishes between pecuniary loss and necessary expenses," and "expenses for legal fees and costs incurred during an investigation and prosecution of a defendant would only arise after a victim suffers a pecuniary loss 'as a result of the commission of an offense.'" *Id.* at *6

72

(quoting § 3663A(a)(2)).

The district court disagreed, reasoning that Nike's expenditure of attorneys' fees was "a direct and foreseeable result" of Avenatti's offenses. SPA.71 (citing *Amato*, 540 F.3d at 162). But *Amato* had no occasion to consider the distinct statutory question here—whether attorneys' fees alone make one a victim—because the *Amato* payee had sustained other pecuniary losses. *See* 540 F.3d at 157 (defendants' fraud induced victim to "pay out incentive bonuses"); *id.* at 158 (only about $3 million of $13 million restitution award attributable to attorneys' fees). Moreover, this Court has never read *Amato* to establish that attorneys' fees alone make one a victim. *See United States v. Battista*, 575 F.3d 226, 231–33 (2d Cir. 2009) (applying *Amato* to uphold restitution for attorneys' fees, after separately analyzing, without regard to fees, whether payee was victim).

## CONCLUSION

Based on evidentiary insufficiency (§ I), this Court should reverse the judgment of conviction and remand for entry of judgment of acquittal on all counts. In the alternative, based on instructional error (§ II), this Court should vacate the judgment of conviction and remand for a new trial on all counts. At a minimum, this Court should vacate the restitution order (§ III).

Dated:  New York, New York
        April 4, 2022

                    Respectfully submitted,

                    FEDERAL DEFENDERS OF NEW YORK, INC.
                     APPEALS BUREAU

                    By: /s/ Daniel Habib
                    Attorney for Defendant-Appellant
                         **Michael Avenatti**
                    52 Duane Street, 10th Floor
                    New York, New York 10007
                    Tel.: (212) 417-8742

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this brief contains **13,994** words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using **Microsoft Word** in **14-point font** in **Palatino Linotype** type style.

<u>/s/ Daniel Habib</u>
Attorney for Defendant-Appellant
**Michael Avenatti**

Dated:     New York, New York
         April 4, 2022

---

## CERTIFICATE OF SERVICE

I certify that a copy of this brief has been served by ECF on the United States Attorney/S.D.N.Y.; Attention: **AUSA MATTHEW PODOLSKY, ESQ.,** 1 St. Andrew's Plaza, New York, NY 10007.

<u>/s/ Daniel Habib</u>
Attorney for Defendant-Appellant
**Michael Avenatti**

Dated:     New York, New York
         April 4, 2022

# SPECIAL APPENDIX

## TABLE OF CONTENTS TO THE SPECIAL APPENDIX

Mem. Op. & Order Denying Motion for Judgment of Acquittal (excerpt) (July 6, 2021)................................................................................SPA.1

Defendant's Requests to Charge (excerpt) (Jan. 27, 2020).....................SPA.47

Draft Jury Charge (excerpt) (Feb. 9, 2020)................................................SPA.48

Charge Conference (excerpt) (Feb. 10, 2020)...........................................SPA.50

Jury Charge (excerpt) (Feb. 12, 2020) ......................................................SPA.55

Sentencing (excerpt) (July 8, 2021).............................................................SPA.56

Mem. Op. & Order Awarding Restitution (Feb. 14, 2022) .....................SPA.59

Statutes..............................................................................................................SPA.80

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MICHAEL AVENATTI,

Defendant.

**MEMORANDUM
OPINION & ORDER**

(S1) 19 Cr. 373 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Michael Avenatti is charged in the (S1) Indictment with transmitting interstate

communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One); Hobbs Act

extortion, in violation of 18 U.S.C. § 1951 (Count Two); and honest services wire fraud, in

violation of 18 U.S.C. §§ 1343 and 1346 (Count Three). The Government charges that Avenatti

– who is licensed to practice law in California – transmitted in interstate commerce threats "to

cause financial harm to Nike and its reputation if Nike did not agree to make multimillion dollar

payments to Avenatti"; "used threats of economic and reputational harm in an attempt to obtain

multimillion dollar payments from Nike"; and used interstate communications to "engage[] in a

scheme to obtain payments for himself from Nike based on confidential information provided to

Avenatti by [client Gary Franklin] for the purpose of furthering Avenatti's representation of

[Franklin], without [Franklin]'s knowledge or approval," thereby depriving Franklin of the "duty

of honest services" he was owed. ((S1) Indictment (Dkt. No. 72) ¶¶ 20, 22, 24 (emphasis

omitted))

        Avenatti proceeded to trial on January 27, 2020. After a three-week trial, on

February 14, 2020, the jury returned a verdict finding Avenatti guilty on all counts. (Verdict

(Dkt. No. 265))

**SPA.1**

Avenatti has moved for a judgment of acquittal or a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. (Def. Mot. (Dkt. No. 291)) Avenatti argues that (1) the evidence at trial is insufficient to prove that he acted "wrongfully" and with "intent to defraud"; and (2) the statutes under which he was convicted are unconstitutionally vague-as-applied. (Id. at 24-31)[1] Avenatti also contends that this Court erred in (1) excluding certain text messages and emails; and (2) responding to a jury note regarding permissible inferences from exhibits admitted to show state of mind. (Id. at 32-40)

In a June 4, 2021 letter, Avenatti moves to compel the Government to produce Section 3500 material and alleged Brady/Giglio material concerning Judy Regnier, a Government witness at trial. In a July 5, 2021 letter, Avenatti moves for a new trial on the same basis. (July 5, 2021 Def. Ltr. (Dkt. No. 333)) In his June 4, 2021 letter, Avenatti also raises concerns regarding press access to voir dire. (June 4, 2021 Def. Ltr. (Dkt. No. 315))

For the reasons stated below, Avenatti's post-trial motions will be denied.

## BACKGROUND

## I.    THE EVIDENCE AT TRIAL

### A.    Nike's Sponsorship of Franklin's Basketball Program

In 2005, Gary Franklin was the director and head coach of an amateur youth basketball program (the "Basketball Program") based in Los Angeles, California. (Trial Transcript ("Tr.") 1520) In 2006 or 2007, NIKE USA, Inc. ("Nike") began to sponsor Franklin's Basketball Program, which later became part of Nike's Elite Youth Basketball League (the "EYBL"). Nike formed the EYBL in 2010 as a collection of travel teams made up of talented high school basketball players. (GX 305; Tr. 1524, 1529) Some players from Franklin's

---

[1] The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

Basketball Program went on to compete at Division I or Division II universities, and some went on to play professionally in the National Basketball Association (the "NBA") or overseas.  (Tr. 1521-22)

In 2016, Carlton Debose – Nike's director of Elite Youth Basketball ("EYB") – and Jamal James – Nike's manager of EYB – were two of Franklin's primary contacts at Nike. (GX 201; Tr. 1527, 1530, 1622)  According to Franklin, DeBose and James pressured him to engage in misconduct, including making improper cash payments to players' families and submitting falsified invoices to Nike.  (Tr. 716, 1622-27)

After the 2018 season, Nike did not renew its sponsorship contract with Franklin. (Tr. 266, 1528-30)  Franklin also lost control of the team he had coached for boys who were 17 years old and younger.  Franklin believed that DeBose and James displaced him from the 17 and under team in retaliation for Franklin's refusal to select certain players for the team.  (Tr. 1628-32)

Prior to terminating the sponsorship, Nike had contributed $72,000 a year for Franklin's Basketball Program.  (Tr. 266, 776, 1524-28)  Of that sum, Franklin generally kept $30,000 to $35,000 as his salary for operating the program.  (Tr. 1523)  Nike also supplied Nike merchandise and other "gear" to the Basketball Program.  The total value of Nike's sponsorship of the Basketball Program amounted to approximately $192,000 a year.  (Tr. 720, 1528; GX 201)

Franklin was disappointed that Nike had decided to terminate its sponsorship of the Basketball Program, and he blamed James and DeBose for the lost sponsorship.  (Tr. 1530, 1628-32)  In February 2018, Franklin spoke with Jeffrey Auerbach about trying to regain the sponsorship.  (Tr. 1530-31, 1634)  Auerbach is a producer-writer and consultant in the entertainment industry, and his son had played on one of Franklin's basketball teams.  (Tr. 1531,

1635-36) Franklin also told Auerbach about James and DeBose's misconduct, and about what Franklin perceived as rampant corruption in Nike's EYBL. (Tr. 1534, 1637-38, 1651) Franklin wanted Nike to investigate James and DeBose, and to fire them. (Tr. 1648-49) For more than a year, Franklin and Auerbach communicated about these issues in person, by telephone, and through text messages and email. (Tr. 713, 1635)

In January 2019, Franklin sent a letter to Trent Copeland requesting legal advice concerning his business relationship with Nike. (Tr. 952-54, 1683-89) Copeland was Franklin's friend and an attorney. During a January 2019 meeting, Franklin told Copeland that he wanted (1) to be reinstated as the coach of his 17 and under team; (2) DeBose and James fired; and (3) their wrongdoing reported to the FBI. (Tr. 1655-56, 1683-85) Franklin also told Copeland that he wanted Nike to provide financial restitution to the Basketball Program, to indemnify Franklin and his team from any wrongdoing, and to pay all related legal expenses. (Tr. 1686) Franklin did not retain Copeland as his lawyer, however. (Tr. 1688-89)

At this time – early 2019 – Franklin wanted

> Nike to look into Jamal James' and Carlton DeBose's actions. And I felt like, you know, they were mistreating me. I felt that they were bullying me. And so I wanted those guys to be looked into. And I also wanted my program back, to be back with Nike. And I felt that the activities that was going on with Jamal James and Carlton DeBose, that they had damaged my program in terms of, you know, the support financially, so I wanted, you know, also to seek that as well. . . . Well, I mean, I wanted to have my relation – my contract back with Nike, I wanted to have my relationship back. Because, you know, I had a great relationship with Nike over time so I wanted to have my relationship back.

(Tr. 1534) Franklin told Auerbach that he wanted DeBose and James investigated and fired. (Tr. 770, 1648)

On February 6, 2019, Auerbach – acting on behalf of Franklin – contacted John Slusher, a senior executive at Nike. (Tr. 767-68, 893, 1533-34; GX 304) Auerbach presented

Franklin's complaints about DeBose and James – and the loss of the Nike sponsorship – to

Slusher.  Slusher referred Auerbach and Franklin to Nike's outside counsel – Andrew

Michaelson at the law firm Boies Schiller Flexner.  (Tr. 745, 765-66, 771-73, 786; GX 304)

During his call with Slusher, Auerbach did not suggest that he and Franklin were planning on

calling a press conference, nor did he suggest that Nike pursue an internal investigation.  (Tr.

745-46, 771)

>    After Auerbach's phone conversation with Slusher, Franklin felt that it was

necessary for him to retain an attorney, in part because Slusher had referred Auerbach and

Franklin to Nike's outside counsel.  (Tr. 901, 1536)

### B.    Auerbach Contacts Avenatti

>    On February 28, 2019, Auerbach – acting on behalf of Franklin – contacted

Defendant Michael Avenatti.  Neither Auerbach nor Franklin had had any prior contact with

Avenatti.  (Tr. 713-14, 900)  Avenatti returned Auerbach's call the next day, and the two spoke

for twenty to twenty-five minutes.  (Tr. 714-16)  Auerbach

>> told [Avenatti] a little bit about Gary [Franklin] and what he had endured, you
>> know, over the last two years and basically asked him if he was familiar with the
>> Adidas college basketball scandal and case and – yeah. . . . I told him that Gary
>> had been directed and he was abused and bullied into carrying out certain acts that
>> he was – he felt like he was going to lose his sponsorship if he didn't do it.  And
>> he felt really terribly about it.  And was wanting to report it to the authorities,
>> report it to Nike, and that he wanted to go with them to the authorities and that he
>> also wanted to reestablish his relationship with Nike but he wanted justice above
>> all and that to him meant making sure these two executives at Nike EYBL,
>> Carlton [DeBose] and Jamal [James], did not hurt any other coaches and program
>> directors.

(Tr. 715)

>    Neither Auerbach nor Avenatti mentioned the possibility of holding a press

conference or of pressuring Nike to conduct an internal investigation.  According to Auerbach, a

press conference "would be damaging and detrimental to reaching Gary's goals," which included

reestablishing his relationship with Nike. As to an internal investigation, Auerbach testified that

"Gary knew what happened and he didn't need an internal investigation." Avenatti did not

suggest that a resolution of Franklin's dispute with Nike might include Nike making payments to

Avenatti. (Tr. 717-18)

After the call, Auerbach sent Avenatti an email thanking him and stating that he

looked forward to "further discussing Gary Franklin founder/program director of California

Supreme Youth Basketball v. Nike Elite Youth Basketball and Nike, Inc." (Tr. 722)

Auerbach next spoke with Avenatti on March 2, 2020. (Tr. 725) In this twenty

minute phone conversation, there was likewise no discussion of Avenatti holding a press

conference, filing a lawsuit against Nike, pressuring Nike to conduct an internal investigation, or

asking Nike to retain Avenatti. (Tr. 725-26) Instead, Auerbach and Avenatti continued their

discussion of Franklin's complaints about Nike. (Tr. 726)

### C. Avenatti Contacts Mark Geragos

On March 4, 2019, Avenatti contacted Mark Geragos, a well-known lawyer in

Los Angeles. Avenatti told Geragos that he "got called on a very big case against Nike. This

might make a lot of sense [to do] together." (Tr. 1854; GX 103A) Avenatti was aware that

Geragos had a relationship with Nike's general counsel (Tr. 1854; GX 103A), and Avenatti and

Geragos agreed that they would approach Nike together regarding Franklin's claims. (See Tr.

1857; GX 103B) Avenatti never told Franklin that he was working with Geragos on Franklin's

claims against Nike. (Tr. 1567)

### D. Avenatti's March 5, 2019 Meeting with Franklin and Auerbach

On March 5, 2019 – the day after he spoke with Geragos – Avenatti contacted

Franklin and Auerbach to schedule a meeting. Avenatti suggested that the three meet later that

day at Avenatti's high-rise apartment building in Los Angeles.  The meeting took place in a

conference room and lasted thirty to forty-five minutes.  (Tr. 726-28, 1538-39)  During the

meeting, Auerbach detailed

> what Gary had endured at the hands of Carlton DeBose and Jamal James at Nike
> EYBL and we reiterated what he participated in and then went down what justice
> meant to Gary and what he wanted out of this. . . . [F]rom Gary's point of view he
> was coerced and pressured into making payments to players' families, accepting
> payments, wire payments from Nike to then pass onto handlers and make
> payments to the families of the players, resubmitting fake invoices to Nike and
> things of that nature.

(Tr. 728, 1539-40)  Franklin also complained about being forced to surrender control over his 17

and under team.  (Tr.1540)

At the meeting, Auerbach described "justice" for Franklin in the following terms:

> First and foremost, for Gary I think was making sure that Carlton and Jamal were
> no longer at Nike EYBL.  He was really concerned not so much what had been
> done to him but – at that point, but what others around the league, other coaches,
> other players would suffer because of their actions.  So he wanted to ensure that
> the company knew and wouldn't let that happen.

> He wanted to report his involvement and the actions to the government.  But
> because of wanting to forge and reestablish the relationship with Nike he wanted
> to do it with Nike.  And then he wanted to be financially compensated just to, you
> know, for the damage the club and the brand had suffered. . . . [Gary] had a
> fifteen-year great relationship with [Nike] and he wanted to continue that, and that
> meant hopefully signing a new contract [for Nike to sponsor the Basketball
> Program in the next season] and moving forward.

(Tr. 729-30)

Franklin testified that he told Avenatti at the meeting what he wanted:  "I . . .

reiterated what I wanted, what [Auerbach] had said, which is my team back, have Jamal James

and Carlton DeBose fired, and also let me have some, you know, some sort of restitution for . . .

what I've lost, the years, and also, you know get me covered."  (Tr. 1541)  By "covered,"

Franklin meant whistleblower protection:  "[g]et me covered as far as like some whistleblower or

something of that nature. . . . I was concerned about . . . getting my team back. That was . . . the big focus, and also . . . trying to find out to see if I . . . did anything wrong as far as . . . legally or illegally." Franklin told Avenatti that his most important objective was to "[g]et my team back." (Tr. 1541-42)

At the March 5, 2019 meeting, Auerbach showed Avenatti a 41-page "memorandum of actions" that Auerbach had prepared. Auerbach's memorandum contained "all the evidentiary documents," including "bank wires, cash payments, invoices, and things of that nature," showing Nike's improper payments to players' handlers and parents. (Tr. 731, 1543-44; GX 312) Franklin understood that at some point Avenatti might share these documents with Nike, but assumed that Avenatti would obtain his permission first. (Tr. 1546) Franklin did not want these documents to be made public, because their disclosure could harm the reputations of Nike, the players he had coached and their parents, the Basketball Program, and Franklin himself. (Id.) Franklin and Auerbach also discussed with Avenatti certain recordings that Franklin had made of conversations he had had with DeBose and James. (Tr. 1550-51)

Avenatti told Franklin at the March 5, 2019 meeting that Avenatti would serve as Franklin's lawyer, and that Avenatti would seek immunity for Franklin for his involvement in making payments to players' families and in falsifying invoices that were submitted to Nike for payment. (Tr. 742, 752) There was no discussion at the meeting about a retainer agreement, however, or about attorney's fees for Avenatti, or about Avenatti filing a lawsuit against Nike.[2] (Tr. 744-46, 1552-53) There was likewise no discussion of a press conference, an internal

---

[2] Although Avenatti told Franklin at this meeting that Avenatti was his lawyer, Franklin testified that Avenatti "never said, you know, yes, I'm going to take your case or anything, so I wasn't really sure." (Tr. 1554)

investigation at Nike, or Nike retaining Avenatti to conduct an internal investigation.  (Tr. 745-46, 1553-54)

Auerbach and Avenatti communicated via text message, telephone, and email between March 10, 2019 and March 18, 2019.  (Tr. 753-55, 761-65, 777-79; GX 304, 305, 306, 307, 310R)  In a March 10, 2019 call, Avenatti asked Auerbach to re-send Auerbach's original March 1, 2019 email.  (Tr. 753-55)  And on March 18, 2019, Auerbach sent Avenatti a copy of the racketeering complaint filed against Adidas.  (GX 308)  These text messages, telephone calls, and emails did not contain any reference to an internal investigation of Nike, to Nike retaining Avenatti to perform such an investigation, or to Nike making payments to Avenatti.  (Tr. 753-55, 761-65, 777-79; GX 304, 305, 306, 307)

### E. Geragos Contacts Nike, and Avenatti Contacts the *New York Times*

After speaking with Avenatti, on March 12, 2019, Geragos contacted Casey Kaplan, an attorney in Nike's legal department, about Franklin's claims.  (Tr. 201, 1856; GX 206)  On March 13, 2019, Geragos reported to Avenatti that Nike wanted the two to speak with Boies Schiller – Nike's outside counsel – about Franklin's claims.  (Tr. 1857-58; GX 103B)  Avenatti told Geragos to insist on dealing directly with Nike, in part because Boies Schiller would "never step aside and allow [Avenatti and Geragos] to run an investigation [at Nike]." (Tr. 1858; GX 103B)

In a March 14, 2019 text message to Geragos, Avenatti asked for a status report on "Nike and whether I need to start arranging my presser."  (Tr. 1858-59; GX 103C)

Geragos told Kaplan that Avenatti insisted that at least one lawyer from Nike's in-house department attend a meeting to discuss Franklin's claims, and that Avenatti would not meet with only Boies Schiller lawyers.  (Tr. 1860; GX 206 at 3)

After speaking with Geragos, Kaplan contacted Robert Leinwand, Nike's vice president and chief litigation officer. (Tr. 1125, 1146) Kaplan relayed to Leinwand the substance of his conversation with Geragos. (Tr. 1146-47) Leinwand has been involved in numerous settlements during his time at Nike, and he agreed to meet with Geragos and Avenatti. (Tr. 1128, 1148-50)

In response to Geragos's communications with Kaplan, Scott Wilson, a partner at Boies Schiller, contacted Geragos via email and by telephone on March 13 and 15, 2019. (Tr. 199-202, 1855; GX 203; GX 702) During the telephone call, Geragos told Wilson that the matter was too sensitive to discuss in detail by telephone, but that he had seen documents suggesting that "Nike might have an Adidas problem." (Tr. 203-04) The two agreed to meet at Geragos's New York office on March 19, 2019, and that the meeting would be attended by Geragos, Avenatti, Wilson, and Leinwand. (Tr. 207-08)

On March 16, 2019, Avenatti contacted Rebecca Ruiz, a New York Times reporter. (Tr.1863, GX 702) On March 17, 2019, Avenatti reported to Geragos that if the March 19, 2019 meeting with Nike "doesn't work out," Avenatti had arranged for a press conference on March 20, 2020, and a New York Times story concerning Nike's corrupt influence on youth basketball. (Tr. 1863-64; GX 103D)

In discussing the scheduled March 19, 2019 meeting with Wilson, Avenatti did not mention Franklin, but merely stated that Nike had "a big fucking problem." (Tr. 787, 1560)

## F. **Avenatti's March 18, 2019 Meeting with Franklin and Auerbach**

On March 18, 2019, Avenatti met again with Franklin and Auerbach at a conference room in his apartment building. (Tr. 78-85, 1555) The meeting lasted approximately 20 to 45 minutes. (Tr. 785, 1555) At the beginning of the meeting, Auerbach handed Avenatti a

document that he had prepared that provided "an overview of the hierarchy of some of the
employees at Nike, the cast of characters that was involved in the actions, the coach, which is
[Franklin], and handlers and parents."  (Tr. 1556-57; GX 311)  Although the document includes
a number of questions about Nike's culpability,[3] there was no discussion at the meeting about
these questions.  (Tr. 1557)  Franklin did not authorize Avenatti to disclose or publicize the
contents of this document.  (Id.)

During the March 18, 2019 meeting, Avenatti told Franklin and Auerbach that he
had scheduled a meeting with Nike's lawyers in New York City for the next day.  (Tr. 1558)
Franklin and Auerbach were "shocked" by Avenatti's announcement, because there had been no
discussion of the strategy that would be used in approaching Nike, and "no indication that
[Avenatti] had done anything on [Franklin's] behalf since [the] first meeting."  (Tr. 786, 1558-
59)

Although Franklin and Auerbach understood – by March 18, 2019 – that Avenatti
was acting as Franklin's lawyer (Tr. 796-97, 1560), Franklin was not asked to sign a retainer
agreement.  (Tr. 1563)

At the March 18, 2019 meeting, Avenatti told Franklin that he was "going to first
get you covered with some sort of whistleblower or immunity, and we're going to get James and
DeBose fired.  And I think I can get you a million dollars."  (Tr. 1560-61, 787-88)  Franklin said

---

[3] "Question 1:  Is this a case of rogue executives Carlton DeBose and Ja[mal] James committing
egregious criminal acts on their own, or was Nike, a [F]ortune 100 company, complicit in the
corruption?
Question 2:  Is Nike a company [that] tolerates workplace bullying and abuse by its senior
executives?
Question 3:  Is Nike's enterprise, Nike EYB ('the Racket') guilty of racketeering, having
committ[ed] acts of fraud, bribery, coercion, conspiracy, illegal cash payments, wire fraud, mail
fraud, bank fraud, money laundering, etc.?"  (GX 311 at 5)

that he thought that a $1 million settlement was reasonable – he had previously discussed this amount with Auerbach. (Tr. 796)

Auerbach testified that Avenatti also said that he would try to get Franklin's Basketball Program "back in with Nike and reestablish that relationship." (Tr. 788) Franklin testified that when he asked Avenatti whether he could regain control over his 17 and under team and obtain a new sponsorship agreement with Nike, Avenatti replied, "[w]ell, after this, I don't think they're going to let you be back with them." (Tr. 1561) Franklin did not understand that Avenatti would make no effort to persuade Nike to permit Franklin to regain control over his team, however. (Tr. 1561-62)

There was no discussion at the March 18, 2019 meeting about Avenatti holding a press conference, performing an internal investigation at Nike, or being hired by or paid by Nike. (Tr. 797-98, 1563-64) Moreover, Avenatti did not disclose to Franklin and Auerbach that he was working with Geragos on Franklin's claims. (Tr. 799, 1565)

The March 18, 2019 meeting was Franklin and Auerbach's last in-person meeting with Avenatti. (See Tr. 808, 1538)

### G. Avenatti and Geragos's March 19, 2019 Meeting with Nike's Lawyers

On March 19, 2019, Avenatti and Geragos met with Leinwand, Wilson, and Benjamin Homes – a Boies Schiller associate – at Geragos's New York offices. (Tr. 208, 1138-39, 1149-50, 1414) The meeting lasted between an hour and an hour and a half. (Tr. 271) Avenatti and Wilson did most of the talking at the meeting. (Tr. 209, 1173)

At the outset of the meeting, Avenatti asked whether the meeting would be "a 408 discussion," which Wilson understood to be a reference to Rule 408 of the Federal Rules of Evidence. Although Wilson did not understand the meeting to be a settlement discussion (Tr.

210), he agreed that it would be governed by Rule 408, because he wanted to learn what claims Geragos and Avenatti were making.  (Tr. 211)

Avenatti began by saying that he represented a whistleblower who had information about improper payments Nike had made to amateur basketball players, including the top pick in the 2018 NBA draft.  (Id.)  According to Avenatti, his client was "the head of a program or a program director who had been involved in these payments in connection with the Nike employees making the payments."  (Tr. 215)  Avenatti identified DeBose and James as the Nike employees involved in the misconduct, and he named several players who had received improper payments.  (Tr. 212)  Avenatti added that he was aware that Nike had received a grand jury subpoena in 2017, and that he suspected Nike had not been fully forthcoming with the Government in responding to that subpoena.  (Id.)

Avenatti told Nike's attorneys that "Nike was going to do two things.  Nike was going to pay a civil settlement to his client, who he said had breach of contract, tort, or other claims, and Nike was going to hire Mr. Avenatti and Mark Geragos to conduct an internal investigation into corruption in basketball."  (Tr. 213, 242-43, 1155, 1418)  Leinwand likened Avenatti's demand to the following:  "somebody . . . walk[s] into your store and they mess it up and they say you need protection, you have to hire me to protect you.  And then you say who are you going to protect us from, and they say me . . . because if not, I'm going to destroy your store."  (Tr. 1156)

Avenatti told Nike's lawyers that "he was going to blow the lid on this scandal, that it was going to be a major scandal, that he had a reporter, Rebecca Ruiz, at the New York Times either on speed dial or on call and that he could reach out to her and have her write a story at a moment's notice."  (Tr. 217, 1157, 1419, 1437)  Avenatti said that if Nike did not comply

with his demands, he would "hold a press conference the next day," during which "he could and would take billions of dollars off the company's market cap." (Tr. 218, 244, 1163-64, 1419-20, 1422) Avenatti said nothing about filing a lawsuit. (Tr. 245-46)

Wilson or Leinwand sought more details concerning Avenatti's claims, and Avenatti eventually identified his client as Gary Franklin. (Tr. 251) Avenatti also permitted Wilson to examine "a small package of documents." (Tr. 253) The documents appeared to be "a collection of e-mails, text messages, invoices, redacted bank statements grouped behind a table of contents type, what I call cover sheets. . . . They looked like they were communications between Mr. Franklin and a Nike employee [and a ] family member of [the number one pick in the 2018 NBA draft] from 2016. And then there were other communications involving Mr. Franklin from 2017." (Tr. 253-54) Wilson asked for a break to confer with Leinwand about the documents. (Tr. 254)

During the break, Wilson described the documents "as best [he] could remember them" to his associate, so that Homes could take notes concerning the content of the documents.[4] (Tr. 350, 484-85, 1434-35) After Leinwand heard Wilson's description of the documents, he became less concerned that Nike's lawyers had missed something in conducting their internal review of relevant records, and more focused on the press conference that Avenatti was threatening to convene. (Tr. 1243)

After the break, Wilson asked for more time to consider Avenatti's demands. Avenatti responded that the next day was important, both because it was "the eve of March

---

[4] Homes took notes throughout the meeting, although at some point Avenatti told him to stop taking notes. (Tr. 369, 1162-63, 1414-15, 1420, 1434) After the meeting, Wilson instructed Homes to prepare a typewritten set of notes, and Homes prepared a typewritten set of his notes within an hour or two after the meeting. (Tr. 370, 1421)

**SPA.14**

Madness" and "the eve of a Nike earnings call." Wilson, Leinwand, and Homes understood Avenatti to be saying that his threatened press conference would have a particularly damaging effect on Nike's stock price because of its timing. (Tr. 255-58, 1166-67, 1423-24) Although Avenatti did not ask that Nike fire any Nike employees, he made it clear that both of his demands – the settlement for Franklin, and the hiring of Avenatti and Geragos to conduct an internal investigation at Nike – would have to be met in order to forestall the threatened press conference.[5] (Tr. 1163, 1425, 1431)

As to the settlement for Franklin, Avenatti demanded $1.5 million. (Tr. 265, 1244) As to the internal investigation, Avenatti said that if Nike hired another law firm to conduct the internal investigation, Avenatti and Geragos would have to "get paid two times the fees that Nike paid to that other law firm for actually doing [the] work." (Tr. 266-67, 1159-60, 1246)

At no point during the March 19, 2019 meeting did Avenatti request that Nike enter into a new sponsorship agreement or any other type of business relationship with Franklin. (Tr. 1162)

When the March 19, 2019 meeting ended, Wilson understood that Avenatti would proceed with his threatened press conference the next day if his demands were not met. (Tr. 270)

---

[5] Leinwand testified that Avenatti's threatened press conference presented a much more serious threat than a lawsuit. In a lawsuit, Nike "would have an opportunity to go through the court process; . . . there would be – you know, there would be fact finding and ultimately, you know, some resolution in front of a jury. But here it was – the threat was not a lawsuit, the threat was a press conference. And . . . when you file a lawsuit, . . . [t]here are limits as to what you can put in a complaint. It has to be truthful. And in a press conference there is no such controls as in the legal system." (Tr. 1168)

## H.    Telephone Calls After the March 19, 2019 Meeting

A few hours after the March 19, 2019 meeting ended, Wilson and Leinwand contacted the U.S. Attorney's Office for the Southern District of New York to "relay[] to the prosecutor the information, some of it new, that we had heard about Mr. Franklin and potentially payments involving Nike employees to players in [Mr. Franklin's] program, . . . and a description of Mr. Avenatti's and Mr. Geragos'[s] conduct and the demands that they [had] made."[6]   (Tr. 272, 1139, 1296)

Wilson also spoke with Geragos later that day.  Geragos stated that he had convinced Avenatti to delay his press conference until March 21, 2019.  (Tr. 272-73)

Avenatti spoke by telephone with Auerbach and Franklin after the March 19, 2019 meeting.  (Tr. 800-801, 1566)  Avenatti reported that the March 19, 2019 meeting with Nike "went great" and that Nike's lawyers wanted to meet again on March 21, 2019.  (Tr. 801, 1567)  During the call, Avenatti said nothing about a press conference, an internal investigation at Nike, or Nike hiring him to conduct an internal investigation.  (Tr. 806, 1568)  Avenatti also did not disclose that Geragos was assisting him in representing Franklin.  (Tr. 1567)

From March 20, 2019 on, Wilson's calls with Avenatti and/or Geragos were recorded by the FBI.  (Tr. 274-75, 509-10; GX1, 3, 4)  During a March 20, 2019 call with Avenatti and Geragos, Wilson reported that the issues Avenatti had raised at the March 19, 2019 meeting were being discussed at the "highest levels of the company."  (GX 1 at 01:10-01:17)

---

[6]  Wilson testified that in September 2017, the U.S. Attorney's Office for the Southern District of New York had served Nike with a grand jury subpoena seeking information concerning corruption in amateur basketball.  Pursuant to Nike's cooperation with that investigation, Nike and Boies Schiller lawyers had twice met with an SDNY Assistant U.S. Attorney, and Boies Schiller lawyers had had additional phone calls with the U.S. Attorney's Office.  (Tr. 371-75)  After the March 19, 2019 meeting with Avenatti, Wilson "called a member of the team [at the SDNY U.S. Attorney's Office] investigating Nike."  (Tr. 509, 1174-75)

**SPA.16**

Wilson told Avenatti, "we're not going to give you everything you want, but I think we can give you much of what you want." (Tr. 284-85; GX 1 at 02:07-02:10)

In response, Avenatti said:

[W]e're gonna get a million five for our guy, and we're gonna be hired to handle the internal investigation, and if you don't wanna do that, we're done. . . . I wanna be really clear with you. . . . I'm not fucking around with this, and I'm not continuing to play games. . . . You guys know enough now to know you've got a serious problem. And it's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me. I'm just being really frank with you. So if that's what, if that's what is being contemplated, then let's just say it was good to meet you, and we're done. And I'll proceed with my press conference tomorrow and I'll hang up with you now and I'll call the New York Times, who are awaiting my call. I-I'm not fucking around with this thing anymore. So if you guys think that you know, we're gonna negotiate a million five [for Franklin], and we're gonna, you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done. . . . And I'll go and I'll go take and I'll go take ten billion dollars off your client's market cap. But I'm not fucking around.

(GX 1 at 02:33-03:57)

Avenatti then asked Wilson what Boies Schiller would "ask for, for an internal investigation of this nature? . . . You tell me what Boies Schiller would quote. . . ." Wilson responded that Boies Schiller would "charge millions of dollars for an internal investigation like that." (Id. at 05:55-07:17) Avenatti responded that a number in the "single digit millions" – "five, six, eight, nine million dollars" – was "not in the ballpark" of what he was seeking for the internal investigation. (Id. at 09:01-09:20) He added, "do I think it's gonna be a hundred million? No. Do I think it's gonna be nine million? No." (Id. at 11:12-11:17)

Wilson proposed another meeting at which "we're gonna hammer something out, we're gonna get terms on paper, you know, the releases that we want, all of the bells and whistles . . . it would be ideal to sit down and do that in person." (Id. at 12:20-12:31) Avenatti said that he would be "happy to sit down in a room" with Wilson on March 21, 2019, but that he

**SPA.17**

wanted Wilson to "not only have authority [to settle], but that we be prepared to paper it." (<u>Id.</u> at 13:40-14:14)

Avenatti stated that "this is not gonna take longer than twenty-four hours to paper . . . . This is very straightforward. . . . I mean we're talking about a settlement agreement . . . on a million five with adequate releases etcetera, and we're talking about an engagement letter." (<u>Id.</u> at 14:14-14:36) Avenatti and Wilson agreed to meet the next day at 1:30 p.m., at Geragos's New York office, to prepare the settlement agreement. (<u>Id.</u> at 18:38-19:41)

**I.     Avenatti and Geragos's March 21, 2019 Meeting with Nike's Lawyers**

On March 21, 2019, Avenatti and Geragos met with Wilson and Homes at Geragos's New York office. (Tr. 303-05, 1441) The FBI arranged for surreptitious audio and visual recording of the meeting. (Tr. 303-04; GX 2)

At the outset of the meeting, Avenatti handed Wilson a draft settlement agreement and general release. (GX 2 at 14:00-14:35) Wilson responded: "I don't think that that the um, one point five million dollars to settle [Franklin's] civil claims will be the sticking point." (<u>Id.</u> at 15:01-06)

After discussing the release language and the parties to be released (<u>id.</u> at 14:00-15:59), Avenatti told Wilson that – for purposes of the internal investigation – he and Geragos "want[ed] to report directly" to Leinwand, to Nike's general counsel, or to an executive in Nike's corporate hierarchy above Leinwand and the general counsel. (<u>Id.</u> at 16:07-16:32) Avenatti further proposed that Nike's retention of Avenatti and Geragos "remain confidential . . . with the understanding that . . . over the course of us conducting our internal investigation we're gonna have to disclose that we're working for Nike." (<u>Id.</u> at 16:37-17:07) Avenatti emphasized that

any disclosure to the press would be determined by Nike, "[b]ecause Nike's our client."  (Id. at 17:07-17:25)

As to financial terms, Avenatti demanded a "12 million dollar retainer upon signing.  Evergreen.  Um, that's gonna be deemed earned when paid, we'll cap it at 25 million dollars, minimum of 15 million dollars, unless the scope changes."  (Id. at 17:36-17:57)  When Wilson asked what Avenatti regarded as the scope of the internal investigation, Avenatti said that it was "payments made to players in order to  route them to various colleges, or shoe contracts, prior to them being eligible to receive any such payments."  (Id. at 18:00-18:19)

As to billing rates and costs, Avenatti proposed a blended hourly rate of $950 per hour for attorneys, $450 per hour for paralegals, and reimbursement of all out-of-pocket expenses.  (Id. at 18:23-18:35)

Avenatti told Wilson that – in addition to the settlement agreement with Franklin – the parties would need to enter into "[a] confidential retainer agreement."  Wilson asked "who would be the counterparty" in the retainer agreement.  Avenatti responded that the "counterparty" would "be either my firm, or Mark [Geragos's] firm, or a new entity that we then form."  (Id. at 18:58-19:14)

As to disclosure of the results of the internal investigation, Avenatti stated that "ultimately, it's gonna be up to the client as to whether they want to self-disclose . . . just like any other client. . . . those aren't our decisions to make"; we "report back to Nike, and then Nike makes a decision on what they wanna do."  (Id. at 21:20-21:36)

Wilson responded:  "as I said before[,] I don't think that the . . . settlement of Mr. Franklin's civil claims for 1.5 million dollars is going to be the stumbling block here.  Is there a way to avoid your press conference without hiring you and Mark [Geragos] to do an internal

investigation?"  (<u>Id.</u> at 21:50-22:09)  Avenatti said, "I'm not gonna answer that question."  (<u>Id.</u> at 22:09-22:10)

Wilson then asked, "[c]an we settle this under, could we do this all under the civil settlement agreement? . . . If the money went higher, could we do it all under the civil settlement agreement?"  (<u>Id.</u> at 22:22-34)  In response to Wilson's question as to whether the dispute could be resolved entirely through a settlement agreement between Franklin and Nike, Avenatti said: "I don't think it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin, in light of his role in this. . . . I mean, imagine that."  (<u>Id.</u> at 23:20-23:41)

Wilson told Avenatti that it was difficult for him to explain to the Nike executives "at the top of the heap[] why is it that we have to both um, do a civil settlement, and hire plaintiff's counsel and his colleague . . . to do legal work, for the company. . . . [T]hat's not something we've ever seen before."  (Id. at 23:45-24:25)  "I am struggling with how to sell, to my client, something that is outside of the civil settlement, that is instead a separate um, separate hiring of attorneys they don't know, to conduct an internal investigation, which is a very sensitive thing."  (<u>Id.</u> at 30:57-31:14)  Wilson also told Avenatti that he had "never gotten a 12 million dollar retainer from [Nike]."  (<u>Id.</u> at 32:21-32:23)

Avenatti responded as follows:

> Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em?  This is gonna be a major fucking scandal, you said yourself, that you're surprised Adidas wasn't indicted – I'm going tell ya, if we don't – if we don't figure this out, from moment one, I'm gonna be asking, why Nike hasn't been indicted.
>
> I'm gonna break, I'm gonna bring the power of my platform to bear – to expose what the fuck is goin' on here – appropriately[,] [i]f we can't reach a settlement in the next week.
> . . . .
> [L]et me just explain something to you.  This is not gonna be a single press conference, okay? . . . No, no this is gonna be, no this is gonna be a scandal.  This

is gonna be the biggest scandal in sports, in a long time.  That's what this is gonna be.

(Id. at 32:26-33:46)

     Avenatti added that if Nike

wants to have one confidential settlement agreement – and we're done, they can buy that for 22 and a half million dollars.  And we're done. . . . Fully confidential, we can leave it to Nike and its other lawyers to figure out what to do with this and handle it appropriately – and full confidentiality, we ride off into the sunset, if you need assistance from us as it relates to Mr. Franklin, uh, we'd be happy to provide that, obviously we're not gonna do anything illegal – or he's not gonna do anything illegal – . . . and we can be done.

(Id. at 34:12-35:01)

     Avenatti concluded by saying, "I just wanna share with you what's gonna happen,

if we don't reach a resolution":

As soon as this becomes public, I'm gonna receive calls from all over the country, from parents, and coaches, and friends, and all kinds of people . . . and they're all going to say, "I've got an email, or text message or . . . . [N]ow 90% of that is gonna be bullshit. . . . But 10% of it is actually going to be true.  And then what's gonna happen is, this will snowball.  And then it will be 5 players, and then it will be 9, and then it will be 15, and then it will be 25, and it's gonna snowball – and every time we get more information, that's gonna be The Washington Post, The New York Times, ESPN, a press conference – and the company will die, not die, but they're going to incur, cut after cut after cut after cut, and that's what's gonna happen. . . . I don't know what they did relating to, responding to that subpoena.  I don't know what the scope of that subpoena was.  But, I mean, that – that could be a major fucking problem.

(Id. at 35:23-37:54)

     Wilson said that he understood "the two scenarios.  There's the 1.5, plus the

internal investigation and the parameters you described, or 22 and . . . a half."  (Id. at 38:10-

38:30)

     Avenatti, Geragos, and Wilson agreed to meet again at noon on Monday, March

25, 2019, at Wilson's Boies Schiller office at 55 Hudson Yards.  (Id. at 38:35-55, 1:01:17-28)

Avenatti warned that "if this is not papered on Monday, we're done":

I don't wanna hear about somebody on a bike trip, I don't wanna hear that somebody has, somebody's grandmother passed away or something, I don't look – the dog ate my homework, I don't wanna hear, none of it is gonna go anywhere unless somebody was killed in a plane crash. It's going to go to zero, no place[,] with me.

(Id. at 39:10-39:35)

Avenatti added that he had "assumed that for the sake of our discussion here today, that all of the parameters for 408, confidentiality and everything from before, carried over."[7] (Id. at 38:52-40:00)

Before leaving the meeting, Wilson obtained a copy of the draft settlement agreement from Avenatti. (Id. at 44:25-44:32, 58:53-58:54; Tr. 342, 655; GX 205)

The draft settlement agreement Avenatti gave to Wilson did not reference any specific claims Franklin had, or believed he had, against Nike, nor did it refer to an internal investigation. The draft agreement had an effective date of March 25, 2019. (Tr. 343-45; GX 205)

Within an hour of leaving the March 21, 2019 meeting, Avenatti sent the following "tweet": "Something tells me we that we have not reached the end of this scandal. It is likely far[,] far broader than imagined. . . ." Avenatti attached a link to an article about the Adidas "[c]ollege basketball corruption trial." (Tr. 347-49; GX 106)

**J. Avenatti's Communications with Franklin and Auerbach After the March 21, 2019 Meeting**

Avenatti called Franklin and Auerbach "right after" his March 21, 2019 meeting with Wilson. Avenatti reported that the meeting with Nike's lawyers "went great," and that Nike wanted to have one more meeting on Monday, March 25, 2019, to "wrap things up." Avenatti

---

[7] At trial, Wilson testified that his discussions with Avenatti were not settlement negotiations so much as a "stickup." (Tr. 338)

emphasized that he was "not fucking around with this." (Tr. 807, 1569)  Because Avenatti "said everything was going well," neither Franklin nor Auerbach questioned him, and Avenatti did not provide any specific details as to what had been discussed at the meeting. (Tr. 807, 1570)  During the call, Avenatti made no reference to a $22.5 million settlement, a press conference, an internal investigation, or Nike's retention of him to conduct an internal investigation.  Avenatti also did not seek Franklin and Auerbach's permission to publicly disclose the information they had provided to him. (Tr. 808-09, 1571-73)

The March 21, 2019 call was the last time Auerbach and Franklin spoke with Avenatti. (Tr. 808)

After the March 21, 2019 call with Avenatti, Auerbach saw Avenatti's tweet about the Adidas case not being "the end of this scandal." (Tr. 809-10; GX 106)  Auerbach sent Franklin a screen shot of the tweet. (Tr. 1573-74)  Franklin was concerned by the tweet, because it seemed contrary to Avenatti's representation that everything had gone well at the meeting with Nike, and he thought it might hinder his efforts to rebuild a relationship with Nike. (Tr. 1574-76)

Avenatti called Franklin on March 23, 2019. (Tr. 1576)  Avenatti said that he was calling just to check-in, and that they should know something by Monday. (Id.)  Avenatti did not reference an internal investigation, and did not disclose that he had made a settlement for Franklin contingent on Nike's agreement to hire Avenatti and Geragos to conduct an internal investigation costing millions of dollars. (Tr. 1577-78)

### K.     Events of March 25, 2019

On the morning of March 25, 2019, Franklin's son told him that FBI agents were at Franklin's front door. (Tr. 1578-79)  Franklin called Avenatti, told him that FBI agents were

at his front door, and asked what to do.  Avenatti told Franklin to turn off his phone and not to

speak with the FBI agents.  Avenatti also said that he hoped that "Nike is not trying to fuck you."

(Tr. 1579)  Avenatti then told Franklin that he thought he would "go public."  Avenatti hung up

before Franklin – who was confused and upset – had an opportunity to respond.  (Tr. 1580)

        At about 9:15 a.m. Pacific Time, Avenatti tweeted that "[tomorrow] at 11 am

[Eastern Time], we will be holding a press conference to disclose a major high school/college

basketball scandal perpetrated by @Nike that we have uncovered.  This criminal conduct reaches

the highest levels of Nike and involves some of the biggest names in college basketball."  (GX

107; Tr. 813-14, 1175-76, 1583-84)  Auerbach testified that he had never told Avenatti that there

was criminal conduct at Nike that reached the highest levels of the company.  Auerbach also

believed that Avenatti's tweet was "[c]ompletely opposite" to Franklin's goals and objectives.

(Tr. 814-15)  Franklin likewise testified that he had never told Avenatti that there was criminal

conduct at Nike that reached the highest levels of the company.  Franklin also testified that he

had not discussed the tweet with Avenatti before it was posted, and that Avenatti had not sought

his permission before posting the tweet.  (Tr. 1584)

        After Avenatti posted his tweet, Nike's stock price fell about a dollar a share,

representing a drop of "[s]omething like three hundred million dollars or more" in the value of

Nike's stock.  (Tr. 1177)

        Avenatti was arrested on March 25, 2019, at about 12:39 p.m. Eastern Time, in

the vicinity of Boies Schiller's Hudson Yards office building.  (Tr. 1840-41, 1897; GX S-1)

        *          *          *          *

        Franklin and Auerbach testified that – throughout their interactions with Avenatti

– he never discussed (1) an internal investigation at Nike, or the possibility that Nike would

retain Avenatti to conduct such an investigation; (2) the possibility of a press conference; (3) the filing of a lawsuit against Nike; or (4) a $22.5 million settlement.  (Tr. 808, 1585-86)

L.  **Evidence of Avenatti's Dire Financial Condition**

At trial, the Government offered evidence that Avenatti was in dire financial straits at the time he was demanding that Nike pay him and Geragos $15 to $25 million.  The evidence showed that Avenatti was approximately $11 million in debt (GX S-4), and that his law firm had been evicted from its offices in November 2018 for a failure to pay rent.  Since that time, the lawyers and other firm employees had been forced to work from home.  (Tr. 1401-02)  Between March 15, 2019 and March 25, 2019, Avenatti told his office manager – Judy Regnier – that he was "working on something that could potentially provide [the firm with] a way to . . . resolve a lot of the debt that had currently been hanging over the law firm," and allow Avenatti to "start a new firm."  (Tr. 1405-06)

M.  **The Defense Case**

Avenatti did not testify and he called no witnesses.  He introduced a number of exhibits that purportedly went to his state of mind, including travel team contracts, Auerbach's "memorandum of actions," an article about the Adidas bribery scandal, a PowerPoint presentation Auerbach had prepared, a memorandum from Auerbach concerning his call with Slusher, and excerpts of Avenatti's web browsing and search history.  (Tr. 2115-26; DX I-1, I-2, I-3, I-4, I-5, HHH, III, S-20)

## DISCUSSION

I.  **AVENATTI'S RULE 29 AND RULE 33 MOTIONS**

In moving for a judgment of acquittal or a new trial, Avenatti argues that (1) the evidence is insufficient to prove that he acted "wrongfully" and with "intent to defraud"; and (2)

the statutes under which he was convicted are unconstitutionally vague-as-applied.  (Def. Mot. (Dkt. No. 291) at 24-31)  Avenatti also contends that this Court erred in (1) excluding certain text messages and emails; and (2) responding to a jury note regarding permissible inferences from exhibits admitted to show state of mind.  (Id. at 32-40)

**A.**     **Legal Standards**

**1.**     **Rule 29 Sufficiency of Evidence Challenges**

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

"In evaluating a sufficiency challenge, [a court] 'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'"  United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)); see also United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) ("The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury.").  In assessing a sufficiency challenge, "[t]he evidence is to be viewed 'not in isolation but in conjunction.'"  Mariani, 725 F.2d at 865 (quoting United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).  "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'"  United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).

"The Second Circuit has observed that '[t]hese strict rules are necessary to avoid judicial usurpation of the jury function.'" United States v. DiPietro, No. S502 Cr. 1237 (SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865) (alterations in DiPietro). "[T]he task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001). Given this standard, "[a] defendant bears a 'very heavy burden' in challenging a conviction based on insufficient evidence." United States v. Goldstein, No. S2 01 Cr. 880 (WHP), 2003 WL 1961577, at *1 (S.D.N.Y. Apr. 28, 2003) (quoting United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994)).

## 2. Rule 33 Standard

Pursuant to Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, see United States v. Leslie, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence, United States v. Ferguson, 246 F.3d 129, 136 (2d Cir. 2001) ("We cannot say that the district judge abused her discretion when she concluded that the weight of the evidence showed that [the defendant] was an outside hit man and not a [gang] member acting to further that membership."). Moreover, in contrast to the analysis under Rule 29, a district court considering a Rule 33 motion need not view the evidence in the light most favorable to the Government. United States v. Lopac, 411 F. Supp. 2d 350, 359 (S.D.N.Y.

2006) (citing <u>United States v. Ferguson</u>, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999), <u>aff'd</u>, 246

F.3d 129 (2d Cir. 2001)).

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand
> would be a manifest injustice.  The trial court must be satisfied that competent,
> satisfactory and sufficient evidence in the record supports the jury verdict.  The
> district court must examine the entire case, take into account all facts and
> circumstances, and make an objective evaluation.  There must be a real concern
> that an innocent person may have been convicted.  Generally, the trial court has
> broader discretion to grant a new trial under Rule 33 than to grant a motion for
> acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority
> sparingly and in the most extraordinary circumstances.

<u>Ferguson</u>, 246 F.3d at 134 (internal quotation marks and citations omitted).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the

evidence and credibility of witnesses."  <u>United States v. Autuori</u>, 212 F.3d 105, 120 (2d Cir.

2000) (citing <u>Sanchez</u>, 969 F.2d at 1413).  However, "[t]he district court must strike a balance

between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role

of the jury."  <u>Ferguson</u>, 246 F.3d at 133 (quoting <u>Autuori</u>, 212 F.3d at 120) (second alteration in

<u>Ferguson</u>).  "Because the courts generally must defer to the jury's resolution of conflicting

evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can

be demonstrated that the trial judge may intrude upon the jury function of credibility

assessment.'"  <u>Id.</u> at 133-34 (quoting <u>Sanchez</u>, 969 F.2d at 1414) (alteration in <u>Ferguson</u>).  Such

"exceptional circumstances" may exist "where testimony is 'patently incredible or defies

physical realities.'"  <u>Id.</u> at 134 (quoting <u>Sanchez</u>, 969 F.2d at 1414).

### B.  Avenatti's Arguments Under Rule 29

Avenatti contends that the evidence is insufficient as to all three counts of

conviction:  transmitting interstate communications with intent to extort, in violation of 18

U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count

Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).

According to Avenatti, he is entitled to a judgment of acquittal on all counts because the

Government did not offer sufficient evidence that he acted "wrongfully" and with "intent to

defraud."  (Def. Mot. (Dkt. No. 291) at 24)

### 1.      <u>Wrongfulness</u>

Avenatti argues that he is entitled to a judgment of acquittal on Counts One and

Two because the evidence is insufficient to prove that he acted "wrongfully" in "demanding that

he be hired and paid by Nike to conduct an internal investigation."  (<u>Id.</u>)  According to Avenatti,

"[t]he evidence was uncontroverted that Coach Franklin wanted to root out corruption so that

what happened to him would not happen to other coaches."  (<u>Id.</u>)  "The evidence suggested that

Mr. Avenatti believed that [the Boies Schiller firm] was not capable of conducting an

independent investigation, and Coach Franklin did not have the power to force Nike to terminate

DeBose and James, nor the money to conduct his own investigation of Nike EYBL.  Neither Mr.

Auerbach nor Coach Franklin placed any restrictions on how Mr. Avenatti might seek to achieve

those objectives."  (<u>Id.</u> at 25)  Accordingly, "[t]he government presented insufficient evidence

that Mr. Avenatti believed that he was exceeding the authority granted to him by Coach Franklin

by demanding that he, Mr. Avenatti, be retained by Nike to conduct an internal investigation."

(<u>Id.</u>)

### a.      <u>Applicable Law and the Jury Charge</u>

A conviction for transmission of interstate communications with intent to extort

or for Hobbs Act extortion requires proof of "wrongfulness."  <u>See</u> <u>United States v. Jackson</u>, 180

F.3d 55, 65, 67 (2d Cir. 1999) ("<u>Jackson I</u>") (listing elements of Section 875(d) offense and

discussing "wrongfulness" requirement), <u>conviction</u> <u>reinstated</u>, 196 F.3d 383 (2d Cir. 1999)

("<u>Jackson II</u>") (threat to reputation found sufficient where defendant had no plausible claim to

**SPA.29**

the $40 million she sought); United States v. Clemente, 640 F.2d 1069, 1077 (2d Cir. 1981)

(discussing "wrongfulness" element of Hobbs Act extortion).

            To act with "intent to extort" means to act with the intent to obtain money from an

entity, with the entity's consent, but where that consent was caused or induced by the wrongful

use of fear of harm to that entity's reputation.  Although "a threat to cause economic loss [or

reputational harm] is not inherently wrongful," a threat to cause harm "becomes wrongful . . .

when it is used to obtain property to which the threatener is not entitled."  Jackson I, 180 F.3d at

70; see also Clemente, 640 F.2d at 1077 ("[T]he use of fear of economic loss to obtain property

to which one is not entitled is wrongful.").  A threat of harm to property or reputation combined

with a demand for money may also be "wrongful" where the individual making the threat has a

plausible claim of right to the funds, but the Government has shown beyond a reasonable doubt

that there is no nexus between the threat of harm to property or reputation and the claim of right.

See Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 579 (S.D.N.Y. 2014), aff'd, 833 F.3d 74

(2d Cir. 2016) ("The element of wrongfulness may be supplied by (1) the lack of a plausible

claim of entitlement to the property demanded, or (2) the lack of a good faith belief of

entitlement, or (3) the lack of a nexus between the threat and the claim of right.  It may be

supplied also, in this Court's view, by inherently wrongful conduct." (emphases in original)).

            At trial, this Court instructed the jury that,

> [i]n order to conclude that Mr. Avenatti acted wrongfully, you must find that the
> Government has proven beyond a reasonable doubt either that (1) in demanding
> that he be hired and paid to conduct an internal investigation, Avenatti understood
> that he was acting in furtherance of his own interests, and was not pursuing
> Franklin's objectives; or (2) Avenatti's threat of harm and demand that he be
> hired and paid to perform an internal investigation had no nexus to any claim of
> Franklin's that Avenatti reasonably believed he had been authorized by Franklin
> to pursue.  As you can see from how these issues are posed, they do not turn on

the precise amount of money that Mr. Avenatti was demanding to perform the internal investigation.

In determining whether Mr. Avenatti's threat to harm Nike's property or reputation was wrongful, you should be aware that it is irrelevant whether the factual allegations underlying the threat to harm Nike's reputation were true.

(Tr. 2329-30)

The Court also instructed the jury that,

[u]nder California law, it is the client who defines the objectives of the representation and not the lawyer. A lawyer cannot act without the client's authorization, and a lawyer may not take over decision-making for a client, unless the client has authorized the lawyer to do so. A lawyer must abide by a client's decisions concerning the objectives of the representation and shall reasonably consult with the client as to the means by which the objectives are to be pursued.

Subject to requirements of client confidentiality, a lawyer may take such actions on behalf of the client as is impliedly authorized to carry out the representation. The client has the ultimate authority to determine the purposes to be served by the legal representation, however, within the limits imposed by law and the lawyer's professional obligations. A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions. A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself.

(Tr. 2338)

Avenatti contends that he honestly believed that he was acting within the scope of his authority as Franklin's lawyer, and that he "took such actions as were 'impliedly authorized to carry out the representation.'" (Def. Mot. (Dkt. No. 291) at 26) Under the jury instructions cited above, however, these issues were laid squarely before the jury, and in convicting Avenatti, the jury rejected his arguments. As discussed below, this Court concludes that the jury's determination was supported by ample evidence.

**b.** <u>Analysis</u>

Avenatti contends that the evidence does not demonstrate that he understood that he was exceeding the authority granted to him by Franklin. According to Avenatti, his demands

that Nike retain him to conduct an internal investigation and pay him millions of dollars were "entirely consistent with Coach Franklin's goal of getting DeBose and James fired and assisting Nike to clean up EYB and self-report to authorities." (Def. Reply (Dkt. No. 294) at 3-4)

Viewing "the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence,'" Coplan, 703 F.3d at 62 (quotation marks and citation omitted), the evidence was more than sufficient to demonstrate that Avenatti acted wrongfully.

The evidence at trial showed that Franklin did not ask Avenatti to seek an internal investigation of Nike, and that Avenatti never told Franklin (or Auerbach) that he had made such a demand to Nike, much less that Avenatti had demanded that Nike pay him and Geragos millions of dollars to perform the internal investigation at Nike. (Tr. 797-99, 807-09, 1553, 1567-73, 1577-78) Nor did Avenatti tell Franklin and Auerbach that he intended to disclose confidential information that they had shared with him – information that could damage Franklin's reputation and that of his Basketball Program – with the press. (Tr. 1545-47)

Moreover, during his meetings with Nike's lawyers, Avenatti repeatedly used threats of economic and reputational harm to demand millions of dollars for himself, to which he had no plausible claim of right. Avenatti used Franklin's confidential information to demand that Nike pay him $15 to $25 million, and he did so without Franklin's knowledge and to Franklin's detriment. (See GX 1 at 02:33-03:57, 09:01-09:20; GX 2 at 17:36-17:57)

Indeed, when Nike's lawyer asked whether Nike could resolve Avenatti's demands simply by paying Franklin – rather than by retaining Avenatti to perform the internal investigation – Avenatti rejected that proposal, stating that he "[didn't] think that it makes any

sense for Nike to be paying . . . an exorbitant sum of money to Mr. Franklin in light of his role in

this. . . . ." (GX 2 at 23:20-23:41) Avenatti made clear to Nike that his settlement offer to Nike

had two components: a $1.5 million "civil settlement" for Franklin, and an agreement to retain

Avenatti and Geragos to perform an internal investigation, for which they would be paid $15 to

$25 million. (Tr. 265, 1163, 1425, 1431) Nike's refusal to agree to both components would

result in a press conference that would "take 5, 6 billion dollars in market cap off of [Nike's

stock]." (GX 2 at 32:26-32:31)

    In sum, a reasonable jury could have found that Avenatti understood that he was

acting in furtherance of his own interests, that he was not pursuing Franklin's objectives, that he

had not been authorized – either explicitly or impliedly – to pursue the $15 to $25 million

internal investigation, and that Avenatti's demands for millions of dollars for himself had no

nexus to any claim of Franklin that Avenatti reasonably believed he had been authorized by

Franklin to pursue.

    To the extent that Avenatti argues that his conduct – in demanding that Nike

retain him to conduct an internal investigation – was in furtherance of Franklin's goal of

eliminating corrupt influences in Nike's youth basketball program, there was ample evidence

that Avenatti had no genuine interest in pursuing a legitimate internal investigation or in

eliminating any corrupt influence Nike might be wielding over youth basketball. Avenatti

proposed a $12 million retainer, due upon signing, and "deemed earned when paid."

Accordingly, under Avenatti's proposed financial terms, he and Geragos would not have to

demonstrate that they performed any investigation in order to obtain the $12 million fee. (GX 2

at 17:36-17:57) Moreover, Avenatti told Wilson that while he and Geragos would "report [the

results of their investigation] back to Nike, . . . Nike makes a decision on what they want to do."

(Id. at 21:20-21:36) Wilson understood Avenatti to be saying that he was not focused on "root[ing] out misconduct," but that "whatever work [Avenatti and Geragos] were going to do [on the internal investigation], if Nike wanted to stick [the results] in a drawer after they were done," it could. (Tr. 322-23) Later in the negotiations, Avenatti offered an alternative settlement proposal. He told Wilson that Nike could obtain "full confidentiality" if it paid him $22.5 million. There would be no investigation and no disclosure, and Avenatti would simply "ride off into the sunset." (GX 2 at 34:12-35:01)

In short, the Government offered ample evidence of "wrongfulness."

## 2. **Intent to Defraud**

In connection with the honest services wire fraud charged in Count Three, Avenatti contends that the Government did not demonstrate that he – in demanding that Nike pay him millions of dollars to perform an internal investigation – acted with the "intent to defraud" Franklin. (Def. Mot. (Dkt. No. 291) at 24)

The Government responds that Avenatti solicited a bribe from Nike – without Franklin's knowledge or approval – and that Avenatti's bribe solicitation was based on confidential information that Franklin had provided to Avenatti for purposes of Avenatti's representation of Franklin. The Government further argues that – in "using Franklin's information to demand payments for the defendant, and indeed [in] making any settlement with Franklin contingent on the defendant being paid," Avenatti "created a conflict of interest requiring, at a minimum, informed written consent." (Govt. Opp. (Dkt. No. 292) at 12 (citing Tr. 747, 1572, 2337-38))

### a. **Applicable Law**

Avenatti is a member of the California Bar, and he met with Franklin in his capacity as an attorney. (Tr. 1579) As an attorney, Avenatti owed Franklin certain duties under

**SPA.34**

California law, including duties of loyalty, confidentiality, and reasonable communication. (Tr. 2336-40)

The honest services wire fraud statute applies to schemes involving bribes or kickbacks. See Skilling v. United States, 561 U.S. 358, 409 (2010). "[T]o violate the right to honest services, the charged conduct must involve a quid pro quo, i.e., an 'intent to give or receive something of value in exchange for an . . . act.'" United States v. Nouri, 711 F.3d 129, 139 (2d Cir. 2013) (quoting United States v. Bruno, 661 F.3d 733, 743-44 (2d Cir. 2011)). To demonstrate a quid pro quo agreement, the Government "ha[s] to prove, beyond a reasonable doubt, . . . that the defendant received, or intended to receive, something of value in exchange for an . . . act." United States v. Silver, 864 F.3d 102, 111 (2d Cir. 2017) (citing Bruno, 661 F.3d at 743-44 (in a prosecution of honest services wire fraud under a bribery theory, "[t]he key inquiry is whether, in light of all the evidence, an intent to give or receive something of value in exchange for an . . . act has been proved beyond a reasonable doubt")). The Government is not required to prove that the fraudulent scheme was successful. See Pasquantino v. United States, 544 U.S. 349, 371 (2005) ("[T]he wire fraud statute punishes the scheme, not its success." (citation omitted)).

### b.    **Analysis**

Avenatti argues that he merely took such actions as were "impliedly authorized to carry out the representation," and that the Government "presented insufficient evidence that Mr. Avenatti believed that he was exceeding the authority granted to him by Coach Franklin by demanding that he, Mr. Avenatti, be retained by Nike to conduct an internal investigation." (Def. Mot. (Dkt. No. 291) at 25-26)

The Government responds that Avenatti proposed a quid pro quo arrangement to Nike, in which Avenatti offered to take certain action regarding the settlement of Franklin's

claims in exchange for Nike paying Avenatti millions of dollars.  (Govt. Opp. (Dkt. No. 292) at 17)

In his first meeting with Nike's lawyers, Avenatti demanded that Nike pay Franklin $1.5 million and retain Avenatti to conduct an internal investigation at Nike.  (Tr. 267, 1244-45)  In the event that Nike decided to use another firm to conduct the internal investigation, Avenatti proposed that he "get paid two times the fees that Nike paid to that other law firm for actually doing [the] work."  (Tr. 266-67, 1159-60, 1246)

In a phone call following that first meeting, Avenatti made clear that his payment for conducting the internal investigation would have to exceed "single digit millions."  "A few million dollars doesn't move the needle for me.  I'm just being really frank with you. . . . So if you guys think that you know, we're gonna negotiate a million five, and we're gonna, you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done. . . . And I'll go and I'll go take and I'll go take ten billion dollars off your client's market cap.  But I'm not fucking around."  (GX 1 at 02:33-03:57, 09:01-09:20)

At Avenatti's second meeting with Nike's lawyers, Wilson told Avenatti that a settlement of "Franklin's civil claims for 1.5 million dollars" would not be "the stumbling block here."  Wilson asked, however, whether there was a way "to avoid [Avenatti's] press conference without hiring [Avenatti] and [Geragos] to do an internal investigation."  (GX 2 at 21:50-22:09)  Avenatti refused to directly answer the question (id. at 22:09-22:10), but stated that he "[didn't] think that it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin in light of his role in this. . . ."  (Id. at 23:20-23:41)  Avenatti thus made clear to Nike that the lion's share of any payment from Nike should go to him rather than to his client.

In making any settlement paid to Franklin contingent on Nike paying Avenatti millions of dollars, Avenatti acted with intent to defraud his client. And in soliciting a multi-million dollar payment from Nike for himself in exchange for settling Franklin's claims, Avenatti was proposing a quid pro quo and soliciting a bribe.

The Government offered sufficient evidence that Avenatti acted with intent to defraud Franklin and that he solicited a bribe from Nike.

### 3. Whether the Statutes of Conviction Are Vague-as-Applied

Avenatti contends that the statutes under which he was convicted are vague-as-applied. According to Avenatti, "the jury's determination of Mr. Avenatti's guilt on all three counts turned on their application of the California Rules of Professional Conduct on the allocation of authority[, which] underscores the vagueness of this prosecution. Mr. Avenatti was not on notice that the negotiating tactics he employed during confidential settlement negotiations . . . could expose him to criminal prosecution under the extortion and honest services wire fraud statutes." (Def. Mot. (Dkt. No. 291) at 27)

"'The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" United States v. Halloran, 821 F.3d 321, 337-38 (2d Cir. 2016) (quoting United States v. Rosen, 716 F.3d 691, 699 (2d Cir. 2013)); see also United States v. Napout, 963 F.3d 163, 181 (2d Cir. 2020). "'The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions.'" Id. (quoting Rosen, 716 F.3d at 699). "Under the 'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" Halloran, 821 F.3d at 338 (quoting Rosen, 716 F.3d at 699); see also Mannix v. Phillips, 619 F.3d 187, 197 (2d

Cir. 2010) ("The 'touchstone' of the notice prong 'is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" (quoting United States v. Lanier, 520 U.S. 259, 267 (1997))).

Where "the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.'" United States v. Rybicki, 354 F.3d 124, 129-30 (2d Cir. 2003) (en banc) (quoting United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993)). Moreover, "[o]ne whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." Id. (collecting cases) (quotation marks omitted).

"Although a law has to provide minimal guidelines in the form of explicit standards regarding what conduct is unlawful, it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." Rosen, 716 F.3d at 699 (quotation marks and citation omitted); see also Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) (a statute need not define the offense with "mathematical certainty"). "[S]ome inherent vagueness" is inevitable and thus permissible. Rose v. Locke, 423 U.S. 48, 49-50 (1975). A statute must nonetheless provide "relatively clear guidelines as to prohibited conduct," Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 525 (1994), because "'[t]he underlying principle is that no man [or woman] shall be held criminally responsible for conduct which he [or she] could not reasonably understand to be proscribed.'" United States v. Genovese, 409 F. Supp. 2d 253, 257 (S.D.N.Y. 2005) (quoting United States v. Harriss, 347 U.S. 612, 617 (1954)).

### a. **Extortion Statutes**

Avenatti was convicted of transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One), and Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two). (Verdict (Dkt. No. 265)) Section 875(d) prohibits extortion

through the use of interstate communications and provides that "[w]hoever, with intent to extort

from any person . . . any money or other thing of value, transmits in interstate or foreign

commerce any communication containing any threat to injure the property or reputation of the

addressee or of another . . . shall be [guilty of a crime]."  The Hobbs Act prohibits "the obtaining

of property from another, with his consent, induced by wrongful use of actual or threatened

force, violence, or fear" or attempting to do so.  18 U.S.C. § 1951(b)(2).

Avenatti argues that "the use of economic fear or a threat to injure the reputation

of another is not inherently wrongful," and that "[e]very one of the acts attributed to Mr.

Avenatti in the Superseding Indictment was independently lawful and protected by the First

Amendment."  (Def. Mot. (Dkt. No. 291) at 29-30 (emphasis omitted))  "The extortion statutes

failed to provide clear guidance that Mr. Avenatti could face criminal prosecution by making a

settlement demand involving two components that, if agreed to by Nike, would have fulfilled

Coach Franklin's objectives of seeking compensation and justice."  (Id. at 31)

### i.    **Analysis**

United States v. Jackson, 180 F.3d 55 (2d Cir. 1999), on reh'g, 196 F.3d 383 (2d

Cir. 1999), is the leading case in this area.  (See Jan. 6, 2020 Order (Dkt. No. 120) at 9-14)  In

Jackson, the Second Circuit instructed that

> not all threats to reputation are within the scope of § 875(d), that the objective of
> the party employing fear of economic loss or damage to reputation will have a
> bearing on the lawfulness of its use, and that it is material whether the defendant
> had a claim of right to the money demanded.
>
> We do, however, view as inherently wrongful the type of threat to reputation that
> has no nexus to a claim of right. . . .
>
> Where there is no plausible claim of right and the only leverage to force the
> payment of money resides in the threat, where actual disclosure would be
> counterproductive, and where compliance with the threatener's demands provides
> no assurance against additional demands based on renewed threats of disclosure,

we regard a threat to reputation as inherently wrongful. We conclude that where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful and its transmission in interstate commerce is prohibited by § 875(d).

Jackson, 180 F.3d at 70-71.

In sum, Section 875(d) and the Hobbs Act render unlawful the "wrongful" use of threats to extort a victim, and Jackson instructs district courts to look to the following factors in determining whether a "threat to reputation [is] inherently wrongful":

(1) did the defendant have a "plausible claim of right";

(2) did the defendant's leverage to force the payment of money reside solely in the threat, and would the leverage be lost if actual disclosure were made; and

(3) would compliance with the "threatener's demands" provide any assurance that additional demands premised on threats of disclosure would not be made.

Id. at 71. Where "the threatener does not have, and cannot reasonably believe []he has, a claim of right, or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful . . . ." Id.

Moreover, the First Amendment does not protect threats made in furtherance of an attempted extortion, or misrepresentations made in furtherance of a fraud scheme. See, e.g., Illinois ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); Jackson, 180 F.3d at 64 (citing district court's ruling that Section 875(d) is not "unconstitutionally overbroad or vague . . . because [it] target[s] only extortionate threats, not expressions of ideas or advocacy that typically implicate First Amendment protections").

Avenatti contends that the extortion statutes did not provide fair notice to him that his conduct vis a vis Nike was illegal. As discussed above, however, in addressing an as-applied

vagueness challenge, the "touchstone" of the inquiry as to "fair notice" is "'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'"  Halloran, 821 F.3d at 338 (citation omitted); Mannix, 619 F.3d at 197.

In Jackson and Clemente, the Second Circuit construed the "wrongfulness" element of the extortion statutes, and those decisions provide "fair notice" that the type of conduct Avenatti engaged in is criminal.

Although Avenatti contends that his conduct amounts to no more than "lawful bargaining" (Def. Mot. (Dkt. No. 291) at 30), his conduct meets each of the Jackson criteria for "inherently wrongful" acts.

As an initial matter, Avenatti used Franklin's potential claims against Nike as leverage to obtain millions of dollars for himself, to which he had no plausible claim of right. Although Avenatti characterizes his demands as "fulfill[ing] Coach Franklin's objectives of seeking compensation and justice" (id. at 31), Avenatti used Franklin's claims as a device to obtain a large windfall for himself, and he did so without his client's knowledge or consent. Indeed, Avenatti never told Franklin that he was demanding that Nike agree to an internal investigation, much less an internal investigation that Avenatti would be paid millions to perform.

Moreover, in demanding that Nike agree to pay him $15 to $25 million to perform an internal investigation, Avenatti acted to the detriment of his client.  When Wilson stated that Nike was prepared to enter into a $1.5 million civil settlement with Franklin, Avenatti made clear that no settlement would be possible absent Nike's agreement to pay Avenatti $15 to $25 million.  But Avenatti had no plausible claim of right to these monies, particularly if his

**SPA.41**

insistence on obtaining the $15 to $25 million might result in Franklin obtaining nothing. (See GX 2 at 17:36-17:57, 21:50-22:10) And when Nike suggested a larger settlement for Franklin in exchange for Avenatti dropping his demand for an Avenatti-led internal investigation, Avenatti rejected the idea, saying that he "[didn't] think that it makes any sense for Nike to be paying . . . an exorbitant sum of money to Mr. Franklin in light of his role in this . . . ." (Id. at 23:20-23:41)

        And to the extent that Avenatti contends that his demand for an Avenatti-led internal investigation fulfilled Franklin's desire for "justice" – as discussed above – there is ample evidence that Avenatti had no genuine interest in performing a legitimate internal investigation and in disclosing Nike's alleged corrupt activities. This inference is readily drawn from Avenatti's demand for a $12 million retainer that would be "deemed earned when paid" (GX 2 at 17:36-17:57); his statement that "Nike makes a decision on what they want to do" with respect to the results of an investigation (id. at 21:20-21:36), which meant that "if Nike wanted to stick [the results of the investigation] in a drawer after [Avenatti and Geragos] were done," it could do so (Tr. 322-23); and his alternative proposal that Nike simply pay him $22.5 million for "full confidentiality," after which Avenatti would "ride off into the sunset." (GX 2 at 34:12-35:01, 38:10-38:30)

        Jackson provided clear notice to Avenatti that his demand for $15 to $25 million from Nike was not premised on any plausible claim of right, and Avenatti could not have reasonably believed that he had a plausible claim of right to this money. Avenatti instead hijacked Franklin's claims to pursue his own agenda, which was to obtain a multi-million windfall for himself.

        Analysis of the other components of the Jackson test confirms that Avenatti was on notice that his conduct was "inherently wrongful," and thus unlawful and criminal. "[T]he

only leverage to force the payment of money reside[d] in [Avenatti's] threat to [hold a press conference]." Jackson, 180 F.3d at 71. "[A]ctual disclosure would [have been] counterproductive," because Avenatti would thereby lose his leverage to demand that Nike hire him to conduct an internal investigation. Id. And had Nike complied with Avenatti's demands to pay him millions of dollars, it would have had little assurance that he would not later reappear – perhaps with another coach or a player – and make "additional demands based on renewed threats of disclosure." Id.

In sum, the extortion statutes are not unconstitutionally vague as applied to Avenatti's conduct. To the contrary, Jackson put Avenatii on clear notice that his conduct was unlawful and criminal.

### b.   Honest Services Wire Fraud

At trial, Avenatti was convicted of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346. (Verdict (Dkt. No. 265))

Title 18, United States Code, Section 1343 provides that

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

Title 18, United States Code, Section 1346 provides that

> the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346.

As discussed above, in <u>Skilling v. United States</u>, 561 U.S. 358 (2010), the Supreme Court held that "§ 1346 criminalizes <u>only</u> the bribe-and-kickback core of the pre-<u>McNally</u> case law." <u>Skilling</u>, 561 U.S. at 409 (emphasis in original). Moreover, "to violate the right to honest services, the charged conduct must involve a <u>quid</u> <u>pro</u> <u>quo</u>, <u>i.e.</u>, an 'intent to give or receive something of value in exchange for an . . . act.'" <u>Nouri</u>, 711 F.3d at 139 (quoting <u>Bruno</u>, 661 F.3d at 743-44). The alleged fraudulent scheme need not have been successful to support a conviction, however. <u>See</u> <u>Pasquantino</u>, 544 U.S. at 371 ("'[T]he wire fraud statute punishes the scheme, not its success.'" (citation omitted)).

Here, Avenatti contends that the honest services wire fraud statute is vague as-applied, because "this case [is] not a 'paradigmatic' bribery case" as <u>Skilling</u> requires, and he "did not have fair notice that he could be convicted of honest services wire fraud for demanding that Nike retain him and Mr. Geragos to conduct an internal investigation to root out corruption at Nike." (Def. Mot. (Dkt. No. 291) at 31)

### i. **Analysis**

As discussed above, as a member of the California Bar and as Franklin's attorney, Avenatti owed his client duties of, <u>inter alia</u>, loyalty, confidentiality, and reasonable communication. Cal. R. Prof'l Conduct 1.7 (Conflict of Interest: Current Clients); Cal. Bus. & Prof. Code § 6068(e)(1) ("It is the duty of an attorney to . . . maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client."); Cal. Bus. & Prof. Code § 6068(m); Cal. R. Prof'l Conduct 1.4. (<u>See</u> <u>also</u> Tr. 2336-40)

In his initial meeting with Avenatti on March 5, 2019, Franklin told Avenatti what he hoped to achieve through Avenatti's representation: he wanted his "team back"; he wanted "Jamal James and Carlton DeBose fired"; he wanted "some sort of restitution" for the lost Nike sponsorship; and he wanted to be "covered" as a "whistleblower." (Tr. 1541-42) In furtherance

of these objectives, Franklin and Auerbach provided confidential information to Avenatti concerning Nike's alleged corruption in connection with youth basketball.  (Tr. 731, 1543-44; GX 312)

At the March 5, 2019 meeting, Avenatti told Franklin and Auerbach that he would serve as Franklin's lawyer, and that he would seek immunity for Franklin for his involvement in making improper payments to players' families and in falsifying invoices that were submitted to Nike for payment.  (Tr. 742, 744-45)

In a March 18, 2019 meeting with Franklin and Auerbach, Avenatti represented that he was "going to first get [Franklin] covered with some sort of whistleblower or immunity," and that he was then "going to get James and DeBose fired."  Avenatti also said that he thought he could obtain a $1 million settlement from Nike for Franklin.  (Tr. 1560-61, 787-88)

There was no discussion at the March 5 and March 18, 2019 meetings about Avenatti (1) threatening to hold a press conference; (2) demanding that Nike commission an internal investigation; or (3) demanding that Nike retain Avenatti and Mark Geragos – at a cost of $12 million or more – to perform an internal investigation of Nike.  Franklin and Auerbach were never told – either at these meetings or in telephone conversations with Avenatti – that Avenatti would make such demands, and Franklin never authorized Avenatti to make such demands.  And Avenatti never told Franklin and Auerbach that he would hold a settlement for Franklin hostage to his demand that Nike agree to pay him millions of dollars to conduct an internal investigation.[8]

---

[8]  There is also no evidence that Avenatti attempted to persuade Nike to revive its sponsorship relationship with Franklin, and to fire DeBose and James.  Nor is there any evidence that Avenatti approached the authorities about whistleblower protection for Franklin.

Although Avenatti contends that the honest services fraud statutes and the case law construing these statutes did not give him fair notice that his conduct could subject him to criminal liability, application of these statutes here is straightforward. Avenatti does not contest that – as Franklin's lawyer – he owed Franklin duties of loyalty, confidentiality, and reasonable communication. The evidence at trial showed that Avenatti breached the duties he owed Franklin. Instead of pursuing the objectives Franklin had identified, Avenatti devised an approach to Nike that was designed to enrich himself. Avenatti used the confidential information Franklin had provided to demand that Nike retain him to conduct an internal investigation, for which Avenatti would be paid between $15 and $25 million. And Avenatti made these demands without Franklin's knowledge or authorization and to Franklin's detriment, telling Nike that no settlement with Franklin could be reached absent Nike's agreement to pay Avenatti millions of dollars.

And while Avenatti contends that "this case [is] not a 'paradigmatic' bribery case," Avenatti proposed a quid pro quo arrangement to Nike, in which he agreed not to make public Franklin's claims against Nike, and to settle Franklin's claims against Nike, if Nike paid him millions of dollars. And Avenatti proposed this quid pro quo arrangement to Nike without his client's knowledge or authorization.

The honest services fraud statutes provided fair notice to Avenatti that such conduct would expose him to criminal liability.

**REQUEST NO. 37 – <u>Scope of Representation and Allocation of Authority</u>**

California Rule 1.2 provides that a lawyer shall abide by a client's decisions concerning the objectives of the representation and shall reasonably consult with the client as to the means by which they are to be pursued.  Subject to rules on confidentiality, a lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation.

That means that a lawyer begins with broad authority to make choices advancing the client's objectives.  That broad authority may be limited by an agreement between the lawyer and the client or by the client's instructions.  In the absence of an agreement or instruction, however, a lawyer has the authority to take any lawful measure within the scope of representation that is reasonably calculated to advance a client's objectives as defined by the client.  In the absence of a contrary agreement or instruction, a lawyer has authority to initiate or engage in settlement discussions, although not to conclude them.  A client may authorize a lawyer to negotiate a settlement that is subject to the client's approval or to settle a matter on terms indicated by the client.  Ultimately, the lawyer shall abide by the client's decision whether to settle the matter and the client must sign the settlement agreement.[47]

---

[47] Cal. Rule of Prof'l Conduct 1.2; Restatement of the Law (Third), The Law Governing Lawyers, §§21, 22 (pp. 175, 181 of the American Law Institute edition); *Williams v. Saunders*, (1997) 55 Cal.App.4th 1158, 1163-64, 64 Cal. Rptr. 2d 571; Cal. Code Civ. Proc., §664.6

Under California law, it is the client who defines the objectives of the representation and not the lawyer.[21] A lawyer cannot act without the client's authorization, and a lawyer may not take over decision-making for a client, unless the client has authorized the lawyer to do so.[22] A lawyer must abide by a client's decisions concerning the objectives of the representation and shall reasonably consult with the client as to the means by which the objectives are to be pursued.[23]

Subject to requirements of client confidentiality, a lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. The client has the ultimate authority to determine the purposes to be served by the legal representation, however, within the limits imposed by law and the lawyer's professional obligations. A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions. A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself.[24]

---

[20] Cal. R. Prof'l Conduct 1.7.

[21] Nehad v. Mukasey, 535 F.3d 962, 970 (9th Cir. 2008) (citing Davis v. State Bar, 33 Cal.3d 231, 188 Cal. Rptr. 441, 655 P.2d 1276, 1279 (1983); see also Model Rules of Prof'l Conduct R. 1.2(a) (2002)).

[22] Jarvis v. Jarvis, 244 Cal. Rptr. 3d 722, 738 (Cal. Ct. App. 2019) ("The lawyer's duty of loyalty requires the lawyer to act at a client's direction. A lawyer cannot act without the client's authorization. Nor can the lawyer take over the decision making for a client absent authority to do so.")

[23] Cal. R. Prof'l Conduct 1.2.

[24] Cal. R. Prof'l Conduct 1.2; Cal R. Prof'l Conduct 1.2, Comment 1.

In the context of settlement, only the client may decide whether to make or accept an offer of settlement.[25]

---

[25] <u>Nehad v. Mukasey</u>, 535 F.3d 962, 970 (9th Cir. 2008) (citing <u>Estate of Falco</u>, 188 Cal.App.3d 1004, 233 Cal. Rptr. 807, 815 (1987) ("A client's right to reject settlement is absolute.")).

[26] Cal. Bus. & Prof. Code § 6068(e)(1) ("It is the duty of an attorney to . . . maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.");

[27] Cal. R. Prof'l Conduct 1.6.

[28] Cal. R. Prof'l Conduct 1.8.2.

[29] Cal. Bus. & Prof. Code § 6068(m).

[30] Cal. R. Prof'l Conduct 1.4.

[31] Cal. R. Prof'l Conduct 1.0.1(h).

K2A9AVE6

18          MR. S. SREBNICK:  So then the court begins to define

19     the allocation of authority.  And we had proposed language in

20     our instruction that we thought was an accurate statement of

21     the law that we would ask that the court give instead of the

22     court's instruction.  I would have to find it if the court will

23     give me a moment.

24          It starts with the California Rule 1.2.  And this is

25     at document 219, ECF pagination 61.  And it goes an entire

1    page.  And that's the instruction that we would prefer

2    because --

3              THE COURT:  I've used a lot of your language actually.

4    If you bothered to look at it, you would see that I've used a

5    lot of your language.  Some of it I've used in haec verba.  For

6    example, you wanted the following sentence, and I quote, this

7    is from page 61, "Subject to rules on confidentiality, a lawyer

8    may take such action on behalf of the client as is impliedly

9    authorized to carry out the representation."

10             I used those words in haec verba.  I made no change in

11   the language you requested at all.

12             MR. S. SREBNICK:  I see that.

13             So we would ask that the court also include the first

14   sentence of the second paragraph under my request no. 37 at

15   page 61 which includes "That means a lawyer begins with broad

16   authority to make choices advancing the client's objectives."

17             And the third sentence of that paragraph, "In the

18   absence of an agreement or instruction, however, a lawyer has

19   the authority to take any lawful measure within the scope of

20   representation that is reasonably calculated to advance a

21   client's objectives as defined by the client."

22             MR. RICHENTHAL:  At least the first of those, and I'll

23   just say it, I'm the one who researched this area for our team.

24   At least the first of those to my knowledge is definitely

25   false.

**SPA.51**

1          THE COURT:  Is, I'm sorry?

2          MR. RICHENTHAL:  Is false.  A lawyer doesn't start

3   with some unbounded authority.  It's all determined by the

4   scope of the relationship.  Indeed that's what Rule 1.2 is all

5   about.  You're supposed to consult with your client, determine

6   his or her objectives, determine the means.  I mean that's the

7   whole point.

8          Some of the other language here I think is right and

9   the court adopted it either literally in its entirety or

10  substantively.  But that first sentence is just wrong.

11         MR. S. SREBNICK:  So just so the court is aware.  I

12  actually bought this book because Professor Nora Engstrom

13  relied on it in her opinions.  And reading directly from the

14  book, which is the restatement of the law governing lawyers,

15  that sentence is lifted directly from the book that Professor

16  Engstrom, their expert, relied on.  The lawyer begins with

17  broad authority advancing the client's interests.

18         THE COURT:  Yeah, well, we didn't hear from Professor

19  Engstrom and that was for a good reason because actually she's

20  not the vehicle for the law.  And so if you have a California

21  rule that articulates that or a case that says that I'm happy

22  to look at it.  I didn't see it.  I am not that interested in

23  what Professor Engstrom says.  I am interested in what the

24  California Rules of Professional Conduct say as well as related

25  statutes and cases.  And if you want to cite me a rule or a

**SPA.52**

1    case that contains that language that a lawyer begins with

2    broad authority to make choices, happy to look at it.  I'm not

3    familiar with that.

4              MR. S. SREBNICK:  The rule itself is a broad rule and

5    then there's not a lot of case law.  I haven't found any case

6    law that actually discusses anything related to this.  But

7    California courts routinely rely on the restatement of the law,

8    the law governing lawyers.

9              THE COURT:  I've said what I have to say.

10             MR. RICHENTHAL:  The only other comment I would make,

11   your Honor, is sentences standing alone are really not, in our

12   view, the way to do this.  The point is what's the duty as a

13   whole.

14             That sentence perhaps is accurate, although I think

15   Professor Engstrom spoke of interests and not objectives.  But

16   the concern is that, as structured, what the defense proposal

17   seems to be saying is you start very broad and you continue to

18   have broad authority unless the client affirmatively limits it.

19   That's how I read the second sentence of the defense proposal.

20   That's not our understanding of the scope of this duty.  It's,

21   I agree, it's hard to have this conversation in a vacuum.

22             THE COURT:  So what I've tried to do, and I've tried

23   to do this throughout the charge, I've tried to present

24   language that allows each side to make their arguments.  I was

25   sensitive to the defense's theory on this point as in all

1    others.  And for that reason I included the language about, "A
2    lawyer may take such action on behalf of the client as is
3    impliedly authorized to carry out the representation."  That's
4    an incredibly broad statement.  Any arguments the defense wants
5    to make along those lines are authorized by that.

6           Now we're just -- frankly, we're wasting time because
7    the language that the defense wants to argue is already in the
8    charge.  And now they want a slightly different iteration for
9    which there is no rule or case that contains that language.
10   And so we need to -- I'm happy to look at other language from
11   the Rules of Professional Conduct I should be looking at or
12   perhaps statutes and case law I should be looking at.  I've
13   cited a lot of it in the footnotes so that everyone is clear
14   where I'm drawing the language from.  I believe that this is a
15   fair presentation of the various duties that are at issue here
16   and I'm happy to add other material or take material out if
17   someone has a cogent argument as to why it's not right or why
18   it's unfair.  But absent that, we're not -- this isn't really
19   productive.

20

21

22

23

24

25

1

2

3          Under California law, it is the client who defines the

4   objectives of the representation and not the lawyer.  A lawyer

5   cannot act without the client's authorization, and a lawyer may

6   not take over decision-making for a client, unless the client

7   has authorized the lawyer to do so.  A lawyer must abide by a

8   client's decisions concerning the objectives of the

9   representation and shall reasonably consult with the client as

10  to the means by which the objectives are to be pursued.

11         Subject to requirements of client confidentiality, a

12  lawyer may take such actions on behalf of the client as is

13  impliedly authorized to carry out the representation.  The

14  client has the ultimate authority to determine the purposes to

15  be served by the legal representation, however, within the

16  limits imposed by law and the lawyer's professional

17  obligations.  A lawyer retained to represent a client is

18  authorized to act on behalf of the client, such as in

19  procedural matters and in making certain tactical decisions.  A

20  lawyer is not authorized merely by virtue of the lawyer's

21  retention to impair the client's substantive rights or the

22  client's claim itself.

23             In the context of settlement, only the client may

24         decide whether to make or accept an offer of settlement.

25

L78TAVES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          The government seeks an order of restitution in favor

18     of Nike.  It has not sought an order of restitution in favor of

19     Franklin.

20          As to Nike, the submissions to date are not adequate

21     to permit me to make a determination as to restitution.  The

22     billing records submitted in support of the application have

23     been redacted in such a way to make it impossible to determine

24     whether the fees sought fall within the recoverable categories

25     as set forth in *Lagos v. United States*, 138 S.Ct. 1684 (2018).

L78TAVES

1      Moreover, Nike seeks recovery for expenses that do not

2 fall within recoverable categories.  As I stated in a

3 June 25th, 2021 order, courts in this district have

4 "interpreted *Lagos* as limiting restitution to expenses incurred

5 for investigatory activities that the government expressly and

6 specifically invited or requested."  Citing the June 23rd, 2021

7 Order, Docket No. 326 at page 1.

8      But Nike seeks to recover fees for, among other

9 things, Avenatti's ongoing assault on Nike following his

10 arrest."  Citing the Nike restitution letter, Exhibit C, Docket

11 No. 329-4, page 13.  Avenatti's post-arrest "assault on Nike"

12 cannot have had any bearing on the government's prosecution of

13 Avenatti, nor is there any reason to believe the government

14 "specifically invited and requested" that Nike address

15 Avenatti's post-arrest attack on the company.

16      In sum, the papers submitted by Nike provide an

17 example of what is not appropriate under *Lagos* where the

18 Supreme Court stated that the restitution statute should be

19 narrowly construed to relieve the district courts from the

20 "significant administrative burdens" of resolving "potentially

21 time-consuming controversies as part of criminal sentencing"

22 particularly "in cases involving multimillion dollar

23 investigation expenses for teams of lawyers."  Citing *Lagos*,

24 138 S.Ct. at 1689.

25      I will give the government and Nike another

L78TAVES

1    opportunity to make a submission as to restitution that

2    complies with *Lagos*.   That submission will be made by July 14,

3    2021.   The defendant may put in a response by July 21, 2021.   A

4    determination as to restitution will be deferred in the

5    interim.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

MICHAEL AVENATTI,

                Defendant.

**MEMORANDUM
OPINION & ORDER**

(S1) 19 Cr. 373 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        A jury convicted Michael Avenatti of transmitting interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d) (Count One); Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Two); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three).  (Verdict (Dkt. No. 265))

        On July 8, 2021, this Court imposed an aggregate sentence of 30 months' imprisonment and three years' supervised release.  (Judgment (Dkt. No. 339))  Because of inadequate briefing, this Court deferred decision on the Government's application for an order of restitution.  (Sentencing Tr. (Dkt. No. 341) at 47-48; Judgment (Dkt. No. 339) at 7)  The parties have made supplemental submissions addressing restitution (July 14, 2021 Govt. Supp. Ltr. (Dkt. No. 338); July 21, 2021 Def. Supp. Ltr. (Dkt. No. 340)), and this Court now has an adequate record on which to base a decision regarding restitution.

## **BACKGROUND**[1]

## I.      **AVENATTI's EXTORTION OF NIKE**

        Avenatti's offenses arise from his representation of Gary Franklin, the coach of an amateur youth basketball program sponsored by Nike.  After the 2018 season, Nike withdrew its

---

[1]  The evidence is discussed at length in this Court's July 6, 2021 Memorandum Opinion & Order.  (Dkt. No. 336)  Familiarity with that opinion is assumed.

**SPA.59**

sponsorship of Franklin's youth basketball program. Franklin claimed that he had lost the sponsorship because of his refusal to engage in the corrupt acts of certain Nike employees, including improper payments to players' families and handlers, and the submission of falsified invoices to Nike. (Trial Transcript ("Tr.") 266, 716, 1520, 1528-30, 1622-32) Franklin sought assistance from Jeffrey Auerbach, whose son Franklin had coached. (Tr. 1530-31, 1634-36) On or around March 1, 2019, Auerbach contacted Avenatti about assisting Franklin in regaining his Nike sponsorship and repairing his relationship with Nike. (Tr. 713-15, 900, 1534-36) On March 4, 2019, Avenatti recruited a well-known Los Angeles lawyer – Mark Geragos – to assist him in approaching Nike regarding Franklin's claims. (Tr. 199, 1854; GX 103A)

On March 12, 2019, Geragos contacted Casey Kaplan, a lawyer he knew in Nike's legal department, about Franklin's claims. (Tr. 201, 1856; GX 206) After speaking with Geragos, Kaplan reported the substance of their conversation with Robert Leinwand, Nike's vice president and chief litigation officer, who agreed to meet with Geragos and Avenatti. (Tr. 1125, 1128, 1146-50) Nike's outside counsel – Scott Wilson, a partner at Boies Schiller Flexner LLP – contacted Geragos, who told Wilson that Nike had an "Adidas problem." (Tr. 203-04) Wilson – who understood Geragos to be asserting that Nike was involved in corrupt activities in amateur youth basketball – arranged a March 19, 2019 meeting to be attended by Geragos, Avenatti, Wilson, and Leinwand, at which Franklin's claims would be discussed. (Tr. 199-204, 207-08, 1855)

On March 19, 2019, Avenatti and Geragos met with Wilson, Benjamin Homes – a Boies Schiller associate – and Leinwand at Geragos's New York offices. (Tr. 208, 1138-39, 1149-50, 1414) At the meeting, Avenatti told the Nike lawyers that he represented a whistleblower who could expose corruption in Nike's amateur youth basketball program, and he

shared certain confidential documents Franklin and Auerbach had provided to him.  (Tr. 211,

253, 272)  Avenatti stated that if Nike did not agree to (1) pay a $1.5 million settlement to

Franklin; and (2) hire Avenatti and Geragos to conduct an internal investigation at Nike, he

would hold a press conference the next day that "would take billions of dollars off the company's

market cap."  (Tr. 217-18, 242-44, 265, 1157, 1244, 1418-20)

   Nike's lawyers had been in contact with the U.S. Attorney's Office for the

Southern District of New York in connection with Nike's response to a grand jury subpoena, and

they contacted the U.S. Attorney's Office soon after their meeting with Avenatti and Geragos.

(Tr. 272, 1139, 1296)  Avenatti's subsequent interactions with the Nike lawyers were recorded

by agents of the Federal Bureau of Investigation (the "FBI").  (Tr. 272-75, 282, 285-86, 303-04;

GX 1, 2, 3, 4)  Those interactions included a March 19, 2019 call with Wilson, and a March 21,

2019 meeting at Geragos's New York office.

   At the outset of the March 21, 2019 meeting, Avenatti handed Wilson a draft

settlement agreement and general release.  (GX 2 at 14:00-14:35)  Avenatti demanded the Nike

pay him and Geragos a $12 million retainer to conduct an internal investigation at Nike.  The

internal investigation would range in cost from a minimum of $15 million to a maximum of $25

million.  (Id. at 17:36-17:57)  Later in the meeting, Avenatti told Wilson that Nike could forego

an internal investigation, and obtain "full confidentiality," if it agreed to pay him and Geragos

$22.5 million.  He and Geragos would then "ride off into the sunset."  (Id. at 34:12-35:01)

Avenatti, Geragos and Wilson agreed to meet again at noon on March 25, 2019, at Boies

Schiller's office.  At that meeting, Nike would inform Avenatti whether it agreed to his demands.

(Id. at 38:35-55, 1:01:17-28)  Avenatti was arrested on March 25, 2019, in the vicinity of the

Boies Schiller office building in Hudson Yards.  (Tr. 1840-41, 1897; GX S-1)

## II.   NIKE'S INVOLVEMENT IN THE PROSECTION OF AVENATTI

The Indictment in this case was filed on May 22, 2019.  (Dkt. No. 8)

In response to Government subpoenas, Nike produced relevant documents to the Government, which were then shared with Avenatti pursuant to a protective order.  (See Am. Protective Order (Dkt. No. 44))  In September 2019 – pursuant to Fed. R. Crim P. 17(c) – Avenatti sought permission to serve a subpoena duces tecum on Nike seeking the production of additional documents.  (Dkt. Nos. 50-52)  On behalf of Nike, Boies Schiller moved to quash the subpoena.  (Dkt. No. 58)  The Government separately opposed Avenatti's request to subpoena Nike.  (Dkt. No. 62)  Avenatti later subpoenaed five Nike employees to testify at trial.  Nike also moved to quash those subpoenas.  (Dkt. Nos. 114, 115, 227, 228, 229, 246, 247)

In January 2020, Boies Schiller moved to quash a subpoena duces tecum in which Avenatti sought documents from both Nike and Boies Schiller.  (Dkt. No. 138)

Because the Government's witnesses at trial included Nike's in-house counsel and outside lawyers, Boies Schiller moved pursuant to Fed. R. Evid. 502(d) for an order stating that the testimony of these lawyers would not result in a waiver of Nike's attorney-client and work product privileges.  (Dkt. No. 217)

Boies Schiller also worked to help prepare Nike witnesses for their trial testimony, including both Nike employees and Boies Schiller lawyers who had represented Nike. Boies Schiller lawyers attended nearly every pretrial conference as well as the trial, including voir dire and jury deliberations.

## III.   RELEVANT SENTENCING SUBMISSIONS

On May 13, 2020, the Probation Office issued its Presentence Investigation Report for Avenatti.  (Dkt. No. 295)  The report states that "[r]estitution is not an issue."  (Id. ¶¶

145-46; see also id. at page 44 (noting restitution is "[n]ot applicable" and "[n]ot recommended"))

On June 16, 2021, the Government filed a sentencing brief, which includes a request for restitution as to Nike, but not as to Franklin. (Govt. Br. (Dkt. No. 321) at 17-19) The Government appended a victim impact statement from Nike, prepared by Boies Schiller. (Dkt. No. 321-1) The Government contends that Nike is entitled to restitution based on "the attorneys' fees [Nike] has incurred in connection with its cooperation with the Government's investigation and prosecution of this case." (Govt. Sent. Br. (Dkt. No. 321) at 18) "Nike conservatively estimate[d] those costs to be at least $1 million." (Id.; see also Nike Victim Stmt. (Dkt. No. 321-1) at 6) Avenatti requested an adjournment of his sentencing – then scheduled for June 30, 2021 – to address the Government's restitution request. (Dkt. No. 324)

On June 23, 2021, the Court ordered the parties to submit "additional briefing and billing records demonstrating that the fees sought fall within recoverable categories, as set forth in Lagos [v. United States, 138 S. Ct. 1684 (2018)]" so that the Court could "determine what amount, if any, of Nike's attorneys' fees are subject to restitution." (Dkt. No. 326)

On June 25, 2021, the Government filed a supplemental letter regarding restitution (Dkt. No. 329), along with a letter from Nike addressing restitution (Dkt. No. 329-1). Nike sought restitution of $1 million for attorneys' fees billed by Boies Schiller, claiming that it is entitled to restitution for work performed in connection with the following matters:

1. Assisting in the [G]overnment's investigation of Mr. Avenatti, including participating in recorded meetings and calls, conferring with the prosecutors and the FBI, and responding to the government's requests for documents and information;

2. Preparing Nike and [Boies Schiller] witnesses for interviews by the [G]overnment and to testify at Mr. Avenatti's trial;

3. Analyzing court filings and engaging in motion practice;

    4.   Attending hearings and the trial;

    5.   Addressing Mr. Avenatti's ongoing assault on Nike following his arrest, which is described in detail in Nike's Victim Impact Statement (Dkt. 321, Ex. A); and

    6.   Representing Nike in connection with sentencing and restitution.

(June 25, 2021 Nike Ltr. (Dkt. No. 329-1) at 3-4)[2]  In support of its application, Nike submitted a summary of the billable rates for the attorneys and non-legal staff who worked on the matter, the amounts paid by Nike, and monthly diary entries from Boies Schiller lawyers and non-legal staff, which Boies Schiller "redacted to remove privileged information and entries for which Nike does not seek restitution."  (Id.)  The diary entries submitted total more than 100 pages.  (See Dkt. No. 329-4)

        Avenatti filed his opposition on July 1, 2021.  (July 1, 2021 Def. Ltr. (Dkt. No. 332))  Avenatti objects to Nike's restitution request, arguing that "Nike is not a 'victim'" that is entitled to recover legal expenses, and that the expenses for which Nike seeks reimbursement "were obviously not 'necessary.'"  Avenatti also complains that the Boies Schiller lawyers and staff engaged in block billing, which makes it impossible to segregate recoverable expenses from those that are not.  (July 1, 2021 Def. Ltr. (Dkt. No. 332) at 1-2)  Finally, Avenatti annotated the Boies Schiller diary entries with a series of specific objections.  (Id., Ex. 1 (Dkt. No. 332-1))

        Avenatti was sentenced on July 8, 2021.  (Dkt. Nos. 339, 341)  Pursuant to 18 U.S.C. § 3664(d)(5), the Court deferred decision on the Government's application for restitution for 90 days.[3]  The Court explained that an appropriate restitution award could not be determined at that time because of inadequate submissions from the Government and from Nike:

---

[2]  Nike claimed that "at least $1,705,116.45 is properly collectible as restitution, of which Nike seeks restitution only for $1 million."  (June 25, 2021 Nike Ltr. (Dkt. No. 329-1) at 5)
[3]  Section 3664(d)(5) provides that "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or probation officer shall so

As to Nike, the submissions to date are not adequate to permit me to make a determination as to restitution. The billing records submitted in support of the application have been redacted in such a way to make it impossible to determine whether the fees sought fall within the recoverable categories as set forth in Lagos v. United States, 138 S. Ct. 1684 (2018).

Moreover, Nike seeks recovery for expenses that do not fall within recoverable categories. As I stated in a June [23rd], 2021 order, courts in this district have "interpreted Lagos as limiting restitution to expenses incurred for investigatory activities that the government expressly and specifically invited or requested." . . . But Nike seeks to recover fees for, among other things, Avenatti's ongoing assault on Nike following his arrest." . . . Avenatti's post-arrest "assault on Nike" cannot have had any bearing on the government's prosecution of Avenatti, nor is there any reason to believe the government "specifically invited and requested" that Nike address Avenatti's post-arrest attack on the company.

In sum, the papers submitted by Nike provide an example of what is not appropriate under Lagos[,] where the Supreme Court stated that the restitution statute should be narrowly construed to relieve the district courts from the "significant administrative burdens" of resolving "potentially time-consuming controversies as part of criminal sentencing[,]" particularly "in cases involving multimillion dollar investigation expenses

inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." 18 U.S.C. §3664(d)(5). The Second Circuit has noted, however, that "the purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets." United States v. Zakhary, 357 F.3d 186, 191 (2d. Cir. 2004). An extension of the 90-day statutory period is permitted "unless the defendant can show that the extension caused him actual prejudice." United States v. Douglas, 525 F.3d 225, 253 (2d Cir. 2008) (rejecting challenge to four-day extension); see also United States v. Ebrahim, No. 12 CR. 471 JPO, 2013 WL 2216580, at *2 (S.D.N.Y. May 21, 2013) (issuing an order approximately four months after the statutory period had ended, over the defendant's objection).

Here, the Government – on behalf of Nike – requested that payment of any restitution award be delayed until "any individual victims in the defendant's other pending cases are paid restitution, if ordered." (July 14, 2021 Govt. Supp. Ltr. (Dkt. No. 338) at 1) The other case pending in this District – United States v. Avenatti, No. 19 Cr. 374 (S.D.N.Y.) (JSF) – went to trial only recently, and ended in a guilty verdict on February 4, 2022. (Avenatti, No. 19 Cr. 374 (S.D.N.Y.) (JSF), Verdict Form (Dkt. No. 371) at 9)) Sentencing is scheduled for May 24, 2022. (Avenatti, No. 19 Cr. 374 (S.D.N.Y.) (JSF), (Dkt. No. 372)) The third criminal case against Avenatti – United States v. Avenatti, No. 19 Cr. 0061 (C.D. CA) (JVS) – ended in a mistrial on August 24, 2021, and that case is currently on appeal. No new trial date has been set. (Avenatti, No. 19 Cr. 0061 (C.D. CA) (JVS), (Dkt. Nos. 780, 852, 866)) Given these circumstances, this Court will not further delay the determination of restitution in the instant case.

for teams of lawyers." Citing <u>Lagos</u>, 138 S. Ct. at 1689. I will give the government and Nike another opportunity to make a submission as to restitution that complies with <u>Lagos</u>.

(Sentencing Tr. (Dkt. No. 341) at 46-48)

      The Government submitted a letter prepared by Nike's counsel, which states that Nike is seeking only $856,162 in attorneys' fees. (June 14, 2021 Nike Supp. Ltr. (Dkt. No. 338-1)) Avenatti also submitted supplemental briefing. (Dkt. No. 340)

## ANALYSIS

## I.    LEGAL STANDARD

      The Mandatory Victims Restitution Act (the "MVRA") provides that a defendant convicted of a referenced offense, including extortion, must "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4).[4] Recoverable "'other expenses' include attorneys' fees that a 'victim was required to incur to advance the investigation or prosecution of the offense.'" <u>United States v. Afriyie</u>, No. 16-CR-377 (PAE), 2020 WL 634425, at *1 (S.D.N.Y. Feb. 11, 2020) (quoting <u>United States v. Maynard</u>, 743 F.3d 374, 381 (2d Cir. 2014)). To be recoverable as "other expenses" under the MVRA, a victim's attorneys' fees must be "necessary" and "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." <u>United States v. Amato</u>, 540 F.3d 153, 161 (2d Cir. 2008) (internal quotation marks and citations omitted).

---

[4] For purposes of the MVRA, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

In <u>Lagos v. United States</u>, 138 S. Ct. 1684 (2018), the Supreme Court found that –
while restitution is allowed for expenses incurred by a victim in connection with assisting
"government investigations and criminal proceedings" – recoverable expenses do not include
"the costs of a private investigation that the victim chooses on its own to conduct." <u>Lagos</u>, 138
S. Ct. at 1690. <u>Lagos</u> thus "limit[s] restitution to expenses incurred for investigatory activities
that the government expressly and specifically 'invited or requested.'" <u>United States v. Napout</u>,
No. 15-CR-252 (PKC), 2018 WL 6106702, at *4 (E.D.N.Y. Nov. 20, 2018); <u>accord</u> <u>United
States v. Razzouk</u>, No. 11-CR-430 (ARR), 2021 WL 1422693, at *5 (E.D.N.Y. Apr. 15, 2021)
(requiring specific request by Government for investigative assistance; incidentally "helping and
contributing to the government's investigation [is] not enough to trigger mandatory restitution
under § 3663A(b)(4)"); <u>see</u> <u>also</u> <u>United States v. Mobley</u>, 971 F.3d 1187, 1206-08 (10th Cir.
2020) (in international kidnapping case, denying restitution for attorneys' fees incurred in
returning victim's children to the United States; noting that "[t]here is no evidence that the
government directed or sanctioned this action," or that this action assisted the Government in its
investigation and prosecution).

Courts in this District have identified three categories of legal expenses for which
a corporate victim may seek restitution: (1) responding to subpoenas and requests from the
Government in connection with assisting in the prosecution; (2) preparation of witnesses who
testify at trial; and (3) preparation of materials in support of a post-verdict request for restitution.
<u>See</u> <u>Afriyie</u>, 2020 WL 634425, at *2.

"[D]ispute[s] as to the proper amount or type of restitution . . . [are resolved
pursuant to] the preponderance of the evidence [standard]." 18 U.S.C. § 3664(e). The

**SPA.67**

Government bears the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense." Id.

## II.   **ANALYSIS**

The Government argues that Nike – as the victim of Avenatti's extortion scheme – is entitled to restitution for "the attorneys' fees it . . . incurred in connection with its cooperation with the Government's investigation and prosecution of this case." (Govt. Sent. Br. (Dkt. No. 321) at 18) "[T]he Government requests that the Court order restitution in the amount of $856,162, to be paid only after any individual victims in the defendant's other pending cases are paid restitution, if ordered, as sought by Nike." (July 14, 2021 Govt. Supp. Ltr. (Dkt. No. 338))

As discussed above, Nike now seeks restitution of $856,162 for attorneys' fees it paid to Boies Schiller for work performed in connection with the following matters:

(1) Assisting in the [G]overnment's investigation of Mr. Avenatti, including participating in recorded meetings and calls, conferring with the prosecutors and the FBI, and responding to the [G]overnment's requests for documents and information;

(2) Preparing Nike and [Boies Schiller] witnesses for interviews by the [G]overnment and to testify at Mr. Avenatti's trial;

(3) Analyzing court filings and engaging in motion practice;

(4) Attending hearings and the trial; and

(5) Representing Nike in connection with [Mr. Avenatti's] sentencing and [in seeking] restitution.

(July 14, 2021 Nike Supp. Ltr. (Dkt. No. 338-1) at 1)

In its June 25, 2021 letter to the Court, Nike acknowledged that the categories of work for which it sought restitution were not "coextensive" with the permissible categories identified in Afriyie. Nike argued, however, that the categories for which it sought restitution

"are permissible under the MVRA for similar reasons that the categories of work analyzed in that case were permissible." (June 25, 2021 Nike Ltr. (Dkt. No. 329-1) at 4 (citing Afriyie, 2020 WL 634425, at *2); see also July 14, 2021 Nike Supp. Ltr. (Dkt. No. 338-1) at 4)

Avenatti contends that no restitution award for attorneys' fees is appropriate for the following reasons:

(1) Nike is not a "victim" for purposes of the MVRA, because pecuniary loss is a necessary predicate for a restitution award, and Nike did not "suffer an actual pecuniary loss as a direct result of the offenses of conviction";

(2) the attorneys' fees that Nike incurred were for services that were not (a) requested or invited by the Government, or (b) necessary for purposes of assisting in the Government's investigation and prosecution of him; and

(3) the attorneys' fees are not reasonable,

(July 1, 2021 Def. Ltr. (Dkt. No. 332) at 1-7; July 21, 2021 Def. Supp. Ltr. (Dkt. No. 340) at 1-3)[5] As noted above, Avenatti has also annotated the Boies Schiller time records with specific objections. (July 1, 2021 Def. Ltr., Ex. 1 (Dkt. No. 332-1) at 2)

---

[5] Avenatti's complete list of general objections is as follows:

Objection 1: There is no evidence that these activities were required or requested by the government. Further, the total amount billed for the tasks identified is not reasonable.

Objection 2: Nike is not permitted to recover for fees for time spent on tasks that are redacted and not fully disclosed.

Objection 3: Nike may not recover for time spent relating to press and media relations, including time spent monitoring and responding to Mr. Avenatti's exercise of his right to free speech after his arrest on the morning of March 25, 2019. This is especially true because of the USAO-SDNY press conference held on March 25, 2019 and Nike's public statements after Mr. Avenatti's arrest; Mr. Avenatti had a First Amendment right at all times to publicly defend himself.

Objection 4: Nike may not recover for any expenses or fees incurred before the government's investigation or prosecution began.

A.     <u>Whether Nike Is a Victim For Purposes of the MVRA</u>

Avenatti contends that Nike is not a "victim" for purposes of the MVRA because it has not suffered a direct pecuniary loss.  (July 1, 2021 Def. Ltr. (Dkt. No. 332) at 1-3; July 21, 2021 Def. Supp. Ltr. (Dkt. No. 340) at 1)  According to Avenatti, proof of a direct pecuniary loss is a necessary predicate to a victim recovering "other expenses" under 18 U.S.C. § 3663A(b)(4). (July 1, 2021 Def. Ltr. (Dkt. No. 332) at 1-2)

In support of this argument, Avenatti cites <u>United States v. Xue</u>, No. 16-22, 2021 WL 2433857 (E.D. Pa. June 15, 2021), <u>appeal</u> <u>filed</u>, <u>United States v. Tao Li</u>, No. 21-2228 (3d Cir. 2021), in which the court ruled that GlaxoSmithKline was not entitled to restitution for its legal expenses in responding to a subpoena, because it had suffered no pecuniary loss in connection with the theft of trade secrets that was the premise for the prosecution.  The <u>Xue</u> court held that a victim could not recover attorneys' fees as "other expenses" under the MVRA absent a direct pecuniary loss resulting from the offense of conviction.  <u>Xue</u>, 2021 WL 2433857, *4 & n.3.

In reaching this conclusion, <u>Xue</u> rejected <u>United States v. Kuruzovich</u>, No. 09 Cr. 824 (DC), 2012 WL 1319805, *4-5 (S.D.N.Y. Apr. 13, 2012), in which Judge Chin – sitting by designation – found that legal expenses incurred by a victim company in connection with a Government investigation and prosecution constitute a "pecuniary loss."  The <u>Xue</u> court rejected "<u>Kuruzovich</u> – and the Second Circuit precedent it relied upon – [because it] predate[s] the

Objection 5:  Includes time spent on tasks that Nike expressly stated in its letter it was not seeking reimbursement for (ECF 329-1:5).

(July 1, 2021 Def. Ltr., Ex. 1 (Dkt. No. 332-1) at 2)  Nike has withdrawn its request for restitution as to expenses that are the subject of Avenatti Objections Two through Five, including "any [fee] entries that relate in any way to press, news media, or Twitter monitoring or analysis." (July 14, 2021 Nike Supp. Ltr. (Dkt. No. 338-1) at 3)

**SPA.70**

United States Supreme Court's decision in <u>Lagos</u>, where the Court held that the language in § 3663A(b)(4) should be narrowly interpreted." <u>Xue</u>, 2021 WL 2433857, at *6 (citing <u>Lagos</u>, 138 S. Ct. at 1689).

<u>Kuruzovich</u> relies on <u>United States v. Amato</u>, 540 F.3d 153 (2d Cir. 2008), in which the Second Circuit rejected a defendant's argument "that 'other expenses' cannot encompass attorney fees and accounting costs because such expenses amount only to indirect or consequential damages, whereas restitution is limited to direct harm." <u>Amato</u>, 540 F.3d at 161. The court's reasoning is as follows:

> Defendants perpetrated a complicated fraud against a large corporation and a number of its clients, as well as the states to which those clients were required to turn over escheated funds. That this fraud would force the corporation to expend large sums of money on its own internal investigation as well as its participation in the government's investigation and prosecution of defendants' offenses is not surprising. There is no doubt that [the victim corporation's] attorney fees and auditing costs were a direct and foreseeable result of defendants' offenses.

<u>Id.</u> at 162. The same logic applies here: the attorneys' fees Nike incurred in assisting the Government's investigation and prosecution of Avenatti's crimes "were a direct and foreseeable result of [his] offenses." (<u>Id.</u>)

<u>Lagos</u> abrogates <u>Amato</u> to the extent that <u>Amato</u> authorizes the recovery of attorneys' fees expended in connection with an internal investigation, <u>see Lagos</u>, 138 S. Ct. at 1688, but <u>Lagos</u> does not call into question <u>Amato</u>'s ruling that attorneys' fees expended in assisting a government investigation or prosecution are recoverable under the MVRA as a direct cost.

The issue before the <u>Lagos</u> court was quite narrow: the Supreme Court was called upon to "decide whether the words 'investigation' and 'proceedings' [as used in the MVRA] are limited to government investigations and criminal proceedings, or whether they include private

**SPA.71**

investigations and civil proceedings." The Court concluded that those words "are limited to government investigations and criminal proceedings." (Id. at 1687) Nothing in that holding or in the reasoning of Lagos undermines the Amato court's conclusion that attorneys' fees incurred in assisting a government investigation or prosecution are recoverable as direct costs under the MVRA. See Razzouk, 2021 WL 1422693, at *3 ("The Supreme Court did not interpret the scope of 'other expenses' in Lagos but only interpreted the scope of 'investigation.'" (citing Lagos, 138 S. Ct. at 1687-88)).

Post-Lagos, courts in this District have continued to order restitution for attorneys' fees expended in assisting a government investigation or prosecution, even where the victim corporation did not suffer a loss flowing directly from the defendant's offense. For example, in Afriyie, the victim corporation was awarded restitution for attorneys' fees it incurred in assisting the Government's investigation and prosecution of an employee who was convicted of insider trading. Afriyie, 2020 WL 634425, at *2. There is no suggestion in Afriyie that the corporate victim suffered a "direct provable loss" (July 1, 2021 Def. Ltr. (Dkt. No. 332) at 2) that flowed from the defendant employee's insider trading.

The Court concludes that Nike is a "victim" within the meaning of the MVRA, and that it is entitled to restitution for the reasonable attorneys' fees that it incurred in assisting in the Government's investigation and prosecution of Avenatti's crimes.

**B.    Whether the Attorneys' Fees that Nike Incurred Were "Necessary"**

Avenatti argues that "Nike has failed to establish that the government invited, required, or requested each of the activities for which Nike seeks reimbursement." (July 1, 2021 Def. Ltr. (Dkt. No. 332) at 4)  At sentencing, the Court agreed that Nike sought restitution for attorneys' fees that had not been expended on activities that were invited, required,  requested, or otherwise induced by the Government.  (Sentencing Tr. (Dkt. No. 341) at 47-48)  Nike has since withdrawn its request for restitution regarding certain categories of work, but argues that (1) the remaining expenses for which it seeks restitution qualify for recovery under the MVRA; and (2) it is not required to show that the Government required or requested the legal services for which it seeks restitution.  (July 15, 2021 Nike Supp. Ltr. (Dkt. No. 338-1) at 1, 4)

Nike relies on United States v. Gupta, 925 F. Supp. 2d 581, 585 (S.D.N.Y. 2013), aff'd, 747 F.3d 111 (2d Cir. 2014)), in which the court rejected defendant's argument that a victim "is entitled to restitution of only those fees it can demonstrate were necessarily incurred in connection with specific requests by the government or were otherwise required to be done in the investigation or prosecution." Id.  (internal quotation marks and citations omitted).  The Gupta court determined that the Government proved "by a preponderance of evidence[] that nearly all of the expenses [the victim corporation] claims were the necessary, direct, and foreseeable result of the investigation and prosecution of Gupta's offense of conviction and thus well within the statute's coverage as interpreted by the Second Circuit," including expenses incurred during an internal investigation, work related to the advancement of legal fees for Gupta, and fees incurred during a post-verdict restitution proceeding.  Id.  Given Lagos, Gupta's formulation of what expenses are "necessary" under the MVRA is no longer good law.

This Court concludes that restitution under the MVRA is available for attorneys' fees incurred in connection with services that were invited, required, requested, or otherwise induced by the Government. See Razzouk, 2021 WL 1422693, at *4 (holding that "the [legal] costs covered" by the MVRA are "only those incurred 'at the government's request.'" (citations omitted); Afriyie, 2020 WL 634425, at *2 (ordering restitution for attorney's fees incurred in connection with responding to subpoenas, preparing witnesses to testify at trial, and preparing restitution submission); see also Napout, 2018 WL 6106702, at *4 (denying restitution for fees incurred by victim in connection with, inter alia, an internal investigation, because the Government had not invited this investigation and victim was motivated by "self-preservation" (internal quotation marks and citations omitted)); Mobley, 971 F.3d at 1206-08 (in international kidnapping case, denying restitution for fees incurred in connection with rescue of children, where such action was not invited by the Government and did not assist Government's investigative or prosecutorial efforts).

Accordingly, to the extent that Nike seeks restitution for reasonable attorneys' fees it incurred in (1) "participating in recorded meetings and calls, conferring with the prosecutors and the FBI, and responding to the government's requests for documents and information"; (2) "[p]reparing Nike and [Boies Schiller] witnesses for interviews by the government and to testify at Mr. Avenatti's trial"; and (3) "[r]epresenting Nike in connection with sentencing and restitution" (July 14, 2021 Nike Supp. Ltr. (Dkt. No. 338-1) at 1), these expenses are recoverable under the MVRA.

Nike also seeks restitution for legal services that are not recoverable under the MVRA, however, including attorneys' fees associated with "[a]nalyzing court filings and engaging in motion practice," and "[a]ttending hearings and the trial." (Id.) "[N]ot every

category of attorney work product meets the essential burden in our circuit that the government show all charges were 'required to incur to advance the investigation or prosecution of the offense.'" United States v. Cuti, 708 F. App'x 21, 24 (2d Cir. 2017) (summary order) (quoting Maynard, 743 F.3d at 381 and citing United States v. Hatfield, No. 06-CR-0550 (JS)(AKT), 2015 WL 13385926, at *13 (E.D.N.Y. Mar. 27, 2015) (denying restitution for legal fees for "attendance at proceedings, reviewing trial transcripts, generating memorand[a] and summaries of motion practice, and drafting press releases").

        For example, Nike requests reimbursement for attorneys' fees generated by several Boies Schiller attorneys who spent hours reviewing, analyzing, researching, and corresponding with Nike about Avenatti's motions to dismiss. (Revised Nike Time Entries (Dkt. No. 338-2) at 3-4, 8-9), But there is no evidence that Boies Schiller's assessment of Avenatti's motions was invited, required, requested, or otherwise induced by the Government, much less that it was of use to the Government. Nor has the Government demonstrated how Boies Schiller's review of motions in limine, the jury questionnaire, expert filings, post-trial motions, and other unidentified "SDNY filings" was invited, required, requested, or otherwise induced by the Government, or of use to the Government. (Id. at 9-15, 17-18, 21-22) Assuming arguendo that the presence of Nike's counsel in the courtroom was helpful to the Government when Nike's in-house and outside counsel were testifying, the Government does not explain why it was "necessary" for Nike's counsel to be present for multiple pretrial hearings – in which counsel made no argument to the Court – or for the entire trial. (Id. at 4, 16-21) The Court concludes that Nike cannot recover for attorneys' fees it incurred for time spent (1) analyzing court filings and the motions referenced above; (2) attending pretrial conferences and portions of the trial during which Nike witnesses did not testify.

Nike also seeks to recover for attorneys' fees it incurred in moving to quash certain Rule 17(c) subpoenas Avenatti issued to Nike and Nike employees. In these subpoenas, Avenatti sought documents and information regarding Nike's alleged corrupt role in amateur youth basketball. (Dkt. Nos. 50, 58, 63, 114-15, 137-39, 191, 202, 225-29, 231-33, 247) The Government moved to quash these same subpoenas, on relevance grounds. (Dkt. No. 62) As Nike admits, its motions to quash were aimed at preventing Avenatti from "obtain[ing] or introduc[ing] evidence relating to Nike's underlying conduct." (July 14, 2021 Nike Supp. Ltr. (Dkt. No. 338-1) at 5) "[A] corporation acting out of self-preservation cannot turn around and have its costs reimbursed through restitution." Napout, 2018 WL 6106702, at *4 (internal quotation marks and citations omitted).

"That [Nike] is not entitled to the full amount of legal expenses claimed, however, does not beget the conclusion that the claim for legal expenses should be disallowed in its entirety," so long as the Court can "make a reasonable approximation of recoverable losses." Hatfield, 2015 WL 13385926, at *13 (citations omitted). The expenses that the Court finds not "necessary" and thus unrecoverable pertain primarily to "[a]nalyzing court filings and engaging in motion practice" and "[a]ttending hearings and the trial." (July 14, 2021 Nike Supp. Ltr. (Dkt. No. 338-1) at 1)

This Court's ability to accurately determine recoverable expenses is significantly handicapped by Boies Schiller's use of block billing for its time entries. Block billing prevents the Court from segregating recoverable expenses from non-recoverable expenses.[6] In awarding

---

[6] The following two examples are representative: In an entry for September 20, 2019, Boies Schiller bills Nike for one hour of time spent "[r]eview[ing] Avenatti response to Rule 17 letter and confer[ring] with client re same; email[ing] correspondence with SDNY." (Revised Nike Time Entries (Dkt. No. 338-2) at 8) And in an entry for December 10, 2019, Boies Schiller bills Nike for 2.8 hours spent "[r]eview[ing] and analyz[ing] motions in limine filed by M. Avenatti;

attorneys' fees, "block billing is not preferred," and it is only permissible where "the records allow the court to conduct a meaningful review of the hours requested."  Restivo v. Hessemann, 846 F.3d 547, 591 (2d Cir. 2017) (citation omitted).

   Here, in many instances, no effort is made to attribute amounts of time to particular tasks within the same billing entry.  "If [Nike's] counsel had anticipated restitution, they could have kept better track of their hours by implementing separate billing codes or stricter time card narratives."[7]  Cuti, 708 F. App'x at 24.

   This Court cannot now attempt to extricate recoverable expenses from non-recoverable expenses in block-billing entries.  Nor should it.  The Supreme Court has sought to relieve district courts from the "significant administrative burdens" of resolving "potentially time-consuming controversies as part of criminal sentencing," particularly "in cases involving multimillion dollar investigation expenses for teams of lawyers."  See Lagos, 138 S. Ct. at 1689. Having carefully reviewed the revised Nike time entries (see Dkt. No. 338-2), the Court has subtracted from the total requested amount any entry that contains an unrecoverable expense. The total expenses for which Nike can seek recovery amount to $259,800.50.[8]

---

review[ing] previous productions, discussions, and meeting notes to provide response to SDNY open asks."  (Id. at 11)  Boies Schiller thus mixes and mingles recoverable expenses – i.e., communicating with the Government and responding to its requests – with non-recoverable expenses – i.e., analyzing court filings and activity related to Nike's motion to quash.
[7]  Nike contemplated a possible award of restitution as early as June 2019, as evidenced by the following billing entry:  "[c]onduct legal research regarding victims' rights statutes; draft and revise memorandum regarding victims' rights statutes; emails with S. Wilson, P. Skinner, and A. Michaelson regarding victims' rights statutes."  (Revised Nike Time Entries (Dkt. No. 338-2) at 3)
[8]  This amount reflects the exclusion of the following entries, identified by page and line number: (Revised Nike Time Entries (Dkt. No. 338-2) at 2:1, 22; 3:12-14; 4:1, 3-8, 10-12; 5:1-6, 9-13, 15; 6:1-15; 7:1-3, 5, 7-15; 8:1-14; 9:8-10, 12-20; 10:1-2; 11:1-10, 12-15; 12:2-4, 7-9, 11-14, 18-19; 13:1-18; 14:1-7, 9-13, 15-19; 15:1-2, 4-8, 10-11, 13-14, 16, 18-21; 16:1-7, 11-13, 16-20; 17:1-3, 5-6, 8-13; 18:1, 4, 7, 10, 14-15; 19:2-3, 6-7, 10, 12-14, 16-17; 20:2-5, 9-13, 18-19; 21:1-15, 21; 22:2-3, 11-12, 23; 23:1, 3-7)

C.    **Whether Boies Schiller's Fees Are Reasonable**

Avenatti complains that Boies Schiller frequently staffed multiple lawyers on the same task, leading to unreasonably high bills.  (July 1, 2021 Def. Ltr. (Dkt. No. 332) at 5-6; July 21 Def. Supp. Ltr. (Dkt. No. 340) at 2)

"The Second Circuit has not yet ruled on the question of whether district courts have a duty to scrutinize the amount of attorneys' fees requested pursuant to the MVRA." Napout, 2018 WL 6106702, at *5 (internal quotation marks, citation, and alteration omitted). "However, courts in this circuit have reduced attorneys' fees in connection with restitution proceedings where they have 'exceeded what was reasonably necessary under the MVRA.'"  Id. at *5-6 (collecting cases); see also Gupta, 925 F. Supp. 2d at 587-88 (reducing restitution award by 10% where "the number of attorneys staffed on a task . . . exceeded what was reasonably necessary under the MVRA," even if the same staffing might be "perfectly appropriate on the assumption that [the corporate victim] wished to spare no expense on a matter of great importance to it").

Here, most of the entries in which multiple Boies Schiller attorneys billed dozens of hours for the same project involve review of pretrial briefs filed by Avenatti or the Government (see, e.g., Revised Nike Time Entries (Dkt. No. 338-2) at 4 (four attorneys reviewing Avenatti motion to dismiss and other filings)), or motion practice related to the motions to quash (see, e.g., id. at 15-16 (three attorneys drafting and editing reply brief)), which the Court has determined are unrecoverable expenses.  This argument is thus moot; no further reductions are necessary.

     **D.**    **Sequence of Restitution Payments**

          The Government reports that Nike requests that any award of restitution "be paid only after any individual victims in the defendant's other pending cases [– United States v. Avenatti, No. 19 Cr. 374 (JMF) (S.D.N.Y.), and United States v. Avenatti, No. 19 Cr. 61 (C.D. Cal.) –] are paid restitution, if ordered." (July 15, 2021 Govt. Supp. Ltr. (Dkt. No. 338); Govt. Sentencing Br. (Dkt. No. 321) at 18) The restitution statute does not authorize the Court to create a schedule for restitution payments that takes into account a hypothetical restitution order in another case, in which no judgment of conviction has been entered. Accordingly, the application is denied.

## CONCLUSION

          For the reasons stated above, the total amount of expenses that Nike can recover is $259,800.50. By **February 16, 2022**, the Government will submit a proposed order of restitution, including the address to which the Clerk of Court should forward any restitution payments.

Dated: New York, New York
      February 14, 2022

                           SO ORDERED.

                           _____

                           Paul G. Gardephe
                           United States District Judge

**18 U.S.C. § 875–Interstate communications**

(d) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

**18 U.S.C. § 1343—Fraud by wire, radio, or television**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. ...

**18 U.S.C. § 1346—Definition of "scheme or artifice to defraud"**

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

**18 U.S.C. § 1951— Interference with commerce by threats or violence**

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires so to do, ...  shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section— ...

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

## 18 U.S.C. § 3663A—Mandatory restitution to victims of certain crimes.

(a)

(1) Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense ....

(2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered ....

(b) The order of restitution shall require that such defendant— ...

(4) in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

(c)

(1) This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense—

(A) that is— ...

(ii) an offense against property under this title ... including any offense committed by fraud or deceit; ...

(B) in which an identifiable victim or victims has suffered a ... pecuniary loss.

**18 U.S.C. § 3664—Procedure for issuance and enforcement of order of restitution.**

(d)

(5) If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. ...