# 21-1778(L)

## 22-351(CON)

*To Be Argued By*:
MATTHEW D. PODOLSKY

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 21-1778(L), 22-351(CON)

➤➤➤

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MICHAEL AVENATTI,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

MATTHEW D. PODOLSKY,
DANIEL C. RICHENTHAL,
ROBERT B. SOBELMAN,
DANIELLE R. SASSOON,
   *Assistant United States Attorneys,
      Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . .  3

        1.  Avenatti's Financial Condition . . . . . . .  3

        2.  Avenatti's Initial Communications with Franklin . . . . . . . . . . . . . . . . . . . . . . . . .  4

        3.  Avenatti's Threats to Nike and Misrepresentations and Omissions to Franklin . . . . . . . . . . . . . . . . . . . . . . .  7

            a.  The Initial Contacts with Nike . . .  7

            b.  The March 19 Meeting . . . . . . . . . .  9

            c.  The March 20 Call . . . . . . . . . . .  12

            d.  The March 21 Meeting . . . . . . . .  14

            e.  Avenatti's Arrest . . . . . . . . . . . . .  19

    B.  The Defense Case, Rule 29 and 33 Motions, and Verdict . . . . . . . . . . . . . . . . . . . . . . . .  20

    C.  The Sentencing . . . . . . . . . . . . . . . . . . . . . .  21

ARGUMENT:

POINT I—Sufficient Evidence Supported the Convictions . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  22

ii

PAGE

1. Sufficiency of the Evidence Claims. . .  22

2. Extortion. . . . . . . . . . . . . . . . . . . . . . .  23

3. Honest Services Wire Fraud . . . . . . . .  24

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  25

1. The Evidence of Wrongfulness Was
   Sufficient . . . . . . . . . . . . . . . . . . . . . . .  25

2. The Evidence of Intent to Defraud Was
   Sufficient . . . . . . . . . . . . . . . . . . . . . . .  33

POINT II—The District Court Correctly Instructed
the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  35

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . .  41

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  43

1. Judge Gardephe's Jury Instructions
   Were Correct . . . . . . . . . . . . . . . . . . . .  43

2. Avenatti Cannot Show Prejudice . . . .  46

POINT III—The Restitution Order Should Be
Affirmed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . .  49

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  51

iii

PAGE

1. The District Court Was Authorized to
   Order Restitution. . . . . . . . . . . . . . . . . 51

2. Nike Was Entitled to Restitution . . . . 54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**TABLE OF AUTHORITIES**

*Cases*:

*DeFalco v. Bernas,*
   244 F.3d 286 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 26

*Dolan v. United States,*
   560 U.S. 605 (2010). . . . . . . . . . . . . . 50, 51, 54, 56

*Fowlkes v. Ingraham,*
   81 Cal. App. 2d 745 (Cal. Dist. Ct. App. 1947) . . 44

*Jackson v. Virginia,*
   443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . 23

*Kolburn v. P.J. Walker Co.,*
   101 P.2d 747 (Cal. Dist. Ct. App. 1940). . . . . . . . 43

*Neder v. United States,*
   527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . 42, 46, 49

*Ross v. Ross,*
   120 Cal. App. 2d 70 (Cal. Dist. Ct. App. 1953) . . 44

*Skilling v. United States,*
   561 U.S. 358 (2010). . . . . . . . . . . . . . . . . . . . . . . 25

iv

PAGE

*United States v. Afriyie*,
27 F.4th 161 (2d Cir. 2022) . . . . . . . . . . . . . . 50, 56

*United States v. Amato*,
540 F.3d 153 (2d Cir. 2008) . . . . . . . . . . . . . . 50, 56

*United States v. Avenatti*,
No. S1 19 Cr. 373 (PGG), 2021 WL 2809919
(S.D.N.Y. July 6, 2021) . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Avenatti*,
No. S1 19 Cr. 373 (PGG), 2022 WL 452385
(S.D.N.Y. Feb. 14, 2022) . . . . . . . . . . . . . . . . . . . . 21

*United States v. Bruno*,
661 F.3d 733 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 33

*United States v. Capo*,
817 F.2d 947 (2d Cir. 1987) . . . . . . . . . . . . . . . . . 24

*United States v. Carr*,
880 F.2d 1550 (2d Cir. 1989) . . . . . . . . . . . . 41, 45

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . 23, 29

*United States v. Crowley*,
318 F.3d 401 (2d Cir. 2003) . . . . . . . . . . . . . 41, 45

*United States v. Dalicandro*,
711 F. App'x 38 (2d Cir. 2017) . . . . . . . . . . . . . . 53

*United States v. Farrah*,
No. 98 Cr. (AWT), 2000 WL 92349 (D. Conn. Jan.
5, 2000), *aff'd*, 11 F. App'x 34 (2d Cir. 2011) . . . . 31

v

PAGE

*United States v. Frady,*
   456 U.S. 152 (1982). . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Gansman,*
   657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 42

*United States v. Guadagna,*
   183 F.3d 122 (2d Cir. 1999) . . . . . . . . . . . . . . . 23

*United States v. Gushlak,*
   728 F.3d 184 (2d Cir. 2013) . . . . . . . . . . . . . 53, 54

*United States v. Hassan,*
   578 F.3d 108 (2d Cir. 2008) . . . . . . . . . . . . . . . 22

*United States v. Hymas,*
   584 F. App'x 361 (9th Cir. 2014) . . . . . . . . . . . . 52

*United States v. Jackson,*
   180 F.3d 55 (2d Cir. 1999) . . . . . . . . . . . . . . 24, 26

*United States v. Jackson,*
   196 F.3d 383 (2d Cir. 1999) . . . . . . . . . . . . . 30, 31

*United States v. Kozeny,*
   667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . . . 22

*United States v. Kuruzovich,*
   No. 09 Cr. 824 (DC), 2012 WL 1319805 (S.D.N.Y.
   Apr. 13, 2012), *abated by*, 541 F. App'x 124 (2d
   Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 57

*United States v. Landesman,*
   17 F.4th 298 (2d Cir. 2021) . . . . . . . . . . . . . . . 23

*United States v. Marcus,*
   560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . . 42

vi

PAGE

*United States v. Masotto,*
    73 F.3d 1233 (2d Cir. 1996) . . . . . . . . . . . . . . . . 41

*United States v. Matthews,*
    20 F.3d 538 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 23

*United States v. McDermott,*
    245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . 23, 27

*United States v. Middlemiss,*
    217 F.3d 112 (2d Cir. 2008) . . . . . . . . . . . . . 29, 33

*United States v. Milstein,*
    481 F.3d 132 (2d Cir. 2007) . . . . . . . . . . . . . . . . 50

*United States v. Mulder,*
    273 F.3d 91 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 41

*United States v. Nektalov,*
    461 F.3d 309 (2d Cir. 2006) . . . . . . . . . . . . . . . . 46

*United States v. Nouri,*
    711 F.3d 129 (2d Cir. 2013) . . . . . . . . . . . . . 25, 34

*United States v. Pickett,*
    612 F.3d 147 (2d Cir. 2010) . . . . . . . . . . . . . . . . 52

*United States v. Qurashi,*
    634 F.3d 699 (2d Cir. 2011) . . . . . . . . . . . . . . . . 49

*United States v. Rivernider,*
    828 F.3d 91 (2d Cir. 2016) . . . . . . . . . . . . . 50, 53

*United States v. Roy,*
    783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . . . 41

*United States v. Sabhnani,*
    599 F.3d 215 (2d Cir. 2010) . . . . . . . . . . . . . . . . 22

vii

PAGE

*United States v. Skelly*,
  442 F.3d 94 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 42

*United States v. Suriel*,
  335 F. App'x 136 (2d Cir. 2009) . . . . . . . . . . . . . 42

*United States v. Whab*,
  355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . . 51

*United States v. White*,
  552 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 41

*United States v. Wilkerson*,
  361 F.3d 717 (2d Cir. 2004) . . . . . . . . .   41, 43, 45

*United States v. Xue*,
  No. 16 Cr. 22 (JHS), 2021 WL 2433857 (E.D. Pa.
  June 15, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Zvi*,
  168 F.3d 49 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 48

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1951 . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

18 U.S.C. § 3663A(a)(2) . . . . . . . . . . . . . . . . . . . . . . 54

18 U.S.C. § 3663A(b)(4) . . . . . . . . . . . . . . . . . . . . . 50

18 U.S.C. § 3663A(c) . . . . . . . . . . . . . . . . . . . . . . . . 49

18 U.S.C. § 3664(d)(5) . . . . . . . . . . . . . . . . . . . . . . 50

18 U.S.C. § 875(d) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket Nos. 21-1778(L), 22-351(CON)

―――――――――

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MICHAEL AVENATTI,

*Defendant-Appellant.*

―――――――――

## BRIEF FOR THE UNITED STATES OF AMERICA

―――――――――

### Preliminary Statement

Michael Avenatti appeals from a judgment of conviction entered on July 15, 2021, and an amended judgment of conviction entered on February 18, 2022, in the Southern District of New York, following a three-week jury trial before the Honorable Paul G. Gardephe, United States District Judge.

Superseding Indictment S1 19 Cr. 373 (PGG) (the "Indictment") was filed on November 13, 2019, in three counts. Count One charged Avenatti with making interstate threats with intent to extort, in violation of 18 U.S.C. § 875(d). Count Two charged Avenatti with attempted extortion, in violation of 18 U.S.C. § 1951.

2

Count Three charged Avenatti with honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

Trial commenced on January 27, 2020, and ended on February 14, 2020, when Avenatti was convicted of all counts.

On July 8, 2021, Judge Gardephe sentenced Avenatti principally to an aggregate term of 30 months' imprisonment, and deferred a final determination as to restitution.

On February 18, 2022, following a memorandum opinion and order as to restitution, Judge Gardephe entered an amended judgment imposing $259,800.50 in restitution.

Avenatti is serving his sentence.

## Statement of Facts

Avenatti wrongfully used confidential information obtained from his client, Gary Franklin, Sr., in a scheme to extort NIKE, Inc. ("Nike"), a publicly-traded company, into paying at least $15 million to Avenatti. Avenatti demanded that Nike pay him personally, or else Avenatti would use his considerable media influence and hold a press conference intended to cause harm to Nike's stock price. During a series of calls and meetings, most of which were consensually recorded at the direction of law enforcement, Avenatti threatened harm to Nike's market value, demanded personal payments from Nike under a sham retention agreement with Nike, and made explicit that Nike would have to pay or employ Avenatti because Avenatti had the power to harm Nike. Avenatti did not inform Franklin

3

of his demands, much less receive authorization for what he did, but instead misled Franklin regarding the nature of the purported negotiations with Nike, concealed facts from Franklin, and misused Franklin's confidential information.

## A.   The Government's Case

The Government introduced extensive evidence at trial of Avenatti's desperate financial circumstances, his omissions and lies to his client, and his extortionate and wrongful threats and demands. The core evidence of Avenatti's misconduct was not in dispute: Avenatti's threats were captured on audio- and video-recordings of phone calls and an in-person meeting at which Avenatti laid bare his scheme. The Government introduced the testimony of seven witnesses, including Nike's attorneys who met with Avenatti and received his extortionate demands, Franklin himself, a friend of Franklin who participated in discussions with Avenatti, and Avenatti's former paralegal and office manager. The Government also introduced documentary evidence, including text messages, emails, and phone logs.

### 1.   Avenatti's Financial Condition

The central events of this case transpired in less than a month, over the course of March 2019, between when Avenatti met Franklin and when Avenatti was arrested. By the time Avenatti met Franklin, Avenatti's law firm was failing financially. (*See* A. 398

4

(Tr. 1401-02)).[1] The firm could not pay its bills and had been evicted from its offices for failure to pay rent. (A. 398-99 (Tr. 1402-05)). Avenatti was also facing dire personal economic circumstances. Four different judgments had recently been entered requiring Avenatti to pay a total of approximately $11 million, and through March 2019, these debts remained outstanding in full. (A. 1696-97).

### 2. Avenatti's Initial Communications with Franklin

On March 1, 2019, Avenatti was contacted by Jeffrey Auerbach, a friend of Franklin, who explained that Franklin was looking for representation in connection with a potential dispute with Nike. (A. 224 (Tr. 713-14)). Specifically, Franklin was the coach of a youth amateur basketball team that had previously been sponsored by Nike, but the sponsorship of which had been terminated after what Franklin felt was bullying by two Nike employees. Those employees had requested that Franklin make certain payments to players' families that Franklin suspected could have been in violation of rules of the National Collegiate Athletic Association or even illegal given the similarity to

---

[1] "Br." refers to Avenatti's brief on appeal; "A." and "SPA" refer to the appendix and special appendix filed with that brief, respectively; "Tr." refers to the trial transcript; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

5

conduct that had been the basis for a prosecution of Adidas employees in the Southern District of New York. (A. 225 (Tr. 715-16); *see also* A. 223 (Tr. 707-10), A. 427-30 (Tr. 1520-30)). Nike had previously sponsored Franklin's team by providing annual funding and other benefits. (A. 429 (Tr. 1526-28), A. 967-75). Auerbach explained to Avenatti that Franklin was looking to bring the potential misconduct to Nike's attention, work with Nike to report the misconduct to authorities, make sure the two Nike employees did not harm anyone else, and reestablish his relationship with Nike. (A. 225 (Tr. 715)). Avenatti then contacted another attorney, Mark Geragos, about working together on a case against Nike because Geragos had a professional relationship with Nike's general counsel. (A. 934).

On March 5, 2019, Avenatti asked to meet with Auerbach and Franklin. (A. 227 (Tr. 726)). During the ensuing meeting, Auerbach and Franklin reiterated the facts and goals conveyed previously by Auerbach. (*See* A. 228 (Tr. 728-29), A. 432-33 (Tr. 1539-41)). Auerbach again stressed that Franklin wanted to be compensated for his lost sponsorship and, importantly, to restore his relationship with Nike, as Franklin "lived and breathed Nike." (A. 228-29 (Tr. 729-31)). For his part, Franklin emphasized that renewing Nike's sponsorship of his team was the most important goal for him. (A. 433 (Tr. 1541-43)). At the meeting, Avenatti agreed to represent Franklin, but said nothing about any retainer agreement or fees. (A. 234 (Tr. 752), A. 435 (Tr. 1551-52)).

6

At no time during this meeting, or in any subsequent communications between the three men, did Avenatti, Franklin, or Auerbach mention, propose, or otherwise discuss the idea of holding a press conference to publicize any allegations by Franklin concerning Nike. (A. 225 (Tr. 717), A. 227 (Tr. 725), A. 232 (Tr. 744-45), A. 235 (Tr. 755), A. 236 (Tr. 762), A. 435-36 (Tr. 1552-53), A. 439 (Tr. 1568), A. 986-1205). That was unsurprising, because it was important to Franklin to keep the issues he raised from becoming public. (A. 435-36 (Tr. 1552-53), A. 443 (Tr. 1584)).

Avenatti also said nothing during this meeting, or at any other point, about Nike conducting an internal investigation, much less about Avenatti being paid in connection with such an investigation. (A. 225 (Tr. 718), A. 227 (Tr. 725-26), A. 232 (Tr. 746), A. 235 (Tr. 755), A. 236-37 (Tr. 762-63), A. 435-36 (Tr. 1552-54), A. 994-1205). That too was unsurprising, because Franklin had no interest in an internal investigation and believed he already knew what had happened. (A. 225 (Tr. 718), A. 232 (Tr. 746), A. 436 (Tr. 1553)). And Franklin had even less interest in Avenatti being hired or paid by Nike, as it was palpable even to non-lawyers, such as Auerbach and Franklin, that Avenatti seeking employment or money for himself would be detrimental to Franklin and a "total conflict of interest" because "every dollar or moment you're discussing what's good for Mr. Avenatti . . . you're taking away from the client, Gary." (A. 225-26 (Tr. 718-19); *see also* A. 232-33 (Tr. 746-47), A. 436 (Tr. 1554), A. 440 (Tr. 1572)).

7

Nevertheless, after meeting Franklin, Avenatti told his office manager that "he was working on something" that would allow him to resolve his outstanding debts and "live his life as he wanted to live it." (A. 399 (Tr. 1405-06)).

### 3. Avenatti's Threats to Nike and Misrepresentations and Omissions to Franklin

#### a. The Initial Contacts with Nike

Geragos reached out to Nike to set up a meeting for Avenatti. (A. 95 (Tr. 201), A. 982-93). Avenatti encouraged Geragos to speak directly with someone internal at Nike for fear that an outside attorney would stymie Avenatti's efforts to be "hired" by Nike. (A. 95 (Tr. 202), A. 936, A. 938, A. 984). Geragos eventually spoke to Scott Wilson, an attorney at the firm Boies Schiller Flexner LLP ("Boies Schiller") who represented Nike. (A. 95 (Tr. 200-03), A. 935-40, A. 984). Geragos stated that the matter was too sensitive to discuss over the phone and that Nike may have "an Adidas problem." (A. 95-96 (Tr. 203-04)). Wilson agreed to meet with Avenatti and Geragos and to bring a Nike in-house attorney to a meeting at Geragos's office in New York four days later, on March 19, 2019. (A. 96-97 (Tr. 205-08)). Avenatti made arrangements to have a press conference in the event that the March 19 meeting was unsuccessful to publicize purported corruption in youth basketball connected to Nike and for a related article to be published by *The New York Times*. (A. 561 (Tr. 1863), A. 943, A. 1689; *see also* A. 99 (Tr. 217)).

8

On March 18, Avenatti again met in person with Franklin and Auerbach, and informed them that a meeting with Nike had been arranged for the following day. (A. 242 (Tr. 784-85), A. 436-37 (Tr. 1555-58)). Avenatti also told them that he thought he could get Franklin "a million dollars" from Nike. (A. 242 (Tr. 785), A. 437-38 (Tr. 1560-61)). Franklin and Auerbach impressed on Avenatti the importance to Franklin of repairing his relationship with Nike and renewing the sponsorship for Franklin's team. (A. 243 (Tr. 788), A. 438 (Tr. 1561-62)). Although Avenatti stated that he did not think reinstatement with Nike was likely, Franklin and Auerbach understood from Avenatti that he would still seek to renew the sponsorship. (A. 243 (Tr. 788), A. 438 (Tr. 1561-62)).

Notwithstanding the fact that Avenatti had already taken steps to arrange for a press conference and news article regarding Franklin's allegations concerning Nike, Avenatti said nothing about publicity to Franklin and Auerbach. (A. 245 (Tr. 797-98), A. 438 (Tr. 1564)). Franklin and Auerbach wished to keep these matters confidential, and stamped documents shared with Avenatti with the words "privileged" and "confidential" to make clear the importance of confidentiality. (A. 245 (Tr. 796-97), A. 1163-64). As Franklin testified, it was critically important to him that the information not be made public because it could "potentially harm Nike, potentially harm the kids that were involved, the parents that were involved, hurt the program, and as well as myself." (A. 434 (Tr. 1546)). Franklin was particularly concerned about the impact of public allegations on the players he coached, observing, "I know these kids, you know, I've

9

coached them, worked with them in the gym. I mean, they're 16/17-year-old kids. I mean, I definitely would not want those kids hurt, their names being brought up." (A. 434 (Tr. 1546-47)). And although Avenatti had already begun working to have Nike "hire" and pay him, and had enlisted Geragos's help, he concealed this too. (A. 245-46 (Tr. 798-99), A. 438 (Tr. 1564)).

**b.** **The March 19 Meeting**

On March 19, 2019, Avenatti, Geragos, Wilson, Nike attorney Robert Leinwand, and Boies Schiller associate Benjamin Homes met at Geragos's office in Manhattan. (A. 97 (Tr. 208), A. 334 (1149-50), A. 401 (Tr. 1414-15)).

At the beginning of the meeting, Avenatti asked "if this would be a 408 discussion," in apparent reference to the rule of evidence governing settlement discussions, although it became clear that Avenatti was not engaged in anything resembling settlement discussions. (A. 97 (Tr. 210-11), A. 99 (Tr. 216), A. 112 (Tr. 271), A. 334-35 (Tr. 1150-53)). Rather, after stating that he represented a "whistleblower" with knowledge and involvement in allegedly unlawful activities at Nike, Avenatti laid out his demand: "Nike was going to pay a civil settlement to his client, who he said had breach of contract, tort, or other claims, and Nike was going to hire Mr. Avenatti and Mark Geragos to conduct an internal investigation into corruption in basketball." (A. 97-98 (Tr. 211-13), A. 105 (Tr. 242-43), A. 335 (Tr. 1155)). Avenatti also stated what would happen if his demands were not promptly met: "he was going to blow the lid on this scandal" and

10

"he had a reporter, Rebecca Ruiz, at the New York Times either on speed dial or on call" to "write a story at a moment's notice." (A. 99 (Tr. 217), A. 106 (Tr. 244), A. 336 (Tr. 1158)).

Avenatti emphasized throughout the meeting that he had the power to generate a scandal. (A. 106 (Tr. 247), A. 107 (Tr. 249)). He also made explicit that his intent—if his demands were not met—was to cause harm to Nike, namely, "he could and would take billions of dollars off the company's market cap." (A. 99 (Tr. 218)). He further threatened that the damage would be heightened because the timing of the threatened press conference would coincide both with "March Madness," when there would be popular focus on college basketball, and with Nike's upcoming earnings call. (A. 109 (Tr. 257-58), A. 338 (Tr. 1166-67), A. 403 (Tr. 1422-24)).

Importantly, Avenatti made clear that the scandal he would generate could not be avoided unless Avenatti *himself* were paid off by Nike. (A. 105-06 (Tr. 243-44), A. 107 (Tr. 248)). Avenatti told Nike's attorneys that if Nike undertook an internal investigation and hired someone other than Avenatti to conduct it, Nike would still have to pay Avenatti, and indeed, would have to pay him twice as much money as Nike was paying the firm conducting the investigation for doing nothing aside from maintaining his silence about Franklin's allegations. (A. 111 (Tr. 267), A. 336-37 (Tr. 1159-60), A. 404 (Tr. 1425-26)). Avenatti also made clear that the payoff to him would have to be significant. (A. 404-05 (Tr. 1427-29)). Of course, the request for Nike to "hire" Avenatti—who was

11

representing someone Avenatti said had potential claims against Nike—presented an obvious conflict of interest. (A. 123 (Tr. 312), A. 335-36 (Tr. 1155-57)).

Avenatti told Nike's attorneys that he would carry out his threat unless his demands were met immediately and rejected Wilson's requests for more time. (A. 109 (Tr. 258-59), A. 334 (Tr. 1150-51), A. 339 (Tr. 1169-71)). Wilson asked Avenatti to consider the impact on the young players' lives of holding a press conference. (A. 111 (Tr. 264), A. 339 (Tr. 1170)). Wilson testified regarding Avenatti's response: "I don't remember which of these two expletives he used, but I remember he leaned forward and he shouted at me: I don't give a fuck about these kids, or, I don't give a shit about these kids." (A. 111 (Tr. 264); *see also* A. 339 (Tr. 1170), A. 406 (Tr. 1436)).

Nike's attorneys quickly understood that Avenatti was not making a litigation demand or indeed threatening litigation at all—he was threatening to use his media platform to cause reputational and financial damage to Nike if Nike did not pay him personally. (A. 99 (Tr. 217-18), A. 106 (Tr. 245-47), A. 334 (Tr. 1151), A. 405 (Tr. 1429-30), A. 407 (Tr. 1438)). In fact, apart from saying he had a client, Avenatti never discussed legal claims or suggested he might file a legal action on Franklin's behalf. (A. 112 (Tr. 270-71)).

Notably, Avenatti did not pursue what Franklin wanted: Avenatti neither asked for the two Nike employees who allegedly bullied Franklin to be fired nor pressed for Franklin's first priority, to have his sponsorship with Nike reinstated. (A. 337 (Tr. 1162), A. 405 (Tr. 1431)). Rather, Avenatti did the opposite,

12

"stat[ing] as a matter of fact that Gary Franklin, his client, would never be able to work with Nike again." (A. 405 (Tr. 1431); *see also* A. 337 (Tr. 1162)).

After meeting with Nike's attorneys, Avenatti spoke by phone with Franklin and Auerbach. (A. 246 (Tr. 800-01), A. 439 (Tr. 1566), A. 1209). During that call, Avenatti stated that the meeting went well and that he planned to meet with Nike's attorneys again in two days. (A. 246 (Tr. 801), A. 439 (Tr. 1567)). Avenatti did not mention that he had threatened to hold a press conference or that he had demanded that Nike "hire" and pay him—let alone that he had insisted Nike pay him even if he performed no work. (A. 247 (Tr. 806), A. 439 (Tr. 1568)).

### c.    The March 20 Call

Shortly after the conclusion of the March 19 meeting, Wilson and Leinwand contacted the United States Attorney's Office for the Southern District of New York to relay what had transpired at the meeting. (A. 112-13 (Tr. 271-72), A. 331 (Tr. 1139)). At the request of the Federal Bureau of Investigation ("FBI"), Wilson's subsequent interactions with Avenatti were audio- or video-recorded. (A. 113 (Tr. 274-75), A. 172 (Tr. 509-10)).

On March 20, 2019, Wilson spoke with Avenatti and Geragos on a recorded telephone call. (A. 113 (Tr. 275), A. 857-77). At the outset of the call, Wilson stated that Nike was considering Avenatti's demands, and that Wilson thought a deal could be reached, but that Nike could not give Avenatti all he wanted. (A. 859). Avenatti replied, "I mean we're gonna get a

13

million five for our guy, and we're gonna be hired to handle the internal investigation, and if you don't wanna do that, we're done." (A. 860).

Wilson attempted to respond, but Avenatti cut in, saying:

> No just listen, listen to me . . . I wanna be really clear with you. . . . I'm not fucking around with this, and I'm not continuing to play games. . . . this isn't complicated. You guys know enough now to know you've got a serious problem. And it's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me. I'm just being really frank with you. So if that's what, if that's what is being contemplated, then let's just say it was good to meet you, and we're done. And I'll proceed with my press conference tomorrow and I'll hang up with you now and I'll call the New York Times, who are awaiting my call. I-I'm not fucking around with this thing anymore. So if you guys think that you know, we're gonna negotiate a million five, and we're gonna, you're gonna hire us to do an internal investigation, but it's gonna be capped at 3 or 5 or 7 million dollars, like let's just be done.

(A. 860-61). Wilson again attempted to speak, but Avenatti continued, "I'll go take ten billion dollars off your client's market cap. But I'm not fucking around." (A. 861).

14

Wilson sought clarity as to the amount of money that Nike would have to pay Avenatti for him not to carry through with his threats, noting that in their prior meeting, Avenatti had alluded to a $31 million settlement and that it might make a difference to Nike if Avenatti was seeking "a cap at a million dollars versus a cap at fifty million dollars." (A. 862-63). In response, Avenatti asked what Boies Schiller might charge for a large internal investigation, and when Wilson suggested a number "in the single digit millions," Avenatti responded, "Yeah that's not in the ballpark," and specified that "five, six, eight, nine million dollars" would not be sufficient. (A. 863-67).

Avenatti stated that he was willing to meet in person to finalize details, but that Wilson should "be prepared to paper it. Because this is not gonna take longer than twenty-four hours to paper." (A. 871). Avenatti explained that, "we're talking about a settlement agreement, on a relatively-you know, on on a million five with adequate releases etcetera, and we're talking about an engagement letter." (A. 871). Avenatti agreed to meet Wilson in person the following morning to give his final demands, and to delay his press conference by several days for Nike to provide a definitive answer. (A. 874-75).

### d.    The March 21 Meeting

On March 21, 2019, Wilson and Homes went to Geragos's office to meet with Avenatti and Geragos. (A. 120 (Tr. 303)). Wilson and Homes audio- and video-recorded the meeting with FBI equipment. (A. 120 (Tr. 303-04), A. 408 (Tr. 1441), A. 878-925).

15

At the outset, Avenatti declared that "we'll start with the easiest part." (A. 887). Avenatti then showed Wilson and Homes a draft settlement agreement covering the requested payment from Nike to Franklin. (A. 121-22 (Tr. 307-10), A. 887; *see also* A. 130-31 (Tr. 342-44), A. 978-81). Wilson stated, "I don't think that that the um, one point five million dollars to settle the civil claims will be the sticking point." (A. 888).

Avenatti then turned to the demand for him to be "hired" by Nike: "12 million dollar retainer upon signing Evergreen. Um, that's gonna be deemed earned when paid, we'll cap it at 25 million dollars, minimum of 15 million dollars, unless the scope changes." (A. 891). In other words, Nike would have to pay Avenatti $12 million upfront and ultimately a minimum of $15 million, whether Avenatti actually did any of the purported, unrequested, and unwanted work at all. (A. 123 (Tr. 313-16)).

Wilson pressed Avenatti as to whether there was "a way to avoid your press conference without hiring you and Mark [Geragos] to do an internal investigation?" (A. 895). Avenatti responded that he was "not gonna answer that question." (A. 895). Wilson then asked whether Nike could instead increase its settlement payment to Franklin. (A. 896). Avenatti replied: "I don't think that it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin, in light of his role in this." (A. 897).

Wilson asked Avenatti how he could explain to business executives at Nike that, in order to settle claims by a potential plaintiff, Nike would have to "hire plaintiff's counsel," in addition to paying a

16

settlement. (A. 897-99). Wilson also emphasized that Avenatti was seeking a large amount of money, noting that "I've never gotten a 12 [m]illion dollar retainer from this client." (A. 899-900). Avenatti responded: "Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em?" (A. 900).

Avenatti also reiterated his threat: "This is not gonna be a single press conference, okay? . . . this is gonna be a scandal. This is gonna be the biggest scandal in sports, in a long time." (A. 901). Avenatti then offered an alternative proposal:

> If, um, if your client wants to have one confidential settlement agreement—and we're done, they can buy that for 22 and a half million dollars. And we're done. . . . and full confidentiality, we ride off into the sunset, if you need assistance from us as it relates to Mr. Franklin, uh, we'd be happy to provide that, obviously we're not going to do anything illegal—or he's not gonna do anything illegal—. . . And, we can be done.

(A. 901-02). And Avenatti laid out the threat once again:

> I just wanna share with you what's gonna happen, if we don't reach a resolution—. . . . No, this is not me pounding my chest, or any of that shit. . . . As soon as this becomes public, I'm gonna receive calls from all over the country, from parents, and

17

coaches, and friends, and all kinds of peo-
ple, because this is always what happens
—and they're all going to say, "I've got an
email, or text message or—now. 90% of
that is gonna be bullshit. Cause it's al-
ways bullshit 90% of the time. Always.
Whether it's R. Kelly, or Trump, or the
list goes on and on. But 10% of it is actu-
ally going to be true. And then what's
gonna happen is, this will snowball. And
then it will be 5 players, and then it will
be 9, and then it will be 15, and then it
will be 25, and it's gonna snowball—and
every time we get more information,
that's gonna be The Washington Post,
The New York Times, ESPN, a press con-
ference—and the company will die, not
die, but they're going to incur, cut after
cut after cut after cut, and that's what's
gonna happen. As soon as this thing be-
comes public. So, it is in the company's
best interest to avoid this becoming pub-
lic . . . .

(A. 903-04). Avenatti went on:

If this is not papered on Monday, we're
done. . . . I don't wanna hear about some-
body on a bike trip, I don't wanna hear
that somebody has, somebody's grand-
mother passed away or something, I don't
—look—the dog ate my homework, I don't
wanna hear, none of it is gonna go any-
where unless somebody was killed in a

18

> plane crash. It's going to go zero, no place
> with me.

(A. 906).

Before the meeting concluded, Avenatti provided Wilson and Homes with a form settlement agreement and Avenatti and Wilson agreed to meet on March 25 to finalize matters. (A. 920-23).

Following the March 21 meeting, Avenatti spoke with Franklin and Auerbach. (A. 248 (Tr. 807), A. 440 (Tr. 1569), A. 1689). During the call, Avenatti said, "I think things are going well and I told them I'm not fucking around with this" and that Nike would provide an answer soon. (A. 440 (Tr. 1569-70)). Avenatti did not tell them about his request for an internal investigation, his threats about a potential press conference, his rejection of a settlement for $1.5 million for Franklin unless Avenatti were personally paid, or Avenatti's alternative demand for $22.5 million. (A. 248 (Tr. 808), A. 440 (1571-72)). Avenatti also never sought permission to publicize Franklin's information or shared his plans to do so. (A. 248 (Tr. 808-09), A. 440-41 (Tr. 1572-73)).

Nevertheless, approximately five minutes after the call, Avenatti tweeted, with a link to a story about the Adidas corruption trial, "Something tells me that we have not reached the end of this scandal. It is likely far far broader than imagined. . ." (A. 953). When Franklin saw the tweet, he found it "[s]cary" and had "concerns" that it would hinder the relationship he believed Avenatti was working to repair between Franklin and Nike. (A. 441 (Tr. 1574-75)). For his part, Wilson saw

19

the tweet "as a shot across the bow, of [Avenatti] trying to flex his muscles and show me that he, with hundreds of thousands of Twitter followers, that he could . . . make good on the threats that he had made." (A. 132 (Tr. 349-50)).

### e.    Avenatti's Arrest

On March 25, 2019, Avenatti went to Boies Schiller's offices in Manhattan, where he had been scheduled to meet again with Wilson. (*See* A. 555-56 (Tr. 1840-41), A. 923, A. 1690). Shortly before the meeting was supposed to start, FBI agents came to Franklin's door, and Franklin, still believing Avenatti to be serving Franklin's interests as his attorney, called Avenatti. (A. 442 (Tr. 1578-79), A. 1689). During his testimony, Franklin narrated the call:

> I said: Hey, the FBI just showed up at my door. . . . He said the FBI is at your door now? OK. Well, turn your phone completely off. And don't talk to them. I hope Nike is not trying to fuck you. . . . he said I think I'm going to go public and hung the phone up.

(A. 442 (Tr. 1579-80)). Franklin was "scared, upset, confused, felt betrayed," because "[i]t felt like . . . something just . . . wasn't right at that point," and "was terrified and just . . . did not want [Avenatti] to go public with it." (A. 442 (Tr. 1580)).

Approximately 15 minutes later, Avenatti tweeted:

> Tmrw at 11 am ET, we will be holding a press conference to disclose a major high

20

> school/college basketball scandal perpe-
> trated by @Nike that we have uncovered.
> This criminal conduct reaches the high-
> est levels of Nike and involves some of the
> biggest names in college basketball.

(A. 954). Neither Franklin nor Auerbach had ever told Avenatti that "criminal conduct reach[ed] the highest levels of Nike" and both perceived Avenatti's publicity of information shared in confidence as contrary to Franklin's explicitly stated goals. (A. 249-50 (Tr. 814-15), A. 443 (Tr. 1584)). After the tweet, Nike's stock price dropped by approximately $1 per share, resulting in a roughly $300 million decline in Nike's market capitalization. (A. 341 (Tr. 1177)).

Avenatti was arrested soon after. (A. 1690).

## B.  The Defense Case, Rule 29 and 33 Motions, and Verdict

At the conclusion of the Government's case, Avenatti moved orally for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. (A. 571-74 (Tr. 1902-09, 1911-15)). The District Court reserved decision, noting that "this case does present the archetypical jury issue, which is one of criminal intent." (A. 573 (Tr. 1911), A. 575 (Tr. 1917)).

In addition to extensive cross-examination of Government witnesses, the defense introduced several exhibits, including documents provided to Avenatti by Franklin and Auerbach and certain internet browser data from Avenatti's computer, that the defense argued showed Avenatti's state of mind. (A. 624-27 (Tr. 2114-25), A. 1738-1857).

21

On February 14, 2020, the jury returned a verdict of guilty as to all three counts. (A. 701-02 (Tr. 2420-22), A. 703).

On March 23, 2020, Avenatti renewed in writing his motion for acquittal under Rule 29, and moved for a new trial pursuant to Federal Rule of Criminal Procedure 33. (Dkt. 291). Judge Gardephe rejected Avenatti's motions in a written opinion. *See United States v. Avenatti*, No. S1 19 Cr. 373 (PGG), 2021 WL 2809919 (S.D.N.Y. July 6, 2021); (SPA 1-46).

## C. The Sentencing

On July 8, 2021, Judge Gardephe sentenced Avenatti to 24 months' imprisonment on Count One (making interstate threats) and 30 months' imprisonment on each of Counts Two (attempted extortion) and Three (honest services wire fraud), to be served concurrently, for an aggregate term of 30 months' imprisonment. (A. 800-12, A. 815). Judge Gardephe declined to impose a fine on the basis that Avenatti lacked the ability to pay, but ordered Avenatti to pay a $300 special assessment, and deferred a determination of restitution until October 8, 2021, on the basis that the materials thus far submitted about Nike's costs were insufficient to permit final determination. (A. 811, A. 819).

On February 14, 2022, following supplemental briefing, Judge Gardephe determined in a written opinion that Nike was entitled to recover $259,800.50 in restitution based on the costs Nike incurred during the investigation and prosecution of the offense. *See United States v. Avenatti*, No. S1 19 Cr. 373 (PGG),

22

2022 WL 452385 (S.D.N.Y. Feb. 14, 2022); (SPA 59-79). Judge Gardephe subsequently entered an order directing Avenatti to pay $259,800.50 in restitution to Nike. (A. 846).

# A R G U M E N T

## POINT I

### Sufficient Evidence Supported the Convictions

Avenatti argues that the evidence adduced at trial was insufficient to prove that he acted wrongfully with respect to the extortion counts and with intent to defraud with respect to the honest services wire fraud count. (Br. 28-48). The evidence as to each of these elements was extensive, and far more than sufficient.

## A.  Applicable Law

### 1.  Sufficiency of the Evidence Claims

"A defendant challenging the sufficiency of the evidence bears a heavy burden," *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). This Court reviews the sufficiency of the evidence *de novo*, *see United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010), but the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight

23

of the evidence," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). Ultimately, "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

A conviction must therefore be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021) ("A court must defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence."). In assessing the proof at trial, the Court must analyze each piece of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

### 2. Extortion

The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do" shall be guilty of a crime. 18 U.S.C. § 1951(a). The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear."

24

18 U.S.C. § 1951(b)(2). This Court has "repeatedly stressed that the element of 'fear' required by the [Hobbs] Act can be satisfied by putting the victim in fear of economic loss." *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (en banc) (quotation marks and citation omitted).

Similarly, 18 U.S.C. § 875(d) prohibits extortion through interstate communications. Section 875(d) provides that "[w]hoever, with intent to extort from any person . . . any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another" shall be guilty of a crime. 18 U.S.C. § 875(d).

This Court has explained with respect to both provisions, "a threat to cause economic loss [or reputational harm] is not inherently wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is not entitled." *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999). Accordingly, a threatener may be found guilty of extortion based on a threat of economic or reputational harm where the threatener "seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right." *Id.* at 71.

### 3. Honest Services Wire Fraud

The wire fraud statute prohibits the use of interstate wires by one who has "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

25

pretenses, representations, or promises," 18 U.S.C. § 1343, or "a scheme or artifice to deprive another of the intangible right of honest services," *id*. § 1346. Section 1346 proscribes "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling v. United States*, 561 U.S. 358, 404 (2010). "[T]o violate the right to honest services, the charged conduct must involve a *quid pro quo*, *i.e.*, an intent to give or receive something of value in exchange for an . . . act." *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013).

## B. Discussion

### 1. The Evidence of Wrongfulness Was Sufficient

Avenatti argues that the evidence was insufficient to prove that his extortionate threats were wrongful. (Br. 24). But there was overwhelming evidence that Avenatti had no claim of right to the money he demanded and that his exorbitant demands had no nexus to a plausible claim of right. The record is replete with evidence, including Avenatti's own recorded statements, that Avenatti well understood that he had no entitlement to be hired or paid by Nike, much less that he be paid more than $20 million. Avenatti's arguments to the contrary amount to nothing more than a disagreement with the jury's interpretation of the evidence, which was perfectly rational and therefore entitled to deference.

As Judge Gardephe found, the jury had ample basis to conclude that Avenatti was guilty of extortion

26

because he "repeatedly used threats of economic and reputational harm to demand millions of dollars for himself, to which he had no plausible claim of right." (SPA 32); *see Jackson*, 180 F.3d at 70 (a "threat to cause economic loss" is wrongful when the threatener seeks money "to which the threatener does not have, and cannot reasonably believe she has, a claim of right"); *DeFalco v. Bernas*, 244 F.3d 286, 318 (2d Cir. 2001) (same). Avenatti does not and cannot argue that he, rather than Franklin, had any legitimate claim to money from Nike. And yet Avenatti's own recorded statements made explicit that his threat-backed demands to be hired and paid by Nike were not connected to any legal claim of Franklin's and were for his own enrichment. (*See, e.g.*, A. 860-61, A. 891, A. 897, A. 900). Avenatti never mentioned during his talks with Nike a potential lawsuit and did not substantively elaborate on any legal claims. (*See, e.g.*, A. 405 (Tr. 1429)). Nor had he taken any steps toward bringing any kind of legal action. (A. 1721). Rather, Avenatti was simply threatening that he be paid immediately or he would harm Nike's reputation and market value. (A. 109 (Tr. 257-58), A. 111 (Tr. 264), A. 338 (Tr. 1166-67), A. 339 (Tr. 1170), A. 403 (Tr. 1422-24), A. 406 (Tr. 1436), A. 906). Avenatti threatened that even if Nike paid a settlement to Franklin, he would still inflict significant damage on Nike unless Nike acceded to his demands to be "hired" by Nike and paid him millions of dollars completely divorced from any work Avenatti performed. (*See, e.g.*, A. 860, A. 891; *see also* A. 111 (Tr. 267), A. 336-37 (Tr. 1159-60), A. 404 (Tr. 1425-26)).

27

Avenatti argues that the Government failed to prove that Avenatti did not reasonably believe that he had a claim of right to demand that Nike hire him to investigate. (Br. 34). But the evidence demonstrated—and certainly the jury was entitled to infer—that Avenatti's demand to be "hired" to conduct an internal investigation was nothing more than a cover story for funneling money from Nike to Avenatti. *See McDermott*, 245 F.3d at 137 ("the task of choosing among competing, permissible inferences" is for the jury). In his first meeting with Nike's attorneys, Avenatti not only said that he would have to be "hired," but also made the true nature of the demand apparent, stating that if Nike ultimately undertook an internal investigation and hired someone else, Nike would still have to pay Avenatti twice as much money for doing nothing at all. (A. 111 (Tr. 267), A. 336-37 (Tr. 1159-60), A. 404 (Tr. 1425-26)). Avenatti soon refined his demand, directing that Nike must pay him $12 million upfront, at least $15 million in all, and perhaps up to $25 million, "unless the scope changes." (A. 891). As Wilson explained, there was no true discussion of scope; it is apparent from the recorded conversations that the "negotiations" about the internal investigation were a sham. (*See* A. 123 (Tr. 313-16), A. 857-933). It was also obvious that Avenatti could never represent Nike, least of all in conducting an internal investigation, as it would have created a clear conflict of interest. (*See* A. 123 (Tr. 312), A. 335-36 (Tr. 1155-57)).

In arguing that his demands related to Franklin's claims of right, Avenatti contends that he "contravened no directive from Franklin." (Br. 35). This argument is farcical. Avenatti's actions were not only self-

28

interested, but they were also contrary to Franklin's stated aims. For one, Avenatti's threats of a press conference contravened Franklin's directives to keep matters confidential to avoid damaging his and his players' reputations. (SPA 32). Avenatti's insistence that this was mere "[h]ard bargaining" (Br. 38) is belied by Avenatti's tweets about a scandal at Nike that left Franklin scared and concerned (A. 441-42 (Tr. 1574-75, 1580)). And contrary to Avenatti's assertion on appeal, an internal investigation did not "align[] with Franklin's objectives" as "conveyed . . . to Avenatti" (Br. 34)—in fact, Avenatti made clear that he understood that this demand would preempt Franklin's stated interest in renewing his relationship with Nike (A. 225 (Tr. 715), A. 243 (Tr. 788), A. 438 (Tr. 1561-62), A. 337 (Tr. 1162), A. 405 (Tr. 1431); *see also* A. 232 (Tr. 746), A. 436 (Tr. 1553); SPA 32).

The jury had more than enough reason to conclude that Avenatti subordinated Franklin's chief interests (repairing his relationship with Nike and receiving restitution) to Avenatti's own personal greed. Indeed, despite Wilson's apparent willingness to settle Franklin's claim for $1.5 million (A. 888) and to increase the amount of any settlement for Franklin (A. 896), Avenatti made crystal clear that the "exorbitant sum of money" that Avenatti demanded as a condition of any settlement was for him, and not for Franklin (A. 897). Contrary to his client's interests, Avenatti was poised to reject a settlement offer that would have exceeded Franklin's expectations, unless Avenatti personally received a massive payoff. As Avenatti made clear, his willingness to call off the threatened press conference was dependent on Nike making a large

enough payoff to make it worthwhile to Avenatti personally, regardless whether Nike satisfied Franklin's request for $1 million: "it's worth more in exposure to me to just blow the lid on this thing. A few million dollars doesn't move the needle for me." (A. 860-61).

Avenatti does not claim that Franklin approved his specific demands and threats, and the fact that Franklin never explicitly forbade some of Avenatti's conduct was a product of Avenatti's deceit, and thus was further proof of wrongfulness. Avenatti repeatedly misled Franklin, directly and through Auerbach. Avenatti at no time discussed with Franklin or Auerbach an internal investigation or Nike hiring Avenatti (much less for millions of dollars). (*See, e.g.*, A. 436 (Tr. 1553), A. 439-42 (Tr. 1567-78)). Nor did Avenatti say anything to Franklin or Auerbach regarding his threats to disclose Franklin's confidential information—information potentially damaging to Franklin—through a press conference (*see, e.g.*, A. 433 (Tr. 1542)), despite repeatedly threatening to do so when meeting with Nike and contacting the press on multiple occasions (*see, e.g.*, A. 860-61, A. 937-43, A. 953-54, A. 1689). *See United States v. Middlemiss*, 217 F.3d 112, 119 (2d Cir. 2008) (jury could infer criminal intent from "nondisclosure" of certain information and "conclude that defendants wrongfully" used their positions "as leverage to demand . . . payments").

Avenatti argues that the demand for $22.5 million was meant for Franklin (Br. 34-37), but the jury was free to reject this speculative assertion that had no support in the record. Taken in the light most favorable to the Government, *Coplan*, 703 F.3d at 62, the jury

30

was entitled to infer that Avenatti had no intention of telling Franklin about anything other than the $1 million that Avenatti promised he would seek, particularly because Avenatti did not tell Franklin about the $22.5 million offer when he had the chance. Instead, Avenatti kept that fact, among many others, to himself. Contrary to Avenatti's suggestion that he was generating options (*i.e.*, between an Avenatti-led internal investigation or a larger settlement) for Franklin to choose from (*see* Br. 37), Avenatti never presented either option to his client. (A. 248 (Tr. 808), A. 440 (Tr. 1571-72), A. 441 (Tr. 1576)). The jury was free to conclude that Avenatti's failure to raise this, and other matters, with Franklin demonstrated that Avenatti was well aware that his demands were wrongful and not based on any claim of Franklin; had Avenatti thought otherwise, he would not have repeatedly misled Franklin regarding the nature of the discussions with Nike.

Moreover, even if Avenatti's demands were based on a plausible claim of right by Franklin—which they were not—the evidence still established that there was no nexus between any claim Franklin might have had and the specific demands made by Avenatti. Avenatti argues that the Government must show that there is no nexus between the threat made and the claim of right, as opposed to between the demand made and claim of right. (Br. 44). This argument is foreclosed by *Jackson II*, which held that a demand is wrongful in either scenario. *See United States v. Jackson*, 196 F.3d 383, 387 (2d Cir. 1999) ("*Jackson II*") (upholding extortion conviction where, to the extent the defendant believed she had certain filial rights, there was no

31

"requisite nexus between her belief and the demand for $40 million"); *see also United States v. Farrah*, No. 98 Cr. 146 (AWT), 2000 WL 92349, at *3 (D. Conn. Jan. 5, 2000) (threat was not wrongful where the person making the threat "had a rightful claim to the very thing that they were seeking," *i.e.*, return of the exact amount of an initial investment without interest), *aff'd*, 11 F. App'x 34 (2d Cir. 2001).

Avenatti is therefore simply incorrect that the "size of Avenatti's demand was irrelevant." (Br. 43). As in *Jackson II*, the sums demanded by Avenatti—$15 million with $12 million upfront "deemed earned when paid" (A. 891)—bore no conceivable relationship to any theoretical claims of Franklin, which were based on a youth basketball team sponsorship contract worth $72,000 (*see* A. 111 (Tr. 266), A. 967-75). The jury could readily reach that conclusion in light of Avenatti and Franklin's assessment that any claim might be worth around $1 million. (A. 245 (Tr. 796)). Nor did the amounts demanded by Avenatti bear any relationship to the actual cost of any putative investigation, which, as noted above, was entirely fictional to begin with, but rather related purely to how much money Avenatti needed to pay off his debts, which amounted to approximately $11 million. (*See* A. 123 (Tr. 313-16), A. 399 (Tr. 1405-06), A. 857-933, A. 1696-97). As Avenatti framed it, Nike would have to pay him $12 million upfront and ultimately a minimum of $15 million, whether Avenatti actually did any of the purported, unrequested, and unwanted work at all. (A. 123 (Tr. 313-16)). When Wilson asked Avenatti how to justify his monetary demand, given that Wilson had never been paid that much for an investigation

32

(A. 898-900), Avenatti made unmistakably clear that it bore no relation to the reasonable cost of an investigation, but instead to wrongful leverage: "Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em?" (A. 900).

Of course, the alternative demand for $22.5 million (*see* A. 901-02) bore even less relation to Franklin's claims. Avenatti even explained where the $22.5 million figure came from: "there's something magical about that number" (A. 905). Thus, even if one were to accept Avenatti's dubious assertion that a $22.5 million settlement agreement was intended for Franklin (Br. 37), that staggering amount would still support the finding of guilt. Indeed, giving Nike the option of make a larger, $22.5 million payment to Franklin, or otherwise escaping with a smaller payoff of $12 or $15 million directly to Avenatti, is the very essence of extortion (not to mention, as discussed below, bribery and honest services wire fraud).

Avenatti also characterizes his conduct as "a request for his own fees," citing civil cases about the questionable ethics of negotiating attorney's fees as part of a settlement. (Br. 39-42). This description of the facts of this case has no basis in the record (or logic), and is certainly not one a reasonable juror was required to accept. As described above, the evidence demonstrated that Avenatti was not, in fact, settling anything, and that his demand for payment might only be described as a demand for fees insofar as he used that terminology as a fig leaf for extortion payments. At the very least, a jury could, and did, reject

33

Avenatti's argument that "the evidence at trial was insufficient to show that he did anything more than act as an attorney . . . and help [his client] obtain money to which [he was] entitled." *Middlemiss*, 217 F.3d at 119; *see id.* at 118 (jury "rationally could infer" that extortion payments were "unrelated" to any claim of right, and was free "to reject [the defendant's] evidence and credit the government's version of events").

### 2. The Evidence of Intent to Defraud Was Sufficient

For substantially the same reasons, the evidence was more than sufficient to prove the intent element of honest services fraud, *i.e.*, that Avenatti intended to defraud Franklin through the solicitation of a bribe. Even when Nike was clear that a settlement in the amount Franklin wanted was not a "sticking point" (A. 888), Avenatti did not present that offer to Franklin, but instead jeopardized it to extract more money for himself. It is difficult to imagine a purer distillation of honest services fraud than an attorney directing a putatively adverse party not to pay a client a larger settlement but instead to "hire" or pay the attorney as a condition of settlement. (A. 897). *See, e.g.*, *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) (evidence of *quid pro quo* sufficient where reasonable jury could "find that [the defendant] performed virtually non-existent consulting work for substantial payments").

The arguments now advanced by Avenatti do not undermine this conclusion. *First*, Avenatti again claims that his "demand disobeyed no instruction of

34

Franklin's." (Br. 45). As discussed *supra* Point I.B.1, Avenatti's demands were transparently contrary both to Franklin's interests and to the directions Franklin gave Avenatti. In any event, Avenatti provides no support for the idea that the victim of a bribery scheme must expressly instruct the defendant not to solicit a bribe.

*Second*, Avenatti asserts that "no settlement could have been reached without Franklin's consent." (Br. 45). But even under Avenatti's version of events, the $22.5 million option only crystallizes the bribe scheme: Nike could pay $22.5 million under the guise of a settlement agreement or it could pay millions less by delivering money directly to Avenatti under the cover of a sham retainer agreement that required a $12 million upfront payment—the very essence of soliciting a bribe.

*Third*, Avenatti points to discussions with Judge Gardephe regarding whether, for purposes of the jury instructions, it was clearer to characterize the action Avenatti offered to take as action favorable to Nike or action that would allow Nike to avoid harm. (Br. 46-47). The distinction has no legal significance and is wholly irrelevant to whether the proof was sufficient establish the solicitation of a bribe. What the Government had to—and did—prove was that Avenatti intended to receive something of value in exchange for taking an action with respect to his representation of a client to whom he owed a fiduciary duty. *See Nouri*, 711 F.3d at 139. The Government argued to the jury that Avenatti sought a *quid pro quo* payment by telling Nike's attorneys that he would cause Franklin's claims

35

to be settled only if Nike paid Avenatti. (A. 640
(Tr. 2178)). This bribery scheme is precisely what the
evidence demonstrated, as Judge Gardephe concluded.
(SPA 34-37).

## POINT II

### The District Court Correctly Instructed the Jury

Avenatti argues that the District Court erred by
adopting some, but not all, of Avenatti's proposed in-
structions about the allocation of authority between
attorney and client under California law. (Br. 48). But
the instructions Judge Gardephe declined to give did
not represent a correct statement of the law. Moreover,
Avenatti's complaints about the jury charge amount to
little more than nit-picking; Judge Gardephe's instruc-
tions as a whole accurately conveyed the law and
Avenatti's duties as Franklin's attorney. In any event,
there is no conceivable prejudice from any purported
error because the evidence overwhelming proved that
Avenatti's conduct ran afoul of his fiduciary duties,
even as articulated by Avenatti, and Avenatti was not
hindered from pressing his arguments to the contrary
to the jury.

### A.  Relevant Facts

Prior to trial, Judge Gardephe ruled that he would
instruct the jury on the duties and responsibilities an
attorney owes a client under California law because an
element of honest services wire fraud is proof of viola-
tion of a fiduciary duty. (*See* Dkt. 102 at 7-23; Dkt. 235
at 21-44). Accordingly, Judge Gardephe instructed the
jury:

36

Lawyers owe a duty of loyalty to their clients. This means that, when acting on behalf of a client, lawyers must put their clients' interests first.

Moreover, a lawyer shall not, without informed written consent from the client, represent a client if there is a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a third party, or by the lawyer's own interests.

. . .

A conflict of interest requiring informed written consent exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal.

Under California law, it is the client who defines the objectives of the representation and not the lawyer. A lawyer cannot act without the client's authorization, and a lawyer may not take over decision-making for a client, unless the client has authorized the lawyer to do so. A lawyer must abide by a client's decisions concerning the objectives of the

37

representation and shall reasonably con-
sult with the client as to the means by
which the objectives are to be pursued.

Subject to requirements of client confi-
dentiality, a lawyer may take such ac-
tions on behalf of the client as is im-
pliedly authorized to carry out the repre-
sentation. The client has the ultimate au-
thority to determine the purposes to be
served by the legal representation, how-
ever, within the limits imposed by law
and the lawyer's professional obligations.
A lawyer retained to represent a client is
authorized to act on behalf of the client,
such as in procedural matters and in
making certain tactical decisions. A law-
yer is not authorized merely by virtue of
the lawyer's retention to impair the cli-
ent's substantive rights or the client's
claim itself.

In the context of settlement, only the cli-
ent may decide whether to make or ac-
cept an offer of settlement.

Lawyers owe a duty of confidentiality to
their clients. The duty includes infor-
mation that the client wants kept in con-
fidence because it might be embarrassing
or otherwise detrimental to the client.
The duty of confidentiality requires a
lawyer not to reveal confidential client in-
formation unless the client has given in-
formed consent to the disclosure, as I

38

have previously defined that term. A law-
yer shall not use a client's confidential in-
formation to the disadvantage of the cli-
ent unless the client gives informed con-
sent.

Lawyers are required to keep clients rea-
sonably informed of significant develop-
ments in matters with regard to which
the attorney has agreed to provide legal
services and to respond promptly to rea-
sonable status inquiries of clients. A law-
yer must also reasonably consult with the
client about the means by which the law-
yer will try to achieve the client's goals
and objectives; keep the client reasonably
informed about significant developments
relating to the representation; and ex-
plain a matter to a client to the extent
reasonably necessary to permit the client
to make informed decisions during the
representation. Reasonably refers to the
conduct of a reasonably prudent and com-
petent lawyer. A lawyer owes his client a
duty of full and frank disclosure of all rel-
evant information relating to the subject
matter of the representation.

A lawyer shall promptly communicate to
the lawyer's client all amounts, terms,
and conditions of any written offer of set-
tlement made to the client. An oral offer
of settlement made to a client in a civil
matter must also be communicated if it is

39

a significant development in the representation.

(A. 680-81 (Tr. 2337-40)).

Before this charge was given, Judge Gardephe held a charge conference, at which Avenatti stated that he "would prefer" that Judge Gardephe deliver the jury instructions proposed by Avenatti. (A. 603 (Tr. 2031-32)). In response, Judge Gardephe observed that he had used much of Avenatti's proposed language, some of it verbatim. (A. 603 (Tr. 2032)). Avenatti then requested that Judge Gardephe add the following statements to the jury charge:

- "That means a lawyer begins with broad authority to make choices advancing the client's objectives."

- "In the absence of an agreement or instruction, however, a lawyer has the authority to take any lawful measure within the scope of representation that is reasonably calculated to advance a client's objectives as defined by the client."

(A. 603-04 (Tr. 2032-33)). Avenatti did not object to the District Court's proposed language regarding settlement offers or seek any additional instruction on the topic.

Judge Gardephe asked Avenatti for legal authority for the propositions he advanced. (A. 604 (Tr. 2033-34)). Defense counsel responded that "there's not a lot of case law" and "I haven't found any case law that actually discusses anything related to this," asking Judge Gardephe to refer to the applicable Restatement of Law. (A. 604 (Tr. 2034)).

Judge Gardephe observed that he had "tried to present language that allows each side to make their arguments" and that he "was sensitive to the defense's theory on this point as in all others." (A. 604 (Tr. 2034-35)). Judge Gardephe further noted that he "included language about, 'A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation,'" which is "an incredibly broad statement" that provides authority for "[a]ny arguments the defense wants to make along those lines." (A. 604 (Tr. 2035)). Finally, Judge Gardephe stated in denying the defense request that "the language that the defense wants to argue is already in the charge[a]nd now they want a slightly different iteration for which there is no rule or case that contains that language." (A. 604 (Tr. 2035)).

In addition to instructing the jury on the wrongfulness element of the extortion and threats counts (A. 678 (Tr. 2327-30)), Judge Gardephe instructed the jury that the Government was required to prove that Avenatti did not act in good faith regarding the honest services wire fraud count. He instructed that "if you find that Mr. Avenatti honestly believed that Mr. Franklin had authorized him to demand that Nike hire him and pay him millions of dollars to conduct an internal investigation of Nike, then Mr. Avenatti acted in good faith and he did not have a specific intent to defraud." (A. 682 (Tr. 2344)).

## B.  Applicable Law

An appellant challenging a jury instruction faces a heavy burden. He must demonstrate that: (1) he

41

requested a charge that "accurately represented the law in every respect"; and (2) the charge actually delivered, when viewed as a whole, was erroneous and prejudicial. *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004); *see also United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009) ("To secure reversal on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice."). In reviewing jury instructions, this Court does not look only to the particular words or phrases challenged by the defendant, but must "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989); *see also United States v. Mulder*, 273 F.3d 91, 105 (2d Cir. 2001). An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015).

To preserve any objection to jury instructions, a defendant must "direct the trial court's attention to the contention that is to be raised on appeal." *United States v. Masotto*, 73 F.3d 1233, 1237 (2d Cir. 1996); *see also* Fed. R. Crim. P. 30(d). "The mere fact that a defendant submitted his proposed language as part of a requested charge does not in itself preserve the point for appeal," and therefore "a party who has requested an instruction that has not been given is not relieved of the requirement that he state distinctly his objection to the instruction that is given." *United States v. Crowley*, 318 F.3d 401, 412-13 (2d Cir. 2003); *see also United States v. Suriel*, 335 F. App'x 136, 140 (2d Cir. 2009) (objection to jury instruction not preserved for

42

appeal where defendant raised issue in pre-charge letter but did not object to court's instructions).

Where the defendant fails to properly object, this Court reviews the alleged failure for plain error. *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006). To establish plain error, the defendant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; [and] (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). Where those elements are met, this Court may exercise its discretion to correct the error if "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* Reversal for plain error should "be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982).

Where a defendant has properly preserved an objection to the jury instructions, reversal will not be warranted if the alleged error was harmless. Fed. R. Crim. P. 52(a); *see United States v. Gansman*, 657 F.3d 85, 91-92 (2d Cir. 2011). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

43

## C. Discussion

### 1. Judge Gardephe's Jury Instructions Were Correct

Avenatti's requested additional instructions about a lawyer's broad authority did not accurately represent the law in every respect. *See Wilkerson*, 361 F.3d at 732. Avenatti sources his proposed instructions to the Restatement of the Law Governing Lawyers ("Restatement"), and seems to suggest that this Restatement provides controlling legal authority. (Br. 51-52). To the contrary, "rules announced in the Restatement of the Law do not have the force of statutory enactment or supersede judicial decisions. They are intended to preserve the common law system of developing law through the judicial determination of cases." *Kolburn v. P.J. Walker Co.*, 101 P.2d 747, 750 (Cal. Dist. Ct. App. 1940). On its own terms, the Restatement explains, "[t]he scope of this Restatement goes well beyond the scope of the ethics codes in all jurisdictions." Restatement Foreword. Nor does Avenatti provide any authority for the notion that the Restatement carries the force of law, instead merely citing California decisions discussing the Restatement as informative commentary. (*See* Br. 52).

In any event, Avenatti's proposed instructions do not accurately capture the language of the Restatement. Avenatti claims that Judge Gardephe should have instructed that "a lawyer begins with broad authority" and that "[i]n the absence of an agreement or instruction, . . . a lawyer has the authority to take any lawful measure within the scope of representation that

44

is reasonably calculated to advance a client's objectives as defined by the client." (A. 603-04 (Tr. 2032-33)). But the Restatement is not so boundless. Rather, the actual language of the Restatement contains a limiting clause: "a lawyer may take any lawful measure within the scope of representation that is reasonably calculated to advance a client's objectives as defined by the client, *consulting with the client as required by § 20.*" Restatement § 21(3) (emphasis added). Section 20 of the Restatement, in turn, requires attorneys to consult with clients, including "to a reasonable extent concerning decisions to be made by the lawyer," and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Thus, it is not the case that a lawyer simply may "take any lawful measure," as suggested by Avenatti's proposed instruction.

Nor does Avenatti cite any legal authority that supports the breadth of his proposed instructions. For example, Avenatti cites *Ross v. Ross*, 120 Cal. App. 2d 70, 74 (Cal. Dist. Ct. App. 1953), for the proposition that a lawyer generally has "broad authority." (Br. 52). But *Ross* does not hold that attorneys have boundless, "broad authority." Rather, consistent with Judge Gardephe's instructions, *Ross* notes that attorneys have broad authority "in many matters affecting the managing and control of a case," and in fact reaffirms that a lawyer may not impair a client's case without the client's knowledge and consent. 120 Cal. App. 2d at 74. Similarly, the language drawn by Avenatti from *Fowlkes v. Ingraham*, 81 Cal. App. 2d 745, 746-47 (Cal. Dist. Ct. App. 1947), and the other cases he relies upon (*see* Br. 52-53), indicates nothing more than that an

45

attorney generally maintains authority on how to conduct trials, and does not support the proposal to instruct the jury that an attorney has "broad authority to make choices" regarding a client's case.

Avenatti's contentions also fail for the independent reason that Judge Gardephe's instructions, taken as a whole, accurately conveyed the law. *Wilkerson*, 361 F.3d at 732. Avenatti does not claim on appeal that the substance of Judge Gardephe's instructions was inaccurate in any way, only that the instructions were incomplete. But reviewing "the instructions as a whole," as this Court must, *see Carr*, 880 F.2d at 1555, Judge Gardephe accurately conveyed the implied authority that a lawyer has to take action on behalf of his client, as well as the limits on that authority recognized under California law, such as the circumstances in which a lawyer must obtain informed consent, the restriction against acting to impair the client's rights or breaching a client's confidentiality, and the need to keep a client informed of significant developments. (A. 680-81 (Tr. 2337-40)). Avenatti does not claim, nor could he, that Judge Gardephe misstated the limits on a lawyer's authority in those respects.

With respect to the suggestion that Judge Gardephe should have supplemented his jury instructions to specify further that a "client must sign the settlement agreement" (Br. 51), Avenatti failed to make a contemporaneous objection and in any event fails now to make any argument that Judge Gardephe's instructions were erroneous, let alone plainly so. *See Crowley*, 318 F.3d at 412-13. Moreover, Avenatti's request was duplicative of language in Judge Gardephe's

instructions, including that "[i]n the context of settlement, only the client may decide whether to make or accept an offer of settlement." (A. 680 (Tr. 2338)).

### 2. Avenatti Cannot Show Prejudice

Even assuming *arguendo* that Avenatti's instructional claims were both preserved and had substantive merit, any error was harmless. *Neder*, 527 U.S. at 18; *United States v. Nektalov*, 461 F.3d 309, 313-14 (2d Cir. 2006).

It is pellucid that the jury would not have changed its verdict had the overbroad language requested by Avenatti been given because even Avenatti's proposed instruction included the important limitation that a lawyer may "take any *lawful* measure" within the scope of the representation that is "reasonably calculated to advance a client's objective as defined by the client." (A. 603 (Tr. 2032) (emphasis added)). And inasmuch as the jury concluded, beyond a reasonable doubt, that Avenatti engaged in unlawful threats, extortion, and honest services wire fraud, it is difficult to comprehend how an instruction indicating that lawyers may take lawful steps would have caused any rational juror to alter his or her conclusion of guilt. At most, the inclusion of such an instruction would have introduced circular reasoning and begged the very question the jury was tasked with deciding: whether Avenatti's conduct was lawful. In addition, the evidence overwhelmingly showed that Avenatti acted against Franklin's objectives as Franklin expressly defined them. As discussed *supra* Point I.B, Avenatti sought to enrich himself, even when that entailed

47

disregarding Franklin's request for confidentiality and his desire to repair his relationship with Nike, and jeopardizing the prospect of Franklin receiving the $1 million settlement that Franklin and Avenatti had discussed. Moreover, Avenatti's actions breached many of the other affirmative duties included in Judge Gardephe's instruction, the accuracy of which Avenatti does not challenge, including the duty to obtain informed written consent in the event of a conflict of interest, to honor a client's request for confidentiality, and to keep a client informed of significant developments. (A. 680-81 (Tr. 2337-40)).

Moreover, as Judge Gardephe pointed out (A. 604 (Tr. 2035)), the charge as given permitted Avenatti to make the arguments for acquittal he now presses, and he made those very arguments to the jury—they were simply rejected on the basis of the overwhelming evidence of guilt. Judge Gardephe instructed the jury that "a lawyer may take such actions on behalf of the client as is impliedly authorized to carry out the representation," that "[a] lawyer retained to represent a client is authorized to act on behalf of the client," and that a lawyer must keep a client informed of significant developments and reasonably consult the client on the means to achieve the client's objectives. (A. 680-81 (Tr. 2337-40)). And, significantly, Judge Gardephe instructed the jury that it could convict Avenatti on each count only if the Government proved that Avenatti did not believe he was acting in furtherance of Franklin's objectives and pursuant to what Franklin had authorized. (A. 678 (Tr. 2329-30), A. 682 (Tr. 2344)).

48

These instructions provided Avenatti ample basis to argue to the jury that "[w]hen Avenatti asked Nike to hire him and Geragos to conduct an internal investigation, he reasonably believed himself to be acting within his authority in pursuit of Franklin's objectives." (Br. 55). It is simply incorrect that, as Avenatti suggests (Br. 55-62), the instructions given by Judge Gardephe—including both the instructions regarding duties owed by attorneys and the substantive instructions regarding threats, extortion, and honest services wire fraud—did not permit a jury to acquit Avenatti if it believed the defense he both advanced at trial and raises now. *See, e.g.*, *United States v. Zvi*, 168 F.3d 49, 58 (2d Cir. 1999) ("We review a jury charge in its entirety and not on the basis of excerpts taken out of context.").

Avenatti's suggestion that an instruction that a "client must sign the settlement agreement" (Br. 57-58) would have presented any difference from the instructions given—that "only the client may decide whether to make or accept an offer of settlement" and "[a] lawyer shall promptly communicate to the lawyer's client all amounts, terms, and conditions of any written offer of settlement made to the client" (A. 680-81 (Tr. 2338-39))—is similarly nonsensical. The jury rejected the claim that Avenatti intended to inform Franklin of any settlement offer given the overwhelming evidence to the contrary. Moreover, Avenatti is incorrect that, "if the jury had reasonable doubt whether Avenatti would have presented any settlement to Franklin to sign, then the jury could not have found a bribe" (Br. 58). As discussed *supra* Point I.B.2, this argument is incorrect, and the purported failure to

instruct the jury further on settlement agreements had no bearing on the outcome of this case.

For the reasons set forth above, the evidence presented at trial overwhelmingly demonstrated that Avenatti did not believe that he was authorized by Franklin to undertake any of the outrageous and criminal behavior in which he engaged. On this basis alone, his challenges to the jury instruction must be rejected. *See Neder*, 527 U.S. at 18.

## POINT III

### The Restitution Order Should Be Affirmed

Avenatti contends that the restitution order should be vacated because the order was entered more than 90 days after sentencing and because Nike did not suffer pecuniary loss. (Br. 62-73). Avenatti did not make the first of these arguments before the District Court and neither argument is correct.

### A. Applicable Law

The Mandatory Victim Restitution Act ("MVRA") provides for mandatory restitution to victims of certain crimes, including extortion. *See* 18 U.S.C. § 3663A(c). "The primary and overarching goal of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011).

To that end, the MVRA requires defendants convicted of covered offenses to "reimburse the victim for lost income and necessary child care, transportation,

50

and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). A victim's attorney fees are among the types of "other expenses" that may be included in such a restitution order where they are "necessary" and "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *United States v. Amato*, 540 F.3d 153, 161 (2d Cir. 2008).

Section 3664(d)(5) provides that if the victim's losses are not ascertainable ten days prior to sentencing, "the court shall set a date for final determination of the victim's losses, not to exceed 90 days after sentencing." 18 U.S.C. § 3664(d)(5). This rule is merely a "time-related directive" that, although "legally enforceable," does not "deprive the court of the power to order restitution" where the "sentencing court misses the statute's 90-day deadline, even through its own fault or that of the Government." *Dolan v. United States*, 560 U.S. 605, 611 (2010).

A district court has "broad discretion to determine restitution." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007). This Court "review[s] a restitution order's legal conclusions de novo and its findings of fact for clear error, reversing only if in [the Court's] view the trial court abused its discretion." *United States v. Afriyie*, 27 F.4th 161, 166 (2d Cir. 2022). Where an objection to restitution is not raised in the district court, this Court "review[s] only for plain error." *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016).

51

## B. Discussion

### 1. The District Court Was Authorized to Order Restitution

Avenatti argues that Judge Gardephe lacked authority to order restitution because he did not make sufficiently clear before Section 3664(d)(5)'s 90-day deadline expired that he intended to order restitution. (Br. 65-69). Because Avenatti did not object below, his claim is reviewable for plain error only.

Avenatti cannot establish error, let alone error that was clear or obvious, because neither this Court nor the Supreme Court has held that a district court may impose restitution after the 90-day deadline *only* when it has already made clear that it will order restitution. *See United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004). In arguing otherwise, Avenatti attempts to artificially narrow *Dolan*'s holding. *Dolan* explained that a sentencing court retains the power to order restitution "*at least*" where it has made its intention to impose restitution clear, rather than *only* under those circumstances. 560 U.S. at 608 (emphasis added). *Dolan*'s analysis easily supports the conclusion that a district court retains power to order restitution under broader circumstances because the deadline is a "time-related directive" that does not "deprive a judge . . . of the power to take the action to which the deadline applies if the deadline is missed." *Id.* at 611. Moreover, the considerations delineated in *Dolan*—including the importance of ensuring crime victims receive full restitution, *id.* at 613-14—apply equally when a sentencing judge fails to make clear before the deadline that

52

restitution will be imposed. At the very least, any pu-
tative error is not plain.[2]

In any event, Avenatti's premise that Judge
Gardephe failed to specify that he would impose resti-
tution is inconsistent with the record. Before sentenc-
ing, the Government filed a sentencing submission ob-
serving that restitution was mandatory under the
MVRA and seeking reimbursement on behalf of Nike.
(Dkt. 321 at 15-16). Avenatti opposed. (Dkt. 332). At
sentencing, Judge Gardephe found that the

---

[2] Contrary to Avenatti's contention, neither
*Qurashi*, 634 at 705, nor *United States v. Pickett*, 612
F.3d 147, 149 (2d Cir. 2010) (per curiam), held that
"timely notice of the intent to award restitution is nec-
essary to excuse noncompliance" with the 90-day dead-
line. (Br. 67). Each case simply upheld a restitution or-
der entered after the deadline, where the district court
had made clear at sentencing its intention to leave the
sentence open to impose restitution. Avenatti also re-
fers this Court to the summary order in *United States
v. Hymas*, 584 F. App'x 361 (9th Cir. 2014), which va-
cated a restitution order on the basis that the district
court had not made clear that it would award restitu-
tion prior to the expiration of the 90-day deadline. This
out-of-circuit decision does not suffice to establish
plain error; it also contains no substantive analysis,
has no precedential value, and the district court there
appears to have given less indication at sentencing
that it intended to award restitution prior to the expi-
ration of the deadline. *See United States v. Hymas*, No.
10-30341 (9th Cir. 2013), Dkt. No. 4.

53

submissions made to date were insufficient to allow him to determine restitution and requested further briefing. (A. 811 (Tr. 46-48)). On the Judgment subsequently entered, Judge Gardephe checked the box indicating that "[t]he determination of restitution is deferred until 10/8/2021." (A. 819). On February 14, 2022, Judge Gardephe issued a memorandum opinion and order that calculated restitution in the amount of $259,800.50. (SPA 68-79). Avenatti cannot show that this sequence of events plainly failed to give him sufficient notice under *Dolan* of potential restitution, particularly where the judgment itself held open a final determination of restitution. *See United States v. Gushlak*, 728 F.3d 184, 191 n.4 (2d Cir. 2013) (explaining that the "purpose" of *Dolan* was "to guard against a sentencing judge entering what appears to be a final sentence, thus relinquishing authority to order restitution, only then to impose restitution more than ninety days thereafter").

Finally, Avenatti cannot plausibly show any form of prejudice given the relatively short time frame in which the District Court resolved the restitution issue. *See United States v. Dalicandro*, 711 F. App'x 38, 40-41 (2d Cir. 2017) (no prejudice even where district court had five-year delay in imposing restitution). Perhaps cognizant that he suffered no prejudice, Avenatti insists that "[p]rejudice does not matter." (Br. 68). That entreaty cannot be squared with this Court's cases, *see, e.g.*, *Dalicandro*, 711 F. App'x at 40 (citing *Rivernider*, 828 F.3d at 115, for the proposition that plain error applies to failure to object to timeliness of restitution order), the incentive for a defendant to "mitigate any harm that a missed deadline might

54

cause" by objecting in a timely fashion, *see Dolan*, 560 U.S. at 615-16, or the purpose of the MVRA to ensure that crime victims receive restitution, and are not unfairly harmed by a missed deadline for which they "bear no responsibility," *id*. at 612-14. *See also Gushlak*, 728 F.3d at 191 ("'the statute seeks speed primarily to help the victims of crime and only secondarily to help the defendant'" (quoting *Dolan*, 560 U.S. at 613)).

## 2. Nike Was Entitled to Restitution

Avenatti also contends that no award of restitution was permitted under the MVRA because no "identifiable victim . . . has suffered a physical injury or pecuniary loss," as required under 18 U.S.C. § 3663A(c)(1)(B). (Br. 69-73). This argument is contrary to the language and purpose of the statute, the law of this Circuit, and common sense, and should be rejected.

As an initial matter, Avenatti does not appear to contest that Nike was a victim of his criminal scheme. Nor could he. There is no doubt that Nike was "directly and proximately harmed as a result of the commission" of Avenatti's offenses. 18 U.S.C. § 3663A(a)(2); *see also United States v. Kuruzovich*, No. 09 Cr. 824 (DC), 2012 WL 1319805, at *4-5 (S.D.N.Y. Apr. 13, 2012) (corporate target of blackmail scheme a victim under MVRA), *abated by* 541 F. App'x 124 (2d Cir. 2013). For example, witnesses testified about efforts that Nike had to undertake in direct response to Avenatti's threats, as well as the reputational and financial harm caused by Avenatti's tweets.

55

Avenatti nevertheless argues that Nike did not suffer any "pecuniary loss" because, in his estimation, the only monetary harm to Nike consisted of the expenses it incurred during its participation in the investigation or prosecution of the offenses, and, he claims, such losses do not count as pecuniary loss under Section 3663A(c)(1)(B). (Br. 71). Avenatti is incorrect.

*First*, Avenatti's premise is mistaken. The record firmly establishes that Nike suffered pecuniary harm even before the Government's investigation. It is evident from the record that, as a result of Avenatti's criminal demands, Nike had to pay its outside attorneys to meet with Avenatti and provide advice on how to respond to the extortionate threats. Moreover, Avenatti's tweet, which falsely referenced "criminal conduct reach[ing]the highest levels of Nike" (A. 954), resulted in an approximately $300 million decline in Nike's market capitalization (A. 341 (Tr. 1177)).

*Second*, Judge Gardephe correctly concluded that expenses incurred by a victim in its participation in the investigation or prosecution of the offenses do qualify as pecuniary loss under Section 3663A(c)(1)(B). (SPA 73-79). Avenatti points to nothing in the statute that limits the categories of "pecuniary loss" and there is none. Instead, he argues merely that all victims would incur expenses as part of a government investigation, rendering the "pecuniary loss" requirement meaningless. (Br. 71-72). That logic does not hold. As just one example, some broad financial crimes target whole markets or vast numbers of consumers who might be entitled to restitution but who never become involved in the government's investigation and

56

prosecution. Moreover, Avenatti's interpretation of the statute would lead to absurd results: an extortion victim who resists succumbing to threats and instead reports the conduct to law enforcement would not receive restitution, whereas a victim who pays the offender would. This result would both be contrary to the public interest and would be inconsistent with the MVRA's purpose "to ensure that victims of a crime receive full restitution." *Dolan*, 560 U.S. at 612.

Not surprisingly, this Court and courts in this Circuit have approved restitution for victims whose only apparent pecuniary harm was incurred in connection with its participation in a government investigation and prosecution.[3] This Court has long held that where defendants have perpetrated a fraud against a company, "[t]here is no doubt that ... attorney fees and auditing costs [are] a direct and foreseeable result of defendants' offenses." *Amato*, 540 F.3d at 162. And it recently affirmed a restitution award pertaining to such expenses, *see Afriyie*, 27 F.4th at 164-65, even where there was otherwise no suggestion that the

_____

[3]    Avenatti relies heavily on *United States v. Xue*, No. 16 Cr. 22 (JHS), 2021 WL 2433857 (E.D. Pa. June 15, 2021). (Br. 69, 72-73). As Judge Gardephe recognized (SPA 70-71), this out-of-circuit decision should be disregarded—it is both wrongly decided and expressly contrary to the law in this Circuit. *See Xue*, 2021 WL 2433857, at *6 (noting that "to the extent that the Second Circuit equates payment of legal fees as being subsumed under the term 'pecuniary loss,' this Court disagrees").

57

corporate victim suffered a "direct provable loss . . . that flowed from the defendant employee's insider trading." (SPA 72). Likewise, Judge Chin, sitting by designation in *Kuruzovich*, held that a company was a victim eligible to recover legal expenses even where the defendant alleged, as Avenatti does here, that the company otherwise "sustained no injury as a result of his conduct." 2012 WL 1319805, at *4-6.

For all these reasons, Judge Gardephe properly exercised his discretion in imposing restitution.

## CONCLUSION

**The judgment of conviction and restitution order should be affirmed.**

Dated:    New York, New York
          July 5, 2022

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

MATTHEW D. PODOLSKY,
DANIEL C. RICHENTHAL,
ROBERT B. SOBELMAN,
DANIELLE R. SASSOON,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,974 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: DANIELLE R. SASSOON,
*Assistant United States Attorney*